**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

_____

REGENTS OF THE UNIVERSITY
OF MINNESOTA,

    Plaintiff,

vs.

LSI CORPORATION and AVAGO
TECHNOLOGIES U.S. INC.,

    Defendants.

Court File No. 16-cv-02891-WMW-SER

**JURY TRIAL DEMAND**

_____

**DEFENDANT LSI CORPORATION'S ANSWER AND COUNTERCLAIMS**
**TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

   Defendant LSI Corporation. ("Defendant") hereby answers Plaintiff Regents of the University of Minnesota's ("the University") First Amended Complaint (ECF No. 40) as follows.  Unless specifically admitted, all allegations of the First Amended Complaint are denied:

*I.*

**ANSWER**

**[ALLEGED] NATURE OF THE ACTION**

   1.  Defendant admits that this action arises under the patent laws of the United States, but denies any other allegations of paragraph 1.

2.      Defendant lacks sufficient knowledge or information to form a belief as to the first sentence of this paragraph and on that basis denies the same.  Defendant admits that Jaekyun Moon and Barrett J. Brickner are the named inventors on the face of the '601 Patent, but otherwise denies any allegation in the second sentence.  The third sentence of this paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent a response is required, the allegation is denied.  All other allegations in paragraph 2 are denied.

3.      Denied.

## [ALLEGED] PARTIES

4.      Defendant admits that the University is a public institution of higher education with a principal place of business in Minneapolis, Minnesota, but lacks sufficient knowledge or information to form a belief as to the first sentence of this paragraph and on that basis denies the same.

5.      Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

6.      Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

7.      Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

8.      Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

9.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

10.    Admitted.

11.    Defendant admits that LSI maintains an office at Mendota Heights, as to the remaining allegations Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

12.    Admitted.

13.    Defendant admits that LSI has an office in this district; otherwise, the allegations in this paragraph are denied.

14.    Defendant admits that LSI and Avago U.S. are indirect subsidiaries of holding company Broadcom Limited, any other allegation is denied.

15.    Defendant admits the allegations in the first and second sentences of paragraph 15.  Defendant lacks sufficient knowledge or information to form a belief as to the third sentence of this paragraph and on that basis denies the same.

16.    Admitted.

17.    Admitted.

18.    Defendant admits that the quotations in this paragraph are derived from Exhibit 1 to the First Amended Complaint.

19.    Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

20.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it alleges an invention as described in the '601 Patent; to the extent and answer is required, the allegations are denied.

21.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

22.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

23.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it alleges an invention as described in the '601 Patent; to the extent and answer is required, the allegations are denied.

24.     Defendant admits that the quotations in this paragraph are derived from Exhibit 1 to the First Amended Complaint.

25.     Defendant admits that the quotations in this paragraph are derived from Exhibit 1 to the First Amended Complaint.

26.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent and answer is required, the allegations are denied.

## [ALLEGED] JURISDICTION AND VENUE

27.     Admitted.

28.     Admitted.

29.     Defendant admits that this Court has personal jurisdiction over Defendant. All other allegations are denied.

30.    Defendant admits that this Court has personal jurisdiction over Defendant. All other allegations are denied.

31.    Defendant admits that venue exists as to Defendant in this District, but states that venue in his District is grossly inconvenient and that transfer to the N.D. California is proper.  All other allegations in this paragraph are denied.

## [ALLEGED] FACTUAL BACKGROUND

**A.    Data Storage**

32.    Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

33.    Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

34.    Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

35.    Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

36.    Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

37.    Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.  By way of further response, Defendant admits that the quotation in this paragraph was derived from the cited URL.

38.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

39.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

40.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

41.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

42.     Defendant admits that the quotation in this paragraph was derived from the cited URL.

43.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

44.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

45.     Defendant lacks sufficient knowledge or information to form a belief as to the specifics of every HDD device and on that basis denies the same.

**B.     The University's Patent**

46.     Admitted.

47.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it alleges an invention as described in the '601 Patent; to the extent that a response is required, the allegations are denied.

48.     Defendant admits that Jaekyun Moon and Barrett J. Bricker are listed on the patent as the inventors.

49.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it alleges an invention as described in the '601 Patent; to the extent that a response is required, the allegations are denied.

50.     Admitted.

51.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegations are denied.

52.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegations are denied.  By way of further response, Defendant admits that the patent and the paper appear to have some similar figures.

53.     Admitted.

54.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

55.     Admitted.

56.     Defendant admits that the quotation in paragraph 56 was derived from Exhibit 4 of the First Amended Complaint.

57.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

58.     Admitted.

59.     Defendant admits that the quotation in paragraph 59 was derived from Exhibit 5 to the First Amended Complaint and that the paper at issue cited an invention disclosure (that was not attached and that the Defendant have never seen) and a 1996 paper by J. Moon and B. Bricker.  Any other allegation in paragraph 60 is denied.

60.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

61.     Admitted.

62.     Admitted.

63.     Defendant admits that the quotation in paragraph 63 is derived from the IBM paper referenced in this paragraph.  Otherwise denied.

64.     Admitted.

65.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it calls for claim construction; to the extent that a response is required, the allegation is denied.

66.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it calls for claim construction; to the extent that a response is required, the allegation is denied.

67.     This paragraph sets forth a legal conclusion and questions of law to which no response is required in that it calls for claim construction; to the extent that a response is required, the allegation is denied.

68.     Defendant admits that the quoted language in paragraph 68 is derived from language in claim 13 of the '601 Patent.  Otherwise denied.

69.     Defendant admits that the quoted language in paragraph 69 is derived from language in claim 14 of the '601 Patent.  Otherwise denied.

70.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

71.     Defendant admits that the quoted language is derived from the '601 Patent; any other allegation is denied.

72.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

73.     Defendant lacks sufficient knowledge or information to form a belief as to truth of this paragraph and on that basis denies the same.

74.     Denied.

**C.     Defendants' [Alleged] Unauthorized Use of the Methods Claimed in the '601 Patent**

75.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied. By way of further response, Defendant admits that they make and sell products in the TrueStore product line.

76.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

77.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

78.     With respect to the first sentence in paragraph 78, Defendant admits that the quotation was derived from Dr. Yang's LinkedIn page.  Defendant admits that Dr. Yang is Director of Engineering at Avago Technologies.  Otherwise denied.

79.     Admitted.

80.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

81.     Admitted.

82.     Admitted.

83.     Admitted.

84.     Admitted.

85.     Defendant admits that paragraph 85 appears to shows slide 6 of Dr. Lee's presentation.  Otherwise denied.

86.     Admitted.

87.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

88.     Admitted.

89.     Admitted.

90.     Defendant admits that the quotation in paragraph 90 is derived from Exhibit 10 of the First Amended Complaint.  Otherwise denied.

91.     Defendant admits that the paper refers to a code where $m = 17$, $n = 18$, $j = 3$, and $k = 13$, and that the quotation in paragraph 91 was derived from Exhibit 10 of the First Amended Complaint.  Defendant lacks sufficient knowledge or information to form

a belief as to the truth of third sentence of this paragraph and on that basis denies the same.

92.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

93.     Defendant admits that the quotations in paragraph 93 were derived from Compl. Ex. G, D.I. 1-9 at 10 in the *Spectra Licensing Group* case referenced in paragraph 93 of the First Amended Complaint.  Otherwise denied.

94.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

95.     Defendant admits the first sentence of paragraph 95.  Regarding the second sentence, the Defendant lacks sufficient knowledge or information to form a belief and on that basis denies the same.

96.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

97.     Denied.

98.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

99.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

100.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

101.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

102.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

103.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

104.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

105.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

106.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

107.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

108.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

109.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

110.     This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

111.     This paragraph sets forth a legal conclusion and questions of law to which no response is required to the extent that a response is required, the allegation is denied.

112.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

113.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

**D.     Defendants' [Alleged] Sales Cycle for the MTR-enabled Products**

114.    Admitted.

115.    Defendant admits that the quotation in paragraph 115 was derived from Exhibit 1 to the First Amended Complaint.  Otherwise denied.

116.    Defendant admits that the quotation in paragraph 116 was derived from Pl. Mem. In Supp. Of Mot. for Entry of Prelim. Inj. In the *Broadcom vs. Emulex Corp*. case cited in this paragraph.  Otherwise denied.

117.    Defendant admits that the quotation in paragraph 117 was derived from Exhibit 1 to the First Amended Complaint.  Otherwise denied.

118.     Denied.

119.    Denied.

120.    Defendant admits that the quotation in paragraph 120 was derived from Exhibit 1 to the First Amended Complaint.  Otherwise denied.

121.    Defendant admits that the quotation in paragraph 121 was derived from Br. of Pl.-Appellee Broadcom Corp. in the *Broadcom vs. Emulex* appeal cited in the paragraph.  Otherwise denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

127.    Denied.

128.    Denied.

129.    Denied.

**E.    Defendants' [Alleged] Knowledge of the '601 Patent**

130.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

131.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

132.    This paragraph sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegation is denied.

133.    Defendant lacks sufficient knowledge or information to form a belief as to the truth of this paragraph and on that basis denies the same.

134.    Denied.

135.    Denied.

136.    Admitted.

137.    Defendant denies that the Moon 1996 IEEE Paper is a seminal paper, but admits that the Moon 1996 IEEE Paper is referenced in the other papers cited in paragraph 137 of the First Amended Complaint.

138.    Denied.

139.    Defendant denies that Defendant infringed the '601 Patent, but admits that Dr. Wilson was employed at LSI and Avago Technologies and is now employed by Broadcom Limited.

140.    Defendant admits that the Moon 1996 IEEE paper is referenced in the other papers cited in paragraph 140 of the First Amended Complaint.  Otherwise denied.

141.    Denied.

142.    Defendant admits that the Moon 1996 IEEE paper is referenced in the other papers cited in paragraph 142 of the First Amended Complaint.  Otherwise denied.

143.    Defendant admits that Dr. Brickner was an employee of LSI.  Defendant denies that they infringed the '601 Patent.  Defendant lacks sufficient knowledge or information to form a belief as to Dr. Brickner's knowledge and on that basis denies that Dr. Brickner had knowledge of the '601 Patent when he was an LSI employee.

144.    Defendant lacks sufficient knowledge or information to form a belief as to what is meant by "Dr. Moon's invention," and on that basis denies the first sentence of this paragraph.  The second and third sentences are denied.

145.    Defendant lacks sufficient knowledge or information to form a belief as to why it was that Dr. Moon contacted Dr. Lee and on that basis denies this paragraph.

146.    Defendant admits that Dr. Lee referred Dr. Moon to Ryan Phillips in an email and that Dr. Wilson was copied on the email.  Defendant's denies that Dr. Wilson had direct knowledge of the '601 Patent.  The allegation regarding "LSI's MTR code"

sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, this allegation is denied.

147.   Defendant admits that someone from the University emailed Mr. Phillips to schedule a call to discuss unnamed technology that was allegedly developed by Dr. Jae Moon while he was at the University; any other allegation is denied.

148.   Defendant admits that the University's representative stated that Dr. Lee had referred him to Mr. Phillips but Defendant denies that Dr. Lee had suggested a licensing discussion.  Otherwise denied.

149.   The allegation regarding "MTR codes" and "the inventions" sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegations in paragraph 149 are denied.  By way of further response, Defendant denies that Dr. Lee had suggested a licensing discussion.  Otherwise denied.

150.   The allegation regarding "use of the inventions described therein" sets forth a legal conclusion and questions of law to which no response is required; to the extent that a response is required, the allegations are denied.  Defendant denies that Mr. Philips summarily denied using outside intellectually property, but admits that Mr. Phillips stated that the Defendant's policy or respecting third party intellectual property rights. Defendant denies that Mr. Phillips willfully blinded himself from gaining additional knowledge of the '601 patent and denies that LSI admitted to using the claimed technology.  Otherwise denied.

151.    Defendant lacks sufficient knowledge or information to form a belief as to why it was that the University elected to not proceed further, and on that basis denies the same.  By way of further response, Defendant denies that there was a licensing discussion.

152.    Denied.

153.    Admitted.

154.    Admitted.

155.    Admitted.

156.    Admitted.

157.    Admits that the listed patents reference the 1996 Moon IEEE paper; otherwise denies knowledge or information sufficient to form a belief as to the truth of allegation and therefore denies the allegation.

158.    Denied.

**COUNT I—[ALLEGED] INFRINGEMENT OF THE '601 PATENT**

159.    Defendant incorporates by reference its responses to Paragraphs 1-158 above.

160.    Denied.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied.

166. Denied.

167. Denied.

168. Denied.

169. Denied.

## [ALLEGED] PRAYER FOR RELIEF

Defendant denies that the University is entitled to any of the relief sought in its

prayer for relief.

A.  Defendant denies that they have infringed the '601 Patent;

B.  Defendant denies that they have willfully infringed the '601 Patent;

C.  Defendant denies that the University is entitled to damages, compensation, pre-

judgment interest, or costs;

D.  Defendant denies that the University is entitled to any other damages permitted

by 35 U.S.C. § 284 and denies that the University is entitled to increased damages;

E.  Defendant denies that the University is entitled to costs or attorneys' fees

incurred in this action; and

F.  Defendant denies that the University is entitled to any other kind of relief.

## [ALLEGED] JURY DEMAND

Defendant admits that the First Amended Complaint contains a demand for a trial

by jury on all issues triable of right by a jury.

## DENIAL OF FACTS NOT ADMITTED

Except as expressly admitted above, Defendant denies each and every allegation

of the First Amended Complaint.

*II.*

**AFFIRMATIVE DEFENSES**

**FIRST DEFENSE: FAILURE TO STATE A CLAIM**

1.      The allegations in the First Amended Complaint fail to state a claim upon which relief can be granted.

**SECOND DEFENSE: NON-INFRINGEMENT / NO WILLFUL INFRINGEMENT**

2.      Defendant has not and does not infringe any claim of the '601 Patent, literally or under the doctrine of equivalents, willfully or otherwise.

**THIRD DEFENSE: INVALIDITY**

3.      All of the claims of the '601 Patent are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, 256, and/or under any invalidity defenses authorized under the Patent Act and 35 U.S.C. § 282(b).

**FOURTH DEFENSE: FAILURE TO MARK**

4.      The University's claims for relief are barred, in whole or in part, by the failure of the University, its predecessors in interest, and/or its licensees to comply with the marking and/or notice provisions of 35 U.S.C. § 287.

**FIFTH DEFENSE: PROSECUTION HISTORY ESTOPPEL**

5.      By reason of admissions, arguments, and/or amendments made by or on behalf of the applicants during the proceedings in the U.S. Patent and Trademark Office during prosecution of each of the applications that resulted in the issuance of the asserted patent, the University is estopped, in whole or in part, from construing any claim of the asserted patent to include any accused product, method, process, machine, manufacture,

or composition of matter based on a theory of the doctrine of equivalents because of the doctrine of prosecution history estoppel.

### SIXTH DEFENSE: LIMITATION ON DAMAGES AND COSTS

6.     The University's claims for damages, if any, are limited by 35 U.S.C. §§ 286 and 287.  The University's recovery of costs, if any, is limited by 35 U.S.C. § 288.

### SEVENTH DEFENSE: ESTOPPEL / EQUITABLE ESTOPPEL / WAIVER

7.     The University's claims for relief are barred, in whole or in part, by the doctrines of estoppel, equitable estoppel, and/or waiver.

### EIGHTH DEFENSE: INEQUITABLE CONDUCT

8.     The '601 patent is unenforceable due to inequitable conduct by the named inventors listed on the patent, Drs. Moon and Brickner, and/or the University and its patent agents or attorneys that prosecuted the '601 patent before the Patent Office.

9.     The allegations set forth below in Count III of the Defendant's counterclaims are incorporated as if fully set forth herein in this eighth defense.

### NINTH DEFENSE: LICENSE / EXHAUSTION

10.     The University and/or its customers are licensed, expressly or impliedly, and/or the University's patent rights are exhausted, in whole or in part.

### TENTH DEFENSE: PATENT EXPIRATION

11.     The University is not entitled to any monetary or non-monetary remedies for any alleged acts of infringement occurring after the '601 Patent's term expired.

## ELEVENTH DEFENSE: DISCLOSURE DEDICATION

12.      The University has dedicated to the public all methods, apparatus, and products disclosed in the '601 Patent, but not literally claimed therein, and is estopped from claiming infringement by any such public domain methods, apparatus, or products.

## TWELFTH DEFENSE: IMPROPER VENUE

13.      Venue is not proper in this district and is not convenient.

## RESERVATION OF AFFIRMATIVE DEFENSES

14.      Defendant reserves all affirmative defenses permitted under the Federal Rules of Civil Procedure, the patent laws of the United States, and/or at law or in equity, that may now exist or in the future be available based on discovery and further investigation in this case.

### *III.*

## COUNTERCLAIMS

LSI Corporation ("LSI") pleads the following counterclaims, and alleges as follows:

## THE PARTIES

1.      LSI is a Delaware corporation with a principal place of business at 1320 Ridder Park Drive, San Jose, California.

2.      The Regents of the University of Minnesota ("the University") is a public institution of higher learning having a principal place of business in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

3.      Subject to Defendant's affirmative defenses and denials, the University alleges that the Court has jurisdiction over the subject matter of these Counterclaims under, without limitation, 28 U.S.C. 1331, 1367, 1338(a), 2201, and 2202, and venue for these Counterclaims is proper in this district.

4.      This Court has personal jurisdiction over the University because the University has sued Defendant in this district, and because the University resides in this district and regularly conducts business in this district.

## FACTUAL BACKGROUND

5.      In its Complaint and in its First Amended Complaint, the University asserts that LSI has infringed U.S. Patent No. 5,859,601 ("the '601 patent").

6.      LSI has not and does not infringe any valid and enforceable claim of the '601 patent.

7.      Consequently, there is an actual case or controversy between the parties over the '601 patent.

## COUNT ONE:
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## OF U.S. PATENT NO. 5,859,601

8.      LSI restates and incorporate by reference the allegations in the preceding paragraphs in its Counterclaims.

9.      An actual case or controversy exists between LSI and the University as to whether the '601 patent is not infringed by LSI.

10.     LSI has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '601 patent.

11.     This is an exceptional case under 35 U.S.C. § 285 because the University filed its Complaint and First Amended Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT TWO:
## DECLARATORY JUDGMENT OF INVALIDITY
## OF U.S. PATENT NO. 5,859,601

12.     LSI restates and incorporates by reference the allegations in the preceding paragraphs in its Counterclaims.

13.     An actual case or controversy exists between LSI and the University as to whether the '601 patent is invalid.

14.     The claims of the '601 patent are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, 256, and/or under any invalidity defenses authorized under the Patent Act and 35 U.S.C. § 282(b).

15.     This is an exceptional case under 35 U.S.C. § 285 because the University filed its Complaint and First Amended Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT THREE:
## DECLARATORY JUDGMENT OF UNENFORCEABILITY
## OF U.S. PATENT NO. 5,859,601

16.     LSI restates and incorporates by reference the allegations in the preceding paragraphs in its Counterclaims.

17.     An actual case or controversy exists between LSI and the University as to whether the '601 patent is unenforceable.

18.     The '601 patent is unenforceable due to inequitable conduct by the named inventors listed on the patent, Drs. Moon and Brickner, and/or the University and its patent agents or attorneys that prosecuted the '601 patent before the Patent Office.

19.     The University alleges that "Drs. Moon and Brickner also described their invention in [an allegedly] seminal academic paper, 'Maximum Transition Run Codes for Data Storage Systems,' *IEEE Trans. Magn*., vol. 32, no. 5, September 1996 ('the Moon 1996 IEEE Paper')."  First Amended Complaint, ECF No. 40 at ¶¶ 49-52.  The University alleges that the Moon 1996 IEEE Paper "is substantially similar to the '601 Patent" and "discloses all of the elements of claim 13 … [and] many of the same figures."  *Id*.  The Moon 1996 IEEE Paper is attached as Exhibit 3 to the First Amended Complaint.  *See* ECF No. 40-3.

20.     The abstract of the Moon 1996 IEEE Paper states that "[a] new code is presented with improves the minimum distance properties of sequence detectors operating at high linear densities.  This code, which is called the maximum transition run code, eliminates data patterns producing three or more consecutive transitions will imposing the usual k-constraint necessary for timing recovery."

21.     The abstract of the '601 patent (ECF No. 40-2) uses similar language: "[t]he coding scheme of the present invention is referred to as maximum transition run (MTR) code and eliminates data patterns producing long runs of consecutive transitions will imposing the usual k constraint necessary for timing recovery."

24

22.     The authors of the Moon 1996 IEEE Paper—who are the only people that are named as inventors on the face of '601 patent—admitted on the first page of the Moon 1996 IEEE Paper that "*[a]n independent study also suggests that removing long runs of consecutive transitions* improves the offtrack performance in some PRML systems [6]." (Emphasis added).

23.     Reference [6] of the Moon 1996 IEEE Paper is identified as "E. Soljanin, 'On-track and off-track distance properties of class 4 partial response channels,' SPIE Conference, Philadelphia, PA, Oct. 1995." ECF No. 40-3 at page 3 of 3.

24.     As such, the named inventors admitted that they had actual knowledge that another researcher, Emina Soljanin, had already publicly described, "independently," the alleged invention claimed in the '601 patent. *See* Moon 1996 IEEE Paper, first page, right column.

25.     Professor Emina Soljanin, Ph. D., submitted a declaration regarding the '601 patent in support of a Petition for Inter Partes Review ("IPR") in Case No. IRP2017-01068. Professor Soljanin's declaration is attached as Exhibit 1.

26.     Professor Soljanin declared that:

The inventors of the '601 patent authored a paper published in 1996 entitled "Maximum Transition Run Codes for Data Storage Systems," which is attached as Appendix A (and is also Exhibit 1012). The Patent Owner asserts that this so-called "Moon 1996 IEEE Paper" is "substantially similar to the '601 Patent." (Ex. 1003, at ¶¶ 51-52.) This is noteworthy because the inventors confirmed in their paper that I, in my "independent study," had found that "removing long runs of consecutive transitions" can improve the performance of data storage systems.

(Appendix A, first page, right column (citing reference [6].)  My work was
presented at a public conference in October 1995. (Appendix A, Reference [6].)  It
also resulted in a paper published in 1995 entitled "On-track and off-track distance
properties of class 4 partial response channels," which is attached as Appendix B.

Soljanin Declaration, Exhibit 1, at ¶ 14.

27.     The published paper corresponding to reference [6] in the Moon 1996 IEEE
Paper is attached as Appendix B to Professor Soljanin's Declaration in IRP2017-01068.
The paper describes an invention that anticipates, or in the very least, renders obvious
certain claims of the '601 patent.  For example, the Soljanin paper states that an

> improvement in the off-track performance of this channel can be accomplished *by
> limiting the length of sequences of alternating symbols to four.  For the NRZI type
> of recording, this can be achieved by a code that limits the runs of successive ones
> to three*, as the binary complement of the industry standard 8/9 (0,3) block code,
> introduced for IBM 3480 tape drive.  This code has a simple and inexpensive
> implementation proposed by A.M. Patel.

Professor Soljanin's paper, Appendix B to Exhibit 1 hereto, at page 99 (emphasis added).

28.     This disclosure is material to at least claim 13 of the '601 patent, which
recites a method involving "generating no more than j consecutive transitions of said
sequence in the recorded waveform such that $j \geq 2[]$."

29.     This claim 13 is very broad.  According to Dr. Soljanin, an expert in the
field:

> Independent claims 1 and 13 of the '601 patent respectively claim a generic
> "apparatus" and a generic "method" for converting "m-bit binary datawords" of
> unspecified length into "n-bit binary codewords" of unspecified length.  These
> claims require that a pair of constraints "j;k" are imposed.  But the "k" constraint

is entirely unspecified while "j" can be any integer "greater than 2." (['601 patent],

claims 1 and 13.)  As such, these claims effectively attempt to cover the concept of

MTR coding, per se. I understand that the Patent Owner alleged in the

corresponding litigation that "[a]ny commercially-viable implementation of MTR

coding requires performance of the methods of claim 13 of the '601 Patent."

([First Amended Complaint, ECF No. 40], at ¶ 131.)

Soljanin Declaration, Exhibit 1, at ¶ 58.

30.     The named inventors of the '601 patent expressly admitted in columns 1-2

of the '601 that the claimed "k" constraint was well-known in the prior art.  And during

prosecution, the University admitted that the "k constraint in the present invention is

defined in a manner similar to standard [prior art] RLL codes."  Applicant Response

mailed December 16, 1997, at page 6.  The file history for the '601 patent is attached as

Exhibit 2 and incorporated herein by reference, in its entirety.  The applicant urged that

the alleged point of novelty of the claimed invention is the "j" constraint.  *See id*. ("One

of the distinguishing aspects of the present invention includes that j be equal to or greater

than two.")

31.     Professor Soljanin's conference and publication discloses the claimed MTR

"j" constraint, as it discloses "limiting the length of sequences of alternating symbols to

four" which in NRZI format "limits the runs of successive ones to three."  Soljanin paper

at 99.  Professor Soljanin's  paper thus anticipates, or at least renders obvious (alone or in

view of other prior art), at least independent claim 13 of the '601 patent.

32.     Professor's Soljanin's conference and paper additionally anticipate, or at

least render obvious (alone or in view of other prior art), claims 14-17 of the '601 patent,

wherein the maximum transition limit "j" can be greater than or equal to 2 but less than 10. *Compare* claims 14-17 *with* Soljanin paper at 99 ("limiting the length of sequences of alternating symbols to four" which in NRZI format "limits the runs of successive ones to three.").

33.     The '601 patent indicates that its application was filed on October 15, 1996, and the patent purports to claim priority to a provisional application (No. 60/014,954) filed April 5, 1996.  Professor Soljanin's prior "work was presented at a public conference in October 1995"—which corresponds to reference [6] in the Moon 1996 IEEE Paper'—and that this conference "resulted in a paper published in 1995[.]" Soljanin Declaration, Exhibit 1, at ¶ 14.

34.     As such, Professor Soljanin's conference, and her paper, are each prior art to the '601 patent, at least under pre-AIA 35 U.S.C. § 102(a).

35.     And as mentioned above, the named inventors of the '601 patent admitted in the Moon 1996 IEEE Paper that Professor Soljanin had "independently" disclosed her work on maximum transition run coding.  Thus, the named inventors expressly admitted that Professor Soljanin's work was not derived from their own work.

36.     The first named inventor on the '601 patent, Dr. Moon, personally attended Professor Soljanin's conference in October 1995.  After hearing Professor Soljanin's presentation, which was presented publicly, Dr. Moon approached Professor Soljanin and suggested to her that the two of them be named as joint inventors on a patent application claiming MTR coding.  Professor Soljanin declined this invitation.

37.     About six months later, Professor Moon and his then-graduate student, Dr. Brickner, filed their provisional patent application, without acknowledging Professor Soljanin's prior work.  Dr. Moon and Dr. Brickner elected to withhold from the Patent Office that Professor Soljanin had already "independently" presented and published information that is material to certain claims of the '601 patent, as discussed above.

38.     While knowledge and intent may be averred generally, Fed. R. Civ. P. 9(b), based on the facts above, a reasonable inference to be drawn is that Dr. Moon and Dr. Brickner withheld material information from the Patent Office in order to deceive the Patent Office into issuing a patent on MTR coding having broad claims, such as claims 13-17, as discussed above.

39.     The University and its patent agents or attorneys, and the named inventors Drs. Moon and Brickner, had many opportunities to tell the Patent Office about Professor Soljanin's prior public disclosures of MTR coding.  But they did not do so and elected to remain silent despite their duty of candor to the Patent Office.

40.     Additionally, Dr. Moon withheld from the Patent Office the fact that he had asked Professor Soljanin at the October 1995 conference to join him as a co-inventor on a patent claiming MTR coding.  These facts support an inference that Dr. Moon actually knew and actually appreciated that Professor Soljanin had invented the subject matter of the '601 patent.

41.     As such, Professor Soljanin's conference presentation and publication additionally qualify as prior art under pre-AIA 35 U.S.C. § 102(f) ("he did not himself invent the subject matter sought to be patented") and/or § 102(g)(2) ("before such

person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it").

42.     That Dr. Moon chose to not disclose this information to the Patent Office is strong evidence that Dr. Moon intended to deceive the Patent Office.  Dr. Moon had an incentive to hide the fact that Professor Soljanin declined Dr. Moon's invitation to be listed as a joint inventor on a patent application.

43.     If the patent office was informed of Professor Soljanin's prior public disclosures and/or was informed that Professor Soljanin should have been listed as an inventor, the examiner would not have allowed the application, and the '601 patent would not have issued, because the claims would be unpatentable over one or more of pre-AIA 35 U.S.C. § 102(a), (f), (g) and/or 35 U.S.C. § 103.  *See also* 37 C.F.R. § 1.56 (regarding the duty of candor to the Patent Office).

44.     Further, Dr. Moon knowingly submitted a false declaration to the Patent Office.  Even though Dr. Moon had given an indication directly to Professor Soljanin that Professor Soljanin had invented MTR coding, Dr. Moon knowingly falsely told the Patent Office that he believes he is the "original, first and sole inventor," and he acknowledged his duty of candor to the Patent Office and expressly accepted that willful false statements like this one are punishable under 18 U.S.C. § 1001 and may "jeopardize the validity of the application or any patent issued thereon."  *See* Moon and Brickner "Declaration for United States Patent Application," which is a part of the official file history for the '601 patent, Exhibit 2.

45.     For the reasons explained above, each of (1) Professor Soljanin's 1995 conference presentation, (2) the corresponding 1995 Soljanin paper, and (3) Dr. Moon's rejected request that Professor Soljanin join Dr. Moon as a named inventor on a patent application are material to the patentability / validity of at least claims 13-17 the '601 patent.

46.     This withheld information is not cumulative to any information that was cited during the prosecution of the '601 patent.  As the file history of the '601 patent shows, the closest prior art of record was the Iketani patent, U.S. Patent No. 4,760,378, which the University argued did not disclose the key limitation of independent claim 13 of "generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$."  *See* Exhibit 2, Response dated December 16, 1997 (University distinguishing Iketani).

47.     It is reasonable to infer that Dr. Moon, Dr. Brickner, and the University and its patent agents and attorneys actually knew that the withheld information was material to patentability and that they specifically intended to deceive the Patent Office into issuing a patent that would not have otherwise issued.

48.     Moreover, the face of the '601 patent contains only six citations of prior art references—all six of which were found by the examiner.  The University did not disclose any prior art to the Patent Office.  *See* File History, Office Action Mailed September 16, 1997, Notice of References Cited (PTO-892), Exhibit 2.

49.     The patent examiner actually identified one of Dr. Soljanin's patents, U.S. Patent No. 5,608,397 as prior art that was "not relied upon" but was "considered pertinent

to applicant's disclosure."  Office Action Mailed September 16, 1997 at 3.  However, the examiner apparently did not discover the Soljanin 1995 paper discussed above, which was intentionally withheld from the Patent Office by Drs. Moon and Brickner.

50.     In addition to the multiple acts of inequitable conduct discussed, Dr. Moon, Dr. Brickner, and/or the University or its patent agents and attorneys knowingly withheld additional material information with the specific intent to deceive the Patent Office.

51.     The first page of the Moon 1996 IEEE Paper (ECF No. 40-3) states that the "work was supported in part by Seagate Technology[.]"

52.     According to Dr. Brickner's LinkedIn page, he took a job at Seagate Technology, where he worked from September 1998 until March 2001 performing "[r]esearch and development of coding and signal processing for data storage read channels."  *See* https://www.linkedin.com/in/barrettbrickner/ (accessed July 10, 2017).

53.     Dr. Brickner filed various patent applications while at Seagate, including U.S. Patent No. 6,388,587, which is attached as Exhibit 3.  One of the prior art patents cited on the face of this patent is U.S. Patent No. 5,731,768, to Tsang ("the Tsang patent").  *See* Exhibit 3.  The Tsang patent is attached as Exhibit 4.

54.     The inventor of the Tsang patent, Kinhing P. Tsang, resided in Minnesota and worked for Seagate Technology.  *See* Exhibit 4.  The Tsang patent application was filed on January 31, 1996, and predates the effective filing date of the '601 patent.  *Id.*

55.     Even before Dr. Brickner went to work for Seagate, Drs. Moon and Brickner filed a patent application assigned to the University of Minnesota, which patent also cites the Tsang patent.  *See* U.S. Patent No. 5,956,195, attached as Exhibit 5.

56.     Based on the above facts alone, it is reasonable to conclude that Drs. Moon and Brickner, and/or the University or its patent agents and attorneys, had actual knowledge of the Tsang patent before the '601 patent issued.  There is additional evidence of such knowledge, as discussed below.

57.     First, many aspects of the Tsang patent are strikingly similar to key aspects of the '601 patent.  *See generally*, Soljanin Declaration, Exhibit 1, at ¶¶ 60-62, 119-172.

58.     For example, aside from the facts that Drs. Moon and Brickner admit that Seagate Technology (which owns the Tsang patent) supported the work that culminated in the '601 patent, that Dr. Tsang also resided in Minnesota, and that Dr. Brickner went to work for Seagate immediately after graduating from the University of Minnesota, the titles of the Tsang patent and the '601 patent are essentially identical.  *Compare* the title of the '601 patent ("Method and Apparatus for Implementing Maximum Transition Run Codes") *with* the title of the prior art Tsang patent ("Method and Apparatus for Implementing Codes with Maximum Transition Run Length.")  *See also* Soljanin Declaration, Exhibit 1, at ¶¶ 60-62.

59.     On information and belief, the similarity in these titles is not coincidental in that at least Drs. Moon and Brickner had knowledge that Dr. Tsang had invented MTR coding and/or that Dr. Tsang was preparing or had already filed a patent application on MTR coding.

60.     Second, the Tsang patent sets forth "a key finding from Seagate's research—a finding previously presented in the Seagate Annual Report," which exact

same finding was then set forth in the later-filed application that issued as the '601 patent. *See* Soljanin Declaration, Exhibit 1, at ¶¶ 60-62.

61.     Third, the University in the First Amended Complaint falsely implied that the '601 patent "coined" the phrase 'Maximum Transition Run ('MTR') codes." ECF No. 40 at ¶ 47.  But the truth is that Seagate's Dr. Tsang was the one that had actually coined this phrase, and the one that had actually invented MTR codes.  *See* Exhibit 4 at e.g., the Title and at column 2, lines 22-28 ("A class of block codes that limits the number of consecutive symbol transitions, typically representing binary '1's', are known as maximum transition run (MTR) codes.")

62.     Fourth, as discussed above with respect to the Drs. Moon and Brickner's intentional withholding of Dr. Soljanin's prior art conference presentation and paper, the alleged point of novelty of the claims of the '601 patent is the idea that the MTR "j" constraint should be greater than or equal to 2.  *See supra*.  But Dr. Tsang had already invented this concept.  *See* Exhibit 1, Soljanin Declaration, at ¶ 60 (citing the Tsang patent at 2:25-44 and 19:33-64).

63.     Dr. Soljanin set forth detailed claim charts showing that claims 1, 2, 8-10, and 13-17 are anticipated under pre-AIA 35 U.S.C. § 102(a) and/or 102(g) by Tsang. Soljanin Declaration, Exhibit 1, at ¶¶ 51, 60-62, 119-172.  Further, Dr. Soljanin opines that Tsang in view of one additional instance of prior art (U.S. Patent No. 5,341,386 to Shimoda) renders obvious claims 12 and 21 of the '601 patent.  *Id*. at ¶¶ 188-198.

64.     Thus, the Tsang patent is material to at least claims 1, 2, 8-10, 12, 13-17, and 21 of the '601 patent.  *Id*. at ¶¶ 51, 60-62, 119-172, 188-198.

65.     Based on the above facts, there is a reasonable probability that Drs. Moon and Brickner and/or the University's patent agents and attorneys had actual knowledge of the Tsang patent.  Yet they chose to withhold this information from the Patent Office in connection with the prosecution of the '601 patent that is at issue in this civil action.

66.     The withheld information is not cumulative to any information that was cited by the patent examiner or by the University during the prosecution of the '601 patent.  As discussed, the file history of the '601 patent shows that the closest prior art of record was the Iketani patent, U.S. Patent No. 4,760,378, which the University argued did not disclose the key limitation of independent claim 13 of "generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$." *See* Exhibit 2, Response dated December 16, 1997 (University distinguishing Iketani).  The Tsang patent discloses and claims this subject matter, which means that it is not cumulative and it should have been disclosed to the patent examiner.

67.     Based on all of these facts, it is reasonable to infer that Drs. Moon, Dr. Brickner, and the University and its patent agents and attorneys knew that the withheld information was material to patentability and that they specifically intended to deceive the Patent Office into issuing a patent that should not have otherwise issued.

68.     If the patent examiner had been aware of the Tsang patent, he would have rejected the claims of the '601 patent application and/or declared an interference under pre-AIA 35 U.S.C. § 135, for the reasons set forth in Dr. Soljanin's Declaration.

69.     An interference proceeding is costly and uncertain; only one of the interfering applications is awarded priority and becomes a patent.

35

70.     On information and belief, Drs. Moon and Brickner and/or the University wanted to obtain the first patent on "MTR" coding, even though they actually knew that Dr. Tsang of Seagate had already made such an invention.

71.     Finally, the University alleges that Seagate is a "customer" of the Defendants and the University implies that the Defendants are liable for induced and contributory infringement by virtue of customer Seagate's (and other customers) alleged direct infringement of the '601 patent.  *See*, ECF No. 40 at *e.g.*, ¶¶ 20, 21, 23, 29, 93, 95-99, 103-109, 113, 116, 118.

72.     But the University omitted from the Complaint that Seagate is licensed under the '601 patent.

73.     In response to an inquiry from counsel for Defendants, counsel for the University confirmed, for the very first time, in an email of January 13, 2017, that "it does appear that Seagate has certain rights with respect to the '601 patent."

74.     It is reasonable to infer that the University was aware long before it filed the Complaint that Seagate was licensed under the '601 patent.  These facts further support an inference that the University was aware of Seagate's Tsang patent, which is directed to the identical subject matter claimed in the '601 patent.

75.     This is an exceptional case under 35 U.S.C. § 285 because the University filed its Complaint and First Amended Complaint with knowledge of the facts stated in this Counterclaim.

## **PRAYER FOR RELIEF**

WHEREFORE, LSI prays for judgment as follows:

A.      That the University take nothing by way of its First Amended Complaint;

B.      A judgment dismissing the University's First Amended Complaint with prejudice;

C.      A judgment in favor of LSI on all of its Counterclaims;

D.      A declaration that LSI has not infringed any valid and enforceable claim of the '601 patent;

E.      A declaration that all claims of the '601 patent are invalid;

F.      A declaration that the '601 patent is unenforceable due to inequitable conduct;

G.      A judgment in favor of LSI declaring that this case is exceptional;

H.      An award in favor of LSI of its taxable and non-taxable costs and its reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285 or otherwise; and

I.      Such other relief that this Court deems just and proper.

## JURY DEMAND

76.    Pursuant to Federal Rule of Civil Procedure 38, LSI demands a trial by jury on all issues triable of right by a jury.


### KILPATRICK TOWNSEND & STOCKTON LLP


Dated: July 13, 2017           By */s/ David E. Sipiora*
                               David E. Sipiora (CO # 29759), admitted *pro hac vice*
                               Edward J. Mayle (VA #80667), admitted *pro hac vice*
                                1400 Wewatta Street, Suite 600
                               Denver, Colorado  80202
                               Telephone: (303) 405-8528
                               Facsimile: (303) 593-3905
                                dsipiora@kilpatricktownsend.com
                               TMayle@kilpatricktownsend.com

                               *Attorneys for Defendants*

                                *and*

                               **BASSFORD REMELE**
                               *A Professional Association*

Dated: July 13, 2017           By */s/ Jessica L. Klander*
                               Lewis A. Remele, Jr. (MN #90724)
                               Jessica L. Klander (MN #392290)
                                100 South Fifth Street, Suite 1500
                               Minneapolis, Minnesota  55402-1254
                               Telephone:   (612) 333-3000
                               Facsimile:    (612) 333-8829
                               lremele@bassford.com
                               jklander@bassford.com