Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
Jas Dhillon (SBN 252842)
jas.dhillon@klgates.com
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

*Counsel for Plaintiff*
*Regents of the University of Minnesota*

*Additional counsel listed on signature pages*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REGENTS OF THE UNIVERSITY OF MINNESOTA, | Civil Action No. 5:18-cv-00821-EJD-NMC |
| Plaintiff, | **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | Tutorial and *Markman* Hearing: July 19, 2023 |
| LSI CORPORATION AND AVAGO TECHNOLOGIES U.S. INC., | Time: 10:30 a.m. |
| Defendants. | Location: San Jose, Courtroom 4, 5th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND ........................................................................................................1

        A.      Basics of Magnetic Recording ..........................................................................1

        B.      The Innovation of Maximum Transition Run ("MTR")
                Encoding in the Asserted Claims of the '601 Patent ..........................................3

                1.      Problem Addressed By the '601 Patent ..................................................3

                2.      The Solution Provided by the Asserted Claims of the
                        '601 Patent ........................................................................................4

        C.      File History ........................................................................................................6

        D.      IPR ........................................................................................................6

III.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION ............................................8

IV.     THE DISPUTED CLAIM TERMS ............................................................................8

        A.      "producing sequences of n-bit codewords" ......................................................8

        B.      "encoded waveform" ......................................................................................13

        C.      "transition" ......................................................................................................16

V.      CONCLUSION ......................................................................................................22

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003)..................................................................................13

5

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
895 F.3d 1374 (Fed. Cir. 2018)..................................................................................12

6

7

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
986 F. Supp. 2d 574 (W.D. Pa. 2013)..........................................................................1

8

*Click-to-Call Techs. LP v. Ingenio, Inc.*,
45 F.4th 1363 (Fed. Cir. 2022)...................................................................................7

9

10

*Continental Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019)....................................................................................11

11

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016)..................................................................................18

12

13

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)..................................................................................12

14

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004)..................................................................................11

15

16

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)..................................................................................10

17

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018)..................................................................................20

18

19

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999)....................................................................................12

20

*Kamstrup A/S v. Axioma Metering UAB*,
43 F.4th 1374 (Fed. Cir. 2022) ............................................................................10, 12

21

22

*In re Koninklijke Philips Patent Litig.*,
No 18-cv-01885-HSG, 2020 WL 2733931 (N.D. Cal. May 26, 2020) ...................20

23

*Linear Tech. Corp. v. ITC*,
566 F.3d 1049 (Fed. Cir. 2009).............................................................................9, 10

24

*LSI Corp. v. Regents of Univ. of Minn.*,
43 F.4th 1349 (Fed. Cir. 2022) ...........................................................................3, 4, 7, 12

25

26

*MyMail, Ltd. v. IAC Search & Media, Inc.*,
No. 17-cv-04488-LHK, 2020 WL 1043659 (N.D. Cal. Mar. 4, 2020)....................21

27

28

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)...................................................................................18, 22

*In re Packard*,
   751 F.3d 1307 (Fed. Cir. 2014)...............................................................................................14

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc).............................................................8, 14, 19, 20

*Renishaw PLC v. Marposs Societa' per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998)...............................................................................................12

*Roche Diagnostics Operations, Inc. v. Lifescan Inc.*,
   452 F. App'x 989 (Fed. Cir. 2012) ..........................................................................................12

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)...............................................................................................14

*Synopsys, Inc. v. Siemens Indus. Software Inc.*,
   No. 20-cv-04151-WHO, 2021 WL 4427437 (N.D. Cal. Sept. 27, 2021) ...............................19

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015)....................................................................................................................8

*Thorner v. Sony Comput. Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)......................................................................................8, 9, 10

*Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016).................................................................................................7

*TVIIM, LLC v. McAfee, Inc.*,
   851 F.3d 1356 (Fed. Cir. 2017).................................................................................................13

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007).................................................................................................11

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)............................................................................................19, 20

**Statutes**

35 U.S.C. § 101......................................................................................................................15, 19

35 U.S.C. § 102(b)..........................................................................................................................7

35 U.S.C. § 112(d)..........................................................................................................................7

35 U.S.C. § 315(e)(2)......................................................................................................................7

iv

## TEXT OF ASSERTED CLAIMS

13.[1] A method for encoding m-bit binary datawords into n-bit binary codewords in a recorded waveform, where m and n are preselected positive integers such that n is greater than m, comprising the steps of:

receiving binary datawords; and

producing sequences of n-bit codewords;

imposing a pair of constraints (j;k) on the encoded waveform;

generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$; and

generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform.


14. The method as in claim 13 wherein the consecutive transition limit is defined by the equation $2 \leq j < 10$.


17. The method as in claim 14 wherein the binary sequences produced by combining codewords have no more than one of j consecutive transitions from 0 to 1 and from 1 to 0 and no more than one of k+1 consecutive 0's and k+1 consecutive 1's when used in conjunction with the NRZ recording format.

---

[1] Claim 13 is not asserted in this litigation, but its text is provided because asserted claims 14 and 17 depend from it.

v

# LIST OF EXHIBITS

## Exhibits to Amended Joint Claim Construction and Prehearing Statement (Dkt. 238)

**Exhibit A:**    U.S. Patent 5,859,601 ("'601 Patent")

**Exhibit B:**    Final Written Decision, *LSI Corp. v. Regents of the Univ. of Minn.*, IPR2017-01068, Paper 58 (P.T.A.B. Apr. 14, 2021)

**Exhibit C:**    Claim Chart

**Exhibit D:**    Declaration of Prof. Steven W. McLaughlin, *Regents of the Univ. of Minn. v. LSI Corp.*, Case No. 5:18-cv-00821-EJD-NMC (N.D. Cal. Mar. 14, 2018)

**Exhibit E:**    Deposition Transcript, Prof. Steven W. McLaughlin, *Regents of the Univ. of Minn. v. LSI Corp.*, Case No. 5:18-cv-00821-EJD-NMC (N.D. Cal. May 7, 2018)

**Exhibit F:**    Declaration of Prof. Steven W. McLaughlin, *LSI Corp. v. Regents of the Univ. of Minn.*, IPR2017-01068, Ex. 2017 (P.T.A.B. Jul. 12, 2020)

**Exhibit G:**    Deposition Transcript of Prof. Steven W. McLaughlin, *LSI Corp. v. Regents of the Univ. of Minn.,* IPR2017-01068, Ex. 1035 (P.T.A.B. Sept. 17, 2020)

**Exhibit H:**    Declaration of Prof. Emina Soljanin, *Regents of the Univ. of Minn. v. LSI Corp.*, Case No. 5:18-cv-00821-EJD (N.D. Cal. Apr. 13, 2018)

**Exhibit I:**    Deposition Transcript of Prof. Emina Soljanin, *Regents of the Univ. of Minn. v. LSI Corp.*, Case No. 5:18-cv-00821-EJD-NMC (N.D. Cal. May 9, 2018)

**Exhibit J:**    Declaration of Prof. Emina Soljanin, *LSI Corp. v. Regents of the Univ. of Minn.*, IPR2017-01068, Ex. 1010 (P.T.A.B. Mar. 9, 2017)

**Exhibit K:**    Deposition Transcript of Prof. Emina Soljanin,, *LSI Corp. v. Regents of the Univ. of Minn.,* IPR2017-01068, Ex. 2011 (P.T.A.B. June 12, 2020)

**Exhibit L:**    Deposition Transcript of Dr. Jaekyun Moon, *LSI Corp. v. Regents of the Univ. of Minn.,* IPR2017-01068, Ex. 1034 (P.T.A.B. September 15, 2020)

## Additional Exhibits

**Exhibit 1:**    Excerpts from file history of '601 Patent

vi

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC

## I.       INTRODUCTION

Plaintiff Regents of the University of Minnesota ("UMN") asserts that Defendants LSI Corp. and Avago Techs. U.S., Inc. (collectively, "LSI") infringe claims 14 and 17 ("Asserted Claims") of U.S. Patent No. 5,859,601 ("'601 Patent").  The parties dispute the construction of three claim terms in the Asserted Claims, which appear in independent claim 13.

UMN's proposed constructions apply the established canons of claim construction and reflect the ordinary meanings of the three claim terms in dispute, as a person of ordinary skill in the art would understand them in light of the teachings of the '601 Patent.  UMN supports its proposed claim constructions with declarations and testimony from its expert, Prof. Steven W. McLaughlin ("McLaughlin"), who has a Ph.D. in electrical engineering and is currently the Provost and Executive Vice President for Academic Affairs at Georgia Tech, having previously served at Georgia Tech as chair of the School of Electrical and Computer Engineering and dean of the College of Engineering.  Dkt. 238, Ex. D, ¶¶ 2-4, Ex. F, ¶¶ 2-4.[2]  A federal district court described McLaughlin, following his testimony at trial, as "extremely thorough, complete, and clear" and "by far the best of the technical witnesses" who had testified.  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 986 F. Supp. 2d 574, 620 n.67 (W.D. Pa. 2013).

In contrast, LSI's claim constructions depart from the intrinsic record, are inconsistent with prior positions LSI took in its failed attempt to invalidate the Asserted Claims in an *inter partes* review ("IPR"), and improperly seek to import claim limitations for tactical advantage.  LSI also has no expert testimony to support its proposed constructions, having abandoned its argument that certain claim terms were indefinite.  For the reasons explained below, the Court should adopt UMN's proposed constructions.

## II.      BACKGROUND

### A.       Basics of Magnetic Recording

The '601 Patent relates generally to "a channel coding technique to improve data storage devices such as magnetic computer disk drives and professional and consumer tape recorders."

---

[2] Lettered exhibits refer to the exhibits attached to the parties' Amended Joint Claim Construction and Prehearing Statement filed on May 16, 2023.  Dkt. 238.

Ex. A, col. 2:40-43; Ex. B at 3.[3]  A magnetic disk drive, often referred to as a "hard disk drive" ("HDD"), includes a magnetically-coated disk and records binary data—represented by sequences of 1s and 0s—by magnetically polarizing, with a write head, individual bit regions on a track according to the data to be stored.  Ex. D, ¶¶ 9, 11.  When adjacent polarized regions are magnetized in opposing directions, there is a "transition" in the polarity of the adjacent regions. *Id.* at ¶¶ 11-12.  Conversely, when adjacent regions are polarized in the same direction, there is no transition, as illustrated in the diagram below. *Id.* at ¶ 13.



To read the previously written data, a read head of the HDD hovers over the rotating disk and senses the magnetic fields from the individually polarized bit regions.  *Id.* at ¶15.  The signal generated from the sensed magnetic fields is referred to as the "readback signal," which is an analog electrical signal.  *Id.*  A read-side sequence detector in the HDD then converts the analog readback signal from the read head into the corresponding binary data by determining from the signal the likely sequence of transitions and non-transitions recorded to the magnetic medium.  *Id.* at ¶¶ 15-21.

As explained in the '601 Patent, there are two common recording formats for magnetic recording—NRZI and NRZ.  Ex. A, col. 1:24-32.  With NRZI, "a magnetic transition is represented by a 1 and no transition by 0."  *Id.*  With NRZ recording, "the binary '1' represents a positive level in the magnetization waveform" (*i.e.*, magnetizing the corresponding bit region in one direction, for example S→N) and "the binary '0' [a] negative level in the same waveform" (*i.e.*, magnetizing the bit region in the opposite direction, for example N←S).  *Id.*; Ex. D, ¶¶ 12-14; Ex. B at 21.

---

[3] The '601 Patent describes the field of invention as digital storage systems, but as the patent goes on to describe the invention in the context of magnetic recording, UMN likewise focuses on magnetic recording here.

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC

Before recording the data in accordance with either the NRZI or NRZ format, a HDD commonly encodes the data, such that encoded data are written to the disk.  Ex. D, ¶ 10.  The purpose of encoding the data is to enhance the ability of the read-side sequence detector to read accurately and reliably the data written to the disk.  *Id.*, Appx. D, § 8.1 (Wang et al., *Magnetic Information Storage Technology* (Academic Press, 1999)).  To perform the encoding, an encoder takes an input "dataword" that is m-bits long (e.g., 0000) and encodes it into an output codeword that is n-bits long, where n is greater than m (e.g., 10000).  As such, the HDD writes to the disk codewords that are longer than the datawords, and the ratio of m to n (*e.g.*, 4/5 in the example) is known as the "code rate."  Ex. D, ¶ 27.  Then, on the read-side, a corresponding decoder converts the n-bit codewords detected by the read-side detector back into their corresponding m-bit datawords.  While encoding improves the accuracy and reliability of the system, each encoding scheme comes with a "rate penalty," which is the difference between the upper bound on the rate at which information could be transmitted reliably over the channel (i.e., the capacity of the data channel) and its code rate.  *Id.*

**B.    The Innovation of Maximum Transition Run ("MTR") Encoding in the Asserted Claims of the '601 Patent**

1.    Problem Addressed By the '601 Patent

Some potential write pattern sequences, particularly patterns with a long run of consecutive transitions, are prone to errors by the read-side sequence detector.  Ex. A, 3:53-61; *LSI Corp. v. Regents of Univ. of Minn.*, 43 F.4th 1349, 1351 (Fed. Cir. 2022) (hereinafter "*LSI v. UMN*"); Ex. D, ¶¶ 22-23.  At the time of the invention of the '601 Patent, so-called runlength limited ("RLL") codes were commonly used to address this problem.  RLL codes have "d" and "k" constraints, where d and k are, respectively, in NRZI recording, the minimum and maximum number of non-transitions between transitions.  Ex. A, col. 1:29-34.[4]  A RLL code where d=1 (denoted "RLL(1,k)"), which was common in magnetic recording at the time of the invention of the '601 Patent, requires at least one non-transition between transitions because d=1.  *Id.* at col. 4:8-12; Ex.

---

[4] For NRZ recording, with RLL coding, d+1 is the minimum number and k+1 is the maximum number of consecutive like symbols.  Ex. A, col. 1:24-29.

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                         CASE NO. 5:18-CV-00821-EJD-NMC

D, ¶ 26.  Thus, RLL(1,k) codes serve the purpose of eliminating patterns with many consecutive transitions, which improves the performance of the read-side sequence detector (often referred to as "gain").  Ex. A, col. 4:15-22; Ex. D, ¶ 26.  This gain, however, comes with a low code rate, meaning there is a reduction of the total amount of real, raw data that can be stored to the HDD. Ex. F, ¶¶ 31-34. When RLL code is used, there is significant rate penalty, *i.e.*, a large difference between the capacity on the HDD and the code rater for the RLL (1,k) code because all sequences with two or more consecutive transitions are prohibited by inserting non-data-representing "0" between each transition.  *Id.*; Ex. A, col. 4:10-30.

2. <u>The Solution Provided by the Asserted Claims of the '601 Patent</u>

To eliminate error-prone write patterns in a more efficient way, *i.e.*, with a small rate penalty, Drs. Jaekyun Moon and Barrett Brickner, both then at the University of Minnesota, developed a novel technique to code data that they referred to as "Maximum Transition Run" or "MTR" codes.  Moon and Brickner discovered that imposing specific limits on the number of consecutive transitions and non-transitions that are to be recorded would allow the read-side sequence detector to detect the recorded data more accurately and maintain a suitably small rate penalty, a result that was not achievable with the prior art.  Ex. A, col. 4:52-60; Ex. D, ¶¶ 29-30; Ex. F, ¶ 36.  In particular, Moon's and Brickner's improved MTR code eliminated error-prone write patterns by both (1) limiting the number of consecutive transitions on the recording medium to a selected limit that must be two or greater; and (2) limiting the number of consecutive non-transitions, which constraints collectively provide the benefit of eliminating patterns with long transition runs while ensuring timing recovery by eliminating patterns with long runs of non-transitions.[5]  Ex. A, col. 2:40-47, col. 4:46-48; Ex. D, ¶ 29; *LSI v. UMN*, 43 F.4th at 1351-52.  The '601 Patent refers to the limit on the number of consecutive transitions as the "j constraint" (where $j \geq 2$) and to the limit on the number of consecutive non-transitions as the "k constraint."  Ex. A, col. 2:59-65, col. 4:46-48.

In claim 14 of the '601 Patent, Moon and Brickner describe and claim a particular

---

[5] Timing recovery refers to ensuring an adequate frequency of transition for synchronization of the read clock.  Ex. A., col. 1:37-41; Ex. D, ¶ 60.

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                           CASE NO. 5:18-CV-00821-EJD-NMC

implementation of the novel MTR code method where j is greater than or equal to 2, and less than 10.  Thus, where an MTR code uses j=2, no more than two consecutive transitions can be written to the disk.  Fig. 6 of the '601 Patent illustrates such an MTR code for NRZI recording (where a 1 is a transition and a 0 is a non-transition):

### Fig. 6

DATAWORD • CODEWORD

```
0000 • 10000
0001 • 00001
0010 • 00010
0011 • 10001
0100 • 00100
0101 • 00101
0110 • 00110
0111 • 10110
1000 • 01000
1001 • 01001
1010 • 01010
1011 • 10010
1100 • 01100
1101 • 01101
1110 • 10100
1111 • 10101
```

Here, the dataword length is four (m=4), the codeword length is five (n=5), j=2 and k=8 (which can be denoted as a "MTR(2,8)" code.  The 4-bit datawords are mapped to 5-bit codewords, where no single codeword has more than two consecutive 1s and no codeword starts or ends with two consecutive 1s.  Consequently, even when two codewords are written consecutively (*i.e.*, "concatenated"), there will not be more than two consecutive transitions.  The limit of eight consecutive non-transitions in NRZI recording is met when the codewords 10000 and 00001 are concatenated.  Ex. A, col. 5:1-20; Ex. D, ¶ 31.

The beauty of MTR codes is that they reduce the likelihood of the read-side sequence detector making errors by removing error-prone write patterns, *i.e.*, prohibiting patterns with more than j consecutive transitions, in a highly efficient manner that improves accuracy (or "gain") and comes with an acceptably low rate penalty.  Ex. A, col. 2:40-47, col. 3:3-9; Ex. D, ¶ 30; Ex. F, ¶

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC

36.  This means that the read-side sequence detector can perform better than the prior art in high data density, miniaturized devices.  Ex. F, ¶ 36.  As explained in the '601 Patent, an improvement in performance "can be traded for an increase in storage density," which was critical to commercial efforts that were directed to increasing storage density in smaller devices.  Ex. A, col. 2:49-58.

**C.    File History**

The '601 Patent application was filed on October 15, 1996 and claims priority to a provisional application filed on April 5, 1996.  *See* Ex. A.  The USPTO issued only one rejection, which covered only some of the original claims.  Ex. 1 at UMN_0000739-741.  UMN amended the independent claims and the USPTO allowed the application directly thereafter.  *Id.* at UMN_0000745-746, UMN_00000758-759.

**D.    IPR**

LSI petitioned for IPR of the '601 Patent in March 2017.  To streamline the issues to be determined in the IPR, UMN filed a statutory disclaimer to cancel claims that were not asserted in this litigation, leaving only independent claim 13 and dependent claims 14 and 17 at issue in the IPR.  Ex. B at 2.  LSI asserted two grounds to invalidate these claims: anticipation by Okada (U.S. Pat. No. 5,392,270) and anticipation by the Tsang Patent (U.S. Pat. No. 5,731,768).[6]  In support of the IPR, LSI relied on testimony from Prof. Emina Soljanin ("Soljanin"), who opined that both Okada and the Tsang Patent possessed all of the elements of claims 13, 14 and 17.  Ex. J, ¶¶ 105-12, 116-18, 156-65, 170-72.  In connection with the Tsang Patent, Soljanin testified that the Tsang Patent discloses so-called "state-dependent" MTR codes.  *Id.* at ¶¶ 131-33.  Soljanin did not explain what she meant by "state-dependent" codes, but the '601 Patent teaches how the invention could be implemented with a state-dependent encoder by comparing such an implementation to one using "block" codes, where there is only one possible data word for each codeword.  Ex. A, col. 6:34-36.   With state-dependent codes, a single codeword might correspond to different

---

[6] This patent is referred to herein as the "Tsang Patent" to avoid confusion with the individual, "Mr. Tsang," who is the sole named inventor of the Tsang Patent.

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC

datawords, and the decoder has to examine adjacent codewords to decode the codeword.  *Id.* at col. 5:50-56; *see also* Ex. J, ¶ 71 (Soljanin testifying that the '601 Patent "teaches that 'good rates' can be realized by state-dependent . . . encoders").  And Soljanin testified that the Tsang Patent "anticipated" claims 13, 14 and 17, Ex. J, ¶ 119, which, according to her, means that the Tsang Patent "disclose[s] each and every limitation" of claims 13, 14 and 17.  *Id.* at ¶ 33.

On April 14, 2021, the Patent Trial and Appeal Board ("Board") issued its Final Written Decision in which it found that LSI had "show[n] by a preponderance of the evidence that claim 13 of the '601 patent is unpatentable under 35 U.S.C. § 102(b) (pre-AIA) as anticipated by [the] Okada [reference], but [LSI] has not shown that claims 14 and 17 are unpatentable." Ex. B at 21-32, 44.[7]  In finding claim 13 anticipated, the Board determined that "transition" "should receive its plain and ordinary meaning."  *Id.* at 20-21.  The Board further observed that the plain and ordinary meaning "did not exclude [LSI's] position that a transition can be logically represented in multiple ways depending on the encoding format . . . ."  *Id.*

In confirming the patentability of the Asserted Claims, the Board found that Okada did not disclose all of the elements of claims 14 and 17.  The Board also found that the Tsang Patent did not qualify as prior art to the '601 Patent.  *Id.* at 32-41.   Accordingly, the Board held that the Tsang Patent could not anticipate claims 13, 14 or 17 because it does not disclose an invention "by another" as required by pre-AIA § 102(e).  *Id.*

LSI appealed the Board's decision with respect to claims 14 and 17, and the Federal Circuit affirmed the Board's determination that those claims survived LSI's IPR challenge.  *See LSI v. UMN.*  Consequently, LSI now is estopped from asserting that the Asserted Claims are invalid "on any ground that [LSI] raised or reasonably could have raised during" the IPR.  35 U.S.C. § 315(e)(2); *see also Click-to-Call Techs. LP v. Ingenio, Inc.*, 45 F.4th 1363, 1368 (Fed. Cir. 2022) (petitioner estopped from asserting invalidity of a claim based on a ground not asserted in its

---

[7] Although claim 13 was canceled during the IPR, because the Asserted Claims depend from claim 13, the terms of claim 13 are incorporated into the Asserted Claims.  35 U.S.C. § 112(d) (a dependent claim "shall be construed to incorporate by reference all the limitations of the claim to which it refers"); *see also Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) ("construing the independent claim to exclude material covered by the dependent claim would be inconsistent").

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC

petition), *petition for cert. filed*, No. 22-873 (U.S. Mar. 9, 2023).

## III.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION

The interpretation of a patent claim is a question of law that may involve subsidiary factual findings.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015).  Claims terms generally are "given their ordinary and customary meaning," from the perspective of a person of ordinary skill in the art (a "POSITA") at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  The court's inquiry generally begins with the intrinsic evidence, which includes the claims themselves, the specification and the prosecution history of the patent.  *Id.* at 1313-14, 1317.  The court may also consider extrinsic evidence, such as dictionaries or expert testimony, which "can be useful to a court for a variety of purposes," such as "ensur[ing] that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA]."  *Id.* at 1318.  In the context of the '601 Patent, a POSITA is someone working in the electrical engineering field and specializing in data coding and detection techniques used in connection with reading data from various storage media such as hard disk drives and optical media.  Ex. D, ¶ 33; Ex. H, ¶ 23; Ex. B at 7-8.

"The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope" in a "clear and unmistakable" manner.  *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).  Courts "do not read limitations from the specification into claims," even if "the only embodiments, or all of the embodiments, contain a particular limitation."  *Id.* at 1366.

## IV.     THE DISPUTED CLAIM TERMS

### A.     "producing sequences of n-bit codewords"

| | |
|---|---|
| **UMN's Construction:** | producing, as output, sequences of bits, where each sequence is n-bits long |
| **LSI's Construction:** | producing a series of concatenated n-bit codewords, such that each received m-bit binary dataword is encoded into an n-bit codeword in a manner that is not state-dependent |

In substance, LSI does not dispute that UMN's proposed construction of "producing, as

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                          CASE NO. 5:18-CV-00821-EJD-NMC

1  output, sequences of bits, where each sequence is n-bits long" is correct.  Indeed, LSI adopts

2  nearly identical substantive language in the beginning portion of its construction, albeit with more

3  verbiage that is not as clear as UMN's proposed construction.  Specifically, both parties agree that

4  the codewords are n-bits long and that a sequence, or concatenation, of codewords is produced.

5  This is a straightforward application of the intrinsic evidence.   Ex. A, col. 4:65 ("n-bit

6  codewords"); *id.* at col. 6:19 (describing that in the example of Figure 6, the codeword length is

7  n=5); *id.* at col. 5:19-20 (two codewords that "occur in sequence").

8     LSI, however, inappropriately proposes to import a limitation into its claim construction

9  solely to manufacture a non-infringement defense.  LSI seeks a construction that requires the series

10  of codewords to be produced "***in a manner that is not state-dependent.***"   Such a proposed

11  limitation, which would in turn have to be further defined, is at odds with the intrinsic record.

12  Moreover, it is completely inconsistent with the position LSI maintained in the IPR and with the

13  Board's Final Written Decision.   Accordingly, the Court should adopt UMN's proposed

14  construction.

15     The limitation in LSI's proposed construction clearly is not part of the ordinary meaning of

16  the claim term "producing sequences of n-bit codewords."  Nothing in the words of the claim term

17  excludes state-dependent MTR codes, nor can LSI point to anything in the '601 Patent or its file

18  history that excludes so-called state-dependent MTR codes.  Thus, the Court cannot adopt LSI's

19  attempt to import a limitation unless LSI carries its burden to show that one of the exacting

20  exceptions justifying departure from a term's ordinary and customary meaning applies—"1) when

21  a patentee sets out a definition and acts as his own lexicographer or 2) when the patentee disavows

22  the full scope of a claim term either in the specification or during prosecution."  *Thorner*, 669 F.3d

23  at 1365; *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1060 (Fed. Cir. 2009) (overturning

24  construction that read in limitation where "there is no basis in the patent specification for adding"

25  the limitation).  LSI cannot carry its burden here.

26     ***First***, the '601 Patent does not expressly define "producing sequences of n-bit codewords"

27  in any manner that excludes so-called state-dependent MTR codes.  To the contrary, the '601

28

9

Patent explicitly recognizes that the invention can be implemented using a state-dependent encoder.  For example, at col. 4:61-62, the '601 Patent states that "state-dependent encoders . . . can be designed for the MTR constraint . . . ."  Ex. A, col. 4:61-62.  The '601 Patent further teaches that both block codes and "[s]tate-dependent encoders" can be used, with state-dependent encoders providing the advantage that more codewords can be used and high efficiencies can be achieved "because the state carries information about the previously used codeword(s)."  *Id.* at col. 5:50-55.  Still further, the '601 Patent describes a hybrid system with "state-depended [sic] encoders that use block decoders."  *Id.* at col. 5:58-60.  In such a hybrid system, "the mapping from dataword to codeword is dependent on the previously used codeword, but if the mapping from codeword to dataword is unique, a block decoder can be used."  *Id.* at col. 5:64-67.

Thus, far from defining the disputed claim term to exclude state-dependent codes, the '601 Patent in fact embraces the concept of state-dependent codes.  In light of this intrinsic record, it is improper to read into the claim a limitation that precludes an embodiment expressly disclosed in the patent.  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[A] court may not read a limitation into a claim from the specification."); *Thorner*, 669 F.3d at 1366-67 ("We do not read limitations from the specification into claims; we do not redefine words.  Only the patentee can do that."); *Linear*, 566 F.3d at 1060 (overturning construction that read in negative limitation where "there is no basis in the patent specification for adding" the negative limitation); *Kamstrup A/S v. Axioma Metering UAB*, 43 F.4th 1374, 1383-84 (Fed. Cir. 2022) (rejecting proposed construction that read in a negative limitation that was "at odds with the claim language" and the specification).

***Second***, UMN did not disavow the full scope of the claim term in the specification or in the file history.  As noted above, the specification embraces the concept of state-dependent encoding.  When amending claim 13 during prosecution, as shown below (following which the examiner allowed the claim), UMN left the claim term "producing sequences of n-bit codewords" untouched.

> 13. (Once amended) A method for encoding $m$-bit binary datawords into $n$-bit binary codewords in a recorded waveform, where $m$ and $n$ are preselected positive integers such that $n$ is greater than $m$, comprising the steps of:
>
> receiving binary datawords; and
>
> producing sequences of $n$-bit codewords;
>
> imposing a pair of constraints (j;k) on the encoded waveform;
>
> generating no more than $j$ consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$; and
>
> generating no more than $k$ consecutive sample periods of said sequences without a transition in the recorded waveform.

Ex. 1 at UMN_0000746.  The only amendment to claim 13 was the addition of the step "imposing a pair of constraints (j;k) on the encoded waveform."  Thus, UMN could not have imparted a special meaning to the step of "producing sequences of n-bit codewords" through any amendment.

UMN also did not create any such disclaimer through argument.  During prosecution of the '601 Patent, UMN never discussed, much less disclaimed, state-dependent codes in its remarks accompanying the claim amendments.  Ex. 1 at UMN_0000747-755.  Although UMN's accompanying remarks referred at times to "state transitions diagrams," *see id.* at UMN_0000752, UMN_0000756, nothing in the remarks rise to the level of the "clear disavowal" required.  *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal . . . in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."); *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) ("[T]o operate as a disclaimer, the statement in the prosecution history must be clear and unambiguous, and constitute a clear disavowal of scope." (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007))).

Even if there were support in the file history to find a disclaimer of so-called state-dependent codes—and there is not—the disclaimer would have to be premised upon a term in the

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                                    CASE NO. 5:18-CV-00821-EJD-NMC

claim that is "susceptible of clarification." *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("Without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow" the scope of the claim.). In other words, "there must be a textual reference in the actual language of the claim with which to associate a proffered claim construction." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). Here, there is no such term or textual reference in claim 13 (or the dependent Asserted Claims) to read in LSI's proposed limitation, let alone a basis for such a limitation in the specific claim term of "producing sequences of n-bit codewords." LSI's imported limitation is, instead, a blatant attempt to bolster a defense, which is improper. *See e.g., Roche Diagnostics Operations, Inc. v. Lifescan Inc.*, 452 F. App'x 989, 997 (Fed. Cir. 2012) (rejecting "invitation to inappropriately read a limitation from the specification into" claim term "detecting"); *Kamstrup*, 43 F.4th at 1383 (refusing to read negative limitation into claim term "cavity separated from the flow tube"); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1379-80 (Fed. Cir. 2014) (refusing to read limitation into claim term "bed condition message" that required certain status conditions in the message); *Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1377-78 (Fed. Cir. 2018) (refusing to read limitations into claim term "attachment surface" to require it to be connected to another component).

The Court also should reject LSI's proposed construction because it is inconsistent with the Board's interpretation of the '601 Patent and the positions LSI asserted in the IPR. In its Final Written Decision, the Board held that the Asserted Claims were not limited to specific MTR rates, such as the Tsang Patent's "state-dependent codes" (*i.e.*, 5/6 and 6/7 MTR rates). Ex. B. at 38-39. Specifically, the Board found that "the challenged claims cover any positive integer value of m and n that satisfy the recited MTR constraints," which included what LSI contended were so-called "state-dependent" codes in the Tsang Patent. *Id.*[8]

Consistent with the Board's interpretation of the '601 Patent, LSI and its expert specifically

---

[8] In affirming the Board's decision, the Federal Circuit expressly declined "to decide whether the claims of the '601 patent are sufficiently broad to cover Tsang's specific embodiments." *LSI v. UMN*, 43 F.4th at 1353 n.2.

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                          CASE NO. 5:18-CV-00821-EJD-NMC

asserted that the term "producing sequences of n-bit codewords" ***includes*** state-dependent codes. Ex. J, ¶ 68 (Soljanin testifying that corresponding structures in the '601 Patent for producing sequences of fixed length codewords includes "**state-dependent encoders**" (emphasis in original)).  Similarly, when claiming Okada anticipated, LSI did not argue that Okada produced the n-bit codewords "in a manner that is not state-dependent," even though the construction LSI proposes now would have required LSI to do so.  Ex. B at 23-24 (Board explaining why Okada discloses "producing sequences of n-bit codewords"); Ex. J, ¶¶ 83-84, 108 (Soljanin testimony on this limitation).   After prevailing on claim 13 in the IPR using, on invalidity, a broader construction for the disputed claim term that encompassed state-dependent codes, LSI, now looking ahead to infringement, asks the Court to adopt a different, substantially narrower claim construction for "producing sequences of n-bit codewords."

"It is axiomatic that claims are construed ***the same way*** for both invalidity and infringement."  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) (emphasis added); *see also TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017). LSI's new, narrowed construction violates this fundamental tenet of patent law.  *See Amgen*, 314 F.3d at 1330.  LSI prevailed on a broad, supposed "plain and ordinary" meaning construction to support its invalidity argument in the IPR, but now seeks to add a limitation to the scope of claim 13 so that the Asserted Claims do not read on to MTR methods that use state-dependent codes. LSI cannot have it both ways.  Thus, the Court should reject LSI's proposed construction and adopt UMN's instead.

**B.**     **"encoded waveform"**

| UMN's Construction: | the recorded waveform |
|---|---|
| LSI's Construction: | the produced sequences of n-bit codewords |

UMN proposes that the term "encoded waveform" should be construed as the "recorded waveform" term referenced earlier in claim 13.  The parties agree that "recorded waveform" should be accorded its plain and ordinary meaning.  Dkt. 238 at 2.  The Court should adopt UMN's

13

1   construction for several reasons.

2      ***First***, the preamble of claim 13 explains that the claimed method "***encod[es]***" datawords

3   into codewords "in a ***recorded*** waveform."  Ex. A, col. 10:45-50 (emphases added).  In the steps of

4   the method, in turn, the (j;k) constraints must be imposed on the "encoded waveform" which is

5   necessarily recorded (*i.e.*, "generating" the (j;k) constraint "in the recorded waveform").  Thus, the

6   preamble and steps of the method, taken together, specify that the "recorded waveform" consists of

7   encoded codewords, making the "recorded" waveform and "encoded" waveform the same in the

8   claimed method, as UMN's proposal reflects.  Ex. D, ¶ 45; *see also Phillips,* 415 F.3d at 1314

9   (stating that in determining the ordinary and customary meaning, the claim language "provide[s]

10  substantial guidance as to the meaning of particular claim terms").

11     ***Second***, claim 13 first refers to the "encoded waveform" as "***the*** encoded waveform."  Ex.

12  A, col. 10:52-53 (emphasis added).  Claim 13 does not include any other reference to an "encoded

13  waveform."  The ***only*** prior reference to any type of "waveform" is in the preamble, which refers

14  to "***a*** recorded waveform" in which the codewords are encoded.  *Id.* at col. 10:45-50 (emphasis

15  added).   The fact that the antecedent "the" is used before "encoded waveform" in claim 13

16  establishes that "the encoded waveform" must refer back to a previously referenced waveform.

17  Because the only previously recited waveform in claim 13 is the preamble's "recorded waveform"

18  in which the codewords are encoded, there is no doubt that the "encoded waveform" is the

19  preamble's "recorded waveform."  Ex. D at ¶¶ 44-46; *see also Summit 6, LLC v. Samsung Elecs.*

20  *Co.,* 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("[U]se of the term 'said' indicates that this portion of

21  the claim limitation is a reference back to the previously claimed" term.); *In re Packard*, 751 F.3d

22  1307, 1326 (Fed. Cir. 2014) ("'[T]he raised side end edge' does not lack antecedent basis because

23  a person of skill in the art would understand that it refers to the claimed 'raised side edge end.'").

24     ***Third***, the file history confirms claim 13 uses the terms "recorded waveform" and

25  "encoded waveform" interchangeably.  In the application as filed, none of the original claims

26  referred to an "encoded waveform," only to a "recorded waveform."  Ex. 1, UMN_0000713-719.

27  During the initial examination of the '601 Patent, the examiner issued a first (and only) Office

28

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC

Action, explaining why certain claims were rejected and why others would be allowable. *Id.* at UMN_0000740 at ¶ 2; UMN_000741 at ¶ 4. In that Office Action, the examiner introduced the term "encoded waveform" but not in distinction from the "recorded waveform" that already appeared in the original claims. Thus, the examiner effectively used "recorded waveform" and "encoded waveform" interchangeably by referring to an "encoded waveform" in the reasons for allowance without saying that this particular term, which had not yet appeared in the claim language, was needed to avoid the prior art.

The Court should reject LSI's assertion that "encoded waveform" should be construed to mean "the produced sequences of n-bit codewords." LSI's construction should not be adopted because it does not account for the fact that, as the '601 Patent specifically teaches and claims, the "said sequences"—*i.e.*, the encoded waveform—are in the "recorded waveform." Ex. F, ¶ 35 (McLaughlin explaining that codewords are written to the magnetic recording medium). LSI's construction that the "encoded waveform" is simply "the produced sequences of n-bit codewords" effectively reads waveform out of the term by suggesting that the codewords referenced in claim 13 are not recorded, even though the preamble expressly requires them to be.

LSI's proposed construction plainly is conjured in support of its attempt to invalidate the '601 Patent on § 101 grounds. *See* Dkts. 190, 198, 201, 210. Indeed, LSI so desperately wants to divorce the waveform (and more generally the invention) from descriptions of the '601 Patent because it argued in its § 101 Motion that "in Figure 1, waveforms are depicted on paper representing binary values – 0s and 1s," such that purportedly no physical recording medium is necessary to practice the Asserted Claims. Dkt. 210 at 9. As explained above, the specification of the '601 Patent directly contradicts LSI's proposed construction. Moreover, Prof. McLaughlin explained why a POSITA would understand that the waveform that is written to the recording medium is both encoded and recorded. Ex. D at ¶ 45 (preamble of claim 13 explains that the claimed method encodes datawords into codewords "in a recoded waveform"); *see also id.* at ¶¶ 46-49 (body of claim 13, file history, and general knowledge of a POSITA confirm the understanding that the encoded codewords are recorded to recording medium). LSI's construction,

which fails to specify that the encoded waveform is recorded, is inconsistent with how a POSITA would understand the term in light of the specification.

Therefore, the Court should adopt UMN's construction of "encoded waveform."

### C.   "transition"

| | |
|---|---|
| **UMN's Construction:** | A change in the recording medium from one state to another, which can be represented in different ways depending on the recording format. |
| **LSI's Construction:** | Plain and ordinary meaning; a transition can be logically represented in multiple ways depending on the encoding format used—a change from 0 to 1 or from 1 to 0 when using NRZ format, for example, or a 1 when using NRZI format. |

The Asserted Claims require that a limit be imposed on the number of consecutive "transitions" generated in the recorded waveform.  Ex. A, col. 10:55-56 (claim 13 reciting "generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$").  In the IPR, UMN asserted that, when read in the context of the specification and its focus on magnetic recording devices, "transition" should be construed as "a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium."  Ex. B at 10.  Alternatively, UMN proposed that "transition" should be construed as "a change from one state or stage to another."  *Id.*  LSI asserted that "transition" should be given its "plain and ordinary meaning."  *Id.* at 18.

Ultimately, the Board opined that "transition" "should receive its plain and ordinary meaning," without providing an explicit construction.  *Id.* at 20.  The Board observed, however, that the "plain and ordinary meaning" did "not exclude [LSI's] position that a transition can be logically represented in multiple ways depending on the encoding format used—a change from 0 to 1 or from 1 to 0 when using NRZ format, for example, or a 1 when using NRZI format."  *Id.* at 20-21.  While UMN maintains that its original proposed construction of "transition" that limits it to magnetic recording is appropriate and that the Court should adopt it here,[9] UMN has adjusted its

---

[9] UMN preserves its argument made on appeal to but not reached by the Federal Circuit in the IPR that the Board erred by rejecting UMN's proposed construction of "transition"—"a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium."  Ex. B at 10; Ex. F at ¶¶ 43-51.

16

1  proposed construction here to account for the Board's opinion.  Specifically, in light of the IPR,

2  UMN proposes that this Court construe transition as "a change in the recording medium from one

3  state to another, which can be represented in different ways depending on the recording format."

4  The Court should adopt UMN's construction because the intrinsic and extrinsic evidence support

5  that construction.

6       ***First***, the '601 Patent does not explicitly define "transition"—it describes what a

7  "transition" is in the context of a magnetic recording device.  Specifically, the '601 Patent explains

8  that, with NRZI recording, a "1" is written to the recording medium with a transition, (Ex. A, col.

9  1:30-31, col. 4:31-33), and, in NRZ recording, the binary sequences 01 and 10 are written with a

10  transition.  *Id.* at col. 7:55-57.  The '601 Patent then goes on to provide examples of MTR codes

11  for the NRZI and NRZ ***recording*** formats, which the '601 Patent explains are magnetic recording

12  formats.  *Id.* at col. 1:19-34; *id.* at col. 2:59-61 ("More specifically, the MTR code imposes a limit

13  on the maximum number of consecutive transitions that can occur in the written ***magnetization***

14  pattern in magnetic recording." (emphasis added)); *id.* at col. 2:40-44 ("The present invention

15  relates to a channel coding technique to improve data storage devices such as ***magnetic*** computer

16  disk drives and professional and consumer tape recorders." (emphasis added)); *id.* at col. 4:31-33

17  (1 is used in NRZI to present "a ***magnetic*** transition" (emphasis added)); Ex. D, ¶¶ 13-14

18  (McLaughlin explaining that hard disk drives, which are magnetic recording systems, use NRZ and

19  NRZI recording formats); Ex. F, ¶ 12 (similar).  There is no dispute that a POSITA would

20  understand that a transition in both formats (i.e., the NRZ and NRZI formats) involves a change in

21  the recording medium.  Ex. D, ¶¶ 9-12 (McLaughlin testimony about how data are written to

22  magnetic recording medium using a sequence of reversals and non-reversals of bit regions on the

23  magnetic recording medium); Ex. F, ¶¶ 7-10 (similar).

24       ***Second***, beyond the specific descriptions of a "transition" in the context of magnetic

25  recording, a POSITA would understand that a "transition" in the context of the Asserted Claims,

26  and in view of the specification, requires some recording medium where there is a change from

27  one state to another.  Ex. D, ¶¶ 12-13, 35-36; Ex. F, ¶¶ 43-53.  In the IPR, the Board noted that the

28

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                   CASE NO. 5:18-CV-00821-EJD-NMC

1   '601 Patent discusses "data storage devices" -- which necessarily requires a means to "store" the

2   data -- and concluded that the '601 Patent is not limited to "a particular **recording** technology."

3   Ex. B at 13-15 (emphasis added).  In the Summary of the Invention, the '601 Patent explains that

4   the invention "relates to a channel coding technique to improve **data storage devices** such as

5   magnetic computer disk drives and professional and consumer tape recorders" by eliminating data

6   patterns "that **are to be recorded in the storage medium**."  Ex. A, col. 2:40-47 (emphasis added)

7   In the Background of the Invention, the '601 Patent distinguishes between the "transmission" of

8   data and "record[ing] [the data] onto a medium in a storage device."  *Id.* at col. 1:15-20.

9   Consistent with that distinction, the Asserted Claims require a "recorded waveform" which, in

10  light of the foregoing teachings, requires the waveform to be recorded onto a medium in the

11  storage device.

12        ***Finally***, a POSITA would understand, as the Board recognized, that a transition can be

13  represented logically in different ways depending on the recording format, a concept UMN

14  incorporates in its proposed construction.  Ex. B at 21; *see also* Ex. D, ¶¶ 13-14 (McLaughlin

15  testifying how transitions are manifested with NRZ and NRZI recording); Ex. F, ¶ 12 (similar).

16  Although the Board's plain and ordinary meaning did not expressly state that the term "transition"

17  requires "an actual change in state of the recording medium," (Ex. B at 17-18), the Board's

18  reference to how a transition is "logically" represented in the NRZ and NRZI recording formats

19  can correspond only to physical state changes on the recording medium.  Ex. D, ¶¶ 12-14; Ex. F,

20  ¶¶ 9-12.

21        In contrast to UMN's proposed construction of "transition," both parts of LSI's proposed

22  construction of "transition" are fundamentally flawed.  The first part—"plain and ordinary

23  meaning"—is inadequate because it does not actually define "transition."  Indeed, the Board

24  recognized "that the term 'transition' is very general and may have different meanings depending

25  on context."  Ex. B at 16.  Thus, LSI's proposed construction does not resolve the parties' dispute

26  over the scope of the claim term and adopting that construction would constitute legal error

27  because it would leave "the question of claim scope unanswered . . . [and] for the jury to decide."

28

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                   CASE NO. 5:18-CV-00821-EJD-NMC

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318-19 (Fed. Cir. 2016)*; O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360-61 (Fed. Cir. 2008) (determination that a claim term should be accorded a "plain and ordinary" construction is inadequate, for example, "when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute"); *Synopsys, Inc. v. Siemens Indus. Software Inc.*, No. 20-cv-04151-WHO, 2021 WL 4427437, at *2 (N.D. Cal. Sept. 27, 2021) ("It is 'legal error' for a court to instruct a jury to give a claim term its 'plain and ordinary' meaning when there are unresolved disputes as to a claim's scope.").

The Court also should reject the second part of LSI's proposed construction—namely the purported different ways that a transition can be represented logically in so-called "encoding formats." LSI's proposed definition is not grounded in any part of the intrinsic evidence but is designed principally to support LSI's motion that the Asserted Claims are abstract under 35 U.S.C. § 101 by suggesting that transitions can occur in some non-physical manifestation of "encoding." *See* Dkts. 190, 198, 201, 210. In fact, the term "encoding format" embedded in LSI's proposed construction does not appear even a single time in the '601 Patent. To the contrary, the '601 Patent consistently and exclusively discusses "recording" formats, not "encoding" formats:

- Col. 1:24-25: "With the Non-Return-to-Zero (NRZ) *recording* format . . .";

- Col. 1:29-30: "With the Non-Return-to-Zero-Inversion (NRZI) *recording* format . . .";

- Col. 4:31-32: "Referring now to FIG. 2, the MTR j=2 code based on the NRZI *recording* convention . . .";

- Col. 7:52: "assuming the NRZ *recording* format . . ." and

- Claims 9, 10, 16 and 17: all reciting NRZ or NRZI "recording" formats.

Contrary to these "highly relevant" disclosures in the intrinsic evidence, LSI cannot point to any intrinsic evidence that describes NRZ and NRZI as so-called encoding formats divorced from a physical medium. *See Phillips*, 415 F.3d at 1315 (specification is "always highly relevant to the claim construction analysis" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996))); *id.* at 1314 ("Other claims of the patent in question, both asserted and

19

unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Moreover, adopting a construction that suggests that NRZ or NRZI are encoding formats would contradict, or at least generate confusion in connection with, asserted claim 17, which expressly refers to NRZ as a "***recording*** format," thereby making LSI's proposed construction improper. *See id.* at 1320-1321 (specification is "single best guide to the meaning of [the] disputed term") (quoting *Vitronics,* 90 F.3d at 1582; *Intellectual Ventures I LLC v. T-Mobile USA, Inc.,* 902 F.3d 1372, 1378 (Fed. Cir. 2018) (disfavoring a construction that is inconsistent with dependent claims).

LSI undoubtedly will argue that the Court should adopt its construction because it was used by the Board, but the key determination by the Board was that the term was not limited to ***magnetic*** recording media.  Ex. B at 11-16.  Conceding that UMN's proposed alternative construction was consistent with the plain meaning of the term, the Board noted that UMN's proposed "alternative construction of 'a change from one state or stage to another' does not illuminate further the plain and ordinary definition of the term 'transition.'"  *Id.* at 17.  In doing so, the Board considered only the non-technical dictionary definitions cited by UMN, finding those definitions, alone, did not support a requirement that there be "an actual change in state of the recording medium."  *Id.*  But that part of the Board's analysis did not account for the intrinsic evidence that UMN cited in the IPR (and again cites here) or substantively address the point of contention here—that a "transition" is a change of state in ***something***, with that something in the context of the '601 Patent being a recording medium.  Indeed, the Board itself recognized that a "transition" is a change in state of some kind when it pointed to the two recording formats, *id.*, and UMN's proposed construction properly adds the critical recording medium context dictated by the '601 Patent specification.  *Phillips*, 415 F.3d at 1313 (a POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification").

Moreover, while the Board's discussion of "transition" should be considered, the Board's conclusion is not binding on this Court.  *See, e.g.*, *In re Koninklijke Philips Patent Litig.*, No 18-cv-01885-HSG, 2020 WL 2733931, at *1-2 (N.D. Cal. May 26, 2020) (holding Board's claim

---

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                        CASE NO. 5:18-CV-00821-EJD-NMC

constructions were *not* binding on district court because Federal Circuit declined to address and rule on the Board's claim constructions in its decision affirming IPR Final Written Decision); *MyMail, Ltd. v. IAC Search & Media, Inc.*, No. 17-cv-04488-LHK, 2020 WL 1043659, at *6 (N.D. Cal. Mar. 4, 2020) (prior claim constructions  made by a different federal district court and the Board in an IPR Final Written Decision "are not binding").  Here, the Court should not adopt the Board's conclusion that "transition" "should receive its plain and ordinary meaning" because, just like LSI's proposal, a "plain and ordinary meaning" construction in the litigation does not resolve the parties' dispute over the scope of the claim term.

In the IPR, the Board did not actually define "transition."  Instead, the Board explained how a transition can be "logically represented" with the NRZ and NRZI formats (erroneously calling them "encoding formats" as explained above) and noted that "transition" did not exclude non-magnetic media, but left unanswered the question of what a transition actually is.  LSI likewise did not provide a specific definition for a "transition."  In fact, LSI's expert, Soljanin, applied various definitions of "transition"—demonstrating the need for "transition" to be construed here.  Ex. J, ¶¶ 63-75; Ex. B at 10 (Board stating, "Petitioner [LSI] does not propose explicit constructions for any terms of the challenged claims").  In her initial declaration, Soljanin asserted that a "1" in a NRZI sequence is a transition in a recorded waveform.  Ex. J, ¶ 101 (for dependent claim 9, which focuses on NRZI recording, testifying that Okada's j constraint on the number of transitions is satisfied by having "no more than 2 consecutive 1's . . ."); *id.* at ¶¶ 140, 141, 150, 153 (interpreting a "1" as a transition in a recorded waveform to opine the Tsang Patent anticipates).  She also relied on a "1" as constituting a transition for claims limited to NRZ recording, *id.* at ¶ 102 (for dependent claim 10), even though a 1 does not represent a transition with the NRZ recording format.  Ex. B at 21 (Board stating that with NRZ format, a transition is logically represented by a change from 0 to 1 or from 1 to 0).

On cross-examination, Soljanin provided a different definition of "transition":

> Q.  So my – now that we have established that you addressed two – at least two claims with the word "transition" in it, I want to ask you, what do you mean by "transition"?

---

21

A. (Soljanin)  **So by transition, it can be a transition from 0 to 1.  It can be from 1 to 0.  It can be both**.

\*   \*   \*

Q.   Okay.   And is that the definition that you applied [in your IPR declaration] when you decided that Claim 13 was anticipated by Tsang [Patent]?

A.       I applied the definition that – in general, I **apply definition that transitions are from 0 to 1, I believe, but it can be either one:  From 0 to 1, 1 to 0, or both**.  Yes, that's the definition.

Ex. K at 53:4-54:3 (emphasis added).   As Soljanin's shifts demonstrate, ruling that transition is entitled to a "plain and ordinary" definition would not resolve the parties' dispute and would only introduce ambiguity into the scope of the Asserted Claims.   *See O2 Micro*, 521 F.3d at 1360-61 ("plain and ordinary" meaning construction inadequate when it "does not resolve the parties' dispute" over claim scope).

While the Board found that Soljanin's testimony merely recognized that what constitutes a transition depends on the context, (Ex. B at 16), the ambiguity in her testimony, as well as the intrinsic evidence detailed above, demonstrates that "transition" in the context of the '601 Patent must be defined by how a transition is physically manifested.   UMN's proposed construction provides clarity on how a POSITA would understand a transition to be physically manifested in light of the '601 Patent's specification.   Providing an explicit construction for the term at the claim construction stage would resolve the parties' dispute about claim scope and provide clarity for the factfinders in this matter who will be tasked with applying the Court's claim constructions to factual issues of infringement and validity.

For these reasons, the Board should adopt UMN's proposed construction of "transition."

## V.       CONCLUSION

For the reasons set forth above, the Court should adopt UMN's proposed constructions for the disputed claim terms.

22

Dated:  May 17, 2023


By:     */s/ Christopher M. Verdini*
Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
Jas Dhillon (SBN 252842)
jas.dhillon@klgates.com
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580

*Counsel for Plaintiff*
*Regents of the University of Minnesota*

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                    CASE NO. 5:18-CV-00821-EJD-NMC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on May 17, 2023.

*/s/ Christopher M. Verdini*
Christopher M. Verdini

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF                                    CASE NO. 5:18-CV-00821-EJD-NMC