# EXHIBIT E

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1                    UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF CALIFORNIA

2                         SAN JOSE DIVISION

3

4    REGENTS OF THE UNIVERSITY   )

     OF MINNESOTA,               )

5                                )

                 Plaintiff,      )

6                                ) CIVIL ACTION FILE

             vs.                 )

7                                ) NO: 18-CV-00821-EJD-NMC

     LSI CORPORATION AND AVAGO   )

8    TECHNOLOGIES U.S., INC.,    )

                                 )

9                 Defendants.    )

10

11

12

13        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

14

15

16            VIDEOTAPED DEPOSITION OF

17         PROFESSOR STEVEN W. MCLAUGHLIN

18              ATLANTA, GEORGIA

19             MONDAY, MAY 7, 2018

20

21

22

23   REPORTED BY:  TANYA L. VERHOVEN-PAGE,

                   CCR-B-1790

24

25   JOB NO.  140342

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1              May 7, 2018
 2              8:00 a.m.
 3
 4         Videotaped deposition of
 5    PROFESSOR STEVEN W. MCLAUGHLIN, held at the
 6    offices of Kilpatrick Townsend & Stockton,
 7    LLP, 1100 Peachtree Street, Atlanta, Georgia
 8    before Tanya L. Verhoven-Page, Certified Court
 9    Reporter and Notary Public of the State of
10    Georgia.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              APPEARANCES OF COUNSEL
 2
      On behalf of the Plaintiffs:
 3
         K&L GATES
 4       210 Sixth Avenue
         Pittsburgh, Pennsylvania 15222
 5       BY:  CHRISTOPHER VERDINI, ESQ.
         BY:  MARK KNEDEISEN, ESQ.
 6
 7
 8
 9
10    On behalf of the Defendants:
11       KILPATRICK TOWNSEND & STOCKTON
         1400 Wewatta Street
12       Denver, Colorado 80202
         BY:  EDWARD MAYLE, ESQ.
13       BY:  DAVID SIPIORA, ESQ.
14
15
16
17
18    THE VIDEOGRAPHER:  Rick Richey
19
20              -  -  -
21
22
23
24
25
```

Page 4

```
 1              I N D E X
 2
 3    WITNESS: PROFESSOR STEVEN W. MCLAUGHLIN
 4
 5    Examination                     Page
 6    BY MR. MAYLE                       8
      BY MR. VERDINI                   389
 7
 8
 9              EXHIBITS:
10    McLaughlin
      Deposition
11    Exhibit     Description     Page
12    Exhibit 1001   U.S. Patent
                  Number 5,859,601     10
13
14    Exhibit 1002   Prosecution history   10
15    Exhibit 1003   Joint Claim Construction
                  and Prehearing Statement
                  UNDER PATENT L.R. 4-3   10
16
17    Exhibit 1004   Proposed constructions   10
18    Exhibit 1005   Declaration of Professor
                  Steven W. McLaughlin    10
19    Exhibit 1006   Declaration of Professor
                  Emina Soljanin     10
20
21    Exhibit 1007   White paper Blu-ray
                  disc format 1.B Physical
                  Format Specifications
22                for BD-R          21
23
24
25
```

Page 5

```
 1              EXHIBITS:
 2    McLaughlin
      Deposition
 3    Exhibit     Description     Page
 4
      Exhibit 1008   U.S. Patent
 5              Number 4,501,000     33
 6    Exhibit 1009   U.S. Patent
                  Number 5,537,382     42
 7
      Exhibit 1010   U.S. Patent
 8              Number 5,450,443     76
 9    Exhibit 1011   U.S. Patent
                  Number 5,608,397     82
10
11    Exhibit 1012   Document bearing Bates
                  numbers UMN_0001330
                  through UMN_0001347   169
12
      Exhibit 1013   Document bearing Bates
13              number UMN_0000916   172
14    Exhibit 1014   Document bearing Bates
                  number UMN_0001655   175
15
      Exhibit 1015   Document bearing Bates
16              number UMN_0001202   179
17    Exhibit 1016   Document bearing Bates
                  numbers UMN_0001204
18                through UMN_0001205   183
19    Exhibit 1017   Document bearing Bates
                  numbers UMN_0001072
20                through UMN_0001074   186
21    Exhibit 1018   Document bearing Bates
                  numbers UMN_0001055
22                through UMN_0001057   189
23    Exhibit 1019   Document bearing Bates
                  numbers UMN_0001058
24                through UMN_0001060   192
25
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

EXHIBITS:
McLaughlin
Deposition
Exhibit      Description       Page

Exhibit 1020    Block Diagram of
                Read Channel      283
Exhibit 1021    Plaintiff's Claim
                Construction Charts  319

Exhibit 1022    Document bearing Bates
                number UMN_0001355     324

---

Page 7

ATLANTA, GEORGIA; MONDAY, MAY 7, 2018
       8:00 A.M.

       P R O C E E D I N G S

       THE VIDEOGRAPHER:  Good morning,
ladies and gentlemen.  This is the
beginning of media number one in the
videotaped deposition of Steven W.
McLaughlin, Ph.D.
       Today's date is May 7th, 2018.
It's 8:00 a.m.  The case is Regents of
the University of Minnesota, Plaintiff,
versus LSI Corporation and Avago
Technologies U.S. Inc., Defendants, Civil
Action No. 18-CV-00821-EJD-NMC in the
United States District Court for the
Northern District of California, San Jose
Division.
       My name is Rick Richey, I'm the
videographer, the court reporter is Tanya
Page, and we represent TSG Reporting.
       Today's deposition is at the
Atlanta offices of Kilpatrick Townsend,
1100 Peachtree Street, Atlanta, Georgia.

---

Page 8

       Would the attorneys please
introduce themselves.
       MR. MAYLE:  Good morning.  This is
Ted Mayle from the Kilpatrick Townsend
firm.  We're in the Denver office.
Sitting here is my colleague, Mr. David
Sipiora, for the Defendants.
       MR. VERDINI:  Chris Verdini and
Mark Knedeisen of K&L Gates on behalf of
the Plaintiffs and witness.
       THE VIDEOGRAPHER:  Would the court
reporter please swear the witness.

       Thereupon --
       PROFESSOR STEVEN W. MCLAUGHLIN,
called as a witness, having been first duly sworn,
was examined and testified as follows:

       EXAMINATION
BY MR. MAYLE:
       Q    Good morning, Professor.  McLaughlin?
       A    Good morning.
       Q    Is it McLaughlin?
       A    McLaughlin.
       Q    Did I say it correctly?  Okay.

---

Page 9

       You've been deposed before, right?
       A    Yes, I have.
       Q    Several times?
       A    Yes.
       Q    And when was the most recently, about?
Last couple years?
       A    Two years ago, maybe.  Something like
that.
       Q    Okay.  So you understand that this is
being transcribed and you need to speak up and your
answers should be verbal because the court reporter
can't record head nods and things of that nature.
       A    Yes.  Yes.
       Q    We'll try to agree not to talk over each
other.
       A    Okay.  Sounds good.
       Q    You've taken the oath.  You understand
that that requires you to tell the truth and the
whole truth?
       A    Yes.
       Q    If you don't understand a question that I
ask, please ask -- please ask me to rephrase and I'll
try to do that, okay?
       A    Okay.
       Q    And if you need a break at any time, you

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 10

1  know, feel free to let us know.  If we're in the
2  middle of a questioning, I'll try to finish that off
3  if I can and then we'll work to take a break.  Is
4  that okay?
5      A   Okay.  Sounds good.
6      Q   Are you taking any sort of medications
7  that would impede your ability to recall or give full
8  and accurate testimony today?
9      A   No, I'm not.
10     Q   Is there any reason why you can't give
11 full and accurate testimony today?
12     A   No.
13     Q   I have a few exhibits here, as you might
14 suspect.
15     A   Okay.
16     Q   Some of them I've marked already.
17         MR. MAYLE:  And Counsel, we're
18 going to start with 1001 for us so you
19 guys can do Exhibit 1 when you do your
20 depos.
21         MR. VERDINI:  Sounds good.
22         (McLaughlin Exhibits Nos. 1001 to
23 1006 were marked for the record.)
24         MR. MAYLE:  And I'll pass a few of
25 these out.  One for you with a copy on

Page 11

1  it.  Exhibit 1001 has been premarked.
2  BY MR. MAYLE:
3      Q   Do you recognize that as the '601 patent,
4  Professor?
5      A   Yes, I do.
6      Q   All right.  I'm just going to give you
7  about six of them, just so we have them.
8          Exhibit No. 1002 that's been premarked.
9      A   Okay.
10     Q   Do you recognize this, Professor
11 McLaughlin?
12     A   Yeah, that's the prosecution history.
13     Q   Yeah, that's the file history for the
14 '601 patent.
15         Exhibit 1003, premarked again.  It's --
16 it says Document 204 on the top.  Have you seen this
17 document?  I'll just tell you that it's something
18 that the parties filed for the joint claim
19 construction statement.
20     A   I think I've seen --
21     Q   Roughly familiar with that?
22     A   -- a chart or something.  I think, yeah,
23 I'm familiar with it.
24     Q   Exhibit 1004, do you see on the top it
25 says Document 204-2 in Exhibit B?

Page 12

1      A   Yeah.  Yes, I've seen it.
2      Q   So this is the parties' proposed
3  constructions?
4      A   Yes, yes.
5      Q   And Exhibit 1005 you're probably familiar
6  with.  That's your declaration; isn't that right?
7      A   Yes.
8      Q   And one more.  Let's get Exhibit 1006.
9  And this says the Declaration of Professor Emina
10 Soljanin.  Do you see that?  Have you seen that
11 before?
12     A   Yes.
13     Q   So let's just have those so we have them.
14 Let's look at your Exhibit 1005, which is your
15 declaration.  And let's please start with paragraph
16 four.  You're talking about your background and
17 qualifications.  And you say in Paragraph four that:
18 My research interests include communications and
19 information theory.
20         Can you kind of tell us at a high level
21 what that means?
22     A   We study theoretical and practical
23 aspects of how communication systems work.
24 Communication systems include things like wireless
25 communications, wire line communications, data

Page 13

1  storage systems.
2      Q   In the field of data storage systems,
3  what are some examples of that, different types?
4      A   Magnetic recording systems, optical
5  storage systems.
6      Q   What are some examples of optical
7  systems?
8      A   CD, DVD, Blu-ray.
9      Q   And magnetic systems would be like hard
10 disc drives?
11     A   Exactly.
12     Q   And you say in this paragraph that many
13 of your papers and patents deal with coding
14 techniques and optical -- for optical and magnetic
15 data storage devices.
16     A   Yes.
17     Q   And you say that because there's some
18 overlap in the coding techniques that are used for
19 magnetic and optical systems, right?
20         MR. VERDINI:  Object to the form.
21         THE WITNESS:  Yeah, there are some
22 common aspects to both magnetic and
23 optical recording.
24 BY MR. MAYLE:
25     Q   What are some of those common aspects?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 14

1    A    Run link limited codes, partial response,
2 like techniques, error correction coding.
3    Q    Is there any others?
4    A    Probably.
5    Q    Nothing that comes to mind right now?
6    A    Nothing that -- no.
7    Q    You referenced a -- you said that you're
8 the principal scientist for Calmetrics.  Can you kind
9 of tell us at a high level what that work involves?
10   A    I was.
11   Q    In the past?
12   A    Yeah, exactly.  I no longer am --
13 Calmetrics was a company that commercialized a
14 technique for optical storage to change the format
15 for how information was stored in optical disc.  And
16 I did a whole bunch of research in that area and, for
17 a period of time, was the principal scientist trying
18 to help -- mostly on the technical side, but trying
19 to commercialize some technologies I developed and
20 some technologies they were developing.
21       So it was coding and signal processing,
22 related things for optical storage.
23   Q    And that coding, were those RLO codes?
24   A    Not for Calmet -- not explicitly for
25 Calmetrics.  But Calmetrics inherited some of my

Page 15

1 patents from previous work where I worked on RLO
2 codes for optical storage.
3    Q    Can you tell us at a high level how an
4 optical system -- let's pick Blu-ray or DVD -- how it
5 stores binary data?
6        MR. VERDINI:  Object to the form.
7        THE WITNESS:  It's -- it depends on
8 whether it's ROM or R or RW media.  Each
9 one of those stores data in different
10 ways.
11       So in ROM -- in ROM data, it stores
12 it through pits and lands, modulating the
13 length of the pits and lands.  In R
14 media, it ablates the media in a similar
15 way to kind of mimic pits and lands.  And
16 in RW media it uses face change materials
17 to change the -- to change the amorphous
18 and crystalline state of the media to,
19 again, kind of mimic the pits and lands
20 in ROM.
21       It's a long answer, but that's the
22 short version.
23   Q    No, no.  Thank you.
24       Is a pit -- a pit on a disc is like a
25 mark on the disc; is that right?

Page 16

1        MR. VERDINI:  Object to form.
2        THE WITNESS:  I'm okay with that
3 characterization.  I mean, a pit is a
4 depth.  So to the extent that a mark
5 represents kind of a change in depth.
6 BY MR. MAYLE:
7    Q    A depth.  Is land, then, the absence of a
8 pit?
9    A    Yeah.  Generally speaking, yeah.
10   Q    And how are those marks or pits put
11 there?  Is it put there by a laser?
12   A    No, it's put there by a stamper.
13   Q    A stamper?
14   A    In ROM.
15   Q    Let's stick with ROM.
16   A    Yeah, it's put there by a stamper.
17   Q    And then how -- how is the data then
18 retrieved?
19   A    A laser reads the pits and lands -- or a
20 laser focuses the light and it focuses the spot to --
21 focuses the spot, and as the light passes over the
22 pits and lands there's a difference in the intensity
23 in the reflected light, reflecting whether it's a pit
24 or a land.
25   Q    Is that different intensity then used to

Page 17

1 infer where the pits and lands are?
2    A    Correct.  There's an analog signal
3 produced by a detector.  An optical detector is
4 detecting the light that comes off the disc, and that
5 analog signal corresponds more or less to the pits
6 and lands.
7    Q    Thank you.
8    A    The intensity --
9    Q    Are you familiar with -- sorry.
10   A    Sorry.  I was going to say the intensity
11 of that.
12   Q    Sorry to interrupt you.
13   A    No, it's okay.
14       The intensity of that light is
15 representative of pits and lands.
16   Q    Are you familiar with something called
17 eight to fourteen modulation?
18   A    Yes.
19   Q    Is that also known as EFM?
20   A    Yes.
21   Q    Is that used in CDs?
22       MR. VERDINI:  Object to form.
23       THE WITNESS:  Yes, it's the -- it's
24 the standard in a code or encoding method
25 that's used in CD.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 18

BY MR. MAYLE:

Q    When you say standard, are you using -- in what sense are you using that word standard?

A    It conforms to a standard.  There's a standard that dictates the use of that code.

Q    What do you -- what do you mean by -- can you explain what your understanding of a standard is?

A    Standard is an agreed upon -- agreed upon method, for lack of a better term, on how the information should be encoded and stored on the optical disc.  And so all the discs that claim to be CD need to conform to that standard.

Q    So does that mean that all the discs that claim to be a CD use the EFM coding?

A    That -- they better or they may not be readable by a CD.  So I mean, I'm splitting hairs on you.

Q    Yes.

A    All the manufacturers better conform to that standard or their disc may not be readable.  So I think the answer is basically yes, they need to -- they need to be compliant.

Q    In that name, eight to fourteen, what's the eight and what's the fourteen mean, at a high level?

Page 19

A    Eight is eight information bits or a byte comes in and that gets encoded into 14 other bits that are then stored on the disc.

Q    Is the eight kind of like the data words and then 14 is the code words?

MR. VERDINI:  Object to the form.

THE WITNESS:  Yeah, in the language of the '601 patent we're using, yes.

BY MR. MAYLE:

Q    I'm not asking you if the '601 patent covers it, per se.

A    Yeah, I know.

Q    I just want to get the background.

A    Yeah.  But I think you're using those terms --

Q    Yes.

A    There's data word -- yeah.  So, yes.

Q    Does that mean that the rate of the CD is eight divided by 14?

MR. VERDINI:  Object to the form.

THE WITNESS:  The rate of the code.

BY MR. MAYLE:

Q    The rate.  Sorry.

A    The rate for the code is eight to 14, yes.  Eight over 14.

Page 20

Q    Is that --

A    Code rate.

Q    Is that considered a high rate, a low rate or is there a way to characterize that?

MR. VERDINI:  Object to form.

THE WITNESS:  Yeah, that's considered a low rate.

BY MR. MAYLE:

Q    Why would a standard use a low rate code?

MR. VERDINI:  Same objection.

THE WITNESS:  So the -- it's a long answer.

So in that case, the -- that code rate is used in conjunction with a modulation technique to encode information in pits and lands.  And so the overall data storage rate is not -- I would not consider low, but the rate the code is used -- the rate of the code is considered to be low.

So the -- so in that case, the rate of the code's eight over 14, but there are three data -- three code word bits in a minimum feature.  So to determine the density -- the density is considered to

Page 21

be relatively high.  How much information is stored in -- in a -- in the minimum size pit is considered to be relatively high, but the code rate for that is considered to be low.  So it's the combination of those two.

The point I'm trying to make is it's a clever way of combining the run link limited code with the minimum feature and minimum pit size to get relatively high density with a low code rate.

So I know that might only be coherent to -- to people that really work on CDs.

Q    Thank you.

MR. MAYLE:  Well, I'm going to introduce another exhibit here if I may.  It looks like there was only one copy in here.  There should have been two.

Could you mark this as Exhibit 1007.

(McLaughlin Exhibit No. 1007 was marked for the record.)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 22

1   BY MR. MAYLE:
2     Q   So I'm handing the Professor exhibit
3  marked as 1007. And Professor, have you seen
4  anything -- have you seen this document before?
5     A   I don't -- I don't think so. I don't
6  remember. If I did, it was probably 14 years ago.
7     Q   What is --
8     A   Maybe not 14 years ago, but ten years.
9     Q   When it says on the front cover 1.D
10  Physical Format Specifications for DB-R, would you
11  know what that means?
12        MR. VERDINI: I'm going to object.
13  Foundation. I'm just going to object as
14  he's never seen the document, but go
15  ahead.
16        THE WITNESS: I'm sorry. Ask your
17  question again.
18  BY MR. MAYLE:
19     Q   The front cover of this document refers
20  to -- it says -- 1.B Physical Format Specifications
21  for BD-R.
22        Are you familiar with this terminology
23  here?
24     A   I think I know what it's going -- what's
25  going to be in the document. It makes sense to me.

Page 23

1  Like I said, I haven't seen -- I don't believe I've
2  seen the document; if I have, it's been ten years,
3  so -- I think I know what's coming in the document.
4     Q   Are you familiar at all with any of the
5  specifications for Blu-ray disc?
6        MR. VERDINI: Object to the form.
7        THE WITNESS: Well, the best way to
8  answer that, I was very familiar. It's
9  probably ten years since I've spent a lot
10  of time with it.
11  BY MR. MAYLE:
12     Q   Let me ask a different question. You
13  said that CDs have spes -- have standards?
14     A   Yes.
15     Q   Do Blu-ray discs have standards?
16     A   Yes.
17     Q   Let's flip to page 22. And I'll direct
18  your attention to the middle of the page, under the
19  figure -- you see there's the heading that says Y17
20  PP. Do you see that?
21     A   Yes.
22     Q   And I'll direct your attention to the
23  first sentence there. It says: All RLL codes used
24  in optical recording are DC free, that is, they have
25  almost no content at low frequencies.

Page 24

1        Do you see that?
2     A   Yes.
3     Q   Is that a true statement?
4        MR. VERDINI: Object to the form.
5  Foundation.
6        THE WITNESS: I'm not sure. It may
7  be -- they may be referring just to --
8  they -- it may just be referring to
9  Blu-ray. I'm not sure. I'm trying to
10  think if for DVD and CD, whether that's a
11  true statement or not.
12  BY MR. MAYLE:
13     Q   All right. Let's ask for Blu-ray. Do
14  you know if Blu-ray is a DC-free code -- has a
15  DC-free code?
16        MR. VERDINI: Same objection.
17        THE WITNESS: Honestly, I don't
18  remember. I mean, I'm taking this at
19  face value, assume that it's a correct
20  statement, but -- yeah, it's been a long
21  time since I've played around with that.
22  BY MR. MAYLE:
23     Q   Have you heard of the 17PP code before?
24     A   Yes. I'm sure the answer is yes, but
25  it's not -- I'm not recalling it at the top of my

Page 25

1  head. It's been a while, at least ten years.
2     Q   Then I'll --
3     A   And I couldn't tell you what PP even
4  means from memory.
5     Q   Okay. Then you see there's an equation.
6  And below that equation, there's a sentence that
7  starts with The DC-free property is needed for a
8  number of reasons. Do you see that?
9     A   Yes.
10     Q   And it says, number one --
11     A   I'm sorry. Could you point?
12     Q   It's two sentence -- two lines below the
13  equation.
14     A   Okay.
15     Q   It starts, The DC-free property is needed
16  for a number of reasons.
17     A   Yes.
18     Q   It says: Number one, for separation of
19  the data signal from disc noise such as fingerprints
20  or dust.
21        Do you see that?
22     A   Yes, I see it.
23     Q   Do you know what that means?
24        MR. VERDINI: Objection. Form,
25  foundation.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1      THE WITNESS:  Separation of the
2  data signal from disc noise such as
3  fingerprints or dust.  I know what that
4  means.  I'm not -- I'm not connecting
5  that I with a need for DC free.
6  BY MR. MAYLE:
7      Q   So let's say someone touches a CD and
8  puts a smudge on that.
9      A   Yeah.
10     Q   Could that introduce a low frequency
11 component that shouldn't be there?
12     MR. VERDINI:  Object to the form.
13 BY MR. MAYLE:
14     Q   To the data?
15     A   What -- when someone puts a fingerprint,
16 I usually think of that as producing kind of a signal
17 that might result in errors as opposed to low
18 frequency content.  It's been a while since I --
19     Q   Well, let's assume that the 17PP code is
20 DC free.
21     A   Okay.
22     Q   If there was a smudge put on it that
23 introduced a low frequency content, that would
24 potentially introduce an error in the readback,
25 correct?

Page 27

1      MR. VERDINI:  Object to the form.
2      THE WITNESS:  Yes, I'm with you so
3  far.  I'm okay with that.
4  BY MR. MAYLE:
5      Q   And the system would know that that would
6  be an error because it was expecting something that
7  was DC free, correct?
8      MR. VERDINI:  Same objection.
9      THE WITNESS:  There's a difference
10 between DC free, which is zero DC
11 content, and low frequency content -- low
12 frequency content.  So your -- so ask the
13 question again.
14 BY MR. MAYLE:
15     Q   So let's say the system uses a running
16 digital sum.
17     A   Yes.
18     Q   And is expecting only a limited number of
19 different values for this RDS.
20     A   Yes.
21     Q   And it's expecting a power spectral
22 density function vanishing at DC.
23     A   Yes.
24     Q   And there's a smudge on the disc.  Would
25 that smudge introduce something into the system that

Page 28

1  would depart from the system's expectation of a
2  spectral density function vanishing at DC?
3      MR. VERDINI:  Object to the form.
4      THE WITNESS:  I -- I'm okay with
5  that.  That all makes sense, but honestly
6  that's -- like you said, the DC-free
7  property I don't normally attribute to
8  that, but it's here.  It's written by
9  someone.  I'm willing to accept the
10 statement.
11 BY MR. MAYLE:
12     Q   Okay.
13     A   Yeah.
14     Q   One quick, we'll skip number two.  Number
15 three, it says:  The DC properties needed for the
16 servo systems.
17     Do you understand what they're saying
18 there?
19     MR. VERDINI:  Object to the form.
20     THE WITNESS:  I think so.  I think
21 so.
22 BY MR. MAYLE:
23     Q   Does that have something to do with not
24 jumping the track?
25     MR. VERDINI:  Same objection.

Page 29

1      THE WITNESS:  Yeah.  Servo systems
2  are used to keep track of where you are
3  on the track, to try to help you keep
4  centered on the track.
5  BY MR. MAYLE:
6      Q   And would a DC-free code help the system
7  keep track of itself in the playback?
8      A   Again, the -- it's funny.  You skipped
9  past number two.  Number two, in my own head, is the
10 reason for DC-free because you need to have kind of a
11 balanced signal.  In order to set the slicer level,
12 you don't want the DC level of the signal to vary too
13 much.  You'd like to set, you know, a slicer level.
14     So that's -- when I think of DC free,
15 that's the primary reason I think of it.  So the
16 servo --
17     Q   Just to be --
18     A   There's other reasons -- there's other
19 ways to control servo that are much more effective
20 and important than the DC-free code.
21     Q   Okay.  Let's go to the slicer real quick
22 and we'll move on.  I skipped it because I didn't
23 know what it meant.  So there was no agenda there, so
24 I'm glad that you clarified.
25     But what you said about using the DC-free

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

1  for the control of the slicer level, is that specific
2  to an optical system?
3      A   I mean, it is the reason -- it's the
4  reason, you're saying?  Is the reason specific to an
5  optical system?
6      Q   Let me rephrase.
7          What you said before about how you
8  understand this point two, the control of the slicer
9  level and why you would want DC -- DC-free code, is
10 that concern something that's particular to an
11 optical system, as opposed to, say, a magnetic
12 system?
13         MR. VERDINI:  Object to the form.
14         THE WITNESS:  Ask again.  I'm
15 sorry.  I was distracted by the --
16 BY MR. MAYLE:
17     Q   So you explained earlier -- you testified
18 that you felt that point two in this document, it
19 says for control of the slicer level, was a reason to
20 have a DC-free code; fair so far?
21     A   Yes.
22     Q   Is that reason for having a DC-free code
23 to control the slicer level a particular concern for
24 optical systems?
25         MR. VERDINI:  Object to the form.

Page 31

1          THE WITNESS:  Yes.
2  BY MR. MAYLE:
3      Q   And do magnetic systems have that same
4  concern?
5      A   Magnetic systems are guaranteed to have a
6  DC-free content just by -- well, let me be careful.
7  Magnetic recordings also have a -- have a reason --
8  have a similar reason for making sure that the DC
9  content doesn't drift, that you want to balance the
10 DC content and the signal for very similar reasons.
11     Q   Do all magnetic systems have a running
12 digital sum that take on a limited number of
13 different values?
14         MR. VERDINI:  Object to form.
15 Foundation.
16         THE WITNESS:  I don't believe so.
17 I don't believe that this constraint
18 is in -- is in -- I don't -- I'm most --
19 I don't believe this constraint is
20 enforced explicitly -- that I'm aware
21 of -- in magnetic recording systems.
22 BY MR. MAYLE:
23     Q   So if we impose an RDS -- what should
24 we -- what should I call it, a DC-free constraint?
25         Using the word constraint, are you

Page 32

1  talking about a DC-free constraint?
2      A   This RDS equation, I think, is enforced
3  as a -- the DC-free code -- the purpose of the
4  DC-free code is to enforce a running digital sum
5  constraint.
6      Q   Okay.  If --
7      A   If you bound the -- if the running
8  digital sum is bounded between a couple values, then
9  it's guaranteed to have some DC free.
10     Q   If one imposes an RDS -- a bounded RDS
11 constraint on a code, would that come at the expense
12 of the rate, lowering the rate that the code could
13 otherwise achieve?
14         MR. VERDINI:  Object to the form.
15         THE WITNESS:  Yes, if you put a
16 DC-free constraint on, it constrains the
17 sequences and that means the rate would
18 be lower than if it was not constrained.
19         MR. MAYLE:  I'd like -- let's see.
20 I have another exhibit.  You can set that
21 aside, if you want.  Sorry about that.
22 We were supposed to have two copies, but
23 for some reason we have one.
24         Ma'am, could you mark this as
25 Exhibit No. 1009 -- sorry -- 1008.

Page 33

1          (McLaughlin Exhibit No. 1008 was
2  marked for the record.)
3  BY MR. MAYLE:
4      Q   So I'm handing you, Professor, a patent
5  that was marked Exhibit 1008.  I'll direct your
6  attention, it says patent 4,501,000.  It was issued
7  in 1985.
8          And do you see the first name there, the
9  inventor is Kornelis A. Immink?
10     A   Uh-huh, yes.
11     Q   Are you familiar with Dr. Immink?
12     A   Yes.
13     Q   And how are familiar with Dr. Immink?
14     A   He is a colleague that I've known for
15 probably 25 years.  So I've had many conversations
16 with him.
17     Q   Is he pretty well known in the field?
18     A   Yes.
19     Q   Let's look at the abstract.
20     A   I think he's -- he claims, I don't know
21 whether it's true or not.  He claims to be the
22 inventor of the EFM code.
23     Q   Oh, that he invented the EFM code?
24     A   That might be a bit boastful, but I think
25 he gets credit for it.  It shows up all over the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 34

1 place that he's the inventor of it.
2     Q     And let's look at the abstract.  The
3 second sentence, starting four lines down, it says:
4 Data words of m-bits are translated into information
5 blocks of n sub 1 bits.
6         Do you see that sentence?
7     A     Yes.
8     Q     Is that m and n -- well, it says n sub
9 one.  But is m and n kind of a conventional way to
10 describe, in your field, encoding from m-bits to
11 n-bits?  Do people always pick m and n for a reason?
12         MR. VERDINI:  I'm going to object
13 to the form.  Foundation.
14 BY MR. MAYLE:
15     Q     Do you understand the question?
16     A     I do understand the question, yes.
17 Sometimes people use other -- other letters, but it
18 is common to use m and n in that form that you've
19 described.
20     Q     And it's also common to specify that the
21 n number would be bigger than the m number, correct?
22         MR. VERDINI:  Object to form.
23         THE WITNESS:  Yes, that's correct.
24 BY MR. MAYLE:
25     Q     And then it goes on.  It says:  That

Page 35

1 satisfy a (d,k)-constraint.
2         Do you see that?
3     A     Yes.
4     Q     And it says that:  A d -- At least d "0"
5 bits but no more than k "0" bits occur between
6 successive "1" bits?
7     A     Yes.
8     Q     Do you understand what that mean?
9     A     Yes.
10     Q     What does that mean?
11     A     It means what it says.  So ones can't
12 occur next to each other.  You have to have at least
13 d between ones and, at most, k between ones.
14     Q     When you're specifying that as in zero bits,
15 does that imply that he's talking about an NRZI
16 format?
17         MR. VERDINI:  Object to the form.
18 Foundation.
19         THE WITNESS:  Could you ask the
20 question again.
21 BY MR. MAYLE:
22     Q     Could that specif- -- instead of
23 saying -- let me ask it this way.
24         If someone says that there has to be at
25 least d zero bits between successive ones, is that

Page 36

1 the same as saying there has to be d nontransitions
2 between successive transitions?
3         MR. VERDINI:  Object to the form.
4         THE WITNESS:  No, that's not what
5 that says.  It says there has to be d
6 zeros between -- between successive ones.
7 It doesn't say anything about
8 transitions.
9 BY MR. MAYLE:
10     Q     Okay.  If we move down more than half the
11 way, there's a reference to NRZ-M.  It says:  Then
12 the encoded signal is modulated as an NRZ-M signal in
13 which a "1" becomes a transition and a "0" becomes an
14 absence of a transition.
15         Do you see that?
16     A     Okay.
17     Q     Is NRZ-M another name for what we call
18 NRZI?
19         MR. VERDINI:  Object to the form.
20 Foundation.
21         THE WITNESS:  Actually, that's
22 probably the first time I've ever seen
23 the NRZ-M as a descriptor.  So I'm
24 wondering why he's using -- why he's
25 using that.

Page 37

1 BY MR. MAYLE:
2     Q     Well, it's -- let's ask it this way.
3         If a one is a transition and a zero
4 becomes an absence of a transition, is that what you
5 understand to be NRZI, in general?
6         MR. VERDINI:  Object to form.
7         THE WITNESS:  I'm not -- I'm
8 just -- I'm not -- I'm fiddling with the
9 word becomes.  But NRZI -- it is true
10 NRZI indicates it's time to make a
11 transition in the medium -- in the state
12 of the medium.  That's the point --
13 BY MR. MAYLE:
14     Q     And a one -- sorry.
15     A     And a one indicates transition the state
16 of the medium, and a zero means don't transition the
17 state of the medium.
18     Q     And if you see the last sentence in this
19 abstract, it says:  The foregoing technique can be
20 used to advantage in recording digitized music on an
21 optical disc.
22         Do you see that?
23     A     Yes.
24     Q     And so that would -- does that indicate
25 that, at least as the date of this patent, that NRZI

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 38

1  codes were used in optical discs?
2      MR. VERDINI:  Object to the form.
3  Foundation.
4      THE WITNESS:  Yeah, I'm okay with
5  that.
6  BY MR. MAYLE:
7      Q    Okay.  Let's flip to column one of this
8  patent, and specifically to line 49.  It says that:
9  It may further be required that the transitions not
10  follow too closely after each other in order to limit
11  intersymbol interference.
12      Do you see that?
13      A    Yes.
14      Q    Is it the case that intersymbol
15  interference was a potential problem that was known
16  for optical systems in the '80s?
17      MR. VERDINI:  Object to form.
18  Foundation.
19      THE WITNESS:  I'm sorry.  Say it
20  again.  I'm -- I'm just reading.
21  BY MR. MAYLE:
22      Q    Isn't it true that people knew about --
23  with, in particular, in optical systems -- that
24  intersymbol interference could be a potential problem
25  in an optical system, at least back in the '80s?

Page 39

1      MR. VERDINI:  Same objections.
2      THE WITNESS:  Yes, the codes that
3  were used to -- the codes that were used
4  were designed to avoid intersymbol
5  interference.  So I would -- I would
6  say -- back in the '85, I would say not
7  to limit intersymbol interference.  I
8  would say that's really to avoid
9  intersymbol interference.
10      But that's common -- that's the
11  common understanding of why these codes
12  were used is to eliminate -- or avoid
13  intersymbol interference, not really
14  eliminate it.
15  BY MR. MAYLE:
16      Q    And then the next sentence says --
17      A    But I think -- what I want to do is I'm
18  looking at the word transitions here, and they
19  clearly are -- they're talking here about transitions
20  in the state of the medium, whether it's a pit or a
21  no-pit.
22      Q    And that's because they're talking about
23  optical data, right?
24      A    Yes.
25      Q    And the next sentence says:  In the case

Page 40

1  of magnetic or optical recording, the latter
2  requirement may also be related to the information
3  density on the recording medium.
4      Do you see that?
5      A    The latter requirement.  I'm not sure
6  what they're referring to, latter requirement.
7      Q    Let's assume the latter requirement is
8  the limiting of intersymbol interference.  Then it
9  would read:  In the case of magnetic or optical
10  recording, the need to limit intersymbol interference
11  may also be related to the information density on the
12  recorded medium.
13      Would that be a fair read?
14      MR. VERDINI:  Object to the form.
15      THE WITNESS:  Yeah, this is the
16  first time -- probably the very first
17  time I've seen this patent or read this
18  patent, so I'm just trying to absorb a
19  little bit more of the context.
20  BY MR. MAYLE:
21      Q    Let me ask you in general.  Is it the
22  case that intersymbol interference could become a
23  greater problem as the density of the data on the
24  recording medium gets higher?
25      A    Yes.

Page 41

1      Q    Isn't that what this sentence is saying?
2      MR. VERDINI:  Object to the form.
3  Foundation.
4      THE WITNESS:  You know, the way you
5  asked the question makes complete sense
6  to me.  The -- you're reading in other
7  stuff that's not -- that's not written
8  there.  So that's why I'm just trying to
9  absorb.  You know, the latter
10  requirement, there's -- no one is listing
11  any kind of requirement here.
12      Oh, I'm sorry.  It may be required
13  that the transitions not follow closely
14  after each other.  In the case of
15  magnetic -- the latter requirement may
16  also be related to the -- okay.
17      Yeah, I guess I'm okay with that.
18  Yeah.  I apologize for taking --
19      MR. MAYLE:  No worries.  We can set
20  that aside now.  And let's mark real
21  quick one more exhibit.
22      We're going to take a break off the
23  record for a minute.
24      THE VIDEOGRAPHER:  8:38.  We're off
25  the record.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 42

1      (Brief pause.)
2          THE VIDEOGRAPHER:  8:43.  We're
3   back on the record.
4   BY MR. MAYLE:
5      Q    Professor McLaughlin, before we took a
6   break, we were talking about one of the Immink
7   patents?
8      A    Uh-huh.
9          MR. MAYLE:  I'd like to mark one
10  more exhibit here, if I may.  I think
11  we're up to number nine, right?  Is that
12  right?
13         MR. VERDINI:  I have 1000 on my
14  notes.  Yeah, I don't think so.
15         MR. MAYLE:  Okay.  Well, this is
16  nine now.  And it says on it that it's
17  patent 5,537,382.
18         (McLaughlin Exhibit No. 1009 was
19  marked for the record.)
20  BY MR. MAYLE:
21     Q    I'm handing it to the professor, and you
22  see on the top, Professor, it says McLaughlin.  Would
23  that be you?
24     A    That's me.
25     Q    And it says it was signed to Optex

Page 43

1   Corporation and AT&T Corp.
2          Do you see that?
3      A    Uh-huh.
4      Q    And do you know what Optex Corporation
5   is?
6      A    Yes.
7      Q    What is that, basically?
8      A    That was a start-up company that tried to
9   commercialize a new optical recording format.
10     Q    Were you affiliated with that company?
11     A    Yes.
12     Q    What was your role?
13     A    My affiliation -- I was not affiliated.
14  I was never an employee or anything like that.  I had
15  a research project that was sponsored by them.  When
16  I was at RIT in Rochester they funded some research
17  work for my group and I performed that work.  So I
18  was never an employee or anything like that.
19     Q    Was that research work in the field of
20  optical recording codes?
21     A    Yes.
22     Q    All right.  We can put that aside.  We
23  might talk about that later.  Let's go back to your
24  declaration, which I think is Exhibit 1005.  Let's
25  talk about that for a while.

Page 44

1          And if you could please turn to page 16,
2   and we'll start with paragraph 33.  And you say --
3   you opine that a person having ordinary skill in the
4   art, a PHOSITA, in the field to which the '601 patent
5   pertains, would be someone working in the electrical
6   engineering field and specializing in data coding and
7   detection techniques used in connection with reading
8   data from various storage media such as hard disc
9   drives and optical media, correct?
10     A    Yes.
11     Q    And you testified earlier that the codes
12  used for hard disc drives and optical media have
13  certain things in common, correct?
14         MR. VERDINI:  Object to form.
15         THE WITNESS:  Yes.
16  BY MR. MAYLE:
17     Q    And isn't it true that the potential
18  problem of intersymbol interference is a problem for
19  hard disc drives and magnetic and for optical media?
20         MR. VERDINI:  Object to the form.
21         THE WITNESS:  Yes, but they're
22  not -- they're not the same.  So they're
23  not -- they're not the same, but both of
24  them -- intersymbol interference plays a
25  factor in both magnetic recording and

Page 45

1   optical recording.
2   BY MR. MAYLE:
3      Q    And isn't it the case that, in magnetic
4   recording and in optical recording, as the data
5   density that gets recorded gets higher, the potential
6   problem of symbol interference also gets higher?
7      A    Yes.
8      Q    And you've listed in Appendix A in your
9   CV -- Appendix A in your declaration was your CV.
10     A    Okay.
11     Q    To the best of your knowledge, is that
12  current, fully accurate?  I mean, without going
13  through it, as far as you know?
14     A    I'm sure it was accurate at the time.
15     Q    Okay.  Now, do you -- do you know when
16  you started work on this declaration in terms of, you
17  know, what calendar date?
18     A    It certainly was not a year ago.  It was
19  a couple months ago.  I'm sorry.  My memory is pretty
20  bad.
21     Q    You signed it on April 13th, 2018, I
22  believe.  Right.  On the last page, page 41, you
23  signed it on --
24     A    March 13th.
25     Q    Sorry.  March 13th?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 46

1    A    Yes.
2    Q    Do you know about how long before that
3  date you started work on this declaration?
4    A    Roughly a month.
5    Q    A month?
6    A    Roughly.
7    Q    And do you know how many hours you put
8  into this?
9    A    No.  Well, I mean roughly -- probably not
10  100, but certainly more than 30 or 40.
11    Q    Did you bill your time for those hours?
12    A    Yes.
13    Q    And you were compensated for all of that
14  time?
15    A    Yes.
16    Q    Can you tell us, in general, what was the
17  process of you making your declaration?
18        MR. VERDINI:  Object to the form.
19    I'm going to caution him on privilege,
20    but I'm not -- because I don't know what
21    you mean by the process.
22  BY MR. MAYLE:
23    Q    Do you understand the question?
24    A    I can say, generally speaking, I was
25  asked to provide opinions on certain -- certain claim

Page 47

1  terms.  Also asked to -- I think this is -- I was
2  asked to write a tutorial on hard disc drive basics
3  and to provide certain opinions on what some of the
4  claim terms meant.
5    Q    How did you go about giving your opinions
6  on what the claim terms mean?
7        MR. VERDINI:  Same objection.
8        THE WITNESS:  I read the patent
9    within the contents of the patent and
10    context of what the -- my understanding
11    of the general area, but in view of the
12    patent specification and the claims, I
13    was asked to provide meanings,
14    interpretations of some of the claim
15    elements.  That's what I did.
16  BY MR. MAYLE:
17    Q    Were you aware of -- were you provided a
18  list of proposed constructions before you started on
19  your declaration?
20        MR. VERDINI:  Object to the form.
21    And calls for privileged information, so
22    don't answer the question.
23        THE WITNESS:  Sorry.  On the advice
24    of counsel, I'm not going to answer the
25    question.

Page 48

1  BY MR. MAYLE:
2    Q    Well, you're aware that the University
3  has submitted to the court proposed constructions of
4  claims, right?
5    A    Yes.
6    Q    And you realize the Defendants did the
7  same thing, right?
8    A    Yes.
9    Q    And both sides know each other's
10  positions, correct?
11    A    Yes.
12    Q    I'm simply asking whether you knew either
13  side's proposed constructions before you started work
14  on your declaration.  Just a factual question.
15        MR. VERDINI:  It isn't -- I mean,
16    you can -- you can answer whether you
17    knew the Defendant's constructions.
18    Plaintiff's proposed constructions, I
19    think, calls for communications with
20    counsel.
21  BY MR. MAYLE:
22    Q    Let me ask you this:  Did you consider
23  the Plaintiff's proposed constructions when you made
24  your opinions.
25        MR. VERDINI:  Object to the form.

Page 49

1        THE WITNESS:  Yeah, I'm not sure
2    the question is factual in the way you've
3    posed it.  Maybe ask the question again
4    so I can understand the question.
5  BY MR. MAYLE:
6    Q    Did you consider the Defendant's proposed
7  construction when you made your declaration?
8    A    No.
9    Q    So you know what that -- you know what I
10  mean when I ask -- so what --
11        Did you consider the Plaintiff's proposed
12  constructions when you made your declaration?
13        MR. VERDINI:  I'm going to object
14    to the form because it assumes that there
15    were proposed constructions before he
16    started.  You've asked that two or three
17    times.
18  BY MR. MAYLE:
19    Q    Let's go, then, to Materials Reviewed.
20  It's page three of your declaration.
21    A    Page --
22    Q    Page three, paragraph seven.
23    A    Yes.
24    Q    So it said that you've reviewed the
25  patent and the file history, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 50

1  A   Yes.
2  Q   Did you read the file history?
3  A   A long time ago, yeah.  I say -- I
4 scanned through it, scanned through the file history.
5  Q   Did you read all the references that were
6 in the file history, prior art references?
7  A   Did I read -- please ask the question
8 again.
9  Q   Did you read all of the prior art
10 references that are referenced in the file history
11 for the '601 patent?
12  A   I don't remember if I read all of them.
13  Q   Did you read any of the references that
14 are in the file history?
15  A   I'm sure I did.
16  Q   Do you know which ones?
17  A   No, I'm sorry.  No.
18  Q   It says that you've considered the IPR
19 request filed against the '601 patent and the
20 exhibits thereto; is that correct?
21  A   Yes.  It's been a while since I've seen
22 the IPR request.
23  Q   And you reviewed the Defendant's
24 invalidity contentions, correct?
25  A   Again, that's been a while, but yes.

Page 51

1  Q   And you reviewed the University's
2 original and supplemental claim construction charts
3 and the documents cited therein, right?
4  A   Yes, that's what that says.
5  Q   And you've also reviewed, it says, other
6 documents and sources cited in your declaration; is
7 that correct?
8  A   That's what that says, yes.
9  Q   Is this the entire universe of the
10 materials that you considered in coming to your
11 opinions?
12  MR. VERDINI:  Object to the form.
13  THE WITNESS:  Was your question
14  about documents?  I mean, obviously, I
15  drew on my own personal experience and
16  understanding of magnetic recording.  So
17  I'd say these are not -- these are not
18  the only sources of information that I
19  draw on to form my opinions.  There's
20  just a larger universe of things that
21  I've read over time that would -- that
22  would come into play in forming opinions.
23 BY MR. MAYLE:
24  Q   Were those things that you knew outside
25 of the context of this case, just from background?

Page 52

1  A   Yeah, I think that's accurate.
2  Q   Did you review anything else that's
3 specific to this case besides what's listed here?
4  MR. VERDINI:  Object to the form.
5  THE WITNESS:  That's specific to
6  this case?  Not that I remember.
7 BY MR. MAYLE:
8  Q   Did you select the list of materials to
9 review on this list?
10  A   I was -- for example, the -- certainly
11 the first one, that would have been natural for me to
12 want.  The -- I believe I was handed -- or I was
13 given the IPR request.  I don't remember whether I
14 requested that or not, but probably not.
15  Defendant's invalidity contentions.  I
16 don't remember the timing.  I may have seen that
17 before I started writing this report.  So it was a
18 natural thing to have had in my head.  Probably the
19 same for the next one.  I just don't know the timing
20 of which documents I saw when.
21  Q   Okay.  So the first named inventor on the
22 patent is Jae Moon.  That's -- do you know Professor
23 Moon?
24  A   Yes.
25  Q   And how -- how do you know Professor

Page 53

1 Moon?
2  A   Colleague.  Colleague I probably have
3 known for 20, 25 years.  So, you know, a small
4 community.  As a Ph.D. student, probably saw him give
5 a talk or read his papers or something like that.
6  Q   Have you ever talked to him about the
7 '601 patent?
8  A   Have I talked to him about the '601
9 patent?  Yes.
10  Q   When was that?
11  A   The last time I talked to him was
12 probably a month or so ago, two or three -- a month
13 or so ago.
14  Q   When you talked to Dr. Moon about the
15 patent, was the -- let's try to go to the first time
16 you talked to him about the patent.  Was that before
17 you submitted this declaration or after?
18  A   Before.  Please ask the question again.
19 I'm sorry.
20  Q   Yeah.  The first time you talked to
21 Dr. Moon about the '601 patent, was that before this
22 declaration was submitted or after?
23  A   It would have been before March 13th.
24 Right before March 13th, yeah.
25  Q   And did you ask to talk to Dr. Moon about

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 54

1  the patent?
2      A    No, I don't believe so.
3      Q    Then how was it the case that you were
4  talking to Dr. Moon about the '601 patent?  Why did
5  that happen?
6      A    Oh, we were on a conference call.
7      Q    Who was on the call?
8      A    Attorneys and Dr. Moon and myself.
9      Q    And the subject of the call was the '601
10  patent?
11         MR. VERDINI:  I'm going to caution
12     the witness.  You can answer that
13     question, but obviously the details of
14     what was discussed are privileged.
15         THE WITNESS:  Yeah, it was related
16     to the '601 patent.
17  BY MR. MAYLE:
18      Q    Did you ask Professor Moon anything about
19  how he might interpret any of the disputed claim
20  terms in the '601 patent?
21         MR. VERDINI:  Objection.
22     Privileged.  Don't answer.
23         MR. MAYLE:  Well, Professor Moon
24     doesn't work for the University anymore,
25     does he?

Page 55

1         MR. VERDINI:  You know he has a
2     common interest agreement.  We produced
3     it.
4         MR. MAYLE:  That's -- his common
5     interest -- his business interest --
6         MR. VERDINI:  You can challenge
7     that at a different time.  I'm
8     instructing the witness not to answer.
9  BY MR. MAYLE:
10      Q    Professor McLaughlin, in your
11  declaration, you don't at all discuss your
12  conversations with Dr. Moon about the '601 patent;
13  isn't that right?
14      A    Yes, I don't believe that's in -- that's
15  mentioned in there, in the declaration.
16      Q    How many times did you talk to Dr. Moon
17  about the '601 patent?  Was it just that one time or
18  were there others?
19      A    There were other times.
20      Q    Do you know how many times?
21      A    Three times, four times.
22      Q    Three or four times?
23      A    Yes.
24      Q    And do you know, if you added all those
25  times together, how much time have you talked to

Page 56

1  Dr. Moon about the '601 patent in terms of hours,
2  minutes?
3      A    Maybe a half hour each time.
4      Q    Half hour each time.  So maybe --
5      A    Hour, hour and a half.
6      Q    Hour, hour and a half total.
7         Have you reviewed any documents from
8  Dr. Moon where he -- where Dr. Moon may have taken
9  positions on what the patent terms mean?
10      A    No.
11      Q    Did you ask for any documents like that?
12      A    From -- from Dr. Moon?
13      Q    From anybody.
14      A    No.
15      Q    Are you aware of any documents like that?
16      A    Please ask the question again.
17      Q    Sitting here today, are you aware of any
18  documents showing Dr. Moon's understanding of what
19  the claim terms mean?
20         MR. VERDINI:  Object to the form.
21         THE WITNESS:  No.
22  BY MR. MAYLE:
23      Q    No.  Dr. Moon didn't mention anything
24  about that?
25         MR. VERDINI:  Object to the form.

Page 57

1     Don't answer the question.
2  BY MR. MAYLE:
3      Q    I'll strike that.
4         Do you know -- the second inventor is
5  Dr. Barrett Britner, right?
6      A    Yes.
7      Q    And do you know Dr. Brickner?
8         THE WITNESS:  Not really.  I
9     probably met him once or twice or been to
10     a talk of his, but I don't know.
11  BY MR. MAYLE:
12      Q    And have you spoken with Dr. Brickner
13  about the '601 patent?
14      A    No.
15      Q    Did you ask to talk to Dr. Brickner about
16  the patent?
17      A    No.
18      Q    Have you spoken with anyone at the
19  universe -- who is at the University, who is not a
20  lawyer, about the '601 patent?
21      A    No.
22      Q    Before this case, have you ever
23  personally spoken with Dr. Moon?
24      A    Yes.
25         MR. VERDINI:  Go ahead.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 58

1    THE WITNESS:  Yes.
2  BY MR. MAYLE:
3    Q    Were those work related topics,
4  generally?
5        MR. VERDINI:  Object to the form.
6        THE WITNESS:  Define work.
7    Sometimes it's magnetic recording,
8    sometimes it's about academic matters.
9        We have a relationship with the
10   University, and he and I are peers at
11   this institution.
12  BY MR. MAYLE:
13   Q    Okay.  In your declaration, I didn't see
14  a section -- kind of like a legal section -- that
15  lays out, counsel has informed me that this is how
16  the claims are construed, or something like that.
17       Did you make any assumptions in rendering
18  your opinions on claim construction about how claims
19  are supposed to be construed?
20       MR. VERDINI:  Object to the form.
21       THE WITNESS:  I'm not a lawyer, and
22   asked what some claim terms mean or
23   provide opinion on what some of the claim
24   terms mean and that's what I did.
25

Page 59

1  BY MR. MAYLE:
2    Q    And can you explain for us, what is your
3  understanding of how claims are supposed to be
4  construed?
5    A    Again, I'm not a lawyer, but in the
6  context of the patent, in the context of the
7  specification, to try to elucidate or try to make
8  clear -- clearer -- for someone skilled in the art
9  what those terms might mean.
10   Q    And similarly, I haven't seen in here a
11  legal section in your declaration, a section that
12  says, Here is the legal standard for when the claim
13  is indefinite.
14       And so what's your understanding of how
15  to determine whether or not a claim is indefinite?
16   A    I don't -- I don't know the legal
17  definition of that.
18   Q    Did you make any assumptions -- in
19  rendering your opinion that certain claim terms are
20  not indefinite, did you make any assumptions as to
21  how that methodology should be done?
22   A    The patent claims are completely clear to
23  me, so the issue of indef -- whether indefinite or
24  not didn't -- never came to my mind.
25   Q    Okay.  Do you know Professor Emina

Page 60

1  Soljanin?
2    A    Sure do.  Soljanin.
3    Q    I'm sure I've said it wrong every single
4  time.
5        MR. VERDINI:  Soljanin.  I learned
6    that yesterday.
7        THE WITNESS:  No J.  It's a Y.
8        MR. MAYLE:  She's too nice.  She
9    never corrects me.  Everyone gets my name
10   wrong too, but I'm not important.
11  BY MR. MAYLE:
12   Q    Have you spoken with Professor Soljanin
13  about the '601 patent or the case?
14   A    No.
15   Q    And how long have you known her, about?
16   A    Probably about 20, 25 years.
17   Q    Can you tell us what you did, if
18  anything, to prepare for this deposition?
19   A    We met yesterday with -- I met with these
20  guys yesterday for -- I don't know -- four or five
21  hours and then I just, over the last week, probably
22  looked at my report briefly, reed the patent briefly.
23   Q    Did you look at any other documents
24  besides your report and things cited in your report?
25   A    No.

Page 61

1    Q    Have you seen -- when you prepared for
2  this deposition, have you seen any documents that you
3  hadn't seen before?
4    A    No.
5    Q    Okay.  And are you being compensated for
6  your time in prep and for this depo?
7    A    Yes.
8    Q    And that's at your hourly rate?
9    A    Correct.
10   Q    Let's, please, go to -- let's stay with
11  your declaration.  Let's go the opinions now, page
12  16.
13       And the first -- the first one, I'll
14  direct your attention there -- at Roman numeral IV,
15  it says construction of claim terms, and it says
16  transitions.  And then you have a chart that says:
17  UMN's proposed construction for transitions is a
18  reversal in the magnetic orientation of adjacent bit
19  regions along a recording track of a magnetic
20  recording medium.
21       Right?
22   A    Uh-huh.
23   Q    And in paragraph 35, on the next page,
24  you give your opinion, and it looks to me like
25  you've -- you've said that UMN's proposed

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 62

1  construction on page 16 is the correct one.  Is that
2  right, that's your opinion?
3      A   Yes.
4      Q   If we keep this out, but real quick go to
5  Exhibit 1004.  Keep these out.
6      A   1004 is what?
7      Q   Yeah.  It's the chart that has the
8  proposed constructions.  Yeah, the next one, and you
9  see the top page has Transitions.
10          And I want you to look at the Proposed
11  Construction, the left-hand column says:
12  Plaintiff's.  You can see that they have there:  A
13  reversal in the magnetic orientation of adjacent bit
14  regions.
15          Right?
16      A   Uh-huh.
17      Q   And if you look back to page 16 in the
18  report, it doesn't look like they have the same -- a
19  different construction --
20      A   Uh-huh.
21      Q   -- where they've now omitted the phrase,
22  along a recording track of a magnetic recording
23  medium.
24          MR. VERDINI:  Object to form.
25          THE WITNESS:  Uh-huh.

Page 63

1  BY MR. MAYLE:
2      Q   I think we're talking over each other.
3          So it looks likes the University's
4  proposed construction in Exhibit 1004 is different
5  than the one from Exhibit 1005 on page 16, right?
6          MR. VERDINI:  Objection.
7          THE WITNESS:  Yes.
8          MR. VERDINI:  Object to the form.
9  BY MR. MAYLE:
10      Q   And the difference is, is that the
11  University has, in Exhibit 1004, omitted the
12  reference to, quote, along a recording track of a
13  magnetic recording medium, unquote, correct?
14      A   Yes, it's been shortened.
15      Q   And in Paragraph 35 -- we can put aside
16  Exhibit 1004 now.  We'll just stick with your
17  declaration.  Let's stick with your declaration,
18  1005, still on page 17.
19          So in paragraph 35, you're saying that,
20  essentially, you agree with the University.  And then
21  in the last sentence of paragraph 35 you say there
22  are several reasons for this.
23          Do you see that?
24      A   Uh-huh.
25      Q   And then in -- I need yes or nos.

Page 64

1      A   Yes.
2      Q   Sorry about that.
3          There are several reasons, and I count
4  four.  So let's see, paragraph 36 begins with First.
5  That's -- that's going to be one of those reasons,
6  right?
7      A   Okay, yes.
8      Q   And paragraph 37 says Second, that would
9  be the second reason, I guess, correct?
10      A   Okay.
11      Q   And then paragraph 38 says Third, so that
12  would be your third reason, correct?
13      A   Uh-huh.
14      Q   And then paragraph 39 says Finally, so
15  that would be the fourth reason, correct?
16      A   Yes.
17      Q   So I'd like to kind of go through those
18  one at a time.
19          Let's start with 36.  You say that the
20  ordinary meaning of a term, quote, transition,
21  unquote, to a PHOSITA in the field of magnetic data
22  storage is a reversal in the magnetic orientation of
23  adjacent bit regions along a recording track of a
24  magnetic recording medium.
25          Right?

Page 65

1      A   Uh-huh, yes.
2      Q   You've limited this sentence to, in the
3  field of -- a PHOSITA in the field of magnetic data
4  storage, correct?
5      A   Yes.
6      Q   But as we discussed in paragraph 33 on
7  the opposite page, you've said that the field of the
8  patent relates to someone that's specializing in data
9  coding used in connection with reading data from
10  various media such as hard disc drives and optical
11  media, correct?
12          MR. VERDINI:  Object to the form.
13          THE WITNESS:  I'm sorry.  I was
14  reading through that paragraph.
15  BY MR. MAYLE:
16      Q   Paragraph 33 --
17      A   Yes.
18      Q   -- says that the field of the patent -- a
19  PHOSITA in the field of the patent would be working
20  in various recording media, correct?
21      A   Yes.
22      Q   And those various recording media include
23  hard disc drives and optical media, correct?
24      A   Uh-huh, yes.  That's what that sentence
25  says, yeah.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 66

1    Q    And so that's the field of the patent,
2  correct?
3         MR. VERDINI:  Object to the form.
4         THE WITNESS:  I would say the field
5    of the patent is magnetic recording,
6    clearly it's magnetic recording.
7  BY MR. MAYLE:
8    Q    But you -- but you opined here at
9  paragraph 33 that the PHOSITA in the field to which
10  the patent pertains would be working also on optical
11  media, correct?
12    A    I'm not sure I said working.  Someone
13  working in the electrical engineering field and
14  specializing in data coding with connection.  So
15  they're working in the electrical engineering field.
16  I'm not saying they're working in optical recording.
17  I'm saying they have familiarity with magnetic
18  recording and optical -- hard drives in optical
19  media.
20         An electrical engineer working in this is
21  either -- typically either working on a magnetic
22  recording system or an optical recording system, but
23  they would probably have some familiarity with -- if
24  they were working on this in magnetic recording,
25  they'd have some knowledge of optical recording like

Page 67

1  the error control coding or the run link codes or
2  something like that.  That's what that means.
3    Q    So going over to paragraph 36, you're
4  now -- now that you're giving your opinions on what
5  transition means, you're saying in paragraph 36 that
6  the ordinary meaning of the term transition, to a
7  PHOSITA in the field of magnetic data storage, is a
8  reversal in magnetic orientation of adjacent bits,
9  right?
10    A    Correct.
11    Q    So are you assuming in paragraph 36 when
12  you make the statement that the field of the patent
13  is limited to magnetic data storage?
14    A    I'm not sure I'm assuming it is.  It is.
15         It says a PHOSITA in the field.  It's
16  looking for someone skilled in the art in the field
17  of magnetic data storage.  Meaning of the term
18  "transition" to a PHOSITA in the field of magnetic
19  storage is a reversal in magnetic orientation.
20         I think that's -- that's what that says.
21    Q    If that's a true statement, if that's all
22  we had, does that mean that the claim term transition
23  in the patent is also limited to magnetic
24  transitions?
25    A    Yes.

Page 68

1    Q    Isn't that a bit of a circular reasoning?
2         MR. VERDINI:  Object to the form.
3         THE WITNESS:  What's the circular
4    reasoning?
5  BY MR. MAYLE:
6    Q    So the goal of claim construction is --
7  of the word transition -- we're trying to figure out
8  what transition means, right?
9    A    Yes.
10    Q    And you're saying, if I limit myself to
11  the knowledge of a PHOSITA in the field of magnetic
12  data storage systems, transition means one thing,
13  correct?
14         MR. VERDINI:  Object to the form.
15         THE WITNESS:  I'm not sure
16    that's -- I'm sorry.  I'm confused by
17    your question.
18         Saying that if you have someone
19    skilled in the art in magnetic storage,
20    that the transition means -- transition
21    means what it is I said.
22  BY MR. MAYLE:
23    Q    What you're saying in paragraph 36 is --
24  let me -- are you basically saying, in the field of
25  magnetic data storage systems -- so if I'm already in

Page 69

1  that field, now I'm going to tell you what a
2  transition is.  Is that what you're doing?
3         MR. VERDINI:  Object to the form.
4         THE WITNESS:  Ask again, please.
5  BY MR. MAYLE:
6    Q    Are you saying basically, in paragraph
7  36, that if you start out in the field of magnetic
8  data storage systems, you're then going to tell us
9  what a transition would mean in that field, correct?
10         MR. VERDINI:  Object to the form.
11         THE WITNESS:  Yeah, in the context
12    of magnetic data storage, a transition is
13    what we -- what I said.  It's a reversal
14    in magnetic orientation.
15  BY MR. MAYLE:
16    Q    And you say that your opinion is
17  supported by several books and academic papers on
18  data storage, right?
19    A    Uh-huh.
20    Q    And there was one that you said is cited
21  in the patent itself that uses this term transition,
22  right?
23    A    Uh-huh, yes.
24    Q    And I think you're talking about --
25         MR. SIPIORA:  You need to get yes

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 70

1   or nos.
2       THE WITNESS: I'm sorry. Yes.
3   BY MR. MAYLE:
4       Q   Yes?
5       A   Yes.
6       Q   And in paragraph, you have -- A, you have
7   P. Siegel, an article from P. Siegel, right?
8       A   Yes.
9       Q   And do you know who P. Siegel is?
10      A   Yes.
11      Q   Tell us who he is.
12      A   Is that Paul Siegel.
13      Q   He's at UCSD now?
14      A   Yes.
15      Q   And he has an article that was cited
16  right in the patent, right, at column one, 34 and 36?
17      A   Yes.
18      Q   He has some articles in the patent,
19  doesn't he? If you look at the patent Exhibit 1 --
20  1001 -- keep your declaration out -- handy. We'll
21  flip back and forth.
22      A   Okay.
23      Q   Just go to the first column on the
24  patent. It's after all the figures. You have to
25  flip back to column one.

Page 71

1       At the bottom of column one, around line
2   60, 61, it says: In optical data storage, a special
3   type of RLL constraint is applied.
4       It goes on, and then it cites R. Karabed
5   and P.H. Siegel.
6       Do you see that article there?
7       A   Yes.
8       Q   Is that P.H. Siegel the same Siegel we're
9   talking about?
10      A   Yes. Yes.
11      Q   And do you know who R. Karabed is?
12      A   Yes.
13      Q   And is he a professor somewhere?
14      A   No.
15      Q   And that article there is entitled Even
16  Mark Modulation for Optical Recording, right?
17      A   Yes.
18      Q   And you didn't cite that article in your
19  opinion, right?
20      A   I don't believe so.
21      Q   And the reason you didn't cite it is
22  because it's an article that is not from the field of
23  magnetic recording, right?
24      MR. VERDINI: Object to the form.
25      THE WITNESS: I'm not sure that's

Page 72

1   the reason why I didn't cite it.
2   BY MR. MAYLE:
3       Q   Well --
4       A   They're just mentioning -- they're just
5   mentioning RLL constraints apply in optical data
6   storage and here's an example of one.
7       Q   Right, but you cite Professor Siegel's
8   article up at line 35 area. And the reason you cited
9   that one, the earlier article from Professor Siegel,
10  is that it was limited to magnetic storage, right?
11  That's the reason you cited it?
12      MR. VERDINI: Object to the form.
13      THE WITNESS: I don't remember the
14      reason, this was a while ago since I
15      wrote that. But the reason we cited it
16      was because it mentions the word
17      transitions.
18  BY MR. MAYLE:
19      Q   Ah.
20      A   And so this -- the job of this was to try
21  to highlight places where the word transition is
22  mentioned, and I don't remember if this other paper
23  talks about transitions or not.
24      Q   Okay. If it -- there are such a thing as
25  transitions in optical recording; isn't there?

Page 73

1       MR. VERDINI: Object to form.
2       THE WITNESS: It would be a
3       different kind of a transitioning. If --
4       you'd have to put something in front of
5       me around optical recording, but there
6       are -- there are changes of state in --
7       in the medium in optical -- optical
8       recording.
9   BY MR. MAYLE:
10      Q   So you can't tell me whether -- you can't
11  tell me whether there's transitions in optical
12  recording without me showing you a document; is that
13  what you're saying?
14      MR. VERDINI: Object to form.
15      THE WITNESS: This -- certainly,
16      the state of the media and optical
17      recording changes state. So if that's
18      what we're calling a transition, I'm okay
19      with that.
20  BY MR. MAYLE:
21      Q   I'm aware that that's from the Webster's
22  Dictionary, change of state. But isn't it true that
23  people -- PHOSITAs in the art, including yourself --
24  understand what a transition is in an optical medium
25  outside the context of this case?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 74

1    MR. VERDINI:  Objection.
2    THE WITNESS:  A change of state is
3  a really common -- it's a common usage of
4  that, but it's also a specific term in
5  the art.  I'll say it's a specific term
6  in the art.  The change of state, the
7  kind of pit or no pit, would be a
8  transition.  Yeah, I'm okay with that.
9  BY MR. MAYLE:
10   Q    You keep talking about change of state.
11 That's something from the Webster's Dictionary,
12 right?
13   MR. VERDINI:  Object to form.
14   THE WITNESS:  No, that's how --
15 that's how I think of -- that's how I
16 think of the system, whether it's ROM, R,
17 RW, magnetic, optical.  That's the --
18 that's the -- that's what a transition
19 is.
20 BY MR. MAYLE:
21   Q    We'll get more back to that.  Let's look
22 at paragraph -- or column two of the patent, lines 34
23 to 37.
24   A    Okay.
25   Q    Maybe you'll see there's another article

Page 75

1  from R. Karabed and P. H. Siegel.
2    Do you see that?
3    A    Uh-huh.  Yes.  Sorry.
4    Q    It was given at the proceedings of the
5  International Society for Optical Engineering,
6  correct?
7    A    Uh-huh.
8    MR. VERDINI:  Yes.
9    THE WITNESS:  Yes.
10 BY MR. MAYLE:
11   Q    Have you ever heard of the International
12 Society for Optical Engineering?
13   A    I'm not sure that's the society --
14 there's other optical societies I'm more familiar
15 with.  The Optical Society of America, SPIE, I'm not
16 sure -- and which, that's fine.
17   Q    You haven't cited that article in your
18 declaration; isn't that right?
19   A    I don't believe so.
20   Q    If you flip to the front cover of the
21 patent and -- the very front cover, just all the way
22 to the front.
23    You see on the top right there are some
24 patents that are cited there?
25   A    Yes.

Page 76

1    Q    And you see there's one to patent
2  5,450,443 to Siegel?
3    A    Yes.
4    Q    And do you think that's the same
5  Dr. Siegel that we've been talking about that's cited
6  in the patent otherwise?
7    A    I think it's the same.  Yes.
8    MR. MAYLE:  Can we mark it Exhibit
9  -- we're up to number 1010.
10   (McLaughlin Exhibit No. 1010 was
11 marked for the record.)
12 BY MR. MAYLE:
13   Q    First off, Professor, this -- well, take
14 a look at it and see if you can determine for sure
15 whether this is the same Dr. Siegel.
16   A    Yes.  This is the same Siegel, yes.
17   Q    You haven't cited this patent in your
18 declaration, right?
19   A    I don't believe so.
20   Q    And it looks -- you see on the cover of
21 the Siegel patent, under Other Publications, he's
22 cited some other articles from your other colleague,
23 Dr. Immink, right?
24   A    Uh-huh, yes.
25   Q    If we look -- if we go into the Siegel

Page 77

1  patent to column one and we look at -- around lines
2  45 to 51 or around 40 to 51.  Just read that real
3  quickly to yourself.
4    A    I'm sorry?
5    Q    If you could read this -- you know,
6  quickly scan this paragraph that ends on line 51.
7    MR. VERDINI:  To the extent you
8  need to read others, you can do that, as
9  well.
10   MR. MAYLE:  We're not going to
11 spend much time on this patent.
12   MR. VERDINI:  Well, I think he --
13 you asked him whether he's seen it
14 before, but --
15   THE WITNESS:  Okay.  I read that
16 paragraph.
17 BY MR. MAYLE:
18   Q    So around line 48, do you see where he
19 has a reference to digital magnetic or optical
20 recording?
21   A    Uh-huh.
22   Q    Do you see that reference?
23   A    Yes, I do.
24   Q    So in the patent in -- so back to the
25 patent and back to your declaration, you cited one of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 78

1  professor Siegel's articles that talks about magnetic
2  recording, right?
3      A   Yes.
4      Q   And he has two other articles in the
5  patent in the first two columns and a patent cited on
6  the face of the patent.  And those other references
7  that you didn't cite are broader than magnetic
8  recording, correct?
9          MR. VERDINI:  Object to form,
10  foundation.
11         THE WITNESS:  For example, this --
12  this paragraph mentions both magnetic and
13  optical recording, but I'm not sure any
14  of those other references refer to
15  transition.  And I think that's the
16  section we're on, so when we're looking
17  for a description of transition, I'm not
18  sure why I would cite these.
19  BY MR. MAYLE:
20      Q   Well, we'll do two things real quick.
21  We're going to take a break in a minute.  And let's
22  go back to your declaration, Exhibit 1005.  We talked
23  about paragraph 37 -- 36A.
24      A   I'm sorry.  Where are we?  Oh.
25      Q   Yeah, we talked about 36A, the Siegel

Page 79

1  article, in your declaration, Exhibit 1005, on page
2  17.
3      A   Yes.
4      Q   And then you go on and you have B, and
5  you cite an Ashar article, right?  At the bottom of
6  page 17 to 18?
7      A   Yes.
8      Q   And Ashar is not cited in the patent,
9  right?
10     A   They're -- all the citations are listed
11  up front; is that right?
12     Q   Yeah, well --
13     A   I'm just checking.  I'm just confirming,
14  but it doesn't look like it is.
15     Q   If you see on the bottom of page 17, you
16  see it says Ashar was published in 1997, right?
17     A   Okay, uh-huh.
18     Q   That was after this patent was filed,
19  right?
20         MR. VERDINI:  Object to the form.
21         THE WITNESS:  Yeah.
22  BY MR. MAYLE:
23     Q   So what's the filing date of the '601
24  patent?  It was in 1996, right?
25     A   October 15th, 1996.

Page 80

1      Q   So they couldn't have cited Ashar because
2  Ashar hadn't existed yet, right?
3      A   Yeah, that was after -- after '96.  I
4  don't know when, if there were previous versions of
5  Ashar or not.
6      Q   You didn't cite any in your declaration,
7  right?
8      A   I did not.
9      Q   Did you understand that the claims are
10  construed as of the time of the invention?  Have you
11  heard that?
12     A   I believe so, yeah.
13     Q   And what does it mean, as of the time of
14  the invention?  That means as of the filing date,
15  right?
16         MR. VERDINI:  Object to the form.
17         THE WITNESS:  I think that's
18  correct, yeah.
19  BY MR. MAYLE:
20     Q   Right.
21     A   So it would mean information before that
22  date, prior art or background.
23     Q   Right.  And Ashar is not part of the
24  prior art, is it?
25     A   But it's just an example of a really,

Page 81

1  really common use of the word transition.  So that's
2  why it was cited.  But that's very, very well known
3  and really common.
4      Q   Professor, that's not my question and you
5  have to answer the question.
6          Ashar is not part of the prior art to the
7  '601 patent, right?
8      A   It has a publication date after.  I'm not
9  sure what we're claiming it as prior art, but just
10  giving an example of something that's really commonly
11  known.
12     Q   Paragraph C -- and after this it will be
13  time for a break.
14         Paragraph C, 36C of your declaration,
15  page 18, you cite the Bertram article, right?
16     A   Yes.
17     Q   That's also not cited in the patent?
18     A   Correct, it's not.
19     Q   So just to sum up where we are before we
20  take a break, we said before you that you have --
21  when -- you gave your opinion for transitions and you
22  had four reasons.  And paragraph 36 was the first
23  reason.  All this is the first reason, right?
24     A   Okay.
25     Q   And you've cited a Siegel article, an

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 82

1    Ashar article and a Bertram article, correct?
2        A    Uh-huh, yes.
3        Q    And you -- and that's the entirety of the
4    bases for your first reason of why transitions are
5    construed in the way that you construe them, correct?
6        MR. VERDINI:  Object to the form.
7        THE WITNESS:  Those are the three
8    articles that are cited.
9        MR. MAYLE:  Okay.  I think this is
10   a convenient time for a break.
11       THE VIDEOGRAPHER:  9:29.  We're off
12   the record.  This is the end of media
13   number one.
14       (Brief pause.)
15       (McLaughlin Exhibit No. 1011 was
16   marked for the record.)
17       THE VIDEOGRAPHER:  9:42.  We're
18   back on the record.  This is the
19   beginning of media number two.
20       MR. MAYLE:  I'm handing to
21   Professor McLaughlin an Exhibit marked
22   No. 1011.  It says it's No. -- it's
23   patent 5,608,397.
24   BY MR. MAYLE:
25       Q    Professor McLaughlin, do you know if

Page 83

1    you've considered this patent in rendering your
2    declaration?  Does it look familiar to you?
3        A    It's been a while.  This is the Soljanin
4    patent listed here.
5        Q    Right.  So that's -- that -- this patent,
6    Exhibit 1011, is the Soljanin patent that's listed on
7    the face of the '601 patent, right?
8        A    Uh-huh, yeah.
9        Q    And I would direct your attention to
10   column ten of the Soljanin patent.  And I would
11   direct your attention to line -- it looks like it's
12   either 57 or 58, where it starts with For example.
13       A    Uh-huh.
14       Q    It says:  For example, the above
15   teachings are not limited to magnetic recordings,
16   slash, writing channels.
17           Do you see that?
18       A    Yes.
19       Q    And you haven't cited this patent in your
20   declaration, right?
21       A    That's right.  I have not.
22       Q    Let's go back -- we're done with
23   Soljanin.
24           Go back to Exhibit 1009, which we've
25   previously introduced.

Page 84

1        MR. VERDINI:  It's Professor
2    McLaughlin's patent.
3        MR. MAYLE:  Yes, the '382.
4    BY MR. MAYLE:
5        Q    That's your patent, right?
6        A    Yes.
7        Q    And it was filed in 1994, right?
8        A    Yes.
9        Q    Let's go to column eight, lines -- I'll
10   let you get to column eight.  And if you -- I'll
11   direct your attention to line 34.  The sentence
12   itself starts with However.
13           It says:  However, in one embodiment of
14   the optical recording channel, timing is derived from
15   symbol amplitude transitions.
16           Do you see that?
17       A    Yes.
18       Q    And you testified earlier that in this
19   paragraph 36 of your declaration you were looking to
20   find out what transitions meant so that -- and then
21   you looked at articles and things of this nature that
22   used the word transitions, right?
23       MR. VERDINI:  Object to the form.
24       THE WITNESS:  Ask again, please.
25   BY MR. MAYLE:

Page 85

1        Q    You testified earlier before the break
2    with respect to your opinion in paragraph 36 of your
3    declaration that you selected -- the articles that
4    you selected in those paragraph 36 were based upon
5    whether or not the articles and the materials used
6    the word transitions, correct?
7        A    Yes.
8        MR. VERDINI:  Object to the form.
9        THE WITNESS:  Yes, that's what I
10   said.
11   BY MR. MAYLE:
12       Q    And this patent, your patent, Exhibit
13   1009, uses the word transitions in the context of an
14   optical recording channel, correct?
15       A    This is -- this is a patent regarding
16   optical recording and, yes, I use the word
17   transitions.
18       Q    And yet you did not cite your own patent
19   that uses the word transitions in an optical
20   recording channel in your declaration at paragraph
21   36, correct?
22       A    I did not cite this, correct.
23       Q    And so it's the case that you cited those
24   three articles in paragraph 36 that use transitions
25   in the magnetic sense, correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 86

1    MR. VERDINI:  Object to the form.
2    THE WITNESS:  Correct.
3  BY MR. MAYLE:
4    Q    But you didn't cite any materials in
5  paragraph 36 of your declaration that use the word
6  transitions for optical channels, correct?
7    A    Correct.  None of those articles had the
8  word -- those other ones had transitions in, I don't
9  believe.
10    Q    But this patent, your own patent filed in
11  1994, does use the word transitions in an embodiment
12  of an optical recording channel, correct?
13    MR. VERDINI:  Object to the form.
14    THE WITNESS:  It uses that, but if
15    you're implying that something that I
16    wrote 24 years ago I intentionally or
17    somehow knew it was there and chose not
18    to put it, of course that's ridiculous.
19  BY MR. MAYLE:
20    Q    I was just asking a question, Professor.
21    A    I understand.  But that's the -- in
22  hearing that and hearing how you're asking the
23  question and the tone of your voice implies that I
24  intentionally knew that in an optical paper I had the
25  words transitions, but obviously that's ridiculous.

Page 87

1  That's 24 years ago.
2    Q    If you had considered this your own
3  patent when you were rendering your declaration,
4  would you have included it in paragraph 36 of your
5  declaration?
6    A    A hypothetical question.  I'd have to --
7  I'd have to study it some more, but I don't know.  I
8  don't know whether I would have or not.
9    Q    Let's go --
10    A    It's clearly in the context of the
11  patent, and you'll see it in those other sections
12  that transition's referring to.  Those are magnetic,
13  so it may not have even been relevant to cite this.
14    Q    Let's look at the patent, Exhibit 1001,
15  again.  In the background section, column one, 14,
16  there's a heading.  It says Background Of The
17  Invention.  Do you see that?  In column one at the
18  top?
19    A    Column one.
20    Q    Do you see there's a heading around line
21  14, Background Of The Invention?
22    A    Yes.
23    Q    And then you see in column two there's a
24  heading Summary Of The Invention.
25    A    Yes.

Page 88

1    Q    And then throughout the patent there's
2  different headings?
3    A    Yes.
4    Q    Do those section headings and which
5  material is under which section heading have any
6  relevance to your opinion on how the claims should be
7  construed?
8    MR. VERDINI:  Object to the form.
9    THE WITNESS:  Yeah, everything
10    that's in the -- in the patent is
11    important to how I rendered my opinions.
12  BY MR. MAYLE:
13    Q    So if someone said to you -- if someone
14  cites something from the Background section of the
15  invention, starting at column one, 14, and if someone
16  was to argue, oh, that talks about an optical system,
17  would you then argue and say, well, that's only the
18  background section so it's not as important?  Is that
19  an argument that you would make?
20    MR. VERDINI:  Object to the form.
21    Calls for speculation.
22    THE WITNESS:  No, I don't think so.
23    The background is important for setting
24    the -- you know, for setting the context
25    for -- it's important for setting the

Page 89

1  context.
2  BY MR. MAYLE:
3    Q    And under -- the first sentence in the
4  Background, it says:  The channel codes, sometimes
5  called modulation codes, are mapping of data bits
6  into the symbols that are either transmitted in a
7  communication system or recorded onto a medium in a
8  storage device.
9    Correct?
10    A    I'm sorry.  Can you point to that?
11    Q    The first sentence under the Background.
12    A    Okay, I'm sorry.  Got you.
13    Q    And it mentions a medium and a storage
14  device, correct?
15    A    Yes.
16    Q    And it mentions channel codes, and it
17  says they're sometimes called modulation codes,
18  right?
19    A    Yes.  That's what it says, yes.
20    Q    Would an RLL code be an example of a
21  channel code or a modulation code?
22    MR. VERDINI:  Object to the form.
23    THE WITNESS:  I would say an RLL
24    code is a type of modulation code.
25    Channel code's often used in a different

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 90

1    context for error correction.  The more
2    common use of channel codes is error
3    correction, but that's fine.
4         RLL codes are modulation codes,
5    yes.
6  BY MR. MAYLE:
7    Q    And EFM is an RLL code, isn't it?
8    A    Correct.
9    Q    And EFM is used for CDs -- it's in the CD
10   standard, correct?
11   A    Yes.
12   Q    Let's switch gears back to your -- let's
13   go to your declaration on the next ground.  It's
14   paragraph 37.
15        Remember, we mentioned earlier -- we're
16   still on transitions -- and you said there were
17   four -- you gave four reasons for your opinion on why
18   transitions are magnetic transitions.  We talked
19   about 36A.
20   A    Yes.
21   Q    Let's go to paragraph 37.
22   A    Okay.
23   Q    And you start that -- you say that the
24   patent's use of the term transition corresponds to
25   how a PHOSITA would understand the term, right?

Page 91

1    A    Yes.
2    Q    And you cite column two, 59, 61 and
3    column two, 40, 42, right?
4    A    Okay.  Yes.
5    Q    That's what's cited in paragraph 37 of
6    your declaration?
7    A    Yes.
8    Q    And there's no other part of the
9    specification that's cited in paragraph 37 of your
10   declaration, right?
11   A    Those are the only two sections, yes.
12   Q    And you don't cite any claims in
13   paragraph 37, correct, from the 601 patent?
14   A    That's correct, do not.
15   Q    And you don't cite the prosecution
16   history of the 601 patent in paragraph 37 of your
17   declaration, right?
18   A    Correct, I do not.
19   Q    And you're aware that the Claim 13
20   doesn't have the word magnetic in the Claim, right?
21   A    If I remember correctly, yeah, 13 does
22   not -- does not -- the word magnetic does not appear
23   in Claim 13.
24   Q    Right.  So you're reading in the word
25   magnetic into the Claim 13 from the specification,

Page 92

1    right?
2         MR. VERDINI:  Object to the form.
3         THE WITNESS:  The -- reading in, I
4    think, is a legal term, but it's clear
5    that Claim 13 is referring to a magnetic
6    medium.  The --
7  BY MR. MAYLE:
8    Q    And you say that it's clear that Claim 13
9    is referring to a magnetic medium, if we look at your
10   declaration at paragraph 37, because -- the reason
11   you say that is because you cite these lines from the
12   specification at paragraph 37 in your declaration,
13   right?
14        MR. VERDINI:  Object to the form.
15  BY MR. MAYLE:
16   Q    That's one of the reasons you say that,
17   right?
18   A    That's one of the reasons, yes.
19   Q    Is that the reason given in paragraph 37
20   of your declaration?
21   A    Yes.
22   Q    And there's no other reason in paragraph
23   37 of your declaration for -- for concluding that the
24   claim term transition is a magnetic transition,
25   right?

Page 93

1    A    Those -- those are the ones that are
2    listed there.  There's other parts of the patent that
3    make it clear that that's -- that's referring to
4    magnetic recording.
5    Q    Let's just stick with paragraph 37.
6    We're going to go through all your reasons.
7         In paragraph 37, the only reasons that
8    you list for construing transition as a magnetic
9    transition in Claim 13 of the 601 patent are these
10   citations to column two, 59, 61, and column two, 40
11   to 42 of the specification, right?
12   A    Yes.
13   Q    And is there a reason -- of these two
14   cites that you give, you cite line 59 through 61
15   first, right?  If you look at paragraph 37.
16   A    Yes.  Yes.
17   Q    And then you cite line 40 to 42 second,
18   right?
19   A    Yes.
20   Q    Is there any reason that you cited lines
21   59 to 61 before you cite line 40 to 42?
22        MR. VERDINI:  Object to the form.
23        THE WITNESS:  I'm not sure
24    there's -- no, I don't remember any
25    reason why -- why I would have done that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 94

1    first.
2        I mean, 59 through 61 is, I think,
3    just unequivocal about the connection
4    between transitions and being for the
5    magnetization pattern in magnetic
6    recordings.  So it just couldn't be
7    clearer that that's what transition is
8    referring to.
9        So maybe that's why I emphasize it
10   first, because it's so crystal clear that
11   that's what transitions means.
12   BY MR. MAYLE:
13       Q    Does lines 40 to -- lines 40 to 42
14   unequivocal in that transitions are magnetic
15   transitions?
16       A    Lines 40 to 42, yes, it's pretty clear
17   that the -- I'm sorry.  I just want to confirm one
18   more, please.
19       Yeah, that's pretty clear it's referring
20   to magnetic recording.
21       Q    The question was, is line 40 to 42 of the
22   specification unequivocal that the claim term
23   transition is a magnetic transition?
24       MR. VERDINI:  Object to the form.
25   Asked and answered.

Page 95

1        THE WITNESS:  I guess it uses the
2    word, such as magnetic computer disc.  It
3    doesn't mention others.  It mentions
4    tape, which is also a magnetic medium.
5    So that seem really clear that it's
6    referring to -- the present invention is
7    referring to magnetic disc drives in tape
8    recorders.  So, such as, it's listing
9    those two.
10   BY MR. MAYLE:
11       Q    Let me rephrase the question.
12       A    That's pretty -- yeah, that's
13   unequivocal.
14       Q    Okay.  So now you're saying that lines 40
15   to 42 are unequivocal in that the claim term
16   transition is limited to magnetic; is that your
17   opinion?
18       A    Yeah, that's pretty clear.
19       Q    And what does -- what does the phrase
20   Such As mean?  Does it mean For Example?
21       A    For Example, and then it lists two
22   things, two examples.
23       Q    Do you think that that --
24       A    It didn't list others.
25       Q    Okay.  So you -- you interpret the lack

Page 96

1    of other examples as being a closed set, so there are
2    no other examples?  Is that how you interpret that
3    sentence?
4        A    I just think it's a emphatic statement
5    that says the present invention relates to channel
6    coding techniques to improve data storage such as
7    magnetic discs and tape recorders.
8        When I say Such As, it's implying.  If it
9    just listed one, maybe there are others.  In this
10   case it's listing two.  And it's saying the present
11   invention and it lists those two things.  So it seems
12   really clear to me.
13       Q    Is Such As synonymous with For Example in
14   your mind?
15       A    I'm not an English major.  Is Such As and
16   For Example -- yeah, I'm okay with them being -- I
17   can't think of how they would be different.  So yeah,
18   I'm okay with them being the same.
19       Q    So in your mind, the word Such As in
20   lines 40 to 42 of the specification is synonomous
21   with for example, right?
22       MR. VERDINI:  Objection.  Asked and
23   answered.
24       THE WITNESS:  Okay.  Yes.
25

Page 97

1    BY MR. MAYLE:
2        Q    Yes.  Lines 40 to 42 uses the phrase, The
3    Present Invention, right?
4        A    Yes.
5        Q    And lines 59 to 61 does not use the
6    phrase The Present Invention, correct?
7        A    Fifty-nine through 61 does not use the
8    word Present Invention.  Is that your -- correct,
9    yes.
10       Q    Yes.
11       A    But the present invention is about the
12   MTR code.  So it's clearly -- when it says, more
13   specifically the MTR code, it's certainly referring
14   to the present invention, that's for sure.
15       Q    I just want to take it piece by piece.  I
16   first just want to know -- I want you to confirm, if
17   you can, that the words The Present Invention are not
18   in lines 59 through 61.
19       MR. VERDINI:  Objection.  Asked and
20   answered.
21       THE WITNESS:  That's correct, those
22   words are not there, but the other words,
23   the MTR code, which is the present
24   invention, is in that.
25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 98

BY MR. MAYLE:

Q   When you say the MTR code is the present invention, what does that mean?

A   The patent's referring to the MTR code.

Q   Which claim is the MTR code, if any?

MR. VERDINI:  Object to the form.

THE WITNESS:  I don't remember if the terms MTR code are used in the patent claims but that's what the patent is about, exactly.

BY MR. MAYLE:

Q   And you say that -- one last time in paragraph 37 of your declaration.  The reason you say that the patent is limited in the way that you say is because of lines, column two, line 59 through 61 and column two, line 40 to 42, right?

MR. VERDINI:  Object to form.

THE WITNESS:  Yes.  Yes.

BY MR. MAYLE:

Q   Let's go to paragraph 38 in your declaration.  You give the third reason of why -- of your construction of transitions, right?  That's what paragraph 38 does?

A   Yes.

Q   And here again, you cite the

Page 99

specification, correct?  In paragraph 38 you cite the specification of the patent?

A   Yes.

Q   And you cite column two, 40 to 42 and column two, 59 to 61, right?

A   Okay.  Yes.

Q   And those are the same citations that you gave in your paragraph 37 of your declaration, right?

A   Yes.

Q   There's nothing new in paragraph 38 of your declaration that's not in paragraph 37 of your declaration, right?

MR. VERDINI:  Object to the form.

THE WITNESS:  Yes, no new citations -- 38 does not include any new citations.

BY MR. MAYLE:

Q   So what you give as your third reason -- do you see paragraph 38 starts with Third?

A   Uh-huh.

Q   That's the same as the second reason given in paragraph 37, correct?

MR. VERDINI:  Object to the form.

THE WITNESS:  It's the same two citations, maybe expounding on a couple

Page 100

points.  Maybe emphasizing in this case the magnetic pattern.  I can see that that's highlighted there.

BY MR. MAYLE:

Q   So in paragraph 38, are you -- are you pointing to the fact that you used bold italics on magnetization pattern on line 17?  Is that what you were talking about just now?

MR. VERDINI:  Object to the form.

THE WITNESS:  You said line 17. Sorry, I got distracted.

BY MR. MAYLE:

Q   So paragraph 38 of your declaration at line 17.

A   Now I'm with you.

Q   You've added bold italics font to magnetization pattern, correct?

A   Uh-huh.

Q   Yes?

A   Yes.

Q   Is that -- is that what you were referring to as something that was highlighted in paragraph 38 that's not in 37?

A   Yeah, you're right.  Those two paragraphs are very similar.  Yeah, they cite the same pieces.

Page 101

I'm trying to -- trying to recall why I included that second paragraph, which the second -- the second mentions of those two.  And I think you're right, they're consistent.

Q   Okay.  Let's go then to what's listed as paragraph 39, as Finally.

A   Uh-huh.

Q   And here you say in paragraph 39 that the University's proposed construction is consistent with the nontechnical, ordinary meaning of transition. And you say -- you quote, which is a quote -- quote, a passage from one state, stage, subject or place to another, colon, changed, unquote.

A   Uh-huh.

Q   And here you're citing Webster's Dictionary, correct?

A   Yes.

Q   And you also have an Appendix C, which is another dictionary, right?

A   I believe so, yes.

Q   That definition that you quote in paragraph 39, the passage from one state, stage, subject to another, change, is also consistent with what a transition would be in an optical storage system, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 102

1   A   Ask again, please.
2   Q   The definition of transition from the
3   nontechnical dictionary that you quote in paragraph
4   39 of your declaration, a passage from one state,
5   stage, subject or place to another, colon, change, is
6   also consistent with a transition in an optical
7   storage system, right?
8        MR. VERDINI:  Object to the form.
9        THE WITNESS:  Yeah, I'm okay with
10       that.  That -- yes, change of state in
11       optical, it wouldn't surprise me that a
12       change of state in an optical disc would
13       be described as a transition.  I think
14       that's okay.  I'm okay with that.
15   BY MR. MAYLE:
16   Q   And let's assume for a minute that the
17   court construes the claim transition as a switch from
18   a binary one to a binary zero or vice versa.  So
19   assume the court does that.
20       Would that interpretation by the court --
21   hypothetical interpretation by the court be
22   consistent with the nontechnical, ordinary dictionary
23   meaning of transition that you've quoted in your
24   paragraph 39?
25       MR. VERDINI:  Object to the form.

Page 103

1        THE WITNESS:  Ask one -- please ask
2   one more time.
3   BY MR. MAYLE:
4   Q   If the court -- I want you to assume --
5   A   Okay.
6   Q   I want you to assume that the court will
7   construe the claim term transition as a switch from a
8   binary one to a zero or vice versa.
9   A   Okay.
10  Q   If the court does that, would that
11  hypothetical interpretation be consistent with the
12  nontechnical, ordinary meaning of transition that
13  you've quoted in paragraph 39 of your declaration?
14       MR. VERDINI:  Object to form.
15       THE WITNESS:  Yeah, I'm okay with
16       that.
17  BY MR. MAYLE:
18  Q   Do you think that a PHOSITA would need to
19  resort to a nontechnical, ordinary meaning of
20  transition to figure out what the claims mean, or
21  could the PHOSITA to figure out what the transition
22  means without resorting to the nontechnical
23  dictionary?
24  A   I think the PHOSITA wouldn't need the --
25  wouldn't need the -- Webster's definition.  A PHOSITA

Page 104

1   would know what a transition is.  Would know what a
2   transition is, yes.
3   Q   So of these reasons in paragraph 36, 37,
4   38 and 39 of your declaration, do you feel that any
5   of these reasons that you've listed are the strongest
6   reasons for your opinion on what transition means?
7        MR. VERDINI:  Object to the form.
8        THE WITNESS:  No, I wouldn't say
9        one -- one of them is stronger than the
10       other.  I think they're all good reasons.
11  BY MR. MAYLE:
12  Q   Do you think that column two, lines 59 to
13  61, is a stronger reason to limit transition to
14  magnetic than the Webster's Dictionary?
15       MR. VERDINI:  Object to the form.
16       THE WITNESS:  I guess now that you
17       phrase it that way, yeah, I mean, that --
18       that 59 through 61 is crystal clear about
19       transitions being -- transitions in the
20       context of the patent being for a
21       magnetic recording.
22  BY MR. MAYLE:
23  Q   Do you feel that that is the -- in your
24  opinion, is that the best evidence to support your
25  opinion on the meaning of transitions in Claim 13?

Page 105

1        MR. VERDINI:  Object to the form.
2        THE WITNESS:  You use the term best
3        evidence.  I don't know whether that's
4        legal or not.  I just think it's a very
5        short, concise, very clear statement
6        really early in the patent that sets the
7        whole -- that sets the whole framework.
8   BY MR. MAYLE:
9   Q   Let me ask it this way.  Other than lines
10  two, 59 through -- we've gone through all of your
11  reasons.
12       But I want to know, of those that we've
13  talked about, other than lines column two, 59 through
14  61, is there something that in your opinion is even
15  more clear that transitions should be magnetic
16  transitions?
17  A   I like that statement because it's short,
18  concise, at the beginning, unequivocal.
19  Q   All right.  Let's look at the claims
20  then.  Claim 13.  Well, if you can pull out the
21  patent.
22  A   Okay.
23  Q   And do you know that the preamble, and
24  then there's a step of receiving data words,
25  producing code words, imposing a pair of constraints.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 106

1  And then it talks about generating, and it uses the
2  phrase:  J consecutive transitions of said sequence.
3         Do you see where I'm talking about?
4      A   Yup.
5      Q   When it says, j consecutive transitions
6  of said sequence, in your opinion, what is the said
7  sequence referring to?
8      A   It's referring to looking for the place
9  where the word sequence appears.  And it appears that
10  sequences, just a couple lines above, producing
11  sequences of m-bit code words.  And so then when
12  it -- yeah, so when it says said sequence, that's
13  what it's referring to.
14     Q   And the m-bit code words are -- they're
15  binary ones and zeros?
16     A   They're binary, yes.
17     Q   And they're not magnetic transitions, are
18  they?
19     A   Correct.  They are ones and zeros.
20     Q   Now, let's look at Claim 17.  And will
21  you agree with me that the word transitions is also
22  used in Claim 17?
23     A   Yes, it is.
24     Q   And is -- in your opinion, does the word
25  transitions in Claim 13 have the same meaning as the

Page 107

1  word transitions in Claim 17?
2      A   Yes.
3      Q   And Claim 17 specifies explicitly that
4  the j consecutive transitions are from zero to one
5  and one to zero, right?
6          MR. VERDINI:  Object to form.
7          THE WITNESS:  It's saying
8      transitions from zero to one and from one
9      to zero, yeah.  And those are -- that's a
10     magnetic transition.  That's a -- as you
11     go from zero to one and one to zero, that
12     produces a change in the magnetization
13     pattern and that's what that's referring
14     to.
15  BY MR. MAYLE:
16     Q   You're jumping ahead.  Let's take this in
17  little steps.
18         The Claim 17, you agree it says, quote, j
19  consecutive transition from zero to one and from one
20  to zero, unquote, correct?
21     A   Yes.
22     Q   And Claim 13 uses transitions, and the
23  meaning of transitions in 13 is the same as it is in
24  17, correct?
25     A   Yes.

Page 108

1      Q   And in Claim 13, when it says j
2  consecutive transitions of said sequence, that means
3  j consecutive transitions of m-bit code words,
4  correct?
5          MR. VERDINI:  Object to the form.
6          THE WITNESS:  Come back again.
7      Sorry.
8  BY MR. MAYLE:
9      Q   In Claim 13, when it says j consecutive
10  transitions of said sequence, that means j
11  consecutive transitions of sequences of m-bit code
12  words, right?
13         MR. VERDINI:  Object to form.
14         THE WITNESS:  It's saying j
15     consecutive transitions of said sequence
16     in the recorded waveform.  So the
17     transition's referring to -- so, changes
18     from one to zero and changes from zero to
19     one that -- of said sequence are a --
20     result in transitions in waveform, which
21     are the transitions in the magnetic
22     medium.
23         So the Claim 13, consecutive
24     transitions of said sequence in the
25     recorded waveform.  It's referring to

Page 109

1      the -- it's referring to the changes in
2      the sequence that result in the
3      transitions in the recorded waveform.
4  BY MR. MAYLE:
5      Q   And that's because you interpret
6  transitions as being limited to magnetic because of
7  what's in the specification, right?
8      A   Yes.  Yes.
9      Q   Correct.  The claim doesn't actually use
10  the word magnetic, does it?
11         MR. VERDINI:  Objection.  Asked and
12     answered.
13         THE WITNESS:  But it's referring to
14     recorded, and recorded is referring to
15     storage medium, and in this case it's
16     referring to magnetic recording.  That's
17     the context the patents were recorded.  I
18     would say -- I want to say, you know, it
19     brings in the word magnetic, but it's
20     clearly referring to storing a waveform
21     on a magnetic medium.
22  BY MR. MAYLE:
23     Q   Well, right now we're still talking about
24  transitions.  We're going to get to recorded
25  waveform.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 110

1    A    You asked -- correct.  The word -- the
2  question was, is the word magnetic in there.  No,
3  it's not, but I'm saying by virtue of the reference
4  to record it, it is referring to magnetic recording.
5  But you're right, it does not have the word magnetic
6  in it.  I think that was where we were at.
7    Q    If I took Claim 13 and wrote in the word
8  magnetic in front of transitions, would that change
9  the meaning of the claim?  If I literally wrote in
10  the word magnetic into the claim, would that change
11  the meaning of the claim?
12        MR. VERDINI:  Object to the form.
13  Where are you writing it in?
14  BY MR. MAYLE:
15    Q    If I -- where it says j consecutive
16  transitions, if we wrote in j consecutive magnetic
17  transitions, would that change the meaning of Claim
18  13?
19    A    I don't think so.
20    Q    Optical systems have n code words, don't
21  they?
22        MR. VERDINI:  Object to the form.
23        THE WITNESS:  Right.  For example,
24  EFM has -- yes.
25

Page 111

1  BY MR. MAYLE:
2    Q    And they use ones and zeros in optical
3  systems, in EFM, for example, correct?
4    A    Yes.
5    Q    And so if the court rejects your
6  construction and says that transitions are not
7  limited to magnetic transitions but can include
8  optical transitions, if the court does that, would
9  the Claim 13 still make sense under that hypothetical
10  construction?
11        MR. VERDINI:  Object to the form.
12        THE WITNESS:  Ask again, please.
13  BY MR. MAYLE:
14    Q    If the court rejects your construction
15  and says, transitions are not limited to magnetic,
16  they can be any sort of transitions --
17    A    Uh-huh.
18    Q    -- for example optical, but not limited
19  to that -- let's assume that the court does that --
20    A    Okay.
21    Q    -- would Claim 13 then still make sense
22  to you under that construction?
23        MR. VERDINI:  Object to the form.
24        THE WITNESS:  I think it would
25  still make sense.

Page 112

1  BY MR. MAYLE:
2    Q    Let's go to your declaration, Exhibit
3  1005, and let's go to paragraph ten.
4    A    I'm sorry.  Where are you?
5    Q    Paragraph ten in your declaration.  Look
6  at page four and five.  So not before --
7        On page four on your declaration, at the
8  bottom, you have a picture of -- a schematic picture
9  of a magnetic hard disc drive, right?
10    A    Uh-huh.
11    Q    And that's from the Ashar article that we
12  talked about earlier on page four?
13    A    I believe so, yes.
14    Q    Okay.  And it has something labeled
15  Electronics in the corner there?
16    A    Yes.
17    Q    Is that like where the read channel -- is
18  that where a chip would be, a read channel chip, for
19  example?
20    A    Yeah, that makes sense.
21    Q    And then you have a write head,
22  basically, correct?
23        MR. VERDINI:  Object to the form.
24        THE WITNESS:  Yes.  The head
25  slider, at the end of it there's a write

Page 113

1  head.
2  BY MR. MAYLE:
3    Q    And then you have something, level two
4  discs, right?
5    A    Uh-huh.
6    Q    Is that the platters, is that what that
7  is?
8    A    Yes.
9    Q    Let's look at paragraph ten.  You say in
10  the first sentence:  In the write process, the data
11  are modified prior to writing the data to the disc.
12  Right?
13    A    Uh-huh.  Yes.
14    Q    What does that mean, the data are
15  modified?  What's that referring to?
16    A    Now, ask your question again.  Sorry.  I
17  was reading the previous paragraph.
18    Q    The first sentence of your declaration
19  says:  In the write process, the data are modified
20  prior to writing the data to the disc.
21    A    Uh-huh.
22    Q    I'm asking, what does it mean that the
23  data are modified?
24    A    Data might be encoded.  There might be
25  error correction bits added.  There might be a run

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 114

1  link code added.  So that's a general statement that,
2  you know, the information you want to store is
3  modified --
4      Q    Okay.
5      A    -- by adding those things to it before it
6  goes on the disc.
7      Q    And then when it says:  First, the user
8  data are encoded according to applicable and coding
9  schemes --
10     A    Uh-huh.
11     Q    -- was that referring back to the first
12 sentence there?
13     A    Yes, I believe so.
14     Q    So you're saying that the data are
15 modified prior to writing to the disc, and that
16 includes data being encoded, right?
17     A    Yes.
18     Q    And you say:  This is where the novel MTR
19 codes of the '601 patent are implemented.
20         Right?
21     A    Yes.
22     Q    So where we are in paragraph ten right
23 now, where the data are encoded, let's assume it's
24 happening on this schematic on page four.
25     A    Yes.

Page 115

1      Q    Where would that be happening?
2      A    Very likely it would be in that
3  electronics box.  The box where it's highlighted is
4  electronics.
5      Q    And when you say this is where the novel
6  MTR codes of the '601 patent are implemented, you're
7  talking about the electronics box?
8      A    That's where the -- that's where the
9  encoding of the MTR code would take place, that
10 portion.
11     Q    And the encoding part, is that basically
12 m-bits going to n-bits?
13         MR. VERDINI:  Object to the form.
14         THE WITNESS:  Yeah, that -- the
15     m-bits to the n -- the m to the n-bits of
16     the MTR code would be happening in that
17     electronics box.
18 BY MR. MAYLE:
19     Q    And then would the sequences of m-bit
20 code words obey or conform to the j and k
21 constraints?
22         MR. VERDINI:  Object to the form.
23         THE WITNESS:  The j and k
24     constraints are on the waveform.  They
25     would be -- that's where the -- the j and

Page 116

1      k constraints are on the waveform, on the
2      transitions in the waveform.  So the MTR
3      code is a way of enforcing those
4      constraints.
5  BY MR. MAYLE:
6      Q    Let me ask it a different way.  We're
7  still in the chip in this -- what we've been talking
8  about, we're still in the chip.  We're not onto the
9  disc yet.
10     A    Okay.
11     Q    We now have m-bit code word -- m-bit data
12 words coming in.  They're being coded in the chip to
13 n-bit code words, correct?
14     A    Yes.
15     Q    And in those n-bit code words, the
16 sequences -- would be sequences of ones and zeros,
17 correct?
18     A    That's correct.
19     Q    And if those sequences of one and zeros
20 have a j constraint, there will be no more than j
21 consecutive transitions in the sequences of ones and
22 zeros in the chip, right?
23         MR. VERDINI:  Object to the form.
24         THE WITNESS:  On the bit sequences,
25     yes.

Page 117

1  BY MR. MAYLE:
2      Q    Yes?
3      A    Yes.
4      Q    And if those sequences of ones and zeros
5  in the chip, in the n-bit code words, obey the k
6  constraint, that means that there will be at most k
7  consecutive nontransitions of the bits while on the
8  chip, right?
9      A    K consecutive zeros.  K consecutive
10 zeros, if you're using NRZI.
11     Q    Okay, let's go with NRZI and let me ask
12 it again.
13         Let's say we're still on the chip.
14     A    Yes.
15     Q    And let's say that we're trying to
16 practice the method of Claim 13.
17     A    Yes.
18     Q    And we've -- we've done the encoding and
19 we now have sequences of m-bit code words.  That
20 means that there will be, at most, j consecutive ones
21 in the sequence of m-bit code words, right?
22     A    Yes.
23     Q    And that's -- and that also means that
24 there will be, at most, k -- k consecutive zeros of
25 the sequences in the m-bit code words, correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 118

1    A    That's correct, assuming NRZI.
2    Q    Assuming NRZI.
3    A    Yes.
4    Q    We're in the chip.  And then let's go
5  back to paragraph ten.  It says:  Second, a processor
6  converts the encoded data into an analog signal that
7  is applied to the write head.
8        And it goes on.  Let's take it one at a
9  time.  What's a processor that converts encoded user
10  data into an analog signal?  What does that mean?
11    A    There the term processes is being used as
12  a generic term.  It's not referring to necessarily a
13  microprocessor.  It's something that takes the bits
14  and converts it to an analog waveform, a continuous
15  time, continuous analog waveform.
16    Q    And where is that waveform -- which part
17  of -- in a typical device like on page four, where
18  would that processor be and where would the waveform
19  be?
20    A    The waveform would be -- so that
21  processor could be in that electronics box, it could
22  be tied to a preamplifier that may or may not be in
23  that electronics box.  It might be a separate box.
24  It might be closer to the head, it might be in that
25  box.

Page 119

1        The waveform -- the waveform would be,
2  you know, what's produced at the head or what
3  ultimately shows up at the head.
4        I'm sorry, what your question was.
5    Q    Where was it before -- before it goes to
6  the write head, you said there's a waveform, right?
7    A    Uh-huh.
8    Q    Well, where is it?
9        MR. VERDINI:  Object to the form.
10        THE WITNESS:  That waveform might
11        be generated in electronics box.  There
12        may be -- that electronics box -- I'm
13        assuming that that electronics box has
14        some digital stuff and it may have some
15        analog stuff in it, as well.
16        So normally -- I mean, in
17        this picture, it's probably produced in
18        that electronics box, but that
19        electronics box has all the -- you know,
20        has the -- both the digital and the
21        analog pieces.  And then that waveform
22        would then be transferred out to the
23        head.
24  BY MR. MAYLE:
25    Q    When it transfers to the head, is it --

Page 120

1  then what happens when it gets to the head?
2    A    Then it's -- then it's applied to the
3  head, which produces a magnetic field which is put on
4  the disc.
5    Q    What gets put on the disc?
6    A    What gets put on the disc is magnetic
7  flux from the head that -- that comes from the wave.
8  The waveform generates the magnetic flux that goes on
9  to the disc.
10    Q    Now, let's say I unplug the hard disc
11  drive.  We did what you just said, now I unplug it.
12        Is there a magnetic flux on the disc
13  still?
14    A    Yes.
15    Q    And is it being generated just by
16  virtue -- how's it being generated?
17    A    It's not being generated.  It's resident
18  on the disc.  That's the magnetic domains produce the
19  flux.  That flux stays there.  It stays there until
20  it's erased or moved.
21    Q    When you say magnetic flux, are you
22  talking about an electromagnetic wave?  Or are you
23  talking about physically what's on the disc in terms
24  of particles?
25    A    Same thing.  The magnetic -- the magnetic

Page 121

1  domains have been -- magnetic domains have been set
2  into a certain pattern and even if the whole thing
3  shut off, they're emanating an electromagnetic field
4  that doesn't go away.  Otherwise, your data is
5  erased, it's gone.  That's the whole purpose.
6    Q    But I'm asking you -- and I think there's
7  two options, correct me if I'm wrong.  I want to
8  know, then, what would be a recorded waveform.
9        Is it the physical bit series on the
10  discs or is it the magnetic flux that they create?
11  Are those two different things?
12        MR. VERDINI:  Object to the form.
13        THE WITNESS:  There's a one-to-one
14        correspondence between -- ask again.  I'm
15        sorry.
16  BY MR. MAYLE:
17    Q    So in this experiment we've just done,
18  there's going to be some magnetic bit -- physical
19  particles altered on the magnetic disc, correct?
20    A    Uh-huh.
21    Q    Yes?
22    A    Yes.  I'm sorry.
23    Q    And the configuration of those physical
24  particles would then engender a magnetic field,
25  correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 122

1   A   Correct.
2   Q   Which one of those, if either, is a
3  waveform?
4       MR. VERDINI:  Object to the form.
5       THE WITNESS:  There's -- the
6   recorded -- I think of the recorded
7   waveform as the, you know, square wave,
8   continuous time signal that's at the
9   head -- that's at the head -- that's then
10  recorded on the medium.
11  BY MR. MAYLE:
12  Q   But it gets recorded on the medium not as
13 a continuous square wave, but rather as a collection
14 of discrete particles, correct?
15  A   Yes.
16  Q   And so if the claim is -- if the claim
17 term -- if the claims somehow would require the
18 concept of a continuous signal, that would not
19 describe the magnetic particles that are on the disc,
20 right?
21      MR. VERDINI:  Object to the form.
22      THE WITNESS:  Ask again, please.
23  BY MR. MAYLE:
24  Q   If the claim somehow requires a
25 continuous signal varying with time in the

Page 123

1  waveform --
2   A   Yes.
3   Q   -- that such a construction would not
4  accurately describe the magnetic particles that are
5  actually on the disc, correct?
6       MR. VERDINI:  Object to the form.
7       THE WITNESS:  I'm not trying to
8   give you a hard time.  I'm trying to
9   really understand your question.
10      The -- the waveform that's coming
11  out of the head that's stored on the
12  medium is what I think of as the recorded
13  waveform.
14 BY MR. MAYLE:
15  Q   Right.  That's what I'm asking you.
16      If the worded waveform is required to be
17 a continuous signal that varies with time --
18 continuous.
19  A   Yes.
20  Q   -- that means that it is not the actual
21 particles that are on the disc.  Those are
22 discontinuous, correct?
23      MR. VERDINI:  Object to the form.
24      THE WITNESS:  No.  No, they're
25  continuous, as well.

Page 124

1  BY MR. MAYLE:
2   Q   What do you mean by continuous?
3   A   Start from an analog signal.  A signal
4  that -- a signal that is continuous for all time.
5   Q   Like an analog signal, right?
6   A   Yeah, like an analog signal is
7  continuous.
8   Q   A digital signal would not be continuous,
9  correct?
10  A   Incorrect.  Continuous in time, a digital
11 signal -- I don't know what you mean by digital
12 signal.
13      A sequence of ones and zeros I would not
14 say is an analog signal, I would not say is a
15 continuous time, but a square wave is certainly a
16 continuous signal.  For sure.
17      There's continuous in amplitude and
18 there's continuous in time.  It's a continuous time
19 signal.  And the domains that you store on the disc
20 would be a continuous signal.
21  Q   Well, in the real word, there's no such
22 thing as a square wave for real.  You can't have a
23 square wave?
24      MR. VERDINI:  Objection to form.
25      THE WITNESS:  The edges are always

Page 125

1       at least a little rounded.
2  BY MR. MAYLE:
3   Q   So you're talking about something that's
4  not really a square wave, correct?
5       MR. VERDINI:  Object to the form.
6  BY MR. MAYLE:
7   Q   There is no such thing as a square wave
8  in the real world, correct?
9       MR. VERDINI:  Objection.  Asked and
10  answered.
11      THE WITNESS:  Yeah, I'm okay with
12  that.  Yeah.
13 BY MR. MAYLE:
14  Q   Okay.  Let's pretend we do a hypothetical
15 square wave that's really a square.
16  A   Okay.
17  Q   It's at one level and then it
18 instantaneously jumps to a different level with zero
19 time in between.  That's a discontinuous signal,
20 isn't it?
21  A   No, that's a continuous time signal.
22 That's a continuous time signal.  Continuous -- it
23 has a value.  It has a value for all time.  Every
24 single time instance there's a value.  That's a
25 continuous signal.  Every single instant of time

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 126

1 there's a value, regardless of how fine you've sliced
2 them.
3    Q    But it will jump a non-zero or finite
4 amount in zero time, correct?
5    A    Right, that's why it's still continuous,
6 in zero time.
7    Q    Do you use the word continuous in this
8 context in the same way that a mathematician would
9 say a function is continuous?
10       MR. VERDINI:  Object to the form,
11 foundation.
12       THE WITNESS:  I'm not sure.
13 BY MR. MAYLE:
14    Q    Do you know what a continuous function is
15 in the mathematical sentence?
16    A    We just defined it.  It has a value for
17 all time and it can even make jumps in zero time.
18    Q    Give me an example of something that's
19 not dis-- that's not continuous, then.
20       MR. VERDINI:  Object to the form.
21       THE WITNESS:  I mean, I think we
22 said before, a bit sequence -- a bit
23 sequence is not a waveform.  A bit
24 sequence is not a continuous -- is not a
25 continuous signal.

Page 127

1 BY MR. MAYLE:
2    Q    But at each bit I can say it's a one or a
3 zero.  That's continuous, isn't it?
4       MR. VERDINI:  Object to the form.
5       THE WITNESS:  There are spaces of
6 time between those for which there's
7 no -- at this clock period it's a one, at
8 this clock period a zero.  In between
9 there, there's no value in the signal.
10 BY MR. MAYLE:
11    Q    Are you using continuous, in what you've
12 been telling me, as synonomous with analog?
13    A    Yeah, I think so.  Yeah.
14    Q    So would you consider the particles that
15 actually go onto the disc, the magnetic individual
16 particles, as an analog signal?
17    A    Uh-huh, yeah.
18    Q    And that's because why?
19    A    Each -- each one of those bit cells is
20 not one particle.  It might be millions of particles.
21 There's kind of where those transitions occur are not
22 exactly sharp.  They all -- the particles, where the
23 transitions occur, there's many, many, many
24 particles.  There's not just kind of, you know, one
25 line that you could draw for that.

Page 128

1       And so that's -- that variation produces
2 an analog -- an analog signal.  It's made up of --
3 that -- that one kind of high level magnetization
4 pattern is actually tens, hundreds, thousands,
5 millions of aggregated magnets.  And so that's --
6 it's clearly an analog signal, that produces an
7 analog signal.
8    Q    If we looked at page nine of your
9 declaration, you've drawn a schematic where you have
10 some blue and red little magnets, right?
11    A    Yup.
12    Q    And you've drawn them as perfectly,
13 idealized where you have an arrow going from left to
14 right --
15    A    Uh-huh.
16    Q    -- and then one from right to left right
17 next to it, right?
18    A    Yeah.
19    Q    In the ideal world, as you've drawn it,
20 would that be a discontinuous signal or continuous
21 signal?
22       MR. VERDINI:  Object to the form.
23       THE WITNESS:  That would be a
24 continuous -- which signal are you
25 referring to?

Page 129

1 BY MR. MAYLE:
2    Q    The orientation of the magnets on the
3 disc that you've drawn.
4    A    I think we're talking about apple and
5 oranges.  It's not the signal on -- what I think
6 of --
7    Q    A waveform.
8    A    Something that you can observe on a
9 waveform.  So that's not a waveform.
10    Q    Okay.  Let's set that aside for a second.
11       Let's -- if you look back in Claim 13
12 again.  And we were just talking about,
13 hypothetically, what would happen on this
14 hypothetical hard disc drive that you've drawn.
15       The step of receiving the m-bit data
16 boards would be on the chip in your picture, right?
17    A    Uh-huh.
18    Q    In your declaration?  That would be on
19 the chip?
20    A    You mean in the electronics?
21    Q    Yeah, the electronics.  Probably?
22    A    Yeah, probably.  I'm sorry, let me just
23 get back here.
24    Q    It's on page four?
25    A    Yes.  Uh-huh.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 130

1    Q    And then the next part of the claim says
2    you know, producing m-bit code words.
3         Let's assume that this figure four --
4    this figure on page four actually does that.  Would
5    that also be in the electronics?
6         MR. VERDINI:  Object to the form.
7         THE WITNESS:  Yes, likely it would
8    be there, yes.
9    BY MR. MAYLE:
10   Q    Then the next part of the claim talks
11   about imposing j and k constraints, right?  Where
12   would that happen on the device shown on page four of
13   your declaration?
14        MR. VERDINI:  Object to the form.
15        THE WITNESS:  That's also likely to
16   be in that electronics.
17   BY MR. MAYLE:
18   Q    Right.  And then the next step says
19   Generating.  There's two steps of generating, right?
20        MR. VERDINI:  I'm going to object
21   to the form.
22   BY MR. MAYLE:
23   Q    In the claim.
24   A    Yes.
25   Q    You agree with that.

Page 131

1    A    Yes.
2    Q    So the first step of Generating talks
3    about generating no more than j consecutive
4    transitions.  Where would that happen on the device
5    on page four of your declaration?
6         MR. VERDINI:  Object to the form.
7         THE WITNESS:  I mean, that would be
8    in -- that's in the analog portion of
9    that because that's producing the
10   waveform, and that very well could be in
11   the electronics.  That box might contain
12   all of the electronics, both the analog
13   and digital electronics.
14   BY MR. MAYLE:
15   Q    Is there a recorded waveform in that box
16   called -- there's no recorded waveform in the box
17   called Electronics on page four of your declaration,
18   right?
19        MR. VERDINI:  Object to the form.
20        THE WITNESS:  The waveform -- as I
21   said, the recorded waveform, I think when
22   we talked about it before, I said I think
23   of that as being right at that tip of
24   that head.
25        That could very well be the exact

Page 132

1    same signal that comes out of that
2    electronics box.
3    BY MR. MAYLE:
4    Q    Whether it's the same signal that comes
5    out or not, the recorded waveform is not in the
6    electronic box, correct?
7         MR. VERDINI:  Object to the form.
8         THE WITNESS:  No, it could be
9    produced right there.  Like you said,
10   that box, the output of that box could be
11   that -- could be a waveform, and that's
12   the exact same waveform.  You know, but
13   then it goes down that slider and ends up
14   right at the top of the head.
15        So that recorded waveform could be
16   right -- it's the same -- it's the signal
17   that's at the top of the -- right at the
18   head could be, probably, exactly the
19   signal that, if -- that signal could
20   originate inside that electronics box.
21   BY MR. MAYLE:
22   Q    Where is the waveform -- the recorded
23   waveform?  Where is that recorded?
24        MR. VERDINI:  Object to the form.
25        THE WITNESS:  It's recorded on the

Page 133

1    medium.  As I said, I think of the
2    recorded waveform as being the waveform
3    that's right at the tip of the head.  It
4    generates the magnetic flux that's then
5    stored on the disc.  That's the waveform
6    that is recorded on the disc.
7    BY MR. MAYLE:
8    Q    Wouldn't it be more accurate under your
9    interpretation to say that's the waveform that is
10   going to be recorded?  It's not actually recorded
11   yet, right?
12        MR. VERDINI:  Object to the form.
13        THE WITNESS:  That is the waveform
14   that's recorded on the disc.  There's no
15   other wave -- different waveform that's
16   recorded on the disc.  That's the
17   waveform that's recorded on the disc.
18   BY MR. MAYLE:
19   Q    Okay.  Let's say I change this device
20   here, right, remove the disc.  There's no disc.  All
21   the other parts there are there.  I plug it in.
22   A    So you've removed the disc.
23   Q    I physically take out the magnetic media.
24   It's gone, remove it.  I still have the write head,
25   everything else is there and the device works.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 134

1  A   Yeah.
2  Q   Would there be a recorded waveform in
3  that scenario if I turned the thing on, ran it,
4  according to --
5        MR. VERDINI:  Object to the form.
6        THE WITNESS:  Obviously, I know
7  it's a hypothetical.
8        But the signal that's right at the
9  tip of that head, that's -- that's the
10 waveform that's going to be recorded on
11 something that's not there.
12 BY MR. MAYLE:
13 Q   Right.
14 A   That's the waveform that's going to be
15 recorded.
16 Q   That's not my question, though.
17      Would there be a recorded waveform?
18 Could we get to a recorded waveform?
19      MR. VERDINI:  Object to form.
20      THE WITNESS:  I don't think you're
21 describing a system that would -- that
22 would apply to the patent.  I think we
23 can safely assume there's a disc that
24 we're sending -- recording information on
25 in the context of the claim.

Page 135

1  BY MR. MAYLE:
2  Q   Professor, I'm trying to understand your
3  interpretation of the claim.  And so I want to know
4  where these steps happen.
5  A   Uh-huh, I understand.
6  Q   And it goes to your interpretation of the
7  claim.
8  A   I understand.
9  Q   And that's what I'm trying to get to.  So
10 I'm giving you these hypotheticals.  It doesn't
11 matter if no one would actually do it.  I'm not
12 trying to eliminate what someone would do in the lab.
13 I'm trying to figure out what your interpretations
14 are.
15      So I'm going to ask it again.  If I
16 remove the magnetic medium entirely, as a
17 hypothetical.
18 A   Uh-huh.
19 Q   And let's pretend that everything else is
20 equal in this device and it could do the method
21 otherwise, without the medium.  Could it perform the
22 method of Claim 13 without a magnetic recording
23 medium?
24      MR. VERDINI:  Object to the form.
25

Page 136

1  BY MR. MAYLE:
2  Q   Under your interpretation of the claims?
3  A   As I said, the -- I view the recorded
4  waveform as the waveform that's sitting at the
5  head -- at the head -- and so, yes.
6        If you -- if you pulled out the -- if you
7  pulled out the disc and did everything the same,
8  would I call that the recorded waveform, the waveform
9  that's sitting at the head?  Yes, because as I put
10 the media back in, that would be the waveform that's
11 recorded on the disc.
12 Q   Okay.  Let's say I put the media back in
13 but now this time I put a CD instead, an optimal
14 system.  Would you still say there's a recorded
15 waveform within the scope of 13 if I ran the device
16 with a CD below it?
17 A   There's still a recorded waveform at the
18 tip of the head, even though it makes no sense
19 because you -- you have the wrong media in there.
20 Q   Where is the magnetic transition in that
21 system?  There's not one, right?
22 A   Right.  And that's the exact point of why
23 the magnet -- why there's a context of a magnetic
24 medium, and that -- you can't put a magnetic
25 transition onto an optical disc.

Page 137

1  Q   But you say that the recorded waveform is
2  sitting on the end of the write head, correct?
3  A   Yes.
4  Q   Before it gets to the medium?
5  A   Yeah, yeah.
6  Q   So I put in an optical medium, you'll
7  still say there's a recorded waveform sitting on the
8  write head, correct?
9  A   Yes.
10 Q   In your declaration -- look on page 16 of
11 your declaration.
12 A   Page 16.  Okay.  Page 16?
13 Q   Right.  I'm confused, because I see what
14 you said here or in paragraph -- we could go to
15 paragraph 35.  That's the University's construction.
16 On 16, paragraph 35.  You say:  In my opinion, when
17 read in light of the '601 patent specifications, a
18 PHOSITA would understand that the claim term
19 transition in Claim 13 to mean a reversal in the
20 magnetic orientation of adjacent bit regions along a
21 recording track of a magnetic recording medium.
22      That's your opinion, right?
23 A   Yes.
24 Q   But you just told me -- you've just
25 changed your opinion.  You said, no, it's on the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 138

1  write head and it doesn't matter what the medium is,
2  correct?
3          MR. VERDINI:  No.  Object to the
4      form.
5          THE WITNESS:  Are we talking about
6      transitions?  We're not talking about
7      recorded waveforms.  We're talking about
8      transitions as a reversal in the magnetic
9      orientation.
10 BY MR. MAYLE:
11     Q    Where are the transitions in Claim 13
12 under your interpretation?  Where would they be?
13         MR. VERDINI:  Object to form.
14 BY MR. MAYLE:
15     Q    In the recorded waveform, right?
16     A    The transition -- the recorded waveform
17 has -- has -- recorded waveform does have transitions
18 that result in changes in the magnetic orientation.
19     Q    Magnetic orientation of what?
20     A    Of the medium.
21     Q    Which medium?  What kind of medium?
22     A    A magnetic medium.
23     Q    So I'll ask the hypothetical again.
24         I take the device we've been talking
25 about on page four of your declaration and I take out

Page 139

1  the magnetic medium and I either put nothing back or
2  I put a CD back.  And I turn the device on, I put in
3  data words.  I do the encoding on the chip, it
4  imposes j and k constraints.  A signal comes out, it
5  goes to the write head and I hit pause.
6          Have I now practiced Claim 13?
7          MR. VERDINI:  Object to the form.
8          THE WITNESS:  That's a really long
9      question.  Please ask again.  I'm not
10     trying to be a pain.
11         You talked about a whole bunch of
12     stuff, I just want to make sure I
13     understand the hypothetical, which you
14     know is like taking a disc, a magnetic
15     disc out and asking -- obviously, this
16     patent is all about the fact that there
17     has to be a disc or something in there,
18     so the hypothetical just seems --
19 BY MR. MAYLE:
20     Q    You don't like my hypothetical?
21     A    No, I don't like your hypothetical, so --
22     Q    Okay.  The reason you don't like it is
23 because it's --
24     A    Oh, it's ridiculous.  The reason I don't
25 like it, it's ridiculous.

Page 140

1      Q    Professor, remember, we agreed not talk
2  over each other.
3      A    Okay.
4      Q    It seems that you don't like it because
5  you've said in your declaration, the one you
6  submitted to the Court, that transitions are in a
7  recorded waveform and transitions require a reversal
8  in the magnetic orientation of adjacent bit regions
9  along a recording track of a magnetic recording
10 medium.
11     A    Uh-huh.
12     Q    But when I'm probing you on that, you
13 say, no, the claim -- the method is completed when I
14 get to the -- the signal to the end of the write
15 head.  That's what you say in your deposition,
16 correct?
17         MR. VERDINI:  Object to the form.
18         THE WITNESS:  I don't think I said
19     the method is completed.  I think I said
20     the recorded waveform is at the -- so --
21 BY MR. MAYLE:
22     Q    Well, the last step --
23     A    The recorded waveform is at the head.
24 That's the signal that's going to be recorded on the
25 disc and so that's the recorded waveform.  It's right

Page 141

1  at the head.
2      Q    The verbs used in the claim are
3  generating no more than j consecutive transitions in
4  the recorded waveform.
5      A    Yes.
6      Q    Where is that verb generating done under
7  your understanding of the claim?  Is it the tip of
8  the write head or is it on the disc somewhere?  Where
9  does it first happen, if it happens more than once?
10         MR. VERDINI:  Object to the form.
11         THE WITNESS:  Where does the
12     generating take place?
13 BY MR. MAYLE:
14     Q    Yes.
15     A    It could very well be -- I mean, I think
16 of that as being in that electronics box.  That
17 electronics box has the digital and -- and I'm
18 assuming it has the digital and analog pieces.  The
19 outcome of that box is the waveform that travels down
20 a wire, goes to the head and sits -- is recorded on
21 the medium.
22     Q    Okay.  Well, then --
23     A    Those transitions, whatever analog --
24 wherever the analog circuitry is that produces that
25 final waveform, that's where that generating step is

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 142

1  met.  Maybe it's in that electronics piece, maybe
2  there's another piece of electronics.
3      Q    And you would agree that the last step of
4  the Claim 13 is something about generating j and k,
5  correct, in the recorded waveform?
6          MR. VERDINI:  Object to the form.
7  BY MR. MAYLE:
8      Q    Then the claim just ends.  There's a
9  period.
10     A    Okay.
11     Q    So let's go to paragraph page four again,
12  and let's run the hypothetical back even further.
13  We --
14     A    I'm sorry, sir.  Tell me again where we
15  are.
16     Q    Page four of your declaration -- we're
17  talking about this hypothetical hard disc drive.
18     A    Okay.
19     Q    Now you've just told me that the
20  generating steps could happen in the electronics box,
21  right?  That's what you just said, right?
22     A    Uh-huh.
23     Q    So now let's do a hypothetical where I
24  take a screwdriver and I rip off the write head, but
25  I keep the circuitry intact, or something like that.

Page 143

1  I disable the write head.
2      A    Okay.
3      Q    And all I have is the electronic box and
4  I have a processor associated with the electronic box
5  that can convert the m-bit code words into an analog
6  signal.  Do you follow so far?
7      A    I think so.
8      Q    But then I somehow impede the analog
9  signal from making it to the write head or I break
10  the write head.  Do you follow the hypothetical?
11     A    I think so.
12     Q    Is it your opinion, then, that there
13  would be transitions in a recorded medium under this
14  new hypothetical?
15         MR. VERDINI:  Object to the form.
16         THE WITNESS:  You've broken the
17     system, so there can't be any transitions
18     on the magnetic medium.
19  BY MR. MAYLE:
20     Q    Which claim term requires transitions to
21  get to the magnetic medium, if any?
22         MR. VERDINI:  Object to the form.
23     That was your question.
24         MR. MAYLE:  No, it wasn't.
25

Page 144

1  BY MR. MAYLE:
2      Q    Do you understand what I'm saying now?
3      A    No, I don't.  No, I'm just --
4          MR. VERDINI:  Your question was, is
5      it your opinion that there would be
6      transitions in a recorded medium under
7      this new hypothetical.
8  BY MR. MAYLE:
9      Q    First, let's go back.  Do you understand
10  that hypothetical?
11     A    I think so.  I think -- I'll just -- my
12  vision is you just cut the wire on that -- on the --
13     Q    Right.  So the signal will come out?
14     A    The thing going out to the head, you cut
15  it.
16     Q    Yeah.  The signal will come out probably,
17  but then it will reach a dead end.  Okay?  Is that
18  fair?
19     A    Yeah.
20     Q    In Claim 13, in that hypothetical, where,
21  if anywhere, would the step of generating no more
22  than j consecutive transitions happen or does it not
23  happen?
24         MR. VERDINI:  Object to the form.
25         THE WITNESS:  I would still say

Page 145

1  it does -- it still happens.
2  BY MR. MAYLE:
3      Q    And where does it happen?
4      A    Wherever the analog circuitry is that
5  produces the waveform, which is presumably before
6  your cut.  There's a waveform there, we've enforced
7  this -- the j and k constraints.  They -- that
8  waveform has been generated, you just have cut its
9  ability to get to the head.  But that waveform --
10  whether that cut is there or not, that waveform still
11  exists.
12     Q    Okay.  But would it also be true that in
13  that hypothetical there won't be any reversals in the
14  magnetic orientation of adjacent bit regions along a
15  recording track of a magnetic recording medium?
16     A    Yeah, because you broke the system.
17  There's no way to store any information on the disc.
18  You just broke it.  It's a different system.  You're
19  describing a different system than is described in
20  the patent.  The patent assumes a working whole
21  system.
22     Q    Let me ask it again.  I'm looking for a
23  yes or no answer if you can give me one.
24         Under the hypothetical we just gave,
25  there would not exist a reversal of the magnetic

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 146

1  orientation of adjacent bit regions along the
2  recording track of a magnetic recording medium,
3  correct?
4      A    Yeah, under that circumstance, you've --
5  you've broken the system.  You might as well throw
6  away the hard drive.  You might as well throw it out,
7  send it back.  CK, it's broken.  It doesn't work.  It
8  doesn't -- it's irrelevant.
9      Q    Professor?
10     A    No, I understand, but it's just -- so,
11 yeah, there can't be any transitions on it, you broke
12 the system.  So the answer is yes, but I'm calling
13 out --
14     Q    What we're doing at this deposition is
15 trying to understand your claim construction.
16     A    I understand.
17     Q    And so I'm perfectly entitled to ask you
18 any hypotheticals I want to.
19     A    Yup.
20     Q    And if you don't understand them, you can
21 tell me.  But I'm trying to get to your understanding
22 of what the claims mean.  I'm not trying to spar with
23 you or anything like that.
24     A    I'm not trying to spar with you either.
25     Q    Okay.  I'm just going to do this one more

Page 147

1  time.
2      A    Go for it.
3      Q    We'll do it the hypothetical again.
4          Page four of your declaration.  We have
5  the hypothetical system.  It's fully functional,
6  except the circuit going to the write head has been
7  disabled.  Let's also say I removed the recording
8  medium.  It otherwise works.  So, for example, I
9  could test whether the encoding is working in the
10 chip, right?
11     A    Uh-huh.
12     Q    Someone might do that, right?
13     A    Uh-huh.
14         MR. KNEDEISEN:  You need to answer.
15 BY MR. MAYLE:
16     Q    Yes?
17     A    Yes.  I'm sorry.
18     Q    So I could test the encoding of the chip
19 without hooking into a write head, correct?
20         MR. VERDINI:  Object to the form.
21         THE WITNESS:  Yes.  Yes.
22 BY MR. MAYLE:
23     Q    Okay.  So let's say I do that.  I take a
24 hypothetical hard disc drive.  There's no magnetic
25 recording medium and I've removed the current at

Page 148

1  the -- that gets to the tip of the write head.  Okay?
2  Fair enough?
3      A    Yes.
4      Q    I plug in the device.  I feed in data
5  words and the chip does encoding to m-bit code words.
6  So far so good?
7      A    Yes.
8      Q    And then there's some kind of processor
9  that converts into an analog signal that starts going
10 towards the write head.
11     A    Yes.
12     Q    Correct?
13     A    Yes.
14     Q    Now let's look at Claim 13, and I'll ask
15 you, has each step been performed.  I'll go through
16 them one at a time.  That's the hypothetical.
17         Claim 13, the first step says:  Receiving
18 m-bit binary data words.
19         Correct?
20     A    Yes.
21     Q    Has that happened in our hypothetical?
22     A    Yes.
23     Q    And the second step says -- let me get it
24 out -- producing sequences of m-bit code words.
25         Has that happened?

Page 149

1      A    Yes.
2      Q    And where did that happen?
3      A    In the electronics.
4      Q    Right.  The third step says:  Imposing a
5  pair of constraints, j, colon, k, on the encoded
6  waveform.
7          Has this happened in our hypothetical?
8      A    Yes.
9      Q    Where has this happened?
10     A    Presumably in the electronics.  I'm okay
11 with that.
12     Q    Then it says, the fourth step:
13 Generating no more than j consecutive transitions of
14 said sequence in the recorded waveform, such that j
15 is greater than or equal to two.
16     A    Yes.
17     Q    Has this happened?
18     A    Yes.
19     Q    Where has this happened?
20     A    In the electronics.
21     Q    Okay.  Now I just want to see if
22 there's -- if what you're saying now under this
23 hypothetical is consistent with your interpretation
24 of transitions.
25     A    Okay.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 150

1      Q    That's what I'm trying to do.  There's no
2  surprise here.
3      A    Uh-huh.
4      Q    In paragraph 35 of your declaration, you
5  say that it's your opinion that the claim term
6  transition means a reversal in the magnetic
7  orientation of adjacent bit regions along a recording
8  track of a magnetic recording medium.
9      A    Uh-huh.
10     Q    But in the hypothetical we just did,
11  number one, there's no magnetic recording medium at
12  all, correct?
13     A    Correct.
14     Q    And the write head -- even if it was
15  there, the write head was unplugged so there could be
16  no reversal of magnetic orientation of adjacent bits,
17  right?
18     A    Correct, but the transitions in that
19  waveform still exist and if you had not broken the
20  system they would result in the magnetic transitions
21  that the patent is talking about.  So there's
22  transition in the waveform that would exactly show up
23  on the disc.
24     Q    I'm not asking what would have happened.
25  Let's just stick with what did happen in the

Page 151

1  hypothetical.  Okay?
2      A    Okay.
3      Q    In that hypothetical, it meets every step
4  of the claim as you interpret it?
5      A    Uh-huh.
6      Q    That's what you're saying?  Yes?
7      A    Yes.  Sorry.  Just zap me.
8      Q    But, isn't the case that if the Court
9  adopts your construction of transition, in that
10  hypothetical there are no transitions in the way that
11  you've defined it?
12         MR. VERDINI:  Object to the form.
13         Asked and answered.
14         THE WITNESS:  That's correct, there
15  are no reversals in magnetic, yeah.
16  BY MR. MAYLE:
17     Q    So I'm trying to understand.  To me, it
18  sounds like a contradiction.
19         That must mean that whatever that
20  hypothetical did, did not satisfy every step of the
21  claim, because there's no transitions, correct?
22     A    There's no transitions in the magnetic
23  medium, but there are transition in the waveform that
24  would exact -- if the system hadn't -- if we had a
25  system that was described in the patent, they would

Page 152

1  show up on the medium.
2      Q    So you're saying that -- are you saying
3  that the hypothetical I gave you is a system that's
4  not described in the patent?
5      A    That you -- this is describing the
6  waveform that's generated that eventually ends up on
7  the -- on the -- on the disc that ends up recording.
8  That's what I'm saying.
9      Q    And do you think that it eventually --
10  once you have something that will eventually get
11  there, you're done with the analysis?  That's good
12  enough for you?  Then there's -- there might be a
13  transition or there will be a transition, so there is
14  a transition; is that what you're saying?
15         MR. VERDINI:  Object to the form.
16         THE WITNESS:  That there's a
17  one-to-one correlation between the
18  transitions and the waveform that's
19  generated at the electronics box with the
20  transitions on the disc.  That's what I'm
21  saying.  Those are -- there's a
22  one-to-one correlation between them.
23  BY MR. MAYLE:
24     Q    They're not the same, though, right?
25         MR. VERDINI:  Object to the form.

Page 153

1         THE WITNESS:  I would say they are
2  the same.  There's a one-to-one
3  correlation between them.
4  BY MR. MAYLE:
5      Q    Nothing in your declaration -- when you
6  had your chance to opine on the meaning of
7  transition, there's nothing in here in your actual
8  declaration that says, oh, when I said a reversal of
9  the magnetic orientation of bit regions, I meant or
10  anything that correlates to that, correct?  That's
11  not what you said in your declaration?
12     A    That's not in the declaration.
13     Q    Right.
14     A    Those words are not there.
15     Q    So one more hypothetical.
16     A    But someone skilled in the art would
17  certainly understand that, for sure.
18     Q    I'm trying to stick with what's in your
19  declaration.
20         Let's say I take that electronics
21  piece -- let's call it a chip -- that is fully
22  capable of doing m-to-n encoding and it's fully
23  capable of imposing j and k constraints.  And I -- I
24  write a computer code that would model the circuit
25  exactly.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 154

1    Are you familiar with something like
2  that?
3      A    Okay.  Yes.
4      Q    Yes?
5      A    Yes.
6      Q    Can we call it a computer simulation?
7      A    I'm okay with that.
8      Q    Have you heard of a computer simulation?
9          MR. VERDINI:  Object to the form.
10         THE WITNESS:  Yes.
11  BY MR. MAYLE:
12     Q    And I generate random numbers as -- as --
13  to represent incoming data.
14     A    Okay.
15     Q    Are you familiar with that?
16     A    I'm okay -- I think I know what you're
17  saying.  I mean, yes, I'm following you so far.
18     Q    I feed in -- let's say I set my program
19  so I want to have it -- pick a number -- four to
20  five, m equals four and n equals five, j equals two,
21  k equals ten.
22         I set it up on a computer program on,
23  say, this laptop.  And I write a subroutine that
24  would generate random data.
25     A    Uh-huh.

Page 155

1      Q    And then I -- in my simulation program, I
2  use my simulated encoder to generate m-bit code
3  words.  I could do that on a laptop, right?
4      A    Okay.  Yes.
5      Q    Are you following what I'm saying so far?
6      A    I think so, yeah.
7      Q    And the computer program generates those
8  m-bit code words in such a way that it will satisfy a
9  j and k constraint on the computer.  Do you follow
10  that?
11     A    I think so.
12     Q    Would that hypothetical involve
13  transitions as you -- within the scope of Claim 13 of
14  the patent, as you understand that claim term
15  transitions?
16         MR. VERDINI:  Object to the form.
17         THE WITNESS:  That simulation --
18         that simulation would simulate an analog
19         waveform that had -- that had had the
20         transitions in them that met the j and k
21         constraints.  So that --
22  BY MR. MAYLE:
23     Q    But I'm asking you if those transitions,
24  as you're calling them transitions, do those
25  transitions meet your definition of transitions

Page 156

1  that's given in your declaration on paragraph 35?
2      A    In that simulation, there's not a
3  magnetic medium.  There wouldn't be transitions in
4  the magnetic medium in that case, but there would be
5  a waveform, a recorded waveform, that would have the
6  transitions that, if put on a disc, would result in
7  transitions.
8      Q    We're going to take a break.  I'm just
9  looking for a yes or no if you can.
10         In that simulation that we just
11  described, if we use your definition of transitions
12  in paragraph 35 and we just did that simulation and
13  stopped, would there be transitions in that
14  simulation under your definition in paragraph 35 of
15  your declaration?
16     A    There would not be magnetic transitions.
17     Q    So the answer is no, correct?
18         MR. VERDINI:  Objection.  Asked and
19         answered.
20         THE WITNESS:  But there would be --
21         there would be transitions -- there would
22         not be magnetic transitions.
23  BY MR. MAYLE:
24     Q    So the answer to my question is no,
25  right?

Page 157

1          MR. VERDINI:  Objection.  Asked and
2  answered.
3          THE WITNESS:  Yeah, I think I've
4  answered it the best way I could.  I said
5  there won't be magnetic transitions, but
6  there would be a waveform that, if
7  written on the disc, would result in
8  magnetic transitions.
9          I mean, the simulation doesn't
10  actually have the magnets in it and it
11  doesn't have the disc in it so you can't
12  have the magnetic transitions, but you
13  would have a waveform that, if written,
14  would result in it.
15  BY MR. MAYLE:
16     Q    Let me ask it another way then, come at
17  it at another angle.
18     A    Okay.
19     Q    If we did that simulation that we just
20  described, would that -- and then stopped, unplugged
21  the computer.  We're done, that was the simulation
22  for the day.  Does that practice Claim 13 of the '601
23  patent?
24         MR. VERDINI:  I object to outside
25         the scope of the deposition, and the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 158

1    claims haven't been construed.  So --
2  BY MR. MAYLE:
3      Q   Do you understand my question?
4      A   Ask again.
5      Q   If we did the hypothetical on the laptop,
6  we ran the simulation as we described and then
7  unplugged the laptop, never to do it again, and then
8  we break the laptop and throw acid on it and burn
9  it --
10     A   Uh-huh.
11     Q   -- would that process practice every step
12  of Claim 13 of the '601 patent as you construe the
13  claim?
14         MR. VERDINI:  Object to the form.
15         THE WITNESS:  The waveform that --
16     that -- the waveform that meets the
17     constraints is gone now.  Under your
18     hypothetical, it's gone, never to be
19     recovered again, so it -- it --
20         I'm sorry.  This thing just
21     collapsed.
22         That waveform is gone, and never
23     recorded onto a disc, never resulted in
24     magnetic transitions.
25

Page 159

1  BY MR. MAYLE:
2      Q   Then the conclusion would be that --
3      A   But the -- I would say that -- that it
4  would have generated a waveform that would have --
5  that would have met the elements of the claim if that
6  other stuff -- if there was a magnetic disc there.
7  So I guess -- and it's gone now.  So --
8         THE VIDEOGRAPHER:  11:06.  We're
9     off the record.  This is the end of media
10     number two.
11         (Brief pause.)
12         THE VIDEOGRAPHER:  11:21.  We're
13     back on the record.  This is the
14     beginning of media number three.
15  BY MR. MAYLE:
16     Q   Professor McLaughlin, during the break
17  did you talk to your counsel about the substance of
18  your testimony?
19     A   Not about the substance of the testimony.
20     Q   And do you recall that before the break
21  we were talking about a hypothetical scenario where
22  we ran a simulation.
23     A   Yes.  Yes.
24     Q   And we had to take break, but I want to
25  go back to my question.

Page 160

1      A   Sure.
2      Q   If we ran this hypothetical as we just
3  described -- if you can give me a yes or no answer,
4  that's what I'm looking for -- would every step of
5  Claim 13 -- as you understand the meaning of the
6  terms, would every step of that Claim 13 be practiced
7  by the simulation hypothetical?
8         MR. VERDINI:  Object to the form.
9         THE WITNESS:  In the form of a yes
10     or no answer, I'd say no.
11  BY MR. MAYLE:
12     Q   Okay.  And that's because?
13     A   There's no magnetic medium.
14     Q   There's no magnetic medium?
15     A   And there can't be magnetic transitions.
16     Q   Okay.  Thank you.
17         And you interpret transitions as a
18  reversal in the magnetic orientation of adjacent bit
19  regions along the recording track of magnetic
20  recording medium, correct?
21     A   Yes.
22     Q   We talked earlier in the day about
23  Professor Immink.  Do you remember that?
24     A   Yes.
25     Q   And we talked about EFM coding?

Page 161

1      A   Yes.
2      Q   And I think you told me that you
3  understand that EFM would be standard essential to
4  CD?
5      A   Yes.
6      Q   The CD standard?
7      A   Yes.
8      Q   And EFM is a DC-free code, right?
9         MR. VERDINI:  Object to the form.
10         THE WITNESS:  I don't remember.
11     Sorry, I don't remember.
12  BY MR. MAYLE:
13     Q   It wouldn't surprise you if EFM was a
14  DC-free code, right?
15         MR. VERDINI:  Objection.  Asked and
16     answered.
17         THE WITNESS:  You don't want to
18     hear my spiel, I don't think.
19  BY MR. MAYLE:
20     Q   Okay.  Well, I'll --
21     A   There's no such thing as DC free in
22  optical recording, period, because there's -- it's
23  only positive signals, so there can't be DC free.
24  It's called DC balanced.
25     Q   DC balanced.  We talked about the RDS

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Page 162

1  concept; is that what you're talking about?
2          MR. VERDINI: Object to the form.
3          THE WITNESS: I'm sorry.
4  BY MR. MAYLE:
5      Q    There was a phrase we saw earlier in that
6  -- remember that Blu-ray exhibit? It said something
7  running digital sum RDS. Do you remember seeing
8  that?
9      A    Yes.
10     Q    And there it is. It's on page 22 of that
11 Exhibit 1007, if you want to refresh your memory.
12     A    Uh-huh.
13     Q    As we discussed, at least page 22 of that
14 Exhibit 1007, says that RLL codes in optical systems
15 are DC free. And then it went to characterize that
16 as an RDS issue, correct?
17     A    Correct. And I answered that as saying,
18 in Blu-ray, it makes sense. I couldn't recall
19 whether, in CD, that there was a DC-free code or not.
20     Q    Okay.
21     A    I think I'm answering the same thing.
22     Q    Fair enough. Fair enough. And Blu-ray,
23 that Blu-ray paper mentioned something about a
24 slicer, remember? I didn't understand it.
25     A    Yeah.

## Page 163

1      Q    Is it fair to say that you understood
2  that something to do with the slicer had --
3      A    Was the reason.
4      Q    Was the reason for -- was the reason for,
5  quote, the DC-free constraint, correct?
6      A    Yes.
7      Q    Correct.
8          Do magnetic hard disc drives require a
9  DC-free constraint?
10         MR. VERDINI: Object to the form.
11     Q    In general?
12     A    I'm not -- I wouldn't use the -- I
13 wouldn't use the -- I wouldn't use the requirement in
14 the strictest possible way. It's certainly
15 desirable, certainly highly desirable, but I --
16         Because hard disc drives aren't standards
17 driven, they don't have standards associated with
18 them, then, you know, saying there's a requirement --
19 I think it's highly desirable as opposed to a
20 requirement that conforms to a standard. I'm trying
21 to be strict in the use of that.
22     Q    Thank you. I understand.
23         Let's set aside the standard essentiality
24 aspect for a moment, and I'll ask just you like for
25 technical reasons.

## Page 164

1          Is there a technical reason that you know
2  of that -- that a magnetic hard disc drive -- that a
3  waveform used in a magnetic hard disc drive cannot
4  have a DC component?
5          MR. VERDINI: Object to the form.
6  BY MR. MAYLE:
7      Q    Should I say the question again?
8      A    Please.
9      Q    Forget about standard -- standards. I
10 just want to focus on technical reasons.
11     A    Right.
12     Q    Is there any technical reason that a
13 waveform used in a magnetic hard disc drive cannot
14 have a DC component?
15         MR. VERDINI: Object to the form.
16         THE WITNESS: I'm just afraid you
17     used a double negative, and that's what
18     my brain is trying to unravel. So I'm
19     not trying to give you a hard time. I'm
20     just trying to understand.
21 BY MR. MAYLE:
22     Q    Yeah, let me phrase it again.
23         I'm not saying cannot have a DC free, I'm
24 saying cannot have a DC. So is there any technical
25 reason that a magnetic hard disc drive -- strike.

## Page 165

1          Is there any technical reason that the
2  waveform in a magnetic hard disc drive cannot have a
3  DC component?
4          MR. VERDINI: Object to the form.
5          THE WITNESS: I'm really not trying
6     to give you grief. I'm really trying to
7     understand, and I don't want to ask the
8     question for you, but that's the -- I
9     know I'm not supposed to do that, but I
10    think you're basically asking do magnetic
11    recording channels, should they be DC
12    free or not. Is that not what you're
13    asking?
14 BY MR. MAYLE:
15     Q    No, that's --
16     A    That's what my brain was going towards.
17     Q    I'm not asking if they are desirable or
18 if they ever have this. I'm saying, is there a
19 technical reason that they must have.
20     A    A DC-free component?
21     Q    A DC-free component.
22         MR. VERDINI: Object to the form.
23         THE WITNESS: Yes, because the
24    channel doesn't pass DC. So we don't
25    want to put a DC component in there that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 166

1  differentiated, because the head is a
2  differentiator.  It will eliminate any DC
3  content.  That's -- so you don't want to
4  put -- you don't want to put information
5  in the DC piece because the head will
6  eliminate it.
7        I know that -- again, that may not
8  be the question you're asking.  That's
9  where my brain is zeroing in on and
10  that's what I'm trying to get out of.
11 BY MR. MAYLE:
12     Q    Right.  No, I thank you for clarifying.
13        What I'm getting at is -- let's say we're
14 in a system on a chip that has the encoder that's
15 going to be used for a magnetic disc hard drive.
16     A    Okay.
17     Q    And we're just now talking about bits.
18 We're in the binary words still.
19     A    Yeah.
20     Q    And let's assume that this encoder will
21 impose a j constraint, as you understand that term
22 from the Claim 13 of the patent.
23     A    Okay.
24     Q    And it will impose a k constraint.
25     A    Yes.

Page 167

1      Q    And it will thereby achieve some code
2  rate which is defined as m over n, correct?
3      A    Right.
4      Q    And let's say we don't worry about the
5  DC-free.  And we say we want to make the rate --
6  generally we'd like to make the rate high, right, m
7  over n to be high?
8        Is that generally true for magnetic
9  systems?
10     A    That we want to make the rate high?
11     Q    Yes.
12     A    Yes.
13     Q    And if we then, on top of the j and k
14 constraints, imposed an additional constraint?
15     A    I understand.  I'm with you.
16     Q    Right.  To limit the DC component?
17     A    Okay.
18     Q    Wouldn't that then come at the expense of
19 rate, if we did that?
20     A    Likely, yes.
21     Q    And would -- is there a technical
22 reason -- and if we just stick with magnetic systems
23 and we're just on the chip -- that we must impose a
24 DC-free constraint and sacrifice the rate?  Is there
25 a reason that we would have to do that?

Page 168

1        MR. VERDINI:  Object to the form.
2        THE WITNESS:  What I would say is
3     we wouldn't necessarily have to do it,
4     but it would be desirable, but that we
5     wouldn't -- so I'll leave it at that.
6  BY MR. MAYLE:
7      Q    Okay.  Yeah, I think that answers it.
8  And as you said -- just one last thing.  I don't want
9  to mischaracterize, but I think that you're not -- is
10 it true that you're not aware of any standards that
11 would apply to a magnetic system that would require a
12 DC-free component in a code used in a magnetic
13 system; is that right?
14        MR. VERDINI:  Object to the form.
15        THE WITNESS:  That's correct.
16 BY MR. MAYLE:
17     Q    We're still talking about transitions.
18 I'm about to transition off.  And it was your
19 declaration, we started in, remember, paragraph -- we
20 went through paragraph 36, 37, 38, 39.
21     A    Yes, uh-huh.
22     Q    And we looked at the reasons that you
23 gave for your interpretation of transition.
24        You don't discuss any of the patent
25 figures in your declaration, at this part of your

Page 169

1  declaration, do you?
2      A    I don't believe so.
3      Q    And the patent doesn't have any pictures
4  of hard disc drives, does it?
5      A    That's correct.  I don't believe it does.
6      Q    And in these paragraphs, 34 through 40 of
7  your declaration on transitions, you don't cite the
8  prosecution history, right?
9      A    That's correct, I do not.
10     Q    So let's move on to some other topics.
11 I'd like to introduce a new exhibit.  This is 1012.
12        (McLaughlin Exhibit No. 1012 was
13     marked for the record.)
14 BY MR. MAYLE:
15     Q    Professor McLaughlin, have you ever seen
16 this document?
17     A    I don't believe so.
18     Q    Okay.
19     A    No.
20     Q    And you see on the bottom right-hand
21 corner, it says UMN_0001330?
22     A    Yes.
23     Q    In other cases you've been in, have you
24 heard the concept of Bates numbers?
25     A    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 170

1    Q    And in this case, I'll just tell you that
2 if it's UMN, underscore, that means it came from
3 University's files.
4    A    Yes.
5    Q    So this one starts at UMN_0001330 and it
6 goes on for some pages and ends on 1346, right?
7    A    Yes.
8    Q    And do you see on the first cover page,
9 on the top left, some handwritten -- something in
10 handwriting?
11    A    Yes.
12    Q    And what does that say?
13    A    I think it says: Patent no -- presumably
14 patent number -- 5,859,601.
15    Q    So that's the '601 patent in this case,
16 right?
17    A    Yes.
18    Q    And you do you see at the top it says
19 Alpha Consulting, Technology Transfer and
20 Commercialization?
21    A    Yes.
22    Q    Have you ever heard of this outfit?
23    A    No.
24    Q    And do you see below that it says MTR
25 Codes, University of Minnesota Invention Disclosure?

Page 171

1    A    Yes.
2    Q    And then you see it says Tech Assess,
3 March of 1999?
4    A    Yes.
5    Q    So keep this out.  Just look at the
6 patent for a minute, if you can, Exhibit 1 -- 1001,
7 somewhere.  And can you tell me the issue date -- no
8 the '601 patent.
9    A    I'm sorry.  Yes.  The what date?  Issue
10 date?
11    Q    The top right, so --
12    A    Yeah.  Issue date, January 12th, 1999.
13    Q    So this document, this Exhibit 1012 that
14 we're on now, was in March '99, so a couple months
15 after the patent issued, right.
16    A    After, yes.
17    Q    And you see at the bottom, the last
18 sentence, the last two sentences of this first page
19 of this document, it says:  Additional IC firms are
20 listed which appear to be serving other disc markets
21 such as DVD and DSL market.  These should also be
22 targeted.
23    Do you see that?
24    A    Okay.  Yes, I see that.
25    Q    And DVDs are -- well, they're optical

Page 172

1 systems, right?
2    A    Correct.
3    Q    They're not magnetic systems, right?
4    A    Correct.
5    Q    DSLs are not magnetic systems, right?
6    A    Correct.
7    MR. MAYLE:  Let's go -- let's do
8 another exhibit.  You can set that one
9 aside.
10    (McLaughlin Exhibit No. 1013 was
11 marked for the record.)
12 BY MR. MAYLE:
13    Q    Dr. McLaughlin, have you seen the exhibit
14 marked as Exhibit 1013?
15    A    I've never seen this before.
16    Q    And you see in the bottom right it's a
17 Bates number UMN ending in 916, correct?
18    A    Yes.
19    Q    And you see at the top of the page it's
20 on University of Minnesota letterhead?
21    A    Uh-huh, yes.
22    Q    And it says Patents and Technology
23 Marketing right below that, right?
24    A    Yes.
25    Q    And you see the date of May 11, 1999?

Page 173

1    A    Yes.
2    Q    So remember, just to orientate, the
3 patent was issued in January '99.
4    A    Yes.
5    Q    The previous exhibit we looked at talked
6 about targeting from -- it was in March of '99.  It
7 talked about targeting DVDs and DSLs, right?
8    A    Yes.
9    Q    Then this exhibit is now May 11, 1999,
10 right?
11    A    Yes.
12    Q    And do you see it's from a -- it's to a
13 Mr. Stephen Pomraning, IT manager at Lucent?
14    A    Yes.
15    Q    And he was at Murry Hill, New Jersey?
16    A    Yes.
17    Q    You used to work there, didn't you?
18    A    Yes.
19    Q    At Murray Hill, New Jersey?
20    A    Yup.
21    Q    And you see, after the greeting, it says
22 that Mr. Jaekyun Moon from the University of
23 Minnesota has developed a coding scheme to improve
24 storage capacity of magneto optical storage drives.
25    Do you see that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 174

1   A   Yes.
2   Q   And do you see at the bottom above the
3   signature block they enclose the patent, the '601
4   patent, right?
5   A   Yes.
6   Q   So it's fair to say the letter is talking
7   about the patent, right?
8   A   Yes.
9   Q   And it mentions magneto optical storage
10  devices, right, in the first sentence?
11  A   Yes.
12  Q   And then in the second paragraph, they
13  mention DVDs and DSLs again, correct?
14  A   Yes, they do.  Yes.
15  Q   And you said you haven't seen this
16  document before, right?
17  A   I have not.
18  Q   So it appears from this document that, at
19  least on this date, the University of Minnesota does
20  not have the view that the '601 patent is limited to
21  magnetic, according to you, correct?
22      MR. VERDINI:  Object to the form.
23      THE WITNESS:  I'm sorry.  I just
24  read it.  Could you ask your question
25  again.

Page 175

1   BY MR. MAYLE:
2   Q   So wouldn't it be fair to say that if the
3   University of Minnesota thought that '601 patent was
4   limited to magnetic recording media, they wouldn't be
5   sending out letters to Lucent mentioning DVDs and DSL
6   modems, correct?
7      MR. VERDINI:  Object to the form.
8      THE WITNESS:  Yes, they seem to be
9   indicating that the patent applies to
10  DVDs and DSL.
11  BY MR. MAYLE:
12  Q   Thank you.  Let's do another one.
13      Professor McLaughlin, would you disagree
14  with the University's apparent position there that
15  the patent applies to DSLs and modems, correct?
16  A   Yes, I would disagree with that, at least
17  within the context of the claims that we're looking
18  at.  But as a whole, yes, I would disagree with that
19  assertion.
20      MR. MAYLE:  We're up to 1014.
21      (McLaughlin Exhibit No. 1014 was
22  marked for the record.)
23  BY MR. MAYLE:
24  Q   I'm handing you the document 1014.  On
25  the bottom right it has the Bates number

Page 176

1   UNM_00016155.
2      Do you see that?
3   A   Yes.
4   Q   And have you seen this document before?
5   A   I have not.
6   Q   Okay.  And it appears to be an e-mail
7   dated April 3rd, 2002, right, an e-mail chain?
8   A   Yes.
9   Q   And let's go to the bottom, which would
10  be the -- I guess, the leading e-mail.  It says --
11  it's signed by -- it's from Jae Moon, correct?
12  A   Yes.
13  Q   And he wrote the e-mail on April 3rd,
14  2002 to someone named Beth Trend, right?
15  A   Yes.
16  Q   And then he copied himself, Jae
17  Moon@vermai.com in the To line?
18  A   Yes.
19  Q   And then he also wrote it to
20  Bbrickner@bermai.com?
21  A   Yes.
22  Q   And B. Brickner is probably Barrett
23  Brickner, right?
24  A   I assume so.
25  Q   And Jae says: As for the MTR patent, I'm

Page 177

1   not aware of any specific potential licensees but
2   given its wide applicability to new areas like DVD
3   and tape storage channels, I think it's worth paying
4   the $455 maintenance fee.
5      Right?
6   A   That's what he says, yes.
7   Q   And do you know what a maintenance fee is
8   in a patent?  Heard of it?
9   A   I think so.  I've heard of it.  Just to
10  kind of keep the patent alive or something like that?
11  Q   Right.  And so it appears he's telling
12  the University to pay the $455 maintenance fee,
13  right?
14  A   That what it seems, yeah.
15  Q   And he's saying we should do that because
16  the patent has wide applicability to DVD, correct?
17      MR. VERDINI:  Object to the form.
18      THE WITNESS:  Correct, that's what
19  he's saying.  Given its wide
20  applicability to new areas like this,
21  yes, he's saying that.
22  BY MR. MAYLE:
23  Q   Right.  And DVD is not a magnetic system,
24  right?
25  A   Correct.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 178

1    Q    And so you said you talked to Jae Moon
2  about the '601 patent, right?
3    A    Uh-huh.
4    Q    Did this issue come up when you talked to
5  Jae Moon?
6    A    No.
7        MR. VERDINI:  Objection.  Calls for
8    what we discussed in privileged
9    conversations, unless there are
10   conversations you had with Jae outside of
11   counsel.
12 BY MR. MAYLE:
13   Q    So do you disagree with Jae Moon's
14 comment in this e-mail that the patent has wide
15 applicability to new areas like DVD?
16   A    I disagree because the DVD is a standard
17 and the DVD standard does not, as far as I know, have
18 anything with MTR codes in it.
19   Q    But this was in 2002, right?
20   A    Yes.
21   Q    Was the DVD standard out in 2002?
22   A    I'm almost certain.  I'm not sure when
23 the DVD standard started.
24   Q    Right.  Setting aside --
25   A    He may have -- he may have contemplated

Page 179

1  it to go in the standard.
2    Q    Setting aside the issue of whether the
3  standard of DVD requires MTR --
4    A    Okay.
5    Q    -- you would -- isn't it true that you
6  disagree with Jae Moon's comment about DVD because
7  you limit the claims to magnetic transitions only,
8  correct?
9    A    Yes.
10   Q    And that's one reason you would disagree
11 with him, right?
12   A    Correct.
13       MR. MAYLE:  All right.  Let's do
14   another one.
15       (McLaughlin Exhibit No. 1015 was
16   marked for the record.)
17 BY MR. MAYLE:
18   Q    This is Exhibit 15 now.  You see the
19 Bates number at the bottom of the first page is UMN_
20 then 1202, right?  Professor, is that the one we're
21 looking at?
22   A    Yes.
23   Q    And on the backside there's something.
24 If you look on the back.  Flip it over real quick.
25 Do you have two pages?

Page 180

1    A    Yes.
2    Q    It was supposed to be two pages, they
3  printed it front and back.
4    A    Okay.
5    Q    So there's like an attachment, it says,
6  and then it goes to page 1203.
7    A    Yup, uh-huh.
8    Q    So let's start in the middle of the page.
9  You see at lerch 11:42 p.m., 6/9/2008.
10   A    Middle of the page.  I'm sorry.
11   Q    It's a third of the way down maybe.
12   A    Okay, yeah, yeah.  Now I'm with you.
13   Q    So now the last thing -- the maintenance
14 fee document we just looked at was in 2002.  So now
15 we're in 2008, right?
16   A    Okay.
17   Q    And let's see if he signs it.  If you
18 look on the back page you'll see who signs it.  It's
19 JAE.
20   A    Yeah.
21   Q    That's Jae Moon, right?
22   A    Yeah.
23   Q    And he's writing to someone named Ann
24 Slavec.
25       Do you see that?

Page 181

1    A    Uh-huh, yes.
2    Q    And another person named Jay, but this
3  time Jay Schrankler?
4    A    Uh-huh.
5    Q    It's S-c-h-r-a-n-k-l-e-r.
6    A    Yes.
7    Q    Do you know who Ann Slavec and Jay
8  Schrankler are?
9    A    No.
10   Q    And Jae Moon says in his e-mail, June 9,
11 2008: I think we have something very significant
12 here.  You may recall that I mentioned more than once
13 about how I expected the U patented MTR technology
14 might be used by optical recording products.
15       Do you see that?
16   A    Uh-huh, yes.
17   Q    And then you see in the next paragraph he
18 says he has strong evidence that the modulation code
19 called 17PP that's in Blu-ray and HDVD products is
20 derived from our MTR technology, right?
21   A    I see that he's saying that, yes.
22   Q    And then he has a summary of how the 17PP
23 code uses the MTR code idea, right?
24   A    Uh-huh, yes.
25   Q    And Blu-ray and HDVD products are not

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 182

1  magnetic systems, right?
2      A   That's correct.
3      Q   And so would you disagree with Jae
4  Moon -- Jae Moon -- well, strike that.
5          You understand he's talking about the
6  '601 patent here, correct?
7          MR. VERDINI:  Object to the form.
8          THE WITNESS:  He hasn't explicitly
9      said the '601 patent, but when he says
10     Our MTR technology, it makes sense that
11     that's -- his referring to the overall
12     technology wouldn't surprise me, that
13     he's referring to the patent.  He may
14     have other MTR stuff that's not in the
15     patent, I don't know.
16 BY MR. MAYLE:
17     Q   Well, let's assume for a moment that he's
18 talking about the '601 patent and he says in his
19 e-mail -- he talks about Blu-ray products and HDVD
20 products using the MTR code idea.  Would you disagree
21 with that?
22         MR. VERDINI:  Object to the form.
23         THE WITNESS:  I'm sorry.  You're
24     asking me to disagree with what?
25

Page 183

1  BY MR. MAYLE:
2      Q   So do you think it's possible -- under
3  your understanding of Claim 13 is it even possible
4  that a Blu-ray product could use Claim 13 of the '601
5  patent?
6      A   It's not for optical recording, so it
7  would have to be something else.  The '601 maybe had
8  other stuff or modifying versions of it or whatever.
9      Q   Okay.  Well, let's look at the -- if you
10 flip it over, you'll see there's an attachment?
11     A   Okay.
12     Q   So I haven't given you the attachment
13 yet, so let's mark the next exhibit.
14         MR. MAYLE:  This one is also
15     printed double side.  Have they all been
16     double sided?
17         MR. VERDINI:  At least the ones
18     that we've gotten.  I don't know about --
19         MR. MAYLE:  I wasn't positive about
20     this one.
21         MR. VERDINI:  They do appear to be
22     all double sided.
23         (McLaughlin Exhibit No. 1016 was
24     marked for the record.)
25

Page 184

1  BY MR. MAYLE:
2      Q   So the 04 is the first page.  This is a
3  two-page document.  This is 1016.
4          This is a two-page document and,
5  Professor, you'll see in the bottom right corner of
6  the top page it starts with Bates number UMN 1204,
7  right?
8      A   Yes.
9      Q   And it goes over to 1205?
10     A   Yes.
11     Q   And flip it over to the back and look at
12 the bottom:  In conclusion, it's safe to say -- it
13 seems safe to say that all current Blu-ray and HDVD
14 players discs infringe upon the University of
15 Minnesota technology as described in the Moon, et
16 al., U.S. patent 5,859,601, right?
17     A   That's what that says, yes.
18     Q   So he's definitely talking about -- in
19 the e-mail we just looked at, he's talking about the
20 '601 patent, right?
21         MR. VERDINI:  Object to the form.
22         THE WITNESS:  I think that's a safe
23     assumption.
24 BY MR. MAYLE:
25     Q   And in the paragraph above, the one we

Page 185

1  just looked at, he actually talks about Claim 13.  He
2  mentions Claim 13, right?
3      A   Sorry.  I'm looking at what he's talking
4  about.  I'm sorry.  Your question was?
5      Q   So I was just saying that Jae Moon, in
6  this attachment, actually mentions Claim 13
7  specifically, correct?
8      A   Yes.
9      Q   And so it's fair that he's saying that he
10 thinks, that Jae Moon thinks, that the Blu-ray
11 standards or -- sorry -- the Blu-ray players practice
12 Claim 13 of the '601 patent, right?
13         MR. VERDINI:  Object to the form,
14     foundation.
15         THE WITNESS:  Yup, that's what
16     he -- that seems what he's saying, yeah.
17 BY MR. MAYLE:
18     Q   And would you disagree with that?
19     A   Yes, I disagree with that.
20     Q   And the basis is -- is the basis of your
21 disagreement because you interpret Claim 13 as being
22 limited to do magnetic transitions?
23     A   That's correct.
24         MR. VERDINI:  Object to the form.
25         MR. MAYLE:  Let's do another one.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 186

1          (McLaughlin Exhibit No. 1017 was
2     marked for the record.)
3     BY MR. MAYLE:
4          Q    This is -- I'm handing you Exhibit 1017.
5     And Professor, you see that there's a Bates number on
6     the bottom right UMN_1072, and then it continues on
7     to 1074, right?
8          A    Yes.
9          Q    And you see the date at the top,
10    December 17, 2008, on the cover page?
11         A    Yes.
12         Q    So we're still in 2008.
13         A    Yes.
14         Q    The last e-mail we just looked at was in
15    2008, right?
16         A    Yes.
17         Q    And you see it's the letterhead of the
18    University of Minnesota, Office of the General
19    Counsel?
20         A    Uh-huh.
21         Q    And they're sending this letter via
22    Federal Express to someone named Mr. Lawrence A.
23    Horn.  Do you see that?
24         A    Yes.
25         Q    Have you heard of Mr. Lawrence A. Horn?

Page 187

1          A    No.
2          Q    Have you heard this MPEG LA, LLC?
3          A    I think that's the consortium that
4     manages the MPEG patent pool or something like that.
5          Q    And you see the Re line, Evaluation of
6     U.S. Patent 5,859,601 for Blu-ray Disc Patent
7     Portfolio License?
8          A    Okay.  Yeah.  So maybe I was right.
9     Miracle.
10         Q    And you see after Dear Mr. Horn, the
11    first paragraph says that the University is
12    submitting the '601 patent for an evaluation of
13    essentiality for the Blu-ray disc standard, right?
14         A    Okay.  Yup.
15         Q    And they enclose the patent.  In the next
16    paragraph they enclose the prosecution history and
17    all the references, right?  That's what it says,
18    right?
19         A    Yes.
20         Q    And then they say we're -- the next
21    sentence is they're basically requesting an
22    evaluation on the '601 patent with respect to all
23    basic format specs for Blu-ray formats, correct?
24         A    Yes.
25         Q    And then the next sentence they say --

Page 188

1     the next paragraph they say:  The following is our
2     explanation of the essentiality of Claim 13 of the
3     '601 patent, the Blu-ray format.
4          Correct?
5          A    Yes.
6          Q    And let's just go to the next page, 1073.
7     And you see, second paragraph from the bottom, do you
8     see they quote -- they block quote Claim 13, right,
9     of the 601 patent?
10         A    Uh-huh, yes.
11         Q    And then if you go to the last page above
12    the signature block, where it starts with, In view of
13    the foregoing.  Do you see that?
14         It says:  At least Claim 13 is essential
15    to the Blu-ray disc specifications for recording.
16         A    Yup.
17         Q    And you would disagree with that, right?
18         A    Yes.
19         Q    And the basis for your disagreement, is
20    that you limit Claim 13 to magnetic?
21         A    Yes.
22         Q    And you see -- if you look in the
23    signature block here, you'll see it's Andrew G.
24    Rozycki, Associate General and Senior Patent Counsel.
25    Do you see that?

Page 189

1          A    Okay.  Yes.
2          Q    Have you ever talked to him?
3          A    No.
4          Q    And you see that there are some people
5     copied, MPEG.  Do you see Jay Schrankler is there
6     again?
7          A    Yes.
8          Q    Michael F. Moore is copied there.
9          A    Okay.
10         Q    And you see Jae Moon?
11         A    Okay.
12         Q    And Barrett Brickner is copied on here?
13         A    Yes.
14         Q    Let's do the next one.
15         (McLaughlin Exhibit No. 1018 was
16    marked for the record.)
17    BY MR. MAYLE:
18         Q    We're up to Exhibit 1018, Professor.  And
19    you see that on the bottom right there's a Bates
20    number, UMN_0001055?
21         A    Uh-huh.
22         Q    And it goes to 1057, right?
23         A    Uh-huh.
24         Q    And here there's a letter, do you see the
25    date, March 12, 2009?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 190

1    A   Yes.
2    Q   And you see it's to Mr. Andrew G. Rozycki
3  in the Via E-mail.  It's in the To block at the very
4  top, under the date.
5    A   Oh, sure.  Yes.  I'm sorry.
6    Q   So that was the guy that wrote the e-mail
7  to MPEG or that wrote the letter.
8    A   Yup.
9    Q   The previous exhibit.
10    A   Yes.
11    Q   So this looks like it's -- well, you can
12  see what it is.  The Re line, it's the investigation
13  of the University of Minnesota patents in connection
14  with potential Blu-ray disc patent licensing program.
15       Right?
16    A   Uh-huh, yup.
17    Q   And the center of this letter says:  This
18  letter provides the results of our evaluation
19  regarding the '601 patent.  In summary, it is our
20  opinion that the '601 patent is essential for BD-RO,
21  BFS discs and some other things, correct?
22    A   Uh-huh.
23    Q   And would you disagree with that?
24    A   I would.
25    Q   And again, are you disagreeing because

Page 191

1  you limit the claims to magnetic?
2       MR. VERDINI:  Object to the form.
3       THE WITNESS:  Yup.
4  BY MR. MAYLE:
5    Q   And have you seen this document before?
6    A   No.
7    Q   Are you aware that the University has
8  sought opinions on whether the '601 patent is
9  essential for Blu-ray disc?
10    A   No, this is the first I've seen it.
11    Q   Are you aware that they did receive an
12  opinion on -- and saying that the '601 patent is
13  essential for Blu-ray disc?
14    A   No.
15    Q   Did you ask for any opinions on the '601
16  patent that other people have done?
17    A   No.  I'm not sure what you -- ask your
18  question.  Did I ask for opinions that other people
19  have done on the '601 patent?
20    Q   Did you ask anyone to provide to you, for
21  example, internal documents from the University that
22  would bear on the scope of how they understand the
23  '601 patent?
24    A   I did not ask for that.
25       MR. MAYLE:  Well, there's an

Page 192

1  attachment.  Just so you have the
2  complete, there's an attachment to this
3  document.  It was produced separately, so
4  I'll mark it separately.
5       (McLaughlin Exhibit No. 1019 was
6  marked for the record.)
7  BY MR. MAYLE:
8    Q   Exhibit 1019, you'll see it starts on --
9  Professor, will you confirm that what you're looking
10  at starts with Bates number UMN 1058?
11    A   Yes.
12    Q   And it goes on until 1060?
13    A   Yes.
14    Q   Am I safe to assume you have not seen
15  this document, either?
16    A   I have not seen it.
17    Q   And you see the title of it is the
18  March 2009 Interim Report of the University of
19  Minnesota, U.S. Patents Essential for Blu-ray.
20    A   That's the title, yes.
21    Q   And you see they identify Claim 13 of the
22  '601 patent?
23    A   Yes.
24    Q   And then they give -- this third column
25  of the first page, BD-RO Part 1 BFS.

Page 193

1       Do you see that?
2    A   Yes.
3    Q   Do those letters and numbers mean
4  anything to you?
5    A   BD means Blu-ray disc.  RO -- I can only
6  guess what the rest means.  But it does refer to
7  Blu-ray.
8    Q   That's probably -- do you think that's a
9  standard -- certain Blu-ray standard?
10       MR. VERDINI:  Object to the form.
11       THE WITNESS:  It would not surprise
12  me at all, that they're referring to
13  sections of the standard.
14  BY MR. MAYLE:
15    Q   Do you disagree with anyone who says that
16  Claim 13 of the '601 patent is standard essential to
17  Blu-ray disc technology?
18    A   As I said before, '601 doesn't apply --
19  or applies to magnetic recording, so I disagree.
20    Q   Professor McLaughlin, are you aware of
21  any documents where Dr. Moon has indicated that Claim
22  13 is limited to magnetic recording?
23    A   Other documents?
24    Q   Have you seen any documents at all --
25  setting aside the patent and the way you interpret

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 194

1  the patent and the prosecution, have you seen any
2  documents where Dr. Moon has stated or implied that
3  Claim 13 of the '601 patent shouldn't be limited to
4  magnetic systems?
5      A   Could be some of the papers that he's
6  written.  I don't -- some of the other papers that
7  he's written around MTR codes, he may have -- there
8  may have been language in there that it's limited to.
9  I don't remember.  I've read several of those papers,
10  but I mean, that might be considered part of the
11  package that we're looking at.
12      So no other documents other than the
13  patent and maybe some other papers that he had
14  written.  I think that's the gist of your question.
15      Q   Right, I just wanted to know.
16      We just reviewed -- we've just went over
17  a document that started in 1999 that said --
18  University internal documents that said we should
19  target DVDs and DSLs, right?
20      A   Uh-huh, yes.
21      Q   And then in 1999 they sent a letter to
22  Lucent talking about DVDs and DSLs, right?
23      A   Uh-huh.
24      Q   Then in 2002, Jae Moon said pay the issue
25  fee because the patent has wide applicability to

Page 195

1  DVDs, right?
2      MR. VERDINI:  Object to the form.
3  BY MR. MAYLE:
4      Q   You saw that e-mail.
5      A   Yup.
6      Q   Right?
7      A   Yes.
8      Q   And then we saw in 2008, Jae Moon writes
9  an e-mail and it says, hey, Claim 13 of the '601
10  patent reads on the Blu-ray disc standards, correct?
11      A   Uh-huh, yes.
12      Q   And then the University sent a letter to
13  MPEG LA stating that they think that -- or the
14  University took the position where Claim 13 covers
15  the Blu-ray disc standard, right?
16      MR. VERDINI:  Object to form.
17      THE WITNESS:  Yes, we saw that
18  document.
19  BY MR. MAYLE:
20      Q   And then someone wrote back to the
21  University on behalf of MPEG LA and said that Claim
22  13 covers several Blu-ray disc standards, correct?
23      MR. VERDINI:  Object to the form.
24      THE WITNESS:  Yes.
25

Page 196

1  BY MR. MAYLE:
2      Q   So given this history of the University's
3  positions, aren't you surprised to see how they're
4  asking the court in this case to limit the claim to
5  magnetic recording?
6      MR. VERDINI:  Object to the form.
7      THE WITNESS:  Not at all.  I'm not
8  aware of any of this -- all this is the
9  first time I've seen all of it.  It is
10  really surprising to me that they were
11  able to get that, given what it is I read
12  with the patent, the prosecution history,
13  the documents surrounding it.  It was
14  clear to me that that was the universe in
15  which I was living and it's clear to me
16  that it's directed towards magnetic
17  recording.
18      Everything you've shown me is a
19  surprise to me, I've never seen it
20  before.
21  BY MR. MAYLE:
22      Q   So all those people who came to a
23  contrary conclusion, they just got it wrong, then,
24  right?
25      A   Yeah, I would say they got it wrong.

Page 197

1      Q   Okay.  Even Jae Moon was wrong, wasn't
2  he?
3      MR. VERDINI:  Object to the form.
4      THE WITNESS:  I -- yeah, it doesn't
5  surprise me he would try to do something
6  else, but, no, that -- it doesn't change
7  any of my opinions.
8  BY MR. MAYLE:
9      Q   Why would that not surprise you?
10      A   I think people -- people try to take
11  their patents and extend them beyond what they're
12  originally intended for.  That's what lawyers do,
13  that's what inventors do, try to expand the scope of
14  their inventions to try to license it, get some more
15  money.
16      Q   Do you think that's a fair thing to do
17  for someone who has a patent, is to extend the patent
18  past it's proper scope to get some --
19      A   It doesn't --
20      MR. VERDINI:  Object to the form.
21  BY MR. MAYLE:
22      Q   Let me finish the question.
23      A   Sure.
24      Q   Do you think it's a fair thing to do for
25  someone who has a patent to try to extend the patent

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 198

1  past it's proper scope in order to get some more
2  money?
3        MR. VERDINI:  Object to form.
4        THE WITNESS:  Yeah, I think it's a
5     fair thing to do.  That's why I said it
6     didn't surprise me.  People do that.
7  BY MR. MAYLE:
8     Q    Have you ever seen a patentee, then, that
9  would to try to narrow the scope to avoid invalidity?
10       MR. VERDINI:  Object to the form,
11    foundation.
12       THE WITNESS:  Yeah, I mean, that
13    doesn't surprise me either.  That's the
14    process we're engaged in.
15  BY MR. MAYLE:
16    Q    Do you think that's a fair thing for a
17  patentee to do?
18       MR. VERDINI:  Object to the form.
19       THE WITNESS:  Do I think that's a
20    fair thing for a patentee to do?  Yeah, I
21    think so.
22  BY MR. MAYLE:
23    Q    Do you know if the claims are construed
24  the same for infringement as they are for validity or
25  can they be construed differently?

Page 199

1     A    Say again, slowly.
2     Q    So I'm asking if you know whether or not
3  claims must be construed or should be construed the
4  same way for purposes of infringement as for
5  validity?
6     A    Do --
7     Q    I'm asking if you're aware of anything
8  that would say that?
9     A    Without reading more into it -- I think
10  you're asking is there one construction that would
11  apply to both.
12    Q    Is that the way that claims should be
13  construed?  I'm asking if you --
14    A    Yeah, there's one construction.  That's
15  the job -- that is my job is to take claim terms and
16  try to elucidate them, irrespective of what --
17  whether it's for invalidity or whatever, that's my
18  job.
19    Q    So if the claims cover the Blu-ray
20  standard, they cover optical systems, right?  If?
21       MR. VERDINI:  Object to the form.
22       THE WITNESS:  Ask again.
23  BY MR. MAYLE:
24    Q    If the claims are construed --
25    A    Yes.

Page 200

1     Q    -- this is an if.
2     A    Yeah.
3     Q    -- to cover the Blu-ray disc standard,
4  that must mean that the claims cover optical
5  recording systems, right?
6        MR. VERDINI:  Object to the form.
7        THE WITNESS:  If they're construed
8     to cover Blu-ray, then they cover optical
9     disc.  We're talking about construction;
10    is that right?
11  BY MR. MAYLE:
12    Q    Yes.
13    A    Yes.
14    Q    So that means that the claims are not
15  limited to magnetic systems, right?
16    A    If someone construed them that way.
17    Q    All right.  Let's go back to your
18  opinions, Exhibit No. 1005.  And let's go on.  I
19  think we've already hit part of recorded waveform.
20       MR. VERDINI:  So can we go off the
21    record for a second?
22       MR. MAYLE:  Sure.
23       THE VIDEOGRAPHER:  12:04.  We're
24    off the record.
25       (Brief pause.)

Page 201

1        THE VIDEOGRAPHER:  12:05.  We're
2     back on the record.
3  BY MR. MAYLE:
4     Q    Professor, so we're now going to switch
5  gears a little bit.  What you'll need out for right
6  now is your declaration, so keep that handy.  And
7  also then get back Exhibit 1004, which is what we
8  submitted to the Court, the part we submitted to the
9  Court.  Just have both of those handy.
10    A    That's the --
11    Q    That's that chart.  Okay.
12       So let's start with page 20 on your
13  declaration.  And we'll start with the section B,
14  Recorded Waveform, and then Recorded Waveform, okay?
15    A    Yes.
16    Q    And you have listed UMN's proposed
17  constructions where the recorded waveform is a
18  waveform recorded to a magnetic recorded medium,
19  right?
20    A    Uh-huh.
21    Q    And just keep that out and then flip back
22  to Exhibit 1004.  And page three of 1004.
23    A    Yes.
24    Q    And you see Recorded Waveform?
25    A    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 202

1    Q    And here the University says that a
2  recorded waveform is a continuous signal recorded on
3  a medium, right?
4    A    Uh-huh, uh-huh.
5    Q    So isn't it true that the submission to
6  the Court on Exhibit 1004 for recorded waveform is
7  different than the UMN's proposed construction on
8  page 20 of your declaration?
9         MR. VERDINI:  Object to the form.
10        THE WITNESS:  The words are
11        different, I would say they mean the same
12        thing.  A wave form or continuous signal,
13        I would say, is -- I'm happy with those,
14        both of those.
15 BY MR. MAYLE:
16   Q    Okay.  So -- but on page 20 of your
17 declaration, the recorded waveform would be a
18 magnetic recorded medium, right?
19   A    Uh-huh.
20   Q    But on Exhibit 1004, it's just a
21 continuous signal recorded on a medium.  It doesn't
22 say magnetic recorded medium, right?
23   A    Correct, on this chart it does not say
24 magnetic.
25   Q    So that would be a material difference,

Page 203

1  right?
2         MR. VERDINI:  Object to the form.
3         THE WITNESS:  Well, I mean --
4         material difference, I mean the
5         context -- so the word magnetic is
6         removed, the context is still magnetic
7         medium.  It just simplifies it a little
8         bit.
9  BY MR. MAYLE:
10   Q    Okay.  We talked about earlier continuous
11 signal.
12   A    Yes.
13   Q    We talked about that.
14   A    Uh-huh.
15   Q    So I don't want to -- let's go to
16 paragraph 42 in your declaration.  You start off
17 with:  As described above, the '601 patent discloses
18 a coding scheme intended to reduce bit error
19 probability through the j constraint, which limits
20 the number of consecutive magnetic transitions.
21        Right?
22   A    Yes.
23   Q    When you say as described above, just in
24 this paragraph 42, what are you referring back to?
25 Do you remember?

Page 204

1    A    I assume there's somewhere in my
2  declaration that talks about the purpose or purposes
3  for the -- was around reducing error rate.
4    Q    Okay.  Fair enough.  But then you --
5  after that sentence in paragraph 42, you cite again
6  the specification at column two, 59, 61 and two, 40
7  to 42, right?
8    A    Uh-huh, yes.
9    Q    And we talked about those passages
10 earlier, right?
11   A    Yes.
12   Q    And you remember that those were the
13 passages cited at paragraphs 37 and 38 of your
14 declaration, a page earlier?
15   A    Go again.  I'm sorry.
16   Q    So paragraph 42, you cite column two, 59
17 to 61?
18   A    Yes.
19   Q    And column two, 40 to 42.
20   A    Yes.
21   Q    And that's the only thing you cite there,
22 right?
23   A    Yes.
24   Q    That's the same citations to the spec
25 that appear in paragraph 37 and 38?

Page 205

1    A    Correct.
2    Q    Correct.
3    A    Yup.
4    Q    So in paragraph 42, there's nothing new,
5  right?
6         MR. VERDINI:  Object to the form.
7         THE WITNESS:  I don't know what you
8         mean by nothing new.  We're -- have not
9         cited different parts of the patent.  So
10        if that's what you mean by nothing new, I
11        would agree with that.
12 BY MR. MAYLE:
13   Q    Okay.  Thanks.  Let's go to paragraph 43.
14 You say:  Moreover, the only relevant waveforms
15 referred to in the specification of the '601 patent
16 are magnetization waveforms.
17        Do you see that?
18   A    Yes.
19   Q    What do you mean by the only relevant
20 waveforms referred to in the specification?
21   A    The wave forms that are being referred to
22 in the specification are waveforms that are generated
23 to be recorded on a -- on magnetic disc.
24   Q    But you say the relevant waveforms.  Are
25 there other waveforms in the specification that are

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 206

1  not relevant, according to your opinion?
2     A  I don't remember.  I don't remember if
3  there are other waveforms.  I think relevant
4  waveforms is just -- those are my own words.  I
5  wouldn't be surprised.  It's just in the waveforms.
6     Q  Okay.  And then you dropped --
7     A  I'm not sure I'm intending to
8  relevant to -- distinguish or something.
9     Q  Yeah.  I'm just trying to understand what
10  you mean.
11     A  Yeah, I don't believe I am.
12     Q  You drop a footnote five, right?  Do you
13  see that?
14     A  Uh-huh.
15     Q  In a quick summary, can you just tell us
16  what you're trying to say in footnote five, why
17  you've dropped this footnote five?
18     A  That is just trying to distinguish the
19  difference between a read-back waveform and a
20  recorded waveform.  I'm trying to say they're
21  different things.
22     Q  Well, let me ask you.  Let's assume an
23  ideal situation where there's no noise, the signal
24  was recorded correctly and it was read back
25  perfectly.  Would the read-back waveform be the same

Page 207

1  as the recorded waveform?
2     A  I'm going to get technical on you.  I
3  mean, because of how the head works, it's not -- it
4  depends on what type of optical disc that the read
5  back -- the read back signal detects changes, not the
6  actual waveform itself.  So it -- yeah, it won't be
7  same.
8     Q  I think I understand.  Let me change the
9  question then.  Thank you.
10      Let's assume that the device was using
11  the an NRZI recording format and so it was recording
12  ones for transitions and zeros for nontransitions.
13  Would your answer be the same to the last question?
14     A  Yes.
15     Q  So the read-back signal would not be the
16  same as the recorded signal?
17     A  No.  Again, the head is a differentiator.
18  So whether you're using NRZ or NRZI doesn't matter.
19  The head is a differentiator and all you'll see is
20  blips where the changes are, not the actual, the
21  waveform.
22     Q  I understand.
23      Paragraph 44, let's go to that.  You say
24  that Claim 13 recites imposing a pair of constraints,
25  j, k, on the encoded waveform, right?  Do you see

Page 208

1  that?
2     A  Yes.
3     Q  And then you say:  In my opinion, a
4  PHOSITA would understand the encoded waveform, one
5  read in light of the specification, to be the
6  recorded waveform.
7     A  Yes.
8     Q  That's your opinion, right?
9     A  Yes.
10     Q  When you say, when read in light of the
11  specification, what do you mean by that?
12     A  Just in the context of the -- in the
13  context of the patent, is I think what I mean by
14  that.  Taking the patent by itself in that context.
15     Q  Isn't it true that, outside of the
16  claims, the phrase, the encoded waveform, is not even
17  used in the specification of the '601 patent, right?
18     A  That's correct.  The encoded waveform
19  does not appear in the specification, that term.
20     Q  So when you say a PHOSITA would
21  understand that encoded waveform, in quotes, when
22  read in light of the specification is the recorded
23  waveform, what part of the specification are you
24  talking about?
25     MR. VERDINI:  Objection.  Asked and

Page 209

1  answered.
2     THE WITNESS:  Ask me again.  I'm
3  sorry.
4  BY MR. MAYLE:
5     Q  You say in paragraph 44 that a PHOSITA
6  would understand, quote, the encoded waveform,
7  unquote, when read in light of the specification, to
8  be the encoded waveform.
9     A  Uh-huh.
10     Q  I want to know which specific part of the
11  specification, if any, are you referring to in this
12  sentence?
13     MR. VERDINI:  Same objection.
14     THE WITNESS:  The reading of the
15  term encoded waveform happens in the
16  claim.  So when read, it's read in the
17  claim and it's read in the context of the
18  specification.
19  BY MR. MAYLE:
20     Q  So -- thank you.
21     So the encoded waveform is recited --
22  those words are in Claim 13, right?
23     A  Yes.
24     Q  They're not anywhere else in the
25  specification, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 210

1    A   Right.
2    Q   And so when you put in this paragraph 44
3  the encoded waveform in quotes, and then you say,
4  When read in light of the specification, are you
5  talking about the claim or the specification, both,
6  neither?  What does that mean?
7         MR. VERDINI:  Object to the form
8  and asked and answered.
9         THE WITNESS:  When you read the
10    words encoded waveform, that's in Claim
11    13 or in the claims, and so the context
12    in which that's read is in the entirety
13    of the patent, in the entirety of the
14    patent and in the entirety of the
15    specification.
16  BY MR. MAYLE:
17    Q   Right.  So what we're trying to do here
18  is figure out what the encoded waveform means, right?
19    A   Yes.
20    Q   And that's the term that's in the claim,
21  right?
22    A   Uh-huh.
23    Q   And so I think you're saying that you
24  used the specification to do this, correct?
25    A   Uh-huh.

Page 211

1         MR. VERDINI:  Yes?
2         THE WITNESS:  Yes.  Sorry.
3  BY MR. MAYLE:
4    Q   In this paragraph 44, are you referring
5  to any particular part of it?  Are you setting out a
6  general principle or are you saying something
7  specific about what part of the specification a
8  PHOSITA is looking at?
9    A   I think I'm saying in general, in the
10  entirety, in the entirety of the patent.
11    Q   Okay.  Let's go to paragraph 45.  So now
12  you're talking about Claim 13 itself again, right?
13    A   Uh-huh.
14    Q   And you say that the preamble --
15    A   Yes.
16    Q   The preamble of Claim 13 explains that
17  the claim method -- bold -- encodes data words into
18  code words in a, quote, recorded waveform.
19         That's what you say here, right?
20    A   Yes.
21    Q   And are you making any assumptions about
22  how to use the preamble of a claim to interpret the
23  body of a claim?
24         MR. VERDINI:  Object to the form.
25         THE WITNESS:  Ask again, please.

Page 212

1  BY MR. MAYLE:
2    Q   You mentioned the preamble of the claim
3  in this sentence, and I just want to know if you're
4  making any assumptions about how one should properly
5  use a preamble of a claim to interpret the body of
6  the claim?
7         MR. VERDINI:  Object to the form.
8         THE WITNESS:  I don't think I'm
9    making any assumptions.  And if you're
10    getting towards a legal, I don't know the
11    legal piece of that.  I'm just saying,
12    hey, preamble.  I know there's a
13    preamble, it's making some words, it's
14    kind of setting it up -- setting up the
15    rest of the claim.
16  BY MR. MAYLE:
17    Q   Thank you.
18         And when you bold, italics encodes, why
19  did you do that?
20    A   I was looking at that.  I'm like, why did
21  I do that?  Honestly, I don't remember.
22    Q   Okay.  Then you -- so you say something
23  about the preamble and then you say:  Thus, the
24  recorded waveform must comprise encoded code words.
25         Do you see that?

Page 213

1    A   Uh-huh, yes.
2    Q   So can you help me connect the dots
3  between the first sentence and Thus and then the
4  conclusion.  What's the thought process there?
5    A   So maybe the -- there's an encoding
6  process that -- there's an encoding process that
7  takes bits and puts them onto a waveform.  And so
8  that's probably that process.  The preamble talks
9  about a recorded waveform.
10         So I guess it's emphasizing the things
11  that are said in the -- you know, in the preamble.
12  So thus the recorded waveform must have the encoded
13  code words.  I think that's pretty clear.
14    Q   So are the encoded code words -- well,
15  code words are binary, right?
16    A   Yes.
17    Q   So when you say that the recorded
18  waveform must comprise encoded code words --
19    A   Uh-huh.
20    Q   -- are you saying that the recorded
21  waveform is binary?
22         MR. VERDINI:  Object to the form.
23         THE WITNESS:  No, I'm not saying
24    that.  I'm saying that the recorded
25    waveform has embedded in it bits.  It's

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 214

1    representative of the bits.  The recorded
2    waveform likely is two valued, is one of
3    two -- one of two values.  So in that
4    sense it might be considered binary, but
5    it's not considered binary in a bit form.
6  BY MR. MAYLE:
7      Q    You used that word that -- I think they
8    used the word representative.  Is that what you're
9    saying, that the recorded waveform is representative
10   of the code words?
11           MR. VERDINI:  Object to the form.
12  BY MR. MAYLE
13      Q    Sorry.  I don't want to mischaracterize
14   you.
15      A    No, I think that's fine.  When it says --
16   like that's about the same as when I'm saying must
17   comprise encoded code words.
18      Q    So if I changed this -- if you said, Thus
19   the recorded waveform is represent -- it represents
20   the encoded code words, is that synonomous of what
21   you're saying here?
22      A    I'm good with that.
23      Q    But just to be clear, you agree that the
24   recorded waveform and the code words are not
25   literally the same thing?

Page 215

1           MR. VERDINI:  Object to the form.
2           THE WITNESS:  Encoded code words
3    and waveform are not the same -- they are
4    not the same thing, but they -- one --
5    the waveform is representative of the
6    bit -- of the code bits.
7  BY MR. MAYLE:
8      Q    And let's say there's a waveform coming
9    out of the encoder, an analog signal that's going to
10   the write head and eventually will be written as bits
11   on the magnetic disc.
12      A    Uh-huh.
13      Q    I think we've alluded to this before.
14   But let's say while we're -- a waveform traveling to
15   the write head.  It?
16      A    Uh-huh.
17      Q    It hasn't hit the disc yet.  Are you
18   calling that the encoded waveform or the recorded
19   waveform or both?
20      A    Both.
21      Q    You're saying it's the same thing?
22      A    Exactly.
23      Q    And let's say if we look now with the
24   platter, and those magnetic -- particles; is that
25   what we called them?

Page 216

1      A    That's fine.
2      Q    Call them magnetic particles.  Is that a
3    magnetic waveform, too?
4      A    It's not a waveform.  Those are particles
5    oriented on the disc.  It's not a waveform.
6      Q    That's not the waveform.
7           We talked about transitions for a while.
8    Are the transitions in the recorded waveform?
9      A    The recorded waveform has transitions in
10   it and those are realized on the disc as transitions
11   in the magnetization pattern.
12      Q    Let's not -- let's do it with real eyes
13   next, but where are -- the transitions, as you
14   understand that term and you understand recorded
15   waveform.
16           Where are the transitions -- as you
17   understand that word transitions -- where are they
18   actually located?
19           MR. VERDINI:  Object to the form.
20           THE WITNESS:  Transitions on the
21   disc.
22  BY MR. MAYLE:
23      Q    So are the transitions in the recorded
24   waveform or not?
25      A    There are transitions in the recorded

Page 217

1    waveform, but the transitions in the claim are
2    referring to the transitions on the disc, the
3    transitions in the magnetization pattern.
4      Q    The transitions in the claim are --
5      A    That's the only way to realize the
6    recorded waveform is the transitions on the magnetic
7    disc.
8      Q    So the transitions in the Claim 13 under
9    your understanding, the transitions are on the disc,
10   right?
11      A    Yes.
12      Q    But the recorded waveform is not on the
13   disc; is that right?
14      A    Correct.  Waveforms not on the disc.
15   It's the -- what's on the disc is the domains that
16   have been magnetized d.
17      Q    Let's go back to the Claim 13 again.
18      A    I'm sorry.
19      Q    The patent, yeah.  It's Exhibit 1.
20           I'll direct your attention to the
21   generating step.  It says:  Generating no more than j
22   consecutive transitions of said sequence in the
23   recorded waveform.
24           Right?
25      A    Uh-huh.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 218

1      MR. VERDINI:  Yes.
2  BY MR. MAYLE:
3      Q    Yes?
4      A    Yes, uh-huh.
5      Q    So can there be an interpretation on the
6  one hand of the word transitions and an
7  interpretation on the other hand of the word recorded
8  waveform such that if those interpretations are both
9  accepted, that the transitions would not be in the
10  recorded waveform?
11      Do you understand what I'm saying?
12      A    No, I'm sorry.
13      Q    So I think you're saying that the way you
14  interpret transitions, those are on the disc
15  physically, right?
16      A    Uh-huh, yes.
17      Q    And you're saying that the record -- the
18  way you interpret recorded waveform is not on the
19  disc, correct?
20      A    The recorded waveform, that's the
21  waveform that's sitting at the head and those
22  transitions and that waveform are going to be
23  realized in transitions on the magnetic disc.
24      Q    All right.  I want to stay away from
25  realized for a minute and just answer the simpler

Page 219

1  question.
2      The way you understand recorded waveform,
3  in your opinions, that recorded waveform is actually
4  not on the disc, correct?
5      MR. VERDINI:  Object to the form.
6      THE WITNESS:  That's the waveform
7  that produces the transitions, yes.
8  BY MR. MAYLE:
9      Q    And that waveform is not on the disc,
10  correct?
11      A    Correct.
12      Q    Okay.  But the transitions are on the
13  disc, correct?
14      A    Transitions are on the disc.
15      Q    So when the claim says transitions in the
16  recorded waveform, how can you reconcile that claim
17  language with your opinion that the transition is on
18  the disc but the recorded waveform is not on the
19  disc?
20      A    The waveform has transitions on it that
21  correspond directly to the transitions on the disc.
22  There's a one-to-one correspondence.  For every
23  transition in the waveform, in the recorded waveform
24  that's sitting at the head, there will be a
25  transition on the disc.

Page 220

1      Q    So could we write this claim that says no
2  more than j consecutive transitions corresponding to
3  the transitions in the recorded waveform?  Would that
4  be what you're saying?
5      MR. VERDINI:  Object to the form.
6      THE WITNESS:  Say that again,
7  please.
8  BY MR. MAYLE:
9      Q    So are you effectively -- if I rewrote
10  this claim in a certain, I want to see if it's
11  consistent with what you're saying.
12      If I wrote, no more than j consecutive
13  transitions, corresponding to the transitions in the
14  recorded waveform, if I introduced this concept of
15  corresponding, is that effectively what you're
16  saying?
17      MR. VERDINI:  Object to form.
18      THE WITNESS:  I'm good with that,
19  yeah.  I'm good with that.
20  BY MR. MAYLE:
21      Q    So yes?
22      A    Yes.
23      Q    So you're saying that the transitions in
24  whatever you're calling the recorded waveform are not
25  literally the transitions that are on the disc,

Page 221

1  right?
2      MR. VERDINI:  Object to the form.
3  Mischaracterizes his testimony.
4      THE WITNESS:  Ask again, please.
5  BY MR. MAYLE:
6      Q    Is it true that under your understanding
7  of recorded waveform, whatever, quote, transitions
8  are in a recorded waveform are not literally the same
9  as the, quote, transitions that would be on the disc?
10      MR. VERDINI:  Same objections.
11      THE WITNESS:  I'm saying they are
12  the same.  That for every transition
13  there is in the recorded waveform there's
14  a transition on the disc too.
15  BY MR. MAYLE:
16      Q    But the transition on the disc would be
17  physical transitions between magnetic particles,
18  right?
19      A    Yes.
20      Q    Those magnetic particles live on the
21  disc, right?
22      A    Uh-huh.
23      Q    And they don't live anywhere else in the
24  hard disc drive, right?  They're not in the, for
25  example, chip, encoder chip, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 222

```
 1        A    Correct.
 2        Q    And they're not on any current that's
 3   going to a write head, correct?
 4        A    Uh-huh, correct.
 5        Q    So I'm just trying to get simple facts
 6   straight.
 7             That whatever those transitions are, are
 8   not the same as what you're saying the transitions in
 9   the recorded waveform are, correct?
10             MR. VERDINI:  Objection.  Asked and
11   answered.
12             THE WITNESS:  Yeah, I answered the
13        same as before.  The transitions on the
14        disc, there's a corresponding change in
15        the magnetic waveform and the recorded
16        waveform that produces that transition on
17        the disc.
18   BY MR. MAYLE:
19        Q    Okay.  The concept of what produces what,
20   let's set that aside.  I just want it simple.  This
21   is factual, so I'm just trying to understand your
22   position.
23             The transitions that are on the disc --
24        A    Uh-huh.
25        Q    -- are not physically the same thing as
```

Page 223

```
 1   the transitions in the recorded waveform, right?
 2             MR. VERDINI:  Object to the form.
 3             THE WITNESS:  They're not
 4        physically the same, but there a
 5        one-to-one correspondence between them.
 6   BY MR. MAYLE:
 7        Q    And the reason that they're not
 8   physically the same is that the transitions on the
 9   disc are magnetic particles and what you're calling
10   the transitions in the recorded waveform is some kind
11   of current or voltage, right?
12        A    The -- yes; the changes -- the change
13   from a high to a low in the recorded waveform produce
14   a transition in the disc.  The transition in the disc
15   is particles.  The changes from high to low in the
16   recorded waveform are voltages.
17        Q    Voltages.  Okay.  So are the --
18        A    But there's a one-to-one correspondence.
19        Q    Let's say I set a hard disc drive here, a
20   real one, plugged in, and I tell you, hey, this --
21   I'm practicing Claim 13.  And I asked you -- let's
22   assume that it does practice Claim 13, under your
23   understanding.  And.
24             I say, It has j consecutive transitions.
25   And would you -- would that mean that I'm talking
```

Page 224

```
 1   about j consecutive high-low voltages or am I talking
 2   about j consecutive transitions on the disc of the
 3   magnetic particles?
 4             MR. VERDINI:  Objection to form.
 5             THE WITNESS:  It has to be the j
 6        consecutive transitions on the disc
 7        because that's -- that's the purpose of
 8        the invention.  You can't realize the
 9        invention unless you talk about
10        transitions on the disc, period, in the
11        magnetic.
12   BY MR. MAYLE:
13        Q    So would the number j of the high-low
14   voltages be the same as the number j as the
15   transitions in the -- on the disc?
16             MR. VERDINI:  Object to the form.
17             THE WITNESS:  That's the one-to-one
18        correspondence I'm talking about.
19   BY MR. MAYLE:
20        Q    In number?  So if there was five high-low
21   voltages, there would be five magnetic flips, right?
22        A    Yeah, that's the exact correspondence
23   I've been talking about.
24        Q    That's what I'm trying to drill at.
25   You're just saying in number, but they're different
```

Page 225

```
 1   things?
 2             MR. VERDINI:  Object to the form.
 3             THE WITNESS:  Yeah, the one -- the
 4        magnetic transitions we talked about are
 5        the magnetic domains, and the changes in
 6        voltage are the changes in voltage.  But
 7        for every one in the waveform, there
 8        would be one on the disc.  You can't
 9        realize -- you can't realize the
10        invention without the transitions on the
11        disc.
12   BY MR. MAYLE:
13        Q    Okay.  And then we run that and we
14   record -- let's say we record an MTR waveform on the
15   disc, as you understand it, and then we unplug it,
16   and there's no power left.  There would still be a
17   record on the disc, right?
18        A    Uh-huh, yes.
19        Q    Has the recorded waveform gone away or is
20   it still there?
21             MR. VERDINI:  Object to the form.
22             THE WITNESS:  Yeah, the recorded
23        waveform has gone away.
24   BY MR. MAYLE:
25        Q    It's gone away?
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 226

1     A    Uh-huh.
2     Q    And that's because the recorded waveform,
3  in our simple example, would be the voltage signal
4  that goes to the write head?
5     A    That's the waveform.  What's on the disc
6  is magnetic domain.  It's not a waveform.
7     Q    It's not a waveform.  So it's not a
8  recorded waveform or an encoded waveform, right?
9        MR. VERDINI:  Object to the form.
10       THE WITNESS:  It's the pattern of
11   magnetization on the disc.  It's a
12   domain.  It's not a waveform.
13   BY MR. MAYLE:
14    Q    So let's go to 46 real quick.  You said
15   that the -- in line seven, you refer to the
16   antecedent "the."
17       Do you see that?
18    A    Uh-huh.
19    Q    You say:  By using the antecedent "the,"
20   a PHOSITA would understand that the encoded waveform
21   is previously referred to in the claim.
22       Right?
23    A    Uh-huh.
24    Q    Now, are you basing that statement on
25   some point of law that someone told you, or are you

Page 227

1  assuming something?
2        MR. VERDINI:  Object to form.
3        THE WITNESS:  I don't -- I don't
4    know about the law.  Well, maybe I don't
5    know enough about patents.
6        When you say the encoded waveform,
7    it's referring to something else that it
8    had to have been mentioned before.  I
9    think that's the antecedent basis.  So
10   you go and look for where that is.
11   BY MR. MAYLE:
12    Q    And then you will always find it,
13   correct?
14    A    Yeah.
15    Q    Let's go on to the paragraph 47.
16    A    When you say you'll always find it, it's
17   there.  It's there to be found.
18    Q    Is your going-in proposition that when I
19   see the antecedent "the" in a patent, I'm assuming
20   that I will be able to find the antecedent earlier in
21   the claim or somewhere?
22       MR. VERDINI:  Object to the form.
23       THE WITNESS:  I think it's written
24   in a way where it's there to be found.
25

Page 228

1  BY MR. MAYLE:
2     Q    That's not my question.  I'm not talking
3  about this particular.  I'm just saying when -- I'm
4  trying to get a sense of how you do this.
5        In general, if you see "the" X in a
6  patent claim, are you then assuming that there must
7  be some previous antecedent basis for X?
8     A    Yes.  Yes.
9     Q    And you don't ever assume that maybe
10  there's not an antecedent basis, do you?
11       MR. VERDINI:  Object to the form.
12       THE WITNESS:  No, I think you
13   assume that there is, that it's there to
14   be found.
15   BY MR. MAYLE:
16    Q    Okay.  Let's look at paragraph 47.  You
17   talked about the prosecution, right?
18    A    Uh-huh.
19    Q    You say that the prosecution history
20   supports UMN's construction, right?
21    A    Uh-huh.
22    Q    So let's -- before we see this, so let's
23   look at the prosecution real quick.  I think you have
24   it already from the morning.  It's probably Exhibit
25   2, 1002.  Do you have that?

Page 229

1     A    Yes.
2     Q    And you see on the bottom right-hand
3  corner there it says LSI Corp Exhibit 1006?
4     A    Yes.
5     Q    And I'll just tell you, it is Exhibit
6  1006 because we've used this in the IPR.  You know
7  what the IPR is, right?
8     A    Yes.
9     Q    So let's flip back to page, let's say,
10  59.  And you see where it says Amendment?  You see it
11  says:  In response to an office action, an amendment
12  to the patent has --
13    A    I just want to see where you are.
14    Q    Kind of in the middle.  I'm just making
15  sure we're on the right page.  Amendment.
16    A    Page 59.
17    Q    Yeah, above in the claims it says Dear
18  Sir.
19    A    Oh, amendment.  Yeah.
20    Q    Right.  So he's responding -- so you
21  remember there was an office action, right?
22    A    Yes.
23    Q    And the examiner rejected the claims,
24  right?
25       MR. VERDINI:  Object to the form.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 230

1    THE WITNESS:  Yes, I believe so.
2  BY MR. MAYLE:
3    Q    Well, it looks that way, right?
4    A    Yes.
5    Q    Fair?
6    A    Yeah.
7    Q    Let's flip to the -- well, on this first
8  page, 59, you see Claim 1, it says Once Amended?
9    A    Yes.
10    Q    And then, if you go to the next page, it
11  has some underlined text?
12    A    Yes.
13    Q    You see stuff is underlined.  And then
14  below that Claim 13, it says Once Amended and there's
15  something underlined?
16    A    Yes.
17    Q    So would you understand that the
18  underlines are the stuff that was added to the claim?
19    A    I believe, yes.
20    Q    So if we look in Claim 1 it says -- we
21  have five minutes and we'll finish on this -- means
22  of imposing a pair of --
23    A    We're looking where?  On the patent or --
24
25    Q    Stay in the prosecution on page 60 on the

Page 231

1  top.
2    A    Yes.
3    Q    In Claim one, and you see they put in,
4  means for imposing a pair of constraints, j, k, on
5  the encoded waveform?
6    A    Yes, uh-huh.
7    Q    And it continues on and the fourth line
8  says:  Periods of the encoded waveform.
9        So they make reference to the encoded
10  waveform twice, right?
11    A    I'm not trying to hassle you.  You're
12  going too quickly and my eyes don't move that
13  quickly.
14        Encoded waveform, you're pointing to that
15  first one.
16    Q    Right.
17    A    And then you're pointing to encoded
18  waveform above and encoded waveform here.
19    Q    Right.  So they're both underlined,
20  right?
21    A    Correct.
22    Q    So they've added it to Claim 1, right?
23    A    Yes.  Two uses of the encoded waveform.
24    Q    Correct.  Exactly.  And if you look on
25  the part that's not underlined, encoded waveform is

Page 232

1  not there in Claim 1, right?  So it's been added.
2        See if you can agree with that.
3    A    Correct, yes.
4    Q    Let's look down to 13, there's less
5  added.  You see in Claim 13 they have, Imposing a
6  pair of constraints, j, k, on the encoded waveform.
7        That's all underlined, right?
8    A    Yes.
9    Q    And would you agree that encoded waveform
10  is within that underlined phrase?
11    A    Yes.
12    Q    And it wasn't otherwise in Claim 13,
13  right?
14    A    It's been added.
15    Q    It's been added?
16    A    Yes.
17    Q    Okay.  And do you know what the purpose
18  of this -- these -- let's just stick with Claim 13.
19        Do you have any sense of what the purpose
20  of this amendment is for?
21        MR. VERDINI:  Object to the form.
22        THE WITNESS:  I'm sorry, I don't
23  remember off the top of my head what it's
24  referring to.
25        It's referring to something that

Page 233

1        the examiner didn't like or wanted
2        changed or made a suggestion and this is
3        in response to that.
4  BY MR. MAYLE:
5    Q    And your opinion is that the encoded
6  waveform is the same as the recorded waveform, right?
7    A    Yes.
8    Q    So if I -- if I took out this part that's
9  been added and just deleted it back, do you think
10  that the Claim 13 would still have the same meaning
11  that you give it in your opinion?
12        MR. VERDINI:  Object to the form.
13  What are you deleting out?  The whole
14  thing?
15        MR. MAYLE:  The whole thing.  The
16  part that's underlined.
17        THE WITNESS:  The imposing part.
18  BY MR. MAYLE:
19    Q    Yeah, let's just erase that.  So Claim 13
20  goes back to the way it was before.
21        Would that claim have -- any of the terms
22  have a different meaning?
23    A    Can you please ask your question again?
24  Before you're asking say remove that and has anything
25  changed.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 234

1    Q    If I remove the imposing step all the way
2  to the encoded waveform, the part that's underlined
3  on page 60 here, would that change the meaning of the
4  claim according to the way that you've interpreted ed
5  the claim?
6         MR. VERDINI:  Object to the form.
7         THE WITNESS:  I don't think so.  I
8      think removing it would be okay in terms
9      of interpretation of the claim.
10  BY MR. MAYLE:
11    Q    Okay.  Let's look at Claim 13.  If you
12  would flip back for a second to the page prior, page
13  59.  You see how Claim 1 starts with apparatus?
14    A    Uh-huh.
15    Q    And you remember Claim 13 starts with a
16  method?
17    A    Yes.
18    Q    So do you know what the difference is
19  between an apparatus and method claim, generally?
20    A    Generally, yes.
21    Q    And you see in the apparatus claim, Claim
22  1, you see four lines down it says:  Receiver means
23  for receiving?
24    A    Uh-huh.
25    Q    Have you ever seen that word, means for

Page 235

1  -- the phrases means for in a patent?
2    A    Yes, I have.
3    Q    Are you familiar with that, what it
4  means?
5    A    More or less.
6    Q    And do you understand that it means that
7  when they're specifying an element by a function in a
8  claim that they're referring back to the structure in
9  the specification that could do that function?
10         Is that your understanding?
11         MR. VERDINI:  Object to the form.
12         THE VIDEOGRAPHER:  We have one
13     minute left, sir.
14         MR. MAYLE:  So there's only one
15     minute.  We'll just hold there.  We'll
16     come back to that.
17         THE VIDEOGRAPHER:  12:41.  We're
18     off the record.  This is the end of media
19     number three.
20         (Brief pause.)
21         THE VIDEOGHRAPHER:  1:32.  We're
22     back on the record.  This is the
23     beginning of media number four.
24  BY MR. MAYLE:
25    Q    Good afternoon, Professor.  How are you?

Page 236

1    A    Just fine.
2    Q    Did you have a chance to have lunch?
3    A    Yes.
4    Q    Did you talk to your lawyers about the
5  substance of your testimony during the break?
6    A    No.
7    Q    Just to refresh our memory, I think we
8  were talking about your interpretations of the
9  encoded waveform and the recorded waveform before the
10  break, right?
11    A    Okay, uh-huh.
12    Q    And we were talking about -- I think when
13  we left off we were talking about the prosecution
14  history.  And you remember that Claims 1 and 13 were
15  amended --
16    A    Yes.
17    Q    -- during prosecution?
18    A    Yes.
19    Q    So let's look back at that again, at
20  Exhibit 1002, which is the prosecution.  We'll go
21  back to your declaration in a moment.
22    A    The prosecution history.  Okay.
23    Q    Yes, if you flip to page -- remember, we
24  were on page 59 and 60?
25    A    Okay, yes.

Page 237

1    Q    And we'll just go to that again.  If you
2  look at Claim One, starting on 59, remember it has
3  those words, receiver means for receiving, means for?
4  Do you remember we talked about that before the
5  break?
6    A    Yes.
7    Q    And I think that you said that you had
8  been somewhat familiar or had at least heard of or
9  seen in a patent the words -- those words like means
10  for; is that right?
11    A    Yes.
12    Q    And would your understanding of that have
13  something to do with the fact that someone could
14  claim -- claim a means or a step for doing something
15  without reciting the structure in the claim, but then
16  you would be allowed to look back in the
17  specification to see what the structure was?  Is that
18  generally how you understand that?
19         MR. VERDINI:  Object to the form.
20     Foundation.
21         THE WITNESS:  I'm afraid I'd have
22     to ask you to repeat.
23  BY MR. MAYLE:
24    Q    Well, let me ask you a different way.
25         When it says receive -- encoder --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

---

Page 238

1  receiver means for receiving that word?
2      A    Yes.
3      Q    So that claim is just reciting some sort
4  of a function and it's just calling it a means,
5  correct?
6          MR. VERDINI:  Object to the form.
7          THE WITNESS:  The ability to do
8      that, to perform that function or
9      something like that.  That's how I --
10  BY MR. MAYLE:
11      Q    Correct.  And I want to now go back to
12  your -- keeping in mind that Claim One has these
13  means for language and it's an apparatus claim, if we
14  go back to your declaration, which is Exhibit 1005,
15  at paragraph 47?
16      A    Uh-huh.
17      Q    The reason I looked into the prosecution
18  is because in paragraph 47 of your declaration,
19  you -- you cite the prosecution history, correct?
20      A    Yes.
21      Q    And you say that the prosecution history
22  also supports the University's proposed constructions
23  of recorded waveform and encoded waveform, correct?
24      A    Yes.
25      Q    And you cite this page UMN_750 Bates

---

Page 239

1  number in your paragraph 47, right?
2      A    Yes.
3      Q    Let's look at -- you have a text box, you
4  have a cut and paste from the prosecution, right?
5      A    Uh-huh, yes.
6      Q    And it starts off:  In sharp contrast to
7  Kitani, the present invention provides an apparatus.
8      Do you see that?
9      A    Yes.
10      Q    Now, you remember that Claim One is an
11  apparatus claim, right?
12      A    Correct, yes.
13      Q    And Claim 13 is a method claim, right?
14      A    Yes.
15      Q    And if you look on this call-out, on
16  paragraph -- do you need to look at the prosecution?
17      A    No, I'm good.
18      Q    If you look at this call-out on paragraph
19  47 of your declaration, let's see, down to -- let's
20  say, line 18, you see means for receiving?
21      A    Yes.
22      Q    And then you see on line 19, encoder
23  means?
24      A    Yes.
25      Q    So this part that you've cut and paste

---

Page 240

1  from the prosecution into paragraph 47 of your
2  declaration, that's talking about Claim One, isn't
3  it?
4          MR. VERDINI:  Object to the form.
5          THE WITNESS:  I see that that
6      call-out is referring to means.  I
7      don't -- I don't recall or know that it's
8      directly reporting to One, but I do get
9      your point that it's referring to means.
10  BY MR. MAYLE:
11      Q    It's also referring to an apparatus,
12  right?
13          MR. VERDINI:  Object to the form.
14          THE WITNESS:  Yes.
15  BY MR. MAYLE:
16      Q    And if you see -- let's look at line 21
17  here.  You see it says:  The j constraint is defined
18  as the maximum number of consecutive transitions
19  allowed on the clock -- on consecutive clock periods
20  in the encoder waveform.
21      Do you see that?
22      A    Yes, uh-huh.
23      Q    I'd like you to compare that language
24  with the prosecution on page 60 with the amendment to
25  Claim One.

---

Page 241

1      A    Okay.
2      Q    So would you agree that, in paragraph 47
3  of your declaration where you're citing the
4  prosecution history, that the person who wrote this
5  was referring to the amendment to Claim One of the
6  '601 patent, right?
7          MR. VERDINI:  Objection to form.
8      Foundation.
9          THE WITNESS:  You're pointing out
10      something that makes sense.  I'm just --
11  BY MR. MAYLE:
12      Q    So you would agree that there -- it's
13  referring to Claim One, right?
14          MR. VERDINI:  Object to form.
15          THE WITNESS:  Yes.
16  BY MR. MAYLE:
17      Q    And would you -- well, let's look at page
18  60 of this prosecution.  You notice that in Claim One
19  there was five lines of text underlined, added?
20      A    Yes.
21      Q    And in Claim 13 there was only one line
22  of text that was added?
23      A    Yes.
24      Q    And you see up in Claim One there is a --
25  there's verbiage in Claim One, as amended, wherein

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 242

1  the j constraint is defined as the maximum number of
2  consecutive transitions allowed on consecutive clock
3  periods in the encoded waveform to facilitate the
4  reduction of a probability of a detection error in
5  said receiver means.
6         That's what that says, right?
7     A   Yes.
8     Q   And that language -- would you agree that
9  that language was not inserted into Claim 13 as
10 amended?
11    A   Correct, that's not inserted.
12    Q   And so, in your opinion, does that
13 difference in language have any difference -- give
14 any difference in meaning to the two claims?
15        MR. VERDINI:  Object to the form.
16 Foundation.
17        THE WITNESS:  Please, could you ask
18    the question again?
19 BY MR. MAYLE:
20    Q   In other words, Claim One has some
21 verbiage wherein the j constraint is defined as, and
22 then it gives a definition, correct?
23    A   Yes.
24    Q   That definition was not recited in Claim
25 13 as amended, correct?

Page 243

1     A   It's not -- it was not added to Claim 13.
2  It's not -- it was not added to Claim 13, it's not
3  one of the underlined, but the kind of definition of
4  j was already in Claim 13.
5         But you're -- if the question you're
6  asking, was it added, it was not added to Claim 13,
7  but it was already in 13.
8     Q   And it was in 13 because you've
9  interpreted something along those lines; is that what
10 you're saying?
11        MR. VERDINI:  Object to the form.
12        THE WITNESS:  I'm saying, you know,
13    generating no more than j consecutive
14    transition in the sequence, that, to me,
15    is referring to what j really means.
16    It's trying to shed light on what j
17    means, which I think is what the
18    underlined amendment in Claim One was
19    trying to do.
20 BY MR. MAYLE:
21    Q   And are you saying that, in Claim 13,
22 there already is a step -- in existing Claim 13 there
23 already was a step of generating no more than j
24 consecutive transitions of said sequence in the
25 recorded waveform such that j is greater than or

Page 244

1  equal to two?
2     A   Yes.
3     Q   So are you saying that whatever that
4  means was already there and, therefore, whatever they
5  added in Claim One did not have to be added in Claim
6  13?  Is that what you're saying?
7     A   I don't think so.
8     Q   So Claim 13 -- let's just do baby steps
9  then.  It doesn't literally contain the text.  I
10 mean, we can interpret it in, but it doesn't
11 literally say, the j constraint is defined as X, Y,
12 Z?
13    A   That's correct.
14    Q   Correct.  And it also doesn't say
15 anything about the reduction of a probability of
16 detection error in the receiving means, right?  It
17 doesn't mention that expressly?
18    A   In 13, correct.
19    Q   They did put that in Claim One, right?
20    A   Yes.
21    Q   And are you saying that -- I'm not trying
22 to mischaracterize.  I'm just trying to understand
23 what you're saying.
24        Are you saying that they didn't need to
25 add that additional material in Claim 13 because

Page 245

1  Claim 13 somehow already embraced that material; is
2  that what you're saying?
3     A   At least the j consecutive transitions
4  piece.
5     Q   Okay.  So let's look up to Claim One, the
6  part that's not underlined right below it.
7         It also already said:  Said sequence is
8  generating no more than j consecutive transitions in
9  the recorded waveform such that j is an integer
10 greater than or equal to two.
11        Correct?
12    A   Yup, uh-huh.
13    Q   That's essentially almost the same as --
14    A   Yes, uh-huh.
15    Q   We're talking over each other a little
16 bit.
17        So that part I just read to you in Claim
18 One, that was there before the amendment, was
19 essentially already also in Claim 13 before the
20 amendment, correct?
21    A   Yes.
22    Q   And so would you interpret these -- and
23 back to Claim One, if that language was already
24 there, wouldn't that mean, to you, that the part that
25 was added, the underlined verbiage, must be adding

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 246

1    some other subject matter to the claim?
2          MR. VERDINI:  Object to the form.
3          THE WITNESS:  That makes sense.
4    That makes sense to me.  I agree with
5    that, yeah.
6    BY MR. MAYLE:
7      Q   You agree with that?
8      A   Yeah.
9      Q   Okay.  Then it would logically follow
10   that what was added to Claim One in the underlined
11   part was not added to Claim 13, correct?
12        MR. VERDINI:  Object to the form.
13        THE WITNESS:  It was not added to
14   Claim 13, yes.
15   BY MR. MAYLE:
16     Q   So then one could conclude that Claim 13,
17   the j constraint in Claim 13 does not have the same
18   exact meaning as the j constraint in Claim One,
19   correct?
20        MR. VERDINI:  Object to the form.
21        THE WITNESS:  No, I do think they
22   have the exact same meaning.
23   BY MR. MAYLE:
24     Q   Well, in Claim One they add the text
25   where the j constraint is defined, blah, blah, blah,

Page 247

1    correct?
2      A   Uh-huh.
3      Q   That part -- the j constraint is defined
4    and the blah, blah, blah, the underlined part -- was
5    added in Claim One, correct?
6      A   Uh-huh.
7      Q   An it was not in Claim One before that,
8    correct?
9        MR. VERDINI:  Object to the form.
10       THE WITNESS:  Correct.
11       MR. VERDINI:  And asked and
12    answered.
13       THE WITNESS:  Correct.
14    BY MR. MAYLE:
15     Q   It was also not in Claim 13, correct?
16     A   Correct.
17     Q   And it still is not in Claim 13, correct?
18     A   Correct.
19     Q   So therefore, wouldn't it be reasonable
20    to conclude that the additional matter in Claim
21    One -- starting at Wherein the j constraint is
22    defined as, and ending to the underlined text -- is
23    in Claim One but is not in Claim 13?
24     A   It's -- it is -- it definitely is not in
25    Claim 13.

Page 248

1     Q   So wouldn't that mean that the j
2    constraint -- the definition of the j constraint
3    that's actually written into Claim One is not --
4    should not be the same definition that we should give
5    the j constraint in Claim 13, right?
6        MR. VERDINI:  Object to the form.
7       THE WITNESS:  No, I think it --
8    it's saying that -- the j -- the language
9    in amended One and 13 that says the said
10   sequence is generating no more than j
11   consecutive transitions, that's the same
12   in both.  In Claim One they're
13   illuminating what the j is, they've given
14   the definition.
15       If you ask me, the definition is
16   already in the Said Sequences portion the
17   definition is already there, and it's
18   illuminating the purpose of the j
19   constraint.
20     Q   So if the definition --
21     A   It's the same j constraint.  It's the
22   exact same j constraint.
23     Q   So if the definition -- I think you just
24   said that the definitions that were added were
25   already in Claim One, correct, through another

Page 249

1    phrase?  You've interpreted it in?
2      A   Yes.
3      Q   So that could mean then I could erase
4    everything that was added in Claim One without
5    changing the meaning of Claim One, according to your
6    interpretation, correct?
7        MR. VERDINI:  Object to the form.
8    That mischaracterizes what he said.
9       THE WITNESS:  I don't remember all
10   the context, but, for me, it seems like
11   that -- what would make sense to me is,
12   is that underlined portions in the
13   amended Claim One are intended to
14   illuminate or reemphasize what the j
15   constraint is and what it is for.  That's
16   the way I read it.
17   BY MR. MAYLE:
18     Q   Do you think that the -- you're using the
19   word illuminate and reemphasize.
20       Do you think that the underlined portion
21   in Claim One is adding anything new to Claim One that
22   wasn't there before?
23       MR. VERDINI:  Object to the form.
24       THE WITNESS:  It appears to be
25   telling the reader why there's a need for

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 250

1    a j constraint.  Well, the purpose of the
2    invention was to facilitate a reduction
3    in the probability of detection error.
4    So the -- when the author, inventor,
5    whoever it is, put that in felt like that
6    that was necessary to illuminate the
7    purpose or to overcome some objection or
8    some comment from the examiner.
9        So that seems to be intentional and
10   purposeful and so, as a result,
11   necessary.
12   BY MR. MAYLE:
13       Q    Do you think that this added material in
14   Claim One makes Claim One easier to understand to a
15   PHOSITA?
16           MR. VERDINI:  Object to the form.
17           THE WITNESS:  I'm not sure it makes
18   it easier to understand, but it
19   illuminates the purpose, so -- it
20   illuminates the purpose.  So does that
21   make it easier to understand?
22       It doesn't seem to add anything to
23   the functionality of what it is you would
24   build to implement it, but the
25   illumination seems to be really

Page 251

1    purposeful and needed.
2        It must -- again, I'm answering
3    outside the context of maybe what the --
4    what the examiner said --
5    BY MR. MAYLE:
6        Q    Okay.
7        A    -- that caused this to go in.  So, I
8    mean, maybe the examiner -- we can go back through
9    it -- is saying this was need and the author put it
10   there, inventor put it there for that reason.
11       Q    Let's flip back to page 52 in the
12   prosecution.  And now we're on LSI Corp page 52.  And
13   you see it's something coming from the patent office
14   and it says, Date Mailed 9/16/97.  Do you see that?
15       A    Yes.
16       Q    Top right.  It's under the examiner's
17   name.
18       A    Oh, yeah.  Uh-huh.
19       Q    It has a date mailed 9/16/97.
20       A    I saw it.  Yeah.
21       Q    And then you see the next, look on page
22   53, it says Office Action Summary?
23       A    Yes.
24       Q    Are you familiar with the term Office
25   Action?

Page 252

1        A    Yes.
2        Q    This is the office action from the
3    prosecution history, right?
4        A    Yes.
5        Q    You've seen this at one point, right?
6        A    Yes.
7        Q    And you see that, on this page 53, there
8    was Claims One to 21 that were pending?
9        A    Yes.
10       Q    And do you see that Claims One to Five,
11   Ten, 13 to 17 and 20 are rejected?
12       A    Yes.
13       Q    Let's flip to page 54.  And do you see as
14   Detailed Action, right?  Do you see that, Professor?
15       A    Uh-huh, yes.
16       Q    And in paragraph one he quotes something
17   called 35 USC 102?
18       A    Yes.
19       Q    You're familiar generally with 102, at a
20   high level?  I don't want a legal treatise.
21       A    I'm not -- at one point I'm sure as I --
22   I can't even come close to summarizing what it is
23   right on the spot here.
24       Q    Have you heard of the concept of
25   anticipation in a patent?

Page 253

1        A    Yes.
2        Q    And do you generally understand that
3    means that there was something in the prior art that
4    taught exactly everything that was being claimed?
5        A    Yes.
6        Q    Correct?
7        A    Yes.  That's what 102 is about.  It's
8    about anticipation.
9        Q    Correct.
10       A    Okay.
11       Q    And as opposed to section 103, which is
12   about obviousness.  Have you heard of obviousness?
13       A    Yes.
14       Q    So the examiner is talking about section
15   102, right?
16       A    Yes.
17       Q    And you see in paragraph two he says
18   Claims One to Five, Ten, 13 to 17 and 20 are rejected
19   under 35 USC 102(b) as being anticipated by
20   Iketani -- however you say that -- patent number
21   4,760,378, right?
22       A    Yes.
23       Q    And so he's rejecting, among other
24   claims, Claim One and Claim 13, right?
25       A    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 254

1    Q    The claims we were just talking about,
2 right?
3    A    Uh-huh, yes.
4    Q    And the examiner says that those claims,
5 including Claims One and 13 as written, read on the
6 well known method of channel encoding where m-bit
7 data words are encoded to n-bit code words, with n
8 greater than m, such that there is a minimum physical
9 distance between level transitions in the encoded
10 data to facilitate subsequent protection at a maximum
11 physical distance between level transitions to
12 facilitate synchronization, i.e., d and k
13 constraints.
14         Right?
15    A    Okay.
16    Q    And the examiner says that Iketani has
17 that, right?
18    A    Yes.
19    Q    And you can read to yourself the rest of
20 paragraph two.
21    A    Okay.
22    Q    And the examiner is saying the claim
23 language that was in there, and he's -- would you
24 agree that he's quoting Claim One here:  Generating
25 no more than j consecutive transitions in the

Page 255

1 recorded waveform such that j is an integer greater
2 than or equal to two?
3         That's the bottom two lines?
4    A    Yes, uh-huh.
5    Q    He's quoting Claim One?
6    A    Okay.
7    Q    And the Claim 13 had language that was
8 highly similar to that, wasn't there?
9    A    Yes.
10    Q    Like when it said greater than or equal
11 to two, it used the mathematical greater than or
12 equal to symbol?
13    A    Yes.
14    Q    For some reason, they spelled out greater
15 than or equal to in Claim One, right?
16    A    Uh-huh, yes.
17    Q    But otherwise, those claims were similar,
18 at least with that claim limitation?
19    A    Yes.
20    Q    And the examiner is saying that a
21 d-equals-one constraint in NRZI format would satisfy
22 that claim limitation, right?
23         MR. VERDINI:  Object to the form.
24         THE WITNESS:  Yes.  Yes.
25

Page 256

1 BY MR. MAYLE:
2    Q    And so he's saying -- the examiner it
3 seems -- is it fair to say he's not treating Claim
4 One and Claim 13 differently with respect to the
5 reason for rejecting the claims?
6    A    It seems he's treating them the same.
7    Q    Okay.  So before when I asked you about
8 the amendments to Claim One and 13, you said, well, I
9 wasn't sure of the context, perhaps the examiner had
10 required something different between these two
11 claims.  Do you remember that?
12    A    Yes.
13    Q    So that's not case, right?
14    A    Seems like they're the same, yes.
15    Q    So, for some reason, Claim One has five
16 lines of amended text in response to the office
17 action on page 60, but Claim 13 only has one line of
18 text, right?
19    A    Uh-huh, yes.
20    Q    And so now that you have more context,
21 wouldn't it be fair to say that a PHOSITA would read
22 this and would potentially interpret the j constraint
23 in Claim One as amended as having a slightly
24 different meaning than the j constraint in Claim 13
25 as amended?

Page 257

1         MR. VERDINI:  Object to the form.
2         THE WITNESS:  No, I'm afraid I
3 wouldn't agree with that.  The patent
4 talks only about one j constraint.  In
5 fact, I would say the exact opposite.
6         I would say a PHOSITA, after having
7 read Claim One and heard this language
8 about what -- the definition of j
9 constraint and why it's being used, and
10 going to Claim 13 and seeing j again,
11 saying -- probably asking the question,
12 geez, I wonder why that wasn't -- that
13 additional language wasn't in there, but
14 there's only one j, there's only one
15 language around consecutive transitions,
16 recorded waveform such that j is an
17 integer greater than or equal to two.
18         That's in both.  And that kind of
19 illumination or explanation around the j
20 constraint, I think a PHOSITA, for sure,
21 would see that as applicable to 13, as
22 well.  I have no doubt about that.
23 BY MR. MAYLE:
24    Q    So could we, as a thought experiment,
25 take the added material from Claim One -- could we

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 258

1    write into Claim 13, quote, wherein the j constraint
2    is defined as the maximum number of consecutive
3    transitions allowed consecutive clock periods in the
4    encoded waveform to facilitate the reduction of a
5    probability of a detection error in receiving,
6    unquote?
7            Could we write that quote into Claim 13
8    without changing the meaning of Claim 13?
9            MR. VERDINI:  Object to the form.
10           THE WITNESS:  That seems perfectly
11       logical to me to do that.  And as a -- as
12       a technical matter, the fact that it was
13       illuminated in another claim, because it
14       applies to the exact same thing, writing
15       it into Claim 13 seems completely logical
16       to me.
17   BY MR. MAYLE:
18       Q    Well, let me ask you, when you say it
19   applies to the exact same thing, it applies to the
20   exact same thing only if you construe different text
21   to mean the same thing, correct?
22           MR. VERDINI:  Object to the form.
23           THE WITNESS:  If there's
24       differences in constructions in One and
25       in 13 for which that's -- for which

Page 259

1    that's relevant -- actually, that -- it's
2    a hypothetical, but I think I see where
3    you're going and it makes some sense, but
4    I think --
5    BY MR. MAYLE:
6        Q    I --
7        A    I think --
8        Q    Sorry.  I didn't mean to ask a
9    hypothetical.  I'm just trying to get to your
10   methodology of how you construe claims so I just can
11   understand it, is there a chance.
12           And you've said that the reason that the
13   added text in Claim One could be written in Claim 13
14   without changing the meaning of Claim 13 is because
15   the claims are describing the same exact thing; is
16   that right?
17           MR. VERDINI:  Object to the form.
18           THE WITNESS:  That portion of the
19       claim's talking about the same thing.
20       It's talking about the j constraint.
21   BY MR. MAYLE:
22       Q    And --
23       A    I don't know what is above there or
24   below.  But I mean, clearly this portion is talking
25   about the j constraint.  The underlined text in Claim

Page 260

1    One is just illuminating.  It doesn't seem to be
2    describing any other functions.  It's redefining what
3    J is and then it's saying, hey, here's what j is all
4    about, here's the purpose.
5            And the definition of j in 13 is the
6    same.  And so illuminating it makes sense to me, for
7    the same reason.
8        Q    Are you familiar with the concept of a
9    dependent claim and an independent claim?
10       A    Yes.  Yes.
11       Q    And briefly, can you just tell us without
12   a legal treatise if --
13       A    I'm sorry, I couldn't give a legal
14   treatise.
15       Q    No, I just want your brief understanding.
16       A    A independent claim is a claim that more
17   or less stands on its own and separate.  A dependent
18   claim either illuminates or gives more information
19   about a independent claim or specifies certain
20   values, or something like that, in the original
21   claim, but everything is inherited from the
22   independent claim.
23       Q    Okay.  That's close enough.  A plus.
24           Claims One and 13 are both independent
25   claims, right?

Page 261

1        A    I know 13 is.  Yeah, I guess One is an
2    independent claim, by definition.
3        Q    And so, as you say, they stand on their
4    own, correct?
5        A    Yes.
6        Q    So is there -- are you making an
7    assumption that two independent claims that use words
8    that overlap are describing the exact same thing?
9            MR. VERDINI:  Object to the form.
10           THE WITNESS:  One is a method and
11       one is an apparatus claim.  And so they
12       may describe the same thing, but they go
13       after -- whereas hardware means the
14       ability.  So I mean --
15   BY MR. MAYLE:
16       Q    Okay.  Say --
17       A    But they might say the exact -- they
18   might be describing the exact same function or same
19   technology or whatever.  One is --
20       Q    Setting aside the difference.  That's a
21   good point, apparatus and method.  Let's just stick
22   with j constraint.
23           Both independent Claim One and
24   independent Claim 13 recite the phrase -- actually,
25   they don't.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 262

1        So Claim 13 says imposing a pair of
2 constraints, j comma k -- or j semicolon k, right?
3     A   Yes.
4     Q   A pair of constraints.  Claim One says
5 imposing a pair of constraints, and then it has a
6 wherein clause where it defines the j constraint,
7 correct?
8     A   Correct.
9     Q   So are you saying that Claim One and
10 13 -- the -- the interpretation of j constraint in
11 Claim One and 13 should be exactly the same because
12 the words, a pair of constraints, j and k, are in
13 both claims; is that what you're saying?
14       MR. VERDINI:  Object to form.
15       THE WITNESS:  That would be -- I'd
16    say that's a big reason.  Maybe that's
17    the entire reason of the -- I guess -- I
18    know I'm not supposed to answer a
19    question you didn't ask, but I mean, they
20    both go after the j constraint.  They're
21    both coming at, describing or defining or
22    illuminating the j constraint.
23       It's the exact same thing, j, that
24    constraint is the exact same thing in
25    both places.  So to that extent, I'd say

Page 263

1 they're equivalent.  The j constraint in
2 13 is not different than the j constraint
3 in One.
4       In One they chose to illuminate it,
5    define it and say a little bit more that
6    was removed or not included in 13, but
7    that j constraint is the same thing.
8    It's referring to exactly the same thing.
9 BY MR. MAYLE:
10     Q   And so if I went in Claim One and erased
11 two -- starting at, to facilitate the reduction.  If
12 I erased, to facilitate the reduction of a
13 probability of detection error in said receiver
14 means, so it was not recited as part of the
15 definition of j constraint in Claim One, would --
16 would that change the meaning of Claim One?
17     A   I would say yes, it changes the meaning.
18 It may not change the function or the hardware or the
19 apparatus that the claim is describing.
20       Removing that facilitate doesn't change
21 what it is you would implement in hardware, but the
22 meaning of the claim is -- the whole meaning of the
23 claim, it's purposefully there to illuminate, to send
24 a message, to tell the PHOSITA the purpose.  And
25 that's important, otherwise it wouldn't be included.

Page 264

1     Q   When you say it's the purpose, does that
2 mean that the person who is designing a code that has
3 a j constraint is intending to use it for that
4 purpose?
5       MR. VERDINI:  Object to the form.
6 BY MR. MAYLE:
7     Q   Like, whose purpose is it?  What do you
8 mean by the purpose?
9     A   I mean the purpose of the invention is to
10 reduce error rate.  It does that by eliminating
11 certain sequences, minimum distance error event
12 sequences.  So that's -- and then that gets
13 implemented into the MTR code.
14       So that's the -- that's what I mean when
15 I say the purpose.  The ultimate purpose of the
16 invention is to reduce error rate.  That why it's --
17 that's how this cascade of things happened.  Let's
18 find ways to reduce error rate and -- yeah.
19     Q   Is this the -- let's say I'm designing a
20 code and I don't use -- let's say I use something
21 that one might call a d-equals-1 constraint --
22     A   Yes.
23     Q   Does that constraint facilitate the
24 reduction of a probability of a detection error in
25 the receiving?

Page 265

1       MR. VERDINI:  Object to the form.
2 Foundation.
3       THE WITNESS:  I believe so.  I
4    believe that the d-equals-one constraint
5    would serve the purpose of reducing error
6    rate.  It just happens to do it at low
7    rate.
8 BY MR. MAYLE:
9     Q   Could I implement something called an MTR
10 code at a low rate?
11       MR. VERDINI:  Object to the form.
12       THE WITNESS:  Yes.
13 BY MR. MAYLE:
14     Q   Could I use a rate with an MTR code
15 that's actually lower than a rate I could use with an
16 RLL code?
17     A   Yes.
18     Q   Do the claims require a rate, a certain
19 rate?
20     A   No.
21       MR. VERDINI:  Object to the form.
22       THE WITNESS:  No, they do not.
23 BY MR. MAYLE:
24     Q   How do I know if I'm facilitating the
25 reduction of a probability of detection error in a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 266

1   receiver?
2       MR. VERDINI:  Object to the form.
3   BY MR. MAYLE:
4       Q    Do you understand?
5       A    I think so.
6       Q    How do I know if that's what I'm doing?
7       A    You -- you test.  Put your code, do your
8   thing, implement the whole system and measure error
9   rate.
10      Q    Could use an MTR code that, perhaps, was
11  poorly designed, but still an MTR code that increases
12  the error rate in a system?
13      MR. VERDINI:  Object to the form.
14      THE WITNESS:  You could implement a
15      code that made the error rate worse.  In
16      the sphere of all possible codes I assume
17      that makes sense to me.
18      Could you implement -- I think your
19      question is could I implement basically a
20      really bad MTR code, low rate, very
21      poorly designed, that met that constraint
22      for which the error rate got worse?
23  BY MR. MAYLE:
24      Q    Correct.
25      MR. VERDINI:  Object to the form,

Page 267

1   of his question.
2       THE WITNESS:  These are things I
3   love to do.  So give me two days, I'll
4   come up with it.
5       So my gut is feeling this thing.
6   I'm sure we could come up with some bad
7   MTR codes.
8   BY MR. MAYLE:
9       Q    Right.  So let's do a hypothetical.  We
10  do come up with a bad MTR code.
11      A    Yeah.
12      Q    Does that code have a j constraint?
13      A    I thought that was the calculation I was
14  doing in my head, just by virtue of the j -- that's
15  what your asking, right?
16      Does a j constraint necessarily mean an
17  improved error rate.  I think that's what you're
18  asking.
19      Q    Does it?
20      A    I guess I'll ask the questions for you.
21  No.
22      I don't know.
23      Q    You don't know if the j constraint
24  requires --
25      A    Well, the --

Page 268

1       Q    Excuse me, Professor.
2       When you say I don't know, did you mean I
3   don't know whether the j constraint requires an
4   improvement to the error rate?  Is that what you
5   mean?
6       MR. VERDINI:  Object to the form.
7       THE WITNESS:  Not every j
8   constraint on a system will result in
9   improved error rate.  I implemented a
10  j-equals-three in a system that's not
11  necessarily guaranteed to improve error
12  rate.  It might make it worse, yeah.
13  BY MR. MAYLE:
14      Q    Let's say you have that.  It makes the
15  error rate worse, but it has a limit -- let's say it
16  still has a limit on the maximum number of
17  consecutive transitions in the encoded waveform.
18  Okay?  That's the hypothetical we're talking about.
19  But it makes the error rate worse, right?
20      A    Yes.
21      Q    That system might satisfy Claim 13, which
22  doesn't say anything about reducing the error rate,
23  correct?
24      A    Uh-huh.
25      Q    But it would not satisfy Claim One, which

Page 269

1   expressly says to facilitate the reduction of a
2   probability of detection error in said receiver
3   means, correct?
4       A    Okay.
5       Q    Do you agree with that?
6       MR. VERDINI:  Object to the form.
7       THE WITNESS:  Please ask again.
8   BY MR. MAYLE:
9       Q    So that system, we said it might satisfy
10  Claim 13 because Claim 13 is silent with respect to
11  error rate.
12      A    Uh-huh.
13      Q    But given the hypothetical that we talked
14  about, that system would not satisfy Claim One
15  because Claim One requires -- expressly requires to
16  facilitate the reduction of a probability of a
17  detection error in said receiver means, right?
18      MR. VERDINI:  Object to the form.
19      THE WITNESS:  Uh-huh.  Yeah, I'm
20  with you so far.
21  BY MR. MAYLE:
22      Q    Are you answering in the affirmative to
23  my question?
24      A    Please ask again.
25      Q    Okay.  So the hypothetical on the table

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 270

1 is that you've designed a code. Let's say three
2 consecutive -- only three consecutive transitions are
3 allowed, max.
4 A Okay.
5 Q But the code, when implemented, actually
6 makes the error rate, the bit error rate on a disc go
7 higher. Okay? Do you understand -- you have to say
8 yes.
9 A I'm with you so far, yes.
10 Q That system would not satisfactory Claim
11 One, and the reason it would not satisfy Claim One is
12 because Claim One says that the j constraint is
13 defined as the maximum number of consecutive
14 transitions allowed to facilitate the reduction of a
15 probability of a detection error in said receiver
16 means, correct?
17 MR. VERDINI: Object to the form.
18 THE WITNESS: I'm really sorry.
19 This thing is distracting me and I was
20 with you until the very end. I think I
21 know the question that you're asking.
22 BY MR. MAYLE:
23 Q I'll restate it. The hypothetical is
24 clear, right?
25 A Yes, yes.

Page 271

1 Q The system that you've designed, which
2 has -- which only allows a maximum number of three
3 consecutive transitions, on consecutive clock
4 periods, will not facilitate the reduction of the
5 probability of a detection error in said receiver
6 means, correct?
7 MR. VERDINI: Objection to the
8 form.
9 THE WITNESS: Yes, that
10 hypothetical -- I'm with you on the
11 hypothetical, and the hypothetical,
12 I've -- I've implemented a code that has
13 certain j constraints but makes the
14 system worse from an error probability
15 standpoint.
16 BY MR. MAYLE:
17 Q Incorrect. Don't use the word j
18 constraint.
19 We're saying that in the hypothetical
20 there is a -- there's some constraint. We're not
21 going to say what it is yet. But we know for sure
22 that it -- what it does, and the only thing that it
23 does, is that it limits the number of consecutive
24 transitions in the encoded waveform to three. Okay
25 so far?

Page 272

1 A That is the j constraint, right?
2 Q Let's not call it the j constraint yet.
3 A Okay.
4 Q There's something in the code, a
5 constraint, that limits the maximum number of
6 consecutive transitions to three. Okay?
7 A Okay.
8 Q But when it does that, it makes the bit
9 error rate of the system get higher. Okay?
10 A Okay.
11 Q So that's the hypothetical.
12 A Okay.
13 Q If we take that hypothetical code and we
14 read Claim One, and this amendment, that hypothetical
15 system would meet the part of the claim that says,
16 Wherein the j constraint is defined as the maximum
17 number of consecutive transitions allowed on
18 consecutive clock periods in the encoded waveform,
19 but it would not meet the second part that says, To
20 facilitate the reduction of a probability of a
21 detection error in said receiver means, correct?
22 MR. VERDINI: Objection.
23 THE WITNESS: Correct.
24 BY MR. MAYLE:
25 Q And so, ergo, when you limit the maximum

Page 273

1 number of transitions, it is not a fact that you will
2 automatically facilitate the reduction of a
3 probability of a detection error in said receiver
4 means, correct?
5 MR. VERDINI: Object to the form.
6 THE WITNESS: Correct.
7 BY MR. MAYLE:
8 Q And that is why Claim One could be
9 different than Claim 13 vis-a-vis the j constraint,
10 correct?
11 MR. VERDINI: Object to the form.
12 THE WITNESS: You're -- I see
13 the -- yes, I agree with that. The
14 logic -- the logic follows, except that
15 is the j constraint. The -- so your
16 hypothetical, that is the j constraint,
17 and the purpose of the j constraint in
18 the context of the whole patent is to
19 reduce error rate. That's just been
20 clear from the very beginning.
21 So you're describing a hypothetical
22 that's outside of what's the body of this
23 patent. That's what it feels like.
24 BY MR. MAYLE:
25 Q Okay. So let's stick with Claim 13,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 274

1 then.
2        In our hypothetical that we did where we
3 have some sort of constraint that limits the maximum
4 number of transitions to three, but makes the bit
5 error rate worse.
6        A    Uh-huh.
7        Q    We've agree that that thing, that
8 hypothetical code, would not satisfy Claim One,
9 correct?
10       A    Correct.
11       Q    Would that hypothetical thing satisfy
12 Claim 13?
13       A    It sounds like it would.  It would, but
14 it makes no sense.  It's not -- it's not the claim.
15 The whole patent is about designing a code that
16 reduces error rate.
17       So saying there's a system that increases
18 error rate is -- you're saying that's the purpose of
19 the j constraint, to make sure that we -- the value
20 of j that we use has to be matched to the system to
21 facilitate the reduction in error.
22       Q    Let me try that again.
23       In the hypothetical we have a system --
24 I'm not going to call it a j constraint.  It has some
25 constraint in the code which limits the maximum

Page 275

1 number of consecutive transitions on the encoded
2 waveform to three.
3        A    Uh-huh.
4        Q    But when I implement this code on my
5 system, it makes the error rate of the system higher.
6 Okay.  That's the hypothetical.
7        A    Uh-huh.
8        Q    Would that system -- does that system
9 satisfy Claim 13?
10       MR. VERDINI:  Object to the form.
11       THE WITNESS:  If it does not
12 satisfy the j constraint as communicated
13 in this, it wouldn't meet the limitations
14 of Claim 13.
15 BY MR. MAYLE:
16       Q    And are you saying it doesn't satisfy the
17 j constraint?  It doesn't satisfy the j constraint?
18       MR. VERDINI:  Object to the form.
19 BY MR. MAYLE:
20       Q    The hypothetical system, are you saying
21 it would not satisfy the j constraint of Claim 13?
22       A    I'm not saying it would necessarily
23 violate the -- you're -- you proposed a hypothetical
24 system.  You didn't put j in there.
25       Q    Correct.

Page 276

1        A    But you did talk about transitions.
2        Q    Right.  Now I'm asking you -- now I'm
3 asking you, that system which I didn't call a j
4 constraint, does it have a j constraint as you
5 interpret Claim 13?
6        A    I would say yes, it has a j constraint.
7        Q    It does.
8        A    Yeah.
9        Q    But I thought you said that that
10 same system --
11       A    But --
12       Q    Stay with me, Professor.
13       That same system does not satisfy Claim
14 One, is what you told me, correct.
15       A    Actually, what I'm afraid of is I'm now
16 hopelessly confused, just because -- I -- you've
17 pretty much lost me from the very beginning by saying
18 we had j -- we had a certain number of three
19 consecutive transitions, but you didn't want to say
20 that was the j constraint.  We've pulled that out.
21       Q    Right.  So you understand, what we're
22 trying to do is figure out what the j constraint is.
23 So if I start to tell you there's a j constraint
24 there, it's a very useless exercise.  So let's try it
25 one more time.

Page 277

1        Here's the hypothetical system.
2        A    Seriously, I'm not trying to be a pain in
3 the butt, I really am trying --
4        Q    Professor --
5        A    -- to understand what you're saying.
6        Q    Please don't talk over me.
7        A    Okay.
8        Q    We'll take it in baby steps.  The code
9 has some sort of constraint.  And the code does
10 something such that the maximum number of consecutive
11 transitions that are allowed on consecutive clock
12 periods is three.  Do you understand that?
13       A    I understand that.
14       Q    Are you confused by that?
15       A    I understand it.  So far I'm not
16 confused.
17       Q    Okay.  And then I will tell you -- that's
18 one thing I'm going to tell you about the system.
19       The second thing I'll tell you about the
20 system is that this hypothetical method or system is
21 that, when we implement it, it does not facilitate
22 the reduction of the probability of a detection error
23 in a receiver means.  Do you understand that?
24       A    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 278

1    Q    Are you at all confused so far?
2    A    So far not confused.
3    Q    That system would not satisfy Claim One
4  because Claim One requires, quote, to facilitate the
5  reduction of a probability of a detection error in
6  said receiver means, correct?
7    A    Correct.
8    Q    Now I'm going ask you a simple yes or no
9  question.
10         The same system, the same hypothetical
11  system or method, we're now talking about Claim 13.
12  Does that hypothetical system or method have a j
13  constraint within the meaning of Claim 13?
14         MR. VERDINI:  Object to the form.
15         THE WITNESS:  I think it does.  I
16    think it does.
17  BY MR. MAYLE:
18    Q    Okay.  Then -- so it doesn't have a j
19  constraint with Claim One, but it does have a j
20  constraint with Claim 13.  So that means that the j
21  constraint in Claim One does not necessarily have the
22  same scope as the j constraint of Claim 13, correct?
23         MR. VERDINI:  Object to the form.
24         THE WITNESS:  But the reason --
25

Page 279

1  BY MR. MAYLE:
2    Q    It's yes or -- can you answer me yes or
3  no.
4         Mr. KNEDEISEN:  You're talking over
5    him now.
6  BY MR. MAYLE:
7    Q    Can you answer the question --
8    A    Can I answer the question and you not
9  talk over me?
10    Q    I'm looking for a yes or no if I can have
11  one.
12    A    The rationale for saying that it didn't
13  satisfy One, but did satisfy 13, was because of the
14  error rate, not because of the j constraint.  That's
15  how I process it.
16    Q    Okay.  Thank you.  Thank you.
17         So that would mean that the reduction of
18  the error rate, which is recited in Claim One, is not
19  an inherent part of the j constraint in Claim 13,
20  correct?
21         MR. VERDINI:  Object to the form.
22         THE WITNESS:  I would say no, I
23    wouldn't agree with that.  The j
24    constraint in 13, it's -- the purpose of
25    the j constraint is -- and that's what

Page 280

1    the whole patent talks about -- using the
2    j constraint is to reduce error
3    probability.
4  BY MR. MAYLE:
5    Q    Let me ask --
6    A    No one would implement -- no one would
7  implement a system that lowered the rate and made the
8  error probability worse.  That makes -- no good
9  engineer would ever implement a system like that.
10  That -- that idea that they implement, it would be
11  thrown out by their manager.  Makes no sense.
12    Q    Well, I'm not asking you what someone
13  would do.  I'm trying to get to the meaning of the
14  claims.
15         Wouldn't you agree -- well, let me --
16  when someone is -- when a PHOSITA is construing
17  claims as they are properly construed, and there's
18  two different independent claims, are you assuming
19  that the claims will have the same scope if they
20  address -- if there are some commonalities between
21  the claims?
22         MR. VERDINI:  Object to the form.
23         THE WITNESS:  No, I wouldn't assume
24    the scope would have to be the same.
25

Page 281

1  BY MR. MAYLE:
2    Q    Okay.  Let's -- let's go back to your
3  declaration in 46 real quick.  We talked about
4  paragraph 46 before the lunch.  Do you remember that,
5  the antecedent "the"?
6    A    Yes.
7    Q    I think I got what you said, but now I
8  couldn't remember.
9         Were you saying that when a PHOSITA sees
10  the antecedent "the" in a claim, the PHOSITA would
11  understand that there must be an antecedent basis for
12  the thing in question?  Is that what you're saying?
13         MR. VERDINI:  Object to the form.
14         THE WITNESS:  Yeah, when they see
15    "the" -- something, like, in this case,
16    "the" encoded waveform, they know that
17    there's -- there's something to go find.
18    It's there, it's present.  Go find it.
19    And I guess that's what we're calling the
20    antecedent basis.
21  BY MR. MAYLE:
22    Q    Right.  And forget about -- again, I'm
23  not talking about this claim in particular.  But if a
24  PHOSITA sees that, when you say that they would
25  understand to go find the antecedent basis, does that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 282

1 mean that they would understand that there, in fact,
2 will be an antecedent basis for the object in
3 question?
4          MR. VERDINI:  Object to the form.
5          THE WITNESS:  I don't know whether
6 you're asking a legal -- I'm assuming
7 it's not a legal question, just
8 practically speaking --
9 BY MR. MAYLE:
10     Q    Well, actually --
11     A    -- that they would -- that it's there and
12 they should go look for it and it will be there.
13 That's the way -- I think that's how someone skilled
14 in the art would go for it.
15          They're saying there's an encoded
16 waveform.  It's been talked about before.  You know,
17 it's there, go find it.
18     Q    Do you know if there is a legal standard
19 for antecedent basis in a claim?
20     A    I'm sorry, I don't know that.
21     Q    And is it your understanding that the
22 PHOSITA would think that in a hundred percent of the
23 cases?  When they see an antecedent word like that,
24 that they will a hundred percent of the time, in
25 fact, go find the antecedent basis in the claim?

Page 283

1          MR. VERDINI:  Object to form.
2 BY MR. MAYLE
3     Q    Is that the PHOSITA's understanding?
4          MR. VERDINI:  Object to the form.
5          THE WITNESS:  I think so.  I think
6 it's a safe assumption that someone
7 reading that, seeing "the" something,
8 that that something is somewhere
9 previous.  I think that's a good
10 assumption.
11 BY MR. MAYLE:
12     Q    Did you use that assumption in rendering
13 your opinion in claim 46 -- or sorry -- paragraph 46?
14     A    Yeah, that there was an antecedent basis,
15 yes.
16     Q    Okay.  Thank you.
17          MR. MAYLE:  Let's do an exhibit.
18          MR. VERDINI:  What's the next
19 exhibit?
20          MR. MAYLE:  1020.  And one for your
21 counsel.
22          (McLaughlin Exhibit No. 1020 was
23 marked for the record.)
24 BY MR. MAYLE:
25     Q    Professor, I'm handing you this exhibit,

Page 284

1 that you see on the top it says Block Diagram of a
2 Rechannel?
3     A    Okay.  Yes.
4     Q    Let's just do some thought experiments on
5 this, and let's pretend -- or let's assume, rather,
6 that I have a hard disc, a magnetic hard disc drive
7 system that practices Claim 13 of the '601 patent
8 under your interpretations of the claims.  Okay?
9     A    Okay.
10     Q    And this is a block diagram that
11 represents this system or this hard disc drive that's
12 using Claim 13.  Okay?
13     A    Okay.
14     Q    And I want to walk through the steps and
15 ask you where the various things are happening.
16     A    Uh-huh.
17     Q    So Claim One -- sorry -- Claim 13 of the
18 '601 patent refers to receiving m-bit data words,
19 correct?
20     A    Okay, yes.
21     Q    And if we could point to something on
22 this chart, where would that be happening?
23     A    I'd say 102.
24     Q    102 called user bits under it?
25     A    Yes.

Page 285

1     Q    And then it says -- the Claim 13 goes on
2 it talks about producing sequences of n-bit code
3 words, correct?  In the claim, right?
4     A    I'm sorry.  I'm distracted.  This is the
5 first time I've seen this so I'm probably like way
6 ahead of you.  And I'm sorry, I'm not supposed to do
7 that, but I will know --
8     Q    Okay.  So let's just go -- we'll talk
9 about the claim and then we'll look at the figure.
10          The next claim of the claim, of Claim 13
11 of the '601 talks about producing sequences of n-bit
12 code words, right, in the claim?
13     A    Yes.
14     Q    So where would that be happening in our
15 hypothetical system here?
16     A    The m-bit coverts?
17     Q    The N -- November-bit code words.
18     A    Again, I wouldn't be a hundred percent
19 sure, but I would have to take a guess.  I mean I
20 didn't prepare this, I don't think this is in the
21 patent.  I don't believe this is in the patent.
22          So it wouldn't surprise me that that
23 would be at 112.
24     Q    Okay.  And then the claim talks about
25 that step that was added during prosecution imposing

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 286

1 a pair of constraints, j semicolon k, on the encoded
2 waveform, right?  That's what the claim says, right?
3    A    Yes.
4    Q    Where would that happen, imposing
5 constraints?
6        MR. VERDINI:  Object to form.
7        THE WITNESS:  I would say
8 probably.  I would say there are some --
9 because that 120 is a multiplexer, then
10 that's still -- that's still bits at 120.
11 And so at 122, that -- it's not clear to
12 me whether that's bits or, you know,
13 analog yet.  At some point those bits
14 need to be converted to a waveform, and
15 so there's either something missing from
16 this that -- that shows that piece.
17        I mean, a multiplexer indicates
18 those are bits going in, and outcome is
19 bits.  So maybe the analog portion that
20 produces the waveform is embedded in 104.
21 I don't know.
22        So now what was your question?  Oh,
23 imposing.  That was on imposing.
24 BY MR. MAYLE:
25    Q    So, yeah, let me you unpack your answer.

Page 287

1    That was very helpful.
2    A    I'm sorry --
3    Q    No, you're doing a great job.  So are you
4 saying -- let me just unpack it a little bit.
5        If 120 is a multiplexer, are you saying
6 that everything to the left of that would still be in
7 bit format and not yet analog?
8    A    That's reasonable.
9    Q    Probably?
10    A    That's a reasonable assumption.
11    Q    All right.  Then let's assume something
12 happens after that and there's an analog signal being
13 sent to a write head.  We'll call that 122.  Okay?
14    A    Uh-huh.
15    Q    Let's assume that.
16    A    Okay.  You're saying that there's another
17 box, it's just not shown here.
18    Q    Sure.  Let's assume that that's there.
19 It's downstream of 120, but it's before 104.
20    A    Okay.
21    Q    Okay.  Under that understanding, where --
22 where would the claim step of imposing a pair of
23 constraints, j;k, on the encoded waveform happen?
24    A    I guess I'm going to say at 122.
25    Q    Does the -- does the MTR encoder at 110

Page 288

1 play a role --
2        MR. VERDINI:  Object to the form.
3 BY MR. MAYLE:
4    Q    -- in imposing the j and k constraints?
5        MR. VERDINI:  Object to the form.
6 Foundation.
7        THE WITNESS:  The MTR coder is
8 going to produce bits that -- yeah, the
9 MTR is going to produce bits, but -- I'm
10 just -- let me see where you are.
11        We're talking about imposing a pair
12 of constraints on the encoded waveform,
13 so since that's referring to the waveform
14 not imposing a pair of constraints on the
15 bits, that's why I'm saying imposing that
16 constraint means you have to enforce it
17 or check it or test it, that would be in
18 the analog -- because it's a waveform,
19 that's why I'm saying it's at 122.
20 That's the place at which it's a
21 waveform.
22 BY MR. MAYLE:
23    Q    Thank you.
24        Are you saying that one could not impose
25 constraints without checking or testing whether the

Page 289

1 constraints were imposed?  Is that what you said?
2        MR. VERDINI:  Object to the form.
3 Mischaracterizes what he said.
4        THE WITNESS:  I don't think that's
5 quite what I said.  It's saying imposing
6 constraint on the waveform.  It could
7 happen -- it could happen at the bit
8 level through the code or it could --
9        Because it's talking about the
10 waveform, the constraint really is on the
11 waveform itself.  So that's why I'm
12 saying that's the place where I would
13 validate that the waveform meets that.
14 So that's why I'm saying that's where.
15        Imposing might take place somewhere
16 else, but in order to ensure that it
17 was -- because, you see, I'm focusing on
18 the waveform piece and this is the place
19 where the waveform is.  Clearly before
20 then, it's bits.
21 BY MR. MAYLE:
22    Q    Let me ask it this way.
23        Let's say that the MTR encoder produces
24 n-bit code words in this hypothetical in such a way
25 that we're -- we're still at the bit level.  There'll

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 290

1    be a maximum of j consecutive transitions at the bit
2    level and a maximum of k consecutive nontransitions
3    at the bit level.
4            Do you follow so far?
5        A    I'm with you so far, yeah.
6        Q    Could that be seen as imposing a pair of
7    constraints, j;k, on the encoder waveform?
8            MR. VERDINI:  Object to the form.
9            THE WITNESS:  I would say it's a --
10   I would say it's a less direct or
11   indirect way, but I could see -- I could
12   see how someone would -- I'm sorry I keep
13   going to test, testing.  But I can see
14   that they would test that at the bit
15   level.
16   BY MR. MAYLE:
17       Q    In this hypothetical, let's turn off the
18   LDPC encoder.  Let's erase that.
19       A    Uh-huh.
20       Q    So 112 is n-bit code words, and we have a
21   multiplexer.
22       A    Right.
23       Q    But it's just those.
24       A    I understand.
25       Q    And let's just say the multiplexer, like

Page 291

1    you said, something is happening there or after
2    there, before it get to the disc, to turn the
3    m-bit -- the sequence of m-bit code words into an
4    analog signal.
5            Does that make sense?
6        A    I'm with you so far.
7        Q    And let's just say that, in this system,
8    wherever there was a one in the code word, there's
9    going to be one voltage in the signal at 122.
10   Whenever there was a zero in the string of code
11   words, there's going to be a different voltage in
12   122.  Does that make sense?
13       A    Uh-huh, yes.
14       Q    And let's say that the voltage
15   corresponds exactly to the code words; in other
16   words, every time there's a one, there's one level,
17   there's a zero, but nothing else happens.  It just
18   turns into an analog signal.  Does that make sense?
19       A    I think so, so far, yeah.  I'm with you.
20       Q    So under that understanding, are you
21   going to call that voltages -- that's the encoded
22   waveform under your interpretation?
23       A    Yeah, the analog version is the encoded
24   waveform, yeah.
25       Q    But couldn't one say that the constraints

Page 292

1    have been imposed on the encoded waveform by the MTR
2    encoder in this hypothetical?
3        A    I'm okay with that.
4        Q    Let's go on to the rest of the claim.
5            Then it says -- you remember in the claim
6    they have the two generating steps?
7        A    Yes.
8        Q    Generating no more than j -- I might be
9    paraphrasing.  I should open it up so I get it right.
10           It says -- let's read it:  Generating no
11   more than j consecutive transitions of said sequence
12   in recorded waveform such that j is greater than or
13   equal to two.
14           Let's assume that that happens.  Where
15   would that happen on this hypothetical system?
16           MR. VERDINI:  Object to the form.
17           THE WITNESS:  I mean, again, I
18   would be -- because it's focusing on the
19   transitions and the recorded waveform and
20   because -- I think of, you know, how to
21   validate that that claim is met, I would
22   want to do measurements on the waveform.
23           So that's why I say 122 is the
24   place where I would validate it, but it
25   does make sense that you could -- that

Page 293

1    the -- that the bit sequences that come
2    out of the -- ensuring certain properties
3    of the bit sequence would come out of the
4    encoder would be indicative of that, of
5    meeting that.
6            But the only place to really truly
7    measure and validate that is at the
8    analog -- is in the analog domain.
9    BY MR. MAYLE:
10       Q    Thank you.  Let me ask it a different
11   way.  If you look at the verb generating in Claim 13?
12       A    Uh-huh.
13       Q    Let's assume that this system does that
14   and everything after the verb generating.  Which part
15   -- which component, if any, in this system would be
16   doing the generating, the first generating step?
17       A    Generating transition --
18           MR. VERDINI:  Object to the form.
19           THE WITNESS:  Generating no more
20   than j consecutive transitions of said
21   sequence in the recorded waveform.
22           So I say, you know -- where would
23   we generate consecutive transitions in
24   the recorded waveform?  I would do that
25   in the analog domain.  That's where the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 294

1  changes in the analog -- the continuous
2  time signal is made is in the analog
3  domain.
4        But again, as I said, I see where
5  someone might look at the bit level and
6  say, but it's -- you know, bit level to
7  see if that's, you know, if that's -- if
8  that constraint -- that limitation is
9  going to be met.
10       But it's saying generating no more
11  than j consecutive transitions of the
12  sequence in the recorded waveform, so
13  we're talking about the transitions in
14  the waveform. So I'm doing that in the
15  analog domain.
16  BY MR. MAYLE:
17       Q    And where --
18       A    That's where the true generation of those
19  levels of the waveform would take place, in the
20  analog domain, I'm saying 122.
21       Q    You're saying 122?
22       A    Yes.
23       Q    It wouldn't happen on 104?
24       A    I thought we agreed that there was
25  something at 122 that's not written here that may be

Page 295

1  producing analog signal.
2       Q    No, you're right, we have that, but I'm
3  asking you now, let's assume 104 is -- someone
4  labeled it disc. Let's assume that's the platters of
5  a hard disc drive system, okay?
6       A    Okay, uh-huh.
7       Q    Does the -- does the first generating
8  step in Claim 13 happen at 104?
9            MR. VERDINI: Objection. Asked and
10  answered.
11           THE WITNESS: Say that again, I'm
12  sorry.
13  BY MR. MAYLE:
14       Q    Does the first generating step of Claim
15  13 happen at -- in our hypothetical system, at the
16  part labeled 104?
17           MR. VERDINI: Same objection and
18  objection to form.
19           THE WITNESS: 104 being the
20  platters?
21  BY MR. MAYLE:
22       Q    Correct.
23       A    No, it happens at 122, before the
24  platters.
25       Q    So you would say --

Page 296

1       A    It happens somewhere along this wire
2  before the head, in the analog domain, generating --
3       Q    I understand that.
4       A    -- generating the waveform.
5       Q    I'm just trying to see if it maybe also
6  happens at 104.
7            Does it also happen at 104, the
8  generating step in Claim 13?
9            MR. VERDINI: Object to the form.
10           THE WITNESS: No, because
11  generating is applied to the waveform, so
12  that's happening at 122, not at 104.
13  BY MR. MAYLE:
14       Q    Are there transitions -- say the system
15  does Claim 13 as you interpret it. Would there be
16  transitions -- and when I say transitions, I mean --
17  I am talking about the word transitions in the claim,
18  Claim 13, that those are the transitions that I'm
19  talking about and no others.
20           Are those transitions -- would they be in
21  part labeled 104?
22           MR. VERDINI: Object to the form.
23           THE WITNESS: I'm sorry. Could you
24  say that again?
25

Page 297

1  BY MR. MAYLE:
2       Q    Claim 13, the first generating step uses
3  the word transitions, right?
4       A    Yes.
5       Q    I'm asking about those transitions and
6  not any other transitions. Okay? So far are you
7  with me?
8            MR. VERDINI: Object to the form.
9            MR. MAYLE: I haven't asked a
10  question yet.
11  BY MR. MAYLE:
12       Q    But I want to limit my next question to
13  the transitions that are in the claim and no other
14  transitions. Are you with me so far?
15           MR. VERDINI: Object to the form.
16           THE WITNESS: You're talking just
17  about the transitions in the claim.
18  BY MR. MAYLE:
19       Q    And no other transitions. Are you with
20  me so far?
21           MR. VERDINI: Same objections.
22           THE WITNESS: That's not what I'm
23  not sure, when you say no other
24  transition. We're just --
25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 298

1  BY MR. MAYLE:
2      Q    The claim uses the word transitions,
3  right?
4      A    Yes, uh-huh.
5      Q    Whatever that means, that's what I'm
6  talking about.
7      A    Okay.
8      Q    And I'm not talking about any other
9  transitions.  Okay?  Do you follow so far?
10         MR. VERDINI:  Object to the form.
11         THE WITNESS:  Yes.
12  BY MR. MAYLE:
13      Q    Whatever that means, that word
14  transitions, if our hypothetical system does this
15  claim, where are the transitions on the system?
16  Could you tell me?
17      A    In the context -- in the context of the
18  claim, the transitions are on the medium that were --
19  that's the term -- when we talked about the
20  construction of the term transitions, I think that's
21  what we were referring to.  We're talking about the
22  transitions that occur on the magnetic medium.
23      Q    So are you saying that's 104 on this
24  diagram?
25      A    That's where the medium is, yes, that's

Page 299

1  where the transition would take place, on the medium.
2      Q    Does it make sense to say that
3  transitions can be generated before transitions
4  exist?  Do you follow that question?
5         MR. VERDINI:  Object to the form.
6         THE WITNESS:  Well, it's talking
7  about generating a waveform.
8  BY MR. MAYLE:
9      Q    Actually, let's --
10      A    Generating transitions in a waveform.
11  That's done in the analog domain.  That would be done
12  in 122.  The transitions are the magnetic transitions
13  we're talking about on the disc.
14      Q    Let's say there could be ten consecutive
15  transitions on the recorded waveform.  Okay?
16      A    Waveform.
17      Q    On the recorded waveform, all right?
18      A    Uh-huh.
19      Q    And let's say I -- someone generates the
20  first transition and then it's recorded on the disc,
21  right, just one at a time?
22      A    Okay, yeah.
23      Q    Then the second one is recorded on the
24  disc, correct?
25      A    Yes.

Page 300

1      Q    And then the third one is recorded on the
2  disc, right?
3      A    Yes.
4      Q    When you get to the tenth consecutive
5  transition, those are all on the disc, right?
6      A    Okay, yes.
7      Q    Before they get to the disc or before --
8  say before the tenth one is on the disc, there's not
9  ten consecutive transitions on the recorded waveform,
10  right?
11      A    Uh-huh.
12         MR. VERDINI:  Objection.
13         Mr. KNEDEISEN:  Yes?
14  BY MR. MAYLE:
15      Q    Is that a yes?
16      A    Ask again.
17      Q    So before all ten are -- are recorded,
18  there can't be ten consecutive transitions in the
19  recorded waveform, right?
20         MR. VERDINI:  Object to form.
21  BY MR. MAYLE:
22      Q    You need all ten, right?
23      A    I'm sorry.  Ask again.
24      Q    In our hypothetical, if we're limiting
25  consecutive transitions on the recorded waveform to

Page 301

1  ten --
2      A    To ten, okay.
3      Q    -- and let's say they're recorded one at
4  a time.
5      A    Yes.
6      Q    The first one gets recorded, correct?
7      A    Yes.
8      Q    The second one gets recorded?
9      A    Yes.
10      Q    The ninth one gets recorded?
11      A    Yes.
12      Q    And the tenth one isn't there yet, so
13  right now there's not ten consecutive transitions on
14  the recorded waveform, right?
15         MR. VERDINI:  Object to the form.
16         THE WITNESS:  There's not ten --
17  BY MR. MAYLE:
18      Q    There's not yet ten consecutive
19  transitions on the recorded waveform, correct?
20      A    No, there's not yet ten consecutive
21  transitions on the disc.  There could be a waveform
22  out there that's got the tenth ready to be written.
23      Q    Let's say nine of them have been written
24  to disc so far.
25      A    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 302

1    Q    Are those recorded now?
2        MR. VERDINI:  Object to the form.
3        THE WITNESS:  There's -- bits
4    have been recorded, yes.
5    BY MR. MAYLE:
6        Q    When you say the bits have been recorded,
7    are you talking about magnetic particles or are you
8    talking about ones and zeros?
9        A    The ones and zeros in the waveform,
10   there's a transition that's been written on the disc.
11   That transition, let's say, represents a bit, a one.
12   That's there.
13       Q    Represents a bit, right?
14       A    Represents a bit.
15       Q    But is not a bit?
16       A    Is not a bit.
17       Q    Let's just be clear.
18       A    Yeah.
19       Q    So let's say nine of these transitions
20   are on the disc.
21       A    Yeah.
22       Q    The tenth one has not been recorded yet.
23       A    Right.
24       Q    Would you say that the first nine have
25   been recorded?

Page 303

1        MR. VERDINI:  Object to form.
2        THE WITNESS:  Yes.
3    BY MR. MAYLE:
4        Q    Is the tenth one?  So is there a recorded
5    waveform?
6        MR. VERDINI:  Object to form.
7    BY MR. MAYLE:
8        Q    Yet?
9        A    There's a waveform that may be sitting
10   there getting ready to be put onto the head that will
11   then write the tenth transition.
12       Q    Would you say in our scenario that I just
13   gave you that 90 percent of the waveform has been
14   recorded but not a hundred percent?
15       MR. VERDINI:  Object to the form.
16       THE WITNESS:  Yeah, that sounds
17   right, yes.
18   BY MR. MAYLE:
19       Q    And that's because nine out of the ten
20   transitions are on the disc, but the tenth one is
21   not?
22       A    Yes.
23       Q    Okay.  Thank you.
24       MR. MAYLE:  Let's take a break.
25       THE VIDEOGHRAPHER:  2:48.  We're

Page 304

1    off the record.  This is the end of media
2    number four.
3        (Brief pause.)
4        THE VIDEOGRAPHER:  3:01.  We're on
5    the record.  This is the beginning of
6    media number five.
7    BY MR. MAYLE:
8        Q    Hi, again, Professor.
9        A    Hello.
10       Q    Did you talk to your counsel about the
11   scope of your testimony on the break there?
12       A    No.
13       Q    Okay.  I just have to ask you that.
14       Let's look at paragraph 49 in your
15   declaration.  We're still talking about waveform
16   here, Exhibit 1005.  It's on page 22.  Okay.
17       And at the bottom of page 22, in
18   paragraph 49, you cite the Wang article, right?
19       A    Okay.
20       Q    Do you see that?
21       A    Yes.  Uh-huh, yes.
22       Q    And Wang was not part the patent, was it?
23       MR. VERDINI:  Object to form.
24       THE WITNESS:  I don't believe it
25   was cited in the patent.

Page 305

1    BY MR. MAYLE:
2        Q    Right.  And Wang was published in 1999,
3    right?
4        A    Yes.
5        Q    And that was three years after the patent
6    application was filed?
7        A    Yes.
8        Q    And then you cite, also on page 23, you
9    cite Ashar again, right?
10       A    I guess.
11       Q    Is that the same Ashar article we talked
12   about this morning?
13       A    I believe so, yes.
14       Q    Let's go to page 24, which is Paragraph
15   50 of your -- it starts on page 23.  On page 23, you
16   say:  The prosecution history supports the common
17   understanding of the meaning of waveform.
18       Right?  It's the -- the previous page,
19   start on the bottom of 23.
20       A    Okay.
21       Q    You're now citing the prosecution
22   history, correct?
23       A    Yes.
24       Q    And you've put a cut and paste on page 24
25   of your declaration that comes out of the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 306

1  prosecution, right?  Is that what this picture is?
2      A   I believe so, yeah.
3      Q   And did you add the red text called
4  Waveform and Bit Sequence?
5      A   I believe -- I'm not sure I did, but I
6  asked someone to do that.
7      Q   So that's an annotation for this
8  declaration?
9      A   Yeah.
10     Q   And those red arrows were annotated for
11 this declaration?
12     A   Yes.
13     Q   And you have an arrow from the word
14 waveform to what you're identifying as the waveform,
15 correct?
16     A   Correct.
17     Q   And you have a different arrow from the
18 word bit sequence to what you're identifying as the
19 bit sequence, right?
20     A   Yes.
21     Q   And those are two different arrows,
22 right?
23     A   Yes.
24     Q   And so the waveform is not the same as
25 the bit sequence, right?

Page 307

1      A   That's correct.
2      Q   Let's move along to imposing the pair of
3  constraints, j;k.  It's on page 24 of your
4  declaration.  You see that heading C?
5      A   Yes.
6      Q   And you have here a series of three --
7  you have a table called UMN's Proposed Constructions
8  and you have Imposing Constraint and Pair of
9  Constraints j;k, right?
10     A   Uh-huh, yes.
11     Q   And you list there, for each of those
12 three, that -- the UMN proposed construction,
13 correct?
14     A   Yes.
15     Q   So keep that aside and let's do our
16 exercise again.  Keep your finger there.  Let's look
17 to Exhibit 1004, on page four.
18     A   Okay.
19     Q   And would you just read to yourself the
20 Plaintiff's proposed construction -- it looks like
21 they've lumped in together -- let me ask you this.
22         On Exhibit 1004, page four, the only
23 disputed claim term is imposing a pair of
24 constraints, j;k, right?
25     A   Okay, yes.

Page 308

1      Q   And so -- but in your declaration on page
2  24, you're interpreting each -- imposing
3  separately -- constraint separately.
4      A   Yes.
5      Q   And then a pair of constraints, j;k,
6  separately, right?
7      A   Yes, uh-huh.
8      Q   And let's look at -- other than that, I
9  would point to you in Exhibit 1004 where it says
10 Proposed Construction under the Plaintiffs.  It
11 starts with:  The sequences of m-bit code words are
12 subject to a pair of separate constraints, j;k.
13         Do you see that?
14     A   Yes.
15     Q   And, in particular, it says:  The
16 sequences of m-bit code words is what's subject to
17 the constraints.
18         Right?
19     A   Yes.
20     Q   And if you look on the page 24 of your
21 declaration, would you agree that there's nothing
22 about the sequences of m-bit code words?
23     A   Correct.
24     Q   And so, therefore, would you -- would you
25 agree that the University's proposed construction has

Page 309

1  somewhat changed from what's in your declaration?
2      A   Yes, with --
3          MR. VERDINI:  Object to form.
4          THE WITNESS:  Yes, with that new
5      addition at the very beginning.
6  BY MR. MAYLE:
7      Q   Okay.  Let's go to your -- your
8  declaration now, 51.  You say:  In my opinion, the
9  terms imposing and constraint do not have a
10 specialized technical meanings.
11         That's what you say, right?
12     A   Correct.
13     Q   Let's just stick with constraint.  Are
14 you sure that, in the art, the word constraint
15 doesn't have a specialized meaning?
16         MR. VERDINI:  Object to the form.
17         THE WITNESS:  I mean, a constraint
18     is a technical thing that needs to be
19     satisfied, you know, in the encoding, but
20     the word constraint has its plain and
21     ordinary meaning in that context.
22         I'm saying, we often say a j or k
23     constraint or some kind of constraint, it
24     means something specific, but it's -- but
25     the constraint itself has -- has its own

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

---

Page 310

1  plain and ordinary meaning.
2  BY MR. MAYLE:
3      Q   Okay.  Let me ask you this.  So when you
4  say the constraint has a plain and ordinary meaning,
5  do you mean it has a meaning in the art or it has a
6  meaning as a layman would understand or in general?
7          MR. VERDINI:  Object to the form.
8          THE WITNESS:  I guess I'm saying
9      they're the same thing.
10 BY MR. MAYLE:
11     Q   So are you saying that the word
12 constraint in the field of the patent has the same
13 meaning as the word constraint from the Webster's
14 Dictionary, for example?
15     A   Yes.  Yes.  And, when you tell me what
16 the constraint is, that's a technical thing.  Right.
17 That's a -- I don't want to say a modifier or some
18 description of the constraint.  If someone says
19 constraint in the technical sense, it's not clear
20 exactly what they're referring to as a term of the
21 art.
22         It says -- usually it's a j;k constraint
23 or d;k constraint or an RLL constraint, and all those
24 two things together have a specific meaning in the
25 art.

---

Page 311

1      Q   Before you came to be involved in this
2  case, you would understand exactly what a constraint
3  was in the context of coding for storage systems,
4  correct?
5      A   Yes.
6      Q   And a PHOSITA would -- a PHOSITA, not
7  reading these claims or nothing to do with this case,
8  a PHOSITA would know, in 1996 and before, what a
9  constraint was in the context of coding methods for
10 digital storage systems, right?
11         MR. VERDINI:  Object to the form.
12         THE WITNESS:  Yeah, they would know
13     a broad definition of constraint, but
14     they -- but that, in itself, is not
15     specifying something really specific in
16     the art.
17 BY MR. MAYLE:
18     Q   For example, a PHOSITA would know, if we
19 said to them an RLL, d and k constraints, they know
20 what those are, right?
21     A   Yes.
22     Q   Do you think that a PHOSITA, if the word
23 impose -- if someone said to a PHOSITA before 1996,
24 impose a constraint, they would -- a PHOSITA would
25 know what impose means?

---

Page 312

1      A   Yes.
2      Q   A PHOSITA wouldn't look to a Webster's
3  Dictionary for impose, would he?
4          MR. VERDINI:  Object to the form.
5          THE WITNESS:  I don't think so.
6  BY MR. MAYLE:
7      Q   Okay.  But a PHOSITA wouldn't look up
8  constraint in a Webster's Dictionary, either,
9  correct?
10         MR. VERDINI:  Same objection.
11         THE WITNESS:  I don't think so.
12     They would know what that means, yeah.
13 BY MR. MAYLE:
14     Q   And so let's look at page -- paragraph
15 51, you're saying that ordinary dictionaries define
16 impose to mean establish or apply by authority,
17 correct?
18     A   Uh-huh.
19     Q   And that is that is UMN's proposed
20 construction for the term -- claim term imposing,
21 right?
22         MR. VERDINI:  Object to the form.
23 BY MR. MAYLE:
24     Q   As listed on page 24 of your declaration?
25     A   Yes, uh-huh.

---

Page 313

1      Q   So in other words, UMN's proposed
2  construction on page 24 of your declaration was taken
3  directly and verbatim from an ordinary dictionary,
4  correct?
5          MR. VERDINI:  Object to the form.
6          THE WITNESS:  Yes.
7  BY MR. MAYLE:
8      Q   And let's look at constraint on page 25
9  of your declaration, at paragraph 51.  You say that:
10 The ordinary dictionary defines constraint as a
11 constraining condition in Appendix B and something
12 that restricts, limits or regulates.
13         Right?
14     A   Uh-huh, yes.
15     Q   That latter one, something that
16 restricts, limits or regulates, is UMN's proposed
17 construction on page 24 of your declaration.
18     A   Okay.  Yes.
19     Q   Right?  So for imposing and constraint,
20 at least on page 24 of your declaration, the UMN
21 copied verbatim portions of dictionary definitions,
22 correct?
23         MR. VERDINI:  Object to form.
24         THE WITNESS:  Yes.
25

---

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 314

BY MR. MAYLE:

Q    And is that -- do those proposed constructions -- is that your opinion?

Is it your opinion that those two proposed constructions are the correct constructions?

A    Yes, perfectly comfortable with them.

Q    So let's look at paragraph 52 of your declaration.  You're talking about the file history again here, right, in paragraph 52?

A    Uh-huh, yes.

Q    And you say that you note that the file history for the patent uses the term, quote, restrictive condition, unquote, as a meaning for, constraint, right?

A    Yes.

Q    But I thought you said earlier that the term constraint did not have a specialized meaning and, therefore, you would look it up and the University would look it up in any ordinary dictionary, right?

MR. VERDINI:  Object to form.

BY MR. MAYLE:

Q    Are you now saying that the prosecution contains a meaning for constraint?

MR. VERDINI:  Object to form.

Page 315

THE WITNESS:  I think I'm just pointing out that the use of the term restrictive condition is consistent with a -- with the -- with the dictionary meaning.

BY MR. MAYLE:

Q    Because -- is that because the word restrictive is used in the prosecution and the dictionary uses the word restricts?

A    Yeah.

Q    Is that why they're consistent?

A    Yes.

Q    But let's look at the -- on page 25 of your declaration where you have this cut and paste from the prosecution.

A    Uh-huh.

Q    It doesn't just say restrictive condition.  The sentence at the end of that -- of your call says:  All sequences containing j plus one or more consecutive transitions on consecutive clock periods are prohibited because they violate the restrictive conditions.

Correct?

A    Uh-huh, yes.

Q    So it uses the word prohibited and

Page 316

violate, right?

A    Yes.

Q    And the reason that j plus one consecutive transitions are prohibited is because they violate restrictive conditions, correct?

A    Yes.

Q    And would you agree with me that the words prohibit and violate are absolute terms?

MR. VERDINI:  Object to the form.

THE WITNESS:  Yeah.

BY MR. MAYLE:

Q    In other words, if something is prohibited, you can't have any of it, correct?

A    Yeah, not allowed.

Q    Okay.  So let's compare that concept with UMN's proposed construction of constraint, which was something that restricts, limits or regulates.

So let's take -- let's take something that regulates.  Now, isn't it true that something can be regulated without being prohibited, right, in general?

MR. VERDINI:  Object to the form.

BY MR. MAYLE:

Q    Do you want me to --

A    No, I'm just thinking.  Yes, I'm okay

Page 317

with that.  Regulation is a slightly weaker term than prohibited.

Q    Right.  And I'll give you an example.  Banking regulations do not prohibit banking, right, in general?

A    But they prohibit certain behaviors, prohibit certain behaviors in banking.

Q    So if there's a regulation on banking, is it fair to say that banking is being prohibited?

A    No, but it's --

MR. VERDINI:  Objection.  Asked and answered.

THE WITNESS:  No, but it's regulating certain aspects of banking, not all banking is not.

BY MR. MAYLE:

Q    To prohibit is stronger than to regulate, right?

MR. VERDINI:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. MAYLE:

Q    Now let's look at the word limits.  I could limit the amount of pizza I eat without prohibiting myself from having pizza, right?

A    You are prohibiting yourself from eating

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 318

1   more than a certain amount of pizza, so it is -- it
2   is restrictive, but it's not absolutely restrictive.
3       Q    If I say you are prohibited from having
4   pizza, you can't have any pizza, right?
5       A    Correct.
6       Q    So to prohibit is stronger than to limit,
7   too, right?
8           MR. VERDINI:  Object to the form.
9           THE WITNESS:  You could prohibit me
10          from having more than three pieces of
11          pizza, which is the same thing as
12          regulating -- regulating my pizza.  I
13          mean --
14  BY MR. MAYLE:
15      Q    You changed it up on me.  Let's just say
16  I tell you, you are prohibited from having pizza.
17      A    I understand.
18      Q    That means you can't have any pizza,
19  right?
20      A    Correct.
21      Q    And the other word from the dictionary
22  for constraint was restricts, right?  So let's look
23  at that.
24          I can restrict the amount of TV my
25  daughter watches without saying she's prohibited from

Page 319

1   watching TV, correct?
2       A    Yes.
3       Q    So would you agree that prohibit is a
4   stronger word than restrict?
5           MR. VERDINI:  Object to the form.
6           THE WITNESS:  Yeah, I'm okay so
7   far.
8   BY MR. MAYLE:
9       Q    Okay.  So the prosecution uses the word
10  prohibited, right?  That's in Paragraph 52.
11      A    Okay.  Yes, it does.
12      Q    And the prosecution doesn't say that j
13  plus one consecutive transitions are -- strike that.
14          MR. MAYLE:  Let's go to another
15          exhibit.  It's 1021.
16          (McLaughlin Exhibit No. 1021 was
17          marked for the record.)
18  BY MR. MAYLE
19      Q    And Dr. McLaughlin -- or Professor,
20  sorry.
21      A    It's okay.
22      Q    This document says on the first page that
23  it's Plaintiff's claim construction charts, right?
24      A    Yes.
25      Q    And I think we said earlier that when --

Page 320

1   the materials reviewed for your declaration, this is
2   one of those documents that you reviewed at one time,
3   right?
4       A    Yes.
5       Q    Let's go back -- if you flip back in this
6   thing, you'll see there's something called Exhibit A.
7   There's like a chart.  Go to page nine, Exhibit A,
8   page nine.
9       A    Okay.
10      Q    And I would direct your attention to --
11  you see on the left there's something 13E?
12      A    Yes.
13      Q    And then it says, quoting from Claim 13:
14  Generating no more than j consecutive transitions of
15  said sequence in the recorded waveform such that j is
16  greater than or equal to two.
17          Do you see that?
18      A    Yes.
19      Q    Now, next to that, you see something that
20  the University wrote, starting with:  According to
21  the product specifications.
22          Do you see that?
23      A    Yes.
24      Q    And do you see that they say that the j
25  value in the table above is a, quote, constraint,

Page 321

1   unquote.  That, quote, refers to the maximum run of
2   consecutive transitions, which limits the run length
3   of Nyquist patterns.
4           Do you see that?
5       A    Yes.
6       Q    And they're quoting a Bates number,
7   LSI-UMN?
8       A    Uh-huh.
9       Q    Ends in 1354, right?
10      A    Yes.
11      Q    And then it says:  The j constraint is
12  also a, quote, hard constraint, unquote, in the MTR
13  codes, paren, as opposed to merely a as, quote,
14  measurable constraint, unquote, paren.
15          Do you see that?
16      A    Uh-huh, yes.
17      Q    And you see that they're citing a Bates
18  number at 1355?
19      A    Yes.
20      Q    Okay.  And if you flip back to page A3,
21  do you see that there's certain -- there's a table,
22  it's called Table 260 RLL Code Selection, right?  Do
23  you see that, at the top?
24      A    Yes.
25      Q    And do you see there's something called

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 322

1  RLL Code Rate, the second column?
2      A   Yes.
3      Q   And you see there's 196 over 97, for
4  example?
5      A   Yes.
6      Q   And see the 200 over 201 and the 17 over
7  18s are highlighted?
8      A   Yes.
9      Q   Do you see that?
10     A   Yes.
11     Q   And the other, the 96 over 97 and the 144
12  divided by 145 are not highlighted.
13     A   Yes.
14     Q   Do you see that?
15     A   Yes.
16     Q   So do you have an understanding of what
17  the yellow highlighting means?
18     A   No.
19     Q   Well, I'll tell you to assume that the --
20  the yellow highlighting code rates are the code rates
21  that allegedly infringe claim -- method Claim 13 of
22  the '601 patent, okay?
23     A   Okay.
24     Q   And the -- the ones that are not
25  highlighted yellow are not alleged to infringe Claim

Page 323

1  13 of the '601 patent, okay?
2      A   Okay.
3      Q   And let's go back to page nine, Exhibit
4  A9 of this same document.  And as we talked about,
5  the University says that the j constraint is a hard
6  constraint as opposed to merely a measurable
7  constraint, okay?
8      A   Okay.
9      Q   And so I'm going to tell you to assume
10  that the j constraints that have hard constraints are
11  the ones that were highlighted yellow and are accused
12  of infringing.  Okay?
13     A   Okay.
14     Q   And the j constraints that are merely
15  measurable constraints, are the -- correspond to the
16  codes that are not highlighted yellow and are
17  therefore not allegedly infringing, okay?
18     A   Okay.
19     Q   Have you ever heard of terminology such
20  as hard constraint and measurable constraint?
21     A   Hard constraint, for sure.  Measurable,
22  I'm not sure.  I'm not sure.  It's been a while since
23  I -- since I've looked at this.  It's a constraint
24  that's measurable.  So I don't know if that means
25  it's a hard constraint or not or something weaker

Page 324

1  than a hard constraint.
2      Q   Then let's get out the next exhibit,
3  which is those Bates numbers that the University was
4  citing.  Let's just get a one-pager.
5          (McLaughlin Exhibit No. 1022 was
6      marked for the record.)
7  BY MR. MAYLE:
8      Q   Professor McLaughlin, this is Exhibit
9  1022.  And you see at the bottom of the page, there's
10  a Bates number, LSI-UMN 0001355, right?
11     A   Yes.
12     Q   Now, you see there's Table 260 RLL Codes
13  again on this new exhibit?
14     A   Yes.
15     Q   That's the one that's from the
16  University's claim chart, right?
17     A   Got it.
18     Q   But on the new exhibit I gave you from
19  the product specification, there's some text below
20  table 260.  Do you see that?
21     A   Text.  Yes.  Okay, so this is produce --
22  this comes from their product specification.
23     Q   Sorry.  Let's look at the top left
24  corner.  You see it says True Store RC 5100, RC 5200
25  Series, Spider Rechannel Product Specification.

Page 325

1      A   Oh, got you.
2      Q   So this is from one of LSI's accused
3  product specifications.
4      A   Okay.  Now I'm with you.
5      Q   The text below this table,
6  ████████████████████████████████████
7      A   Yes.
8      Q   ████████████████████████████████████
9  ████████████████████████████████████
10
11      Do you see that?
12     A   Yes.
13     Q   And then it says: ████████████████
14  ████████████████████████████████████
15     A   Okay.
16     Q   Let's read the -- let's skip down to the
17  next paragraph: ████████████████████████████
18  ████████████████████████████████████
19  ████████████████████████████████████
20
21      Do you see that?
22     A   Oh, okay.  Yes.
23     Q   So could we divine from this that a hard
24  constraint is one that is never violated by the RLL
25  encoder and a measurable constraint is something that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Page 326

1   can't -- that can be violated?
2          MR. VERDINI:  Object to the form.
3   Foundation.
4          THE WITNESS:  You skipped over two
5   sentences in that text which I think is
6   saying what you just said: ███████
    ███
    ███
    ███
10  BY MR. MAYLE:
11      Q   Right.  I'm just trying to say -- I was
12  asking you before what the difference between hard
13  and measurable constraint was.
14      A   Yes.
15      Q   And I think this document might shed
16  light --
17      A   I see.
18      Q   -- on that.
19      A   I'm sorry.  I'm talking over you.
20      Q   That's okay.
21          And would you agree with me that one
22  potential way of interpreting the difference between
23  a hard and measurable constraint, as this document is
24  saying it, has something to do with ████████
    ███ ████████████████

Page 327

1   ████████████████████
2      A   Yes.
3      Q   And -- so remember in the University's
4   claim construction chart, they've highlighted --
5   ████████████████████████████████████
    ███
7      A   Okay.
8      Q   And the text below that chart on your new
9   exhibit ████████████████
    ███ ████████
11     A   Okay.
12     Q   Right.
13     A   Yes.
14     Q   So what I'm -- and -- what I'm trying to
15  see is, if the Court accepts your construction of
16  constraints on page 24 of your declaration, which is
17  something that restricts limits or regulates --
18     A   Uh-huh.
19     Q   -- I want to see if that construction is
20  sufficiently strong to respect a difference between a
21  hard constraint and a measurable constraint.
22         Do you follow what the program is?
23     A   I think so, uh-huh.
24     Q   So I'll just ask you, what do you think?
25         Do you think that if the Claim 13 -- if

Page 328

1   constraint really means something that restricts,
2   limits or regulates, would that claim then cover, for
3   example, the ████████████████████████
    ███ ████████████████
5          MR. VERDINI:  Object to the form.
6   The -- I'll just object to the form and
7   leave it at that.
8          THE WITNESS:  I would say a
9   constraint is a constraint.  I see a
10  constraint as being more absolute than
11  loosey-goosey.  So is that what you're
12  asking?
13  BY MR. MAYLE:
14     Q   Try to give me a yes or no and then we
15  can follow up, if you can.
16     A   Okay.
17     Q   If the Court accepts your proposed
18  construction for constraint as something that
19  restricts, limits or regulates --
20     A   Uh-huh.
21     Q   -- would -- would ████████████████
    ███ have a constraint under that definition?
23         MR. VERDINI:  I'm going to object
24  to the form because the Court isn't going
25  to construe constraint.  The parties have

Page 329

1   agreed that the claim language is
2   imposing current constraints.  So that's
3   why I hesitated the last time, but I
4   wanted to make that clear on the record.
5   Go ahead.
6          THE WITNESS:  And for
7   clarification, ████████████████████████
    ███
    ███ ████████████████ is that right?
10  BY MR. MAYLE:
11     Q   Correct.  So I want to know ████████
    ███ ████████████████████████████████
    ███████████████████████ has anything to do with the patent.
14  Which of those -- ████████████████
    ███
    ███ ████████████████████████
17     A   I would say only the hard constraints.
18     Q   Okay.  Let's go back to your declaration.
19  You can set aside that.
20         Let's go to paragraph 53.  So we talked
21  about this a little bit.  On page 26, on top, line
22  two, you said the j constraint.
23     A   I'm sorry.  Where are you?
24     Q   I'm skipping ahead.  Let's talk about the
25  j -- what the j constraint means.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 330

1   You cite the -- the specification at
2   column two, 40 to 49, right?  And you actually have a
3   cut and paste?
4       A   Yes.
5       Q   That portion of the spec does not use the
6   words j constraint, correct?
7       A   J constraint's not there.  It talks about
8   MTR coding, but it doesn't have the -- the term j
9   constraint there.
10      Q   Okay.  And we talked about this before
11  the break.  Flip back to 24 real quick.  I just want
12  to make sure because I skipped ahead a little bit
13  before.
14          MR. VERDINI:  Twenty-four what?
15  BY MR. MAYLE:
16      Q   Page 24 of your declaration.  You have
17  UMN's proposed construction.
18      A   Uh-huh.
19      Q   For j constraint, you say that:  The j
20  constraint reduces the bit error probability of the
21  magnetic recording system by removing error prone
22  write patterns, right?
23      A   Yes.
24      Q   So part of the definition is the concept
25  of reducing the bit error probability, right?

Page 331

1       A   Yes.
2       Q   And so if there's something -- if there's
3   a code that has some sort of a constraint that --
4   that removes error prone write patterns but does not
5   reduce the bit error probability, that would not be a
6   j constraint under your interpretation, right?
7       A   I think you just said two conflicting
8   things, reduces error prone sequences but does not
9   reduce error rate.  That's contradictory.
10      Q   Well, let's start with a -- an RLL code,
11  d-equals-1.
12      A   Yes.
13      Q   And that would reduce -- remove the error
14  prone write patterns, wouldn't it?  It does, right?
15      A   It depends on the PR target, partial
16  response target.  But in the context of the patent,
17  yes, but I mean, it doesn't reduce all error prone
18  patterns for all PR targets.  But I think I know --
19          There are examples where the d-equals-1
20  constraint is an error-reducing constraint.
21      Q   Well, when you say in your proposed
22  definition here, removing error prone write patterns,
23  which targets are you talking about?
24      A   The j constraint needs to be matched to
25  the PR target.  So a particular j constraint doesn't

Page 332

1   work for all PR targets.  You have a certain PR
2   target, and you would identify the corresponding j
3   that reduces error probability for that.
4       Q   When you say identify the corresponding
5   j, do you mean like how big the j is; is that what
6   you mean?
7       A   Yes.
8       Q   Okay.
9       A   Yeah.  For a particular PR target you do
10  an analysis to determine the value of j that would
11  work.
12      Q   Is that analysis complicated or --
13      A   It can be.  It can be very complicated.
14      Q   Does the patent tell you how to do that
15  analysis?
16      A   The patent describes some examples of,
17  you know, how to find those, how to enumerate those
18  patterns.
19      Q   Does that example allow you to -- could
20  you follow that example to match every j to every PR
21  target?
22      A   Yeah, yeah.  I mean, all the common --
23  all the common PR targets.
24      Q   Okay.  So let's -- let's do a
25  hypothetical where I take an RLL d-equals-1

Page 333

1   constraint, right?
2       A   Yes.
3       Q   And I match it to the appropriate PR
4   target.
5       A   Yes.
6       Q   Would that d-equals-1 constraint
7   reduce -- sorry -- would it remove the error prone
8   write patterns?
9       A   Yeah.  Yes, it would.
10      Q   And would it also reduce the bit error
11  probability?
12      A   Yes.
13      Q   So, therefore, it's a j constraint?
14      A   Not necessarily.
15      Q   Why not?
16      A   There are -- there are -- there may be
17  other types of constraints that also reduce error
18  probability.
19      Q   That doesn't mean that the d-equals-1
20  constraint is not a j constraint under your
21  definition, does it?
22      A   I'm sorry.  We were talking about the
23  d --
24      Q   D-equals-1 is -- it fits your definition
25  of j constraint, correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 334

1    A   Because it reduces error probability.
2    Q   And it removes the error prone write
3  patterns, correct?
4    A   Yes.
5    Q   That's all that's required under your
6  definition, right?
7    A   The remainder of the -- the remainder of
8  the -- there are other parts of the claim that
9  describe what the j constraint is.  I'm not -- I'm
10  not defining the j constraint here.  There's a clause
11  later that describes exactly what the j constraint
12  is.
13    Q   Which claim is that in?
14       MR. VERDINI:  I think he said
15  clause.
16       THE WITNESS:  Clause.
17  BY MR. MAYLE:
18    Q   Yeah.  What claim is that clause in?
19    A   Thirteen.
20    Q   Which clause is it?
21    A   Generating no more than j consecutive
22  transitions of said sequence in the recorded
23  waveform.
24    Q   Correct.
25    A   Right.  So that's why I'm saying,

Page 335

1  imposing a pair of constraints, this is not defining
2  what the j constraint is, that the definition of j
3  constraint is down below.  This is illuminating the
4  purpose of the j constraint.
5    Q   So you're saying what's written on page
6  24 here does not define what the j constraint is; is
7  that what you're saying?
8    A   Right.  It says imposing a pair --
9  imposing a pair of constraints.  It's illuminating
10  the j -- that's what it says:  The j constraint
11  reduces the error probability of the magnetic
12  recording system, blah, blah.  The j constraint down
13  -- the j down below.  J is defined down below.
14    Q   Where is j defined?
15       MR. VERDINI:  Objection.  Asked and
16  answered.
17       THE WITNESS:  Generating no more
18  than j consecutive transitions of said
19  sequence in a recorded waveform.
20  BY MR. MAYLE:
21    Q   And what's the definition -- that whole
22  thing is the definition, are you saying?
23    A   That's enough to describe what -- what J
24  is or what -- J is a number and this describes what
25  the constraint is.

Page 336

1    Q   Okay.  We talked about this before, but
2  if you go back to Claim One in the patent, that
3  generation step that you just quoted to me from Claim
4  13 is also recited in Claim One, correct?
5    A   Yes.
6    Q   But Claim One has this additional
7  language and it says:  Wherein the j constraint is
8  defined.
9       Do you see that in Claim One?
10    A   Yes.
11    Q   And that's not in Claim 13, right?
12       MR. VERDINI:  Objection.  Asked and
13  answered.
14       THE WITNESS:  Yes, it's not.
15  BY MR. MAYLE:
16    Q   It's not.  Okay.  So let's look at --
17  now, let's stay with this for a minute.
18       If the j constraint reduces the bit error
19  probability, how much does it -- is there a certain
20  level that it has to reduce the bit error probability
21  in order to count under your definition?
22    A   No, it just needs to reduce it.
23    Q   And reduce it relative to what?
24    A   Reducing it relative to if there was no
25  constraint.

Page 337

1    Q   As if there was no j constraint?
2    A   Yes.
3    Q   Let's look at -- in the patent again,
4  keep your declaration out, but go to column four.
5       Let's start on -- this is the first full
6  paragraph.  I don't know if that's line eight.  Do
7  you see, To obtain a coding gain?
8    A   Yes.
9    Q   It says:  To obtain a coding, paren,
10  improvement in minimum distance to the coding,
11  unparen, the minimum distance pairs shown in figure
12  one must be eliminated.
13       Do you see that?
14    A   Yes.
15    Q   And then it says:  In accordance with the
16  present invention, this can be accomplished using the
17  existing RLL one, comma, k code, which does not allow
18  consecutive transitions.
19       Right?
20    A   Right.
21    Q   So doesn't that say that the invention
22  covers the existing RLL, one, comma, k code?
23       MR. VERDINI:  Object to the form.
24       THE WITNESS:  I don't think it --
25  no, I don't think it says that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 338

1  BY MR. MAYLE:
2      Q    Okay.
3      A    The one, comma, k code -- RLL code is
4  a -- is a completely different kind of constraint.
5  It happens to eliminate the minimum distance error
6  events, but it's not the same -- the same material.
7      Q    Let's look at paragraph 26 in your
8  declaration.  So page 13.
9      A    I'm sorry?
10     Q    Paragraph 36, page 13.
11     A    Yes.
12     Q    So you're talking about the prior art RLL
13  codes.  And I'm going to ask you a question about the
14  last sentence, so why don't you just read it to
15  yourself and then get down to the second to the last
16  sentence.  When you're ready, let me know.
17     A    Okay.
18     Q    You say in paragraph 26 that:  The
19  consequence of using such a RLL code is that the rate
20  penalty is too large to see any coding gain.
21          Right?
22     A    Yes.
23     Q    And you cite the patent at column four,
24  lines 15 to 22, right?
25     A    Okay.

Page 339

1      Q    So let's look at column four again.  And
2  that -- that paragraph that you cited does not start
3  on line 15.  It starts up on line eight, right?
4      A    Okay.
5      Q    And then it goes down to line 30 or
6  something like that, right?
7      A    Yes, uh-huh.
8      Q    And so I would point you to line 24 of
9  this -- line 24 says -- or line 22 to 24 says:  An
10  increase in noise band width translates to increased
11  noise in the system which works against the coding
12  gain.
13          Do you see that?
14     A    Yes.
15     Q    And they're talking about there, they're
16  talking about using a d-equals-one constraint, right?
17     A    I believe so.
18     Q    And so when it says that the increase in
19  noise bandwidth translates to increase in noise and
20  it works against the coding gain, it doesn't say that
21  it completely eliminates coding gain, right?
22     A    Yes, it -- that's correct.
23     Q    What I said was correct?  Is that what
24  you're answering?
25     A    Yes.

Page 340

1      Q    So when you say in paragraph 26 of your
2  declaration -- you say in paragraph 26 of your
3  declaration that:  Using an RLL code, the rate
4  penalty is too large to see any coding gain.
5      A    Uh-huh.
6      Q    That statement in your declaration is not
7  supported by that -- by that paragraph in column four
8  of the patent, is it?
9          MR. VERDINI:  Object to the form.
10         THE WITNESS:  It's a stronger
11     statement than is in the patent, yeah.
12  BY MR. MAYLE:
13     Q    So you could see -- you could see a
14  coding gain with a d-equals-1 constraint, correct?
15         MR. VERDINI:  Object to the form.
16         THE WITNESS:  I don't believe you
17     would.  I don't believe you would.
18  BY MR. MAYLE:
19     Q    You could see it, though, couldn't you?
20         MR. VERDINI:  Same objection, and
21     asked and answered.
22         THE WITNESS:  What you have to do
23     is, because of the rate loss because of
24     the low rate, you have to shrink the size
25     of the marks so that you could be able to

Page 341

1      compare it with a higher rate code, so
2      they both have equal density.
3          And my brain is telling me that,
4      for the d-equals-1 code, that that
5      shrinking of the marks to compensate for
6      the rate penalty is -- increases the
7      noise bandwidth and overwhelms the coding
8      gain.  So that's -- certainly, I stick by
9      that -- that statement.
10  BY MR. MAYLE:
11     Q    So are you now -- are you now saying that
12  you would have to compare an RLL code at a certain
13  rate with something else at the same rate; is that
14  what you're saying?
15         MR. VERDINI:  Object to the form.
16         THE WITNESS:  At the same density.
17     At the same -- you have to compare
18     systems that operate at the same storage
19     density.  And if the rate is low, you
20     have to shrink the marks compared to a
21     high rate code, so that you have the same
22     storage density.  That's the fairest
23     comparison.
24  BY MR. MAYLE:
25     Q    Well, I thought you said before when I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 342

1  asked you how -- how I determine if the bit error
2  rate was improved, you said you would look at the
3  constraint versus no constraint, right?
4      A   Yeah.
5      Q   So now let's -- can we compare a
6  d-equals-zero with a k code versus a d-equals-1 with
7  a k code?
8      A   Yes.
9      Q   And compared those two?
10     A   Absolutely.
11     Q   Would the d-equals-1 code result in any
12 coding gain or, could it, relative to the
13 d-equals-zero code?
14     A   In -- so my previous statement, when we
15 said we need to compare constrained and
16 unconstrained -- that was the first part of your
17 question?
18     Q   Yes.
19     A   That comparison has to occur at -- you
20 doesn't just -- you don't just compare the code rates
21 together.  The fairest comparison is the code rate,
22 together with the size of the mark, so that they're
23 both at the same density.  That's -- I shortened my
24 first answer.
25         That's the fairest comparison.  And I'm

Page 343

1  saying we would do that same kind of comparison for
2  d-equals-zero and d-equals-1 in the example that you
3  gave.
4          So I think it's generally believed that,
5  at equal density, that the d-equals-1 constraint, the
6  rate of that code is just too low to get any kind of
7  coding gain from that.  So I stand by that.
8      Q   So all the stuff that you just said about
9  comparing, with the marks being the same size and the
10 density, none of that is in your declaration, right?
11         MR. VERDINI:  Object to the form.
12         THE WITNESS:  Fine, it's not in the
13 declaration.
14 BY MR. MAYLE:
15     Q   It's also not anywhere in the patent, is
16 it?
17         MR. VERDINI:  Same objection.
18         THE WITNESS:  Anybody who knows
19 anything about data storage, that's --
20 that statement about the d-equals-1 code
21 is not making any sense because it has
22 low rate.  The overriding reason is
23 because you have to compare it at
24 equivalent density.  That's -- that's --
25 that's basic stuff.

Page 344

1  BY MR. MAYLE:
2      Q   SO let's look at the patent.  Let's look
3  at figure -- Oh, let's look at figure 11A.
4      A   Yes.
5      Q   Do you see that list of rates?  Do you
6  see one 0.3333?
7      A   Yes.
8      Q   Where m equals two and n equals six?  Is
9  that a low rate or a high rate or --
10     A   The very first one?
11     Q   Yeah, 0.333.
12     A   That's a low rate, correct.
13     Q   Could I achieve a higher rate than that
14 with a d-equals-1 constraint?
15         MR. VERDINI:  Object to the form.
16         THE WITNESS:  I have to look and
17 see what the rate -- the allowable rates
18 are for d-equals-1.  This is 11A is for
19 what?  It's a --
20 BY MR. MAYLE:
21     Q   You don't know?  Are you saying you don't
22 know?
23     A   I'm saying --
24         MR. VERDINI:  Object to the form.
25         THE WITNESS:  I want to make sure I

Page 345

1  understand the table and the context.
2  You just put this table in front of me.
3          So what's the value of d in this
4  table?
5  BY MR. MAYLE:
6      Q   This is -- this is not -- this is an MTR
7  code.
8      A   It's an MTR code.  Okay, great.
9      Q   And it says it can have a rate of 0.3333,
10 right?
11     A   So what's the value of j and what's the
12 value of k?  K stands at four.  What's the value of j
13 in this example?
14     Q   J equals two.
15     A   J equals two, k equals four.  So this has
16 a rate of .33.  And we want to compare that to a
17 d-equals-1 code; is that right?  That's what you want
18 to compare with?
19     Q   I don't know.  I'm just asking you, could
20 I get a better rate than that, higher than .33, with
21 the d-equals-1 code?
22     A   You might be able to.  You might be able
23 to.
24     Q   So in that case, would the d-equals-1
25 code potentially outperform the MTR code?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 346

1    MR. VERDINI:  Object to the form.
2    THE WITNESS:  It might, yeah.
3    Yeah.  That's a good point.
4  BY MR. MAYLE:
5    Q    Okay.  What I'm trying to get at is
6  whether your interpretation of Claim 13 requires,
7  inherent in the j constraint, some concept of
8  reducing the bit error rate.  That's what I'm trying
9  to get at.
10    And you've told me that the RLL
11  D-equals-1 code will not do that.  You say that in
12  paragraph 26 of your declaration.
13    A    Uh-huh.
14    MR. VERDINI:  Object to the form.
15  BY MR. MAYLE:
16    Q    But within the scope of Claim 13 are
17  extremely low rates MTR codes, right?  The claim says
18  m and n, right?
19    A    Yes.
20    Q    So could I have, in Claim 13, m equals
21  four and n equals 15?  Could I construct a code like
22  that pretty easily?
23    A    Yes, you probably could.
24    Q    And the rate of that code would be four
25  divided by 15, right?

Page 347

1    A    Correct.
2    Q    Let's use four over 16.  Can we do that?
3    A    Okay.
4    Q    So the rate is .25, right?
5    A    Yup.
6    Q    And that's a fairly -- said to be a low
7  rate, correct?
8    A    That's a fairly low rate code.  No one
9  would ever use that code.
10    Q    I'm not saying if anyone would ever use
11  it.  It's claimed, right?
12    MR. VERDINI:  Object to the form.
13    THE WITNESS:  I -- yeah, I believe
14  so.
15  BY MR. MAYLE:
16    Q    Would you say that that code has a j
17  constraint?
18    A    If it's an MTR code, yeah, it has a j
19  constraint.  Yes.
20    Q    And so you think that would reduce the
21  bit error probability on the magnetic recording
22  system?
23    A    Yes.
24    Q    And if I had a low rate like that,
25  wouldn't I have to increase the speed and bandwidth

Page 348

1  at which the decoder must operate to produce data
2  bits at a particular speed?
3    A    Yes, you would need to, but as I said, no
4  one would ever use that code.
5    Q    And if I had to do that, wouldn't you
6  agree with me that doing that would lead to an
7  increase in noise bandwidth, which would translate to
8  increased noise in the system that would work against
9  coding gain in that example, right?
10    A    Yes.
11    Q    But you would still say it has a j
12  constraint, right?
13    A    Yes, by definition it has a j constraint,
14  yup.
15    You're talking about the RLL code or are
16  you talking about the d-equals-1 code or the --
17    Q    The MTR code with the rate 0.25 --
18    A    Yes.
19    Q    -- is what we're talking about.
20    A    Yes.
21    Q    You'll say that has a j constraint?
22    A    Yes.
23    Q    But you would say it doesn't -- or does
24  it reduce the bit error probability of the magnetic
25  recording system?  Can you just a priori whether it

Page 349

1  would or would you have to check something?
2    A    Yeah, you would have to check.  Yeah, you
3  would have to check it.
4    Q    So in your interpretation of the claim I
5  would always have to check it, right, to see if I
6  have a j constraint?
7    MR. VERDINI:  Object to the form.
8    THE WITNESS:  You would select a j
9  constraint that would reduce the error
10  probability.  That's the only thing that
11  makes sense.  You would match the j
12  constraint to the PR target, and you
13  could pick the -- you would pick the j
14  constraint for which it eliminated
15  certain error events, i.e., lower and
16  reduced error probability.
17    You would never pick -- you would
18  never pick a j constraint that had --
19  that had super low rate that may give a
20  noise bandwidth little help.
21  BY MR. MAYLE:
22    Q    Here again, I'm not asking what someone
23  would do or what would typically be done.  We're just
24  talking about claim construction.  That's all we're
25  talking about.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 350

1    A    I understand, and that's one of the
2  reasons do elucidate the j constraint.  It's saying
3  pick a j constraint that reduces the error
4  probability.  You would never pick a j constraint
5  that increased the error probability.
6    Q    Okay.  Then I'm going to tell you to
7  assume that I did just that.  I picked the j
8  constraint in a particular code, in a particular m
9  over n rate, a particular k and when I did that, I
10  limited the consecutive transitions but I increased
11  the error probability.
12    A    Okay.
13    Q    Did I use a j constraint, as you
14  interpret the term j constraint?
15    A    You've used -- yeah, you used the j
16  constraint, but again -- well, yes, you've used the j
17  constraint.  You're talking about the construction
18  that's --
19    Q    Correct.
20    A    -- the construction that I proposed?
21    Q    Yes.
22    A    Yeah, I would say no, you haven't.
23    Q    And the reason you're saying no is
24  because I didn't reduce the bit error probability,
25  correct?

Page 351

1    A    Correct.
2    Q    Even though I've limited the consecutive
3  transitions to j, I still don't have a j constraint;
4  isn't that right?
5    A    If you've limited -- if you've limited
6  the number of j --
7    Q    In my hypothetical, you just said I
8  wouldn't have a j constraint.  And I'm saying, the
9  reason you said that is because I've not reduced the
10  bit error probability, correct?
11    A    You would -- you would still have the j
12  constraint, it's just that you would only want to
13  choose a j that reduces error probability.  That's
14  the purpose for illuminating -- for illuminating that
15  piece in the claim construction.
16    Q    Right.
17    A    Because if you chose the wrong j
18  constraint, you're going to cause the error
19  probability to go up and you're going to get fired
20  because you've got to --
21    Q    I can guarantee, if I was in charge of
22  it, this thing would blow up.
23        But I'm telling you something different.
24  I'm telling you to assume that someone does do that.
25    A    I understand.

Page 352

1    Q    Okay?
2    A    Uh-huh.
3    Q    It doesn't matter if they get fired.
4  We're only doing claim construction.
5    A    Uh-huh.
6    Q    You're telling me, in that example, that
7  that person has not used a j constraint as you
8  understand the term?
9        MR. VERDINI:  Objection.  Asked and
10  answered.
11        THE WITNESS:  That's correct.
12  BY MR. MAYLE:
13    Q    Let's go on to k constraint.  And let's
14  look at 57.
15        MR. KNEDEISEN:  What's 57?
16        MR. MAYLE:  Paragraph 57, sorry.
17  The declaration.
18        THE WITNESS:  I'm sorry.  Page?
19  BY MR. MAYLE:
20    Q    Oh, it's page -- well, first, look on
21  page 24 again.  Look at what the proposal was.
22        On page 24 the proposal -- there is a
23  sentence there that says:  The K constraint ensures
24  timing recovery, correct?
25    A    Yes.

Page 353

1    Q    Now let's go over to -- by the way, is
2  that your opinion of how k constraint should be
3  interpreted?
4    A    Yes.
5    Q    So let's then go to 57, paragraph 57.
6  And you say -- here you're citing the specification
7  at column three, 16 to 17, right?  That's what you're
8  citing?
9    A    Okay.
10    Q    And that part of the specification talks
11  about to facilitate timing recovery, right?
12    A    Yes.
13    Q    But your interpretation is the k
14  constraint ensures timing recovery, right?  You saw
15  that on page 24?
16    A    Yes.
17    Q    Now, is there a difference between to
18  facilitate timing recovery and to ensure timing
19  recovery?
20    A    Ensure is stronger than the word
21  facilitate.
22    Q    And so you're --
23    A    So they're not the quite the same.
24    Q    So you're imposing an even stronger
25  condition on k.  Your opinion is that the k

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 354

1 constraint ensures timing recovery, right?
2         MR. VERDINI:  Object to the form?
3         THE WITNESS:  Yeah, yeah --
4 BY MR. MAYLE:
5    Q    Correct?
6    A    I'm comfortable with the use of the term
7 ensuring timing recovery.
8    Q    And in Claim 13, the word, you know, k is
9 used, right?
10   A    Yes.
11   Q    But there's no upper bound or lower bound
12 to k in the claim, is there?
13        MR. VERDINI:  Object to form.
14        THE WITNESS:  Please ask me again.
15 BY MR. MAYLE:
16   Q    In Claim 13, is there a bound on -- does
17 the claim impose a bound on what k is?
18   A    No, it does not.
19   Q    Does Claim 14 have a bound on what k is?
20   A    No, it does not.
21   Q    And Claim 17 doesn't have a bound on k,
22 either, does it?
23   A    Correct, it does not.
24   Q    Let me give you some hypotheticals again.
25 Let's say someone has an MTR code and they pick k

Page 355

1 equals ten.  Would you expect that that could ensure
2 timing recovery, k equals ten?
3         MR. VERDINI:  Object to the form.
4         THE WITNESS:  It would ensure a
5    certain level of quality in timing
6    recovery.
7 BY MR. MAYLE:
8    Q    Usable?
9    A    It can ensure -- it can't ensure
10 ultimate, 100 percent all the time, but it can ensure
11 a certain quality of timing recovery.
12   Q    Would someone get fired for k equals ten?
13   A    No, that's probably okay.
14   Q    Okay.  Let's try k equals 100, would that
15 ensure timing recovery?
16        MR. VERDINI:  Object to the form.
17        THE WITNESS:  Would be much -- much
18    weaker.  Again, it would only ensure a
19    certain level of timing -- timing
20    recovery.  Probably timing recovery would
21    be ensured 99 percent of the time,
22    something like that.
23 BY MR. MAYLE:
24   Q    How about k equals 1 million, would that
25 ensure timing recovery?

Page 356

1         MR. VERDINI:  Same objection.
2         THE WITNESS:  Same kind of thing.
3    You know, probably the vast -- good
4    majority of the time timing recovery
5    would be satisfied, but just the quality
6    would not be -- wouldn't be as good.
7 BY MR. MAYLE:
8    Q    Let's say I set the k value higher than
9 the bit size of the disc I'm using.
10   A    Just say infinity.
11   Q    Okay, k equals infinity.  Would that
12 ensure timing recovery?
13        MR. VERDINI:  Object to the form.
14        THE WITNESS:  Again, I would say it
15    wouldn't -- a certain level, you know,
16    you still probably would -- just
17    statistically you would have enough
18    ones -- statistically, you wouldn't have
19    an infinite run of zeros.
20        So on average, you know, you get --
21    I would say -- I mean it would ensure a
22    certain level of quality just because the
23    statistical probability of having an
24    extraordinarily long run of zeros is
25    so low.

Page 357

1    Q    So you're saying --
2    A    It would be okay if for some reason other
3 parts of your system were so good, a
4 k-equals-infinity code would still ensure that you
5 have a certain level of timing recovery because of
6 other -- other -- the statistical likelihood of long
7 string of zeros is enough to -- and the other parts
8 of the system are enough to ensure -- ensure timing
9 recovery.
10   Q    So let's do a hypothetical where I set
11 the k equals infinity, and I run a bit string of
12 data.  I force feed it data all zeros to the disc.
13 Would that ensure timing recovery, if I went to read
14 it back?
15        MR. VERDINI:  Object to form.
16        THE WITNESS:  You're going to get
17    fired.
18 BY MR. MAYLE:
19   Q    Let's say I put --
20   A    Because you haven't started any
21 information.
22   Q    Let say I put, randomly, ten ones on
23 there, on the disc, and I fill up the disc with zeros
24 and randomly place in ten ones.  Would that ensure
25 timing recovery?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 358

1    A    Say that -- give the hypothetical again.
2    Q    So the k constraint is set to infinity.
3    A    Yes.
4    Q    Say it's a large disc.  Do you want to
5  pick a side?
6    A    Whatever.  Big.
7    Q    Big.  And I fill it up with zeros, but I
8  randomly place in, say, three ones on the disc.
9    A    Uh-huh.
10    Q    Would that ensure timing recovery?
11        MR. VERDINI:  Object to the form.
12        THE WITNESS:  It's very likely
13    you'd have extraordinarily poor timing
14    recovery.
15  BY MR. MAYLE:
16    Q    So it would not ensure timing recovery,
17  correct?
18    A    It would not ensure timing recovery.
19    Q    Would I still have a k constraint?
20    A    Yes, you would.  You would no longer have
21  your k-plus-infinity constraint.  You've thrown in
22  three ones, so you've guaranteed that there's --
23  you've now -- there's no longer a k-equals-infinity
24  constraint.
25    Q    Three is less than infinity, correct?

Page 359

1    A    I think you told me you put an infinite
2  number of zeros on the disc.
3    Q    Not an infinite number.  I said I filled
4  up the disc.  It's a finite size disc.
5    A    Yup.
6    Q    And flood it with zeros and randomly put
7  in three ones.
8    A    Right.
9    Q    The k equals infinity.
10    A    No, k is no longer infinity.
11    Q    K is not the measure of many -- why is k
12  not equal to infinity?
13    A    Because you threw in -- you purposely put
14  in ones in certain spots, so we're guaranteed to have
15  some finite number of zeros between these ones.
16  You're guaranteed.
17    Q    K is the maximum number of
18  nontransitions, right?
19    A    Yeah.
20    Q    And so I'm below infinity.  Three is less
21  than infinity, correct?
22    A    Yes.  So your constraint is no longer
23  infinity.  Your k constraint is no longer infinity.
24  Your constraint is the longest running zeros between
25  the ones that you put on the disc.

Page 360

1    Q    If k was infinity that just means I can't
2  have infinity plus one nontransitions, right?  It
3  doesn't say how many I can have less than.
4        Every number less than infinity is
5  allowable, correct?
6    A    Yes, but by virtue of the fact that you
7  told me, I'm going to put ones there, you didn't say,
8  statistically I might put ones in there.  But you
9  say, I'm going to put three ones, I absolutely,
10  100 percent know there's no k constraint.
11    Q    Isn't k related to the maximum number of
12  nontransitions that would be allowable in a row?
13        MR. VERDINI:  Object to the form.
14    It's been asked and answered.
15        THE WITNESS:  Ask that again.
16  BY MR. MAYLE:
17    Q    Isn't k related to the maximum number of
18  transitions -- nontransitions that are allowable in a
19  row?  I haven't gone over infinity zeros in a row,
20  have I?
21    A    Right.
22    Q    So therefore, I do have a k constraint,
23  it's just really high, correct?
24    A    Right.  But it's not infinity.
25    Q    Let's say I take a one gigabyte hard

Page 361

1  drive and I set k to ten gigabytes in the chip.  And
2  I fill up the gigabyte hard drive with a -- gigabytes
3  of zeros and three ones that are randomly put in
4  there.  I still have a k constraint, don't I?
5    A    Yes.
6    Q    And it's not been violated, right?
7    A    That's right.
8    Q    And that system that I just devised will
9  not ensure timing recovery, correct?
10    A    It will just have -- it will ensure a
11  very poor level of timing recovery.
12    Q    So is that what you mean -- when you say
13  the k constraint ensures timing recovery, you mean
14  any -- any di minimis-ly low amount is good enough;
15  is that what you're talking about?
16        MR. VERDINI:  Object to the form.
17        THE WITNESS:  Yeah, I guess I am.
18    Even -- even if it's, you know, a billion
19    bits, a billion zeros between consecutive
20    ones, as soon as that -- you may lose
21    timing in between, but as soon as that
22    first one comes back, you'll be able to
23    reimprove your timing.  It won't be very
24    good, but that one will -- will improve
25    your timing recovery.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 362

BY MR. MAYLE:

1  Q    And so you're saying that in every case,
2  in every hypothetical that I can think of where
3  there's -- as long as there's a k constraint, no
4  matter how high it is, even if it's bigger than the
5  disc size, that you will tell -- when I ask you, have
6  I just ensured timing recovery, you will say yes to
7  every hypothetical I can think of, right?
8       MR. VERDINI:  Object to the form.
9       THE WITNESS:  I won't say yes that
10      you'll be able to recover timing
11      throughout, but you'll eventually be able
12      to recover your timing, and that's what I
13      mean bit overall quantity will be very,
14      very low.  You will losing time for a
15      while, you could lose your timing after a
16      certain long string of zeros, and as soon
17      as the ones came, you would recover it
18      back.
19          So, on average, your quality would
20      be very low, but there definitely will be
21      periods of time where, while you will
22      lose -- where you will lose timing.  So
23      the overall -- that's my point.  The
24      quality of the timing recovery, that

Page 363

1  would be unacceptably low.  But it --
2  Q    But it still --
3  A    You would eventually get it back or you
4  get portions of it back.  You lose part -- you would
5  certainly lose it in between.  That's why I'm using
6  the quality.  It's not an absolute.
7  Q    What could I do -- it seems like, to me,
8  the only way I could not have a k constraint is if I
9  put on the disc all the same sequence and fill up the
10 entire disc.  Is that the only way not to have a k
11 constraint?
12      MR. VERDINI:  Object to the form.
13 BY MR. MAYLE:
14 Q    Say like I have a one gigabyte hard drive
15 and I fill it with zeros.
16 A    Uh-huh.
17 Q    And there aren't any ones.
18 A    Right.
19 Q    That would not facilitate timing
20 recovery, right?
21 A    The way systems are designed today,
22 right.  You wouldn't have -- by driving timing from
23 the data, you wouldn't have the ability to do that.
24 Q    So are you saying -- is that the only
25 way, at least sitting here now, is that the only

Page 364

1  hypothetical we could think of where you would tell
2  me that I wouldn't be meeting the definition of k
3  constraint that you've set forth on page 24 of your
4  declaration?
5       MR. VERDINI:  Object to the form.
6       THE WITNESS:  Yeah, I think
7       strictly speaking, yes, it is -- the
8       hypothetical are -- you know, I don't
9       want to say ridiculous because I don't
10      mean to be that pejorative.
11          But a single one on a disc will
12      help -- will help some level of timing
13      recovery.  It will be very, very, very
14      poor, but better -- better timing
15      recovery than you would have with the all
16      zeros.
17 BY MR. MAYLE:
18 Q    Okay.  Now, LSI -- it's on Exhibit 1004,
19 page four -- is proposing that the k constraint is
20 related to the maximum number of allowable
21 consecutive --
22 A    Give me one second here.
23 Q    LSI is --
24 A    Page?  I'm sorry.
25 Q    Page four of this.

Page 365

1       So the University is saying that the k
2  constraint ensures timing recovery.  That's what we
3  just talked about.
4  A    Uh-huh.
5  Q    But the University doesn't say anything
6  about -- with the k constraint, they don't say
7  anything about if the number k relates to a number of
8  consecutive nontransitions.  That's not part of their
9  definition, is it?
10      MR. VERDINI:  Object to the form.
11      THE WITNESS:  That's right, it's
12      not part of the definition.
13 BY MR. MAYLE:
14 Q    They didn't say, whatever it is, it
15 ensures timing recovery, correct?
16      MR. VERDINI:  Same objection.
17      THE WITNESS:  I mean, I think --
18      maybe I should have mentioned before,
19      because I think people know what the k
20      constraint is.  It's not something new in
21      this part of the patent.  A PHOSITA would
22      know what the k constraint -- what the k
23      constraint is.
24 BY MR. MAYLE:
25 Q    So what we're going to do in this case is

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 366

1 the Court will tell us what the claim terms mean.
2    A    Uh-huh.
3    Q    Potentially.
4    A    Uh-huh.
5    Q    And then the jury will get that, and the
6 jury is probably not going to be your students.
7    A    Uh-huh, right.
8    Q    And they probably won't know what this
9 means.  So then they're going to determine, well,
10 using this interpretation, either does this product
11 infringe or does the prior art read on it, et cetera.
12    A    Uh-huh.
13    Q    And so if we just tell someone that the k
14 constraint ensures timing recovery, period, that
15 wouldn't tell the person whether or not it's
16 required -- the k constraint requires a limit on the
17 consecutive number of nontransitions, does it?
18    A    But in explaining it to the jury, you
19 could, again, point out this other -- this other
20 clause in 13 that says k consecutive sample periods
21 without the transition.  That's the -- that clause is
22 enough to explain, you know, the maximum run length
23 of zeros.
24    Q    Okay.
25    A    And it just illuminates that it's for

Page 367

1 timing recovery.
2    Q    Let's look at page 29 of your
3 declaration.  We're going onto a new topic.
4         Producing sequences of n-bit code words.
5    A    Page 20.
6    Q    Yes.
7    A    Uh-huh.
8    Q    You have here on page 29, so I think the
9 parties are basically agreeing on what m-bit and
10 n-bit means, so we'll just skip that.
11    A    Uh-huh.
12    Q    Producing sequences of n-bit code words
13 seems to be a dispute.  And you say that:
14 Minnesota's construction was to claim the coding
15 process produces as output sequences of bits where
16 each sequence is n-bit long.
17         Right?
18    A    Yes.
19    Q    So let's just -- again, keep your finger
20 there.  Let's compare it to what -- Exhibit 1004,
21 page two.
22    A    Okay.
23    Q    There, the University -- it looks like
24 they've just dropped off the phrase, the claim
25 encoding process, essentially.  Would you essentially

Page 368

1 agree with that?
2    A    Yes.
3    Q    And in your declaration, you're agreeing
4 with the University's proposal that was on page 29 of
5 your declaration, right?
6    A    Yeah.
7    Q    That's what you say it means?
8    A    Yup.
9    Q    Okay.  And quick question on this
10 paragraph 62.  You say that the data words are turned
11 or mapped into code words.
12         What does that mean turned or mapped?
13    A    That they can be processed by -- you
14 know, an algorithm or circuitry or they can be --
15 some circuitry could turn them.  Mapping might be
16 just go to a look-up table.  Take the data words in
17 the table and input to the table and look it up.  So
18 I think that's just what that means.
19    Q    In the next sentence you say that a
20 PHOSITA would understand that the data words are
21 inputs to the encoding process and the code words are
22 the output?
23    A    Yes.
24    Q    So does that mean, when you say it that
25 way, the input and the output, does that mean the

Page 369

1 encoding process ends when the n-bit code words are
2 made?
3         MR. VERDINI:  Object to the form.
4         THE WITNESS:  The encoding of
5    that -- of that particular data word is
6    done, but I wouldn't say the whole
7    encoding process is done.  The whole
8    encoding process is done over and over
9    and over again.
10 BY MR. MAYLE:
11    Q    I see.
12    A    So but that --
13    Q    I see, let's go -- enough on that.
14         Let's go to page 31 of your declaration.
15 Generating no more than j consecutive transitions of
16 said sequence and recorded waveform such that j is
17 greater than or equal to two.
18         Do you see on page 31 you have the
19 University's proposed construction, right?
20    A    Yes.
21    Q    And you agree with that -- you're giving
22 your opinion in your declaration.  I think you're
23 agreeing with the University's construction, correct?
24    A    Yes.
25    Q    Now, let's look at paragraph 69 of your

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 370

1  declaration.  Strike that.
2       Let's just look at the claims again.  You
3  can keep your declaration out.  We'll go back to it
4  in a second.  Look at the claims.
5       Claim 13, it says:  Generating no more
6  than j consecutive transitions.
7       Right?
8  A   Uh-huh.
9  Q   Such that j is greater than or equal to
10 two, right?
11 A   Yes.
12 Q   Claim One -- let's compare that with
13 Claim One.  Claim One says, in that part that was
14 added, you remember, in prosecution:  The j
15 constraint is defined as the maximum number of
16 consecutive transitions allowed.
17      Do you see that?
18 A   Uh-huh.
19 Q   Do you think that the maximum number of
20 consecutive transitions allowed, as recited in Claim
21 One, is synonomous with saying in Claim 13,
22 generating no more than j consecutive transitions
23 such that j is greater than or equal to two?
24 A   Yes.
25 Q   So --

Page 371

1  A   It's the same.  They both allow j.
2  Q   So they both would allow j consecutive
3  transitions?
4  A   Uh-huh.
5  Q   But in Claim 13, to do the generating
6  step, could you do the generating step of Claim 13
7  without ever getting to the limit j consecutive
8  transitions which would be allowed?
9       MR. VERDINI:  Object to the form.
10      THE WITNESS:  Could you ask again,
11  please.
12 BY MR. MAYLE:
13 Q   So to do the generating step of Claim 13,
14 could that claim step be performed, hypothetically,
15 without hitting the limit of j of what was allowed?
16 A   You could produce one consecutive
17 transition or two consecutive transitions or three
18 consecutive transitions if j was five.  That's it.
19 Yeah, that's allowed.
20 Q   So what you if I did a d-equals-1
21 constraint and I would only get to one consecutive
22 transition, the a nontransition, would that -- would
23 that scenario -- let's pick j equals two.  Let me
24 start over.
25      J equals two in the Claim 13.  I'm going

Page 372

1  to run a d-equals-1 constraint, such that there's --
2  I'm getting a nontransition after every transition.
3  A   Okay.
4  Q   And I will never get to two consecutive
5  transitions, correct?
6  A   Under the d constraint.
7  Q   D equals 1.
8  A   Correct.
9  Q   And do you think that that scenario would
10 be something that this part of the claim is talking
11 about or is that something different?
12      MR. VERDINI:  Object to the form.
13      THE WITNESS:  I'm trying to
14  understand the gist of your question.  I
15  mean, I'm trying to figure out exactly
16  what the question is you're asking.  You
17  need to ask it again.
18 BY MR. MAYLE:
19 Q   So the way I see it, Claim One talks
20 about the j constraint is defined as what is allowed.
21 A   Yes.
22 Q   Do you see that?
23 A   Uh-huh.
24 Q   It actually uses those words, right?
25 A   Yes.

Page 373

1  Q   Claim 13 doesn't talk about what's
2  allowed.  It says generating no more than, correct?
3  A   Uh-huh.
4  Q   Are those synonomous concepts or any
5  daylight in between them?
6       MR. VERDINI:  Objection.  Asked and
7  answered.
8       THE WITNESS:  I mean, that's
9  generating no more than; it also
10  describes what's allowed.  So -- so one
11  consecutive or two -- if a j equals five,
12  one consecutive or two consecutives or
13  three consecutives are allowed.  They fit
14  inside that definition.
15      MR. MAYLE:  Let's take a break
16  here.  I think the next module will be
17  the last one.
18      THE WITNESS:  Okay.
19      MR. MAYLE:  We're running out of
20  tape.  We're almost done.
21      THE VIDEOGRAPHER:  4:20.  We're off
22  the record.
23      (Brief pause.)
24      THE VIDEOGRAPHER:  4:34.  We're
25  back on the record.  This is the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

---

Page 374

1  beginning of media number six.
2  BY MR. MAYLE:
3      Q    Professor, we've been talking about Claim
4  13 quite a bit today, and it has that generating
5  step. And it says: Generating no more than j
6  consecutive transitions of said sequence in the
7  recorded waveform, right?
8          MR. VERDINI: Object to the form.
9      Such that j is greater than or equal to.
10  BY MR. MAYLE:
11      Q    Such that j is greater than or equal to.
12          My question is: What does it mean to
13  have a transition of a sequence?
14          MR. VERDINI: Object to the form.
15          THE WITNESS: Transition of said
16      sequence in the recorded waveform, are
17      you asking in the context of that, or are
18      you just saying separate from this
19      transition of said sequence?
20  BY MR. MAYLE:
21      Q    Sure. I understand it's in the recorded
22  waveform, that j is greater or equal to. But I'm
23  focusing on what does it mean to say a transition of
24  a sequence?
25      A    A transition of said sequence, just by

---

Page 375

1  itself?
2      Q    Right. Is it -- first, what is the
3  sequence?
4          MR. VERDINI: In -- objection. I
5      think the problem -- in the context of
6      the patent is -- is what you keep asking.
7          THE WITNESS: Right.
8          MR. VERDINI: As opposed to
9      generally.
10  BY MR. MAYLE:
11      Q    I'm talking about the claim. I'll just
12  make clear. I am definitely talking about Claim 13.
13      A    Okay.
14      Q    And it says, transitions of said
15  sequence. It says other things, too, but I'm just
16  focusing on, transition of said sequence. What does
17  that mean?
18      A    Yeah, I mean, the sequence is a sequence
19  of bits, but I think it needs to be read all
20  together, transition of said sequence in the recorded
21  waveform. So there can be a transition from a zero
22  to a one, but the transition in the recorded waveform
23  is the, you know, voltage level that changes from,
24  say, you know, plus one to minus one. That results
25  in a transition recorded on the medium.

---

Page 376

1      Q    Thank you.
2          But a transition from a zero to a one --
3  I understand -- we're setting aside for a minute. I
4  understand your position that the zeros and ones then
5  correspond to voltages.
6      A    Uh-huh, yes.
7      Q    I'm not getting at that point right now.
8      A    Uh-huh.
9      Q    A transition from a zero to a one is not
10  a transition of the sequence, is it?
11      A    Transition from a zero to a one is not a
12  transition of a sequence, I would agree with that.
13  That was your question, I think.
14      Q    Right. And the claim is talking about
15  n-bit -- sequences of n-bit code words, right?
16      A    Sequence is talking about n-bit code
17  words, yes.
18      Q    So there has to be at least -- to make a
19  sequence, there's n-bits in a row and that's a
20  sequence, right?
21      A    Yes.
22      Q    And so --
23      A    I'm sorry, ask it again. I was
24  distracted.
25      Q    The sequence in the claim is n-bits long,

---

Page 377

1  correct? That's a sequence?
2      A    That's a code word.
3      Q    Okay. That's one code word.
4      A    That's one code word.
5      Q    And then there's a sequence of those code
6  words, correct?
7      A    Correct.
8      Q    So the sequence in the claim might be
9  more than one code word long?
10      A    Correct.
11      Q    Let's say n equals five, and we'll take a
12  sequence with three code words. That would have 15
13  bits, right?
14      A    Yes.
15      Q    Does it make sense to speak of a
16  transition of a sequence? Do you understand what I'm
17  trying to understand?
18      A    It does not make sense to say a
19  transition of said sequences. That doesn't make --
20  that's a difficult thing to unravel. It's referring
21  to the transitions in the recorded waveform.
22          So transitions that might occur in the
23  said sequence, those transitions it's really
24  referring to in the recorded waveform.
25      Q    Okay. In the recorded -- then let's go

---

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 378

1   with that angle.
2        In the recorded waveform, should we call
3   them -- let's put some meat on this.  Should we call
4   them voltages or should we call it magnetic
5   particles?  I'm going to let you pick one and then
6   I'll ask you -- I guess I can ask you both ways.
7   Which do you prefer?
8        A    I'm sorry, I was distracted as you were
9   talking.
10       Q    I think I'm not getting through to you
11  the point I'm trying to find out.
12       A    Yup.
13       Q    So let's set aside bits, and let's go to
14  either voltages or magnetic particles or -- because
15  you keep bringing in the recorded waveform.
16       A    Yeah.
17       Q    So I think you want to go there, so which
18  one should we pick?  I'm going to ask my question,
19  but instead of talking about ones and zeros, I'll ask
20  you about voltages, if you're more happy with that.
21  Let's do it with voltages.
22       A    Fine.  Yeah, I don't know what the
23  question ultimately is.
24       Q    Let's do it with voltages.  Let's say
25  that the sequences of n-bit code words are translated

Page 379

1   into voltages.
2        A    Okay.
3        Q    And so wherever I had a one, I could have
4   a one level of a voltage.  Wherever I have a zero, I
5   could have a zero voltage, for example.  Correct?
6        A    Okay, fine.
7        Q    And then that sequence of n-bit code
8   words could be, if you would, a sequence of voltages?
9        Does that make sense?
10       A    Okay.  I'm fine with that, yeah.
11       Q    Something corresponding to that.
12       A    The waveform has that.
13       Q    What does it mean to have a transition of
14  sequence in that context?  Does the whole thing --
15  the whole sequence change or what does it mean?
16       A    Right.  That's -- that's -- I agree that
17  transitions of a sequence is -- doesn't make sense,
18  but the transitions in the recorded waveform does.
19  So that's why, when I read that, that's how I read
20  that, as not referring to transitions of the said
21  sequences.
22       Right, like you said, that doesn't --
23  that doesn't make sense.
24       Q    Is that only doesn't make sense because
25  it -- are you saying it doesn't make sense because

Page 380

1   it's bits or it doesn't make sense because transition
2   of sequence doesn't make sense?  It's like a plural
3   thing, a transition of a sequence.
4        I'm trying to understand --
5        MR. VERDINI:  Objection.
6        THE WITNESS:  There are bits that
7   might be changing inside -- inside a
8   sequence.  So transitions that might
9   occur in the sequences, you know, might
10  make some sense.
11  BY MR. MAYLE:
12       Q    Okay.
13       A    But the way it's written -- that's why I
14  keep going back to, why saying it makes more sense if
15  the transition's referring to the waveform.  That's
16  why I keep going back to that.
17       Q    Right.  So if we're getting away from
18  bits and talking about a waveform --
19       A    Yeah.
20       Q    You'll say it now makes sense?
21       A    It makes -- so far, it makes more sense.
22       Q    But if the sequence of bits corresponds
23  exactly to something on the waveform, and the claim
24  says transitions of said sequence in the recorded
25  waveform, what does that mean?

Page 381

1        A    I think we've been -- we've been through
2   this like a whole bunch of times.  So I guess I'm
3   trying to get at what your question is.
4        But, you know, the -- maybe the easiest
5   thing to do is just to recite what I've written here
6   or what it means.
7        Q    I'm not trying to get to the point of
8   talking about whether it's magnetic or it's voltage
9   or its bits.
10       What if it said transitions -- j
11  consecutive transitions of bits or whatever is
12  represented by bits, inside of -- inside of a
13  sequence, rather than saying -- do you see the point
14  I'm trying to make?
15       A    A transition of a sequence does not make
16  grammatical sense, does it?
17       A    Right, I don't believe it makes
18  grammatical sense.
19       Q    Okay.
20       A    So we're talking about -- and that's
21  where it goes -- that's where we're talking about the
22  transitions in the recorded waveform.  That does make
23  sense.
24       So we're putting no more than j
25  consecutive transitions in the recorded waveform.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 382

1    There is an underlying bit sequence that dictates
2    that, but it's ultimately -- I mean, that's what the
3    patent is really all about, generating no more than j
4    consecutive transitions in the waveform.
5        Q    Okay.
6        A    Right?  And underlying there, there would
7    be changes in the bit sequence that drive that.  But
8    what it's really about is no more than j consecutive
9    transitions in the waveform.
10       Q    Let's go to paragraph 74.  Let's take a
11   couple quick hitters.
12            We're now talking about in paragraph 74,
13   you see above this F:  Generating no more than k
14   consecutive sample periods of said sequences without
15   a transition.
16            We're off j now, finally.  We're on the
17   generating k step.  And you say in paragraph 74 that
18   the patent uses the term sample periods.  Do you see
19   that on the bottom of page 74?
20       A    Yes.
21       Q    And you say it's in the background.  Go
22   to the next page.  You say it's at column two, line
23   ten to 15, right?
24       A    Right.
25       Q    And it says the patent describes the

Page 383

1    sequence detector, and it has sample periods.
2        A    Uh-huh, yeah.
3        Q    So that part of the specification is
4    talking about reading data, correct?
5        A    Right.
6        Q    It's not talking about writing data; is
7    that right?
8        A    Okay.
9        Q    Is that right?
10       A    Right.
11       Q    And is Claim 13 directed to reading data
12   or writing data?
13       A    Claim 13 is about writing, but if you
14   don't have kind of the same sample period in the
15   reading with the writing, those have to be -- those
16   have to be matched.  So whatever sample period we
17   have on the reading side, we have to have the same
18   sample period on the writing side.
19       Q    Okay.  And you say on paragraph 74, you
20   say -- I think it's on page 34.  Line three to four.
21   On page 34, line three to four.
22            You say:  The readback signal generated
23   by the read head is typically sampled once per bit
24   region.
25            Right?

Page 384

1        A    Right.
2        Q    You don't say that it's always sampled
3    once per bit region, right?
4            MR. VERDINI:  Object to form.
5            THE WITNESS:  Right.  I say
6    typically, right.
7    BY MR. MAYLE:
8        Q    And it could -- the readback signal could
9    be -- or the sample rate could be, for example,
10   higher than once per bit region, correct?
11       A    Yes.
12       Q    Let's go to page -- paragraph 85.  And do
13   you see you gave a little example in the middle of
14   the page?  Do you see that Transition One, Transition
15   Two, Transition Three?
16       A    Uh-huh.
17       Q    Now, let me ask you in that example that
18   you gave, which is 001011, how many transitions are
19   there from -- just from zero to one?
20       A    There are two transitions from zero to
21   one.
22       Q    Right.  And how many transitions are
23   there from one to zero?
24       A    There's one transition from one to zero.
25       Q    So there's three transitions from zero to

Page 385

1    one and one transition from one to zero, right?
2        A    Yes.
3        Q    Now, the claim, if you look on page 36 at
4    the bottom -- open up your declaration and look at
5    the previous page.  You're quoting the claim
6    language.  We're on Claim 17 now.
7            And it says:  Wherein the binary
8    sequences produced by combining code words have no
9    more than one of j consecutive transitions from zero
10   to one and from one to zero.
11           Right?  No more than one of zero to one
12   and one to zero, right?
13       A    Okay.
14       Q    So why do you say in paragraph 85 that
15   there's three transitions there?
16       A    There are three transitions there.
17       Q    Is three the sum of the transitions from
18   zero to one plus the transition from one to zero?  Is
19   that how you arrive at three?
20       A    Yes.
21       Q    What about the language that says in the
22   Claim, one of j consecutive transitions from zero to
23   one and from one to zero?  Do you read that as the
24   sum of?
25       A    Yes, that's what and means.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 386

1  Q   But what about the language one of, what
2  does that mean?
3  A   I think it's distinguishing the zero to
4  one and it's distinguishing the one to zero.
5  Q   And are you -- do you have to pick one of
6  those or do you add the two to arrive at how many
7  transitions?
8  A   You consider both of them.
9  Q   And then do you take the higher one, do
10 you add them; do you take the lower one, subtract
11 them? What do you do?
12 MR. VERDINI:  Object to the form.
13 Asked and answered.
14 THE WITNESS:  You take the number
15 of transitions from zero to one and the
16 number of transitions from one to zero
17 and you add them.
18 BY MR. MAYLE:
19 Q   That's how you got the three?
20 A   That's what the means.
21 Q   But it's not what the one of means,
22 right?
23 MR. VERDINI:  Objection.  Asked and
24 answered.
25 THE WITNESS:  I -- I read the and

Page 387

1  as adding.  If it was or, that wouldn't
2  be distinguishing either.  It's not
3  distinguishing them.
4  BY MR. MAYLE:
5  Q   Let me ask you then -- let's go to page
6  38 of your declaration, the top.  You see also in
7  Claim 17 there's also something that says:  No more
8  than of k plus one consecutive zeros and k plus one
9  consecutive ones.
10 Do you see that?
11 A   Okay.
12 Q   That also has the and that you were
13 talking about, right?  It has the word and?
14 A   Uh-huh.
15 Q   And it also has the word one of, the
16 words one of, right?
17 A   Uh-huh.
18 Q   I'll give you an example.  Here's a bit
19 stream, 00111.  Okay?
20 MR. VERDINI:  I don't think that's
21 in your declaration.  I think he's just
22 giving you an example.
23 THE WITNESS:  Okay.
24 BY MR. MAYLE:
25 Q   Yeah.  00111.

Page 388

1  A   Uh-huh.
2  Q   How many consecutive zeros are in that
3  bit stream?
4  A   00111, there are two consecutive zeros.
5  Q   And how many consecutive ones?
6  A   Three.
7  Q   Right.  So would you say that there's
8  five consecutive bits?  Do you add two to three when
9  it comes to k or --
10 MR. VERDINI:  Object to form.
11 BY MR. MAYLE:
12 Q   It says and.  So if I asked you -- if
13 that's the example, 00111, and then I ask you if
14 there's, to read this claim, no more than one of k
15 plus one consecutive zeros and k plus one consecutive
16 ones, what is the value of k in our example 00111?
17 A   What is the value of k?
18 Q   Uh-huh.  Would you look at the zeros or
19 the ones, both, add them?  What would you do?
20 A   K is a constraint.  I would say there are
21 three consecutive ones and two consecutive zeros.  So
22 the --
23 I'm not sure what your question is.
24 What's the value of k?  I don't know what the value
25 of k is.  K is the constraint.  You just gave me a

Page 389

1  sequence.  You told me to count the number of bits in
2  the sequence.  K is a constraint, not --
3  Q   Okay.  Let's say I have a code that
4  allows eight consecutive zeros and 57 consecutive
5  ones.  What's the value of k?
6  MR. VERDINI:  Object to the form.
7  THE WITNESS:  In NRZ format?
8  BY MR. MAYLE:
9  Q   Sure.
10 A   I would say the larger of the two.
11 MR. MAYLE:  I think we're out of
12 time.
13 MR. VERDINI:  I have some
14 questions.  Good timing.  That alarm went
15 off right when you were done.  That was
16 good.
17 EXAMINATION
18 BY MR. VERDINI:
19 Q   Professor McLaughlin, if you would pull
20 out Exhibit 1011, which is a patent by Soljanin.
21 A   Okay.  Soljanin.
22 Q   Soljanin.  I'm going to have to learn
23 that between now and Wednesday.
24 A   She's a friend of mine.  She's not a
25 friend of either one of yours, so --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 390

1   Q   No, clearly.
2       It seems to be the only one you don't
3   have there.  If you would turn to column two of the
4   patent.
5   A   Okay.
6   Q   And read to yourself lines eight through
7   32.
8   A   Okay.
9   Q   Having read that, is lines -- or column
10  two, lines eight through 34, as written by Professor
11  Soljanin, consistent with your definition of
12  transition?
13  A   Yes.
14  Q   Why do you say that?  What would you
15  point to?
16  A   Because in this she is saying -- she is
17  describing the seven binary bits to be represented in
18  the magnetic medium, and then she's describing kind
19  of the waveform in the form of electrical current, as
20  it's been -- then she just goes on to describe the
21  waveform or the electrical signal.
22      That would take that binary sequence and
23  translate it into magnetic medium, you know, the
24  flipping of the domains in the magnetic medium.
25  Q   At line 16, she writes:  In particular,

Page 391

1   transitions from one direction in the current, paren,
2   and consequently in the magnetic field, to the other
3   correspond to binary ones in the sequence.
4       Did I read that correctly?
5   A   Yes.
6   Q   And that's your -- that's consistent with
7   your definition of -- or your interpretation of
8   transitions?
9   A   Yes.  That's NRZI.  She's describing the
10  NRZI method of storing information on a disc.
11  Q   If you would pull out Exhibit 1001, which
12  is the '601 patent.  And if you would turn to column
13  four at line one through nine.
14  A   Column four, line one through nine; is
15  that right?
16  Q   Yes.  What is an E PR4 ML?
17  A   E squared PR4?
18  Q   Yes, sorry.  I missed the squared.
19  A   That's a type of partial response target.
20  It describes the intersymbol interference target.
21  Q   Is that a magnetic recording system?
22  A   Yes.
23  Q   And if you turn to column seven.
24  A   Yes.
25  Q   Line 30 through 40.

Page 392

1   A   Yes.
2   Q   Again, it references the E squared PR4?
3   A   Uh-huh.
4   Q   Is that a reference to a magnetic system?
5   A   Yes.
6   Q   Does E squared PR4 apply to optical?
7   A   No, I don't believe any system has used
8   that target.
9   Q   When Mr. Mayle was asking you questions
10  about the Blu-ray correspondence back and forth in
11  their exhibits 1012 through 1019, you testified you
12  had not seen any of those documents before rendering
13  your opinions as reflected in Exhibit 1005, correct?
14  A   Correct.
15  Q   Having now looked at those, do any of
16  those correspondence change your opinion?
17  A   No.
18  Q   And had you reviewed them before you
19  provided your declaration in Exhibit 1005, would they
20  have changed your opinion?
21  A   No.  I've not -- I have not reviewed them
22  and they would not change my opinion.
23  Q   Turn to 1005, which is your declaration.
24  And page 21 at paragraph 47.
25  A   Okay.

Page 393

1   Q   Mr. Mayle asked you about the call-out in
2   paragraph 47 from the prosecution history, correct?
3   A   Yes.
4   Q   And you did a comparison of what was in
5   the call-out box in 47 as compared to the amendment
6   to Claim One?
7   A   Yes.
8   Q   Do you recall that?
9   A   Uh-huh.
10  Q   If you would, in the middle of call-out
11  box, it's about halfway down, it starts with Means
12  for Imposing?
13  A   Yes.
14  Q   Could you read that?
15  A   Means for -- oh, out loud?
16  Q   Uh-huh.
17  A   Means for imposing a pair of constraints,
18  j;k, on the waveform wherein the j constraint is
19  defined as the maximum number of consecutive
20  transitions allowed on consecutive clock periods in
21  the encoded waveform.
22  Q   Now, if you would turn to Exhibit 1002,
23  which is the prosecution history?
24  A   Uh-huh.
25  Q   And turn to page 60.

99

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

---

Page 394

1    A   Yes.
2    Q   And when they amend Claim One, it reads:
3 Means for imposing a pair of constraints on the
4 encoded waveform.
5       The only thing that's different between
6 what you read in paragraph 47 is they included the
7 word encoded before the waveform on the pair of
8 constraints, correct?
9       MR. MAYLE: Objection.
10       THE WITNESS: The call-out, yes,
11       says only -- says on the waveform and
12       this amendment to Claim One says encoded
13       waveform.
14 BY MR. VERDINI:
15    Q   Isn't that consistent with your opinion
16 that there's only one waveform that's the recorded --
17 encoded recorded waveform?
18       MR. MAYLE: Objection.
19       THE WITNESS: Yes, that's
20       consistent.
21 BY MR. VERDINI:
22    Q   Claim 13 has a preamble, and then we've
23 talked about some steps that occur after the
24 preamble; am I correct?
25    A   Yes.

---

Page 395

1    Q   Is there anything -- strike that.
2       Having read the patent, do those steps
3 have to occur in some sequential order?
4    A   Not necessarily.
5    Q   Why not?
6    A   It's not clear from those individual
7 steps that they all occur in that particular order.
8 That's true. They don't need to -- they don't need
9 to -- they don't need to be done in that order.
10    Q   Exhibit 1004, if you would, turn to that.
11 That's the joint chart.
12    A   Joint chart, yes.
13    Q   This one (indicating).
14       And during Mr. Mayle's direct, he
15 identified some areas where you were proposed -- your
16 identification of the proposed construction in your
17 declaration was different from what was in the claim
18 chart. Do you recall that?
19    A   Yes.
20    Q   Is there any substantive difference, in
21 your mind, between any of the proposed constructions
22 that you identified in your declaration and opined
23 upon as compared to what is more -- the proposed
24 constructions in Exhibit 1004?
25       MR. MAYLE: Objection.

---

Page 396

1       THE WITNESS: No, there's no
2       substantive differences.
3 BY MR. VERDINI:
4    Q   And your opinions that you set forth in
5 Exhibit 1005 would apply to all of the proposed -- to
6 the proposed constructions as stated in Exhibit 1004,
7 correct?
8    A   That's right, yeah.
9    Q   If you would turn to claim term six,
10 which is the generating no more than six
11 consecutive -- no more than j consecutive transitions
12 of said sequence in the recorded waveform such that j
13 is greater than or equal to two.
14       Do you see that?
15    A   Yes.
16    Q   In your opinion as a person of ordinary
17 skill in the art, would a person know what claim term
18 six means in reading the patent?
19    A   Yes.
20    Q   And you talked about it not making
21 grammatical sense in some respects?
22    A   Yes.
23    Q   But to interpret it in the context of the
24 claims and the patent, a person of ordinary skill in
25 your art, in your opinion, would be able to do that?

---

Page 397

1    A   Yes.
2    Q   And is that understanding reflected in
3 the proposed construction by the University?
4    A   Yes.
5    Q   Leaving out -- when you wrote your
6 declaration -- and that's Exhibit 1005 -- I think you
7 testified you did not have the Defendant's proposed
8 constructions for any claim terms; is that correct?
9    A   Correct.
10    Q   I just want to walk through just a
11 couple --
12       MR. MAYLE: Just for the record, I
13       think you actually made a privilege
14       objection when I asked him that and would
15       not allow him to answer.
16       MR. VERDINI: I let him answer the
17       question about Defendant's proposed
18       constructions. I did.
19 BY MR. VERDINI:
20    Q   All right. I want to now to just have
21 you look at their proposed construction, and I'm just
22 going to ask you if you agree with it, and then ask
23 you why or why not.
24       Transitions.
25       MR. MAYLE: Objection. It's

---

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 398

1 outside the scope of his report and I
2 didn't ask him to do that.
3          MR. VERDINI:  Okay.  I'm going to
4 keep asking him the questions.
5          MR. MAYLE:  That's the objection.
6          MR. VERDINI:  What's that?
7          MR. MAYLE:  It's outside the scope
8 of the cross.
9          MR. VERDINI:  If you want to do a
10 running objection, I'll let -- you can
11 object to every question, but I'll give
12 you a running objection, but I'm going to
13 ask the questions just because I don't
14 think there's any way at this point.  You
15 can do whatever you need to do later.
16 BY MR. VERDINI:
17    Q    All right.  So in light of -- so let's --
18 Exhibit B, Claim Term One:  Defendant's proposed
19 construction for transition is a switch from a binary
20 one to a binary zero or vice versa.
21          In light of what you've reviewed in
22 connection with your opinions, do you agree with that
23 construction?
24    A    No.
25          MR. MAYLE:  Objection.

Page 399

1 BY MR. VERDINI:
2    Q    Why not?
3          MR. MAYLE:  Objection.
4          THE WITNESS:  Because as I've shown
5 in numerous places in the patent, column
6 two for example, it's very clear to me
7 what's being referred to is transitions
8 as they relate to reversals in the
9 magnetic medium.
10 BY MR. VERDINI:
11    Q    If the Court adopted LSI's construction,
12 would it cover NRZI recording?
13          MR. MAYLE:  Objection.
14          MR. VERDINI:  Just a second.  Let's
15 take a break.  We're doing --
16          MR. KNEDEISEN:  There's a pending
17 question.
18          MR. VERDINI:  I mean, I'm not going
19 to talk.  We can go off the record.
20          THE VIDEOGRAPHER:  5:04.  We're off
21 the record.
22              (Brief pause.)
23          THE VIDEOGRAPHER:  5:06.  We're
24 back on the record.
25          MR. KNEDEISEN:  This is David

Page 400

1 Sipiora for the Defendant.  We're just
2 making an objection on this whole line of
3 questioning.  Apparently, counsel is
4 intending to introduce a whole new
5 section of declaration testimony or
6 testimony from this witness, live,
7 concerning the LSI expert testimony that
8 was given.
9          This witness has testified he not
10 see this declaration prior to giving his
11 testimony or his report, and now he is
12 going to be asked questions about
13 something which he did not opine on
14 previously and which was not inquired
15 upon during examination today.
16          There's been -- a request was made
17 to provide foundation for this question,
18 this line of questioning, and none has
19 been given.
20          And they're simply going to ask him
21 about information that was not previously
22 discussed in this deposition, nor
23 discussed in his declaration and we're
24 going to object to this line of
25 questioning question by question and move

Page 401

1 to strike if there's any attempt to use
2 his testimony.
3          MR. VERDINI:  And the University
4 disagrees with the objection.  First of
5 all, the proposed constructions by The
6 Defendants are not part of any expert
7 declaration that they provided.
8          We got the constructions after
9 Professor McLaughlin submitted his
10 declaration.  Defendants objected to
11 supplemental declarations to address
12 this, and so we are now -- to make sure
13 that the Court has full record on which
14 to make its decision on claim
15 construction, I'm going to ask the
16 witness while he's here for his opinion
17 on Defendant's proposed constructions.
18 BY MR. VERDINI:
19    Q    All right.  So I think when we got off
20 line, I think the only question I had pending was:
21 Is LSI's proposed -- sorry.
22          Is Defendant's proposed construction of
23 transitions as reflected in Exhibit 1004 consistent
24 with NRZI recording?
25          MR. MAYLE:  Objection.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 402

1      THE WITNESS:  No.
2  BY MR. VERDINI:
3      Q    And why not?
4      A    This -- this -- this proposed
5  construction only addresses the NRZ and -- and,
6  clearly, the patent and the claim doesn't specify.
7  Claim 13, at least, doesn't specify whether you use
8  NRZ or NRZI.
9      Q    And are both NRZ and NRZI recording
10 discussed in the patent?
11     A    Yes.
12     Q    Let's move to page three, claim term
13 three, which is Recorded Waveform.  Defendant's
14 proposed construction is:  The sequences of n-bit
15 code words that are recorded as symbols, patterns in
16 a medium.
17         Do you agree with Defendant's proposed
18 constructions in light of your -- what you reviewed
19 in connection with rendering your opinions in Exhibit
20 1005?
21         MR. MAYLE:  Objection.
22         THE WITNESS:  No, I don't.
23 BY MR. VERDINI:
24     Q    Why not?
25         MR. MAYLE:  Objection.

Page 403

1      THE WITNESS:  Really, the -- this
2  construction, as far as I can tell,
3  completely ignores waveform.  And
4  waveform is key, and so there's
5  nothing in the construction that
6  acknowledges that there's a waveform.  So
7  waveform is, therefore, removed by virtue
8  of their construction.
9  BY MR. VERDINI:
10     Q    And if we move up -- so it's actually
11 page two, Producing Sequences of N-bit Code Words?
12     A    Which one?  I'm sorry.
13     Q    So page two, term two.
14     A    Okay.
15     Q    Producing Sequences of N-bit Code Words.
16 Are you there?
17     A    Yes.
18     Q    Defendant's construction is:  Producing
19 n-bit code words such that each received m-bit binary
20 data word is sequentially encoded into an n-bit code
21 word.
22         Based on what you reviewed in connection
23 with your opinions rendered in Exhibit 1005, do you
24 agree with Defendant's proposed construction?
25         MR. MAYLE:  Objection.

Page 404

1      THE WITNESS:  The use of the term
2  sequentially doesn't make sense.
3  BY MR. VERDINI:
4      Q    Why do you say that?
5      A    There's -- there's nothing in the patent
6  specification that indicates any kind of sequential
7  nature of the encoding of -- this is one m-bit data
8  work into an n-bit code word.  And it's saying it
9  describes that encoding just from m to n as being
10 done sequentially, and there's nothing -- nothing in
11 the specification that highlights the sequential
12 nature.  It doesn't -- that doesn't make sense.
13         MR. VERDINI:  With that, I don't
14 have any further questions.  Thanks,
15 Professor McLaughlin.
16         THE VIDEOGRAPHER:  5:11.  We're off
17 the record.  This is the end of media
18 number six.  This concludes today's
19 portion of the deposition.
20
21         (Thereupon, the deposition was
22 concluded at approximately 5:11 p.m.)
23
24
25

Page 405

1              J U R A T
2
3  I,          , do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on          ;
6  that I have made such corrections as appear noted
7  herein in ink, initialed by me; that my testimony as
8  contained herein, as corrected, is true and correct.
9
10 DATED this ____ day of _____, 20  ,
11 at _____,          .
12
13
14
15
16
17     _____
18         SIGNATURE OF WITNESS
19
20
21
22
23
24
25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 406

D I S C L O S U R E

STATE OF GEORGIA    ) DEPOSITION OF:

FULTON COUNTY      ) PROFESSOR STEVEN W. MCLAUGHLIN

Pursuant to Article 8.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of TSG Reporting.

TSG Reporting was contacted by the offices of Kilpatrick, Townsend & Stockton, LLP to provide court reporting services for this deposition. TSG Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

TSG Reporting has no contract or agreement to provide court reporting services with any party to the case, or any reporter or reporting agency from whom a referral might have been made to cover the deposition.

TSG Reporting will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party in this litigation.

_____
Tanya L. Verhoven-Page,
Certified Court Reporter,
B-1790.

---

Page 407

C E R T I F I C A T E

STATE OF GEORGIA:
FULTON COUNTY:

I hereby certify that the foregoing deposition was reported, as stated in the caption, and the questions and answers thereto were reduced to written page under my direction, that the preceding pages represent a true and correct transcript of the evidence given by said witness.

I further certify that I am not of kin or counsel to the parties in the case, am not in the regular employ of counsel for any of said parties, nor am I in any way financially interested in the result of said case.

Dated this 11th day of May, 2018.

_____
Tanya L. Verhoven-Page,
Certified Court Reporter,
B-1790.

---

Page 408

ERRATA SHEE FOR THE TRANSCRIPT OF:

Case Name:       Regents v. LSI
Dep. Date:       May 7, 2018
Deponent:        Professor Steven W. McLaughlin

CORRECTIONS

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

Pg.  Ln.  Now Reads     Should Read   Reason
____ ____ _____ _____ _____

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME
This the_____ day of_____, 2018.
_____
(Notary Public)    My Commission Expires:_____

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

**A**

**$455 (2)**
177:4,12
**a.m (3)**
2:2 7:2,12
**A3 (1)**
321:20
**A9 (1)**
323:4
**ability (5)**
10:7 145:9 238:7
261:14 363:23
**ablates (1)**
15:14
**able (9)**
196:11 227:20 340:25
345:22,22 361:22
362:11,12 396:25
**absence (3)**
16:7 36:14 37:4
**absolute (3)**
316:8 328:10 363:6
**absolutely (3)**
318:2 342:10 360:9
**absorb (2)**
40:18 41:9
**abstract (3)**
33:19 34:2 37:19
**academic (2)**
58:8 69:17
**accept (1)**
28:9
**accepted (1)**
218:9
**accepts (2)**
327:15 328:17
**accomplished (1)**
337:16
**accurate (6)**
10:8,11 45:12,14 52:1
133:8
**accurately (1)**
123:4
**accused (2)**
323:11 325:2
**achieve (3)**
32:13 167:1 344:13
**acid (1)**
158:8
**acknowledges (1)**
403:6
**action (9)**
1:6 7:16 229:11,21
251:22,25 252:2,14

256:17
**actual (4)**
123:20 153:7 207:6
207:20
**add (9)**
244:25 246:24 250:22
306:3 386:6,10,17
388:8,19
**added (31)**
55:24 100:16 113:25
114:1 230:18
231:22 232:1,5,14
232:15 233:9
241:19,22 243:1,2,6
243:6 244:5,5
245:25 246:10,11
246:13 247:5
248:24 249:4
250:13 257:25
259:13 285:25
370:14
**adding (4)**
114:5 245:25 249:21
387:1
**addition (1)**
309:5
**additional (6)**
167:14 171:19 244:25
247:20 257:13
336:6
**address (2)**
280:20 401:11
**addresses (1)**
402:5
**adjacent (11)**
61:18 62:13 64:23
67:8 137:20 140:8
145:14 146:1 150:7
150:16 160:18
**adopted (1)**
399:11
**adopts (1)**
151:9
**advantage (1)**
37:20
**advice (1)**
47:23
**affiliated (2)**
43:10,13
**affiliation (1)**
43:13
**affirmative (1)**
269:22
**afraid (4)**

164:16 237:21 257:2
276:15
**afternoon (1)**
235:25
**agency (1)**
406:15
**agenda (1)**
29:23
**aggregated (1)**
128:5
**ago (11)**
9:7 22:6,8 45:18,19
50:3 53:12,13 72:14
86:16 87:1
**agree (36)**
9:14 63:20 106:21
107:18 130:25
142:3 205:11
214:23 232:2,9
241:2,12 242:8
246:4,7 254:24
257:3 269:5 273:13
274:7 279:23
280:15 308:21,25
316:7 319:3 326:21
348:6 368:1 369:21
376:12 379:16
397:22 398:22
402:17 403:24
**agreed (5)**
18:8,8 140:1 294:24
329:1
**agreeing (3)**
367:9 368:3 369:23
**agreement (2)**
55:2 406:14
**Ah (1)**
72:19
**ahead (7)**
22:15 57:25 107:16
285:6 329:5,24
330:12
**al (1)**
184:16
**alarm (1)**
389:14
**algorithm (1)**
368:14
**alive (1)**
177:10
**alleged (1)**
322:25
**allegedly (2)**
322:21 323:17

**allow (5)**
332:19 337:17 371:1
371:2 397:15
**allowable (5)**
344:17 360:5,12,18
364:20
**allowed (19)**
237:16 240:19 242:2
258:3 270:3,14
272:17 277:12
316:14 370:16,20
371:8,15,19 372:20
373:2,10,13 393:20
**allows (2)**
271:2 389:4
**alluded (1)**
215:13
**Alpha (1)**
170:19
**altered (1)**
121:19
**amend (1)**
394:2
**amended (11)**
230:8,14 236:15
241:25 242:10,25
248:9 249:13
256:16,23,25
**amendment (13)**
229:10,11,15,19
232:20 240:24
241:5 243:18
245:18,20 272:14
393:5 394:12
**amendments (1)**
256:8
**America (1)**
75:15
**amorphous (1)**
15:17
**amount (5)**
126:4 317:23 318:1
318:24 361:14
**amplitude (2)**
84:15 124:17
**analog (47)**
17:2,5 118:6,10,14,15
119:15,21 124:3,5,6
124:14 127:12,16
128:2,2,6,7 131:8
131:12 141:18,23
141:24 143:5,8
145:4 148:9 155:18
215:9 286:13,19

287:7,12 288:18
291:4,18,23 293:8,8
293:25 294:1,2,15
294:20 295:1 296:2
299:11
**analysis (4)**
152:11 332:10,12,15
**Andrew (2)**
188:23 190:2
**angle (2)**
157:17 378:1
**Ann (2)**
180:23 181:7
**annotated (1)**
306:10
**annotation (1)**
306:7
**answer (30)**
15:21 18:21 20:12
23:8 24:24 47:22,24
48:16 54:12,22 55:8
57:1 81:5 145:23
146:12 147:14
156:17,24 160:3,10
207:13 218:25
262:18 279:2,7,8
286:25 342:24
397:15,16
**answered (26)**
94:25 96:23 97:20
109:12 125:10
151:13 156:19
157:2,4 161:16
162:17 209:1 210:8
222:11,12 247:12
295:10 317:12
335:16 336:13
340:21 352:10
360:14 373:7
386:13,24
**answering (4)**
162:21 251:2 269:22
339:24
**answers (3)**
9:11 168:7 407:8
**antecedent (17)**
226:16,19 227:9,19
227:20 228:7,10
281:5,10,11,20,25
282:2,19,23,25
283:14
**anticipated (1)**
253:19
**anticipation (2)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

252:25 253:8
**anybody (2)**
56:13 343:18
**anymore (1)**
54:24
**apologize (1)**
41:18
**apparatus (10)**
234:13,19,21 238:13
239:7,11 240:11
261:11,21 263:19
**apparent (1)**
175:14
**Apparently (1)**
400:3
**appear (6)**
91:22 171:20 183:21
204:25 208:19
405:6
**APPEARANCES (1)**
3:1
**appears (6)**
106:9,9 174:18 176:6
177:11 249:24
**Appendix (4)**
45:8,9 101:18 313:11
**apple (1)**
129:4
**applicability (5)**
177:2,16,20 178:15
194:25
**applicable (2)**
114:8 257:21
**application (1)**
305:6
**applied (4)**
71:3 118:7 120:2
296:11
**applies (6)**
175:9,15 193:19
258:14,19,19
**apply (8)**
72:5 134:22 168:11
193:18 199:11
312:16 392:6 396:5
**appropriate (1)**
333:3
**approximately (1)**
404:22
**April (3)**
45:21 176:7,13
**area (3)**
14:16 47:11 72:8
**areas (4)**

177:2,20 178:15
395:15
**argue (2)**
88:16,17
**argument (1)**
88:19
**arrive (2)**
385:19 386:6
**arrow (3)**
128:13 306:13,17
**arrows (2)**
306:10,21
**art (25)**
44:4 50:6,9 59:8
67:16 68:19 73:23
74:5,6 80:22,24
81:6,9 153:16 253:3
282:14 309:14
310:5,21,25 311:16
338:12 366:11
396:17,25
**article (20)**
70:7,15 71:6,15,18,22
72:8,9 74:25 75:17
79:1,5 81:15,25
82:1,1 112:11
304:18 305:11
406:7
**articles (10)**
70:18 76:22 78:1,4
82:8 84:21 85:3,5
85:24 86:7
**Ashar (12)**
79:5,8,16 80:1,2,5,23
81:6 82:1 112:11
305:9,11
**aside (16)**
32:21 41:20 43:22
63:15 129:10
163:23 172:9
178:24 179:2
193:25 222:20
261:20 307:15
329:19 376:3
378:13
**asked (41)**
41:5 46:25 47:1,2,13
49:16 58:22 77:13
94:25 96:22 97:19
109:11 110:1 125:9
151:13 156:18
157:1 161:15
208:25 210:8
222:10 223:21

247:11 256:7 295:9
297:9 306:6 317:11
335:15 336:12
340:21 342:1 352:9
360:14 373:6
386:13,23 388:12
393:1 397:14
400:12
**asking (41)**
19:10 48:12 86:20,22
113:22 121:6
123:15 139:15
150:24 155:23
165:10,13,17 166:8
182:24 196:4 199:2
199:7,10,13 233:24
243:6 257:11
267:15,18 270:21
276:2,3 280:12
282:6 295:3 297:5
326:12 328:12
345:19 349:22
372:16 374:17
375:6 392:9 398:4
**aspect (1)**
163:24
**aspects (4)**
12:23 13:22,25
317:14
**assertion (1)**
175:19
**Assess (1)**
171:2
**Associate (1)**
188:24
**associated (2)**
143:4 163:17
**assume (35)**
24:19 26:19 40:7
102:16,19 103:4,6
111:19 114:23
130:3 134:23
166:20 176:24
182:17 192:14
204:1 206:22
207:10 223:22
228:9,13 266:16
280:23 284:5
287:11,15,18
292:14 293:13
295:3,4 322:19
323:9 350:7 351:24
**assumes (2)**
49:14 145:20

**assuming (11)**
67:11,14 118:1,2
119:13 141:18
227:1,19 228:6
280:18 282:6
**assumption (6)**
184:23 261:7 283:6
283:10,12 287:10
**assumptions (6)**
58:17 59:18,20
211:21 212:4,9
**AT&T (1)**
43:1
**Atlanta (5)**
1:18 2:7 7:1,24,25
**attachment (6)**
180:5 183:10,12
185:6 192:1,2
**attempt (1)**
401:1
**attention (9)**
23:18,22 33:6 61:14
83:9,11 84:11
217:20 320:10
**attorneys (2)**
8:1 54:8
**attribute (1)**
28:7
**author (2)**
250:4 251:9
**authority (1)**
312:16
**automatically (1)**
273:2
**Avago (2)**
1:7 7:14
**Avenue (1)**
3:4
**average (2)**
356:20 362:20
**avoid (4)**
39:4,8,12 198:9
**aware (14)**
31:20 47:17 48:2
56:15,17 73:21
91:19 168:10 177:1
191:7,11 193:20
196:8 199:7

_____
           **B**
_____
**b (7)**
11:25 79:4 176:22
201:13 313:11
398:18 406:13

**B-1790 (2)**
406:24 407:23
**baby (2)**
244:8 277:8
**back (77)**
38:25 39:6 42:3 43:23
62:17 70:21,25
74:21 77:24,25
78:22 82:18 83:22
83:24 90:12 108:6
114:11 118:5
129:11,23 136:10
136:12 139:1,2
142:12 144:9 146:7
159:13,25 179:24
180:3,18 184:11
195:20 200:17
201:2,7,21 203:24
206:24 207:5,5
217:17 229:9 233:9
233:20 234:12
235:8,16,22 236:19
236:21 237:16
238:11,14 245:23
251:8,11 281:2
320:5,5 321:20
323:3 329:18
330:11 336:2
357:14 361:22
362:19 363:3,4
370:3 373:25
380:14,16 392:10
399:24
**background (13)**
12:16 19:13 51:25
80:22 87:15,16,21
88:14,18,23 89:4,11
382:21
**backside (1)**
179:23
**bad (4)**
45:20 266:20 267:6
267:10
**balance (1)**
31:9
**balanced (3)**
29:11 161:24,25
**band (1)**
339:10
**bandwidth (5)**
339:19 341:7 347:25
348:7 349:20
**banking (7)**
317:4,4,7,8,9,14,15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Barrett (3)**
57:5 176:22 189:12
**based (2)**
85:4 403:22
**bases (1)**
82:4
**basic (2)**
187:23 343:25
**basically (10)**
18:21 43:7 68:24 69:6
112:22 115:11
165:10 187:21
266:19 367:9
**basics (1)**
47:2
**basing (1)**
226:24
**basis (13)**
185:20,20 188:19
227:9 228:7,10
281:11,20,25 282:2
282:19,25 283:14
**Bates (22)**
5:10,12,14,15,17,19
5:21,23 6:7 169:24
172:17 175:25
179:19 184:6 186:5
189:19 192:10
238:25 321:6,17
324:3,10
**Bbrickner@bermai...**
176:20
**BD (1)**
193:5
**BD-R (2)**
4:22 22:21
**BD-RO (2)**
190:20 192:25
**bear (1)**
191:22
**bearing (9)**
5:10,12,14,15,17,19
5:21,23 6:7
**beginning (10)**
7:8 82:19 105:18
159:14 235:23
273:20 276:17
304:5 309:5 374:1
**begins (1)**
64:4
**behalf (4)**
3:2,10 8:9 195:21
**behaviors (2)**
317:6,7

**believe (35)**
23:1 31:16,17,19
45:22 52:12 54:2
55:14 71:20 75:19
76:19 80:12 86:9
101:20 112:13
114:13 169:2,5,17
206:11 230:1,19
265:3,4 285:21
304:24 305:13
306:2,5 339:17
340:16,17 347:13
381:17 392:7
**believed (1)**
343:4
**Bertram (2)**
81:15 82:1
**best (5)**
23:7 45:11 104:24
105:2 157:4
**Beth (1)**
176:14
**better (6)**
18:9,15,19 345:20
364:14,14
**beyond (1)**
197:11
**BFS (2)**
190:21 192:25
**big (4)**
262:16 332:5 358:6,7
**bigger (2)**
34:21 362:5
**bill (1)**
46:11
**billion (2)**
361:18,19
**binary (19)**
15:5 102:18,18 103:8
106:15,16 148:18
166:18 213:15,21
214:4,5 385:7
390:17,22 391:3
398:19,20 403:19
**bit (76)**
33:24 40:19 61:18
62:13 64:23 68:1
116:24 121:9,18
126:22,22,23 127:2
127:19 137:20
140:8 145:14 146:1
150:7 153:9 160:18
201:5 203:8,18
214:5 215:6 245:16

263:5 270:6 272:8
274:4 287:4,7 289:7
289:25 290:1,3,14
293:1,3 294:5,6
302:11,13,14,15,16
306:4,18,19,25
329:21 330:12,20
330:25 331:5
333:10 336:18,20
342:1 346:8 347:21
348:24 350:24
351:10 356:9
357:11 362:14
374:4 382:1,7
383:23 384:3,10
387:18 388:3
**bits (49)**
19:1,2 20:23 34:5
35:5,5,6,14,25 67:8
89:5 113:25 117:7
118:13 150:16
166:17 213:7,25
214:1 215:6,10
284:24 286:10,12
286:13,18,19 288:8
288:9,15 289:20
302:3,6 348:2
361:19 367:15
375:19 377:13
378:13 380:1,6,18
380:22 381:9,11,12
388:8 389:1 390:17
**blah (8)**
246:25,25,25 247:4,4
247:4 335:12,12
**blips (1)**
207:20
**block (8)**
6:4 174:3 188:8,12,23
190:3 284:1,10
**blocks (1)**
34:5
**blow (1)**
351:22
**Blu-ray (39)**
4:20 13:8 15:4 23:5
23:15 24:9,13,14
162:6,18,22,23
181:19,25 182:19
183:4 184:13
185:10,11 187:6,13
187:23 188:3,15
190:14 191:9,13
192:19 193:5,7,9,17

195:10,15,22
199:19 200:3,8
392:10
**blue (1)**
128:10
**Board (1)**
406:7
**boards (1)**
129:16
**boastful (1)**
33:24
**body (3)**
211:23 212:5 273:22
**bold (4)**
100:6,16 211:17
212:18
**books (1)**
69:17
**bottom (23)**
71:1 79:5,15 112:8
169:20 171:17
172:16 174:2
175:25 176:9
179:19 184:5,12
186:6 188:7 189:19
229:2 255:3 304:17
305:19 324:9
382:19 385:4
**bound (7)**
32:7 354:11,11,16,17
354:19,21
**bounded (2)**
32:8,10
**box (32)**
115:3,3,7,17 118:21
118:23,23,25
119:11,12,13,18,19
131:11,15,16 132:2
132:6,10,10,20
141:16,17,19
142:20 143:3,4
152:19 239:3
287:17 393:5,11
**brain (4)**
164:18 165:16 166:9
341:3
**break (23)**
9:25 10:3 41:22 42:6
78:21 81:13,20
82:10 85:1 143:9
156:8 158:8 159:16
159:20,24 236:5,10
237:5 303:24
304:11 330:11

373:15 399:15
**Brickner (6)**
57:7,12,15 176:22,23
189:12
**brief (9)**
42:1 82:14 159:11
200:25 235:20
260:15 304:3
373:23 399:22
**briefly (3)**
60:22,22 260:11
**bringing (1)**
378:15
**brings (1)**
109:19
**Britner (1)**
57:5
**broad (1)**
311:13
**broader (1)**
78:7
**broke (3)**
145:16,18 146:11
**broken (4)**
143:16 146:5,7
150:19
**build (1)**
250:24
**bunch (3)**
14:16 139:11 381:2
**burn (1)**
158:8
**business (1)**
55:5
**butt (1)**
277:3
**byte (1)**
19:1

─────────
**C**
─────────
**C (8)**
7:4 81:12,14 101:18
307:4 406:1 407:1,1
**calculation (1)**
267:13
**calendar (1)**
45:17
**California (2)**
1:1 7:18
**call (19)**
31:24 36:17 54:6,7,9
136:8 153:21 154:6
216:2 264:21 272:2
274:24 276:3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

287:13 291:21
315:19 378:2,3,4
**call-out (7)**
239:15,18 240:6
393:1,5,10 394:10
**called (17)**
8:16 17:16 89:5,17
131:16,17 161:24
181:19 215:25
252:17 265:9
284:24 306:3 307:7
320:6 321:22,25
**calling (8)**
73:18 146:12 155:24
215:18 220:24
223:9 238:4 281:19
**calls (4)**
47:21 48:19 88:21
178:7
**Calmet (1)**
14:24
**Calmetrics (4)**
14:8,13,25,25
**capable (2)**
153:22,23
**capacity (1)**
173:24
**caption (1)**
407:8
**careful (1)**
31:6
**cascade (1)**
264:17
**case (37)**
7:12 20:13,21 38:14
39:25 40:9,22 41:14
45:3 51:25 52:3,6
54:3 57:22 60:13
73:25 85:23 96:10
100:1 109:15 151:8
156:4 170:1,15
196:4 256:13
281:15 311:2,7
345:24 362:2
365:25 406:15,18
407:16,19 408:2
**cases (4)**
169:23 282:23 325:13
326:7
**cause (1)**
351:18
**caused (1)**
251:7
**caution (2)**

46:19 54:11
**CCR-B-1790 (1)**
1:23
**CD (15)**
13:8 17:25 18:12,14
18:16 19:18 24:10
26:7 90:9 136:13,16
139:2 161:4,6
162:19
**CDs (4)**
17:21 21:15 23:13
90:9
**cells (1)**
127:19
**center (1)**
190:17
**centered (1)**
29:4
**certain (32)**
44:13 46:25,25 47:3
59:19 121:2 178:22
193:9 220:10
260:19 264:11
265:18 271:13
276:18 293:2 317:6
317:7,14 318:1
321:21 332:1
336:19 341:12
349:15 355:5,11,19
356:15,22 357:5
359:14 362:17
**certainly (11)**
45:18 46:10 52:10
73:15 97:13 124:15
153:17 163:14,15
341:8 363:5
**Certified (4)**
2:8 406:9,24 407:23
**certify (3)**
405:3 407:6,14
**cetera (1)**
366:11
**chain (1)**
176:7
**challenge (1)**
55:6
**chance (3)**
153:6 236:2 259:11
**change (29)**
14:14 15:16,17,17
16:5 73:22 74:2,6
74:10 101:23 102:5
102:10,12 107:12
110:8,10,17 133:19

197:6 207:8 222:14
223:12 234:3
263:16,18,20
379:15 392:16,22
**changed (8)**
101:13 137:25 214:18
233:2,25 309:1
318:15 392:20
**changes (16)**
73:6,17 108:17,18
109:1 138:18 207:5
207:20 223:12,15
225:5,6 263:17
294:1 375:23 382:7
**changing (4)**
249:5 258:8 259:14
380:7
**channel (15)**
6:5 84:14 85:14,20
86:12 89:4,16,21,25
90:2 96:5 112:17,18
165:24 254:6
**channels (4)**
83:16 86:6 165:11
177:3
**characterization (1)**
16:3
**characterize (2)**
20:4 162:15
**charge (2)**
351:21 406:17
**chart (13)**
11:22 61:16 62:7
201:11 202:23
284:22 320:7
324:16 327:4,8
395:11,12,18
**charts (3)**
6:6 51:2 319:23
**check (5)**
288:17 349:1,2,3,5
**checking (2)**
79:13 288:25
**chip (22)**
112:18,18 116:7,8,12
116:22 117:5,8,13
118:4 129:16,19
139:3 147:10,18
148:5 153:21
166:14 167:23
221:25,25 361:1
**choose (1)**
351:13
**chose (3)**

86:17 263:4 351:17
**Chris (1)**
8:8
**CHRISTOPHER (1)**
3:5
**circuit (2)**
147:6 153:24
**circuitry (5)**
141:24 142:25 145:4
368:14,15
**circular (2)**
68:1,3
**circumstance (1)**
146:4
**citations (7)**
79:10 93:10 99:7,15
99:16,25 204:24
**cite (35)**
71:18,21 72:1,7 78:7
78:18 79:5 80:6
81:15 85:18,22 86:4
87:13 91:2,12,15
92:11 93:14,17,21
98:25 99:1,4 100:25
169:7 204:5,16,21
238:19,25 304:18
305:8,9 330:1
338:23
**cited (30)**
51:3,6 60:24 69:20
70:15 72:8,11,15
75:17,24 76:5,17,22
77:25 78:5 79:8
80:1 81:2,17,25
82:8 83:19 85:23
91:5,9 93:20 204:13
205:9 304:25 339:2
**cites (3)**
71:4 88:14 93:14
**citing (7)**
101:15 241:3 305:21
321:17 324:4 353:6
353:8
**Civil (2)**
1:6 7:15
**CK (1)**
146:7
**claim (427)**
4:14 6:6 11:18 18:11
18:14 46:25 47:4,6
47:14 51:2 54:19
56:19 58:18,22,23
59:12,15,19 61:15
67:22 68:6 91:19,20

91:23,25 92:5,8,24
93:9 94:22 95:15
98:5 102:17 103:7
104:25 105:20
106:20,22,25 107:1
107:3,18,22 108:1,9
108:23 109:9 110:7
110:9,10,11,17
111:9,21 117:16
122:16,16,24
129:11 130:1,10,23
134:25 135:3,7,22
137:18,19 138:11
139:6 140:13 141:2
141:7 142:4,8
143:20 144:20
146:15 148:14,17
150:5 151:4,21
155:13,14 157:22
158:12,13 159:5
160:5,6 166:22
183:3,4 185:1,2,6
185:12,21 188:2,8
188:14,20 192:21
193:16,21 194:3
195:9,14,21 196:4
199:15 207:24
209:16,17,22 210:5
210:10,20 211:12
211:16,17,22,23
212:2,5,6,15 217:1
217:4,8,17 219:15
219:16 220:1,10
223:21,22 226:21
227:21 228:6 230:8
230:14,18,20 231:3
231:22 232:1,5,12
232:18 233:10,19
233:21 234:4,5,9,11
234:13,15,19,21,21
235:8 237:2,14,14
237:15 238:3,12,13
239:10,11,13,13
240:2,25 241:5,13
241:18,21,24,25
242:9,20,24 243:1,2
243:4,6,18,21,22
244:5,5,8,19,25
245:1,5,17,19,23
246:1,10,11,14,16
246:17,18,24 247:5
247:7,15,17,20,23
247:23,25 248:3,5
248:12,25 249:4,5

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

249:13,21,21
250:14,14 253:24
253:24 254:22,24
255:5,7,15,18,22
256:3,4,8,15,17,23
256:24 257:7,10,25
258:1,7,8,13,15
259:13,13,14,25
260:9,9,16,16,18,19
260:21,22 261:2,11
261:23,24 262:1,4,9
262:11 263:10,15
263:16,19,22,23
268:21,25 269:10
269:10,14,15
270:10,11,12
272:14,15 273:8,9
273:25 274:8,12,14
275:9,14,21 276:5
276:13 278:3,4,11
278:13,19,20,21,22
279:18,19 281:10
281:23 282:19,25
283:13 284:7,12,17
284:17 285:1,3,9,10
285:10,10,12,24
286:2 287:22 292:4
292:5,21 293:11
295:8,14 296:8,15
296:17,18 297:2,13
297:17 298:2,15,18
307:23 312:20
319:23 320:13
322:21,21,25
324:16 327:4,25
328:2 329:1 334:8
334:13,18 336:2,3,4
336:6,9,11 346:6,16
346:17,20 349:4,24
351:15 352:4 354:8
354:12,16,17,19,21
366:1 367:14,24
370:5,12,13,13,20
370:21 371:5,6,13
371:14,25 372:10
372:19 373:1 374:3
375:11,12 376:14
376:25 377:8
380:23 383:11,13
385:3,5,6,22 387:7
388:14 393:6 394:2
394:12,22 395:17
396:9,17 397:8
398:18 401:14

402:6,7,12
**claim's (1)**
259:19
**claimed (2)**
253:4 347:11
**claiming (1)**
81:9
**claims (61)**
33:20,21 47:12 48:4
58:16,18 59:3,22
80:9 88:6 91:12
98:9 103:20 105:19
122:17 136:2
146:22 158:1
175:17 179:7 191:1
198:23 199:3,12,19
199:24 200:4,14
208:16 210:11
229:17,23 236:14
242:14 252:8,10
253:18,24 254:1,4,5
255:17 256:5,11
259:10,15 260:24
260:25 261:7
262:13 265:18
280:14,17,18,19,21
284:8 311:7 370:2,4
396:24
**clarification (1)**
329:7
**clarified (1)**
29:24
**clarifying (1)**
166:12
**clause (8)**
262:6 334:10,15,16
334:18,20 366:20
366:21
**clear (27)**
59:8,22 92:4,8 93:3
94:10,16,19 95:5,18
96:12 104:18 105:5
105:15 196:14,15
213:13 214:23
270:24 273:20
286:11 302:17
310:19 329:4
375:12 395:6 399:6
**clearer (2)**
59:8 94:7
**clearly (10)**
39:19 66:8 87:10
97:12 109:20 128:6
259:24 289:19

390:1 402:6
**clever (1)**
21:8
**clock (11)**
127:7,8 240:19,19
242:2 258:3 271:3
272:18 277:12
315:20 393:20
**close (2)**
252:22 260:23
**closed (1)**
96:1
**closely (2)**
38:10 41:13
**closer (1)**
118:24
**code (195)**
17:24 18:5 19:5,21,24
20:2,9,13,19,19,23
21:4,9,11 24:14,15
24:23 26:19 29:6,20
30:9,20,22 32:3,4
32:11,12 33:22,23
89:20,21,21,24,24
90:7 97:12,13,23
98:2,4,5,8 105:25
106:11,14 108:3,11
110:20 114:1 115:9
115:16,20 116:3,11
116:13,15 117:5,19
117:21,25 130:2
143:5 148:5,24
153:24 155:2,8
161:8,14 162:19
167:1 168:12
181:18,23,23
182:20 211:18
212:24 213:13,14
213:15,18 214:10
214:17,20,24 215:2
215:6 254:7 264:2
264:13,20 265:10
265:14,16 266:7,10
266:11,15,20
267:10,12 270:1,5
271:12 272:4,13
274:8,15,25 275:4
277:9,9,10 285:2,12
285:17 289:8,24
290:20 291:3,8,10
291:15 308:11,16
308:22 321:22
322:1,20,20 328:22
331:3,10 337:17,22

338:3,3,19 340:3
341:1,4,12,21 342:6
342:7,11,13,20,21
343:6,20 345:7,8,17
345:21,25,25
346:11,21,24 347:8
347:9,16,18 348:4
348:15,16,17 350:8
354:25 357:4 367:4
367:12 368:11,21
369:1 376:15,16
377:2,3,4,5,9,12
378:25 379:7 385:8
389:3 402:15
403:11,15,19,20
404:8
**code's (2)**
20:22 89:25
**coded (1)**
116:12
**coder (1)**
288:7
**codes (32)**
14:1,23 15:2 23:23
38:1 39:2,3,11
43:20 44:11 67:1
89:4,5,16,17 90:2,4
90:4 114:19 115:6
162:14 170:25
178:18 194:7
266:16 267:7
321:13 323:16
324:12 325:18
338:13 346:17
**coding (32)**
13:13,18 14:2,21,23
18:14 44:6 65:9
66:14 67:1 96:6
114:8 160:25
173:23 203:18
311:3,9 330:8 337:7
337:9,10 338:20
339:11,20,21 340:4
340:14 341:7
342:12 343:7 348:9
367:14
**coherent (1)**
21:14
**collapsed (1)**
158:21
**colleague (5)**
8:6 33:14 53:2,2
76:22
**collection (1)**

122:13
**colon (3)**
101:13 102:5 149:5
**Colorado (1)**
3:12
**column (44)**
38:7 62:11 70:16,23
70:25 71:1 74:22
77:1 83:10 84:9,10
87:15,17,19,23
88:15 91:2,3 93:10
93:10 98:15,16 99:4
99:5 104:12 105:13
192:24 204:6,16,19
322:1 330:2 337:4
338:23 339:1 340:7
353:7 382:22 390:3
390:9 391:12,14,23
399:5
**columns (1)**
78:5
**combination (1)**
21:6
**combining (2)**
21:8 385:8
**come (15)**
32:11 51:22 108:6
144:13,16 157:16
167:18 178:4
235:16 252:22
267:4,6,10 293:1,3
**comes (11)**
14:5 17:4 19:2 120:7
132:1,4 139:4
305:25 324:22
361:22 388:9
**comfortable (2)**
314:6 354:6
**coming (7)**
23:3 51:10 116:12
123:10 215:8
251:13 262:21
**comma (5)**
262:2 325:19 337:17
337:22 338:3
**comment (3)**
178:14 179:6 250:8
**Commercialization ...**
170:20
**commercialize (2)**
14:19 43:9
**commercialized (1)**
14:13
**Commission (1)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

408:24
**common (17)**
13:22,25 34:18,20
39:10,11 44:13 55:2
55:4 74:3,3 81:1,3
90:2 305:16 332:22
332:23
**commonalities (1)**
280:20
**commonly (1)**
81:10
**communicated (1)**
275:12
**communication (3)**
12:23,24 89:7
**communications (4)**
12:18,25,25 48:19
**community (1)**
53:4
**company (3)**
14:13 43:8,10
**compare (13)**
240:23 316:15 341:1
341:12,17 342:5,15
342:20 343:23
345:16,18 367:20
370:12
**compared (4)**
341:20 342:9 393:5
395:23
**comparing (1)**
343:9
**comparison (6)**
341:23 342:19,21,25
343:1 393:4
**compensate (1)**
341:5
**compensated (2)**
46:13 61:5
**complete (2)**
41:5 192:2
**completed (2)**
140:13,19
**completely (5)**
59:22 258:15 338:4
339:21 403:3
**compliant (1)**
18:22
**complicated (2)**
332:12,13
**component (10)**
26:11 164:4,14 165:3
165:20,21,25
167:16 168:12

293:15
**comprise (3)**
212:24 213:18 214:17
**computer (8)**
95:2 153:24 154:6,8
154:22 155:7,9
157:21
**con (1)**
27:11
**concept (10)**
122:18 162:1 169:24
220:14 222:19
252:24 260:8
316:15 330:24
346:7
**concepts (1)**
373:4
**concern (3)**
30:10,23 31:4
**concerning (1)**
400:7
**concise (2)**
105:5,18
**conclude (2)**
246:16 247:20
**concluded (1)**
404:22
**concludes (1)**
404:18
**concluding (1)**
92:23
**conclusion (4)**
159:2 184:12 196:23
213:4
**condition (5)**
313:11 314:13 315:3
315:18 353:25
**conditions (2)**
315:22 316:5
**conference (1)**
54:6
**CONFIDENTIAL (...**
1:13
**configuration (1)**
121:23
**confirm (3)**
94:17 97:16 192:9
**confirming (1)**
79:13
**conflicting (1)**
331:7
**conform (3)**
18:12,19 115:20
**conforms (2)**

18:4 163:20
**confused (7)**
68:16 137:13 276:16
277:15,17 278:1,2
**conjunction (1)**
20:14
**connect (1)**
213:2
**connecting (1)**
26:4
**connection (8)**
44:7 65:9 66:14 94:3
190:13 398:22
402:19 403:22
**consecutive (125)**
106:2,5 107:4,19
108:2,3,9,11,15,23
110:15,16 116:21
117:7,9,9,20,24
131:3 141:3 144:22
149:13 203:20
217:22 220:2,12
223:24 224:1,2,6
240:18,19 242:2,2
243:13,24 245:3,8
248:11 254:25
257:15 258:2,3
268:17 270:2,2,13
271:3,3,23 272:6,17
272:18 275:1
276:19 277:11,12
290:1,2 292:11
293:20,23 294:11
299:14 300:4,9,18
300:25 301:13,18
301:20 315:20,20
316:4 319:13
320:14 321:2
334:21 335:18
337:18 350:10
351:2 361:19
364:21 365:8
366:17,20 369:15
370:6,16,20,22
371:2,7,16,17,18,21
372:4 373:11,12
374:6 381:11,25
382:4,8,14 385:9,22
387:8,9 388:2,4,5,8
388:15,15,21,21
389:4,4 393:19,20
396:11,11
**consecutives (2)**
373:12,13

**consequence (1)**
338:19
**consequently (1)**
391:2
**consider (6)**
20:18 48:22 49:6,11
127:14 386:8
**considered (13)**
20:3,7,20,25 21:3,5
50:18 51:10 83:1
87:2 194:10 214:4,5
**consistent (15)**
101:4,9,23 102:6,22
103:11 149:23
220:11 315:3,11
390:11 391:6
394:15,20 401:23
**consortium (1)**
187:3
**constrained (2)**
32:18 342:15
**constraining (1)**
313:11
**constrains (1)**
32:16
**constraint (270)**
31:17,19,24,25 32:1,5
32:11,16 35:1 71:3
116:20 117:6 155:9
163:5,9 166:21,24
167:14,24 203:19
240:17 242:1,21
244:11 246:17,18
246:25 247:3,21
248:2,2,5,19,21,22
249:15 250:1
255:21 256:22,24
257:4,9,20 258:1
259:20,25 261:22
262:6,10,20,22,24
263:1,2,7,15 264:3
264:21,23 265:4
266:21 267:12,16
267:23 268:3,8
270:12 271:18,20
272:1,2,5,16 273:9
273:15,16,17 274:3
274:19,24,25
275:12,17,17,21
276:4,4,6,20,22,23
277:10 278:13,19
278:20,21,22
279:14,19,24,25
280:2 288:16 289:6

289:10 294:8 307:8
308:3 309:9,13,14
309:17,20,23,23,25
310:4,12,13,16,18
310:19,22,23,23
311:2,9,13,24 312:8
313:8,10,19 314:14
314:17,24 316:16
318:22 320:25
321:11,12,14 323:5
323:6,7,20,20,21,23
323:25 324:1
325:24,25 326:13
326:23,25 327:21
327:21 328:1,4,9,9
328:10,18,22,25
329:8,9,12,16,22,25
330:6,9,19,20 331:3
331:6,20,20,24,25
333:1,6,13,20,20,25
334:9,10,11 335:2,3
335:4,6,10,12,25
336:7,18,25 337:1
338:4 339:16
340:14 342:3,3
343:5 344:14 346:7
347:17,19 348:12
348:13,21 349:6,9
349:12,14,18 350:2
350:3,4,8,13,14,16
350:17 351:3,8,12
351:18 352:7,13,23
353:2,14 354:1
358:2,19,21,24
359:22,23,24
360:10,22 361:4,13
362:4 363:8,11
364:3,19 365:2,6,20
365:22,23 366:14
366:16 370:15
371:21 372:1,6,20
388:20,25 389:2
393:18
**constraint's (1)**
330:7
**constraints (62)**
72:5 105:25 115:21
115:24 116:1,4
130:11 139:4 145:7
149:5 153:23
155:21 158:17
167:14 207:24
231:4 232:6 254:13
262:2,4,5,12 271:13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

286:1,5 287:23
288:4,12,14,25
289:1 290:7 291:25
307:3,9,24 308:5,12
308:17 311:19
323:10,10,14,15
325:8,9,10,14,17,19
326:7 327:9,16
329:2,15,17 333:17
335:1,9 393:17
394:3,8
**construct (1)**
346:21
**construction (66)**
4:14 6:6 11:19 49:7
51:2 58:18 61:15,17
62:1,11,19 63:4
68:6 98:22 101:9
111:6,10,14,22
123:3 137:15
146:15 151:9
199:10,14 200:9
202:7 228:20
298:20 307:12,20
308:10,25 312:20
313:2,17 316:16
319:23 327:4,15,19
328:18 330:17
349:24 350:17,20
351:15 352:4
367:14 369:19,23
395:16 397:3,21
398:19,23 399:11
401:15,22 402:5,14
403:2,5,8,18,24
**constructions (27)**
4:16 12:3 47:18 48:3
48:13,17,18,23
49:12,15 62:8
201:17 238:22
258:24 307:7 314:3
314:5,5 395:21,24
396:6 397:8,18
401:5,8,17 402:18
**construe (6)**
82:5 103:7 158:12
258:20 259:10
328:25
**construed (16)**
58:16,19 59:4 80:10
82:5 88:7 158:1
198:23,25 199:3,3
199:13,24 200:7,16
280:17

**construes (1)**
102:17
**construing (2)**
93:8 280:16
**Consulting (1)**
170:19
**contacted (1)**
406:11
**contain (2)**
131:11 244:9
**contained (1)**
405:8
**containing (1)**
315:19
**contains (1)**
314:24
**contemplated (1)**
178:25
**content (9)**
23:25 26:18,23 27:11
27:12 31:6,9,10
166:3
**contentions (2)**
50:24 52:15
**contents (1)**
47:9
**context (41)**
40:19 47:10 51:25
59:6,6 69:11 73:25
85:13 87:10 88:24
89:1 90:1 104:20
109:17 126:8
134:25 136:23
175:17 203:5,6
208:12,13,14
209:17 210:11
249:10 251:3 256:9
256:20 273:18
298:17,17 309:21
311:3,9 331:16
345:1 374:17 375:5
379:14 396:23
**continues (2)**
186:6 231:7
**continuous (40)**
118:14,15 122:8,13
122:18,25 123:17
123:18,25 124:2,4,7
124:8,10,15,16,17
124:18,18,20
125:21,22,22,25
126:5,7,9,14,19,24
126:25 127:3,11
128:20,24 202:2,12

202:21 203:10
294:1
**contract (2)**
406:13,14
**contradiction (1)**
151:18
**contradictory (1)**
331:9
**contrary (1)**
196:23
**contrast (1)**
239:6
**control (6)**
29:19 30:1,8,19,23
67:1
**convenient (1)**
82:10
**conventional (1)**
34:9
**conversations (4)**
33:15 55:12 178:9,10
**convert (1)**
143:5
**converted (1)**
286:14
**converts (4)**
118:6,9,14 148:9
**copied (5)**
176:16 189:5,8,12
313:21
**copies (1)**
32:22
**copy (2)**
10:25 21:19
**corner (5)**
112:15 169:21 184:5
229:3 324:24
**Corp (3)**
43:1 229:3 251:12
**Corporation (4)**
1:7 7:14 43:1,4
**correct (271)**
17:2 24:19 26:25 27:7
34:21,23 44:9,13
48:10 50:20,24 51:7
61:9 62:1 63:13
64:9,12,15 65:4,11
65:20,23 66:2,11
67:10 68:13 69:9
75:6 78:8 80:18
81:18 82:1,5 85:6
85:14,21,22,25 86:2
86:6,7,12 89:9,14
90:8,10 91:13,14,18

97:6,8,21 99:1,22
100:17 101:16
106:19 107:20,24
108:4 109:9 110:1
111:3 112:22
116:13,17,18
117:25 118:1 121:7
121:19,25 122:1,14
123:5,22 124:9
125:4,8 126:4 132:6
137:2,8 138:2
140:16 142:5 146:3
147:19 148:12,19
150:12,13,18
151:14,21 153:10
156:17 160:20
162:16,17 163:5,7
167:2 168:15 169:5
169:9 172:2,4,6,17
174:13,21 175:6,15
176:11 177:16,18
177:25 179:8,12
182:2,6 185:7,23
187:23 188:4
190:21 195:10,22
202:23 205:1,2
208:18 210:24
217:14 218:19
219:4,10,11,13
222:1,3,4,9 227:13
231:21,24 232:3
238:5,11,19,23
239:12 242:11,22
242:25 244:13,14
244:18 245:11,20
246:11,19 247:1,5,8
247:10,13,15,16,17
247:18 248:25
249:6 253:6,9
258:21 261:4 262:7
262:8 266:24
268:23 269:3
270:16 271:6
272:21,23 273:4,6
273:10 274:9,10
275:25 276:14
278:6,7,22 279:20
284:19 285:3
295:22 299:24
301:6,19 305:22
306:15,16 307:1,13
308:23 309:12
311:4 312:9,17
313:4,22 314:5

315:23 316:5,13
318:5,20 319:1
329:11 330:6
333:25 334:3,24
336:4 339:22,23
340:14 344:12
347:1,7 350:19,25
351:1,10 352:11,24
354:5,23 358:17,25
359:21 360:5,23
361:9 365:15
369:23 372:5,8
373:2 377:1,6,7,10
379:5 383:4 384:10
392:13,14 393:2
394:8,24 396:7
397:8,9 405:8
407:11
**corrected (1)**
405:8
**correction (4)**
14:2 90:1,3 113:25
**corrections (2)**
405:6 408:5
**correctly (4)**
8:25 91:21 206:24
391:4
**corrects (1)**
60:9
**correlates (1)**
153:10
**correlation (3)**
152:17,22 153:3
**correspond (4)**
219:21 323:15 376:5
391:3
**correspondence (8)**
121:14 219:22 223:5
223:18 224:18,22
392:10,16
**corresponding (7)**
220:2,13,15 222:14
332:2,4 379:11
**corresponds (4)**
17:5 90:24 291:15
380:22
**Council (1)**
406:8
**counsel (14)**
3:1 10:17 47:24 48:20
58:15 159:17
178:11 186:19
188:24 283:21
304:10 400:3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 8

407:15,17
**count (4)**
64:3 329:14 336:21
389:1
**COUNTY (2)**
406:5 407:4
**couple (8)**
9:6 32:8 45:19 99:25
106:10 171:14
382:11 397:11
**course (1)**
86:18
**court (36)**
1:1 2:8 7:17,21 8:11
9:11 48:3 102:17,19
102:20,21 103:4,6
103:10 111:5,8,14
111:19 140:6 151:8
196:4 201:8,9 202:6
327:15 328:17,24
366:1 399:11
401:13 406:7,9,11
406:15,24 407:23
**cover (16)**
22:9,19 75:20,21
76:20 170:8 186:10
199:19,20 200:3,4,8
200:8 328:2 399:12
406:16
**covers (4)**
19:11 195:14,22
337:22
**coverts (1)**
285:16
**create (1)**
121:10
**credit (1)**
33:25
**cross (1)**
398:8
**crystal (2)**
94:10 104:18
**crystalline (1)**
15:18
**current (8)**
45:12 147:25 184:13
222:2 223:11 329:2
390:19 391:1
**customary (1)**
406:18
**cut (10)**
144:12,14 145:6,8,10
239:4,25 305:24
315:14 330:3

**CV (2)**
45:9,9

---

**D**

**d (17)**
4:1 7:4 35:4,4,13,14
35:25 36:1,5 217:16
254:12 311:19
333:23 345:3 372:6
372:7 406:1
**d-equals-1 (23)**
264:21 331:11,19
332:25 333:6,19,24
340:14 341:4 342:6
342:11 343:2,5,20
344:14,18 345:17
345:21,24 346:11
348:16 371:20
372:1
**d-equals-one (3)**
255:21 265:4 339:16
**d-equals-zero (3)**
342:6,13 343:2
**d,k (1)**
35:1
**d;k (1)**
310:23
**data (77)**
12:25 13:2,15 15:5,9
15:11 16:17 19:4,17
20:17,23 25:19 26:2
26:14 34:4 40:23
44:6,8 45:4 64:21
65:3,8,9 66:14 67:7
67:13,17 68:12,25
69:8,12,18 71:2
72:5 89:5 96:6
105:24 113:10,11
113:14,19,20,23,24
114:8,14,16,23
116:11 118:6,10
121:4 129:15 139:3
148:4,18 154:13,24
211:17 254:7,10
284:18 343:19
348:1 357:12,12
363:23 368:10,16
368:20 369:5 383:4
383:6,11,12 403:20
404:7
**date (20)**
7:11 37:25 45:17 46:3
79:23 80:14,22 81:8
171:7,9,10,12

172:25 174:19
186:9 189:25 190:4
251:14,19 408:3
**dated (3)**
176:7 405:10 407:20
**daughter (1)**
318:25
**David (3)**
3:13 8:6 399:25
**day (5)**
157:22 160:22 405:10
407:20 408:22
**daylight (1)**
373:5
**days (1)**
267:3
**DB-R (1)**
22:10
**DC (31)**
23:24 26:5,20 27:7,10
27:10,22 28:2,15
29:12,14 30:9 31:8
31:10 32:9 161:21
161:23,24,25
162:15 164:4,14,23
164:24 165:3,11,24
165:25 166:2,5
167:16
**DC-free (28)**
24:14,15 25:7,15 28:6
29:6,10,20,25 30:9
30:20,22 31:6,24
32:1,3,4,16 161:8
161:14 162:19
163:5,9 165:20,21
167:5,24 168:12
**dead (1)**
144:17
**deal (1)**
13:13
**Dear (2)**
187:10 229:17
**December (1)**
186:10
**decision (1)**
401:14
**declaration (149)**
4:17,19 12:6,9,15
43:24 45:9,16 46:3
46:17 47:19 48:14
49:7,12,20 51:6
53:17,22 55:11,15
58:13 59:11 61:11
63:17,17 70:20

75:18 76:18 77:25
78:22 79:1 80:6
81:14 83:2,20 84:19
85:3,20 86:5 87:3,5
90:13 91:6,10,17
92:10,12,20,23
98:13,21 99:8,11,12
100:13 102:4
103:13 104:4 112:2
112:5,7 113:18
128:9 129:18
130:13 131:5,17
137:10,11 138:25
140:5 142:16 147:4
150:4 153:5,8,11,12
153:19 156:1,15
168:19,25 169:1,7
201:6,13 202:8,17
203:16 204:2,14
236:21 238:14,18
239:19 240:2 241:3
281:3 304:15
305:25 306:8,11
307:4 308:1,21
309:1,8 312:24
313:2,9,17,20 314:8
315:14 320:1
327:16 329:18
330:16 337:4 338:8
340:2,3,6 343:10,13
346:12 352:17
364:4 367:3 368:3,5
369:14,22 370:1,3
385:4 387:6,21
392:19,23 395:17
395:22 397:6 400:5
400:10,23 401:7,10
**declarations (1)**
401:11
**decoder (1)**
348:1
**Defendant (1)**
400:1
**Defendant's (13)**
48:17 49:6 50:23
52:15 397:7,17
398:18 401:17,22
402:13,17 403:18
403:24
**Defendants (7)**
1:9 3:10 7:15 8:7 48:6
401:6,10
**define (4)**
58:6 263:5 312:15

335:6
**defined (19)**
126:16 151:11 167:2
240:17 242:1,21
244:11 246:25
247:3,22 258:2
270:13 272:16
335:13,14 336:8
370:15 372:20
393:19
**defines (2)**
262:6 313:10
**defining (3)**
262:21 334:10 335:1
**definitely (4)**
184:18 247:24 362:21
375:12
**definition (39)**
59:17 101:21 102:2
103:25 155:25
156:11,14 242:22
242:24 243:3 248:2
248:4,14,15,17,20
248:23 257:8 260:5
261:2 263:15
311:13 328:22
330:24 331:22
333:21,24 334:6
335:2,21,22 336:21
348:13 364:2 365:9
365:12 373:14
390:11 391:7
**definitions (2)**
248:24 313:21
**deleted (1)**
233:9
**deleting (1)**
233:13
**density (17)**
20:25,25 21:11 27:22
28:2 40:3,11,23
45:5 341:2,16,19,22
342:23 343:5,10,24
**Denver (2)**
3:12 8:5
**Dep (1)**
408:3
**depart (1)**
28:1
**dependent (2)**
260:9,17
**depends (3)**
15:7 207:4 331:15
**depo (1)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

61:6
**Deponent (2)**
408:4,20
**depos (1)**
10:20
**deposed (1)**
9:1
**deposition (21)**
1:16 2:4 4:10 5:2 6:2
7:9,23 60:18 61:2
140:15 146:14
157:25 400:22
404:19,21 405:5
406:3,12,12,16
407:7
**depth (3)**
16:4,5,7
**derived (2)**
84:14 181:20
**describe (7)**
34:10 122:19 123:4
261:12 334:9
335:23 390:20
**described (12)**
34:19 102:13 145:19
151:25 152:4
156:11 157:20
158:6 160:3 184:15
203:17,23
**describes (7)**
332:16 334:11 335:24
373:10 382:25
391:20 404:9
**describing (13)**
134:21 145:19 152:5
259:15 260:2 261:8
261:18 262:21
263:19 273:21
390:17,18 391:9
**description (5)**
4:10 5:3 6:3 78:17
310:18
**descriptor (1)**
36:23
**designed (6)**
39:4 266:11,21 270:1
271:1 363:21
**designing (3)**
264:2,19 274:15
**desirable (5)**
163:15,15,19 165:17
168:4
**Detailed (1)**
252:14

**details (1)**
54:13
**detecting (1)**
17:4
**detection (16)**
44:7 242:4 244:16
250:3 258:5 263:13
264:24 265:25
269:2,17 270:15
271:5 272:21 273:3
277:23 278:5
**detector (3)**
17:3,3 383:1
**detects (1)**
207:5
**determine (6)**
20:24 59:15 76:14
332:10 342:1 366:9
**developed (2)**
14:19 173:23
**developing (1)**
14:20
**device (13)**
89:8,14 118:17
130:12 131:4
133:19,25 135:20
136:15 138:24
139:2 148:4 207:10
**devices (2)**
13:15 174:10
**devised (1)**
361:8
**di (1)**
361:14
**diagram (4)**
6:4 284:1,10 298:24
**dictates (2)**
18:5 382:1
**dictionaries (1)**
312:15
**dictionary (18)**
73:22 74:11 101:16
101:19 102:3,22
103:23 104:14
310:14 312:3,8
313:3,10,21 314:20
315:4,9 318:21
**difference (16)**
16:22 27:9 63:10
202:25 203:4
206:19 234:18
242:13,13,14
261:20 326:12,22
327:20 353:17

395:20
**differences (2)**
258:24 396:2
**different (41)**
13:3 15:9 16:25 23:12
27:19 31:13 55:7
62:19 63:4 73:3
88:2 89:25 96:17
116:6 121:11
125:18 133:15
145:18,19 202:7,11
205:9 206:21
224:25 233:22
237:24 256:10,24
258:20 263:2 273:9
280:18 291:11
293:10 306:17,21
338:4 351:23
372:11 394:5
395:17
**differentiated (1)**
166:1
**differentiator (3)**
166:2 207:17,19
**differently (2)**
198:25 256:4
**difficult (1)**
377:20
**digital (15)**
27:16 31:12 32:4,8
77:19 119:14,20
124:8,10,11 131:13
141:17,18 162:7
311:10
**digitized (1)**
37:20
**direct (11)**
23:17,22 33:5 61:14
83:9,11 84:11
217:20 290:10
320:10 395:14
**directed (2)**
196:16 383:11
**direction (2)**
391:1 407:10
**directly (3)**
219:21 240:8 313:3
**dis (1)**
126:19
**disable (1)**
143:1
**disabled (1)**
147:7
**disagree (16)**

175:13,16,18 178:13
178:16 179:6,10
182:3,20,24 185:18
185:19 188:17
190:23 193:15,19
**disagreeing (1)**
190:25
**disagreement (2)**
185:21 188:19
**disagrees (1)**
401:4
**disc (177)**
4:21 13:10 14:15
15:24,25 17:4 18:11
18:20 19:3 23:5
25:19 26:2 27:24
37:21 44:8,12,19
47:2 65:10,23 95:2
95:7 102:12 112:9
113:11,20 114:6,15
116:9 120:4,5,6,9
120:10,12,18,23
121:19 122:19
123:5,21 124:19
127:15 129:3,14
133:5,6,14,16,17,20
133:20,22 134:23
136:7,11,25 139:14
139:15,17 140:25
141:8 142:17
145:17 147:24
150:23 152:7,20
156:6 157:7,11
158:23 159:6 163:8
163:16 164:2,3,13
164:25 165:2
166:15 169:4
171:20 187:6,13
188:15 190:14
191:9,13 193:5,17
195:10,15,22 200:3
200:9 205:23 207:4
215:11,17 216:5,10
216:21 217:2,7,9,13
217:14,15 218:14
218:19,23 219:4,9
219:13,14,18,19,21
219:25 220:25
221:9,14,16,21,24
222:14,17,23 223:9
223:14,14,19 224:2
224:6,10,15 225:8
225:11,15,17 226:5
226:11 270:6 284:6

284:6,11 291:2
295:4,5 299:13,20
299:24 300:2,5,7,8
301:21,24 302:10
302:20 303:20
356:9 357:12,23,23
358:4,8 359:2,4,4
359:25 362:6 363:9
363:10 364:11
391:10
**discloses (1)**
203:17
**disclosure (2)**
170:25 406:8
**discontinuous (3)**
123:22 125:19 128:20
**discount (1)**
406:18
**discrete (1)**
122:14
**discs (9)**
18:11,13 23:15 38:1
96:7 113:4 121:10
184:14 190:21
**discuss (2)**
55:11 168:24
**discussed (7)**
54:14 65:6 162:13
178:8 400:22,23
402:10
**dispute (1)**
367:13
**disputed (2)**
54:19 307:23
**distance (6)**
254:9,11 264:11
337:10,11 338:5
**distinction (1)**
329:12
**distinguish (2)**
206:8,18
**distinguishing (4)**
386:3,4 387:2,3
**distracted (5)**
30:15 100:11 285:4
376:24 378:8
**distracting (1)**
270:19
**District (4)**
1:1,1 7:17,18
**divided (4)**
19:19 322:12 325:18
346:25
**divine (1)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 10

325:23
**Division (2)**
1:2 7:19
**document (40)**
5:10,12,14,15,17,19
5:21,23 6:7 11:16
11:17,25 22:4,14,19
22:25 23:2,3 30:18
73:12 169:16
171:13,19 174:16
174:18 175:24
176:4 180:14 184:3
184:4 191:5 192:3
192:15 194:17
195:18 319:22
323:4 326:15,23
329:13
**documents (20)**
51:3,6,14 52:20 56:7
56:11,15,18 60:23
61:2 191:21 193:21
193:23,24 194:2,12
194:18 196:13
320:2 392:12
**doing (12)**
69:2 146:14 153:22
237:14 266:6
267:14 287:3
293:16 294:14
348:6 352:4 399:15
**domain (9)**
226:6,12 293:8,25
294:3,15,20 296:2
299:11
**domains (7)**
120:18 121:1,1
124:19 217:15
225:5 390:24
**dots (1)**
213:2
**double (4)**
164:17 183:15,16,22
**doubt (1)**
257:22
**downstream (1)**
287:19
**Dr (27)**
33:11,13 53:14,21,25
54:4,8 55:12,16
56:1,8,8,12,18,23
57:5,7,12,15,23
76:5,15,23 172:13
193:21 194:2
319:19

**draw (2)**
51:19 127:25
**drawn (5)**
128:9,12,19 129:3,14
**drew (1)**
51:15
**drift (1)**
31:9
**drill (1)**
224:24
**drive (22)**
47:2 112:9 120:11
129:14 142:17
146:6 147:24 164:2
164:3,13,25 165:2
166:15 221:24
223:19 284:6,11
295:5 361:1,2
363:14 382:7
**driven (1)**
163:17
**drives (12)**
13:10 44:9,12,19
65:10,23 66:18 95:7
163:8,16 169:4
173:24
**driving (1)**
363:22
**drop (1)**
206:12
**dropped (3)**
206:6,17 367:24
**DSL (3)**
171:21 175:5,10
**DSLs (6)**
172:5 173:7 174:13
175:15 194:19,22
**duly (1)**
8:16
**dust (2)**
25:20 26:3
**DVD (14)**
13:8 15:4 24:10
171:21 177:2,16,23
178:15,16,17,21,23
179:3,6
**DVDs (8)**
171:25 173:7 174:13
175:5,10 194:19,22
195:1

_____
E
_____
**E (10)**
4:1 7:4,4 391:16,17

392:2,6 406:1 407:1
407:1
**e-mail (13)**
176:6,7,10,13 178:14
181:10 182:19
184:19 186:14
190:3,6 195:4,9
**earlier (15)**
30:17 44:11 72:9
84:18 85:1 90:15
112:12 160:22
162:5 203:10
204:10,14 227:20
314:16 319:25
**early (1)**
105:6
**easier (3)**
250:14,18,21
**easiest (1)**
381:4
**easily (1)**
346:22
**eat (1)**
317:23
**eating (1)**
317:25
**ed (1)**
234:4
**edges (1)**
124:25
**EDWARD (1)**
3:12
**effective (1)**
29:19
**effectively (2)**
220:9,15
**EFM (12)**
17:19 18:14 33:22,23
90:7,9 110:24 111:3
160:25 161:3,8,13
**eight (17)**
17:17 18:23,24 19:1,1
19:4,19,24,25 20:22
84:9,10 337:6 339:3
389:4 390:6,10
**either (18)**
48:12 66:21,21 83:12
89:6 122:2 139:1
146:24 192:15
198:13 260:18
286:15 312:8
354:22 366:10
378:14 387:2
389:25

**electrical (6)**
44:5 66:13,15,20
390:19,21
**electromagnetic (2)**
120:22 121:3
**electronic (3)**
132:6 143:3,4
**electronics (32)**
112:15 115:3,4,7,17
118:21,23 119:11
119:12,13,18,19
129:20,21 130:5,16
131:11,12,13,17
132:2,20 141:16,17
142:1,2,20 149:3,10
149:20 152:19
153:20
**element (1)**
235:7
**elements (2)**
47:15 159:5
**eliminate (6)**
39:12,14 135:12
166:2,6 338:5
**eliminated (2)**
337:12 349:14
**eliminates (1)**
339:21
**eliminating (1)**
264:10
**elucidate (3)**
59:7 199:16 350:2
**emanating (1)**
121:3
**embedded (2)**
213:25 286:20
**embodiment (2)**
84:13 86:11
**embraced (1)**
245:1
**Emina (3)**
4:19 12:9 59:25
**emphasize (1)**
94:9
**emphasizing (2)**
100:1 213:10
**emphatic (1)**
96:4
**employ (1)**
407:16
**employee (2)**
43:14,18
**enclose (3)**
174:3 187:15,16

**encode (1)**
20:15
**encoded (69)**
18:10 19:2 36:12
113:24 114:8,16,23
118:6,9 149:5
207:25 208:4,16,18
208:21 209:6,8,15
209:21 210:3,10,18
212:24 213:12,14
213:18 214:17,20
215:2,18 226:8,20
227:6 231:5,8,9,14
231:17,18,23,25
232:6,9 233:5 234:2
236:9 238:23 242:3
254:7,9 258:4
268:17 271:24
272:18 275:1
281:16 282:15
286:1 287:23
288:12 291:21,23
292:1 393:21 394:4
394:7,12,17 403:20
**encoder (16)**
155:2 166:14,20
215:9 221:25
237:25 239:22
240:20 287:25
289:23 290:7,18
292:2 293:4 325:19
325:25
**encodes (2)**
211:17 212:18
**encoding (22)**
17:24 34:10 115:9,11
117:18 139:3 147:9
147:18 148:5
153:22 213:5,6
254:6 309:19
367:25 368:21
369:1,4,7,8 404:7,9
**ends (8)**
77:6 132:13 142:8
152:6,7 170:6 321:9
369:1
**enforce (2)**
32:4 288:16
**enforced (3)**
31:20 32:2 145:6
**enforcing (1)**
116:3
**engaged (1)**
198:14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**engender (1)**
121:24
**engineer (2)**
66:20 280:9
**engineering (5)**
44:6 66:13,15 75:5,12
**English (1)**
96:15
**ensure (23)**
289:16 353:18,20
355:1,4,9,9,10,15
355:18,25 356:12
356:21 357:4,8,8,13
357:24 358:10,16
358:18 361:9,10
**ensured (2)**
355:21 362:7
**ensures (7)**
352:23 353:14 354:1
361:13 365:2,15
366:14
**ensuring (2)**
293:2 354:7
**entire (3)**
51:9 262:17 363:10
**entirely (1)**
135:16
**entirety (6)**
82:3 210:12,13,14
211:10,10
**entitled (2)**
71:15 146:17
**enumerate (1)**
332:17
**equal (21)**
135:20 149:15 244:1
245:10 255:2,10,12
255:15 257:17
292:13 320:16
341:2 343:5 359:12
369:17 370:9,23
374:9,11,22 396:13
**equals (24)**
154:20,20,20,21
344:8,8 345:14,15
345:15 346:20,21
355:1,2,12,14,24
356:11 357:11
359:9 371:23,25
372:7 373:11
377:11
**equation (4)**
25:5,6,13 32:2
**equivalent (2)**

263:1 343:24
**erase (3)**
233:19 249:3 290:18
**erased (4)**
120:20 121:5 263:10
263:12
**ergo (1)**
272:25
**ERRATA (1)**
408:1
**error (89)**
14:2 26:24 27:6 67:1
90:1,2 113:25
203:18 204:3 242:4
244:16 250:3 258:5
263:13 264:10,11
264:16,18,24 265:5
265:25 266:8,12,15
266:22 267:17
268:4,9,11,15,19,22
269:2,11,17 270:6,6
270:15 271:5,14
272:9,21 273:3,19
274:5,16,18,21
275:5 277:23 278:5
279:14,18 280:2,8
330:20,21,25 331:4
331:5,8,9,13,17,22
332:3 333:7,10,17
334:1,2 335:11
336:18,20 338:5
342:1 346:8 347:21
348:24 349:9,15,16
350:3,5,11,24
351:10,13,18
**error-reducing (1)**
331:20
**errors (1)**
26:17
**ESQ (4)**
3:5,5,12,13
**essential (7)**
161:3 188:14 190:20
191:9,13 192:19
193:16
**essentiality (3)**
163:23 187:13 188:2
**essentially (5)**
63:20 245:13,19
367:25,25
**establish (1)**
312:16
**et (2)**
184:15 366:11

**evaluation (4)**
187:5,12,22 190:18
**event (1)**
264:11
**events (2)**
338:6 349:15
**eventually (6)**
152:6,9,10 215:10
362:12 363:3
**evidence (4)**
104:24 105:3 181:18
407:12
**exact (18)**
131:25 132:12 136:22
151:24 224:22
246:18,22 248:22
257:5 258:14,19,20
259:15 261:8,17,18
262:23,24
**exactly (18)**
13:11 14:12 98:10
127:22 132:18
150:22 153:25
215:22 231:24
253:4 262:11 263:8
291:15 310:20
311:2 334:11
372:15 380:23
**examination (4)**
4:5 8:19 389:17
400:15
**examined (1)**
8:17
**examiner (12)**
229:23 233:1 250:8
251:4,8 253:14
254:4,16,22 255:20
256:2,9
**examiner's (1)**
251:16
**example (42)**
52:10 72:6 78:11
80:25 81:10 83:12
83:14 89:20 95:20
95:21 96:13,16,21
110:23 111:3,18
112:19 126:18
147:8 191:21
221:25 226:3
310:14 311:18
317:3 322:4 328:3
332:19,20 343:2
345:13 348:9 352:6
379:5 384:9,13,17

387:18,22 388:13
388:16 399:6
**examples (7)**
13:3,6 95:22 96:1,2
331:19 332:16
**Excuse (1)**
268:1
**exercise (2)**
276:24 307:16
**exhibit (134)**
4:10,12,13,14,16,17
4:19,20 5:3,4,6,7,9
5:10,12,14,15,17,19
5:21,23 6:3,4,6,7
10:19 11:1,8,15,24
11:25 12:5,8,14
21:18,21,23 22:2
32:20,25 33:1,5
41:21 42:10,18
43:24 62:5 63:4,5
63:11,16 70:19 76:8
76:10 78:22 79:1
82:15,21 83:6,24
85:12 87:14 112:2
162:6,11,14 169:11
169:12 171:6,13
172:8,10,13,14
173:5,9 175:21
179:15,18 183:13
183:23 186:1,4
189:15,18 190:9
192:5,8 200:18
201:7,22 202:6,20
217:19 228:24
229:3,5 236:20
238:14 283:17,19
283:22,25 304:16
307:17,22 308:9
319:15,16 320:6,7
323:3 324:2,5,8,13
324:18 327:9
364:18 367:20
389:20 391:11
392:13,19 393:22
395:10,24 396:5,6
397:6 398:18
401:23 402:19
403:23
**exhibits (7)**
4:9 5:1 6:1 10:13,22
50:20 392:11
**exist (5)**
145:25 150:19 299:4
325:14 326:7

**existed (1)**
80:2
**existing (3)**
243:22 337:17,22
**exists (1)**
145:11
**expand (1)**
197:13
**expect (1)**
355:1
**expectation (1)**
28:1
**expected (1)**
181:13
**expecting (3)**
27:6,18,21
**expense (2)**
32:11 167:18
**experience (1)**
51:15
**experiment (2)**
121:17 257:24
**experiments (1)**
284:4
**expert (2)**
400:7 401:6
**Expires (1)**
408:24
**explain (3)**
18:7 59:2 366:22
**explained (1)**
30:17
**explaining (1)**
366:18
**explains (1)**
211:16
**explanation (2)**
188:2 257:19
**explicitly (4)**
14:24 31:20 107:3
182:8
**expounding (1)**
99:25
**Express (1)**
186:22
**expressly (3)**
244:17 269:1,15
**extend (3)**
197:11,17,25
**extent (3)**
16:4 77:7 262:25
**extraordinarily (2)**
356:24 358:13
**extremely (1)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 12

346:17
**eyes (2)**
216:12 231:12

_____

**F**

**F (3)**
189:8 382:13 407:1
**face (4)**
15:16 24:19 78:6 83:7
**facilitate (22)**
242:3 250:2 254:10
  254:12 258:4
  263:11,12,20
  264:23 269:1,16
  270:14 271:4
  272:20 273:2
  274:21 277:22
  278:4 353:11,18,21
  363:19
**facilitating (1)**
265:24
**fact (9)**
100:6 139:16 237:13
  257:5 258:12 273:1
  282:1,25 360:6
**factor (1)**
44:25
**facts (1)**
222:5
**factual (3)**
48:14 49:2 222:21
**fair (20)**
30:20 40:13 144:18
  148:2 162:22,22
  163:1 174:6 175:2
  185:9 197:16,24
  198:5,16,20 204:4
  230:5 256:3,21
  317:9
**fairest (3)**
341:22 342:21,25
**fairly (2)**
347:6,8
**familiar (19)**
11:21,23 12:5 17:9,16
  22:22 23:4,8 33:11
  33:13 75:14 83:2
  154:1,15 235:3
  237:8 251:24
  252:19 260:8
**familiarity (2)**
66:17,23
**far (26)**
27:3 30:20 45:13

143:6 148:6 154:17
  155:5 178:17
  269:20 270:9
  271:25 277:16
  278:1,2 290:4,5
  291:6,19 297:6,14
  297:20 298:9
  301:24 319:7
  380:21 403:2
**feature (2)**
20:24 21:10
**Federal (1)**
186:22
**fee (5)**
177:4,7,12 180:14
  194:25
**feed (3)**
148:4 154:18 357:12
**feel (3)**
10:1 104:4,23
**feeling (1)**
267:5
**feels (1)**
273:23
**felt (2)**
30:18 250:5
**fiddling (1)**
37:8
**field (33)**
13:2 33:17 34:10
  43:19 44:4,6 64:21
  65:3,3,7,18,19 66:1
  66:4,9,13,15 67:7
  67:12,15,16,18
  68:11,24 69:1,7,9
  71:22 120:3 121:3
  121:24 310:12
  391:2
**Fifty-nine (1)**
97:7
**figure (14)**
23:19 68:7 103:20,21
  130:3,4 135:13
  210:18 276:22
  285:9 337:11 344:3
  344:3 372:15
**figures (2)**
70:24 168:25
**file (10)**
1:6 11:13 49:25 50:2
  50:4,6,10,14 314:8
  314:11
**filed (6)**
11:18 50:19 79:18

84:7 86:10 305:6
**files (1)**
170:3
**filing (2)**
79:23 80:14
**fill (5)**
357:23 358:7 361:2
  363:9,15
**filled (1)**
359:3
**final (1)**
141:25
**finally (3)**
64:14 101:6 382:16
**financial (1)**
406:18
**financially (1)**
407:18
**find (12)**
84:20 227:12,16,20
  264:18 281:17,18
  281:25 282:17,25
  332:17 378:11
**fine (10)**
75:16 90:3 126:1
  214:15 216:1 236:1
  343:12 378:22
  379:6,10
**finger (2)**
307:16 367:19
**fingerprint (1)**
26:15
**fingerprints (2)**
25:19 26:3
**finish (3)**
10:2 197:22 230:21
**finite (3)**
126:3 359:4,15
**fired (4)**
351:19 352:3 355:12
  357:17
**firm (1)**
8:5
**firms (1)**
171:19
**first (62)**
8:16 23:23 33:8 36:22
  40:16,16 52:11,21
  53:15,20 61:13,13
  64:4 70:23 76:13
  78:5 81:22,23 82:4
  89:3,11 93:15 94:1
  94:10 97:16 113:10
  113:18 114:7,11

131:2 141:9 144:9
  148:17 170:8
  171:18 174:10
  179:19 184:2
  187:11 191:10
  192:25 196:9 213:3
  230:7 231:15 285:5
  293:16 295:7,14
  297:2 299:20 301:6
  302:24 319:22
  337:5 342:16,24
  344:10 352:20
  361:22 375:2 401:4
**fit (1)**
373:13
**fits (1)**
333:24
**five (19)**
60:20 112:6 154:20
  154:20 206:12,16
  206:17 224:20,21
  230:21 241:19
  252:10 253:18
  256:15 304:6
  371:18 373:11
  377:11 388:8
**flip (18)**
23:17 38:7 70:21,25
  75:20 179:24
  183:10 184:11
  201:21 229:9 230:7
  234:12 236:23
  251:11 252:13
  320:5 321:20
  330:11
**flipping (1)**
390:24
**flips (1)**
224:21
**flood (1)**
359:6
**flux (8)**
120:7,8,12,19,19,21
  121:10 133:4
**focus (1)**
164:10
**focuses (3)**
16:20,20,21
**focusing (4)**
289:17 292:18 374:23
  375:16
**follow (12)**
38:10 41:13 143:6,10
  155:9 246:9 290:4

298:9 299:4 327:22
  328:15 332:20
**following (4)**
154:17 155:5 188:1
  406:8
**follows (2)**
8:17 273:14
**font (1)**
100:16
**footnote (3)**
206:12,16,17
**force (1)**
357:12
**foregoing (4)**
37:19 188:13 405:4
  407:6
**forget (2)**
164:9 281:22
**form (314)**
13:20 15:6 16:1 17:22
  19:6,20 20:5 23:6
  24:4 25:24 26:12
  27:1 28:3,19 30:13
  30:25 31:14 32:14
  34:13,18,22 35:17
  36:3,19 37:6 38:2
  38:17 40:14 41:2
  44:14,20 46:18
  47:20 48:25 49:14
  51:12,19 52:4 56:20
  56:25 58:5,20 62:24
  63:8 65:12 66:3
  68:2,14 69:3,10
  71:24 72:12 73:1,14
  74:13 78:9 79:20
  80:16 82:6 84:23
  85:8 86:1,13 88:8
  88:20 89:22 92:2,14
  93:22 94:24 98:6,17
  99:13,23 100:9
  102:8,25 103:14
  104:7,15 105:1
  107:6 108:5,13
  110:12,22 111:11
  111:23 112:23
  115:13,22 116:23
  119:9 121:12 122:4
  122:21 123:6,23
  124:24 125:5
  126:10,20 127:4
  128:22 130:6,14,21
  131:6,19 132:7,24
  133:12 134:5,19
  135:24 138:4,13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

139:7 140:17
141:10 142:6
143:15,22 144:24
147:20 151:12
152:15,25 154:9
155:16 158:14
160:8,9 161:9 162:2
163:10 164:5,15
165:4,22 168:1,14
174:22 175:7
177:17 182:7,22
184:21 185:13,24
191:2 193:10 195:2
195:16,23 196:6
197:3,20 198:3,10
198:18 199:21
200:6 202:9,12
203:2 205:6 210:7
211:24 212:7
213:22 214:5,11
215:1 216:19 219:5
220:5,17 221:2
223:2 224:4,16
225:2,21 226:9
227:2,22 228:11
229:25 232:21
233:12 234:6
235:11 237:19
238:6 240:4,13
241:7,14 242:15
243:11 246:2,12,20
247:9 248:6 249:7
249:23 250:16
255:23 257:1 258:9
258:22 259:17
261:9 262:14 264:5
265:1,11,21 266:2
266:13,25 268:6
269:6,18 270:17
271:8 273:5,11
275:10,18 278:14
278:23 279:21
280:22 281:13
282:4 283:1,4 286:6
288:2,5 289:2 290:8
292:16 293:18
295:18 296:9,22
297:8,15 298:10
299:5 300:20
301:15 302:2 303:1
303:6,15 304:23
309:3,16 310:7
311:11 312:4,22
313:5,23 314:21,25

316:9,22 317:19
318:8 319:5 326:2
328:5,6,24 337:23
340:9,15 341:15
343:11 344:15,24
346:1,14 347:12
349:7 354:2,13
355:3,16 356:13
357:15 358:11
360:13 361:16
362:9 363:12 364:5
365:10 369:3 371:9
372:12 374:8,14
384:4 386:12
388:10 389:6
390:19
**format (13)**
4:21,21 14:14 22:10
22:20 35:16 43:9
187:23 188:3
207:11 255:21
287:7 389:7
**formats (1)**
187:23
**forming (1)**
51:22
**forms (1)**
205:21
**forth (4)**
70:21 364:3 392:10
396:4
**found (3)**
227:17,24 228:14
**foundation (21)**
22:13 24:5 25:25
31:15 34:13 35:18
36:20 38:3,18 41:3
78:10 126:11
185:14 198:11
237:20 241:8
242:16 265:2 288:6
326:3 400:17
**four (47)**
12:16,17 34:3 55:21
55:22 60:20 64:4
81:22 90:17,17
112:6,7,12 114:24
118:17 129:24
130:3,4,12 131:5,17
138:25 142:11,16
147:4 154:19,20
234:22 235:23
304:2 307:17,22
337:4 338:23 339:1

340:7 345:12,15
346:21,24 347:2
364:19,25 383:20
383:21 391:13,14
**fourteen (3)**
17:17 18:23,24
**fourth (3)**
64:15 149:12 231:7
**framework (1)**
105:7
**free (13)**
10:1 23:24 26:5,20
27:7,10 29:14 32:9
161:21,23 162:15
164:23 165:12
**frequencies (1)**
23:25
**frequency (5)**
26:10,18,23 27:11,12
**friend (2)**
389:24,25
**front (10)**
22:9,19 73:4 75:20,21
75:22 79:11 110:8
180:3 345:2
**full (4)**
10:7,11 337:5 401:13
**fully (4)**
45:12 147:5 153:21
153:22
**FULTON (2)**
406:5 407:4
**function (10)**
27:22 28:2 126:9,14
235:7,9 238:4,8
261:18 263:18
**functional (1)**
147:5
**functionality (1)**
250:23
**functions (1)**
260:2
**funded (1)**
43:16
**funny (1)**
29:8
**further (4)**
38:9 142:12 404:14
407:14

—————————
**G**
—————————
**G (3)**
7:4 188:23 190:2
**gain (11)**

337:7 338:20 339:12
339:20,21 340:4,14
341:8 342:12 343:7
348:9
**Gates (2)**
3:3 8:9
**gears (2)**
90:12 201:5
**geez (1)**
257:12
**general (14)**
37:5 40:21 46:16
47:11 114:1 163:11
186:18 188:24
211:6,9 228:5 310:6
316:21 317:5
**generally (12)**
16:9 46:24 58:4 167:6
167:8 234:19,20
237:18 252:19
253:2 343:4 375:9
**generate (4)**
154:12,24 155:2
293:23
**generated (11)**
119:11 120:15,16,17
145:8 152:6,19
159:4 205:22 299:3
383:22
**generates (4)**
120:8 133:4 155:7
299:19
**generating (56)**
106:1 130:19,19
131:2,3 141:3,6,12
141:25 142:4,20
144:21 149:13
217:21,21 243:13
243:23 245:8
248:10 254:24
292:6,8,10 293:11
293:14,16,17,19
294:10 295:7,14
296:2,4,8,11 297:2
299:7,10 320:14
334:21 335:17
369:15 370:5,22
371:5,6,13 373:2,9
374:4,5 382:3,13,17
396:10
**generation (2)**
294:18 336:3
**generic (1)**
118:12

**gentlemen (1)**
7:7
**Georgia (9)**
1:18 2:7,10 7:1,25
406:3,8,9 407:3
**getting (8)**
166:13 212:10 303:10
371:7 372:2 376:7
378:10 380:17
**gigabyte (3)**
360:25 361:2 363:14
**gigabytes (2)**
361:1,2
**gist (2)**
194:14 372:14
**give (28)**
10:7,10 11:6 53:4
61:24 93:14 98:21
99:18 123:8 126:18
145:23 160:3
164:19 165:6
192:24 233:11
242:13 248:4
260:13 267:3 317:3
328:14 349:19
354:24 358:1
364:22 387:18
398:11
**given (16)**
52:13 75:4 92:19
99:22 156:1 177:2
177:19 183:12
196:2,11 248:13
269:13 400:8,19
406:18 407:12
**gives (2)**
242:22 260:18
**giving (7)**
47:5 67:4 81:10
135:10 369:21
387:22 400:10
**glad (1)**
29:24
**go (102)**
22:14 29:21 43:23
47:5 49:19 53:15
57:25 61:10,11 62:4
64:17 70:23 76:25
78:22 79:4 83:22,24
84:9 87:9 90:13,21
93:6 98:20 101:5
107:11 112:2,3
117:11 118:4 121:4
127:15 137:14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 14

142:11 144:9 147:2
148:15 159:25
172:7 176:9 179:1
188:6,11 200:17,18
200:20 203:15
204:15 205:13
207:2,23 211:11
217:17 226:14
227:10,15 230:10
236:20 237:1
238:11,14 251:7,8
261:12 262:20
270:6 281:2,17,18
281:25 282:12,14
282:17,25 285:8
292:4 305:14 309:7
319:14 320:5,7
323:3 329:5,18,20
336:2 337:4 351:19
352:13 353:1,5
368:16 369:13,14
370:3 377:25
378:13,17 382:10
382:21 384:12
387:5 399:19
**goal (1)**
68:6
**goes (21)**
34:25 71:4 114:6
118:8 119:5 120:8
132:13 135:6 139:5
141:20 170:6 180:6
184:9 189:22
192:12 226:4
233:20 285:1 339:5
381:21 390:20
**going (88)**
10:18 11:6 17:10
21:17 22:12,13,24
22:25 34:12 41:22
45:12 46:19 47:24
49:13 54:11 64:5
67:3 69:1,8 77:10
78:21 93:6 109:24
115:12 121:18
128:13 130:20
133:10 134:10,14
135:15 140:24
144:14 146:25
147:6 148:9 156:8
165:16 166:15
201:4 207:2 215:9
218:22 222:3
231:12 257:10

259:3 271:21
274:24 277:19
278:8 286:18
287:24 288:8,9
290:13 291:9,11,21
294:9 323:9 328:23
328:24 338:13
350:6 351:18,19
357:16 360:7,9
365:25 366:6,9
367:3 371:25 378:5
378:18 380:14,16
389:22 397:22
398:3,12 399:18
400:12,20,24
401:15
**going-in (1)**
227:18
**good (26)**
7:6 8:3,21,22 9:16
10:5,21 104:10
148:6 152:11
214:22 220:18,19
235:25 239:17
261:21 280:8 283:9
346:3 356:3,6 357:3
361:14,24 389:14
389:16
**gotten (1)**
183:18
**grammatical (3)**
381:16,18 396:21
**great (2)**
287:3 345:8
**greater (19)**
40:23 149:15 243:25
245:10 254:8 255:1
255:10,11,14
257:17 292:12
320:16 369:17
370:9,23 374:9,11
374:22 396:13
**greeting (1)**
173:21
**grief (1)**
165:6
**ground (1)**
90:13
**group (1)**
43:17
**guarantee (1)**
351:21
**guaranteed (6)**
31:5 32:9 268:11

358:22 359:14,16
**guess (19)**
41:17 64:9 95:1
104:16 159:7
176:10 193:6
213:10 261:1
262:17 267:20
281:19 285:19
287:24 305:10
310:8 361:17 378:6
381:2
**gut (1)**
267:5
**guy (1)**
190:6
**guys (2)**
10:19 60:20

---

**H**

**H (1)**
75:1
**hairs (1)**
18:16
**half (5)**
36:10 56:3,4,5,6
**halfway (1)**
393:11
**hand (2)**
218:6,7
**handed (1)**
52:12
**handing (7)**
22:2 33:4 42:21 82:20
175:24 186:4
283:25
**handwriting (1)**
170:10
**handwritten (1)**
170:9
**handy (3)**
70:20 201:6,9
**happen (21)**
54:5 129:13 130:12
131:4 135:4 141:9
142:20 144:22,23
145:3 149:2 150:25
286:4 287:23 289:7
289:7 292:15
294:23 295:8,15
296:7
**happened (8)**
148:21,25 149:7,9,17
149:19 150:24
264:17

**happening (8)**
114:24 115:1,16
284:15,22 285:14
291:1 296:12
**happens (12)**
120:1 141:9 145:1
209:15 265:6
287:12 291:17
292:14 295:23
296:1,6 338:5
**happy (2)**
202:13 378:20
**hard (51)**
13:9 44:8,12,19 47:2
65:10,23 66:18
112:9 120:10 123:8
129:14 142:17
146:6 147:24 163:8
163:16 164:2,3,13
164:19,25 165:2
166:15 169:4
221:24 223:19
284:6,6,11 295:5
321:12 323:5,10,20
323:21,25 324:1
325:10,18,23
326:12,23 327:21
329:8,12,16,17
360:25 361:2
363:14
**hardware (3)**
261:13 263:18,21
**hassle (1)**
231:11
**HDVD (4)**
181:19,25 182:19
184:13
**head (68)**
9:12 25:1 29:9 52:18
112:21,24 113:1
118:7,24 119:2,3,6
119:23,25 120:1,3,7
122:9,9 123:11
131:24 132:14,18
133:3,24 134:9
136:5,5,9,18 137:2
137:8 138:1 139:5
140:15,23 141:1,8
141:20 142:24
143:1,9,10 144:14
145:9 147:6,19
148:1,10 150:14,15
166:1,5 207:3,17,19
215:10,15 218:21

219:24 222:3 226:4
232:23 267:14
287:13 296:2
303:10 383:23
**heading (6)**
23:19 87:16,20,24
88:5 307:4
**headings (2)**
88:2,4
**hear (1)**
161:18
**heard (15)**
24:23 75:11 80:11
154:8 169:24
170:22 177:8,9
186:25 187:2 237:8
252:24 253:12
257:7 323:19
**hearing (2)**
86:22,22
**held (1)**
2:5
**Hello (1)**
304:9
**help (7)**
14:18 29:3,6 213:2
349:20 364:12,12
**helpful (1)**
287:1
**hesitated (1)**
329:3
**hey (4)**
195:9 212:12 223:20
260:3
**Hi (1)**
304:8
**high (19)**
12:20 14:9 15:3 18:24
20:3 21:1,4,11
128:3 167:6,7,10
223:13,15 252:20
341:21 344:9
360:23 362:5
**high-low (3)**
224:1,13,20
**higher (12)**
40:24 45:5,6 270:7
272:9 275:5 341:1
344:13 345:20
356:8 384:10 386:9
**highlight (1)**
72:21
**highlighted (10)**
100:3,22 115:3 322:7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

322:12,25 323:11
323:16 327:4,5
**highlighting (2)**
322:17,20
**highlights (1)**
404:11
**highly (3)**
163:15,19 255:8
**Hill (2)**
173:15,19
**history (27)**
4:13 11:12,13 49:25
50:2,4,6,10,14
91:16 169:8 187:16
196:2,12 228:19
236:14,22 238:19
238:21 241:4 252:3
305:16,22 314:8,12
393:2,23
**hit (3)**
139:5 200:19 215:17
**hitters (1)**
382:11
**hitting (1)**
371:15
**hold (1)**
235:15
**honestly (3)**
24:17 28:5 212:21
**hooking (1)**
147:19
**hopelessly (1)**
276:16
**Horn (3)**
186:23,25 187:10
**hour (6)**
56:3,4,5,5,6,6
**hourly (1)**
61:8
**hours (4)**
46:7,11 56:1 60:21
**how's (1)**
120:16
**hundred (4)**
282:22,24 285:18
303:14
**hundreds (1)**
128:4
**hypothetical (87)**
87:6 102:21 103:11
111:9 125:14
129:14 134:7
135:17 138:23
139:13,18,20,21

142:12,17,23
143:10,14 144:7,10
144:20 145:13,24
147:3,5,24 148:16
148:21 149:7,23
150:10 151:1,3,10
151:20 152:3
153:15 155:12
158:5,18 159:21
160:2,7 259:2,9
267:9 268:18
269:13,25 270:23
271:10,11,11,19
272:11,13,14
273:16,21 274:2,8
274:11,23 275:6,20
275:23 277:1,9,21
278:10,12 285:15
289:24 290:17
292:2,15 295:15
298:14 300:24
332:25 351:7
357:10 358:1 362:3
362:8 364:1,8
**hypothetically (2)**
129:13 371:14
**hypotheticals (3)**
135:10 146:18 354:24

———————
**I**
**i.e (2)**
254:12 349:15
**IC (1)**
171:19
**idea (3)**
181:23 182:20 280:10
**ideal (2)**
128:19 206:23
**idealized (1)**
128:13
**identification (1)**
395:16
**identified (2)**
395:15,22
**identify (3)**
192:21 332:2,4
**identifying (2)**
306:14,18
**ignores (1)**
403:3
**Iketani (2)**
253:20 254:16
**illuminate (5)**
249:14,19 250:6

263:4,23
**illuminated (1)**
258:13
**illuminates (4)**
250:19,20 260:18
366:25
**illuminating (9)**
248:13,18 260:1,6
262:22 335:3,9
351:14,14
**illumination (2)**
250:25 257:19
**Immink (6)**
33:9,11,13 42:6 76:23
160:23
**impede (2)**
10:7 143:8
**implement (13)**
250:24 263:21 265:9
266:8,14,18,19
275:4 277:22 280:6
280:7,9,10
**implemented (6)**
114:19 115:6 264:13
268:9 270:5 271:12
**implied (1)**
194:2
**implies (1)**
86:23
**imply (1)**
35:15
**implying (2)**
86:15 96:8
**important (7)**
29:20 60:10 88:11,18
88:23,25 263:25
**impose (11)**
31:23 166:21,24
167:23 288:24
311:23,24,25 312:3
312:16 354:17
**imposed (3)**
167:14 289:1 292:1
**imposes (2)**
32:10 139:4
**imposing (39)**
105:25 130:11 149:4
153:23 207:24
230:22 231:4 232:5
233:17 234:1 262:1
262:5 285:25 286:4
286:23,23 287:22
288:4,11,14,15
289:5,15 290:6

307:2,8,23 308:2
309:9 312:20
313:19 329:2 335:1
335:8,9 353:24
393:12,17 394:3
**improve (4)**
96:6 173:23 268:11
361:24
**improved (3)**
267:17 268:9 342:2
**improvement (2)**
268:4 337:10
**include (5)**
12:18,24 65:22 99:15
111:7
**included (5)**
87:4 101:1 263:6,25
394:6
**includes (1)**
114:16
**including (2)**
73:23 254:5
**incoming (1)**
154:13
**Incorrect (2)**
124:10 271:17
**increase (5)**
339:10,18,19 347:25
348:7
**increased (4)**
339:10 348:8 350:5
350:10
**increases (3)**
266:11 274:17 341:6
**indef (1)**
59:23
**indefinite (4)**
59:13,15,20,23
**independent (10)**
260:9,16,19,22,24
261:2,7,23,24
280:18
**indicate (1)**
37:24
**indicated (1)**
193:21
**indicates (4)**
37:10,15 286:17
404:6
**indicating (2)**
175:9 395:13
**indicative (1)**
293:4
**indirect (1)**

290:11
**individual (2)**
127:15 395:6
**infer (1)**
17:1
**infinite (3)**
356:19 359:1,3
**infinity (17)**
356:10,11 357:11
358:2,25 359:9,10
359:12,20,21,23,23
360:1,2,4,19,24
**information (20)**
12:19 14:15 18:10
19:1 20:16 21:1
34:4 40:2,11 47:21
51:18 80:21 114:2
134:24 145:17
166:4 260:18
357:21 391:10
400:21
**informed (1)**
58:15
**infringe (4)**
184:14 322:21,25
366:11
**infringement (2)**
198:24 199:4
**infringing (2)**
323:12,17
**inherent (1)**
279:19 346:2
**inherited (2)**
14:25 260:21
**initialed (1)**
405:7
**ink (1)**
405:7
**input (2)**
368:17,25
**inputs (1)**
368:21
**inquired (1)**
400:14
**inserted (2)**
242:9,11
**inside (6)**
132:20 373:14 380:7
380:7 381:12,12
**instance (1)**
125:24
**instant (1)**
125:25
**instantaneously (1)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

125:18
**institution (1)**
58:11
**instructing (1)**
55:8
**intact (1)**
142:25
**integer (3)**
245:9 255:1 257:17
**intended (3)**
197:12 203:18 249:13
**intending (3)**
206:7 264:3 400:4
**intensity (5)**
16:22,25 17:8,10,14
**intentional (1)**
250:9
**intentionally (2)**
86:16,24
**interest (3)**
55:2,5,5
**interested (1)**
407:18
**interests (1)**
12:18
**interference (14)**
38:11,15,24 39:5,7,9
39:13 40:8,10,22
44:18,24 45:6
391:20
**Interim (1)**
192:18
**internal (2)**
191:21 194:18
**International (2)**
75:5,11
**interpret (19)**
54:19 95:25 96:2
109:5 151:4 160:17
185:21 193:25
211:22 212:5
218:14,18 244:10
245:22 256:22
276:5 296:15
350:14 396:23
**interpretation (22)**
102:20,21 103:11
133:9 135:3,6 136:2
138:12 149:23
168:23 218:5,7
234:9 249:6 262:10
291:22 331:6 346:6
349:4 353:13
366:10 391:7

**interpretations (5)**
47:14 135:13 218:8
236:8 284:8
**interpreted (4)**
234:4 243:9 249:1
353:3
**interpreting (2)**
308:2 326:22
**interrupt (1)**
17:12
**intersymbol (13)**
38:11,14,24 39:4,7,9
39:13 40:8,10,22
44:18,24 391:20
**introduce (7)**
8:2 21:18 26:10,24
27:25 169:11 400:4
**introduced (3)**
26:23 83:25 220:14
**invalidity (4)**
50:24 52:15 198:9
199:17
**invented (1)**
33:23
**invention (27)**
80:10,14 87:17,21,24
88:15 95:6 96:5,11
97:3,6,8,11,14,17
97:24 98:3 170:25
224:8,9 225:10
239:7 250:2 264:9
264:16 337:16,21
**inventions (1)**
197:14
**inventor (7)**
33:9,22 34:1 52:21
57:4 250:4 251:10
**inventors (1)**
197:13
**investigation (1)**
190:12
**involve (1)**
155:12
**involved (1)**
311:1
**involves (1)**
14:9
**IPR (5)**
50:18,22 52:13 229:6
229:7
**irrelevant (1)**
146:8
**irrespective (1)**
199:16

**issue (8)**
59:23 162:16 171:7,9
171:12 178:4 179:2
194:24
**issued (3)**
33:6 171:15 173:3
**italics (3)**
100:6,16 212:18
**IV (1)**
61:14

_____

**J**
_____

**j (268)**
60:7 106:2,5 107:4,18
108:1,3,9,10,14
110:15,16 115:20
115:23,25 116:20
116:20 117:20
130:11 131:3 139:4
141:3 142:4 144:22
145:7 149:5,13,14
153:23 154:20
155:9,20 166:21
167:13 203:19
207:25 217:21
220:2,12 223:24
224:1,2,5,13,14
231:4 232:6 240:17
242:1,21 243:4,13
243:15,16,23,25
244:11 245:3,8,9
246:17,18,25 247:3
247:21 248:1,2,5,8
248:10,13,18,21,22
249:14 250:1
254:25 255:1
256:22,24 257:4,8
257:10,14,16,19
258:1 259:20,25
260:3,3,5 261:22
262:2,2,6,10,12,20
262:22,23 263:1,2,7
263:15 264:3
267:12,14,16,23
268:3,7 270:12
271:13,17 272:1,2
272:16 273:9,15,16
273:17 274:19,20
274:24 275:12,17
275:17,21,24 276:3
276:4,6,18,20,22,23
278:12,18,19,20,22
279:14,19,23,25
280:2 286:1 288:4

290:1 292:8,11,12
293:20 294:11
309:22 315:19
316:3 319:12
320:14,15,24
321:11 323:5,10,14
325:8 329:22,25,25
330:6,7,8,19,19
331:6,24,25 332:2,5
332:5,10,20 333:13
333:20,25 334:9,10
334:11,21 335:2,2,4
335:6,10,10,12,13
335:13,14,18,23,24
336:7,18 337:17
345:11,12,14,15
346:7 347:16,18
348:11,13,21 349:6
349:8,11,13,18
350:2,3,4,7,13,14
350:15,16 351:3,3,6
351:8,11,13,17
352:7 369:15,16
370:6,9,14,22,23
371:1,2,7,15,18,23
371:25 372:20
373:11 374:5,9,11
374:22 381:10,24
382:3,8,16 385:9,22
393:18 396:11,12
405:1
**j-equals-three (1)**
268:10
**j;k (9)**
287:23 290:7 307:3,9
307:24 308:5,12
310:22 393:18
**Jae (20)**
52:22 176:11,16,25
178:1,5,10,13 179:6
180:19,21 181:10
182:3,4 185:5,10
189:10 194:24
195:8 197:1
**Jaekyun (1)**
173:22
**January (2)**
171:12 173:3
**Jay (4)**
181:2,3,7 189:5
**Jersey (2)**
173:15,19
**job (6)**
1:25 72:20 199:15,15

199:18 287:3
**joint (4)**
4:14 11:18 395:11,12
**Jose (2)**
1:2 7:18
**Judicial (1)**
406:8
**jump (1)**
126:3
**jumping (2)**
28:24 107:16
**jumps (2)**
125:18 126:17
**June (1)**
181:10
**jury (3)**
366:5,6,18

_____

**K**
_____

**k (108)**
35:5,13 115:20,23
116:1 117:5,6,9,9
117:24,24 130:11
139:4 142:4 145:7
149:5 153:23
154:21 155:9,20
166:24 167:13
207:25 231:4 232:6
254:12 262:2,2,12
286:1 288:4 290:2
309:22 311:19
325:8 337:17,22
338:3 342:6,7
345:12,12,15 350:9
352:13,23 353:2,13
353:25,25 354:8,12
354:17,19,21,25
355:2,12,14,24
356:8,11 357:11
358:2,19 359:9,10
359:11,11,17,23
360:1,10,11,17,22
361:1,4,13 362:4
363:8,10 364:2,19
365:1,6,7,19,22,22
366:13,16,20
382:13,17 387:8,8
388:9,14,15,16,17
388:20,24,25,25
389:2,5
**k-equals-infinity (2)**
357:4 358:23
**k-plus-infinity (1)**
358:21

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**K&L (2)**
3:3 8:9
**Karabed (3)**
71:4,11 75:1
**keep (23)**
29:2,3,7 62:4,5 70:20
74:10 142:25 171:5
177:10 201:6,21
290:12 307:15,16
337:4 367:19 370:3
375:6 378:15
380:14,16 398:4
**keeping (1)**
238:12
**key (1)**
403:4
**Kilpatrick (5)**
2:6 3:11 7:24 8:4
406:11
**kin (1)**
407:15
**kind (33)**
12:20 14:8 15:15,19
16:5 19:4 26:16
29:10 34:9 41:11
58:14 64:17 73:3
74:7 127:21,24
128:3 138:21 148:8
177:10 212:14
223:10 229:14
243:3 257:18
309:23 338:4 343:1
343:6 356:2 383:14
390:18 404:6
**Kitani (1)**
239:7
**Knedeisen (8)**
3:5 8:9 147:14 279:4
300:13 352:15
399:16,25
**knew (6)**
38:22 48:12,17 51:24
86:17,24
**know (153)**
10:1,1 19:12 21:13
22:11,24 23:3 24:14
25:23 26:3 27:5
29:13,23 33:20 41:4
41:9 43:4 45:13,15
45:17 46:2,7,20
48:9 49:9,9 50:16
52:19,22,25 53:3
55:1,20,24 57:4,7
57:10 59:16,25

60:20 70:9 71:11
77:5 80:4 82:25
87:7,8 88:24 97:16
104:1,1 105:3,12,23
109:18 114:2 119:2
119:19 121:8 122:7
124:11 126:14
127:24 130:2
132:12 134:6 135:3
139:14 154:16
163:18 164:1 165:9
166:7 177:7 178:17
181:7 182:15
183:18 194:15
198:23 199:2 205:7
209:10 212:3,10,12
213:11 227:4,5
229:6 232:17
234:18 240:7
243:12 259:23
261:1 262:18
265:24 266:6
267:22,23 268:2,3
270:21 271:21
281:16 282:5,16,18
282:20 285:7
286:12,21 292:20
293:22 294:6,7
309:19 311:8,12,18
311:19,25 312:12
323:24 329:11
331:18 332:17
337:6 338:16
344:21,22 345:19
354:8 356:3,15,20
360:10 361:18
364:8 365:19,22
366:8,22 368:14
375:23,24 378:22
380:9 381:4 388:24
390:23 396:17
**knowledge (3)**
45:11 66:25 68:11
**known (9)**
17:19 33:14,17 38:15
53:3 60:15 81:2,11
254:6
**knows (1)**
343:18
**Kornelis (1)**
33:9

---
**L**

**L (5)**

1:23 2:8 406:1,23
407:22
**L.R (1)**
4:15
**LA (3)**
187:2 195:13,21
**lab (1)**
135:12
**labeled (4)**
112:14 295:4,16
296:21
**lack (2)**
18:9 95:25
**ladies (1)**
7:7
**land (2)**
16:7,24
**lands (10)**
15:12,13,15,19 16:19
16:22 17:1,6,15
20:16
**language (20)**
19:7 194:8 219:17
238:13 240:23
242:8,9,13 245:23
248:8 254:23 255:7
257:7,13,15 329:1
336:7 385:6,21
386:1
**laptop (5)**
154:23 155:3 158:5,7
158:8
**large (3)**
338:20 340:4 358:4
**larger (2)**
51:20 389:10
**laser (3)**
16:11,19,20
**law (2)**
226:25 227:4
**Lawrence (2)**
186:22,25
**lawyer (3)**
57:20 58:21 59:5
**lawyers (2)**
197:12 236:4
**layman (1)**
310:6
**lays (1)**
58:15
**LDPC (1)**
290:18
**lead (1)**
348:6

**leading (1)**
176:10
**learn (1)**
389:22
**learned (1)**
60:5
**leave (2)**
168:5 328:7
**Leaving (1)**
397:5
**left (9)**
128:13,16 170:9
225:16 235:13
236:13 287:6
320:11 324:23
**left-hand (1)**
62:11
**legal (14)**
58:14 59:11,12,16
92:4 105:4 212:10
212:11 252:20
260:12,13 282:6,7
282:18
**length (3)**
15:13 321:2 366:22
**lerch (1)**
180:9
**let's (254)**
12:8,13,14,15 15:4
16:15 23:17 24:13
26:7,19 27:15 29:21
32:19 33:19 34:2
37:2 38:7 40:7
41:20 43:23,24
49:19 53:15 61:10
61:10,11 63:17 64:4
64:19 74:21 78:21
83:22 84:9 87:9,14
90:12,12,21 93:5
98:20 101:5 102:16
105:19 106:20
107:16 111:19
112:2,3 113:9
114:23 117:11,13
117:15 118:4,8
120:10 125:14
129:10,11 130:3
133:19 135:19
136:12 142:11,12
142:23 144:9 147:7
147:23 148:14
150:25 153:20,21
154:18 163:23
166:13,20 167:4

169:10 172:7,7
175:12 176:9
179:13 180:8,17
182:17 183:9,13
185:25 188:6
189:14 200:17,18
201:12 203:15
205:13 206:22
207:10,23 211:11
215:8,14,23 216:12
216:12 217:17
222:20 223:19,21
225:14 226:14
227:15 228:16,22
228:22 229:9,9
230:7 232:4,18
233:19 234:11
236:19 239:3,19,19
240:16 241:17
244:8 245:5 251:11
252:13 261:21
264:17,19,20 267:9
268:14,15 270:1
272:2 273:25
276:24 281:2,2
283:17 284:4,5,5
285:8 287:11,15,18
289:23 290:17,18
290:25 291:7,14
292:4,10,14 293:13
295:3,4 299:9,14,19
301:3,23 302:11,17
302:19 303:24
304:14 305:14
307:2,15,16 308:8
309:7,13 312:14
313:8 314:7 315:13
316:15,18,18
317:22 318:15,22
319:14 320:5 323:3
324:2,4,23 325:16
325:16 329:18,20
329:24 331:10
332:24,24 336:16
336:17 337:3,5
338:7 339:1 342:5
344:2,2,3 347:2
352:13,13 353:1,5
354:25 355:14
356:8 357:10,19
360:25 367:2,19,20
369:13,14,25 370:2
370:12 371:23
373:15 377:11,25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

378:3,13,13,21,24
378:24 382:10,10
384:12 387:5 389:3
398:17 399:14
402:12
**letter (8)**
174:6 186:21 189:24
190:7,17,18 194:21
195:12
**letterhead (2)**
172:20 186:17
**letters (3)**
34:17 175:5 193:3
**level (36)**
12:20 14:9 15:3 18:25
29:11,12,13 30:1,9
30:19,23 113:3
125:17,18 128:3
252:20 254:9,11
289:8,25 290:2,3,15
291:16 294:5,6
336:20 355:5,19
356:15,22 357:5
361:11 364:12
375:23 379:4
**levels (1)**
294:19
**license (2)**
187:7 197:14
**licensees (1)**
177:1
**licensing (1)**
190:14
**light (16)**
16:20,21,23 17:4,14
137:17 208:5,10,22
209:7 210:4 243:16
326:16 398:17,21
402:18
**likelihood (1)**
357:6
**likes (1)**
63:3
**limit (19)**
38:10 39:7 40:10
68:10 104:13
167:16 179:7
188:20 191:1 196:4
268:15,16 272:25
297:12 317:23
318:6 366:16 371:7
371:15
**limitation (3)**
255:18,22 294:8

**limitations (1)**
275:13
**limited (26)**
14:1 21:9 27:18 31:12
65:2 67:13,23 72:10
83:15 95:16 98:14
109:6 111:7,15,18
174:20 175:4
185:22 193:22
194:3,8 200:15
350:10 351:2,5,5
**limiting (2)**
40:8 300:24
**limits (13)**
203:19 271:23 272:5
274:3,25 313:12,16
316:17 317:22
321:2 327:17 328:2
328:19
**line (48)**
12:25 38:8 71:1 72:8
77:6,18 83:11 84:11
87:20 93:14,17,21
94:21 98:15,16
100:7,10,14 127:25
176:17 187:5
190:12 226:15
231:7 239:20,22
240:16 241:21
256:17 329:21
337:6 339:3,3,5,8,9
339:9 382:22
383:20,21 390:25
391:13,14,25 400:2
400:18,24 401:20
**lines (29)**
25:12 34:3 74:22 77:1
84:9 92:11 93:20
94:13,13,16 95:14
96:20 97:2,5,18
98:15 104:12 105:9
105:13 106:10
234:22 241:19
243:9 255:3 256:16
338:24 390:6,9,10
**link (4)**
14:1 21:9 67:1 114:1
**list (7)**
47:18 52:8,9 93:8
95:24 307:11 344:5
**listed (12)**
45:8 52:3 79:10 83:4
83:6 93:2 96:9
101:5 104:5 171:20

**listing (3)**
201:16 312:24
41:10 95:8 96:10
**lists (2)**
95:21 96:11
**literally (6)**
110:9 214:25 220:25
221:8 244:9,11
**litigation (1)**
406:19
**little (13)**
40:19 107:17 125:1
128:10 201:5 203:7
245:15 263:5 287:4
329:21 330:12
349:20 384:13
**live (3)**
221:20,23 400:6
**living (1)**
196:15
**LLC (1)**
187:2
**LLP (2)**
2:7 406:11
**Ln (7)**
408:6,8,10,12,14,16
408:18
**located (1)**
216:18
**logic (2)**
273:14,14
**logical (2)**
258:11,15
**logically (1)**
246:9
**long (14)**
15:21 20:11 24:20
46:2 50:3 60:15
139:8 356:24 357:6
362:4,17 367:16
376:25 377:9
**longer (6)**
14:12 358:20,23
359:10,22,23
**longest (1)**
359:24
**look (89)**
12:14 33:19 34:2
60:23 62:10,17,18
70:19 74:21 76:14
76:25 77:1 79:14
83:2 87:14 92:9
93:15 105:19
106:20 112:5 113:9

129:11 137:10
148:14 171:5
179:24 180:18
183:9 184:11
188:22 215:23
227:10 228:16,23
230:20 231:24
232:4 234:11
236:19 237:2,16
239:3,15,16,18
240:16 241:17
245:5 251:21
282:12 285:9
293:11 294:5
304:14 307:16
308:8,20 312:2,7,14
313:8 314:7,18,19
315:13 317:22
318:22 324:23
336:16 337:3 338:7
339:1 342:2 344:2,2
344:3,16 352:14,20
352:21 367:2
368:17 369:25
370:2,4 385:3,4
388:18 397:21
**look-up (1)**
368:16
**looked (12)**
60:22 84:21 128:8
168:22 173:5
180:14 184:19
185:1 186:14
238:17 323:23
392:15
**looking (17)**
39:18 67:16 78:16
84:19 106:8 145:22
156:9 160:4 175:17
179:21 185:3 192:9
194:11 211:8
212:20 230:23
279:10
**looks (9)**
21:19 61:24 63:3
76:20 83:11 190:11
230:3 307:20
367:23
**loosey-goosey (1)**
328:11
**lose (6)**
361:20 362:16,23,23
363:4,5
**losing (1)**

362:15
**loss (1)**
340:23
**lost (1)**
276:17
**lot (1)**
23:9
**loud (1)**
393:15
**love (1)**
267:3
**low (34)**
20:3,7,9,18,20 21:5
21:11 23:25 26:10
26:17,23 27:11,11
223:13,15 265:6,10
266:20 340:24
341:19 343:6,22
344:9,12 346:17
347:6,8,24 349:19
356:25 361:14
362:15,21 363:1
**lower (5)**
32:18 265:15 349:15
354:11 386:10
**lowered (1)**
280:7
**lowering (1)**
32:12
**LSI (8)**
1:7 7:14 229:3 251:12
364:18,23 400:7
408:2
**LSI's (3)**
325:2 399:11 401:21
**LSI-UMN (2)**
321:7 324:10
**Lucent (3)**
173:13 175:5 194:22
**lumped (1)**
307:21
**lunch (2)**
236:2 281:4

**M**

**m (15)**
34:8,9,11,18,21
115:15 154:20
167:2,6 254:8 344:8
346:18,20 350:8
404:9
**m-bit (29)**
106:11,14 108:3,11
115:19 116:11,11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

117:19,21,25
129:15 130:2 143:5
148:5,18,24 155:2,8
254:6 284:18
285:16 291:3,3
308:11,16,22 367:9
403:19 404:7
**m-bits (4)**
34:4,10 115:12,15
**m-to-n (1)**
153:22
**Ma'am (1)**
32:24
**magnet (1)**
136:23
**magnetic (227)**
13:4,9,14,19,22 30:11
31:3,5,7,11,21 40:1
40:9 41:15 44:19,25
45:3 51:16 58:7
61:18,19 62:13,22
63:13 64:21,22,24
65:3 66:5,6,17,21
66:24 67:7,8,13,17
67:18,19,23 68:11
68:19,25 69:7,12,14
71:23 72:10 74:17
77:19 78:1,7,12
83:15 85:25 87:12
90:18 91:20,22,25
92:5,9,24 93:4,8
94:5,14,20,23 95:2
95:4,7,16 96:7
100:2 104:14,21
105:15 106:17
107:10 108:21
109:6,10,16,19,21
110:2,4,5,8,10,16
111:7,15 112:9
120:3,6,8,12,18,21
120:25,25 121:1,10
121:18,19,24
122:19 123:4
127:15 133:4,23
135:16,22 136:20
136:23,24 137:20
137:21 138:8,18,19
138:22 139:1,14
140:8,9 143:18,21
145:14,15,25 146:2
147:24 150:6,8,11
150:16,20 151:15
151:22 153:9 156:3
156:4,16,22 157:5,8

157:12 158:24
159:6 160:13,14,15
160:18,19 163:8
164:2,3,13,25 165:2
165:10 166:15
167:8,22 168:11,12
172:3,5 174:21
175:4 177:23 179:7
182:1 185:22
188:20 191:1
193:19,22 194:4
196:5,16 200:15
201:18 202:18,22
202:24 203:5,6,20
205:23 215:11,24
216:2,3 217:6
218:23 221:17,20
222:15 223:9 224:3
224:11,21 225:4,5
226:6 284:6 298:22
299:12 302:7
330:21 335:11
347:21 348:24
378:4,14 381:8
390:18,23,24 391:2
391:21 392:4 399:9
**magnetization (9)**
94:5 100:7,17 107:12
128:3 205:16
216:11 217:3
226:11
**magnetized (1)**
217:16
**magneto (2)**
173:24 174:9
**magnets (4)**
128:5,10 129:2
157:10
**mailed (2)**
251:14,19
**maintenance (4)**
177:4,7,12 180:13
**major (1)**
96:15
**majority (1)**
356:4
**making (12)**
31:8 46:17 143:9
211:21 212:4,9,13
229:14 261:6
343:21 396:20
400:2
**manager (2)**
173:13 280:11

**manages (1)**
187:4
**manufacturers (1)**
18:19
**mapped (2)**
368:11,12
**mapping (2)**
89:5 368:15
**March (9)**
45:24,25 53:23,24
171:3,14 173:6
189:25 192:18
**mark (13)**
3:5 8:9 15:25 16:4
21:21 32:24 41:20
42:9 71:16 76:8
183:13 192:4
342:22
**marked (22)**
10:16,23 21:24 22:3
33:2,5 42:19 76:11
82:16,21 169:13
172:11,14 175:22
179:16 183:24
186:2 189:16 192:6
283:23 319:17
324:6
**market (1)**
171:21
**Marketing (1)**
172:23
**markets (1)**
171:20
**marks (5)**
16:10 340:25 341:5
341:20 343:9
**match (3)**
332:20 333:3 349:11
**matched (3)**
274:20 331:24 383:16
**material (8)**
88:5 202:25 203:4
244:25 245:1
250:13 257:25
338:6
**materials (7)**
15:16 49:19 51:10
52:8 85:5 86:4
320:1
**mathematical (2)**
126:15 255:11
**mathematician (1)**
126:8
**matter (8)**

135:11 138:1 207:18
246:1 247:20
258:12 352:3 362:5
**matters (1)**
58:8
**max (1)**
270:3
**maximum (24)**
240:18 242:1 254:10
258:2 268:16
270:13 271:2 272:5
272:16,25 274:3,25
277:11 290:1,2
321:1 359:17
360:11,17 364:20
366:22 370:15,19
393:19
**Mayle (431)**
3:12 4:6 8:3,4,20
10:17,24 11:2 13:24
16:6 18:1 19:9,22
20:8 21:17 22:1,18
23:11 24:12,22 26:6
26:13 27:4,14 28:11
28:22 29:5 30:16
31:2,22 32:19 33:3
34:14,24 35:21 36:9
37:1,13 38:6,21
39:15 40:20 41:19
42:4,9,15,20 44:16
45:2 46:22 47:16
48:1,21 49:5,18
51:23 52:7 54:17,23
55:4,9 56:22 57:2
57:11 58:2,12 59:1
60:8,11 63:1,9
65:15 66:7 68:5,22
69:5,15 70:3 72:2
72:18 73:9,20 74:9
74:20 75:10 76:8,12
77:10,17 78:19
79:22 80:19 82:9,20
82:24 84:3,4,25
85:11 86:3,19 88:12
89:2 90:6 92:7,15
94:12 95:10 97:1
98:1,11,19 99:17
100:4,12 102:15
103:3,17 104:11,22
105:8 107:15 108:8
109:4,22 110:14
111:1,13 112:1
113:2 115:18 116:5
117:1 119:24

121:16 122:11,23
123:14 124:1 125:2
125:6,13 126:13
127:1,10 129:1
130:9,17,22 131:14
132:3,21 133:7,18
134:12 135:1 136:1
138:10,14 139:19
140:21 141:13
142:7 143:19,24
144:1,8 145:2
147:15,22 151:16
152:23 153:4
154:11 155:22
156:23 157:15
158:2 159:1,15
160:11 161:12,15
162:4 164:6,21
165:14 166:11
168:6,16 169:14
172:7,12 175:1,11
175:20,23 177:22
178:12 179:13,17
182:16 183:1,14,19
184:1,24 185:17,25
186:3 189:17 191:4
191:25 192:7
193:14 195:3,19
196:1,21 197:8,21
198:7,15,22 199:23
200:11,22 201:3
202:15 203:9
205:12 209:4,19
210:16 211:3 212:1
212:16 214:6,12
215:7 216:22 218:2
219:8 220:8,20
221:5,15 222:18
223:6 224:12,19
225:12,24 226:13
227:11 228:1,15
230:2 233:4,15,18
234:10 235:14,24
237:23 238:10
240:10,15 241:11
241:16 242:19
243:20 246:6,15,23
247:14 249:17
250:12 251:5 256:1
257:23 258:17
259:5,21 261:15
263:9 264:6 265:8
265:13,23 266:3,23
267:8 268:13 269:8

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

269:21 270:22
271:16 272:24
273:7,24 275:15,19
278:17 279:1,6
280:4 281:1,21
282:9 283:2,11,17
283:20,24 286:24
288:3,22 289:21
290:16 293:9
294:16 295:13,21
296:13 297:1,9,11
297:18 298:1,12
299:8 300:14,21
301:17 302:5 303:3
303:7,18,24 304:7
305:1 309:6 310:2
310:10 311:17
312:6,13,23 313:7
314:1,22 315:6
316:11,23 317:16
317:21 318:14
319:8,14,18 324:7
326:10 328:13
329:10 330:15
334:17 335:20
336:15 338:1
340:12,18 341:10
341:24 343:14
344:1,20 345:5
346:4,15 347:15
349:21 352:12,16
352:19 354:4,15
355:7,23 356:7
357:18 358:15
360:16 362:1
363:13 364:17
365:13,24 369:10
371:12 372:18
373:15,19 374:2,10
374:20 375:10
380:11 384:7
386:18 387:4,24
388:11 389:8,11
392:9 393:1 394:9
394:18 395:25
397:12,25 398:5,7
398:25 399:3,13
401:25 402:21,25
403:25
**Mayle's (1)**
395:14
**McLaughlin (47)**
1:17 2:5 4:3,9,18 5:2
6:2 7:10 8:15,21,23

8:24 10:22 11:11
21:23 33:1 42:5,18
42:22 55:10 76:10
82:15,21,25 159:16
169:12,15 172:10
172:13 175:13,21
179:15 183:23
186:1 189:15 192:5
193:20 283:22
319:16,19 324:5,8
389:19 401:9
404:15 406:5 408:4
**McLaughlin's (1)**
84:2
**mean (117)**
16:3 18:6,13,16,24
19:18 24:18 30:3
35:8,10 45:12 46:9
46:21 47:6 48:15
49:10 51:14 56:9,19
58:22,24 59:9 67:22
69:9 80:13,21 94:2
95:20,20 98:3
103:20 104:17
113:14,22 118:10
119:16 124:2,11
126:21 129:20
131:7 137:19
141:15 146:22
151:19 154:17
157:9 193:3 194:10
198:12 200:4
202:11 203:3,4
205:8,10,19 206:10
207:3 208:11,13
210:6 223:25
244:10 245:24
248:1 249:3 251:8
258:21 259:8,24
261:14 262:19
264:2,8,9,14 267:16
268:2,5 279:17
282:1 285:19
286:17 292:17
296:16 309:17
310:5 312:16
318:13 331:17
332:5,6,22 333:19
356:21 361:12,13
362:14 364:10
365:17 366:1
368:12,24,25
372:15 373:8
374:12,23 375:17

375:18 379:13,15
380:25 382:2 386:2
399:18
**meaning (44)**
64:20 67:6,17 101:10
102:23 103:12,19
104:25 106:25
107:23 110:9,11,17
153:6 160:5 233:10
233:22 234:3
242:14 246:18,22
249:5 256:24 258:8
259:14 263:16,17
263:22,22 278:13
280:13 305:17
309:15,21 310:1,4,5
310:6,13,24 314:13
314:17,24 315:5
**meanings (2)**
47:13 309:10
**means (90)**
12:21 22:11 25:4,23
26:4 32:17 35:11
37:16 67:2,5 68:8
68:12,20,21 80:14
94:11 103:22 104:6
108:2,10 117:6,20
117:23 123:20
150:6 170:2 193:5,6
200:14 210:18
230:21 231:4
234:22,25 235:1,4,6
237:3,3,9,14 238:1
238:4,13 239:20,23
240:6,9 242:5
243:15,17 244:4,16
253:3 261:13
263:14 269:3,17
270:16 271:6
272:21 273:4
277:24 278:6,20
288:16 298:5,13
309:24 311:25
312:12 318:18
322:17 323:24
328:1 329:25 360:1
366:9 367:10 368:7
368:18 381:6
385:25 386:20,21
393:11,15,17 394:3
396:18
**meant (4)**
29:23 47:4 84:20
153:9

**measurable (14)**
321:14 323:6,15,20
323:21,24 325:9,25
326:13,23 327:21
328:4 329:8,12
**measure (3)**
266:8 293:7 359:11
**measurements (1)**
292:22
**meat (1)**
378:3
**media (33)**
7:8 15:8,14,14,16,18
44:8,9,12,19 65:10
65:11,20,22,23
66:11,19 73:16
82:12,19 133:23
136:10,12,19 159:9
159:14 175:4
235:18,23 304:1,6
374:1 404:17
**medications (1)**
10:6
**medium (74)**
37:11,12,16,17 39:20
40:3,12,24 61:20
62:23 63:13 64:24
73:7,24 89:7,13
92:6,9 95:4 108:22
109:15,21 122:10
122:12 123:12
133:1 135:16,21,23
136:24 137:4,6,21
138:1,20,21,21,22
139:1 140:10
141:21 143:13,18
143:21 144:6
145:15 146:2 147:8
147:25 150:8,11
151:23 152:1 156:3
156:4 160:13,14,20
201:18 202:3,18,21
202:22 203:7
298:18,22,25 299:1
375:25 390:18,23
390:24 399:9
402:16
**meet (4)**
155:25 272:15,19
275:13
**meeting (2)**
293:5 364:2
**meets (5)**
151:3 158:16 289:13

**memory (4)**
25:4 45:19 162:11
236:7
**mention (4)**
56:23 95:3 174:13
244:17
**mentioned (8)**
55:15 72:22 90:15
162:23 181:12
212:2 227:8 365:18
**mentioning (3)**
72:4,5 175:5
**mentions (9)**
72:16 78:12 89:13,16
95:3 101:3 174:9
185:2,6
**merely (3)**
321:13 323:6,14
**message (1)**
263:24
**met (9)**
57:9 60:19,19 142:1
155:20 159:5
266:21 292:21
294:9
**method (19)**
17:24 18:9 117:16
135:20,22 140:13
140:19 211:17
234:16,19 239:13
254:6 261:10,21
277:21 278:11,12
322:21 391:10
**methodology (2)**
59:21 259:10
**methods (1)**
311:9
**Michael (1)**
189:8
**microprocessor (1)**
118:13
**middle (7)**
10:2 23:18 180:8,10
229:14 384:13
393:10
**million (1)**
355:24
**millions (2)**
127:20 128:5
**mimic (2)**
15:15,19
**mind (5)**
14:5 59:24 96:14,19
238:12 395:21

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**mine (1)**
389:24
**minimis-ly (1)**
361:14
**minimum (9)**
20:24 21:2,9,10 254:8
264:11 337:10,11
338:5
**Minnesota (11)**
1:4 7:13 170:25
172:20 173:23
174:19 175:3
184:15 186:18
190:13 192:19
**Minnesota's (1)**
367:14
**minus (1)**
375:24
**minute (9)**
41:23 78:21 102:16
171:6 218:25
235:13,15 336:17
376:3
**minutes (2)**
56:2 230:21
**Miracle (1)**
187:9
**mischaracterize (3)**
168:9 214:13 244:22
**mischaracterizes (3)**
221:3 249:8 289:3
**missed (1)**
391:18
**missing (1)**
286:15
**ML (1)**
391:16
**mode (1)**
328:3
**model (1)**
153:24
**modems (2)**
175:6,15
**modified (6)**
113:11,15,19,23
114:3,15
**modifier (1)**
310:17
**modifying (1)**
183:8
**modulated (1)**
36:12
**modulating (1)**
15:12

**modulation (9)**
17:17 20:15 71:16
89:5,17,21,24 90:4
181:18
**module (1)**
373:16
**moment (1)**
163:24 182:17 236:21
**MONDAY (2)**
1:19 7:1
**money (2)**
197:15 198:2
**month (4)**
46:4,5 53:12,12
**months (2)**
45:19 171:14
**Moon (35)**
52:22,23 53:1,14,21
53:25 54:4,8,18,23
55:12,16 56:1,8,8
56:12,23 57:23
173:22 176:11
178:1,5 180:21
181:10 182:4,4
184:15 185:5,10
189:10 193:21
194:2,24 195:8
197:1
**Moon's (3)**
56:18 178:13 179:6
**Moon@vermai.co...**
176:17
**Moore (1)**
189:8
**morning (6)**
7:6 8:3,21,22 228:24
305:12
**move (8)**
29:22 36:10 169:10
231:12 307:2
400:25 402:12
403:10
**moved (1)**
120:20
**MPEG (6)**
187:2,4 189:5 190:7
195:13,21
**MTR (46)**
97:12,13,23 98:2,4,5
98:8 114:18 115:6,9
115:16 116:2
170:24 176:25
178:18 179:3
181:13,20,23

182:10,14,20 194:7
225:14 264:13
265:9,14 266:10,11
266:20 267:7,10
287:25 288:7,9
289:23 292:1
321:12 330:8 345:6
345:8,25 346:17
347:18 348:17
354:25
**multiplexer (5)**
286:9,17 287:5
290:21,25
**Murray (1)**
173:19
**Murry (1)**
173:15
**music (1)**
37:20

_____

**N**

**n (22)**
4:1 7:4 34:5,8,8,9,11
34:18,21 110:20
115:15 154:20
167:2,7 254:7
285:17 344:8
346:18,21 350:9
377:11 404:9
**n-bit (24)**
116:13,15 117:5
254:7 285:2,11
289:24 290:20
367:4,10,12,16
369:1 376:15,15,16
378:25 379:7
402:14 403:11,15
403:19,20 404:8
**n-bits (5)**
34:11 115:12,15
376:19,25
**name (7)**
7:20 18:23 33:8 36:17
60:9 251:17 408:2
**named (5)**
52:21 176:14 180:23
181:2 186:22
**narrow (1)**
198:9
**natural (2)**
52:11,18
**nature (4)**
9:12 84:21 404:7,12
**necessarily (8)**

118:12 168:3 267:16
268:11 275:22
278:21 333:14
395:4
**necessary (2)**
250:6,11
**need (29)**
9:10,25 18:12,21,22
26:5 29:10 40:10
63:25 69:25 77:8
103:18,24,25
147:14 201:5
239:16 244:24
249:25 251:9
286:14 300:22
342:15 348:3
372:17 395:8,8,9
398:15
**needed (4)**
25:7,15 28:15 251:1
**needs (4)**
309:18 331:24 336:22
375:19
**negative (1)**
164:17
**neither (1)**
210:6
**never (19)**
22:14 43:14,18 59:24
60:9 158:7,18,22,23
172:15 196:19
325:19,24 326:25
327:9 349:17,18
350:4 372:4
**new (23)**
43:9 99:10,14,15
143:14 144:7
169:11 173:15,19
177:2,20 178:15
205:4,8,10 249:21
309:4 324:13,18
327:8 365:20 367:3
400:4
**nice (1)**
60:8
**nine (12)**
42:11,16 128:8
301:23 302:19,24
303:19 320:7,8
323:3 391:13,14
**ninth (1)**
301:10
**no-pit (1)**
39:21

**nods (1)**
9:12
**noise (11)**
25:19 26:2 206:23
339:10,11,19,19
341:7 348:7,8
349:20
**non-zero (1)**
126:3
**nontechnical (6)**
101:10 102:3,22
103:12,19,22
**nontransition (2)**
371:22 372:2
**nontransitions (10)**
36:1 117:7 207:12
290:2 359:18 360:2
360:12,18 365:8
366:17
**normally (2)**
28:7 119:16
**Northern (2)**
1:1 7:18
**nos (3)**
10:22 63:25 70:1
**Notary (2)**
2:9 408:24
**note (1)**
314:11
**noted (1)**
405:6
**notes (1)**
42:14
**notice (1)**
241:18
**novel (2)**
114:18 115:5
**November-bit (1)**
285:17
**NRZ (5)**
207:18 389:7 402:5,8
402:9
**NRZ-M (4)**
36:11,12,17,23
**NRZI (19)**
35:15 36:18 37:5,9,10
37:25 117:10,11
118:1,2 207:11,18
255:21 391:9,10
399:12 401:24
402:8,9
**number (87)**
4:12 5:5,6,8,9,13,14
5:16 6:8 7:8 25:8,10

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

25:16,18 27:18
28:14,14 29:9,9
31:12 34:21,21
42:11 76:9 82:13,19
150:11 154:19
159:10,14 170:14
172:17 175:25
179:19 184:6 186:5
189:20 192:10
203:20 224:13,14
224:20,25 235:19
235:23 239:1
240:18 242:1
253:20 258:2
268:16 270:13
271:2,23 272:5,17
273:1 274:4 275:1
276:18 277:11
304:2,6 321:6,18
324:10 335:24
351:6 359:2,3,15,17
360:4,11,17 364:20
365:7,7 366:17
370:15,19 374:1
386:14,16 389:1
393:19 404:18
**numbers (9)**
5:11,17,19,21,23
154:12 169:24
193:3 324:3
**numeral (1)**
61:14
**numerous (1)**
399:5
**Nyquist (1)**
321:3

**O**

**O (2)**
7:4 406:1
**O.C.G.A (1)**
406:13
**oath (1)**
9:17
**obey (2)**
115:20 117:5
**object (307)**
13:20 15:6 16:1 17:22
19:6,20 20:5 22:12
22:13 23:6 24:4
26:12 27:1 28:3,19
30:13,25 31:14
32:14 34:12,22
35:17 36:3,19 37:6

38:2,17 40:14 41:2
44:14,20 46:18
47:20 48:25 49:13
51:12 52:4 56:20,25
58:5,20 62:24 63:8
65:12 66:3 68:2,14
69:3,10 71:24 72:12
73:1,14 74:13 78:9
79:20 80:16 82:6
84:23 85:8 86:1,13
88:8,20 89:22 92:2
92:14 93:22 94:24
98:6,17 99:13,23
100:9 102:8,25
103:14 104:7,15
105:1 107:6 108:5
108:13 110:12,22
111:11,23 112:23
115:13,22 116:23
119:9 121:12 122:4
122:21 123:6,23
125:5 126:10,20
127:4 128:22 130:6
130:14,20 131:6,19
132:7,24 133:12
134:5,19 135:24
138:3,13 139:7
140:17 141:10
142:6 143:15,22
144:24 147:20
151:12 152:15,25
154:9 155:16
157:24 158:14
160:8 161:9 162:2
163:10 164:5,15
165:4,22 168:1,14
174:22 175:7
177:17 182:7,22
184:21 185:13,24
191:2 193:10 195:2
195:16,23 196:6
197:3,20 198:3,10
198:18 199:21
200:6 202:9 203:2
205:6 210:7 211:24
212:7 213:22
214:11 215:1
216:19 219:5 220:5
220:17 221:2 223:2
224:16 225:2,21
226:9 227:2,22
228:11 229:25
232:21 233:12
234:6 235:11

237:19 238:6 240:4
240:13 241:14
242:15 243:11
246:2,12,20 247:9
248:6 249:7,23
250:16 255:23
257:1 258:9,22
259:17 261:9
262:14 264:5 265:1
265:11,21 266:2,13
266:25 268:6 269:6
269:18 270:17
273:5,11 275:10,18
278:14,23 279:21
280:22 281:13
282:2,4 283:1,4
286:6 288:2,5 289:2
290:8 292:16
293:18 296:9,22
297:8,15 298:10
299:5 300:20
301:15 302:2 303:1
303:6,15 304:23
309:3,16 310:7
311:11 312:4,22
313:5,23 314:21,25
316:9,22 318:8
319:5 326:2 328:5,6
328:23 337:23
340:9,15 341:15
343:11 344:15,24
346:1,14 347:12
349:7 354:2,13
355:3,16 356:13
357:15 358:11
360:13 361:16
362:9 363:12 364:5
365:10 369:3 371:9
372:12 374:8,14
384:4 386:12
388:10 389:6
398:11 400:24
**objected (1)**
401:10
**objection (61)**
20:10 24:16 25:24
27:8 28:25 47:7
54:21 63:6 74:1
96:22 97:19 109:11
124:24 125:9
156:18 157:1
161:15 178:7
208:25 209:13
222:10 224:4 241:7

250:7 271:7 272:22
295:9,17,18 300:12
312:10 317:11,19
335:15 336:12
340:20 343:17
352:9 356:1 365:16
373:6 375:4 380:5
386:23 394:9,18
395:25 397:14,25
398:5,10,12,25
399:3,13 400:2
401:4,25 402:21,25
403:25
**objections (3)**
39:1 221:10 297:21
**observe (1)**
129:8
**obtain (2)**
337:7,9
**obviously (5)**
51:14 54:13 86:25
134:6 139:15
**obviousness (2)**
253:12,12
**occur (11)**
35:5,12 127:21,23
298:22 342:19
377:22 380:9
394:23 395:3,7
**October (1)**
79:25
**office (9)**
8:5 186:18 229:11,21
251:13,22,24 252:2
256:16
**offices (3)**
2:6 7:24 406:11
**oh (16)**
33:23 41:12 54:6
78:24 88:16 139:24
153:8 190:5 229:19
251:18 286:22
325:1,22 344:3
352:20 393:15
**okay (276)**
8:25 9:9,16,23,24
10:4,5,15 11:9 16:2
17:13 25:5,14 26:21
27:3 28:4,12 29:21
32:6 36:10,16 38:4
38:7 41:16,17 42:15
45:10,15 52:21
58:13 59:25 61:5
64:7,10 70:22 72:24

73:18 74:8,24 77:15
79:17 81:24 82:9
89:12 90:22 91:4
95:14,25 96:16,18
96:24 99:6 101:5
102:9,14,14 103:5,9
103:15 105:22
111:20 112:14
114:4 116:10
117:11 125:11,14
125:16 129:10
133:19 136:12
137:12 139:22
140:3 141:22
142:10,18 143:2
144:17 145:12
146:25 147:23
148:1 149:10,21,25
151:1,2 154:3,7,14
154:16 155:4
157:18 160:12,16
161:20 162:20
166:16,23 167:17
168:7 169:18
171:24 176:6 179:4
180:4,12,16 183:9
183:11 187:8,14
189:1,9,11 197:1
201:11,14 202:16
203:10 204:4
205:13 206:6
211:11 212:22
219:12 222:19
223:17 225:13
228:16 232:17
234:8,11 236:11,22
236:25 241:1 245:5
246:9 251:6 253:10
254:15,21 255:6
256:7 260:23
261:16 268:18
269:4,25 270:4,7
271:24 272:3,6,7,9
272:10,12 273:25
275:6 277:7,18
278:18 279:16
281:2 283:16 284:3
284:8,9,12,13,20
285:8,24 287:13,16
287:20,21 292:3
295:5,6 297:6 298:7
298:9 299:15,22
300:6 301:2 303:23
304:13,16,19

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

305:20 307:18,25
309:7 310:3 312:7
313:18 316:15,25
319:6,9,11,21 320:9
321:20 322:22,23
323:1,2,7,8,12,13
323:17,18 324:21
325:4,15,22 326:20
327:7,11 328:16
329:18 330:10
332:8,24 336:1,16
338:2,17,25 339:4
345:8 346:5 347:3
350:6,12 352:1
353:9 355:13,14
356:11 357:2
364:18 366:24
367:22 368:9 372:3
373:18 375:13
377:3,25 379:2,6,10
380:12 381:19
382:5 383:8,19
385:13 387:11,19
387:23 389:3,21
390:5,8 392:25
398:3 403:14
**omitted (2)**
62:21 63:11
**once (9)**
57:9 141:9 152:10
181:12 230:8,14
383:23 384:3,10
**one-pager (1)**
324:4
**one-to-one (8)**
121:13 152:17,22
153:2 219:22 223:5
223:18 224:17
**ones (47)**
35:11,13,13,25 36:6
50:16 86:8 93:1
106:15,19 111:2
116:16,21 117:4,20
124:13 183:17
207:12 302:8,9
322:24 323:11
356:18 357:22,24
358:8,22 359:7,14
359:15,25 360:7,8,9
361:3,20 362:18
363:17 376:4
378:19 387:9 388:5
388:16,19,21 389:5
391:3

**open (2)**
292:9 385:4
**operate (2)**
341:18 348:1
**opine (3)**
44:3 153:6 400:13
**opined (2)**
66:8 395:22
**opinion (46)**
58:23 59:19 61:24
62:2 69:16 71:19
81:21 85:2 88:6
90:17 95:17 104:6
104:24,25 105:14
106:6,24 137:16,22
137:25 143:12
144:5 150:5 190:20
191:12 206:1 208:3
208:8 219:17 233:5
233:11 242:12
283:13 309:8 314:3
314:4 353:2,25
369:22 392:16,20
392:22 394:15
396:16,25 401:16
**opinions (22)**
46:25 47:3,5 48:24
51:11,19,22 58:18
61:11 67:4 88:11
191:8,15,18 197:7
200:18 219:3
392:13 396:4
398:22 402:19
403:23
**opposed (8)**
26:17 30:11 163:19
253:11 321:13
323:6 325:9 375:8
**opposite (2)**
65:7 257:5
**Optex (2)**
42:25 43:4
**optical (88)**
13:4,6,14,14,19,23
14:14,15,22 15:2,4
17:3 18:11 23:24
30:2,5,11,24 37:21
38:1,16,23,25 39:23
40:1,9 43:9,20 44:9
44:12,19 45:1,4
65:10,23 66:10,16
66:18,18,22,25 71:2
71:16 72:5,25 73:5
73:7,7,11,16,24

74:17 75:5,12,14,15
77:19 78:13 84:14
85:14,16,19 86:6,12
86:24 88:16 101:24
102:6,11,12 110:20
111:2,8,18 136:25
137:6 161:22
162:14 171:25
173:24 174:9
181:14 183:6
199:20 200:4,8
207:4 392:6
**optimal (1)**
136:13
**options (1)**
121:7
**oranges (1)**
129:5
**order (9)**
1:13 29:11 38:10
198:1 289:16
336:21 395:3,7,9
**ordinary (16)**
44:3 64:20 67:6
101:10 102:22
103:12,19 309:21
310:1,4 312:15
313:3,10 314:19
396:16,24
**orientate (1)**
173:2
**orientation (18)**
61:18 62:13 64:22
67:8,19 69:14 129:2
137:20 138:9,18,19
140:8 145:14 146:1
150:7,16 153:9
160:18
**oriented (1)**
216:5
**original (2)**
51:2 260:20
**originally (1)**
197:12
**originate (1)**
132:20
**other's (1)**
48:9
**outcome (2)**
141:19 286:18
**outfit (1)**
170:22
**outperform (1)**
345:25

**output (4)**
132:10 367:15 368:22
368:25
**outside (9)**
51:24 73:25 157:24
178:10 208:15
251:3 273:22 398:1
398:7
**overall (4)**
20:17 182:11 362:14
362:24
**overcome (1)**
250:7
**overlap (2)**
13:18 261:8
**overriding (1)**
343:22
**overwhelms (1)**
341:7

---

**P**

**P (5)**
7:4 70:7,7,9 75:1
**P.H (2)**
71:5,8
**p.m (2)**
180:9 404:22
**package (1)**
194:11
**page (147)**
4:5,10 5:3 6:3 7:22
23:17,18 44:1 45:22
45:22 49:20,21,22
61:11,23 62:1,9,17
63:5,18 65:7 79:1,6
79:15 81:15 112:6,7
112:12 114:24
118:17 128:8
129:24 130:4,12
131:5,17 137:10,12
137:12 138:25
142:11,16 147:4
162:10,13 170:8
171:18 172:19
179:19 180:6,8,10
180:18 184:2,6
186:10 188:6,11
192:25 201:12,22
202:8,16 204:14
229:9,15,16 230:8
230:10,25 234:3,12
234:12 236:23,24
238:25 240:24
241:17 251:11,12

251:21 252:7,13
256:17 304:16,17
305:8,14,15,15,18
305:24 307:3,17,22
308:1,20 312:14,24
313:2,8,17,20
315:13 319:22
320:7,8 321:20
323:3 324:9 327:16
329:21 330:16
335:5 338:8,10
352:18,20,21,22
353:15 364:3,19,24
364:25 367:2,5,8,21
368:4 369:14,18
382:19,22 383:20
383:21 384:12,14
385:3,5 387:5
392:24 393:25
402:12 403:11,13
407:9
**pages (4)**
170:6 179:25 180:2
407:11
**pain (2)**
139:10 277:2
**pair (26)**
105:25 149:5 207:24
230:22 231:4 232:6
262:1,4,5,12 286:1
287:22 288:11,14
290:6 307:2,8,23
308:5,12 335:1,8,9
393:17 394:3,7
**pairs (1)**
337:11
**paper (4)**
4:20 72:22 86:24
162:23
**papers (7)**
13:13 53:5 69:17
194:5,6,9,13
**paragraph (152)**
12:15,17 13:12 44:2
49:22 61:23 63:15
63:19,21 64:4,8,11
64:14 65:6,14,16
66:9 67:3,5,11
68:23 69:6 70:6
74:22 77:6,16 78:12
78:23 81:12,14,22
84:19 85:2,4,20,24
86:5 87:4 90:14,21
91:5,9,13,16 92:10

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

92:12,19,22 93:5,7
93:15 98:13,20,23
99:1,8,10,11,19,22
100:5,13,23 101:2,6
101:8,22 102:3,24
103:13 104:3 112:3
112:5 113:9,17
114:22 118:5
137:14,15,16
142:11 150:4 156:1
156:12,14 168:19
168:20 174:12
181:17 184:25
187:11,16 188:1,7
203:16,24 204:5,16
204:25 205:4,13
207:23 209:5 210:2
211:4,11 227:15
228:16 238:15,18
239:1,16,18 240:1
241:2 252:16
253:17 254:20
281:4 283:13
304:14,18 305:14
312:14 313:9 314:7
314:9 319:10
325:17 329:20
337:6 338:7,10,18
339:2 340:1,2,7
346:12 352:16
353:5 368:10
369:25 382:10,12
382:17 383:19
384:12 385:14
392:24 393:2 394:6
**paragraphs (3)**
100:24 169:6 204:13
**paraphrasing (1)**
292:9
**paren (4)**
321:13,14 337:9
391:1
**part (47)**
80:23 81:6 91:8
115:11 118:16
130:1,10 168:25
192:25 194:10
200:19 201:8
208:23 209:10
211:5,7 231:25
233:8,16,17 234:2
239:25 245:6,17,24
246:11 247:3,4
263:14 272:15,19

279:19 293:14
295:16 296:21
304:22 330:24
342:16 353:10
363:4 365:8,12,21
370:13 372:10
383:3 401:6
**partial (3)**
14:1 331:15 391:19
**particle (1)**
127:20
**particles (23)**
120:24 121:19,24
122:14,19 123:4,21
127:14,16,20,22,24
215:24 216:2,4
221:17,20 223:9,15
224:3 302:7 378:5
378:14
**particular (16)**
30:10,23 38:23 211:5
228:3 281:23
308:15 331:25
332:9 348:2 350:8,8
350:9 369:5 390:25
395:7
**parties (7)**
11:18 12:2 328:25
367:9 406:18
407:15,17
**parts (6)**
93:2 133:21 205:9
334:8 357:3,7
**party (2)**
406:15,18
**pass (2)**
10:24 165:24
**passage (3)**
101:12,22 102:4
**passages (2)**
204:9,13
**passes (1)**
16:21
**paste (5)**
239:4,25 305:24
315:14 330:3
**patent (247)**
4:12,15 5:4,6,7,9 11:3
11:14 19:8,10 33:4
33:6 37:25 38:8
40:17,18 42:17 44:4
47:8,9,12 49:25
50:11,19 52:22 53:7
53:9,15,16,21 54:1

54:4,10,16,20 55:12
55:17 56:1,9 57:13
57:16,20 59:6,22
60:13,22 65:8,18,19
66:1,5,10 67:12,23
69:21 70:16,18,19
70:24 74:22 75:21
76:1,6,17,21 77:1
77:11,24,25 78:5,5
78:6 79:8,18,24
81:7,17 82:23 83:1
83:4,5,6,7,10,19
84:2,5 85:12,12,15
85:18 86:10,10 87:3
87:11,14 88:1,10
91:13,16 93:2,9
98:8,9,14 99:2
104:20 105:6,21
114:19 115:6
134:22 137:17
139:16 145:20,20
150:21 151:25
152:4 155:14
157:23 158:12
166:22 168:24
169:3 170:13,14,15
171:6,8,15 173:3
174:3,4,7,20 175:3
175:9,15 176:25
177:8,10,16 178:2
178:14 182:6,9,13
182:15,18 183:5
184:16,20 185:12
187:4,6,6,12,15,22
188:3,9,24 190:14
190:19,20 191:8,12
191:16,19,23
192:22 193:16,25
194:1,3,13,25
195:10 196:12
197:17,17,25,25
203:17 205:9,15
208:13,14,17
210:13,14 211:10
217:19 227:19
228:6 229:12
230:23 235:1 237:9
241:6 251:13
252:25 253:20
257:3 273:18,23
274:15 280:1 284:7
284:18 285:21,21
304:22,25 305:5
310:12 314:12

322:22 323:1
329:13,15 331:16
332:14,16 336:2
337:3 338:23 340:8
340:11 343:15
344:2 365:21 375:6
382:3,18,25 389:20
390:4 391:12 395:2
396:18,24 399:5
402:6,10 404:5
**patent's (2)**
90:24 98:4
**patented (1)**
181:13
**patentee (3)**
198:8,17,20
**patents (10)**
13:13 15:1 42:7 75:24
109:17 172:22
190:13 192:19
197:11 227:5
**Pathological (2)**
325:13 326:6
**pattern (10)**
94:5 100:2,7,17
107:13 121:2 128:4
216:11 217:3
226:10
**patterns (10)**
321:3 330:22 331:4
331:14,18,22
332:18 333:8 334:3
402:15
**Paul (1)**
70:12
**pause (9)**
42:1 82:14 139:5
159:11 200:25
235:20 304:3
373:23 399:22
**pay (2)**
177:12 194:24
**paying (1)**
177:3
**Peachtree (2)**
2:7 7:25
**peers (1)**
58:10
**pejorative (1)**
364:10
**penalty (4)**
338:20 340:4 341:6
405:4
**pending (3)**

252:8 399:16 401:20
**Pennsylvania (1)**
3:4
**people (13)**
21:14 34:11,17 38:22
73:23 189:4 191:16
191:18 196:22
197:10,10 198:6
365:19
**percent (8)**
282:22,24 285:18
303:13,14 355:10
355:21 360:10
**perfectly (5)**
128:12 146:17 206:25
258:10 314:6
**perform (2)**
135:21 238:8
**performed (3)**
43:17 148:15 371:14
**period (10)**
14:17 127:7,8 142:9
161:22 224:10
366:14 383:14,16
383:18
**periods (14)**
231:8 240:19 242:3
258:3 271:4 272:18
277:13 315:21
362:22 366:20
382:14,18 383:1
393:20
**perjury (1)**
405:4
**person (9)**
44:3 181:2 241:4
264:2 352:7 366:15
396:16,17,24
**personal (1)**
51:15
**personally (1)**
57:23
**pertains (2)**
44:5 66:10
**Pg (7)**
408:6,8,10,12,14,16
408:18
**Ph.D (2)**
7:10 53:4
**PHOSITA (41)**
44:4 64:21 65:3,19
66:9 67:7,15,18
68:11 90:25 103:18
103:21,24,25

137:18 208:4,20
209:5 211:8 226:20
250:15 256:21
257:6,20 263:24
280:16 281:9,10,24
282:22 311:6,6,8,18
311:22,23,24 312:2
312:7 365:21
368:20
**PHOSITA's (1)**
283:3
**PHOSITAs (1)**
73:23
**phrase (13)**
62:21 95:19 97:2,6
104:17 106:2 162:5
164:22 208:16
232:10 249:1
261:24 367:24
**phrases (1)**
235:1
**physical (9)**
4:21 22:10,20 121:9
121:18,23 221:17
254:8,11
**physically (6)**
120:23 133:23 218:15
222:25 223:4,8
**pick (15)**
15:4 34:11 154:19
349:13,13,17,18
350:3,4 354:25
358:5 371:23 378:5
378:18 386:5
**picked (1)**
350:7
**picture (5)**
112:8,8 119:17
129:16 306:1
**pictures (1)**
169:3
**piece (11)**
97:15,15 142:1,2
153:21 166:5
212:11 245:4
286:16 289:18
351:15
**pieces (4)**
100:25 119:21 141:18
318:10
**pit (10)**
15:24,24 16:3,8,23
21:3,10 39:20 74:7
74:7

**pits (11)**
15:12,13,15,19 16:10
16:19,22 17:1,5,15
20:16
**Pittsburgh (1)**
3:4
**pizza (9)**
317:23,24 318:1,4,4
318:11,12,16,18
**place (16)**
34:1 101:12 102:5
106:8 115:9 141:12
288:20 289:12,15
289:18 292:24
293:6 294:19 299:1
357:24 358:8
**places (3)**
72:21 262:25 399:5
**plain (3)**
309:20 310:1,4
**Plaintiff (2)**
1:5 7:13
**Plaintiff's (7)**
6:6 48:18,23 49:11
62:12 307:20
319:23
**Plaintiffs (3)**
3:2 8:10 308:10
**platter (1)**
215:24
**platters (4)**
113:6 295:4,20,24
**play (2)**
51:22 288:1
**playback (1)**
29:7
**played (1)**
24:21
**players (2)**
184:14 185:11
**plays (1)**
44:24
**please (29)**
8:1,12 9:22,22 12:15
44:1 50:7 53:18
56:16 61:10 69:4
84:24 94:18 102:1
103:1 111:12
122:22 139:9 164:8
211:25 220:7 221:4
233:23 242:17
269:7,24 277:6
354:14 371:11
**plug (2)**

133:21 148:4
**plugged (1)**
223:20
**plural (1)**
380:2
**plus (11)**
260:23 315:19 316:3
319:13 360:2
375:24 385:18
387:8,8 388:15,15
**point (25)**
21:7 25:11 30:8,18
37:12 89:10 136:22
226:25 240:9 252:5
252:21 261:21
284:21 286:13
308:9 339:8 346:3
362:24 366:19
376:7 378:11 381:7
381:13 390:15
398:14
**pointing (5)**
100:6 231:14,17
241:9 315:2
**points (1)**
100:1
**Pomraning (1)**
173:13
**pool (1)**
187:4
**poor (3)**
358:13 361:11 364:14
**poorly (2)**
266:11,21
**Portfolio (1)**
187:7
**portion (9)**
115:10 131:8 248:16
249:20 259:18,24
286:19 330:5
404:19
**portions (3)**
249:12 313:21 363:4
**posed (1)**
49:3
**position (4)**
175:14 195:14 222:22
376:4
**positions (3)**
48:10 56:9 196:3
**positive (2)**
161:23 183:19
**possible (4)**
163:14 183:2,3

266:16
**potential (7)**
38:15,24 44:17 45:5
177:1 190:14
326:22
**potentially (5)**
26:24 256:22 327:1
345:25 366:3
**power (2)**
27:21 225:16
**PP (2)**
23:20 25:3
**PR (10)**
331:15,18,25 332:1,1
332:9,20,23 333:3
349:12
**PR4 (4)**
391:16,17 392:2,6
**practical (1)**
12:22
**practically (1)**
282:8
**practice (5)**
117:16 157:22 158:11
185:11 223:22
**practiced (2)**
139:6 160:6
**practices (1)**
284:7
**practicing (1)**
223:21
**preamble (13)**
105:23 211:14,16,22
212:2,5,12,13,23
213:8,11 394:22,24
**preamplifier (1)**
118:22
**preceding (2)**
325:9 407:10
**prefer (1)**
378:7
**Prehearing (1)**
4:15
**premarked (3)**
11:1,8,15
**prep (1)**
61:6
**prepare (2)**
60:18 285:20
**prepared (1)**
61:1
**present (14)**
95:6 96:5,10 97:3,6,8
97:11,14,17,23 98:2

239:7 281:18
337:16
**presumably (3)**
145:5 149:10 170:13
**pretend (3)**
125:14 135:19 284:5
**pretty (5)**
33:17 45:19 94:16,19
95:12,18 213:13
276:17 346:22
**previous (10)**
15:1 80:4 113:17
173:5 190:9 228:7
283:9 305:18
342:14 385:5
**previously (4)**
83:25 226:21 400:14
400:21
**primary (1)**
29:15
**principal (2)**
14:8,17
**principle (1)**
211:6
**printed (2)**
180:3 183:15
**prior (14)**
50:6,9 80:22,24 81:6
81:9 113:11,20
114:15 234:12
253:3 338:12
366:11 400:10
**priori (1)**
348:25
**privilege (2)**
46:19 397:13
**privileged (4)**
47:21 54:14,22 178:8
**probability (41)**
203:19 242:4 244:15
250:3 258:5 263:13
264:24 265:25
269:2,16 270:15
271:5,14 272:20
273:3 277:23 278:5
280:3,8 330:20,25
331:5 332:3 333:11
333:18 334:1
335:11 336:19,20
347:21 348:24
349:10,16 350:4,5
350:11,24 351:10
351:13,19 356:23
**probably (37)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12:5 14:4 22:6 23:9
33:15 36:22 40:16
46:9 52:14,18 53:2
53:4,12 57:9 60:16
60:21 66:23 119:17
129:21,22 132:18
144:16 176:22
193:8 213:8 228:24
257:11 285:5 286:8
287:9 346:23
355:13,20 356:3,16
366:6,8
**probing (1)**
140:12
**problem (7)**
38:15,24 40:23 44:18
44:18 45:6 375:5
**proceedings (1)**
75:4
**process (17)**
46:17,21 113:10,19
158:11 198:14
213:4,6,6,8 279:15
367:15,25 368:21
369:1,7,8
**processed (1)**
368:13
**processes (1)**
118:11
**processing (1)**
14:21
**processor (6)**
118:5,9,18,21 143:4
148:8
**produce (7)**
120:18 223:13 288:8
288:9 324:21 348:1
371:16
**produced (7)**
17:3 55:2 119:2,17
132:9 192:3 385:8
**produces (12)**
107:12 120:3 128:1,6
141:24 145:5 219:7
222:16,19 286:20
289:23 367:15
**producing (14)**
26:16 105:25 106:10
130:2 131:9 148:24
285:2,11 295:1
367:4,12 403:11,15
403:18
**product (7)**
183:4 320:21 324:19

324:22,25 325:3
366:10
**products (5)**
181:14,19,25 182:19
182:20
**professor (63)**
1:17 2:5 4:3,17,19
8:15,21 11:4,10
12:9 22:2,3 33:4
42:5,21,22 52:22,25
54:18,23 55:10
59:25 60:12 71:13
72:7,9 76:13 78:1
81:4 82:21,25 84:1
86:20 135:2 140:1
146:9 159:16
160:23 169:15
175:13 179:20
184:5 186:5 189:18
192:9 193:20 201:4
235:25 252:14
268:1 276:12 277:4
283:25 304:8
319:19 324:8 374:3
389:19 390:10
401:9 404:15 406:5
408:4
**program (6)**
154:18,22 155:1,7
190:14 327:22
**prohibit (8)**
316:8 317:4,6,7,17
318:6,9 319:3
**prohibited (12)**
315:21,25 316:4,13
316:20 317:2,9
318:3,16,25 319:10
406:13
**prohibiting (2)**
317:24,25
**project (1)**
43:15
**prone (8)**
330:21 331:4,8,14,17
331:22 333:7 334:2
**proper (2)**
197:18 198:1
**properly (2)**
212:4 280:17
**properties (2)**
28:15 293:2
**property (3)**
25:7,15 28:7
**proposal (3)**

352:21,22 368:4
**proposed (55)**
4:16 12:2 47:18 48:3
48:13,18,23 49:6,11
49:15 61:17,25 62:8
62:10 63:4 101:9
201:16 202:7
238:22 275:23
307:7,12,20 308:10
308:25 312:19
313:1,16 314:2,5
316:16 328:17
330:17 331:21
350:20 369:19
395:15,16,21,23
396:5,6 397:3,7,17
397:21 398:18
401:5,17,21,22
402:4,14,17 403:24
**proposing (1)**
364:19
**proposition (1)**
227:18
**prosecution (38)**
4:13 11:12 91:15
169:8 187:16 194:1
196:12 228:17,19
228:23 230:25
236:13,17,20,22
238:17,19,21 239:4
239:16 240:1,24
241:4,18 251:12
252:3 285:25
305:16,21 306:1
314:23 315:8,15
319:9,12 370:14
393:2,23
**protection (1)**
254:10
**PROTECTIVE (1)**
1:13
**provide (8)**
46:25 47:3,13 58:23
191:20 400:17
406:11,15
**provided (3)**
47:17 392:19 401:7
**provides (2)**
190:18 239:7
**Public (1)**
2:9 408:24
**publication (1)**
81:8
**Publications (1)**

76:21
**published (2)**
79:16 305:2
**pull (3)**
105:20 389:19 391:11
**pulled (3)**
136:6,7 276:20
**purpose (26)**
32:3 121:5 204:2
224:7 232:17,19
248:18 250:1,7,19
250:20 260:4
263:24 264:1,4,7,8
264:9,15,15 265:5
273:17 274:18
279:24 335:4
351:14
**purposeful (2)**
250:10 251:1
**purposefully (1)**
263:23
**purposely (1)**
359:13
**purposes (2)**
199:4 204:2
**Pursuant (2)**
1:13 406:7
**put (49)**
16:10,11,12,16 26:22
32:15 43:22 46:7
63:15 73:4 86:18
120:3,5,6 136:9,12
136:13,24 137:6
139:1,2,2 156:6
165:25 166:4,4
210:2 231:3 244:19
250:5 251:9,10
266:7 275:24
303:10 305:24
345:2 357:19,22
359:1,6,13,25 360:7
360:8,9 361:3 363:9
378:3
**puts (3)**
26:8,15 213:7
**putting (1)**
381:24

_____
Q
_____

**qualifications (1)**
12:17
**quality (7)**
355:5,11 356:5,22
362:20,25 363:6

**quantity (1)**
362:14
**question (89)**
9:21 22:17 23:12
27:13 34:15,16
35:20 41:5 46:23
47:22,25 48:14 49:2
49:3,4 50:7 51:13
53:18 54:13 56:16
57:1 68:17 81:4,5
86:20,23 87:6 94:21
95:11 110:2 113:16
119:4 123:9 134:16
139:9 143:23 144:4
156:24 158:3
159:25 164:7 165:8
166:8 174:24 185:4
191:18 194:14
197:22 207:9,13
219:1 228:2 233:23
242:18 243:5
257:11 262:19
266:19 267:1
269:23 270:21
278:9 279:7,8
281:12 282:3,7
286:22 297:10,12
299:4 338:13
342:17 368:9
372:14,16 374:12
376:13 378:18,23
381:3 388:23
397:17 398:11
399:17 400:17,25
400:25 401:20
**questioning (4)**
10:2 400:3,18,25
**questions (8)**
267:20 389:14 392:9
398:4,13 400:12
404:14 407:8
**quick (13)**
28:14 29:21 41:21
62:4 78:20 179:24
206:15 226:14
228:23 281:3
330:11 368:9
382:11
**quickly (4)**
77:3,6 231:12,13
**quite (3)**
289:5 353:23 374:4
**quote (23)**
63:12 64:20 101:11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

101:11,11,21 102:3
107:18 163:5 188:8
188:8 209:6 211:18
221:7,9 258:1,7
278:4 314:12
320:25 321:1,12,13
**quoted (3)**
102:23 103:13 336:3
**quotes (3)**
208:21 210:3 252:16
**quoting (5)**
254:24 255:5 320:13
321:6 385:5

_____

**R**

**R (10)**
7:4 15:8,13 71:4,11
74:16 75:1 405:1
406:1 407:1
**ran (5)**
134:3 136:15 158:6
159:22 160:2
**random (2)**
154:12,24
**randomly (5)**
357:22,24 358:8
359:6 361:3
**rate (97)**
19:18,21,23,24 20:2,3
20:4,7,9,14,17,18
20:19,21 21:4,12
32:12,12,17 61:8
167:2,5,6,10,19,24
204:3 264:10,16,18
265:6,7,10,14,15,18
265:19 266:9,12,15
266:20,22 267:17
268:4,9,12,15,19,22
269:11 270:6,6
272:9 273:19 274:5
274:16,18 275:5
279:14,18 280:7
322:1 328:3,21
331:9 338:19 340:3
340:23,24 341:1,6
341:13,13,19,21
342:2,21 343:6,22
344:9,9,12,13,17
345:9,16,20 346:8
346:24 347:4,7,8,24
348:17 349:19
350:9 384:9
**rates (7)**
322:20,20 342:20

344:5,17 346:17
406:18
**rationale (1)**
279:12
**RC (2)**
324:24,24
**RDS (8)**
27:19 31:23 32:2,10
32:10 161:25 162:7
162:16
**reach (1)**
144:17
**read (70)**
6:5 40:9,13,17 47:8
50:2,5,7,9,12,13
51:21 53:5 77:2,5,8
77:15 112:17,18
137:17 174:24
194:9 196:11
206:24 207:4,5
208:5,10,22 209:7
209:16,16,17 210:4
210:9,12 245:17
249:16 254:5,19
256:21 257:7
272:14 292:10
307:19 325:16
338:14 357:13
366:11 375:19
379:19,19 383:23
385:23 386:25
388:14 390:6,9
391:4 393:14 394:6
395:2 405:4 408:6,8
408:10,12,14,16,18
**read-back (3)**
206:19,25 207:15
**readable (2)**
18:16,20
**readback (3)**
26:24 383:22 384:8
**reader (1)**
249:25
**reading (17)**
38:20 41:6 44:7 65:9
65:14 91:24 92:3
113:17 199:9
209:14 283:7 311:7
383:4,11,15,17
396:18
**reads (10)**
16:19 195:10 394:2
408:6,8,10,12,14,16
408:18

**ready (3)**
301:22 303:10 338:16
**real (15)**
29:21 41:20 62:4 77:2
78:20 124:21,22
125:8 179:24
216:12 223:20
226:14 228:23
281:3 330:11
**realize (5)**
48:6 217:5 224:8
225:9,9
**realized (3)**
216:10 218:23,25
**really (33)**
21:14 39:8,13 57:8
74:3 80:25 81:1,3
81:10 95:5 96:12
105:6 123:9 125:4
125:15 139:8 165:5
165:6 196:10
243:15 250:25
266:20 270:18
277:3 289:10 293:6
311:15 328:1
360:23 377:23
382:3,8 403:1
**reason (72)**
10:10 29:10,15 30:3,4
30:4,19,22 31:7,8
32:23 34:11 64:9,12
64:15 71:21 72:1,8
72:11,14,15 81:23
81:23 82:4 92:10,19
92:22 93:13,20,25
98:13,21 99:18,21
104:13 139:22,24
163:3,4,4 164:1,12
164:25 165:1,19
167:22,25 179:10
223:7 238:17
251:10 255:14
256:5,15 259:12
260:7 262:16,17
270:11 278:24
316:3 343:22
350:23 351:9 357:2
408:6,8,10,12,14,16
408:18
**reasonable (3)**
247:19 287:8,10
**reasoning (2)**
68:1,4
**reasons (22)**

25:8,16 29:18 31:10
63:22 64:3,5 81:22
90:17 92:16,18 93:6
93:7 104:3,5,6,10
105:11 163:25
164:10 168:22
350:2
**recall (8)**
10:7 101:1 159:20
162:18 181:12
240:7 393:8 395:18
**recalling (1)**
24:25
**receive (2)**
191:11 237:25
**received (1)**
403:19
**receiver (14)**
234:22 237:3 238:1
242:5 263:13 266:1
269:2,17 270:15
271:5 272:21 273:3
277:24 278:6
**receiving (11)**
105:24 129:15 148:17
234:23 237:3 238:1
239:20 244:16
258:5 264:25
284:18
**Rechannel (2)**
284:2 324:25
**recite (2)**
261:24 381:5
**recited (6)**
209:21 242:24 263:14
279:18 336:4
370:20
**recites (1)**
207:24
**reciting (2)**
237:15 238:3
**recognize (2)**
11:3,10
**reconcile (1)**
219:16
**record (46)**
9:12 10:23 21:24 33:2
41:23,25 42:3,19
76:11 82:12,16,18
110:4 159:9,13
169:13 172:11
175:22 179:16
183:24 186:2
189:16 192:6

200:21,24 201:2
218:17 225:14,14
225:17 235:18,22
283:23 304:1,5
319:17 324:6 329:4
373:22,25 397:12
399:19,21,24
401:13 404:17
**recorded (184)**
40:12 45:5 89:7
108:16,25 109:3,14
109:14,17,24 121:8
122:6,6,10,12
123:12 131:15,16
131:21 132:5,15,22
132:23,25 133:2,6
133:10,10,14,16,17
134:2,10,15,17,18
136:3,8,11,14,17
137:1,7 138:7,15,16
138:17 140:7,20,23
140:24,25 141:4,20
142:5 143:13 144:6
149:14 156:5
158:23 200:19
201:14,14,17,18,18
201:24 202:2,2,6,17
202:18,21,22
205:23 206:20,24
207:1,16 208:6,22
211:18 212:24
213:9,12,17,20,24
214:1,9,19,24
215:18 216:8,9,14
216:23,25 217:6,12
217:23 218:7,10,18
218:20 219:2,3,16
219:18,23 220:3,14
220:24 221:7,8,13
222:9,15 223:1,10
223:13,16 225:19
225:22 226:2,8
233:6 236:9 238:23
243:25 245:9 255:1
257:16 292:12,19
293:21,24 294:12
299:15,17,20,23
300:1,9,17,19,25
302:1,4,6,22,25
303:4,14 320:15
334:22 335:19
369:16 374:7,16,21
375:20,22,25

377:21,24,25 378:2
378:15 379:18
380:24 381:22,25
394:16,17 396:12
402:13,15
**recorders (2)**
95:8 96:7
**recording (95)**
13:4,23 23:24 31:21
37:20 40:1,3,10,24
43:9,20 44:25 45:1
45:4,4 51:16 58:7
61:19,20 62:22,22
63:12,13 64:23,24
65:20,22 66:5,6,16
66:18,22,22,24,25
71:16,23 72:25 73:5
73:8,12,17 77:20
78:2,8,13 84:14
85:14,16,20 86:12
93:4 94:20 104:21
109:16 110:4
134:24 135:22
137:21,21 140:9,9
145:15,15 146:2,2
147:7,25 150:7,8,11
152:7 160:19,20
161:22 165:11
175:4 181:14 183:6
188:15 193:19,22
196:5,17 200:5
207:11,11 330:21
335:12 347:21
348:25 391:21
399:12 401:24
402:9
**recordings (3)**
31:7 83:15 94:6
**recover (3)**
362:11,13,18
**recovered (1)**
158:19
**recovery (37)**
352:24 353:11,14,18
353:19 354:1,7
355:2,6,11,15,20,20
355:25 356:4,12
357:5,9,13,25
358:10,14,16,18
361:9,11,13,25
362:7,25 363:20
364:13,15 365:2,15
366:14 367:1
**red (3)**

128:10 306:3,10
**redefining (1)**
260:2
**reduce (20)**
203:18 264:10,16,18
273:19 280:2 331:5
331:9,13,17 333:7
333:10,17 336:20
336:22,23 347:20
348:24 349:9
350:24
**reduced (3)**
349:16 351:9 407:9
**reduces (9)**
274:16 330:20 331:8
332:3 334:1 335:11
336:18 350:3
351:13
**reducing (6)**
204:3 265:5 268:22
330:25 336:24
346:8
**reduction (18)**
242:4 244:15 250:2
258:4 263:11,12
264:24 265:25
269:1,16 270:14
271:4 272:20 273:2
274:21 277:23
278:5 279:17
**reed (1)**
60:22
**reemphasize (2)**
249:14,19
**refer (3)**
78:14 193:6 226:15
**reference (7)**
36:11 63:12 77:19,22
110:3 231:9 392:4
**referenced (2)**
14:7 50:10
**references (8)**
50:5,6,10,13 78:6,14
187:17 392:2
**referral (1)**
406:16
**referred (5)**
205:15,20,21 226:21
399:7
**referring (56)**
24:7,8 40:6 87:12
92:5,9 93:3 94:8,19
95:6,7 97:13 98:4
100:22 106:7,8,13

107:13 108:17,25
109:1,13,14,16,20
110:4 113:15
114:11 118:12
128:25 182:11,13
193:12 203:24
209:11 211:4 217:2
227:7 232:24,25
235:8 240:6,9,11
241:5,13 243:15
263:8 288:13
298:21 310:20
326:9 377:20,24
379:20 380:15
**refers (3)**
22:19 284:18 321:1
**reflected (4)**
16:23 392:13 397:2
401:23
**reflecting (1)**
16:23
**refresh (2)**
162:11 236:7
**regarding (2)**
85:15 190:19
**regardless (1)**
126:1
**Regents (3)**
1:4 7:12 408:2
**region (3)**
383:24 384:3,10
**regions (10)**
61:19 62:14 64:23
137:20 140:8
145:14 146:1 150:7
153:9 160:19
**regular (1)**
407:16
**regulate (1)**
317:17
**regulated (1)**
316:20
**regulates (7)**
313:12,16 316:17,19
327:17 328:2,19
**regulating (3)**
317:14 318:12,12
**regulation (2)**
317:1,8
**regulations (2)**
317:4 406:7
**reimprove (1)**
361:23
**rejected (3)**

229:23 252:11 253:18
**rejecting (2)**
253:23 256:5
**rejects (2)**
111:5,14
**relate (1)**
399:8
**related (9)**
14:22 40:2,11 41:16
54:15 58:3 360:11
360:17 364:20
**relates (3)**
65:8 96:5 365:7
**relationship (1)**
58:9
**relative (3)**
336:23,24 342:12
**relatively (3)**
21:1,3,11
**relevance (1)**
88:6
**relevant (8)**
87:13 205:14,19,24
206:1,3,8 259:1
**remainder (2)**
334:7,7
**remember (42)**
22:6 24:18 50:12 52:6
52:13,16 72:13,22
90:15 91:21 93:24
98:7 140:1 160:23
161:10,11 162:6,7
162:24 168:19
173:2 194:9 203:25
204:12 206:2,2
212:21 229:21
232:23 234:15
236:14,23 237:2,4
239:10 249:9
256:11 281:4,8
292:5 327:3 370:14
**remove (7)**
133:20,24 135:16
233:24 234:1
331:13 333:7
**removed (6)**
133:22 147:7,25
203:6 263:6 403:7
**removes (2)**
331:4 334:2
**removing (4)**
234:8 263:20 330:21
331:22
**rendered (2)**

88:11 403:23
**rendering (7)**
58:17 59:19 83:1 87:3
283:12 392:12
402:19
**repeat (1)**
237:22
**rephrase (3)**
9:22 30:6 95:11
**report (8)**
52:17 60:22,24,24
62:18 192:18 398:1
400:11
**reported (4)**
1:23 325:8,17 407:7
**reporter (8)**
2:9 7:21 8:12 9:11
406:9,15,24 407:23
**reporting (11)**
7:22 240:8 406:7,10
406:11,12,14,15
406:15,17
**represent (4)**
7:22 154:13 214:19
407:11
**representative (6)**
17:15 214:1,8,9 215:5
406:10
**represented (2)**
381:12 390:17
**represents (6)**
16:5 214:19 284:11
302:11,13,14
**request (4)**
50:19,22 52:13
400:16
**requested (1)**
52:14
**requesting (1)**
187:21
**require (5)**
122:17 140:7 163:8
168:11 265:18
**required (6)**
38:9 41:12 123:16
256:10 334:5
366:16
**requirement (10)**
40:2,5,6,7 41:10,11
41:15 163:13,18,20
**requires (11)**
9:18 122:24 143:20
179:3 267:24 268:3
269:15,15 278:4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

346:6 366:16
**research (5)**
12:18 14:16 43:15,16
43:19
**resident (1)**
120:17
**resort (1)**
103:19
**resorting (1)**
103:22
**respect (5)**
85:2 187:22 256:4
269:10 327:20
**respects (1)**
396:21
**responding (1)**
229:20
**response (6)**
14:1 229:11 233:3
256:16 331:16
391:19
**rest (4)**
193:6 212:15 254:19
292:4
**restate (1)**
270:23
**restrict (2)**
318:24 319:4
**restrictive (8)**
314:13 315:3,8,17,22
316:5 318:2,2
**restricts (8)**
313:12,16 315:9
316:17 318:22
327:17 328:1,19
**result (12)**
26:17 108:20 109:2
138:18 150:20
156:6 157:7,14
250:10 268:8
342:11 407:19
**resulted (1)**
158:23
**results (2)**
190:18 375:24
**retrieved (1)**
16:18
**reversal (14)**
61:18 62:13 64:22
67:8,19 69:13
137:19 138:8 140:7
145:25 150:6,16
153:8 160:18
**reversals (3)**

145:13 151:15 399:8
**review (2)**
52:2,9
**reviewed (14)**
49:19,24 50:23 51:1,5
56:7 194:16 320:1,2
392:18,21 398:21
402:18 403:22
**rewrote (1)**
220:9
**Richey (2)**
3:18 7:20
**Rick (2)**
3:18 7:20
**ridiculous (5)**
86:18,25 139:24,25
364:9
**right (481)**
9:1 11:6 12:6 13:19
14:5 15:25 24:13
39:23 42:11,12
43:22 45:22 48:4,7
49:25 51:3 53:24
55:13 57:5 61:21
62:2,15 63:5 64:6
64:25 67:9 68:8
69:18,22 70:7,16,16
71:16,19,23 72:7,10
74:12 75:18,23
76:18,23 78:2 79:5
79:9,11,16,19,24
80:2,7,15,20,23
81:7,15,23 83:5,7
83:20,21 84:5,7,22
89:18 90:25 91:3,10
91:17,20,24 92:1,13
92:17,25 93:11,15
93:18 96:21 97:3
98:16,22 99:5,8,12
100:24 101:3,19,25
102:7 105:19 107:5
108:12 109:7,23
110:5,23 112:9
113:4,12 114:16,20
114:22 116:22
117:8,21 119:6
122:20 123:15
124:5 126:5 128:10
128:14,16,16,17
129:16 130:11,18
130:19 131:18,23
132:9,14,16,17
133:3,11,20 134:8
134:13 136:21,22

137:13,22 138:15
140:25 142:21,21
144:13 147:10,12
149:4 150:17
152:24 153:13
155:3 156:25 161:8
161:14 164:11
166:12 167:3,6,16
168:13 169:8 170:6
170:16 171:11,15
172:1,3,5,16,23,23
173:7,10 174:4,7,10
174:16 175:25
176:7,14,23 177:5
177:11,13,23,24
178:2,19,24 179:11
179:13,20 180:15
180:21 181:20,23
182:1 184:5,7,16,20
185:2,12 186:6,7,15
187:8,13,17,18
188:8,17 189:19,22
190:15 194:15,19
194:22 195:1,6,15
196:24 199:20
200:5,10,15,17
201:5,19 202:3,18
202:22 203:1,21
204:7,10,22 205:5
206:12 207:25
208:8,17 209:22,25
210:1,17,18,21
211:12,19 213:15
217:10,13,24
218:15,24 221:1,18
221:21,24,25 223:1
223:11 224:21
225:17 226:8,22
228:17,20 229:7,15
229:20,21,24 230:3
231:10,16,19,20,22
232:1,7,13 233:6
236:10 237:10
239:1,4,11,13
240:12 241:6,13
242:6 244:16,19
245:6 248:5 251:16
252:3,5,14,23
253:15,21,24 254:2
254:14,17 255:15
255:22 256:13,18
259:16 260:25
262:2 267:9,15
268:19 269:17

270:24 272:1 276:2
276:21 281:22
285:3,12 286:2,2
287:11 290:22
292:9 295:2 297:3
298:3 299:17,21
300:2,5,10,19,22
301:13,14 302:13
302:23 303:17
304:18 305:2,3,9,18
306:1,19,22,25
307:9,24 308:6,18
309:11 310:16
311:10,20 312:21
313:13,19 314:9,14
314:20 316:1,20
317:3,4,18,24 318:4
318:7,19,22 319:10
319:23 320:3 321:9
321:22 324:10,16
326:11 327:6,12
329:9 330:2,22,25
331:6,14 333:1
334:6,25 335:8
336:11 337:19,20
338:21,24 339:3,6
339:16,21 342:3
343:10 345:10,17
346:17,18,25 347:4
347:11 348:9,12
349:5 351:4,16
353:7,11,14 354:1,9
359:8,18 360:2,21
360:24 361:6,7
362:8 363:18,20,22
365:11 366:7
367:17 368:5
369:19 370:7,10
372:24 374:7 375:2
375:7 376:7,14,15
376:20 377:13
379:16,22 380:17
381:17 382:6,23,24
383:5,7,9,10,25
384:1,3,5,6,22
385:1,11,12 386:22
387:13,16 388:7
389:15 391:15
396:8 397:20
398:17 401:19
**right-hand (2)**
169:20 229:2
**rip (1)**
142:24

**RIT (1)**
43:16
**RLL (27)**
23:23 71:3 72:5 89:20
89:23 90:4,7 162:14
265:16 310:23
311:19 321:22
322:1 324:12
325:19,24 331:10
332:25 337:17,22
338:3,12,19 340:3
341:12 346:10
348:15
**RLO (2)**
14:23 15:1
**RO (1)**
193:5
**Rochester (1)**
43:16
**role (2)**
43:12 288:1
**ROM (7)**
15:8,11,11,20 16:14
16:15 74:16
**Roman (1)**
61:14
**roughly (4)**
11:21 46:4,6,9
**rounded (1)**
125:1
**row (4)**
360:12,19,19 376:19
**Rozycki (2)**
188:24 190:2
**Rules (1)**
406:7
**run (13)**
14:1 21:8 67:1 113:25
142:12 225:13
321:1,2 356:19,24
357:11 366:22
372:1
**running (9)**
27:15 31:11 32:4,7
162:7 359:24
373:19 398:10,12
**RW (3)**
15:8,16 74:17

—————————
**S**
—————————
**S (3)**
7:4 406:1,1
**S-c-h-r-a-n-k-l-e-r (1)**
181:5

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

**sacrifice (1)**
167:24
**safe (5)**
184:12,13,22 192:14
283:6
**safely (1)**
134:23
**sample (8)**
366:20 382:14,18
383:1,14,16,18
384:9
**sampled (2)**
383:23 384:2
**San (2)**
1:2 7:18
**satisfactory (1)**
270:10
**satisfied (2)**
309:19 356:5
**satisfy (20)**
35:1 151:20 155:8
255:21 268:21,25
269:9,14 270:11
274:8,11 275:9,12
275:16,17,21
276:13 278:3
279:13,13
**saw (8)**
52:20 53:4 162:5
195:4,8,17 251:20
353:14
**saying (141)**
28:17 30:4 35:23 36:1
41:1 63:19 66:16,17
67:5 68:10,18,23,24
69:6 73:13 95:14
96:10 107:7 108:14
110:3 114:14 144:2
149:22 151:6 152:2
152:2,8,14,21
154:17 155:5
162:17 163:18
164:23,24 165:18
177:15,19,21
181:21 185:5,9,16
191:12 210:23
211:6,9 212:11
213:20,23,24 214:9
214:16,21 215:21
218:11,13,17 220:4
220:11,16,23
221:11 222:8
224:25 228:3
243:10,12,21 244:3

244:6,21,23,24
245:2 248:8 251:9
254:22 255:20
256:2 257:11 260:3
262:9,13 271:19
274:17,18 275:16
275:20,22 276:17
277:5 279:12 281:9
281:12 282:15
287:4,5,16 288:15
288:19,24 289:5,12
289:14 294:10,20
294:21 298:23
309:22 310:8,11
312:15 314:23
318:25 326:6,8
334:25 335:5,7,22
341:11,14 343:1
344:21,23 347:10
350:2,23 351:8
357:1 362:2 363:24
365:1 370:21
374:18 379:25
380:14 381:13
390:16 404:8
**says (172)**
11:16,25 12:9 22:9,20
23:19,23 25:10,18
28:15 30:19 33:6
34:3,8,25 35:4,11
35:24 36:5,5,11
37:19 38:8 39:16,25
42:16,22,25 50:18
51:4,5,8 59:12
61:15,15,16 62:11
64:8,11,14 65:18,25
67:15,20 71:2 79:16
82:22 83:14 84:13
87:16 89:4,17,19
96:5 97:12 106:5,12
107:18 108:1,9
110:15 111:6,15
113:19 114:7 118:5
130:1,18 148:17,23
149:4,12 153:8
162:14 169:21
170:13,18,24 171:2
171:19 172:22
173:21 176:10,25
177:6 180:15 181:10
181:18 182:9,18
184:17 187:11,17
188:14 190:17
193:15 195:9 202:1

214:15 217:21
219:15 220:1 229:3
229:10,11,17 230:8
230:14,20 231:8
234:22 237:25
240:17 242:6 248:9
251:14,22 253:17
254:4,16 262:1,4
269:1 270:12
272:15,19 284:1
285:1 286:2 292:5
292:10 308:9,15
310:18,22 315:19
319:22 320:13
321:11 323:5
324:24 325:6,13
327:9 335:8,10
336:7 337:9,15,25
339:9,9,18 345:9
346:17 352:23
366:20 370:5,13
373:2 374:5 375:14
375:15 380:24
382:25 385:7,21
387:7 388:12
394:11,11,12
**scan (1)**
77:6
**scanned (2)**
50:4,4
**scenario (5)**
134:3 159:21 303:12
371:23 372:9
**schematic (3)**
112:8 114:24 128:9
**scheme (2)**
173:23 203:18
**schemes (1)**
114:9
**Schrankler (3)**
181:3,8 189:5
**scientist (2)**
14:8,17
**scope (15)**
136:15 155:13 157:25
191:22 197:13,18
198:1,9 278:22
280:19,24 304:11
346:16 398:1,7
**screwdriver (1)**
142:24
**se (1)**
19:11
**second (25)**

34:3 57:4 64:8,9
93:17 99:21 101:2,2
101:2 118:5 129:10
148:23 174:12
188:7 200:21
234:12 272:19
277:20 299:23
301:8 322:1 338:15
364:22 370:4
399:14
**section (14)**
58:14,14 59:11,11
78:16 87:15 88:4,5
88:14,18 201:13
253:11,14 400:5
**sections (3)**
87:11 91:11 193:13
**see (211)**
11:24 12:10 23:19,20
24:1 25:5,8,21,22
32:19 33:8 34:6
35:2 36:15 37:18,22
38:12 40:4 42:22
43:2 58:13 62:9,12
63:23 64:4 71:6
74:25 75:2,23 76:1
76:14,20 77:18,22
79:15,16 83:17
84:16 87:11,17,20
87:23 99:19 100:2
106:3 137:13
149:21 169:20
170:8,18,24 171:2
171:17,23,24
172:16,19,25
173:12,21,25 174:2
176:2 179:18 180:9
180:17,18,25
181:15,17,21
183:10 184:5 186:5
186:9,17,23 187:5
187:10 188:7,8,13
188:22,23,25 189:4
189:5,10,19,24
190:2,12 192:8,17
192:21 193:1 196:3
201:24 205:17
206:13 207:19,25
212:25 220:10
226:17 227:19
228:5,22 229:2,10
229:10,13 230:8,13
231:3 232:2,5
234:13,21,22

237:17 239:8,19,20
239:22 240:5,16,17
240:21 241:24
251:13,14,21 252:7
252:10,13,14
253:17 257:21
259:2 273:12
281:14 282:23
284:1 288:10
289:17 290:11,12
290:13 294:4,7
296:5 304:20 307:4
308:13 320:6,11,17
320:19,22,24 321:4
321:15,17,21,23,25
322:3,6,9,14 324:9
324:12,20,24 325:5
325:11,17,21
326:17 327:15,19
328:9 336:9 337:7
337:13 338:20
339:13 340:4,13,13
340:19 344:5,6,17
349:5 369:11,13,18
370:17 372:19,22
381:13 382:13,18
384:13,14 387:6,10
396:14 400:10
**seeing (3)**
162:7 257:10 283:7
**seen (38)**
11:16,20 12:1,10 22:3
22:4,14 23:1,2
36:22 40:17 50:21
52:16 59:10 61:1,2
61:3 77:13 169:15
172:13,15 174:15
176:4 191:5,10
192:14,16 193:24
194:1 196:9,19
198:8 234:25 237:9
252:5 285:5 290:6
392:12
**sees (2)**
281:9,24
**select (2)**
52:8 349:8
**selected (2)**
85:3,4
**Selection (1)**
321:22
**semicolon (2)**
262:2 286:1
**send (2)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

146:7 263:23
**sending (3)**
134:24 175:5 186:21
**Senior (1)**
188:24
**sense (52)**
18:3 22:25 28:5 41:5
85:25 111:9,21,25
112:20 136:18
162:18 182:10
214:4 228:4 232:19
241:10 246:3,4
249:11 259:3 260:6
266:17 274:14
280:11 291:5,12,18
292:25 299:2
310:19 329:15
343:21 349:11
377:15,18 379:9,17
379:23,24,25 380:1
380:2,10,14,20,21
381:16,18,23
396:21 404:2,12
**sent (3)**
194:21 195:12 287:13
**sentence (33)**
23:23 25:6,12 34:3,6
37:18 39:16,25 41:1
63:21 65:2,24 84:11
89:3,11 96:3 113:10
113:18 114:12
126:15 171:18
174:10 187:21,25
204:5 209:12 212:3
213:3 315:18
338:14,16 352:23
368:19
**sentences (2)**
171:18 326:5
**separate (4)**
118:23 260:17 308:12
374:18
**separately (5)**
192:3,4 308:3,3,6
**separation (2)**
25:18 26:1
**sequence (81)**
106:2,6,7,9,12 108:2
108:10,15,19,24
109:2 117:21
124:13 126:22,23
126:24 149:14
217:22 243:14,24
245:7 248:10 291:3

292:11 293:3,21
294:12 306:4,18,19
306:25 320:15
334:22 335:19
363:9 367:16
369:16 374:6,13,16
374:19,24,25 375:3
375:15,16,18,18,20
376:10,12,16,19,20
376:25 377:1,5,8,12
377:16,23 379:7,8
379:14,15,17 380:2
380:3,8,22,24
381:13,15 382:1,7
383:1 389:1,2
390:22 391:3
396:12
**sequences (38)**
32:17 106:10,11
108:11 115:19
116:16,16,19,21,24
117:4,19,25 148:24
248:16 264:11,12
285:2,11 293:1
308:11,16,22
315:19 331:8 367:4
367:12,15 376:15
377:19 378:25
379:21 380:9
382:14 385:8
402:14 403:11,15
**sequential (3)**
395:3 404:6,11
**sequentially (3)**
403:20 404:2,10
**series (3)**
121:9 307:6 324:25
**Seriously (1)**
277:2
**serve (1)**
265:5
**services (2)**
406:12,15
**serving (1)**
171:20
**servo (4)**
28:16 29:1,16,19
**set (21)**
29:11,13 32:20 41:19
96:1 121:1 129:10
154:18,22 163:23
172:8 222:20
223:19 329:19
356:8 357:10 358:2

361:1 364:3 378:13
396:4
**sets (2)**
105:6,7
**setting (11)**
88:23,24,25 178:24
179:2 193:25 211:5
212:14,14 261:20
376:3
**seven (4)**
49:22 226:15 390:17
391:23
**sharp (2)**
127:22 239:6
**shed (2)**
243:16 326:15
**SHEE (1)**
408:1
**short (3)**
15:22 105:5,17
**shortened (2)**
63:14 342:23
**show (2)**
150:22 152:1
**showing (2)**
56:18 73:12
**shown (5)**
130:12 196:18 287:17
337:11 399:4
**shows (3)**
33:25 119:3 286:16
**shrink (2)**
340:24 341:20
**shrinking (1)**
341:5
**shut (1)**
121:3
**side (5)**
14:18 183:15 358:5
383:17,18
**side's (1)**
48:13
**sided (2)**
183:16,22
**sides (1)**
48:9
**Siegel (17)**
70:7,7,9,12 71:5,8,8
72:9 75:1 76:2,5,15
76:16,21,25 78:25
81:25
**Siegel's (2)**
72:7 78:1
**signal (76)**

14:21 17:2,5 25:19
26:2,16 29:11,12
31:10 36:12,12
118:6,10 122:8,18
122:25 123:17
124:3,3,4,5,6,8,11
124:12,14,16,19,20
125:19,21,22,25
126:25 127:9,16
128:2,6,7,20,21,24
129:5 132:1,4,16,19
132:19 134:8 139:4
140:14,24 143:6,9
144:13,16 148:9
202:2,12,21 203:11
206:23 207:5,15,16
215:9 226:3 287:12
291:4,9,18 294:2
295:1 383:22 384:8
390:21
**signals (1)**
161:23
**signature (5)**
174:3 188:12,23
405:18 408:20
**signed (4)**
42:25 45:21,23
176:11
**significant (1)**
181:11
**signs (2)**
180:17,18
**silent (1)**
269:10
**similar (6)**
15:14 31:8,10 100:25
255:8,17
**similarly (1)**
59:10
**simple (4)**
222:5,20 226:3 278:8
**simpler (1)**
218:25
**simplifies (1)**
203:7
**simply (2)**
48:12 400:20
**simulate (1)**
155:18
**simulated (1)**
155:2
**simulation (15)**
154:6,8 155:1,17,18
156:2,10,12,14

157:9,19,21 158:6
159:22 160:7
**single (4)**
60:3 125:24,25
364:11
**Sipiora (4)**
3:13 8:7 69:25 400:1
**sir (3)**
142:14 229:18 235:13
**sits (1)**
141:20
**sitting (10)**
8:6 56:17 136:4,9
137:2,7 218:21
219:24 303:9
363:25
**situation (1)**
206:23
**six (7)**
11:7 344:8 374:1
396:9,10,18 404:18
**Sixth (1)**
3:4
**size (8)**
21:3,10 340:24
342:22 343:9 356:9
359:4 362:6
**skill (1)**
44:3 396:17,24
**skilled (5)**
59:8 67:16 68:19
153:16 282:13
**skip (3)**
28:14 325:16 367:10
**skipped (4)**
29:8,22 326:4 330:12
**skipping (1)**
329:24
**slash (1)**
83:16
**Slavec (2)**
180:24 181:7
**sliced (1)**
126:1
**slicer (9)**
29:11,13,21 30:1,8,19
30:23 162:24 163:2
**slider (2)**
112:25 132:13
**slightly (2)**
256:23 317:1
**slowly (1)**
199:1
**small (1)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**small (1)**
53:3
**smudge (4)**
26:8,22 27:24,25
**societies (1)**
75:14
**society (4)**
75:5,12,13,15
**Soljanin (14)**
4:19 12:10 60:1,2,5
60:12 83:3,6,10,23
389:20,21,22
390:11
**somewhat (2)**
237:8 309:1
**soon (3)**
361:20,21 362:17
**sorry (84)**
17:9,10,12 19:23
22:16 25:11 30:15
32:21,25 37:14
38:19 41:12 45:19
45:25 47:23 50:17
53:19 64:2 65:13
68:16 70:2 75:3
77:4 78:24 89:10,12
94:17 100:11 108:7
112:4 113:16 119:4
121:15,22 129:22
142:14 147:17
151:7 158:20
161:11 162:3 171:9
174:23 180:10
182:23 185:3,4,11
190:5 204:15 209:3
211:2 214:13
217:18 218:12
232:22 259:8
260:13 270:18
282:20 283:13
284:17 285:4,6
287:2 290:12
295:12 296:23
300:23 319:20
324:23 326:19
329:23 333:7,22
338:9 352:16,18
364:24 376:23
378:8 391:18
401:21 403:12
**sort (6)**
10:6 111:16 238:3
274:3 277:10 331:3
**sought (1)**

191:8
**sounds (6)**
9:16 10:5,21 151:18
274:13 303:16
**sources (2)**
51:6,18
**spaces (1)**
127:5
**spar (2)**
146:22,24
**speak (2)**
9:10 377:15
**speaking (4)**
16:9 46:24 282:8
364:7
**spec (2)**
204:24 330:5
**special (1)**
71:2
**specialized (3)**
309:10,15 314:17
**specializing (3)**
44:6 65:8 66:14
**specif (1)**
35:22
**specific (12)**
30:1,4 52:3,5 74:4,5
177:1 209:10 211:7
309:24 310:24
311:15
**specifically (3)**
38:8 97:13 185:7
**specification (42)**
47:12 59:7 91:9,25
92:12 93:11 94:22
96:20 99:1,2 109:7
204:6 205:15,20,22
205:25 208:5,11,17
208:19,22,23 209:7
209:11,18,25 210:4
210:5,15,24 211:7
235:9 237:17
324:19,22,25 330:1
353:6,10 383:3
404:6,11
**specifications (8)**
4:21 22:10,20 23:5
137:17 188:15
320:21 325:3
**specifies (2)**
107:3 260:19
**specify (3)**
34:20 402:6,7
**specifying (3)**

35:14 235:7 311:15
**specs (1)**
187:23
**spectral (2)**
27:21 28:2
**speculation (1)**
88:21
**speed (2)**
347:25 348:2
**spelled (1)**
255:14
**spend (1)**
77:11
**spent (1)**
23:9
**spes (1)**
23:13
**sphere (1)**
266:16
**Spider (1)**
324:25
**SPIE (1)**
75:15
**spiel (1)**
161:18
**splitting (1)**
18:16
**spoken (4)**
57:12,18,23 60:12
**sponsored (1)**
43:15
**spot (3)**
16:20,21 252:23
**spots (1)**
359:14
**square (9)**
122:7,13 124:15,22
124:23 125:4,7,15
125:15
**squared (4)**
391:17,18 392:2,6
**stage (3)**
101:12,22 102:5
**stamper (3)**
16:12,13,16
**stand (2)**
261:3 343:7
**standard (32)**
17:24 18:2,3,4,5,7,8
18:12,20 20:9 59:12
90:10 161:3,6
163:20,23 164:9
178:16,17,21,23
179:1,3 187:13

193:9,9,13,16
195:15 199:20
200:3 282:18
**standards (9)**
23:13,15 163:16,17
164:9 168:10
185:11 195:10,22
**standpoint (1)**
271:15
**stands (2)**
260:17 345:12
**start (17)**
10:18 12:15 44:2
64:19 69:7 90:23
124:3 180:8 201:12
201:13 203:16
276:23 305:19
331:10 337:5 339:2
371:24
**start-up (1)**
43:8
**started (10)**
45:16 46:3 47:18
48:13 49:16 52:17
168:19 178:23
194:17 357:20
**starting (6)**
34:3 88:15 237:2
247:21 263:11
320:20
**starts (18)**
25:7,15 83:12 84:12
99:19 148:9 170:5
184:6 188:12 192:8
192:10 234:13,15
239:6 305:15
308:11 339:3
393:11
**state (20)**
2:9 15:18 37:11,15,17
39:20 73:6,16,17,22
74:2,6,10 101:12,22
102:4,10,12 406:3
407:3
**stated (3)**
194:2 396:6 407:7
**statement (18)**
4:15 11:19 24:3,11,20
28:10 67:12,21 96:4
105:5,17 114:1
226:24 340:6,11
341:9 342:14
343:20
**States (2)**

1:1 7:17
**stating (1)**
195:13
**statistical (2)**
356:23 357:6
**statistically (3)**
356:17,18 360:8
**stay (5)**
61:10 218:24 230:25
276:12 336:17
**stays (2)**
120:19,19
**step (37)**
105:24 129:15 130:18
131:2 140:22
141:25 142:3
144:21 148:15,17
148:23 149:4,12
151:3,20 158:11
160:4,6 217:21
234:1 237:14
243:22,23 285:25
287:22 293:16
295:8,14 296:8
297:2 336:3 371:6,6
371:13,14 374:5
382:17
**Stephen (1)**
173:13
**steps (11)**
107:17 130:19 135:4
142:20 244:8 277:8
284:14 292:6
394:23 395:2,7
**Steven (8)**
1:17 2:5 4:3,18 7:9
8:15 406:5 408:4
**stick (12)**
16:15 63:16,17 93:5
150:25 153:18
167:22 232:18
261:21 273:25
309:13 341:8
**Stockton (3)**
2:6 3:11 406:11
**stopped (2)**
156:13 157:20
**storage (39)**
13:1,2,5,15 14:14,22
15:2 20:17 44:8
64:22 65:4 67:7,13
67:17,19 68:12,19
68:25 69:8,12,18
71:2 72:6,10 89:8

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

89:13 96:6 101:24
102:7 109:15
173:24,24 174:9
177:3 311:3,10
341:18,22 343:19
**store (4)**
114:2 124:19 145:17
324:24
**stored (6)**
14:15 18:10 19:3 21:2
123:11 133:5
**stores (3)**
15:5,9,11
**storing (2)**
109:20 391:10
**straight (1)**
222:6
**stream (2)**
387:19 388:3
**Street (3)**
2:7 3:11 7:25
**strict (1)**
163:21
**strictest (1)**
163:14
**strictly (1)**
364:7
**strike (7)**
57:3 164:25 182:4
319:13 370:1 395:1
401:1
**string (4)**
291:10 357:7,11
362:17
**strong (2)**
181:18 327:20
**stronger (8)**
104:9,13 317:17
318:6 319:4 340:10
353:20,24
**strongest (1)**
104:5
**structure (3)**
235:8 237:15,17
**student (1)**
53:4
**students (1)**
366:6
**study (2)**
12:22 87:7
**stuff (11)**
41:7 119:14,15
139:12 159:6
182:14 183:8

230:13,18 343:8,25
**sub (2)**
34:5,8
**subject (7)**
54:9 101:12,23 102:5
246:1 308:12,16
**submission (1)**
202:5
**submitted (7)**
48:3 53:17,22 140:6
201:8,8 401:9
**submitting (1)**
187:12
**subroutine (1)**
154:23
**SUBSCRIBED (1)**
408:21
**subsequent (1)**
254:10
**substance (3)**
159:17,19 236:5
**substantive (2)**
395:20 396:2
**subtract (1)**
386:10
**successive (4)**
35:6,25 36:2,6
**sufficiently (1)**
327:20
**suggestion (1)**
233:2
**sum (8)**
27:16 31:12 32:4,8
81:19 162:7 385:17
385:24
**summarizing (1)**
252:22
**summary (5)**
87:24 181:22 190:19
206:15 251:22
**super (1)**
349:19
**supplemental (2)**
51:2 401:11
**support (1)**
104:24
**supported (2)**
69:17 340:7
**supports (3)**
228:20 238:22 305:16
**supposed (7)**
32:22 58:19 59:3
165:9 180:2 262:18
285:6

**sure (55)**
24:6,9,24 31:8 40:5
45:14 49:1 50:15
60:2,3 66:12 67:14
68:15 71:25 75:13
75:16 76:14 78:13
78:18 81:9 93:23
97:14 124:16
126:12 139:12
153:17 160:1
178:22 190:5
191:17 197:23
200:22 206:7
229:15 250:17
252:21 256:9
257:20 267:6
271:21 274:19
285:19 287:18
297:23 306:5
309:14 323:21,22
323:22 330:12
344:25 374:21
388:23 389:9
401:12
**surprise (11)**
102:11 150:2 161:13
182:12 193:11
196:19 197:5,9
198:6,13 285:22
**surprised (2)**
196:3 206:5
**surprising (1)**
196:10
**surrounding (1)**
196:13
**suspect (1)**
10:14
**swear (1)**
8:12
**switch (5)**
90:12 102:17 103:7
201:4 398:19
**sworn (2)**
8:16 408:21
**symbol (3)**
45:6 84:15 255:12
**symbols (2)**
89:6 402:15
**synchronization (1)**
254:12
**synonomous (6)**
96:13,20 127:12
214:20 370:21
373:4

**system (94)**
15:4 27:5,15,25 29:6
30:2,5,11,12 38:25
66:22,22 74:16
88:16 89:7 101:25
102:7 134:21
136:14,21 143:17
145:16,18,19,21
146:5,12 147:5
150:20 151:24,25
152:3 166:14
168:11,13 177:23
266:8,12 268:8,10
268:21 269:9,14
270:10 271:1,14
272:9,15 274:17,20
274:23 275:5,5,8,8
275:20,24 276:3,10
276:13 277:1,19,21
277:21 278:3,10,11
278:12 280:7,9
284:7,11 285:15
291:7 292:15
293:13,15 295:5,15
296:14 298:14,15
330:21 335:12
339:11 347:22
348:8,25 357:3,8
361:8 391:21 392:4
392:7
**system's (1)**
28:1
**systems (38)**
12:23,24 13:1,2,4,5,7
13:9,19 28:16 29:1
30:24 31:3,5,11,21
38:16,23 68:12,25
69:8 110:20 111:3
162:14 167:9,22
172:1,3,5 182:1
194:4 199:20 200:5
200:15 311:3,10
341:18 363:21

──────────────────

**T**

**T (3)**
405:1 407:1,1
**table (16)**
269:25 307:7 320:25
321:21,22 324:12
324:20 325:5,9
328:4 345:1,2,4
368:16,17,17
**take (42)**

10:3 31:12 41:22
76:13 78:21 81:20
97:15 107:16 115:9
118:8 133:23
138:24,25 141:12
142:24 147:23
153:20 156:8
159:24 197:10
199:15 257:25
272:13 277:8
285:19 289:15
294:19 299:1
303:24 316:18,18
332:25 360:25
368:16 373:15
377:11 382:10
386:9,10,14 390:22
399:15
**taken (4)**
9:17 56:8 313:2 405:5
**takes (2)**
118:13 213:7
**talk (20)**
9:14 43:23,25 53:5,25
55:16 57:10,15
140:1 159:17 224:9
236:4 276:1 277:6
279:9 285:8 304:10
329:24 373:1
399:19
**talked (41)**
53:6,8,11,14,16,20
55:25 78:22,25
90:18 105:13
112:12 131:22
139:11 160:22,25
161:25 173:5,7
178:1,4 189:2
203:10,13 204:9
216:7 225:4 228:17
237:4 269:13 281:3
282:16 298:19
305:11 323:4
329:20 330:10
336:1 365:3 394:23
396:20
**talking (106)**
12:16 32:1 35:15
39:19,22 42:6 54:4
63:2 69:24 71:9
74:10 76:5 100:8
106:3 109:23 115:7
116:7 120:22,23
125:3 129:4,12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

138:5,6,7,24 142:17
150:21 159:21
162:1 166:17
168:17 174:6 182:5
182:18 184:18,19
185:3 194:22 200:9
208:24 210:5
211:12 223:25
224:1,18,23 228:2
236:8,12,13 240:2
245:15 253:14
254:1 259:19,20,24
268:18 278:11
279:4 281:23
288:11 289:9
294:13 296:17,19
297:16 298:6,8,21
299:6,13 302:7,8
304:15 314:8
326:19 331:23
333:22 338:12
339:15,16 348:15
348:16,19 349:24
349:25 350:17
361:15 372:10
374:3 375:11,12
376:14,16 378:9,19
380:18 381:8,20,21
382:12 383:4,6
387:13

**talks (18)**
72:23 78:1 88:16
106:1 130:10 131:2
182:19 185:1 204:2
213:8 257:4 280:1
285:2,11,24 330:7
353:10 372:19

**Tanya (5)**
1:23 2:8 7:21 406:23
407:22

**tape (5)**
95:4,7 96:7 177:3
373:20

**target (12)**
194:19 331:15,16,25
332:2,9,21 333:4
349:12 391:19,20
392:8

**targeted (1)**
171:22

**targeting (2)**
173:6,7

**targets (4)**
331:18,23 332:1,23

**taught (1)**
253:4

**teachings (1)**
83:15

**Tech (1)**
171:2

**technical (15)**
14:18 163:25 164:1
164:10,12,24 165:1
165:19 167:21
207:2 258:12
309:10,18 310:16
310:19

**technique (3)**
14:14 20:15 37:19

**techniques (5)**
13:14,18 14:2 44:7
96:6

**technologies (4)**
1:8 7:15 14:19,20

**technology (9)**
170:19 172:22 181:13
181:20 182:10,12
184:15 193:17
261:19

**Ted (1)**
8:4

**tell (39)**
9:18 11:17 12:20 14:9
15:3 25:3 46:16
60:17 69:1,8 70:11
73:10,11 142:14
146:21 170:1 171:7
206:15 223:20
229:5 260:11
263:24 276:23
277:18,19,20
298:16 310:15
318:16 322:19
323:9 332:14 350:6
362:6 364:1 366:1
366:13,15 403:2

**telling (7)**
127:12 177:11 249:25
341:3 351:23,24
352:6

**ten (32)**
22:8 23:2,9 25:1
83:10 112:3,5 113:9
114:22 118:5
154:21 252:11
253:18 299:14
300:9,17,18,22
301:1,2,13,16,18,20

303:19 355:1,2,12
357:22,24 361:1
382:23

**tens (1)**
128:4

**tenth (8)**
300:4,8 301:12,22
302:22 303:4,11,20

**term (50)**
18:9 64:20 67:6,17,22
69:21 74:4,5 90:24
90:25 92:4,24 94:22
95:15 103:7 105:2
118:11,12 122:17
137:18 143:20
150:5 155:14
166:21 208:19
209:15 210:20
216:14 251:24
298:19,20 307:23
310:20 312:20,20
314:12,17 315:2
317:1 330:8 350:14
352:8 354:6 382:18
396:9,17 398:18
402:12 403:13
404:1

**terminology (2)**
22:22 323:19

**terms (24)**
19:15 45:16 47:1,4,6
54:20 56:1,9,19
58:22,24 59:9,19
61:15 98:8 120:23
160:6 199:15
233:21 234:8 309:9
316:8 366:1 397:8

**test (6)**
147:9,18 266:7
288:17 290:13,14

**testified (8)**
8:17 30:17 44:11
84:18 85:1 392:11
397:7 400:9

**testimony (13)**
10:8,11 159:18,19
221:3 236:5 304:11
400:5,6,7,11 401:2
405:7

**testing (2)**
288:25 290:13

**text (18)**
230:11 239:3 241:19
241:22 244:9

246:24 247:22
256:16,18 258:20
259:13,25 306:3
324:19,21 325:5
326:5 327:8

**thank (17)**
15:23 17:7 21:16
160:16 163:22
166:12 175:12
207:9 209:20
212:17 279:16,16
283:16 288:23
293:10 303:23
376:1

**Thanks (2)**
205:13 404:14

**theoretical (1)**
12:22

**theory (1)**
12:19

**thereto (2)**
50:20 407:9

**they'd (1)**
66:25

**thing (63)**
48:7 52:18 68:12
72:24 120:25 121:2
124:22 125:7 134:3
144:14 158:20
161:21 162:21
168:8 180:13
197:16,24 198:5,16
198:20 202:12
204:21 214:25
215:4,21 222:25
233:14,15 258:14
258:19,20,21
259:15,19 261:8,12
262:23,24 263:7,8
266:8 267:5 270:19
271:22 274:7,11
277:19,20 281:12
309:18 310:9,16
318:11 320:6
335:22 349:10
351:22 356:2
377:20 379:14
380:3 381:5 394:5

**things (23)**
9:12 12:24 14:22
44:13 51:20,24
60:24 78:20 84:21
95:22 96:11 114:5
121:11 190:21

206:21 213:10
225:1 264:17 267:2
284:15 310:24
331:8 375:15

**think (196)**
11:20,22 18:21 19:14
22:5,24 23:3 24:10
26:16 28:20,20
29:14,15 32:2 33:20
33:24 39:17 42:10
42:14 43:24 47:1
48:19 52:1 63:2
67:20 69:24 74:15
74:16 76:4,7 77:12
78:15 80:17 82:9
88:22 92:4 94:2
95:23 96:4,17 101:3
102:13 103:18,24
104:10,12 105:4
110:6,19 111:24
121:6 122:6 123:12
126:21 127:13
129:4,5 131:21,22
133:1 134:20,22
140:18,19 141:15
143:7,11 144:11,11
152:9 154:16 155:6
155:11 157:3 161:2
161:18 162:21
163:19 165:10
168:7,9 170:13
177:3,9 181:11
183:2 184:22 187:3
193:8 194:14
195:13 197:10,16
197:24 198:4,16,19
198:21 199:9
200:19 206:3 207:8
208:13 210:23
211:9 212:8 213:13
214:7,15 215:13
218:13 227:9,23
228:12,23 233:9
234:7,8 236:7,12
237:7 243:17 244:7
246:21 248:7,23
249:18,20 250:13
257:20 259:2,4,7
266:5,18 267:17
270:20 278:15,16
281:7 282:13,22
283:5,5,9 285:20
289:4 291:19
292:20 298:20

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

311:22 312:5,11
315:1 319:25 326:5
326:15 327:23,24
327:25 331:7,18
334:14 337:24,25
343:4 347:20 359:1
362:3,8 364:1,6
365:17,19 367:8
368:18 369:22
370:19 372:9
373:16 375:5,19
376:13 378:10,17
381:1 383:20 386:3
387:20,21 389:11
397:6,13 398:14
401:19,20
**thinking (1)**
316:25
**thinks (2)**
185:10,10
**third (9)**
64:11,12 98:21 99:18
99:19 149:4 180:11
192:24 300:1
**Thirteen (1)**
334:19
**thought (9)**
175:3 213:4 257:24
267:13 276:9 284:4
294:24 314:16
341:25
**thousands (1)**
128:4
**three (51)**
20:23,23 28:15 49:16
49:20,22 53:12
55:21,22 82:7 85:24
159:14 201:22
235:19 270:1,2
271:2,24 272:6
274:4 275:2 276:18
277:13 305:5 307:6
307:12 318:10
353:7 358:8,22,25
359:7,20 360:9
361:3 371:17
373:13 377:12
383:20,21 384:15
385:15,16,17,19
386:19 388:6,8,21
402:12,13
**threw (1)**
359:13
**throw (3)**

146:5,6 158:8
**thrown (2)**
280:11 358:21
**tied (1)**
118:22
**time (74)**
9:25 14:17 23:10
24:21 36:22 37:10
40:16,17 45:14
46:11,14 50:3 51:21
53:11,15,20 55:7,17
55:25 56:3,4 60:4
61:6 64:18 77:11
80:10,13 81:13
82:10 98:12 103:2
118:9,15 122:8,25
123:8,17 124:4,10
124:15,18,18
125:19,21,22,23,24
125:25 126:4,6,17
126:17 127:6
136:13 147:1
148:16 164:19
181:3 196:9 276:25
282:24 285:5
291:16 294:2
299:21 301:4 320:2
329:3 355:10,21
356:4 362:15,22
389:12
**times (10)**
9:3 49:17 55:16,19,20
55:21,21,22,25
381:2
**timing (49)**
52:16,19 84:14
352:24 353:11,14
353:18,18 354:1,7
355:2,5,11,15,19,19
355:20,25 356:4,12
357:5,8,13,25
358:10,13,16,18
361:9,11,13,21,23
361:25 362:7,11,13
362:16,23,25
363:19,22 364:12
364:14 365:2,15
366:14 367:1
389:14
**tip (6)**
131:23 133:3 134:9
136:18 141:7 148:1
**title (2)**
192:17,20

**today (6)**
10:8,11 56:17 363:21
374:4 400:15
**today's (3)**
7:11,23 404:18
**told (9)**
137:24 142:19 161:2
226:25 276:14
346:10 359:1 360:7
389:1
**tone (1)**
86:23
**top (25)**
11:16,24 24:25 42:22
62:9 75:23 87:18
132:14,17 167:13
170:9,18 171:11
172:19 184:6 186:9
190:4 231:1 232:23
251:16 284:1
321:23 324:23
329:21 387:6
**topic (1)**
367:3
**topics (2)**
58:3 169:10
**total (1)**
56:6
**touches (1)**
26:7
**Townsend (5)**
2:6 3:11 7:24 8:4
406:11
**track (15)**
28:24 29:2,3,4,7
61:19 62:22 63:12
64:23 137:21 140:9
145:15 146:2 150:8
160:19
**transcribed (1)**
9:10
**transcript (3)**
405:5 407:12 408:1
**Transfer (1)**
170:19
**transferred (1)**
119:22
**transfers (1)**
119:25
**transition (121)**
36:13,14 37:3,4,11,15
37:16 64:20 67:5,6
67:18,22 68:7,8,12
68:20,20 69:2,9,12

69:21 72:21 73:18
73:24 74:8,18 78:15
78:17 81:1 90:24
92:24,24 93:8,9
94:7,23,23 95:16
101:10,24 102:2,6
102:13,17,23 103:7
103:12,20,21 104:1
104:2,6,13 107:10
107:19 136:20,25
137:19 138:16
150:6,22 151:9,23
152:13,13,14 153:7
168:18,23 219:17
219:23,25 221:12
221:14,16 222:16
223:14,14 243:14
293:17 297:24
299:1,20 300:5
302:10,11 303:11
366:21 371:17,22
372:2 374:13,15,19
374:23,25 375:16
375:20,21,22,25
376:2,9,10,11,12
377:16,19 379:13
380:1,3 381:15
382:15 384:14,14
384:15,24 385:1,18
390:12 398:19
**transition's (3)**
87:12 108:17 380:15
**transitioning (1)**
73:3
**transitions (298)**
36:2,8 38:9 39:18,19
41:13 61:16,17 62:9
67:24 72:17,23,25
73:11 81:21 82:4
84:15,20,22 85:6,13
85:17,19,24 86:6,8
86:11,25 90:16,18
90:18 94:4,11,14,15
98:22 104:19,19,25
105:15,16 106:2,5
106:17,21,25 107:1
107:4,8,22,23 108:2
108:3,10,11,15,20
108:21,24 109:3,6
109:24 110:8,16,17
111:6,7,8,15,16
116:2,21 127:21,23
131:4 138:6,8,11,17
140:6,7 141:3,23

143:13,17,20 144:6
144:22 146:11
149:13,24 150:18
150:20 151:10,21
151:22 152:18,20
155:13,15,20,23,24
155:25,25 156:3,6,7
156:11,13,16,21,22
157:5,8,12 158:24
160:15,17 168:17
169:7 179:7 185:22
203:20 207:12
216:7,8,9,10,13,16
216:17,20,23,25
217:1,2,3,4,6,8,9,22
218:6,9,14,22,23
219:7,12,14,15,20
219:21 220:2,3,13
220:13,23,25 221:7
221:9,17 222:7,8,13
222:23 223:1,8,10
223:24 224:2,6,10
224:15 225:4,10
240:18 242:2
243:24 245:3,8
248:11 254:9,11,25
257:15 258:3
268:17 270:2,14
271:3,24 272:6,17
273:1 274:4 275:1
276:1,19 277:12
290:1 292:11,19
293:20,23 294:11
294:13 296:14,16
296:16,17,18,20
297:3,5,6,13,14,17
297:19 298:2,9,14
298:15,18,20,22
299:3,3,10,12,12,15
300:9,18,25 301:13
301:19,21 302:19
303:20 315:20
316:4 319:13
320:14 321:2
334:22 335:18
337:18 350:10
351:3 360:18
369:15 370:6,16,20
370:22 371:3,8,17
371:18 372:5 374:6
375:14 377:21,22
377:23 379:17,18
379:20 380:8,24
381:10,11,22,25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

382:4,9 384:18,20
384:22,25 385:9,15
385:16,17,22 386:7
386:15,16 391:1,8
393:20 396:11
397:24 399:7
401:23
**translate (2)**
348:7 390:23
**translated (2)**
34:4 378:25
**translates (2)**
339:10,19
**transmitted (1)**
89:6
**traveling (1)**
215:14
**travels (1)**
141:19
**treating (2)**
256:3,6
**treatise (3)**
252:20 260:12,14
**Trend (1)**
176:14
**tried (1)**
43:8
**true (21)**
24:3,11 33:21 37:9
38:22 44:17 67:21
73:22 145:12 167:8
168:10 179:5 202:5
208:15 221:6
294:18 316:19
324:24 395:8 405:8
407:11
**truly (1)**
293:6
**truth (2)**
9:18,19
**try (19)**
9:14,23 10:2 29:3
53:15 59:7,7 72:20
197:5,10,13,14,25
198:9 199:16
274:22 276:24
328:14 355:14
**trying (63)**
14:17,18 21:7 24:9
40:18 41:8 68:7
101:1,1 117:15
123:7,8 135:2,9,12
135:13 139:10
146:15,21,22,24

150:1 151:17
153:18 163:20
164:18,19,20 165:5
165:6 166:10 206:9
206:16,18,20
210:17 222:5,21
224:24 228:4
231:11 243:16,19
244:21,22 259:9
276:22 277:2,3
280:13 296:5
326:11 327:14
346:5,8 372:13,15
377:17 378:11
380:4 381:3,7,14
**TSG (6)**
7:22 406:10,11,12,14
406:17
**turn (13)**
44:1 139:2 290:17
291:2 368:15 390:3
391:12,23 392:23
393:22,25 395:10
396:9
**turned (3)**
134:3 368:10,12
**turns (1)**
291:18
**tutorial (1)**
47:2
**TV (2)**
318:24 319:1
**Twenty-four (1)**
330:14
**twice (2)**
57:9 231:10
**two (112)**
9:7 21:6,20 25:12,12
28:14 29:9,9 30:8
30:18 32:22 49:16
53:12 74:22 78:4,5
78:20 82:19 87:23
91:2,3,11 93:10,10
93:13 95:9,21,22
96:10,11 98:15,16
99:4,5,24 100:24
101:3 104:12
105:10,13 113:3
121:7,11 130:19
149:15 154:20
159:10 171:18
179:25 180:2 204:6
204:6,16,19 214:2,3
214:3 231:23

242:14 244:1
245:10 253:17
254:20 255:2,3,11
256:10 257:17
261:7 263:11 267:3
280:18 292:6,13
306:21 310:24
314:4 320:16 326:4
329:22 330:2 331:7
342:9 344:8 345:14
345:15 367:21
369:17 370:10,23
371:17,23,25 372:4
373:11,12 382:22
384:15,20,25 386:6
388:4,8,21 389:10
390:3,10 396:13
399:6 403:11,13,13
**two-page (2)**
184:3,4
**type (4)**
71:3 89:24 207:4
391:19
**types (2)**
13:3 333:17
**typical (1)**
118:17
**typically (4)**
66:21 349:23 383:23
384:6

---

**U**

**U (3)**
181:13 405:1 406:1
**U.S (10)**
1:8 4:12 5:4,6,7,9
7:15 184:16 187:6
192:19
**UCSD (1)**
70:13
**uh-huh (171)**
33:10 42:8 43:3 61:22
62:16,20,25 63:24
64:13 65:1,24 69:19
69:23 75:3,7 76:24
77:21 79:17 82:2
83:8,13 99:20
100:18 101:7,14
111:17 112:10
113:5,13,21 114:10
119:7 121:20
127:17 128:15
129:17,25 135:5,18
140:11 142:22

147:11,13 150:3,9
151:5 154:25
158:10 162:12
168:21 172:21
178:3 180:7 181:1,4
181:16,24 186:20
188:10 189:21,23
190:16,22 194:20
194:23 195:11
201:20 202:4,4,19
203:14 204:8
206:14 209:9
210:22,25 211:13
213:1,19 215:12,16
217:25 218:4,16
221:22 222:4,24
225:18 226:1,18,23
228:18,21 231:6
234:14,24 236:11
238:16 239:5
240:22 245:12,14
247:2,6 251:18
252:15 254:3 255:4
255:16 256:19
268:24 269:12,19
274:6 275:3,7
284:16 287:14
290:19 291:13
293:12 295:6 298:4
299:18 300:11
304:21 307:10
308:7 312:18,25
313:14 314:10
315:16,24 321:8,16
327:18,23 328:20
330:18 339:7 340:5
346:13 352:2,5
358:9 363:16 365:4
366:2,4,7,12 367:7
367:11 370:8,18
371:4 372:23 373:3
376:6,8 383:2
384:16 387:14,17
388:1,18 392:3
393:9,16,24
**ultimate (2)**
264:15 355:10
**ultimately (3)**
119:3 378:23 382:2
**UMN (7)**
170:2 172:17 179:19
184:6 192:10
307:12 313:20
**UMN's (11)**

61:17,25 201:16
202:7 228:20 307:7
312:19 313:1,16
316:16 330:17
**UMN_0000916 (1)**
5:13
**UMN_0001055 (2)**
5:21 189:20
**UMN_0001057 (1)**
5:22
**UMN_0001058 (1)**
5:23
**UMN_0001060 (1)**
5:24
**UMN_0001072 (1)**
5:19
**UMN_0001074 (1)**
5:20
**UMN_0001202 (1)**
5:16
**UMN_0001204 (1)**
5:17
**UMN_0001205 (1)**
5:18
**UMN_0001330 (3)**
5:11 169:21 170:5
**UMN_0001347 (1)**
5:11
**UMN_0001355 (1)**
6:8
**UMN_0001655 (1)**
5:14
**UMN_1072 (1)**
186:6
**UMN_750 (1)**
238:25
**unacceptably (1)**
363:1
**unconstrained (1)**
342:16
**underlined (20)**
230:11,13,15 231:19
231:25 232:7,10
233:16 234:2
241:19 243:3,18
245:6,25 246:10
247:4,22 249:12,20
259:25
**underlines (1)**
230:18
**underlying (2)**
382:1,6
**underscore (1)**
170:2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**understand (92)**
9:9,17,21 28:17 30:8
34:15,16 35:8 37:5
46:23 49:4 73:24
80:9 86:21 90:25
123:9 135:2,5,8
137:18 139:13
144:2,9 146:10,15
146:16,20 151:17
153:17 155:14
158:3 160:5 161:3
162:24 163:22
164:20 165:7
166:21 167:15
182:5 191:22 206:9
207:8,22 208:4,21
209:6 216:14,14,17
218:11 219:2
222:21 225:15
226:20 230:17
235:6 237:18
244:22 250:14,18
250:21 253:2
259:11 266:4 270:7
276:21 277:5,13,14
277:16,24 281:11
281:25 282:1
290:24 296:3 310:6
311:2 318:17 345:1
350:1 351:25 352:8
368:20 372:14
374:21 376:3,4
377:16,17 380:4
**understanding (23)**
18:7 39:11 47:10
51:16 56:18 59:3,14
141:7 146:21 183:3
217:9 221:6 223:23
235:10 237:12
260:15 282:21
283:3 287:21
291:20 305:17
322:16 397:2
**understood (1)**
163:1
**unequivocal (6)**
94:3,14,22 95:13,15
105:18
**United (2)**
1:1 7:17
**universe (4)**
51:9,20 57:19 196:14
**University (35)**
1:4 7:13 48:2 54:24

57:19 58:10 63:11
63:20 170:25
172:20 173:22
174:19 175:3
177:12 184:14
186:18 187:11
190:13 191:7,21
192:18 194:18
195:12,14,21 202:1
314:19 320:20
323:5 324:3 365:1,5
367:23 397:3 401:3
**University's (14)**
51:1 63:3 101:9
137:15 170:3
175:14 196:2
238:22 308:25
324:16 327:3 368:4
369:19,23
**UNM_00016155 (1)**
176:1
**unpack (2)**
286:25 287:4
**unparen (1)**
337:11
**unplug (3)**
120:10,11 225:15
**unplugged (3)**
150:15 157:20 158:7
**unquote (10)**
63:13 64:21 101:13
107:20 209:7 258:6
314:13 321:1,12,14
**unravel (2)**
164:18 377:20
**upper (1)**
354:11
**Usable (1)**
355:8
**usage (1)**
74:3
**USC (2)**
252:17 253:19
**use (48)**
18:5,14 20:9 34:17,18
81:1 85:16,24 86:5
86:11 90:2,24 97:5
97:7 105:2 109:9
111:2 126:7 155:2
156:11 163:12,13
163:13,21 183:4
211:22 212:5 261:7
264:3,20,20 265:14
265:15 266:10

271:17 274:20
283:12 315:2 330:5
347:2,9,10 348:4
350:13 354:6 401:1
402:7 404:1
**useless (1)**
276:24
**user (3)**
114:7 118:9 284:24
**uses (20)**
15:16 27:15 69:21
85:13,19 86:14 95:1
97:2 106:1 107:22
181:23 231:23
297:2 298:2 314:12
315:9,25 319:9
372:24 382:18
**usual (1)**
406:17
**usually (2)**
26:16 310:22

_____

**V**

**v (1)**
408:2
**validate (4)**
289:13 292:21,24
293:7
**validity (2)**
198:24 199:5
**value (20)**
24:19 125:23,23,24
126:1,16 127:9
274:19 320:25
332:10 345:3,11,12
345:12 356:8
388:16,17,24,24
389:5
**valued (1)**
214:2
**values (5)**
27:19 31:13 32:8
214:3 260:20
**vanishing (2)**
27:22 28:2
**variation (1)**
128:1
**varies (1)**
123:17
**various (5)**
44:8 65:10,20,22
284:15
**vary (1)**
29:12

**varying (1)**
122:25
**vast (1)**
356:3
**verb (3)**
141:6 293:11,14
**verbal (1)**
9:11
**verbatim (2)**
313:3,21
**verbiage (3)**
241:25 242:21 245:25
**verbs (1)**
141:2
**Verdini (397)**
3:5 4:6 8:8,8 10:21
13:20 15:6 16:1
17:22 19:6,20 20:5
20:10 22:12 23:6
24:4,16 25:24 26:12
27:1,8 28:3,19,25
30:13,25 31:14
32:14 34:12,22
35:17 36:3,19 37:6
38:2,17 39:1 40:14
41:2 42:13 44:14,20
46:18 47:7,20 48:15
48:25 49:13 51:12
52:4 54:11,21 55:1
55:6 56:20,25 57:25
58:5,20 60:5 62:24
63:6,8 65:12 66:3
68:2,14 69:3,10
71:24 72:12 73:1,14
74:1,13 75:8 77:7
77:12 78:9 79:20
80:16 82:6 84:1,23
85:8 86:1,13 88:8
88:20 89:22 92:2,14
93:22 94:24 96:22
97:19 98:6,17 99:13
99:23 100:9 102:8
102:25 103:14
104:7,15 105:1
107:6 108:5,13
109:11 110:12,22
111:11,23 112:23
115:13,22 116:23
119:9 121:12 122:4
122:21 123:6,23
124:24 125:5,9
126:10,20 127:4
128:22 130:6,14,20
131:6,19 132:7,24

133:12 134:5,19
135:24 138:3,13
139:7 140:17
141:10 142:6
143:15,22 144:4,24
147:20 151:12
152:15,25 154:9
155:16 156:18
157:1,24 158:14
160:8 161:9,15
162:2 163:10 164:5
164:15 165:4,22
168:1,14 174:22
175:7 177:17 178:7
182:7,22 183:17,21
184:21 185:13,24
191:2 193:10 195:2
195:16,23 196:6
197:3,20 198:3,10
198:18 199:21
200:6,20 202:9
203:2 205:6 208:25
209:13 210:7 211:1
211:24 212:7
213:22 214:11
215:1 216:19 218:1
219:5 220:5,17
221:2,10 222:10
223:2 224:4,16
225:2,21 226:9
227:2,22 228:11
229:25 232:21
233:12 234:6
235:11 237:19
238:6 240:4,13
241:7,14 242:15
243:11 246:2,12,20
247:9,11 248:6
249:7,23 250:16
255:23 257:1 258:9
258:22 259:17
261:9 262:14 264:5
265:1,11,21 266:2
266:13,25 268:6
269:6,18 270:17
271:7 272:22 273:5
273:11 275:10,18
278:14,23 279:21
280:22 281:13
282:4 283:1,4,18
286:6 288:2,5 289:2
290:8 292:16
293:18 295:9,17
296:9,22 297:8,15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

297:21 298:10
299:5 300:12,20
301:15 302:2 303:1
303:6,15 304:23
309:3,16 310:7
311:11 312:4,10,22
313:5,23 314:21,25
316:9,22 317:11,19
318:8 319:5 326:2
328:5,23 330:14
334:14 335:15
336:12 337:23
340:9,15,20 341:15
343:11,17 344:15
344:24 346:1,14
347:12 349:7 352:9
354:2,13 355:3,16
356:1,13 357:15
358:11 360:13
361:16 362:9
363:12 364:5
365:10,16 369:3
371:9 372:12 373:6
374:8,14 375:4,8
380:5 384:4 386:12
386:23 387:20
388:10 389:6,13,18
394:14,21 396:3
397:16,19 398:3,6,9
398:16 399:1,10,14
399:18 401:3,18
402:2,23 403:9
404:3,13

**Verhoven-Page (4)**
1:23 2:8 406:23
407:22

**versa (3)**
102:18 103:8 398:20

**version (2)**
15:22 291:23

**versions (2)**
80:4 183:8

**versus (3)**
7:14 342:3,6

**vice (3)**
102:18 103:8 398:20

**VIDEOGRAPHE...**
235:21 303:25

**videographer (20)**
3:18 7:6,21 8:11
41:24 42:2 82:11,17
159:8,12 200:23
201:1 235:12,17
304:4 373:21,24

399:20,23 404:16
**videotaped (3)**
1:16 2:4 7:9
**view (4)**
47:11 136:3 174:20
188:12
**violate (5)**
275:23 315:21 316:1
316:5,8
**violated (8)**
325:14,24 326:1,8,25
327:1,10 361:6
**violates (1)**
325:20
**virtue (5)**
110:3 120:16 267:14
360:6 403:7
**vis-a-vis (1)**
273:9
**vision (1)**
144:12
**voice (1)**
86:23
**voltage (11)**
223:11 225:6,6 226:3
291:9,11,14 375:23
379:4,5 381:8
**voltages (14)**
223:16,17 224:1,14
224:21 291:21
376:5 378:4,14,20
378:21,24 379:1,8
**vs (1)**
1:6

_____

**W**

**W (8)**
1:17 2:5 4:3,18 7:9
8:15 406:5 408:4
**walk (2)**
284:14 397:10
**Wang (3)**
304:18,22 305:2
**want (64)**
19:13 29:12 30:9 31:9
32:21 39:17 52:12
62:10 94:17 97:15
97:16,16 103:4,6
105:12 109:18
114:2 121:7 135:3
139:12 146:18
149:21 154:19
159:24 161:17
162:11 164:10

165:7,25 166:3,4
167:5,10 168:8
203:15 209:10
212:3 214:13
218:24 220:10
222:20 229:13
238:11 252:20
260:15 276:19
284:14 292:22
297:12 310:17
316:24 327:19
329:11 330:11
344:25 345:16,17
351:12 358:4 364:9
378:17 397:10,20
398:9
**wanted (3)**
194:15 233:1 329:4
**wasn't (9)**
143:24 183:19 197:1
232:12 249:22
255:8 256:9 257:12
257:13
**watches (1)**
318:25
**watching (1)**
319:1
**wave (13)**
120:7,22 122:7,13
124:15,22,23 125:4
125:7,15 133:15
202:12 205:21
**waveform (316)**
108:16,20,25 109:3
109:20,25 115:24
116:1,2 118:14,15
118:16,18,20 119:1
119:1,6,10,21 120:8
121:8 122:3,7 123:1
123:10,13,16
126:23 129:7,9,9
131:10,15,16,20,21
132:5,11,12,15,22
132:23 133:2,2,5,9
133:13,15,17 134:2
134:10,14,17,18
136:4,4,8,8,10,15
136:17 137:1,7
138:15,16,17 140:7
140:20,23,25 141:4
141:19,25 142:5
145:5,6,8,9,10
149:6,14 150:19,22
151:23 152:6,18

155:19 156:5,5
157:6,13 158:15,16
158:22 159:4 164:3
164:13 165:2
200:19 201:14,14
201:17,18,24 202:2
202:6,17 206:19,20
206:25 207:1,6,21
207:25 208:4,6,16
208:18,21,23 209:6
209:8,15,21 210:3
210:10,18 211:18
212:24 213:7,9,12
213:18,21,25 214:2
214:9,19,24 215:3,5
215:8,14,18,19
216:3,4,5,6,8,9,15
216:24 217:1,6,12
217:23 218:8,10,18
218:20,21,22 219:2
219:3,6,9,16,18,20
219:23,23 220:3,14
220:24 221:7,8,13
222:9,15,16 223:1
223:10,13,16 225:7
225:14,19,23 226:2
226:5,6,7,8,8,12,20
227:6 231:5,8,10,14
231:18,18,23,25
232:6,9 233:6,6
234:2 236:9,9
238:23,23 240:20
242:3 243:25 245:9
255:1 257:16 258:4
268:17 271:24
272:18 275:2
281:16 282:16
286:2,14,20 287:23
288:12,13,18,21
289:6,10,11,13,18
289:19 290:7
291:22,24 292:1,12
292:19,22 293:21
293:24 294:12,14
294:19 296:4,11
299:7,10,15,16,17
300:9,19,25 301:14
301:19,21 302:9
303:5,9,13 304:15
305:17 306:4,14,14
306:24 320:15
334:23 335:19
369:16 374:7,16,22
375:21,22 377:21

377:24 378:2,15
379:12,18 380:15
380:18,23,25
381:22,25 382:4,9
390:19,21 393:18
393:21 394:4,7,11
394:13,16,17
396:12 402:13
403:3,4,6,7
**waveforms (11)**
138:7 205:14,16,20
205:22,24,25 206:3
206:4,5 217:14
**way (57)**
15:15 20:4 21:8 23:7
34:9 35:23 36:11
37:2 41:4 49:2
75:21 82:5 98:14
104:17 105:9 116:3
116:6 126:8 145:17
151:10 155:8 157:4
157:16 163:14
180:11 193:25
199:4,12 200:16
217:5 218:13,18
219:2 227:24 230:3
233:20 234:1,4
237:24 249:16
282:13 285:5
289:22,24 290:11
293:11 326:22
353:1 363:8,10,21
363:25 368:25
372:19 380:13
398:14 407:18
**ways (4)**
15:10 29:19 264:18
378:6
**we'll (23)**
9:14 10:3 28:14 29:22
44:2 63:16 70:20
74:21 78:20 147:3
201:13 230:21
235:15,15 236:20
237:1 277:8 285:8,9
287:13 367:10
370:3 377:11
**we're (113)**
8:5 10:1,17 19:8
41:22,24 42:2,11
63:2 68:7 71:8
73:18 76:9 77:10
78:16,16,21 81:9
82:11,17 83:22

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

90:15 93:6 109:23
109:24 116:6,8,8
117:13,15 118:4
129:4 134:24 138:6
138:7 142:16
146:14 156:8
157:21 159:8,12
166:13,17,18
167:23 168:17
171:14 175:17,20
179:20 180:15
186:12 187:20
189:18 194:11
198:14 200:9,23
201:1,4 205:8
210:17 215:14
229:15 230:23
235:17,21 245:15
251:12 268:18
271:19,20 276:21
278:11 281:19
288:11 289:25,25
294:13 297:24
298:21 299:13
300:24 303:25
304:4,15 348:19
349:23,24 352:4
359:14 365:25
367:3 373:19,20,21
373:24 376:3
380:17 381:20,21
381:24 382:12,16
382:16 385:6
389:11 399:15,20
399:23 400:1,23
404:16
**we've (21)**
76:5 83:24 105:10,12
116:7 117:18,18
121:17 138:24
145:6 183:18
194:16 200:19
215:13 229:6 274:7
276:20 374:3 381:1
381:1 394:22
**weaker (3)**
317:1 323:25 355:18
**Webster's (8)**
73:21 74:11 101:15
103:25 104:14
310:13 312:2,8
**Wednesday (1)**
389:23
**week (1)**

60:21
**went (6)**
162:15 168:20 194:16
263:10 357:13
389:14
**Wewatta (1)**
3:11
**White (1)**
4:20
**wide (5)**
177:2,16,19 178:14
194:25
**width (1)**
339:10
**willing (1)**
28:9
**wire (4)**
12:25 141:20 144:12
296:1
**wireless (1)**
12:24
**witness (339)**
4:3 8:10,12,16 13:21
15:7 16:2 17:23
19:7,21 20:6,11
22:16 23:7 24:6,17
26:1 27:2,9 28:4,20
29:1 30:14 31:1,16
32:15 34:23 35:19
36:4,21 37:7 38:4
38:19 39:2 40:15
41:4 44:15,21 47:8
47:23 49:1 51:13
52:5 54:12,15 55:8
56:21 57:8 58:1,6
58:21 60:7 62:25
63:7 65:13 66:4
68:3,15 69:4,11
70:2 71:25 72:13
73:2,15 74:2,14
75:9 77:15 78:11
79:21 80:17 82:7
84:24 85:9 86:2,14
88:9,22 89:23 92:3
93:23 95:1 96:24
97:21 98:7,18 99:14
99:24 100:10 102:9
103:1,15 104:8,16
105:2 107:7 108:6
108:14 109:13
110:23 111:12,24
112:24 115:14,23
116:24 119:10
121:13 122:5,22

123:7,24 124:25
125:11 126:12,21
127:5 128:23 130:7
130:15 131:7,20
132:8,25 133:13
134:6,20 138:5
139:8 140:18
141:11 143:16
144:25 147:21
151:14 152:16
153:1 154:10
155:17 156:20
157:3 158:15 160:9
161:10,17 162:3
164:16 165:5,23
168:2,15 174:23
175:8 177:18 182:8
182:23 184:22
185:15 191:3
193:11 195:17,24
196:7 197:4 198:4
198:12,19 199:22
200:7 202:10 203:3
205:7 209:2,14
210:9 211:2,25
212:8 213:23 215:2
216:20 219:6 220:6
220:18 221:4,11
222:12 223:3 224:5
224:17 225:3,22
226:10 227:3,23
228:12 230:1
232:22 233:17
234:7 237:21 238:7
240:5,14 241:9,15
242:17 243:12
246:3,13,21 247:10
247:13 248:7 249:9
249:24 250:17
255:24 257:2
258:10,23 259:18
261:10 262:15
265:3,12,22 266:14
267:2 268:7 269:7
269:19 270:18
271:9 272:23 273:6
273:12 275:11
278:15,24 279:22
280:23 281:14
282:5 283:5 286:7
288:7 289:4 290:9
292:17 293:19
295:11,19 296:10
296:23 297:16,22

298:11 299:6
301:16 302:3 303:2
303:16 304:24
309:4,17 310:8
311:12 312:5,11
313:6,24 315:1
316:10 317:13,20
318:9 319:6 326:4
328:8 329:6 334:16
335:17 336:14
337:24 340:10,16
340:22 341:16
343:12,18 344:16
344:25 346:2
347:13 349:8
352:11,18 354:3,14
355:4,17 356:2,14
357:16 358:12
360:15 361:17
362:10 364:6
365:11,17 369:4
371:10 372:13
373:8,18 374:15
375:7 380:6 384:5
386:14,25 387:23
389:7 394:10,19
396:1 399:4 400:6,9
401:16 402:1,22
403:1 404:1 405:18
407:13
**wonder (1)**
257:12
**wondering (1)**
36:24
**word (81)**
18:3 19:17 20:23
31:25 37:9 39:18
68:7 72:16,21 81:1
84:22 85:6,13,16,19
86:5,8,11 91:20,22
91:24 95:2 96:19
97:8 106:9,21,24
107:1 109:10,19
110:1,2,5,7,10
116:11 124:21
126:7 203:5 214:7,8
216:17 218:6,7
234:25 238:1
249:19 271:17
282:23 291:8
296:17 297:3 298:2
298:13 306:13,18
309:14,20 310:11
310:13 311:22

315:7,9,25 317:22
318:21 319:4,9
353:20 354:8 369:5
377:2,3,4,9 387:13
387:15 394:7
403:20,21 404:8
**worded (1)**
123:16
**words (96)**
19:4,5 34:4 86:25
97:17,22,22 105:24
105:25 106:11,14
108:3,12 110:20
115:20 116:12,13
116:15 117:5,19,21
117:25 130:2 139:3
143:5 148:5,5,18,24
153:14 155:3,8
166:18 202:10
206:4 209:22
210:10 211:17,18
212:13,24 213:13
213:14,15,18
214:10,17,20,24
215:2 237:3,9,9
242:20 254:7,7
261:7 262:12
284:18 285:3,12,17
289:24 290:20
291:3,11,15,16
308:11,16,22 313:1
316:8,12 330:6
367:4,12 368:10,11
368:16,20,21 369:1
372:24 376:15,17
377:6,12 378:25
379:8 385:8 387:16
402:15 403:11,15
403:19
**work (20)**
10:3 12:23 14:9 15:1
21:14 43:17,17,19
45:16 46:3 48:13
54:24 58:3,6 146:7
173:17 332:1,11
348:8 404:8
**worked (1)**
15:1
**working (12)**
44:5 65:19 66:10,12
66:13,15,16,20,21
66:24 145:20 147:9
**works (5)**
133:25 147:8 207:3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

339:11,20
**world (2)**
125:8 128:19
**worries (1)**
41:19
**worry (1)**
167:4
**worse (8)**
266:15,22 268:12,15
268:19 271:14
274:5 280:8
**worth (1)**
177:3
**wouldn't (45)**
102:11 103:24,25
104:8 133:8 156:3
161:13 163:12,13
163:13 167:18
168:3,5 175:2,4
182:12 206:5
245:24 247:19
248:1 256:21 257:3
263:25 275:13
279:23 280:15,23
285:18,22 294:23
312:2,7 331:14
347:25 348:5 351:8
356:6,15,18 363:22
363:23 364:2
366:15 369:6 387:1
**write (41)**
47:2 112:21,25
113:10,19 118:7
119:6 133:24 137:2
137:8 138:1 139:5
140:14 141:8
142:24 143:1,9,10
147:6,19 148:1,10
150:14,15 153:24
154:23 215:10,15
220:1 222:3 226:4
258:1,7 287:13
303:11 330:22
331:4,14,22 333:8
334:2
**writes (2)**
195:8 390:25
**writing (13)**
52:17 83:16 110:13
113:11,20 114:15
180:23 258:14
383:6,12,13,15,18
**written (21)**
28:8 41:7 157:7,13

194:6,7,14 215:10
227:23 248:3 254:5
259:13 294:25
301:22,23 302:10
335:5 380:13 381:5
390:10 407:9
**wrong (8)**
60:3,10 121:7 136:19
196:23,25 197:1
351:17
**wrote (14)**
72:15 86:16 110:7,9
110:16 176:13,19
190:6,7 195:20
220:12 241:4
320:20 397:5

---

**X**

**X (4)**
4:1 228:5,7 244:11

---

**Y**

**Y (2)**
60:7 244:11
**Y17 (1)**
23:19
**yeah (171)**
11:12,13,22 12:1
13:21 14:12 16:9,9
16:16 19:7,12,14,17
20:6 24:20 26:9
28:13 29:1 38:4
40:15 41:17,18
42:14 49:1 50:3
52:1 53:20,24 54:15
62:7,8 65:25 69:11
74:8 78:25 79:12,21
80:3,12,18 83:8
88:9 91:21 94:19
95:12,18 96:16,17
100:24,25 102:9
103:15 104:17
106:12 107:9
112:20 115:14
124:6 125:11,12
127:13,13,17
128:18 129:21,22
134:1 137:5,5
144:16,19 145:16
146:4,11 151:15
155:6 157:3 162:25
164:22 166:19
168:7 171:12
177:14 180:12,12

180:20,22 185:16
187:8 196:25 197:4
198:4,12,20 199:14
200:2 206:9,11
207:6 217:19
220:19 222:12
224:22 225:3,22
227:14 229:17,19
230:6 233:19 246:5
246:8 251:18,20
261:1 264:18
267:11 268:12
269:19 276:8
281:14 283:14
286:25 288:8 290:5
291:19,23,24
299:22 302:18,21
303:16 306:2,9
311:12 312:12
315:10 316:10,14
319:6 332:9,22,22
333:9 334:18
340:11 342:4
344:11 346:2,3
347:13,18 349:2,2
350:15,22 354:3,3
359:19 361:17
364:6 368:6 371:19
375:18 378:16,22
379:10 380:19
383:2 387:25 396:8
**year (1)**
45:18
**years (14)**
9:6,7 22:6,8,8 23:2,9
25:1 33:15 53:3
60:16 86:16 87:1
305:5
**yellow (5)**
322:17,20,25 323:11
323:16
**yesterday (3)**
60:6,19,20
**yup (19)**
106:4 128:11 146:19
173:20 180:7
185:15 187:14
188:16 190:8,16
191:3 195:5 205:3
245:12 347:5
348:14 359:5 368:8
378:12

---

**Z**

**Z (1)**
244:12
**zap (1)**
151:7
**zero (50)**
27:10 35:14,25 37:3
37:16 102:18 103:8
107:4,5,8,9,11,11
107:19,20 108:18
108:18 125:18
126:4,6,17 127:3,8
291:10,17 375:21
376:2,9,11 379:4,5
384:19,20,23,24,25
385:1,9,10,11,12,18
385:18,22,23 386:3
386:4,15,16 398:20
**zeroing (1)**
166:9
**zeros (41)**
36:6 106:15,19 111:2
116:16,19,22 117:4
117:9,10,24 124:13
207:12 302:8,9
356:19,24 357:7,12
357:23 358:7 359:2
359:6,15,24 360:19
361:3,19 362:17
363:15 364:16
366:23 376:4
378:19 387:8 388:2
388:4,15,18,21
389:4

---

**0**

**0 (3)**
35:4,5 36:13
**0.25 (1)**
348:17
**0.333 (1)**
344:11
**0.3333 (2)**
344:6 345:9
**0001355 (1)**
324:10
**001011 (1)**
384:18
**00111 (5)**
387:19,25 388:4,13
388:16
**04 (1)**
184:2

---

**1**

**1 (17)**
10:19 34:5 35:6 36:13
70:19 171:6 192:25
217:19 230:8,20
231:22 232:1
234:13,22 236:14
355:24 372:7
**1.B (2)**
4:21 22:20
**1.D (1)**
22:9
**1:32 (1)**
235:21
**10 (6)**
4:12,13,15,16,18,19
**100 (4)**
46:10 355:10,14
360:10
**1000 (1)**
42:13
**1001 (8)**
4:12 10:18,22 11:1
70:20 87:14 171:6
391:11
**1002 (5)**
4:13 11:8 228:25
236:20 393:22
**1003 (2)**
4:14 11:15
**1004 (21)**
4:16 11:24 62:5,6
63:4,11,16 201:7,22
201:22 202:6,20
307:17,22 308:9
364:18 367:20
395:10,24 396:6
401:23
**1005 (19)**
4:17 12:5,14 43:24
63:5,18 78:22 79:1
112:3 200:18
238:14 304:16
392:13,19,23 396:5
397:6 402:20
403:23
**1006 (5)**
4:19 10:23 12:8 229:3
229:6
**1007 (6)**
4:20 21:22,23 22:3
162:11,14
**1008 (4)**
5:4 32:25 33:1,5
**1009 (5)**

---

TSG Reporting - Worldwide    877-702-9580

5:6 32:25 42:18
83:24 85:13
**1010 (3)**
5:7 76:9,10
**1011 (5)**
5:9 82:15,22 83:6
389:20
**1012 (5)**
5:10 169:11,12
171:13 392:11
**1013 (3)**
5:12 172:10,14
**1014 (4)**
5:14 175:20,21,24
**1015 (2)**
5:15 179:15
**1016 (3)**
5:17 183:23 184:3
**1017 (3)**
5:19 186:1,4
**1018 (3)**
5:21 189:15,18
**1019 (4)**
5:23 192:5,8 392:11
**102 (6)**
252:17,19 253:7,15
284:23,24
**102(b) (1)**
253:19
**1020 (3)**
6:4 283:20,22
**1021 (3)**
6:6 319:15,16
**1022 (3)**
6:7 324:5,9
**103 (1)**
253:11
**104 (12)**
286:20 287:19 294:23
295:3,8,16,19 296:6
296:7,12,21 298:23
**1057 (1)**
189:22
**1058 (1)**
192:10
**1060 (1)**
192:12
**1073 (1)**
188:6
**1074 (1)**
186:7
**11 (2)**
172:25 173:9
**11:06 (1)**

159:8
**11:21 (1)**
159:12
**11:42 (1)**
180:9
**110 (1)**
287:25
**1100 (2)**
2:7 7:25
**112 (2)**
285:23 290:20
**11A (2)**
344:3,18
**11th (1)**
407:20
**12 (1)**
189:25
**12:04 (1)**
200:23
**12:05 (1)**
201:1
**12:41 (1)**
235:17
**120 (4)**
286:9,10 287:5,19
**1202 (1)**
179:20
**1203 (1)**
180:6
**1204 (1)**
184:6
**1205 (1)**
184:9
**122 (13)**
286:11 287:13,24
288:19 291:9,12
292:23 294:20,21
294:25 295:23
296:12 299:12
**12th (1)**
171:12
**13 (184)**
91:19,21,23,25 92:5,8
93:9 104:25 105:20
106:25 107:22,23
108:1,9,23 110:7,18
111:9,21 117:16
129:11 135:22
136:15 137:19
138:11 139:6 142:4
144:20 148:14,17
155:13 157:22
158:12 160:5,6
166:22 183:3,4

185:1,2,6,12,21
188:2,8,14,20
192:21 193:16,22
194:3 195:9,14,22
207:24 209:22
210:11 211:12,16
217:8,17 223:21,22
230:14 232:4,5,12
232:18 233:10,19
234:11,15 236:14
239:13 241:21
242:9,25 243:1,2,4
243:6,7,8,21,22
244:6,8,18,25 245:1
245:19 246:11,14
246:16,17 247:15
247:17,23,25 248:5
248:9 252:11
253:18,24 254:5
255:7 256:4,8,17,24
257:10,21 258:1,7,8
258:15,25 259:13
259:14 260:5,24
261:1,24 262:1,10
262:11 263:2,6
268:21 269:10,10
273:9,25 274:12
275:9,14,21 276:5
278:11,13,20,22
279:13,19,24 284:7
284:12,17 285:1,10
293:11 295:8,15
296:8,15,18 297:2
320:13 322:21
323:1 327:25 336:4
336:11 338:8,10
346:6,16,20 354:8
354:16 366:20
370:5,21 371:5,6,13
371:25 373:1 374:4
375:12 383:11,13
394:22 402:7
**1346 (1)**
170:6
**1354 (1)**
321:9
**1355 (1)**
321:18
**13E (1)**
320:11
**13th (5)**
45:21,24,25 53:23,24
**14 (12)**
19:2,5,19,24,25 20:22

22:6,8 87:15,21
88:15 354:19
**1400 (1)**
3:11
**140342 (1)**
1:25
**144 (2)**
322:11 325:6
**145 (2)**
322:12 325:6
**15 (7)**
179:18 338:24 339:3
346:21,25 377:12
382:23
**15-14-37 (1)**
406:13
**15222 (1)**
3:4
**15th (1)**
79:25
**16 (12)**
44:1 61:12 62:1,17
63:5 137:10,12,12
137:16 347:2 353:7
390:25
**169 (1)**
5:11
**17 (23)**
63:18 79:2,6,15 100:7
100:10,14 106:20
106:22 107:1,3,18
107:24 186:10
252:11 253:18
322:6 325:18 327:5
353:7 354:21 385:6
387:7
**172 (1)**
5:13
**175 (1)**
5:14
**179 (1)**
5:16
**17PP (4)**
24:23 26:19 181:19
181:22
**18 (5)**
79:6 81:15 239:20
325:18 327:5
**18-CV-00821-EJD-...**
1:7 7:16
**183 (1)**
5:18
**186 (1)**
5:20

**189 (1)**
5:22
**18s (1)**
322:7
**19 (1)**
239:22
**192 (1)**
5:24
**196 (1)**
322:3
**1985 (1)**
33:7
**1994 (2)**
84:7 86:11
**1996 (4)**
79:24,25 311:8,23
**1997 (1)**
79:16
**1999 (7)**
171:3,12 172:25
173:9 194:17,21
305:2

_____
2
**2 (1)**
228:25
**2:48 (1)**
303:25
**20 (9)**
53:3 60:16 201:12
202:8,16 252:11
253:18 367:5
405:10
**200 (3)**
322:6 325:18 327:5
**2002 (6)**
176:7,14 178:19,21
180:14 194:24
**2008 (6)**
180:15 181:11 186:10
186:12,15 195:8
**2009 (2)**
189:25 192:18
**201 (3)**
322:6 325:18 327:5
**2018 (8)**
1:19 2:1 7:1,11 45:21
407:20 408:3,22
**204 (1)**
11:16
**204-2 (1)**
11:25
**21 (4)**
4:22 240:16 252:8

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page  42

392:24
**210 (1)**
3:4
**22 (7)**
23:17 162:10,13
304:16,17 338:24
339:9
**23 (4)**
305:8,15,15,19
**24 (22)**
86:16 87:1 305:14,24
307:3 308:2,20
312:24 313:2,17,20
327:16 330:11,16
335:6 339:8,9,9
352:21,22 353:15
364:3
**25 (6)**
33:15 53:3 60:16
313:8 315:13 347:4
**26 (6)**
329:21 338:7,18
340:1,2 346:12
**260 (3)**
321:22 324:12,20
**283 (1)**
6:5
**29 (3)**
367:2,8 368:4

_____
**3**

**3:01 (1)**
304:4
**30 (3)**
46:10 339:5 391:25
**31 (2)**
369:14,18
**319 (1)**
6:6
**32 (1)**
390:7
**324 (1)**
6:8
**33 (7)**
5:5 44:2 65:6,16 66:9
345:16,20
**34 (7)**
70:16 74:22 84:11
169:6 383:20,21
390:10
**35 (13)**
61:23 63:15,19,21
72:8 137:15,16
150:4 156:1,12,14

252:17 253:19
**36 (20)**
64:4,19 67:3,5,11
68:23 69:7 70:16
81:22 84:19 85:2,4
85:21,24 86:5 87:4
104:3 168:20
338:10 385:3
**36A (3)**
78:23,25 90:19
**36C (1)**
81:14
**37 (25)**
64:8 74:23 78:23
90:14,21 91:5,9,13
91:16 92:10,12,19
92:23 93:5,7,15
98:13 99:8,11,22
100:23 104:3
168:20 204:13,25
**38 (15)**
64:11 98:20,23 99:1
99:10,15,19 100:5
100:13,23 104:4
168:20 204:13,25
387:6
**382 (1)**
84:3
**389 (1)**
4:6
**39 (9)**
64:14 101:6,8,22
102:4,24 103:13
104:4 168:20
**3rd (2)**
176:7,13

_____
**4**

**4-3 (1)**
4:15
**4,501,000 (2)**
5:5 33:6
**4,760,378 (1)**
253:21
**4:20 (1)**
373:21
**4:34 (1)**
373:24
**40 (20)**
46:10 77:2 91:3 93:10
93:17,21 94:13,13
94:16,21 95:14
96:20 97:2 98:16
99:4 169:6 204:6,19

330:2 391:25
**41 (1)**
45:22
**42 (20)**
5:6 91:3 93:11,17,21
94:13,16,21 95:15
96:20 97:2 98:16
99:4 203:16,24
204:5,7,16,19 205:4
**43 (1)**
205:13
**44 (4)**
207:23 209:5 210:2
211:4
**45 (2)**
77:2 211:11
**46 (5)**
226:14 281:3,4
283:13,13
**47 (12)**
227:15 228:16 238:15
238:18 239:1,19
240:1 241:2 392:24
393:2,5 394:6
**48 (1)**
77:18
**49 (4)**
38:8 304:14,18 330:2

_____
**5**

**5,450,443 (2)**
5:8 76:2
**5,537,382 (2)**
5:6 42:17
**5,608,397 (2)**
5:9 82:23
**5,859,601 (4)**
4:12 170:14 184:16
187:6
**5:04 (1)**
399:20
**5:06 (1)**
399:23
**5:11 (2)**
404:16,22
**50 (1)**
305:15
**51 (6)**
77:2,2,6 309:8 312:15
313:9
**5100 (1)**
324:24
**52 (5)**
251:11,12 314:7,9

319:10
**5200 (1)**
324:24
**53 (3)**
251:22 252:7 329:20
**54 (1)**
252:13
**57 (7)**
83:12 352:14,15,16
353:5,5 389:4
**58 (1)**
83:12
**59 (21)**
91:2 93:10,14,21 94:2
97:5,18 98:15 99:5
104:12,18 105:10
105:13 204:6,16
229:10,16 230:8
234:13 236:24
237:2

_____
**6**

**6/9/2008 (1)**
180:9
**60 (8)**
71:2 230:25 234:3
236:24 240:24
241:18 256:17
393:25
**601 (70)**
11:3,14 19:8,10 44:4
50:11,19 53:7,8,21
54:4,9,16,20 55:12
55:17 56:1 57:13,20
60:13 79:23 81:7
83:7 91:13,16 93:9
114:19 115:6
137:17 157:22
158:12 170:15
171:8 174:3,20
175:3 178:2 182:6,9
182:18 183:4,7
184:20 185:12
187:12,22 188:3,9
190:19,20 191:8,12
191:15,19,23
192:22 193:16,18
194:3 195:9 203:17
205:15 208:17
241:6 284:7,18
285:11 322:22
323:1 391:12
**61 (16)**
71:2 91:2 93:10,14,21

94:2 97:5,7,18
98:15 99:5 104:13
104:18 105:14
204:6,17
**62 (1)**
368:10
**69 (1)**
369:25

_____
**7**

**7 (4)**
1:19 2:1 7:1 408:3
**74 (5)**
382:10,12,17,19
383:19
**76 (1)**
5:8
**7th (1)**
7:11

_____
**8**

**8 (1)**
4:6
**8.B (1)**
406:7
**8:00 (3)**
2:2 7:2,12
**8:38 (1)**
41:24
**8:43 (1)**
42:2
**80202 (1)**
3:12
**80s (2)**
38:16,25
**82 (1)**
5:9
**85 (3)**
39:6 384:12 385:14

_____
**9**

**9 (1)**
181:10
**9/16/97 (2)**
251:14,19
**9:29 (1)**
82:11
**9:42 (1)**
82:17
**90 (1)**
303:13
**916 (1)**
172:17
**96 (6)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 80:3 322:11 325:6 328:3,21 329:7<br>**97 (6)**<br> 322:3,11 325:6 328:3 328:21 329:7<br>**99 (4)**<br> 171:14 173:3,6 355:21 | | | | |