# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

REGENTS OF THE UNIVERSITY )
OF MINNESOTA, )
)
Plaintiff, )
) CIVIL ACTION FILE
vs. )
) NO: 18-CV-00821-EJD-NMC
LSI CORPORATION AND AVAGO )
TECHNOLOGIES U.S., INC., )
)
Defendants. )

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF
PROFESSOR STEVEN W. MCLAUGHLIN
ATLANTA, GEORGIA
MONDAY, MAY 7, 2018

REPORTED BY: TANYA L. VERHOVEN-PAGE,
CCR-B-1790

JOB NO. 140342

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

May 7, 2018

8:00 a.m.

Videotaped deposition of PROFESSOR STEVEN W. MCLAUGHLIN, held at the offices of Kilpatrick Townsend & Stockton, LLP, 1100 Peachtree Street, Atlanta, Georgia before Tanya L. Verhoven-Page, Certified Court Reporter and Notary Public of the State of Georgia.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

K&L GATES
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
BY: CHRISTOPHER VERDINI, ESQ.
BY: MARK KNEDEISEN, ESQ.

On behalf of the Defendants:
KILPATRICK TOWNSEND & STOCKTON
1400 Wewatta Street
Denver, Colorado 80202
BY: EDWARD MAYLE, ESQ.
BY: DAVID SIPIORA, ESQ.

THE VIDEOGRAPHER: Rick Richey

\- - -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I N D E X

WITNESS: PROFESSOR STEVEN W. MCLAUGHLIN

| Examination | Page |
|---|---|
| BY MR. MAYLE | 8 |
| BY MR. VERDINI | 389 |

EXHIBITS:

| McLaughlin Deposition Exhibit | Description | Page |
|---|---|---|
| Exhibit 1001 | U.S. Patent Number 5,859,601 | 10 |
| Exhibit 1002 | Prosecution history | 10 |
| Exhibit 1003 | Joint Claim Construction and Prehearing Statement UNDER PATENT L.R. 4-3 | 10 |
| Exhibit 1004 | Proposed constructions | 10 |
| Exhibit 1005 | Declaration of Professor Steven W. McLaughlin | 10 |
| Exhibit 1006 | Declaration of Professor Emina Soljanin | 10 |
| Exhibit 1007 | White paper Blu-ray disc format 1.B Physical Format Specifications for BD-R | 21 |

EXHIBITS:

| McLaughlin Deposition Exhibit | Description | Page |
|---|---|---|
| Exhibit 1008 | U.S. Patent Number 4,501,000 | 33 |
| Exhibit 1009 | U.S. Patent Number 5,537,382 | 42 |
| Exhibit 1010 | U.S. Patent Number 5,450,443 | 76 |
| Exhibit 1011 | U.S. Patent Number 5,608,397 | 82 |
| Exhibit 1012 | Document bearing Bates numbers UMN_0001330 through UMN_0001347 | 169 |
| Exhibit 1013 | Document bearing Bates number UMN_0000916 | 172 |
| Exhibit 1014 | Document bearing Bates number UMN_0001655 | 175 |
| Exhibit 1015 | Document bearing Bates number UMN_0001202 | 179 |
| Exhibit 1016 | Document bearing Bates numbers UMN_0001204 through UMN_0001205 | 183 |
| Exhibit 1017 | Document bearing Bates numbers UMN_0001072 through UMN_0001074 | 186 |
| Exhibit 1018 | Document bearing Bates numbers UMN_0001055 through UMN_0001057 | 189 |
| Exhibit 1019 | Document bearing Bates numbers UMN_0001058 through UMN_0001060 | 192 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

EXHIBITS:

| McLaughlin Deposition Exhibit | Description | Page |
|---|---|---|
| Exhibit 1020 | Block Diagram of Read Channel | 283 |
| Exhibit 1021 | Plaintiff's Claim Construction Charts | 319 |
| Exhibit 1022 | Document bearing Bates number UMN_0001355 | 324 |

TSG Reporting - Worldwide 877-702-9580

LSI Corp. Exhibit 1029
Page 6

ATLANTA, GEORGIA; MONDAY, MAY 7, 2018
8:00 A.M.

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning, ladies and gentlemen. This is the beginning of media number one in the videotaped deposition of Steven W. McLaughlin, Ph.D.

Today's date is May 7th, 2018. It's 8:00 a.m. The case is Regents of the University of Minnesota, Plaintiff, versus LSI Corporation and Avago Technologies U.S. Inc., Defendants, Civil Action No. 18-CV-00821-EJD-NMC in the United States District Court for the Northern District of California, San Jose Division.

My name is Rick Richey, I'm the videographer, the court reporter is Tanya Page, and we represent TSG Reporting.

Today's deposition is at the Atlanta offices of Kilpatrick Townsend, 1100 Peachtree Street, Atlanta, Georgia.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Would the attorneys please introduce themselves.

MR. MAYLE: Good morning. This is Ted Mayle from the Kilpatrick Townsend firm. We're in the Denver office. Sitting here is my colleague, Mr. David Sipiora, for the Defendants.

MR. VERDINI: Chris Verdini and Mark Knedeisen of K&L Gates on behalf of the Plaintiffs and witness.

THE VIDEOGRAPHER: Would the court reporter please swear the witness.

Thereupon --

PROFESSOR STEVEN W. MCLAUGHLIN,

called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MAYLE:

Q Good morning, Professor. McLaughlin?

A Good morning.

Q Is it McLaughlin?

A McLaughlin.

Q Did I say it correctly? Okay.

You've been deposed before, right?
A Yes, I have.
Q Several times?
A Yes.
Q And when was the most recently, about? Last couple years?
A Two years ago, maybe. Something like that.
Q Okay. So you understand that this is being transcribed and you need to speak up and your answers should be verbal because the court reporter can't record head nods and things of that nature.
A Yes. Yes.
Q We'll try to agree not to talk over each other.
A Okay. Sounds good.
Q You've taken the oath. You understand that that requires you to tell the truth and the whole truth?
A Yes.
Q If you don't understand a question that I ask, please ask -- please ask me to rephrase and I'll try to do that, okay?
A Okay.
Q And if you need a break at any time, you

know, feel free to let us know. If we're in the middle of a questioning, I'll try to finish that off if I can and then we'll work to take a break. Is that okay?

A Okay. Sounds good.

Q Are you taking any sort of medications that would impede your ability to recall or give full and accurate testimony today?

A No, I'm not.

Q Is there any reason why you can't give full and accurate testimony today?

A No.

Q I have a few exhibits here, as you might suspect.

A Okay.

Q Some of them I've marked already.

MR. MAYLE: And Counsel, we're going to start with 1001 for us so you guys can do Exhibit 1 when you do your depos.

MR. VERDINI: Sounds good.

(McLaughlin Exhibits Nos. 1001 to 1006 were marked for the record.)

MR. MAYLE: And I'll pass a few of these out. One for you with a copy on

it. Exhibit 1001 has been premarked.

BY MR. MAYLE:

Q Do you recognize that as the '601 patent, Professor?

A Yes, I do.

Q All right. I'm just going to give you about six of them, just so we have them.

Exhibit No. 1002 that's been premarked.

A Okay.

Q Do you recognize this, Professor McLaughlin?

A Yeah, that's the prosecution history.

Q Yeah, that's the file history for the '601 patent.

Exhibit 1003, premarked again. It's -- it says Document 204 on the top. Have you seen this document? I'll just tell you that it's something that the parties filed for the joint claim construction statement.

A I think I've seen --

Q Roughly familiar with that?

A -- a chart or something. I think, yeah, I'm familiar with it.

Q Exhibit 1004, do you see on the top it says Document 204-2 in Exhibit B?

A Yeah. Yes, I've seen it.

Q So this is the parties' proposed constructions?

A Yes, yes.

Q And Exhibit 1005 you're probably familiar with. That's your declaration; isn't that right?

A Yes.

Q And one more. Let's get Exhibit 1006. And this says the Declaration of Professor Emina Soljanin. Do you see that? Have you seen that before?

A Yes.

Q So let's just have those so we have them. Let's look at your Exhibit 1005, which is your declaration. And let's please start with paragraph four. You're talking about your background and qualifications. And you say in Paragraph four that: My research interests include communications and information theory.

Can you kind of tell us at a high level what that means?

A We study theoretical and practical aspects of how communication systems work. Communication systems include things like wireless communications, wire line communications, data

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

storage systems.

Q In the field of data storage systems, what are some examples of that, different types?

A Magnetic recording systems, optical storage systems.

Q What are some examples of optical systems?

A CD, DVD, Blu-ray.

Q And magnetic systems would be like hard disc drives?

A Exactly.

Q And you say in this paragraph that many of your papers and patents deal with coding techniques and optical -- for optical and magnetic data storage devices.

A Yes.

Q And you say that because there's some overlap in the coding techniques that are used for magnetic and optical systems, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, there are some common aspects to both magnetic and optical recording.

BY MR. MAYLE:

Q What are some of those common aspects?

A Run link limited codes, partial response, like techniques, error correction coding.

Q Is there any others?

A Probably.

Q Nothing that comes to mind right now?

A Nothing that -- no.

Q You referenced a -- you said that you're the principal scientist for Calmetrics. Can you kind of tell us at a high level what that work involves?

A I was.

Q In the past?

A Yeah, exactly. I no longer am -- Calmetrics was a company that commercialized a technique for optical storage to change the format for how information was stored in optical disc. And I did a whole bunch of research in that area and, for a period of time, was the principal scientist trying to help -- mostly on the technical side, but trying to commercialize some technologies I developed and some technologies they were developing.

So it was coding and signal processing, related things for optical storage.

Q And that coding, were those RLO codes?

A Not for Calmet -- not explicitly for Calmetrics. But Calmetrics inherited some of my

patents from previous work where I worked on RLO codes for optical storage.

Q Can you tell us at a high level how an optical system -- let's pick Blu-ray or DVD -- how it stores binary data?

MR. VERDINI: Object to the form.

THE WITNESS: It's -- it depends on whether it's ROM or R or RW media. Each one of those stores data in different ways.

So in ROM -- in ROM data, it stores it through pits and lands, modulating the length of the pits and lands. In R media, it ablates the media in a similar way to kind of mimic pits and lands. And in RW media it uses face change materials to change the -- to change the amorphous and crystalline state of the media to, again, kind of mimic the pits and lands in ROM.

It's a long answer, but that's the short version.

Q No, no. Thank you.

Is a pit -- a pit on a disc is like a mark on the disc; is that right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Object to form.
THE WITNESS: I'm okay with that characterization. I mean, a pit is a depth. So to the extent that a mark represents kind of a change in depth.
BY MR. MAYLE:
Q A depth. Is land, then, the absence of a pit?
A Yeah. Generally speaking, yeah.
Q And how are those marks or pits put there? Is it put there by a laser?
A No, it's put there by a stamper.
Q A stamper?
A In ROM.
Q Let's stick with ROM.
A Yeah, it's put there by a stamper.
Q And then how -- how is the data then retrieved?
A A laser reads the pits and lands -- or a laser focuses the light and it focuses the spot to -- focuses the spot, and as the light passes over the pits and lands there's a difference in the intensity in the reflected light, reflecting whether it's a pit or a land.
Q Is that different intensity then used to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

infer where the pits and lands are?

A Correct. There's an analog signal produced by a detector. An optical detector is detecting the light that comes off the disc, and that analog signal corresponds more or less to the pits and lands.

Q Thank you.

A The intensity --

Q Are you familiar with -- sorry.

A Sorry. I was going to say the intensity of that.

Q Sorry to interrupt you.

A No, it's okay.

The intensity of that light is representative of pits and lands.

Q Are you familiar with something called eight to fourteen modulation?

A Yes.

Q Is that also known as EFM?

A Yes.

Q Is that used in CDs?

MR. VERDINI: Object to form.

THE WITNESS: Yes, it's the -- it's the standard in a code or encoding method that's used in CD.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q When you say standard, are you using -- in what sense are you using that word standard?

A It conforms to a standard. There's a standard that dictates the use of that code.

Q What do you -- what do you mean by -- can you explain what your understanding of a standard is?

A Standard is an agreed upon -- agreed upon method, for lack of a better term, on how the information should be encoded and stored on the optical disc. And so all the discs that claim to be CD need to conform to that standard.

Q So does that mean that all the discs that claim to be a CD use the EFM coding?

A That -- they better or they may not be readable by a CD. So I mean, I'm splitting hairs on you.

Q Yes.

A All the manufacturers better conform to that standard or their disc may not be readable. So I think the answer is basically yes, they need to -- they need to be compliant.

Q In that name, eight to fourteen, what's the eight and what's the fourteen mean, at a high level?

A Eight is eight information bits or a byte comes in and that gets encoded into 14 other bits that are then stored on the disc.

Q Is the eight kind of like the data words and then 14 is the code words?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, in the language of the '601 patent we're using, yes.

BY MR. MAYLE:

Q I'm not asking you if the '601 patent covers it, per se.

A Yeah, I know.

Q I just want to get the background.

A Yeah. But I think you're using those terms --

Q Yes.

A There's data word -- yeah. So, yes.

Q Does that mean that the rate of the CD is eight divided by 14?

MR. VERDINI: Object to the form.

THE WITNESS: The rate of the code.

BY MR. MAYLE:

Q The rate. Sorry.

A The rate for the code is eight to 14, yes. Eight over 14.

Q Is that --
A Code rate.
Q Is that considered a high rate, a low rate or is there a way to characterize that?
MR. VERDINI: Object to form.
THE WITNESS: Yeah, that's considered a low rate.
BY MR. MAYLE:
Q Why would a standard use a low rate code?
MR. VERDINI: Same objection.
THE WITNESS: So the -- it's a long answer.
So in that case, the -- that code rate is used in conjunction with a modulation technique to encode information in pits and lands. And so the overall data storage rate is not -- I would not consider low, but the rate the code is used -- the rate of the code is considered to be low.
So the -- so in that case, the rate of the code's eight over 14, but there are three data -- three code word bits in a minimum feature. So to determine the density -- the density is considered to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

be relatively high. How much information is stored in -- in a -- in the minimum size pit is considered to be relatively high, but the code rate for that is considered to be low. So it's the combination of those two.

The point I'm trying to make is it's a clever way of combining the run link limited code with the minimum feature and minimum pit size to get relatively high density with a low code rate.

So I know that might only be coherent to -- to people that really work on CDs.

Q Thank you.

MR. MAYLE: Well, I'm going to introduce another exhibit here if I may. It looks like there was only one copy in here. There should have been two.

Could you mark this as Exhibit 1007.

(McLaughlin Exhibit No. 1007 was marked for the record.)

BY MR. MAYLE:

Q So I'm handing the Professor exhibit marked as 1007. And Professor, have you seen anything -- have you seen this document before?

A I don't -- I don't think so. I don't remember. If I did, it was probably 14 years ago.

Q What is --

A Maybe not 14 years ago, but ten years.

Q When it says on the front cover 1.D Physical Format Specifications for DB-R, would you know what that means?

MR. VERDINI: I'm going to object. Foundation. I'm just going to object as he's never seen the document, but go ahead.

THE WITNESS: I'm sorry. Ask your question again.

BY MR. MAYLE:

Q The front cover of this document refers to -- it says -- 1.B Physical Format Specifications for BD-R.

Are you familiar with this terminology here?

A I think I know what it's going -- what's going to be in the document. It makes sense to me.

Like I said, I haven't seen -- I don't believe I've seen the document; if I have, it's been ten years, so -- I think I know what's coming in the document.

Q Are you familiar at all with any of the specifications for Blu-ray disc?

MR. VERDINI: Object to the form.

THE WITNESS: Well, the best way to answer that, I was very familiar. It's probably ten years since I've spent a lot of time with it.

BY MR. MAYLE:

Q Let me ask a different question. You said that CDs have spes -- have standards?

A Yes.

Q Do Blu-ray discs have standards?

A Yes.

Q Let's flip to page 22. And I'll direct your attention to the middle of the page, under the figure -- you see there's the heading that says Y17 PP. Do you see that?

A Yes.

Q And I'll direct your attention to the first sentence there. It says: All RLL codes used in optical recording are DC free, that is, they have almost no content at low frequencies.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Do you see that?

A Yes.

Q Is that a true statement?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: I'm not sure. It may be -- they may be referring just to -- they -- it may just be referring to Blu-ray. I'm not sure. I'm trying to think if for DVD and CD, whether that's a true statement or not.

BY MR. MAYLE:

Q All right. Let's ask for Blu-ray. Do you know if Blu-ray is a DC-free code -- has a DC-free code?

MR. VERDINI: Same objection.

THE WITNESS: Honestly, I don't remember. I mean, I'm taking this at face value, assume that it's a correct statement, but -- yeah, it's been a long time since I've played around with that.

BY MR. MAYLE:

Q Have you heard of the 17PP code before?

A Yes. I'm sure the answer is yes, but it's not -- I'm not recalling it at the top of my

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

head. It's been a while, at least ten years.

Q Then I'll --

A And I couldn't tell you what PP even means from memory.

Q Okay. Then you see there's an equation. And below that equation, there's a sentence that starts with The DC-free property is needed for a number of reasons. Do you see that?

A Yes.

Q And it says, number one --

A I'm sorry. Could you point?

Q It's two sentence -- two lines below the equation.

A Okay.

Q It starts, The DC-free property is needed for a number of reasons.

A Yes.

Q It says: Number one, for separation of the data signal from disc noise such as fingerprints or dust.

Do you see that?

A Yes, I see it.

Q Do you know what that means?

MR. VERDINI: Objection. Form, foundation.

THE WITNESS: Separation of the data signal from disc noise such as fingerprints or dust. I know what that means. I'm not -- I'm not connecting that I with a need for DC free.

BY MR. MAYLE:

Q So let's say someone touches a CD and puts a smudge on that.

A Yeah.

Q Could that introduce a low frequency component that shouldn't be there?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q To the data?

A What -- when someone puts a fingerprint, I usually think of that as producing kind of a signal that might result in errors as opposed to low frequency content. It's been a while since I --

Q Well, let's assume that the 17PP code is DC free.

A Okay.

Q If there was a smudge put on it that introduced a low frequency content, that would potentially introduce an error in the readback, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yes, I'm with you so far. I'm okay with that.

BY MR. MAYLE:

Q And the system would know that that would be an error because it was expecting something that was DC free, correct?

MR. VERDINI: Same objection.

THE WITNESS: There's a difference between DC free, which is zero DC content, and low frequency con -- low frequency content. So your -- so ask the question again.

BY MR. MAYLE:

Q So let's say the system uses a running digital sum.

A Yes.

Q And is expecting only a limited number of different values for this RDS.

A Yes.

Q And it's expecting a power spectral density function vanishing at DC.

A Yes.

Q And there's a smudge on the disc. Would that smudge introduce something into the system that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

would depart from the system's expectation of a spectral density function vanishing at DC?

MR. VERDINI: Object to the form.

THE WITNESS: I -- I'm okay with that. That all makes sense, but honestly that's -- like you said, the DC-free property I don't normally attribute to that, but it's here. It's written by someone. I'm willing to accept the statement.

BY MR. MAYLE:

Q Okay.

A Yeah.

Q One quick, we'll skip number two. Number three, it says: The DC properties needed for the servo systems.

Do you understand what they're saying there?

MR. VERDINI: Object to the form.

THE WITNESS: I think so. I think so.

BY MR. MAYLE:

Q Does that have something to do with not jumping the track?

MR. VERDINI: Same objection.

THE WITNESS: Yeah. Servo systems are used to keep track of where you are on the track, to try to help you keep centered on the track.

BY MR. MAYLE:

Q And would a DC-free code help the system keep track of itself in the playback?

A Again, the -- it's funny. You skipped past number two. Number two, in my own head, is the reason for DC-free because you need to have kind of a balanced signal. In order to set the slicer level, you don't want the DC level of the signal to vary too much. You'd like to set, you know, a slicer level.

So that's -- when I think of DC free, that's the primary reason I think of it. So the servo --

Q Just to be --

A There's other reasons -- there's other ways to control servo that are much more effective and important than the DC-free code.

Q Okay. Let's go to the slicer real quick and we'll move on. I skipped it because I didn't know what it meant. So there was no agenda there, so I'm glad that you clarified.

But what you said about using the DC-free

for the control of the slicer level, is that specific to an optical system?

A I mean, it is the reason -- it's the reason, you're saying? Is the reason specific to an optical system?

Q Let me rephrase.

What you said before about how you understand this point two, the control of the slicer level and why you would want DC -- DC-free code, is that concern something that's particular to an optical system, as opposed to, say, a magnetic system?

MR. VERDINI: Object to the form.

THE WITNESS: Ask again. I'm sorry. I was distracted by the --

BY MR. MAYLE:

Q So you explained earlier -- you testified that you felt that point two in this document, it says for control of the slicer level, was a reason to have a DC-free code; fair so far?

A Yes.

Q Is that reason for having a DC-free code to control the slicer level a particular concern for optical systems?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And do magnetic systems have that same concern?

A Magnetic systems are guaranteed to have a DC-free content just by -- well, let me be careful. Magnetic recordings also have a -- have a reason -- have a similar reason for making sure that the DC content doesn't drift, that you want to balance the DC content and the signal for very similar reasons.

Q Do all magnetic systems have a running digital sum that take on a limited number of different values?

MR. VERDINI: Object to form. Foundation.

THE WITNESS: I don't believe so. I don't believe that this constraint is in -- is in -- I don't -- I'm most -- I don't believe this constraint is enforced explicitly -- that I'm aware of -- in magnetic recording systems.

BY MR. MAYLE:

Q So if we impose an RDS -- what should we -- what should I call it, a DC-free constraint?

Using the word constraint, are you

talking about a DC-free constraint?

A This RDS equation, I think, is enforced as a -- the DC-free code -- the purpose of the DC-free code is to enforce a running digital sum constraint.

Q Okay. If --

A If you bound the -- if the running digital sum is bounded between a couple values, then it's guaranteed to have some DC free.

Q If one imposes an RDS -- a bounded RDS constraint on a code, would that come at the expense of the rate, lowering the rate that the code could otherwise achieve?

MR. VERDINI: Object to the form.

THE WITNESS: Yes, if you put a DC-free constraint on, it constrains the sequences and that means the rate would be lower than if it was not constrained.

MR. MAYLE: I'd like -- let's see. I have another exhibit. You can set that aside, if you want. Sorry about that. We were supposed to have two copies, but for some reason we have one.

Ma'am, could you mark this as Exhibit No. 1009 -- sorry -- 1008.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(McLaughlin Exhibit No. 1008 was marked for the record.)

BY MR. MAYLE:

Q So I'm handing you, Professor, a patent that was marked Exhibit 1008. I'll direct your attention, it says patent 4,501,000. It was issued in 1985.

And do you see the first name there, the inventor is Kornelis A. Immink?

A Uh-huh, yes.

Q Are you familiar with Dr. Immink?

A Yes.

Q And how are familiar with Dr. Immink?

A He is a colleague that I've known for probably 25 years. So I've had many conversations with him.

Q Is he pretty well known in the field?

A Yes.

Q Let's look at the abstract.

A I think he's -- he claims, I don't know whether it's true or not. He claims to be the inventor of the EFM code.

Q Oh, that he invented the EFM code?

A That might be a bit boastful, but I think he gets credit for it. It shows up all over the

place that he's the inventor of it.

Q And let's look at the abstract. The second sentence, starting four lines down, it says: Data words of m-bits are translated into information blocks of n sub 1 bits.

Do you see that sentence?

A Yes.

Q Is that m and n -- well, it says n sub one. But is m and n kind of a conventional way to describe, in your field, encoding from m-bits to n-bits? Do people always pick m and n for a reason?

MR. VERDINI: I'm going to object to the form. Foundation.

BY MR. MAYLE:

Q Do you understand the question?

A I do understand the question, yes. Sometimes people use other -- other letters, but it is common to use m and n in that form that you've described.

Q And it's also common to specify that the n number would be bigger than the m number, correct?

MR. VERDINI: Object to form.

THE WITNESS: Yes, that's correct.

BY MR. MAYLE:

Q And then it goes on. It says: That

satisfy a (d,k)-constraint.
Do you see that?
A Yes.
Q And it says that: A d -- At least d "0" bits but no more than k "0" bits occur between successive "1" bits?
A Yes.
Q Do you understand what that mean?
A Yes.
Q What does that mean?
A It means what it says. So ones can't occur next to each other. You have to have at least d between ones and, at most, k between ones.
Q When you're specifying d as in zero bits, does that imply that he's talking about an NRZI format?
MR. VERDINI: Object to the form. Foundation.
THE WITNESS: Could you ask the question again.
BY MR. MAYLE:
Q Could that specif- -- instead of saying -- let me ask it this way.
If someone says that there has to be at least d zero bits between successive ones, is that

the same as saying there has to be d nontransitions between successive transitions?

MR. VERDINI: Object to the form.

THE WITNESS: No, that's not what that says. It says there has to be d zeros between -- between successive ones. It doesn't say anything about transitions.

BY MR. MAYLE:

Q Okay. If we move down more than half the way, there's a reference to NRZ-M. It says: Then the encoded signal is modulated as an NRZ-M signal in which a "1" becomes a transition and a "0" becomes an absence of a transition.

Do you see that?

A Okay.

Q Is NRZ-M another name for what we call NRZI?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: Actually, that's probably the first time I've ever seen the NRZ-M as a descriptor. So I'm wondering why he's using -- why he's using that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q Well, it's -- let's ask it this way.

If a one is a transition and a zero becomes an absence of a transition, is that what you understand to be NRZI, in general?

MR. VERDINI: Object to form.

THE WITNESS: I'm not -- I'm just -- I'm not -- I'm fiddling with the word becomes. But NRZI -- it is true NRZI indicates it's time to make a transition in the medium -- in the state of the medium. That's the point --

BY MR. MAYLE:

Q And a one -- sorry.

A And a one indicates transition the state of the medium, and a zero means don't transition the state of the medium.

Q And if you see the last sentence in this abstract, it says: The foregoing technique can be used to advantage in recording digitized music on an optical disc.

Do you see that?

A Yes.

Q And so that would -- does that indicate that, at least as the date of this patent, that NRZI

codes were used in optical discs?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: Yeah, I'm okay with that.

BY MR. MAYLE:

Q Okay. Let's flip to column one of this patent, and specifically to line 49. It says that: It may further be required that the transitions not follow too closely after each other in order to limit intersymbol interference.

Do you see that?

A Yes.

Q Is it the case that intersymbol interference was a potential problem that was known for optical systems in the '80s?

MR. VERDINI: Object to form. Foundation.

THE WITNESS: I'm sorry. Say it again. I'm -- I'm just reading.

BY MR. MAYLE:

Q Isn't it true that people knew about -- with, in particular, in optical systems -- that intersymbol interference could be a potential problem in an optical system, at least back in the '80s?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Same objections.

THE WITNESS: Yes, the codes that were used to -- the codes that were used were designed to avoid intersymbol interference. So I would -- I would say -- back in the '85, I would say not to limit intersymbol interference. I would say that's really to avoid intersymbol interference.

But that's common -- that's the common understanding of why these codes were used is to eliminate -- or avoid intersymbol interference, not really eliminate it.

BY MR. MAYLE:

Q And then the next sentence says --

A But I think -- what I want to do is I'm looking at the word transitions here, and they clearly are -- they're talking here about transitions in the state of the medium, whether it's a pit or a no-pit.

Q And that's because they're talking about optical here, right?

A Yes.

Q And the next sentence says: In the case

of magnetic or optical recording, the latter requirement may also be related to the information density on the recording medium.

Do you see that?

A The latter requirement. I'm not sure what they're referring to, latter requirement.

Q Let's assume the latter requirement is the limiting of intersymbol interference. Then it would read: In the case of magnetic or optical recording, the need to limit intersymbol interference may also be related to the information density on the recorded medium.

Would that be a fair read?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, this is the first time -- probably the very first time I've seen this patent or read this patent, so I'm just trying to absorb a little bit more of the context.

BY MR. MAYLE:

Q Let me ask you in general. Is it the case that intersymbol interference could become a greater problem as the density of the data on the recording medium gets higher?

A Yes.

Q Isn't that what this sentence is saying?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: You know, the way you asked the question makes complete sense to me. The -- you're reading in other stuff that's not -- that's not written there. So that's why I'm just trying to absorb. You know, the latter requirement, there's -- no one is listing any kind of requirement here.

Oh, I'm sorry. It may be required that the transitions not follow closely after each other. In the case of magnetic -- the latter requirement may also be related to the -- okay.

Yeah, I guess I'm okay with that. Yeah. I apologize for taking --

MR. MAYLE: No worries. We can set that aside now. And let's mark real quick one more exhibit.

We're going to take a break off the record for a minute.

THE VIDEOGRAPHER: 8:38. We're off the record.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(Brief pause.)

THE VIDEOGRAPHER: 8:43. We're back on the record.

BY MR. MAYLE:

Q Professor McLaughlin, before we took a break, we were talking about one of the Immink patents?

A Uh-huh.

MR. MAYLE: I'd like to mark one more exhibit here, if I may. I think we're up to number nine, right? Is that right?

MR. VERDINI: I have 1000 on my notes. Yeah, I don't think so.

MR. MAYLE: Okay. Well, this is nine now. And it says on it that it's patent 5,537,382.

(McLaughlin Exhibit No. 1009 was marked for the record.)

BY MR. MAYLE:

Q I'm handing it to the professor, and you see on the top, Professor, it says McLaughlin. Would that be you?

A That's me.

Q And it says it was signed to Optex

Corporation and AT&T Corp.
Do you see that?
A Uh-huh.
Q And do you know what Optex Corporation is?
A Yes.
Q What is that, basically?
A That was a start-up company that tried to commercialize a new optical recording format.
Q Were you affiliated with that company?
A Yes.
Q What was your role?
A My affiliation -- I was not affiliated. I was never an employee or anything like that. I had a research project that was sponsored by them. When I was at RIT in Rochester they funded some research work for my group and I performed that work. So I was never an employee or anything like that.
Q Was that research work in the field of optical recording codes?
A Yes.
Q All right. We can put that aside. We might talk about that later. Let's go back to your declaration, which I think is Exhibit 1005. Let's talk about that for a while.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

And if you could please turn to page 16, and we'll start with paragraph 33. And you say -- you opine that a person having ordinary skill in the art, a PHOSITA, in the field to which the '601 patent pertains, would be someone working in the electrical engineering field and specializing in data coding and detection techniques used in connection with reading data from various storage media such as hard disc drives and optical media, correct?

A Yes.

Q And you testified earlier that the codes used for hard disc drives and optical media have certain things in common, correct?

MR. VERDINI: Object to form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And isn't it true that the potential problem of intersymbol interference is a problem for hard disc drives and magnetic and for optical media?

MR. VERDINI: Object to the form.

THE WITNESS: Yes, but they're not -- they're not the same. So they're not -- they're not the same, but both of them -- intersymbol interference plays a factor in both magnetic recording and

optical recording.

BY MR. MAYLE:

Q And isn't it the case that, in magnetic recording and in optical recording, as the data density that gets recorded gets higher, the potential problem of symbol interference also gets higher?

A Yes.

Q And you've listed in Appendix A in your CV -- Appendix A in your declaration was your CV.

A Okay.

Q To the best of your knowledge, is that current, fully accurate? I mean, without going through it, as far as you know?

A I'm sure it was accurate at the time.

Q Okay. Now, do you -- do you know when you started work on this declaration in terms of, you know, what calendar date?

A It certainly was not a year ago. It was a couple months ago. I'm sorry. My memory is pretty bad.

Q You signed it on April 13th, 2018, I believe. Right. On the last page, page 41, you signed it on --

A March 13th.

Q Sorry. March 13th?

A Yes.

Q Do you know about how long before that date you started work on this declaration?

A Roughly a month.

Q A month?

A Roughly.

Q And do you know how many hours you put into this?

A No. Well, I mean roughly -- probably not 100, but certainly more than 30 or 40.

Q Did you bill your time for those hours?

A Yes.

Q And you were compensated for all of that time?

A Yes.

Q Can you tell us, in general, what was the process of you making your declaration?

MR. VERDINI: Object to the form. I'm going to caution him on privilege, but I'm not -- because I don't know what you mean by the process.

BY MR. MAYLE:

Q Do you understand the question?

A I can say, generally speaking, I was asked to provide opinions on certain -- certain claim

terms. Also asked to -- I think this is -- I was asked to write a tutorial on hard disc drive basics and to provide certain opinions on what some of the claim terms meant.

Q How did you go about giving your opinions on what the claim terms mean?

MR. VERDINI: Same objection.

THE WITNESS: I read the patent within the contents of the patent and context of what the -- my understanding of the general area, but in view of the patent specification and the claims, I was asked to provide meanings, interpretations of some of the claim elements. That's what I did.

BY MR. MAYLE:

Q Were you aware of -- were you provided a list of proposed constructions before you started on your declaration?

MR. VERDINI: Object to the form. And calls for privileged information, so don't answer the question.

THE WITNESS: Sorry. On the advice of counsel, I'm not going to answer the question.

BY MR. MAYLE:

Q Well, you're aware that the University has submitted to the court proposed constructions of claims, right?

A Yes.

Q And you realize the Defendants did the same thing, right?

A Yes.

Q And both sides know each other's positions, correct?

A Yes.

Q I'm simply asking whether you knew either side's proposed constructions before you started work on your declaration. Just a factual question.

MR. VERDINI: It isn't -- I mean, you can -- you can answer whether you knew the Defendant's constructions. Plaintiff's proposed constructions, I think, calls for communications with counsel.

BY MR. MAYLE:

Q Let me ask you this: Did you consider the Plaintiff's proposed constructions when you made your opinions.

MR. VERDINI: Object to the form.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS: Yeah, I'm not sure the question is factual in the way you've posed it. Maybe ask the question again so I can understand the question.

BY MR. MAYLE:

Q Did you consider the Defendant's proposed construction when you made your declaration?

A No.

Q So you know what that -- you know what I mean when I ask -- so what --

Did you consider the Plaintiff's proposed constructions when you made your declaration?

MR. VERDINI: I'm going to object to the form because it assumes that there were proposed constructions before he started. You've asked that two or three times.

BY MR. MAYLE:

Q Let's go, then, to Materials Reviewed. It's page three of your declaration.

A Page --

Q Page three, paragraph seven.

A Yes.

Q So it said that you've reviewed the patent and the file history, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Yes.
Q Did you read the file history?
A A long time ago, yeah. I say -- I scanned through it, scanned through the file history.
Q Did you read all the references that were in the file history, prior art references?
A Did I read -- please ask the question again.
Q Did you read all of the prior art references that are referenced in the file history for the '601 patent?
A I don't remember if I read all of them.
Q Did you read any of the references that are in the file history?
A I'm sure I did.
Q Do you know which ones?
A No, I'm sorry. No.
Q It says that you've considered the IPR request filed against the '601 patent and the exhibits thereto; is that correct?
A Yes. It's been a while since I've seen the IPR request.
Q And you reviewed the Defendant's invalidity contentions, correct?
A Again, that's been a while, but yes.

Q And you reviewed the University's original and supplemental claim construction charts and the documents cited therein, right?

A Yes, that's what that says.

Q And you've also reviewed, it says, other documents and sources cited in your declaration; is that correct?

A That's what that says, yes.

Q Is this the entire universe of the materials that you considered in coming to your opinions?

MR. VERDINI: Object to the form.

THE WITNESS: Was your question about documents? I mean, obviously, I drew on my own personal experience and understanding of magnetic recording. So I'd say these are not -- these are not the only sources of information that I draw on to form my opinions. There's just a larger universe of things that I've read over time that would -- that would come into play in forming opinions.

BY MR. MAYLE:

Q Were those things that you knew outside of the context of this case, just from background?

A Yeah, I think that's accurate.

Q Did you review anything else that's specific to this case besides what's listed here?

MR. VERDINI: Object to the form.

THE WITNESS: That's specific to this case? Not that I remember.

BY MR. MAYLE:

Q Did you select the list of materials to review on this list?

A I was -- for example, the -- certainly the first one, that would have been natural for me to want. The -- I believe I was handed -- or I was given the IPR request. I don't remember whether I requested that or not, but probably not.

Defendant's invalidity contentions. I don't remember the timing. I may have seen that before I started writing this report. So it was a natural thing to have had in my head. Probably the same for the next one. I just don't know the timing of which documents I saw when.

Q Okay. So the first named inventor on the patent is Jae Moon. That's -- do you know Professor Moon?

A Yes.

Q And how -- how do you know Professor

Moon?

A Colleague. Colleague I probably have known for 20, 25 years. So, you know, a small community. As a Ph.D. student, probably saw him give a talk or read his papers or something like that.

Q Have you ever talked to him about the '601 patent?

A Have I talked to him about the '601 patent? Yes.

Q When was that?

A The last time I talked to him was probably a month or so ago, two or three -- a month or so ago.

Q When you talked to Dr. Moon about the patent, was the -- let's try to go to the first time you talked to him about the patent. Was that before you submitted this declaration or after?

A Before. Please ask the question again. I'm sorry.

Q Yeah. The first time you talked to Dr. Moon about the '601 patent, was that before this declaration was submitted or after?

A It would have been before March 13th. Right before March 13th, yeah.

Q And did you ask to talk to Dr. Moon about

the patent?

A No, I don't believe so.

Q Then how was it the case that you were talking to Dr. Moon about the '601 patent? Why did that happen?

A Oh, we were on a conference call.

Q Who was on the call?

A Attorneys and Dr. Moon and myself.

Q And the subject of the call was the '601 patent?

MR. VERDINI: I'm going to caution the witness. You can answer that question, but obviously the details of what was discussed are privileged.

THE WITNESS: Yeah, it was related to the '601 patent.

BY MR. MAYLE:

Q Did you ask Professor Moon anything about how he might interpret any of the disputed claim terms in the '601 patent?

MR. VERDINI: Objection. Privileged. Don't answer.

MR. MAYLE: Well, Professor Moon doesn't work for the University anymore, does he?

MR. VERDINI: You know he has a common interest agreement. We produced it.

MR. MAYLE: That's -- his common interest -- his business interest --

MR. VERDINI: You can challenge that at a different time. I'm instructing the witness not to answer.

BY MR. MAYLE:

Q Professor McLaughlin, in your declaration, you don't at all discuss your conversations with Dr. Moon about the '601 patent; isn't that right?

A Yes, I don't believe that's in -- that's mentioned in there, in the declaration.

Q How many times did you talk to Dr. Moon about the '601 patent? Was it just that one time or were there others?

A There were other times.

Q Do you know how many times?

A Three times, four times.

Q Three or four times?

A Yes.

Q And do you know, if you added all those times together, how much time have you talked to

Dr. Moon about the '601 patent in terms of hours, minutes?

A Maybe a half hour each time.

Q Half hour each time. So maybe --

A Hour, hour and a half.

Q Hour, hour and a half total.

Have you reviewed any documents from Dr. Moon where he -- where Dr. Moon may have taken positions on what the patent terms mean?

A No.

Q Did you ask for any documents like that?

A From -- from Dr. Moon?

Q From anybody.

A No.

Q Are you aware of any documents like that?

A Please ask the question again.

Q Sitting here today, are you aware of any documents showing Dr. Moon's understanding of what the claim terms mean?

MR. VERDINI: Object to the form.

THE WITNESS: No.

BY MR. MAYLE:

Q No. Dr. Moon didn't mention anything about that?

MR. VERDINI: Object to the form.

Don't answer the question.
BY MR. MAYLE:
Q I'll strike that.
Do you know -- the second inventor is Dr. Barrett Britner, right?
A Yes.
Q And do you know Dr. Brickner?
THE WITNESS: Not really. I probably met him once or twice or been to a talk of his, but I don't know.
BY MR. MAYLE:
Q And have you spoken with Dr. Brickner about the '601 patent?
A No.
Q Did you ask to talk to Dr. Brickner about the patent?
A No.
Q Have you spoken with anyone at the universe -- who is at the University, who is not a lawyer, about the '601 patent?
A No.
Q Before this case, have you ever personally spoken with Dr. Moon?
A Yes.
MR. VERDINI: Go ahead.

THE WITNESS: Yes.

BY MR. MAYLE:

Q Were those work related topics, generally?

MR. VERDINI: Object to the form.

THE WITNESS: Define work.

Sometimes it's magnetic recording, sometimes it's about academic matters.

We have a relationship with the University, and he and I are peers at this institution.

BY MR. MAYLE:

Q Okay. In your declaration, I didn't see a section -- kind of like a legal section -- that lays out, counsel has informed me that this is how the claims are construed, or something like that.

Did you make any assumptions in rendering your opinions on claim construction about how claims are supposed to be construed?

MR. VERDINI: Object to the form.

THE WITNESS: I'm not a lawyer, and asked what some claim terms mean or provide opinion on what some of the claim terms mean and that's what I did.

BY MR. MAYLE:

Q And can you explain for us, what is your understanding of how claims are supposed to be construed?

A Again, I'm not a lawyer, but in the context of the patent, in the context of the specification, to try to elucidate or try to make clear -- clearer -- for someone skilled in the art what those terms might mean.

Q And similarly, I haven't seen in here a legal section in your declaration, a section that says, Here is the legal standard for when the claim is indefinite.

And so what's your understanding of how to determine whether or not a claim is indefinite?

A I don't -- I don't know the legal definition of that.

Q Did you make any assumptions -- in rendering your opinion that certain claim terms are not indefinite, did you make any assumptions as to how that methodology should be done?

A The patent claims are completely clear to me, so the issue of indef -- whether indefinite or not didn't -- never came to my mind.

Q Okay. Do you know Professor Emina

Soljanin?

A Sure do. Soljanin.

Q I'm sure I've said it wrong every single time.

MR. VERDINI: Soljanin. I learned that yesterday.

THE WITNESS: No J. It's a Y.

MR. MAYLE: She's too nice. She never corrects me. Everyone gets my name wrong too, but I'm not important.

BY MR. MAYLE:

Q Have you spoken with Professor Soljanin about the '601 patent or the case?

A No.

Q And how long have you known her, about?

A Probably about 20, 25 years.

Q Can you tell us what you did, if anything, to prepare for this deposition?

A We met yesterday with -- I met with these guys yesterday for -- I don't know -- four or five hours and then I just, over the last week, probably looked at my report briefly, reed the patent briefly.

Q Did you look at any other documents besides your report and things cited in your report?

A No.

Q Have you seen -- when you prepared for this deposition, have you seen any documents that you hadn't seen before?

A No.

Q Okay. And are you being compensated for your time in prep and for this depo?

A Yes.

Q And that's at your hourly rate?

A Correct.

Q Let's, please, go to -- let's stay with your declaration. Let's go the opinions now, page 16.

And the first -- the first one, I'll direct your attention there -- at Roman numeral IV, it says construction of claim terms, and it says transitions. And then you have a chart that says: UMN's proposed construction for transitions is a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium.

Right?

A Uh-huh.

Q And in paragraph 35, on the next page, you give your opinion, and it looks to me like you've -- you've said that UMN's proposed

construction on page 16 is the correct one. Is that right, that's your opinion?

A Yes.

Q If we keep this out, but real quick go to Exhibit 1004. Keep these out.

A 1004 is what?

Q Yeah. It's the chart that has the proposed constructions. Yeah, the next one, and you see the top page has Transitions.

And I want you to look at the Proposed Construction, the left-hand column says: Plaintiff's. You can see what they have there: A reversal in the magnetic orientation of adjacent bit regions.

Right?

A Uh-huh.

Q And if you look back to page 16 in the report, it doesn't look like they have the same -- a different construction --

A Uh-huh.

Q -- where they've now omitted the phrase, along a recording track of a magnetic recording medium.

MR. VERDINI: Object to form.

THE WITNESS: Uh-huh.

BY MR. MAYLE:

Q I think we're talking over each other.

So it looks likes the University's proposed construction in Exhibit 1004 is different than the one from Exhibit 1005 on page 16, right?

MR. VERDINI: Objection.

THE WITNESS: Yes.

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q And the difference is, is that the University has, in Exhibit 1004, omitted the reference to, quote, along a recording track of a magnetic recording medium, unquote, correct?

A Yes, it's been shortened.

Q And in Paragraph 35 -- we can put aside Exhibit 1004 now. We'll just stick with your declaration. Let's stick with your declaration, 1005, still on page 17.

So in paragraph 35, you're saying that, essentially, you agree with the University. And then in the last sentence of paragraph 35 you say there are several reasons for this.

Do you see that?

A Uh-huh.

Q And then in -- I need yes or nos.

A Yes.

Q Sorry about that.

There are several reasons, and I count four. So let's see, paragraph 36 begins with First. That's -- that's going to be one of those reasons, right?

A Okay, yes.

Q And paragraph 37 says Second, that would be the second reason, I guess, correct?

A Okay.

Q And then paragraph 38 says Third, so that would be your third reason, correct?

A Uh-huh.

Q And then paragraph 39 says Finally, so that would be the fourth reason, correct?

A Yes.

Q So I'd like to kind of go through those one at a time.

Let's start with 36. You say that the ordinary meaning of a term, quote, transition, unquote, to a PHOSITA in the field of magnetic data storage is a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium.

Right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Uh-huh, yes.

Q You've limited this sentence to, in the field of -- a PHOSITA in the field of magnetic data storage, correct?

A Yes.

Q But as we discussed in paragraph 33 on the opposite page, you've said that the field of the patent relates to someone that's specializing in data coding used in connection with reading data from various media such as hard disc drives and optical media, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I'm sorry. I was reading through that paragraph.

BY MR. MAYLE:

Q Paragraph 33 --

A Yes.

Q -- says that the field of the patent -- a PHOSITA in the field of the patent would be working in various recording media, correct?

A Yes.

Q And those various recording media include hard disc drives and optical media, correct?

A Uh-huh, yes. That's what that sentence says, yeah.

Q And so that's the field of the patent, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I would say the field of the patent is magnetic recording, clearly it's magnetic recording.

BY MR. MAYLE:

Q But you -- but you opined here at paragraph 33 that the PHOSITA in the field to which the patent pertains would be working also on optical media, correct?

A I'm not sure I said working. Someone working in the electrical engineering field and specializing in data coding with connection. So they're working in the electrical engineering field. I'm not saying they're working in optical recording. I'm saying they have familiarity with magnetic recording and optical -- hard drives in optical media.

An electrical engineer working in this is either -- typically either working on a magnetic recording system or an optical recording system, but they would probably have some familiarity with -- if they were working on this in magnetic recording, they'd have some knowledge of optical recording like

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the error control coding or the run link codes or something like that. That's what that means.

Q So going over to paragraph 36, you're now -- now that you're giving your opinions on what transition means, you're saying in paragraph 36 that the ordinary meaning of the term transition, to a PHOSITA in the field of magnetic data storage, is a reversal in magnetic orientation of adjacent bits, right?

A Correct.

Q So are you assuming in paragraph 36 when you make the statement that the field of the patent is limited to magnetic data storage?

A I'm not sure I'm assuming it is. It is.

It says a PHOSITA in the field. It's looking for someone skilled in the art in the field of magnetic data storage. Meaning of the term "transition" to a PHOSITA in the field of magnetic storage is a reversal in magnetic orientation.

I think that's -- that's what that says.

Q If that's a true statement, if that's all we had, does that mean that the claim term transition in the patent is also limited to magnetic transitions?

A Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q Isn't that a bit of a circular reasoning?
MR. VERDINI: Object to the form.
THE WITNESS: What's the circular reasoning?
BY MR. MAYLE:
Q So the goal of claim construction is -- of the word transition -- we're trying to figure out what transition means, right?
A Yes.
Q And you're saying, if I limit myself to the knowledge of a PHOSITA in the field of magnetic data storage systems, transition means one thing, correct?
MR. VERDINI: Object to the form.
THE WITNESS: I'm not sure that's -- I'm sorry. I'm confused by your question.
Saying that if you have someone skilled in the art in magnetic storage, that the transition means -- transition means what it is I said.
BY MR. MAYLE:
Q What you're saying in paragraph 36 is -- let me -- are you basically saying, in the field of magnetic data storage systems -- so if I'm already in

that field, now I'm going to tell you what a transition is. Is that what you're doing?

MR. VERDINI: Object to the form.

THE WITNESS: Ask again, please.

BY MR. MAYLE:

Q Are you saying basically, in paragraph 36, that if you start out in the field of magnetic data storage systems, you're then going to tell us what a transition would mean in that field, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, in the context of magnetic data storage, a transition is what we -- what I said. It's a reversal in magnetic orientation.

BY MR. MAYLE:

Q And you say that your opinion is supported by several books and academic papers on data storage, right?

A Uh-huh.

Q And there was one that you said is cited in the patent itself that uses this term transition, right?

A Uh-huh, yes.

Q And I think you're talking about --

MR. SIPIORA: You need to get yes

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

or nos.

THE WITNESS: I'm sorry. Yes.

BY MR. MAYLE:

Q Yes?

A Yes.

Q And in paragraph, you have -- A, you have P. Siegel, an article from P. Siegel, right?

A Yes.

Q And do you know who P. Siegel is?

A Yes.

Q Tell us who he is.

A Is that Paul Siegel.

Q He's at UCSD now?

A Yes.

Q And he has an article that was cited right in the patent, right, at column one, 34 and 36?

A Yes.

Q He has some articles in the patent, doesn't he? If you look at the patent Exhibit 1 -- 1001 -- keep your declaration out -- handy. We'll flip back and forth.

A Okay.

Q Just go to the first column on the patent. It's after all the figures. You have to flip back to column one.

At the bottom of column one, around line 60, 61, it says: In optical data storage, a special type of RLL constraint is applied.

It goes on, and then it cites R. Karabed and P.H. Siegel.

Do you see that article there?

A Yes.

Q Is that P.H. Siegel the same Siegel we're talking about?

A Yes. Yes.

Q And do you know who R. Karabed is?

A Yes.

Q And is he a professor somewhere?

A No.

Q And that article there is entitled Even Mark Modulation for Optical Recording, right?

A Yes.

Q And you didn't cite that article in your opinion, right?

A I don't believe so.

Q And the reason you didn't cite it is because it's an article that is not from the field of magnetic recording, right?

MR. VERDINI: Object to the form.

THE WITNESS: I'm not sure that's

the reason why I didn't cite it.

BY MR. MAYLE:

Q Well --

A They're just mentioning -- they're just mentioning RLL constraints apply in optical data storage and here's an example of one.

Q Right, but you cite Professor Siegel's article up at line 35 area. And the reason you cited that one, the earlier article from Professor Siegel, is that it was limited to magnetic storage, right? That's the reason you cited it?

MR. VERDINI: Object to the form.

THE WITNESS: I don't remember the reason, this was a while ago since I wrote that. But the reason we cited it was because it mentions the word transitions.

BY MR. MAYLE:

Q Ah.

A And so this -- the job of this was to try to highlight places where the word transition is mentioned, and I don't remember if this other paper talks about transitions or not.

Q Okay. If it -- there are such a thing as transitions in optical recording; isn't there?

MR. VERDINI: Object to form.

THE WITNESS: It would be a different kind of a transitioning. If -- you'd have to put something in front of me around optical recording, but there are -- there are changes of state in -- in the medium in optical -- optical recording.

BY MR. MAYLE:

Q So you can't tell me whether -- you can't tell me whether there's transitions in optical recording without me showing you a document; is that what you're saying?

MR. VERDINI: Object to form.

THE WITNESS: This -- certainly, the state of the media and optical recording changes state. So if that's what we're calling a transition, I'm okay with that.

BY MR. MAYLE:

Q I'm aware that that's from the Webster's Dictionary, change of state. But isn't it true that people -- PHOSITAs in the art, including yourself -- understand what a transition is in an optical medium outside the context of this case?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Objection.

THE WITNESS: A change of state is a really common -- it's a common usage of that, but it's also a specific term in the art. I'll say it's a specific term in the art. The change of state, the kind of pit or no pit, would be a transition. Yeah, I'm okay with that.

BY MR. MAYLE:

Q You keep talking about change of state. That's something from the Webster's Dictionary, right?

MR. VERDINI: Object to form.

THE WITNESS: No, that's how -- that's how I think of -- that's how I think of the system, whether it's ROM, R, RW, magnetic, optical. That's the -- that's the -- that's what a transition is.

BY MR. MAYLE:

Q We'll get more back to that. Let's look at paragraph -- or column two of the patent, lines 34 to 37.

A Okay.

Q Maybe you'll see there's another article

from R. Karabed and P. H. Siegel.

Do you see that?

A Uh-huh. Yes. Sorry.

Q It was given at the proceedings of the International Society for Optical Engineering, correct?

A Uh-huh.

MR. VERDINI: Yes.

THE WITNESS: Yes.

BY MR. MAYLE:

Q Have you ever heard of the International Society for Optical Engineering?

A I'm not sure that's the society -- there's other optical societies I'm more familiar with. The Optical Society of America, SPIE, I'm not sure -- and which, that's fine.

Q You haven't cited that article in your declaration; isn't that right?

A I don't believe so.

Q If you flip to the front cover of the patent and -- the very front cover, just all the way to the front.

You see on the top right there are some patents that are cited there?

A Yes.

Q And you see there's one to patent 5,450,443 to Siegel?

A Yes.

Q And do you think that's the same Dr. Siegel that we've been talking about that's cited in the patent otherwise?

A I think it's the same. Yes.

MR. MAYLE: Can we mark it Exhibit -- we're up to number 1010.

(McLaughlin Exhibit No. 1010 was marked for the record.)

BY MR. MAYLE:

Q First off, Professor, this -- well, take a look at it and see if you can determine for sure whether this is the same Dr. Siegel.

A Yes. This is the same Siegel, yes.

Q You haven't cited this patent in your declaration, right?

A I don't believe so.

Q And it looks -- you see on the cover of the Siegel patent, under Other Publications, he's cited some other articles from your other colleague, Dr. Immink, right?

A Uh-huh, yes.

Q If we look -- if we go into the Siegel

patent to column one and we look at -- around lines 45 to 51 or around 40 to 51. Just read that real quickly to yourself.

A I'm sorry?

Q If you could read this -- you know, quickly scan this paragraph that ends on line 51.

MR. VERDINI: To the extent you need to read others, you can do that, as well.

MR. MAYLE: We're not going to spend much time on this patent.

MR. VERDINI: Well, I think he -- you asked him whether he's seen it before, but --

THE WITNESS: Okay. I read that paragraph.

BY MR. MAYLE:

Q So around line 48, do you see where he has a reference to digital magnetic or optical recording?

A Uh-huh.

Q Do you see that reference?

A Yes, I do.

Q So in the patent in -- so back to the patent and back to your declaration, you cited one of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

professor Siegel's articles that talks about magnetic recording, right?

A Yes.

Q And he has two other articles in the patent in the first two columns and a patent cited on the face of the patent. And those other references that you didn't cite are broader than magnetic recording, correct?

MR. VERDINI: Object to form, foundation.

THE WITNESS: For example, this -- this paragraph mentions both magnetic and optical recording, but I'm not sure any of those other references refer to transition. And I think that's the section we're on, so when we're looking for a description of transition, I'm not sure why I would cite these.

BY MR. MAYLE:

Q Well, we'll do two things real quick. We're going to take a break in a minute. And let's go back to your declaration, Exhibit 1005. We talked about paragraph 37 -- 36A.

A I'm sorry. Where are we? Oh.

Q Yeah, we talked about 36A, the Siegel

article, in your declaration, Exhibit 1005, on page 17.

A Yes.

Q And then you go on and you have B, and you cite an Ashar article, right? At the bottom of page 17 to 18?

A Yes.

Q And Ashar is not cited in the patent, right?

A They're -- all the citations are listed up front; is that right?

Q Yeah, well --

A I'm just checking. I'm just confirming, but it doesn't look like it is.

Q If you see on the bottom of page 17, you see it says Ashar was published in 1997, right?

A Okay, uh-huh.

Q That was after this patent was filed, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah.

BY MR. MAYLE:

Q So what's the filing date of the '601 patent? It was in 1996, right?

A October 15th, 1996.

Q So they couldn't have cited Ashar because Ashar hadn't existed yet, right?

A Yeah, that was after -- after '96. I don't know when, if there were previous versions of Ashar or not.

Q You didn't cite any in your declaration, right?

A I did not.

Q Did you understand that the claims are construed as of the time of the invention? Have you heard that?

A I believe so, yeah.

Q And what does it mean, as of the time of the invention? That means as of the filing date, right?

MR. VERDINI: Object to the form.

THE WITNESS: I think that's correct, yeah.

BY MR. MAYLE:

Q Right.

A So it would mean information before that date, prior art or background.

Q Right. And Ashar is not part of the prior art, is it?

A But it's just an example of a really,

really common use of the word transition. So that's why it was cited. But that's very, very well known and really common.

Q Professor, that's not my question and you have to answer the question.

Ashar is not part of the prior art to the '601 patent, right?

A It has a publication date after. I'm not sure what we're claiming it as prior art, but just giving an example of something that's really commonly known.

Q Paragraph C -- and after this it will be time for a break.

Paragraph C, 36C of your declaration, page 18, you cite the Bertram article, right?

A Yes.

Q That's also not cited in the patent?

A Correct, it's not.

Q So just to sum up where we are before we take a break, we said before you that you have -- when -- you gave your opinion for transitions and you had four reasons. And paragraph 36 was the first reason. All this is the first reason, right?

A Okay.

Q And you've cited a Siegel article, an

Ashar article and a Bertram article, correct?

A Uh-huh, yes.

Q And you -- and that's the entirety of the bases for your first reason of why transitions are construed in the way that you construe them, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Those are the three articles that are cited.

MR. MAYLE: Okay. I think this is a convenient time for a break.

THE VIDEOGRAPHER: 9:29. We're off the record. This is the end of media number one.

(Brief pause.)

(McLaughlin Exhibit No. 1011 was marked for the record.)

THE VIDEOGRAPHER: 9:42. We're back on the record. This is the beginning of media number two.

MR. MAYLE: I'm handing to Professor McLaughlin an Exhibit marked No. 1011. It says it's No. -- it's patent 5,608,397.

BY MR. MAYLE:

Q Professor McLaughlin, do you know if

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

you've considered this patent in rendering your declaration? Does it look familiar to you?

A It's been a while. This is the Soljanin patent listed here.

Q Right. So that's -- that -- this patent, Exhibit 1011, is the Soljanin patent that's listed on the face of the '601 patent, right?

A Uh-huh, yeah.

Q And I would direct your attention to column ten of the Soljanin patent. And I would direct your attention to line -- it looks like it's either 57 or 58, where it starts with For example.

A Uh-huh.

Q It says: For example, the above teachings are not limited to magnetic recordings, slash, writing channels.

Do you see that?

A Yes.

Q And you haven't cited this patent in your declaration, right?

A That's right. I have not.

Q Let's go back -- we're done with Soljanin.

Go back to Exhibit 1009, which we've previously introduced.

MR. VERDINI: It's Professor McLaughlin's patent.

MR. MAYLE: Yes, the '382.

BY MR. MAYLE:

Q That's your patent, right?

A Yes.

Q And it was filed in 1994, right?

A Yes.

Q Let's go to column eight, lines -- I'll let you get to column eight. And if you -- I'll direct your attention to line 34. The sentence itself starts with However.

It says: However, in one embodiment of the optical recording channel, timing is derived from symbol amplitude transitions.

Do you see that?

A Yes.

Q And you testified earlier that in this paragraph 36 of your declaration you were looking to find out what transitions meant so that -- and then you looked at articles and things of this nature that used the word transitions, right?

MR. VERDINI: Object to the form.

THE WITNESS: Ask again, please.

BY MR. MAYLE:

Q You testified earlier before the break with respect to your opinion in paragraph 36 of your declaration that you selected -- the articles that you selected in those paragraph 36 were based upon whether or not the articles and the materials used the word transitions, correct?

A Yes.

MR. VERDINI: Object to the form.

THE WITNESS: Yes, that's what I said.

BY MR. MAYLE:

Q And this patent, your patent, Exhibit 1009, uses the word transitions in the context of an optical recording channel, correct?

A This is -- this is a patent regarding optical recording and, yes, I use the word transitions.

Q And yet you did not cite your own patent that uses the word transitions in an optical recording channel in your declaration at paragraph 36, correct?

A I did not cite this, correct.

Q And so it's the case that you cited those three articles in paragraph 36 that use transitions in the magnetic sense, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Correct.

BY MR. MAYLE:

Q But you didn't cite any materials in paragraph 36 of your declaration that use the word transitions for optical channels, correct?

A Correct. None of those articles had the word -- those other ones had transitions in, I don't believe.

Q But this patent, your own patent filed in 1994, does use the word transitions in an embodiment of an optical recording channel, correct?

MR. VERDINI: Object to the form.

THE WITNESS: It uses that, but if you're implying that something that I wrote 24 years ago I intentionally or somehow knew it was there and chose not to put it, of course that's ridiculous.

BY MR. MAYLE:

Q I was just asking a question, Professor.

A I understand. But that's the -- in hearing that and hearing how you're asking the question and the tone of your voice implies that I intentionally knew that in an optical paper I had the words transitions, but obviously that's ridiculous.

That's 24 years ago.

Q If you had considered this your own patent when you were rendering your declaration, would you have included it in paragraph 36 of your declaration?

A A hypothetical question. I'd have to -- I'd have to study it some more, but I don't know. I don't know whether I would have or not.

Q Let's go --

A It's clearly in the context of the patent, and you'll see it in those other sections that transition's referring to. Those are magnetic, so it may not have even been relevant to cite this.

Q Let's look at the patent, Exhibit 1001, again. In the background section, column one, 14, there's a heading. It says Background Of The Invention. Do you see that? In column one at the top?

A Column one.

Q Do you see there's a heading around line 14, Background Of The Invention?

A Yes.

Q And then you see in column two there's a heading Summary Of The Invention.

A Yes.

Q And then throughout the patent there's different headings?

A Yes.

Q Do those section headings and which material is under which section heading have any relevance to your opinion on how the claims should be construed?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, everything that's in the -- in the patent is important to how I rendered my opinions.

BY MR. MAYLE:

Q So if someone said to you -- if someone cites something from the Background section of the invention, starting at column one, 14, and if someone was to argue, oh, that talks about an optical system, would you then argue and say, well, that's only the background section so it's not as important? Is that an argument that you would make?

MR. VERDINI: Object to the form. Calls for speculation.

THE WITNESS: No, I don't think so. The background is important for setting the -- you know, for setting the context for -- it's important for setting the

context.

BY MR. MAYLE:

Q And under -- the first sentence in the Background, it says: The channel codes, sometimes called modulation codes, are mapping of data bits into the symbols that are either transmitted in a communication system or recorded onto a medium in a storage device.

Correct?

A I'm sorry. Can you point to that?

Q The first sentence under the Background.

A Okay, I'm sorry. Got you.

Q And it mentions a medium and a storage device, correct?

A Yes.

Q And it mentions channel codes, and it says they're sometimes called modulation codes, right?

A Yes. That's what it says, yes.

Q Would an RLL code be an example of a channel code or a modulation code?

MR. VERDINI: Object to the form.

THE WITNESS: I would say an RLL code is a type of modulation code.

Channel code's often used in a different

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

context for error correction. The more common use of channel codes is error correction, but that's fine.

RLL codes are modulation codes, yes.

BY MR. MAYLE:

Q And EFM is an RLL code, isn't it?

A Correct.

Q And EFM is used for CDs -- it's in the CD standard, correct?

A Yes.

Q Let's switch gears back to your -- let's go to your declaration on the next ground. It's paragraph 37.

Remember, we mentioned earlier -- we're still on transitions -- and you said there were four -- you gave four reasons for your opinion on why transitions are magnetic transitions. We talked about 36A.

A Yes.

Q Let's go to paragraph 37.

A Okay.

Q And you start that -- you say that the patent's use of the term transition corresponds to how a PHOSITA would understand the term, right?

A Yes.
Q And you cite column two, 59, 61 and column two, 40, 42, right?
A Okay. Yes.
Q That's what's cited in paragraph 37 of your declaration?
A Yes.
Q And there's no other part of the specification that's cited in paragraph 37 of your declaration, right?
A Those are the only two sections, yes.
Q And you don't cite any claims in paragraph 37, correct, from the 601 patent?
A That's correct, do not.
Q And you don't cite the prosecution history of the 601 patent in paragraph 37 of your declaration, right?
A Correct, I do not.
Q And you're aware that the Claim 13 doesn't have the word magnetic in the Claim, right?
A If I remember correctly, yeah, 13 does not -- does not -- the word magnetic does not appear in Claim 13.
Q Right. So you're reading in the word magnetic into the Claim 13 from the specification,

right?

MR. VERDINI: Object to the form.

THE WITNESS: The -- reading in, I think, is a legal term, but it's clear that Claim 13 is referring to a magnetic medium. The --

BY MR. MAYLE:

Q And you say that it's clear that Claim 13 is referring to a magnetic medium, if we look at your declaration at paragraph 37, because -- the reason you say that is because you cite these lines from the specification at paragraph 37 in your declaration, right?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q That's one of the reasons you say that, right?

A That's one of the reasons, yes.

Q Is that the reason given in paragraph 37 of your declaration?

A Yes.

Q And there's no other reason in paragraph 37 of your declaration for -- for concluding that the claim term transition is a magnetic transition, right?

A Those -- those are the ones that are listed there. There's other parts of the patent that make it clear that that's -- that's referring to magnetic recording.

Q Let's just stick with paragraph 37. We're going to go through all your reasons.

In paragraph 37, the only reasons that you list for construing transition as a magnetic transition in Claim 13 of the 601 patent are these citations to column two, 59, 61, and column two, 40 to 42 of the specification, right?

A Yes.

Q And is there a reason -- of these two cites that you give, you cite line 59 through 61 first, right? If you look at paragraph 37.

A Yes. Yes.

Q And then you cite line 40 to 42 second, right?

A Yes.

Q Is there any reason that you cited lines 59 to 61 before you cite line 40 to 42?

MR. VERDINI: Object to the form.

THE WITNESS: I'm not sure there's -- no, I don't remember any reason why -- why I would have done that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

first.

I mean, 59 through 61 is, I think, just unequivocal about the connection between transitions and being for the magnetization pattern in magnetic recordings. So it just couldn't be clearer that that's what transition is referring to.

So maybe that's why I emphasize it first, because it's so crystal clear that that's what transitions means.

BY MR. MAYLE:

Q Does lines 40 to -- is lines 40 to 42 unequivocal in that transitions are magnetic transitions?

A Lines 40 to 42, yes, it's pretty clear that the -- I'm sorry. I just want to confirm one more, please.

Yeah, that's pretty clear it's referring to magnetic recording.

Q The question was, is line 40 to 42 of the specification unequivocal that the claim term transition is a magnetic transition?

MR. VERDINI: Object to the form. Asked and answered.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS: I guess it uses the word, such as magnetic computer disc. It doesn't mention others. It mentions tape, which is also a magnetic medium.
So that seem really clear that it's referring to -- the present invention is referring to magnetic disc drives in tape recorders. So, such as, it's listing those two.
BY MR. MAYLE:
Q Let me rephrase the question.
A That's pretty -- yeah, that's unequivocal.
Q Okay. So now you're saying that lines 40 to 42 are unequivocal in that the claim term transition is limited to magnetic; is that your opinion?
A Yeah, that's pretty clear.
Q And what does -- what does the phrase Such As mean? Does it mean For Example?
A For Example, and then it lists two things, two examples.
Q Do you think that that --
A It didn't list others.
Q Okay. So you -- you interpret the lack

of other examples as being a closed set, so there are no other examples? Is that how you interpret that sentence?

A I just think it's a emphatic statement that says the present invention relates to channel coding techniques to improve data storage such as magnetic discs and tape recorders.

When I say Such As, it's implying. If it just listed one, maybe there are others. In this case it's listing two. And it's saying the present invention and it lists those two things. So it seems really clear to me.

Q Is Such As synonomous with For Example in your mind?

A I'm not an English major. Is Such As and For Example -- yeah, I'm okay with them being -- I can't think of how they would be different. So yeah, I'm okay with them being the same.

Q So in your mind, the word Such As in lines 40 to 42 of the specification is synonomous with for example, right?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Okay. Yes.

BY MR. MAYLE:

Q Yes. Lines 40 to 42 uses the phrase, The Present Invention, right?

A Yes.

Q And lines 59 to 61 does not use the phrase The Present Invention, correct?

A Fifty-nine through 61 does not use the word Present Invention. Is that your -- correct, yes.

Q Yes.

A But the present invention is about the MTR code. So it's clearly -- when it says, more specifically the MTR code, it's certainly referring to the present invention, that's for sure.

Q I just want to take it piece by piece. I first just want to know -- I want you to confirm, if you can, that the words The Present Invention are not in lines 59 through 61.

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: That's correct, those words are not there, but the other words, the MTR code, which is the present invention, is in that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q When you say the MTR code is the present invention, what does that mean?

A The patent's referring to the MTR code.

Q Which claim is the MTR code, if any?

MR. VERDINI: Object to the form.

THE WITNESS: I don't remember if the terms MTR code are used in the patent claims but that's what the patent is about, exactly.

BY MR. MAYLE:

Q And you say that -- one last time in paragraph 37 of your declaration. The reason you say that the patent is limited in the way that you say is because of lines, column two, line 59 through 61 and column two, line 40 to 42, right?

MR. VERDINI: Object to form.

THE WITNESS: Yes. Yes.

BY MR. MAYLE:

Q Let's go to paragraph 38 in your declaration. You give the third reason of why -- of your construction of transitions, right? That's what paragraph 38 does?

A Yes.

Q And here again, you cite the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

specification, correct? In paragraph 38 you cite the specification of the patent?

A Yes.

Q And you cite column two, 40 to 42 and column two, 59 to 61, right?

A Okay. Yes.

Q And those are the same citations that you gave in your paragraph 37 of your declaration, right?

A Yes.

Q There's nothing new in paragraph 38 of your declaration that's not in paragraph 37 of your declaration, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yes, no new citations -- 38 does not include any new citations.

BY MR. MAYLE:

Q So what you give as your third reason -- do you see paragraph 38 starts with Third?

A Uh-huh.

Q That's the same as the second reason given in paragraph 37, correct?

MR. VERDINI: Object to the form.

THE WITNESS: It's the same two citations, maybe expounding on a couple

points. Maybe emphasizing in this case the magnetic pattern. I can see that that's highlighted there.

BY MR. MAYLE:

Q So in paragraph 38, are you -- are you pointing to the fact that you used bold italics on magnetization pattern on line 17? Is that what you were talking about just now?

MR. VERDINI: Object to the form.

THE WITNESS: You said line 17. Sorry, I got distracted.

BY MR. MAYLE:

Q So paragraph 38 of your declaration at line 17.

A Now I'm with you.

Q You've added bold italics font to magnetization pattern, correct?

A Uh-huh.

Q Yes?

A Yes.

Q Is that -- is that what you were referring to as something that was highlighted in paragraph 38 that's not in 37?

A Yeah, you're right. Those two paragraphs are very similar. Yeah, they cite the same pieces.

I'm trying to -- trying to recall why I included that second paragraph, which the second -- the second mentions of those two. And I think you're right, they're consistent.

Q Okay. Let's go then to what's listed as paragraph 39, as Finally.

A Uh-huh.

Q And here you say in paragraph 39 that the University's proposed construction is consistent with the nontechnical, ordinary meaning of transition. And you say -- you quote, which is a quote -- quote, a passage from one state, stage, subject or place to another, colon, changed, unquote.

A Uh-huh.

Q And here you're citing Webster's Dictionary, correct?

A Yes.

Q And you also have an Appendix C, which is another dictionary, right?

A I believe so, yes.

Q That definition that you quote in paragraph 39, the passage from one state, stage, subject to another, change, is also consistent with what a transition would be in an optical storage system, right?

A Ask again, please.

Q The definition of transition from the nontechnical dictionary that you quote in paragraph 39 of your declaration, a passage from one state, stage, subject or place to another, colon, change, is also consistent with a transition in an optical storage system, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, I'm okay with that. That -- yes, change of state in optical, it wouldn't surprise me that a change of state in an optical disc would be described as a transition. I think that's okay. I'm okay with that.

BY MR. MAYLE:

Q And let's assume for a minute that the court construes the claim transition as a switch from a binary one to a binary zero or vice versa. So assume the court does that.

Would that interpretation by the court -- hypothetical interpretation by the court be consistent with the nontechnical, ordinary dictionary meaning of transition that you've quoted in your paragraph 39?

MR. VERDINI: Object to the form.

THE WITNESS: Ask one -- please ask one more time.

BY MR. MAYLE:

Q If the court -- I want you to assume --

A Okay.

Q I want you to assume that the court will construe the claim term transition as a switch from a binary one to a zero or vice versa.

A Okay.

Q If the court does that, would that hypothetical interpretation be consistent with the nontechnical, ordinary meaning of transition that you've quoted in paragraph 39 of your declaration?

MR. VERDINI: Object to form.

THE WITNESS: Yeah, I'm okay with that.

BY MR. MAYLE:

Q Do you think that a PHOSITA would need to resort to a nontechnical, ordinary meaning of transition to figure out what the claims mean, or could the PHOSITA to figure out what the transition means without resorting to the nontechnical dictionary?

A I think the PHOSITA wouldn't need the -- wouldn't need the -- Webster's definition. A PHOSITA

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

would know what a transition is. Would know what a transition is, yes.

Q So of these reasons in paragraph 36, 37, 38 and 39 of your declaration, do you feel that any of these reasons that you've listed are the strongest reasons for your opinion on what transition means?

MR. VERDINI: Object to the form.

THE WITNESS: No, I wouldn't say one -- one of them is stronger than the other. I think they're all good reasons.

BY MR. MAYLE:

Q Do you think that column two, lines 59 to 61, is a stronger reason to limit transition to magnetic than the Webster's Dictionary?

MR. VERDINI: Object to the form.

THE WITNESS: I guess now that you phrase it that way, yeah, I mean, that -- that 59 through 61 is crystal clear about transitions being -- transitions in the context of the patent being for a magnetic recording.

BY MR. MAYLE:

Q Do you feel that that is the -- in your opinion, is that the best evidence to support your opinion on the meaning of transitions in Claim 13?

MR. VERDINI: Object to the form.

THE WITNESS: You use the term best evidence. I don't know whether that's legal or not. I just think it's a very short, concise, very clear statement really early in the patent that sets the whole -- that sets the whole framework.

BY MR. MAYLE:

Q Let me ask it this way. Other than lines two, 59 through -- we've gone through all of your reasons.

But I want to know, of those that we've talked about, other than lines column two, 59 through 61, is there something that in your opinion is even more clear that transitions should be magnetic transitions?

A I like that statement because it's short, concise, at the beginning, unequivocal.

Q All right. Let's look at the claims then. Claim 13. Well, if you can pull out the patent.

A Okay.

Q And do you know that the preamble, and then there's a step of receiving data words, producing code words, imposing a pair of constraints.

And then it talks about generating, and it uses the phrase: J consecutive transitions of said sequence.

Do you see where I'm talking about?

A Yup.

Q When it says, j consecutive transitions of said sequence, in your opinion, what is the said sequence referring to?

A It's referring to looking for the place where the word sequence appears. And it appears that sequences, just a couple lines above, producing sequences of m-bit code words. And so then when it -- yeah, so when it says said sequence, that's what it's referring to.

Q And the m-bit code words are -- they're binary ones and zeros?

A They're binary, yes.

Q And they're not magnetic transitions, are they?

A Correct. They are ones and zeros.

Q Now, let's look at Claim 17. And will you agree with me that the word transitions is also used in Claim 17?

A Yes, it is.

Q And is -- in your opinion, does the word transitions in Claim 13 have the same meaning as the

word transitions in Claim 17?

A Yes.

Q And Claim 17 specifies explicitly that the j consecutive transitions are from zero to one and one to zero, right?

MR. VERDINI: Object to form.

THE WITNESS: It's saying transitions from zero to one and from one to zero, yeah. And those are -- that's a magnetic transition. That's a -- as you go from zero to one and one to zero, that produces a change in the magnetization pattern and that's what that's referring to.

BY MR. MAYLE:

Q You're jumping ahead. Let's take this in little steps.

The Claim 17, you agree it says, quote, j consecutive transition from zero to one and from one to zero, unquote, correct?

A Yes.

Q And Claim 13 uses transitions, and the meaning of transitions in 13 is the same as it is in 17, correct?

A Yes.

Q And in Claim 13, when it says j consecutive transitions of said sequence, that means j consecutive transitions of m-bit code words, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Come back again. Sorry.

BY MR. MAYLE:

Q In Claim 13, when it says j consecutive transitions of said sequence, that means j consecutive transitions of sequences of m-bit code words, right?

MR. VERDINI: Object to form.

THE WITNESS: It's saying j consecutive transitions of said sequence in the recorded waveform. So the transition's referring to -- so, changes from one to zero and changes from zero to one that -- of said sequence are a -- result in transitions in waveform, which are the transitions in the magnetic medium.

So the Claim 13, consecutive transitions of said sequence in the recorded waveform. It's referring to

the -- it's referring to the changes in the sequence that result in the transitions in the recorded waveform.

BY MR. MAYLE:

Q And that's because you interpret transitions as being limited to magnetic because of what's in the specification, right?

A Yes. Yes.

Q Correct. The claim doesn't actually use the word magnetic, does it?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: But it's referring to recorded, and recorded is referring to storage medium, and in this case it's referring to magnetic recording. That's the context the patents were recorded. I would say -- I want to say, you know, it brings in the word magnetic, but it's clearly referring to storing a waveform on a magnetic medium.

BY MR. MAYLE:

Q Well, right now we're still talking about transitions. We're going to get to recorded waveform.

A You asked -- correct. The word -- the question was, is the word magnetic in there. No, it's not, but I'm saying by virtue of the reference to record it, it is referring to magnetic recording. But you're right, it does not have the word magnetic in it. I think that was where we were at.

Q If I took Claim 13 and wrote in the word magnetic in front of transitions, would that change the meaning of the claim? If I literally wrote in the word magnetic into the claim, would that change the meaning of the claim?

MR. VERDINI: Object to the form.

Where are you writing it in?

BY MR. MAYLE:

Q If I -- where it says j consecutive transitions, if we wrote in j consecutive magnetic transitions, would that change the meaning of Claim 13?

A I don't think so.

Q Optical systems have n code words, don't they?

MR. VERDINI: Object to the form.

THE WITNESS: Right. For example, EFM has -- yes.

BY MR. MAYLE:
Q And they use ones and zeros in optical systems, in EFM, for example, correct?
A Yes.
Q And so if the court rejects your construction and says that transitions are not limited to magnetic transitions but can include optical transitions, if the court does that, would the Claim 13 still make sense under that hypothetical construction?
MR. VERDINI: Object to the form.
THE WITNESS: Ask again, please.
BY MR. MAYLE:
Q If the court rejects your construction and says, transitions are not limited to magnetic, they can be any sort of transitions --
A Uh-huh.
Q -- for example optical, but not limited to that -- let's assume that the court does that --
A Okay.
Q -- would Claim 13 then still make sense to you under that construction?
MR. VERDINI: Object to the form.
THE WITNESS: I think it would still make sense.

BY MR. MAYLE:

Q Let's go to your declaration, Exhibit 1005, and let's go to paragraph ten.

A I'm sorry. Where are you?

Q Paragraph ten in your declaration. Look at page four and five. So not before --

On page four on your declaration, at the bottom, you have a picture of -- a schematic picture of a magnetic hard disc drive, right?

A Uh-huh.

Q And that's from the Ashar article that we talked about earlier on page four?

A I believe so, yes.

Q Okay. And it has something labeled Electronics in the corner there?

A Yes.

Q Is that like where the read channel -- is that where a chip would be, a read channel chip, for example?

A Yeah, that makes sense.

Q And then you have a write head, basically, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yes. The head slider, at the end of it there's a write

head.

BY MR. MAYLE:

Q And then you have something, level two discs, right?

A Uh-huh.

Q Is that the platters, is that what that is?

A Yes.

Q Let's look at paragraph ten. You say in the first sentence: In the write process, the data are modified prior to writing the data to the disc.

Right?

A Uh-huh. Yes.

Q What does that mean, the data are modified? What's that referring to?

A Now, ask your question again. Sorry. I was reading the previous paragraph.

Q The first sentence of your declaration says: In the write process, the data are modified prior to writing the data to the disc.

A Uh-huh.

Q I'm asking, what does it mean that the data are modified?

A Data might be encoded. There might be error correction bits added. There might be a run

link code added. So that's a general statement that, you know, the information you want to store is modified --

Q Okay.

A -- by adding those things to it before it goes on the disc.

Q And then when it says: First, the user data are encoded according to applicable and coding schemes --

A Uh-huh.

Q -- was that referring back to the first sentence there?

A Yes, I believe so.

Q So you're saying that the data are modified prior to writing to the disc, and that includes data being encoded, right?

A Yes.

Q And you say: This is where the novel MTR codes of the '601 patent are implemented.

Right?

A Yes.

Q So where we are in paragraph ten right now, where the data are encoded, let's assume it's happening on this schematic on page four.

A Yes.

Q Where would that be happening?

A Very likely it would be in that electronics box. The box where it's highlighted is electronics.

Q And when you say this is where the novel MTR codes of the '601 patent are implemented, you're talking about the electronics box?

A That's where the -- that's where the encoding of the MTR code would take place, that portion.

Q And the encoding part, is that basically m-bits going to n-bits?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, that -- the m-bits to the n -- the m to the n-bits of the MTR code would be happening in that electronics box.

BY MR. MAYLE:

Q And then would the sequences of m-bit code words obey or conform to the j and k constraints?

MR. VERDINI: Object to the form.

THE WITNESS: The j and k constraints are on the waveform. They would be -- that's where the -- the j and

k constraints are on the waveform, on the transitions in the waveform. So the MTR code is a way of enforcing those constraints.

BY MR. MAYLE:

Q Let me ask it a different way. We're still in the chip in this -- what we've been talking about, we're still in the chip. We're not onto the disc yet.

A Okay.

Q We now have m-bit code word -- m-bit data words coming in. They're being coded in the chip to n-bit code words, correct?

A Yes.

Q And in those n-bit code words, the sequences -- would be sequences of ones and zeros, correct?

A That's correct.

Q And if those sequences of one and zeros have a j constraint, there will be no more than j consecutive transitions in the sequences of ones and zeros in the chip, right?

MR. VERDINI: Object to the form.

THE WITNESS: On the bit sequences, yes.

BY MR. MAYLE:

Q Yes?

A Yes.

Q And if those sequences of ones and zeros in the chip, in the n-bit code words, obey the k constraint, that means that there will be at most k consecutive nontransitions of the bits while on the chip, right?

A K consecutive zeros. K consecutive zeros, if you're using NRZI.

Q Okay, let's go with NRZI and let me ask it again.

Let's say we're still on the chip.

A Yes.

Q And let's say that we're trying to practice the method of Claim 13.

A Yes.

Q And we've -- we've done the encoding and we now have sequences of m-bit code words. That means that there will be, at most, j consecutive ones in the sequence of m-bit code words, right?

A Yes.

Q And that's -- and that also means that there will be, at most, k -- k consecutive zeros of the sequences in the m-bit code words, correct?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A That's correct, assuming NRZI.
Q Assuming NRZI.
A Yes.
Q We're in the chip. And then let's go back to paragraph ten. It says: Second, a processor converts the encoded data into an analog signal that is applied to the write head.
And it goes on. Let's take it one at a time. What's a processor that converts encoded user data into an analog signal? What does that mean?
A There the term processes is being used as a generic term. It's not referring to necessarily a microprocessor. It's something that takes the bits and converts it to an analog waveform, a continuous time, continuous analog waveform.
Q And where is that waveform -- which part of -- in a typical device like on page four, where would that processor be and where would the waveform be?
A The waveform would be -- so that processor could be in that electronics box, it could be tied to a preamplifier that may or may not be in that electronics box. It might be a separate box. It might be closer to the head, it might be in that box.

The waveform -- the waveform would be, you know, what's produced at the head or what ultimately shows up at the head.

I'm sorry, what your question was.

Q Where was it before -- before it goes to the write head, you said there's a waveform, right?

A Uh-huh.

Q Well, where is it?

MR. VERDINI: Object to the form.

THE WITNESS: That waveform might be generated in electronics box. There may be -- that electronics box -- I'm assuming that that electronics box has some digital stuff and it may have some analog stuff in it, as well.

So normally -- I mean, in this picture, it's probably produced in that electronics box, but that electronics box has all the -- you know, has the -- both the digital and the analog pieces. And then that waveform would then be transferred out to the head.

BY MR. MAYLE:

Q When it transfers to the head, is it --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

then what happens when it gets to the head?

A Then it's -- then it's applied to the head, which produces a magnetic field which is put on the disc.

Q What gets put on the disc?

A What gets put on the disc is magnetic flux from the head that -- that comes from the wave. The waveform generates the magnetic flux that goes on to the disc.

Q Now, let's say I unplug the hard disc drive. We did what you just said, now I unplug it.

Is there a magnetic flux on the disc still?

A Yes.

Q And is it being generated just by virtue -- how's it being generated?

A It's not being generated. It's resident on the disc. That's the magnetic domains produce the flux. That flux stays there. It stays there until it's erased or moved.

Q When you say magnetic flux, are you talking about an electromagnetic wave? Or are you talking about physically what's on the disc in terms of particles?

A Same thing. The magnetic -- the magnetic

domains have been -- magnetic domains have been set into a certain pattern and even if the whole thing shut off, they're emanating an electromagnetic field that doesn't go away. Otherwise, your data is erased, it's gone. That's the whole purpose.

Q But I'm asking you -- and I think there's two options, correct me if I'm wrong. I want to know, then, what would be a recorded waveform.

Is it the physical bit series on the discs or is it the magnetic flux that they create? Are those two different things?

MR. VERDINI: Object to the form.

THE WITNESS: There's a one-to-one correspondence between -- ask again. I'm sorry.

BY MR. MAYLE:

Q So in this experiment we've just done, there's going to be some magnetic bit -- physical particles altered on the magnetic disc, correct?

A Uh-huh.

Q Yes?

A Yes. I'm sorry.

Q And the configuration of those physical particles would then engender a magnetic field, correct?

A Correct.

Q Which one of those, if either, is a waveform?

MR. VERDINI: Object to the form.

THE WITNESS: There's -- the recorded -- I think of the recorded waveform as the, you know, square wave, continuous time signal that's at the head -- that's at the head -- that's then recorded on the medium.

BY MR. MAYLE:

Q But it gets recorded on the medium not as a continuous square wave, but rather as a collection of discrete particles, correct?

A Yes.

Q And so if the claim is -- if the claim term -- if the claims somehow would require the concept of a continuous signal, that would not describe the magnetic particles that are on the disc, right?

MR. VERDINI: Object to the form.

THE WITNESS: Ask again, please.

BY MR. MAYLE:

Q If the claim somehow requires a continuous signal varying with time in the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

waveform --

A Yes.

Q -- that such a construction would not accurately describe the magnetic particles that are actually on the disc, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I'm not trying to give you have a hard time. I'm trying to really understand your question.

The -- the waveform that's coming out of the head that's stored on the medium is what I think of as the recorded waveform.

BY MR. MAYLE:

Q Right. That's what I'm asking you.

If the worded waveform is required to be a continuous signal that varies with time -- continuous.

A Yes.

Q -- that means that it is not the actual particles that are on the disc. Those are discontinuous, correct?

MR. VERDINI: Object to the form.

THE WITNESS: No. No, they're continuous, as well.

BY MR. MAYLE:

Q What do you mean by continuous?

A Start from an analog signal. A signal that -- a signal that is continuous for all time.

Q Like an analog signal, right?

A Yeah, like an analog signal is continuous.

Q A digital signal would not be continuous, correct?

A Incorrect. Continuous in time, a digital signal -- I don't know what you mean by digital signal.

A sequence of ones and zeros I would not say is an analog signal, I would not say is a continuous time, but a square wave is certainly a continuous signal. For sure.

There's continuous in amplitude and there's continuous in time. It's a continuous time signal. And the domains that you store on the disc would be a continuous signal.

Q Well, in the real word, there's no such thing as a square wave for real. You can't have a square wave?

MR. VERDINI: Objection to form.

THE WITNESS: The edges are always

at least a little rounded.

BY MR. MAYLE:

Q So you're talking about something that's not really a square wave, correct?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q There is no such thing as a square wave in the real world, correct?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Yeah, I'm okay with that. Yeah.

BY MR. MAYLE:

Q Okay. Let's pretend we do a hypothetical square wave that's really a square.

A Okay.

Q It's at one level and then it instantaneously jumps to a different level with zero time in between. That's a discontinuous signal, isn't it?

A No, that's a continuous time signal. That's a continuous time signal. Continuous -- it has a value. It has a value for all time. Every single time instance there's a value. That's a continuous signal. Every single instant of time

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

there's a value, regardless of how fine you've sliced them.

Q But it will jump a non-zero or finite amount in zero time, correct?

A Right, that's why it's still continuous, in zero time.

Q Do you use the word continuous in this context in the same way that a mathematician would say a function is continuous?

MR. VERDINI: Object to the form, foundation.

THE WITNESS: I'm not sure.

BY MR. MAYLE:

Q Do you know what a continuous function is in the mathematical sentence?

A We just defined it. It has a value for all time and it can even make jumps in zero time.

Q Give me an example of something that's not dis-- that's not continuous, then.

MR. VERDINI: Object to the form.

THE WITNESS: I mean, I think we said before, a bit sequence -- a bit sequence is not a waveform. A bit sequence is not a continuous -- is not a continuous signal.

BY MR. MAYLE:

Q But at each bit I can say it's a one or a zero. That's continuous, isn't it?

MR. VERDINI: Object to the form.

THE WITNESS: There are spaces of time between those for which there's no -- at this clock period it's a one, at this clock period a zero. In between there, there's no value in the signal.

BY MR. MAYLE:

Q Are you using continuous, in what you've been telling me, as synonomous with analog?

A Yeah, I think so. Yeah.

Q So would you consider the particles that actually go onto the disc, the magnetic individual particles, as an analog signal?

A Uh-huh, yeah.

Q And that's because why?

A Each -- each one of those bit cells is not one particle. If might be millions of particles. There's kind of where those transitions occur are not exactly sharp. They all -- the particles, where the transitions occur, there's many, many, many particles. There's not just kind of, you know, one line that you could draw for that.

And so that's -- that variation produces an analog -- an analog signal. It's made up of -- that -- that one kind of high level magnetization pattern is actually tens, hundreds, thousands, millions of aggregated magnets. And so that's -- it's clearly an analog signal, that produces an analog signal.

Q If we looked at page nine of your declaration, you've drawn a schematic where you have some blue and red little magnets, right?

A Yup.

Q And you've drawn them as perfectly, idealized where you have an arrow going from left to right --

A Uh-huh.

Q -- and then one from right to left right next to it, right?

A Yeah.

Q In the ideal world, as you've drawn it, would that be a discontinuous signal or continuous signal?

MR. VERDINI: Object to the form.

THE WITNESS: That would be a continuous -- which signal are you referring to?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q The orientation of the magnets on the disc that you've drawn.

A I think we're talking about apple and oranges. It's not the signal on -- what I think of --

Q A waveform.

A Something that you can observe on a waveform. So that's not a waveform.

Q Okay. Let's set that aside for a second.

Let's -- if you look back in Claim 13 again. And we were just talking about, hypothetically, what would happen on this hypothetical hard disc drive that you've drawn.

The step of receiving the m-bit data boards would be on the chip in your picture, right?

A Uh-huh.

Q In your declaration? That would be on the chip?

A You mean in the electronics?

Q Yeah, the electronics. Probably?

A Yeah, probably. I'm sorry, let me just get back here.

Q It's on page four?

A Yes. Uh-huh.

Q And then the next part of the claim says you know, producing m-bit code words.

Let's assume that this figure four -- this figure on page four actually does that. Would that also be in the electronics?

MR. VERDINI: Object to the form.

THE WITNESS: Yes, likely it would be there, yes.

BY MR. MAYLE:

Q Then the next part of the claim talks about imposing j and k constraints, right? Where would that happen on the device shown on page four of your declaration?

MR. VERDINI: Object to the form.

THE WITNESS: That's also likely to be in that electronics.

BY MR. MAYLE:

Q Right. And then the next step says Generating. There's two steps of generating, right?

MR. VERDINI: I'm going to object to the form.

BY MR. MAYLE:

Q In the claim.

A Yes.

Q You agree with that.

A Yes.

Q So the first step of Generating talks about generating no more than j consecutive transitions. Where would that happen on the device on page four of your declaration?

MR. VERDINI: Object to the form.

THE WITNESS: I mean, that would be in -- that's in the analog portion of that because that's producing the waveform, and that very well could be in the electronics. That box might contain all of the electronics, both the analog and digital electronics.

BY MR. MAYLE:

Q Is there a recorded waveform in that box called -- there's no recorded waveform in the box called Electronics on page four of your declaration, right?

MR. VERDINI: Object to the form.

THE WITNESS: The waveform -- as I said, the recorded waveform, I think when we talked about it before, I said I think of that as being right at that tip of that head.

That could very well be the exact

same signal that comes out of that electronics box.

BY MR. MAYLE:

Q Whether it's the same signal that comes out or not, the recorded waveform is not in the electronic box, correct?

MR. VERDINI: Object to the form.

THE WITNESS: No, it could be produced right there. Like you said, that box, the output of that box could be that -- could be a waveform, and that's the exact same waveform. You know, but then it goes down that slider and ends up right at the top of the head.

So that recorded waveform could be right -- it's the same -- it's the signal that's at the top of the -- right at the head could be, probably, exactly the signal that, if -- that signal could originate inside that electronics box.

BY MR. MAYLE:

Q Where is the waveform -- the recorded waveform? Where is that recorded?

MR. VERDINI: Object to the form.

THE WITNESS: It's recorded on the

medium. As I said, I think of the recorded waveform as being the waveform that's right at the tip of the head. It generates the magnetic flux that's then stored on the disc. That's the waveform that is recorded on the disc.

BY MR. MAYLE:

Q Wouldn't it be more accurate under your interpretation to say that's the waveform that is going to be recorded? It's not actually recorded yet, right?

MR. VERDINI: Object to the form.

THE WITNESS: That is the waveform that's recorded on the disc. There's no other wave -- different waveform that's recorded on the disc. That's the waveform that's recorded on the disc.

BY MR. MAYLE:

Q Okay. Let's say I change this device here, right, remove the disc. There's no disc. All the other parts there are there. I plug it in.

A So you've removed the disc.

Q I physically take out the magnetic media. It's gone, remove it. I still have the write head, everything else is there and the device works.

A Yeah.

Q Would there be a recorded waveform in that scenario if I turned the thing on, ran it, according to --

MR. VERDINI: Object to the form.

THE WITNESS: Obviously, I know it's a hypothetical.

But the signal that's right at the tip of that head, that's -- that's the waveform that's going to be recorded on something that's not there.

BY MR. MAYLE:

Q Right.

A That's the waveform that's going to be recorded.

Q That's not my question, though.

Would there be a recorded waveform? Could we get to a recorded waveform?

MR. VERDINI: Object to form.

THE WITNESS: I don't think you're describing a system that would -- that would apply to the patent. I think we can safely assume there's a disc that we're sending -- recording information on in the context of the claim.

BY MR. MAYLE:

Q Professor, I'm trying to understand your interpretation of the claim. And so I want to know where these steps happen.

A Uh-huh, I understand.

Q And it goes to your interpretation of the claim.

A I understand.

Q And that's what I'm trying to get to. So I'm giving you these hypotheticals. It doesn't matter if no one would actually do it. I'm not trying to eliminate what someone would do in the lab. I'm trying to figure out what your interpretations are.

So I'm going to ask it again. If I remove the magnetic medium entirely, as a hypothetical.

A Uh-huh.

Q And let's pretend that everything else is equal in this device and it could do the method otherwise, without the medium. Could it perform the method of Claim 13 without a magnetic recording medium?

MR. VERDINI: Object to the form.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q Under your interpretation of the claims?

A As I said, the -- I view the recorded waveform as the waveform that's sitting at the head -- at the head -- and so, yes.

If you -- if you pulled out the -- if you pulled out the disc and did everything the same, would I call that the recorded waveform, the waveform that's sitting at the head? Yes, because as I put the media back in, that would be the waveform that's recorded on the disc.

Q Okay. Let's say I put the media back in but now this time I put a CD instead, an optimal system. Would you still say there's a recorded waveform within the scope of 13 if I ran the device with a CD below it?

A There's still a recorded waveform at the tip of the head, even though it makes no sense because you -- you have the wrong media in there.

Q Where is the magnetic transition in that system? There's not one, right?

A Right. And that's the exact point of why the magnet -- why there's a context of a magnetic medium, and that -- you can't put a magnetic transition onto an optical disc.

Q But you say that the recorded waveform is sitting on the end of the write head, correct?

A Yes.

Q Before it gets to the medium?

A Yeah, yeah.

Q So I put in an optical medium, you'll still say there's a recorded waveform sitting on the write head, correct?

A Yes.

Q In your declaration -- look on page 16 of your declaration.

A Page 16. Okay. Page 16?

Q Right. I'm confused, because I see what you said here or in paragraph -- we could go to paragraph 35. That's the University's construction. On 16, paragraph 35. You say: In my opinion, when read in light of the '601 patent specifications, a PHOSITA would understand that the claim term transition in Claim 13 to mean a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium.

That's your opinion, right?

A Yes.

Q But you just told me -- you've just changed your opinion. You said, no, it's on the

write head and it doesn't matter what the medium is, correct?

MR. VERDINI: No. Object to the form.

THE WITNESS: Are we talking about transitions? We're not talking about recorded waveforms. We're talking about transitions as a reversal in the magnetic orientation.

BY MR. MAYLE:

Q Where are the transitions in Claim 13 under your interpretation? Where would they be?

MR. VERDINI: Object to form.

BY MR. MAYLE:

Q In the recorded waveform, right?

A The transition -- the recorded waveform has -- has -- recorded waveform does have transitions that result in changes in the magnetic orientation.

Q Magnetic orientation of what?

A Of the medium.

Q Which medium? What kind of medium?

A A magnetic medium.

Q So I'll ask the hypothetical again.

I take the device we've been talking about on page four of your declaration and I take out

the magnetic medium and I either put nothing back or I put a CD back. And I turn the device on, I put in data words. I do the encoding on the chip, it imposes j and k constraints. A signal comes out, it goes to the write head and I hit pause.

Have I now practiced Claim 13?

MR. VERDINI: Object to the form.

THE WITNESS: That's a really long question. Please ask again. I'm not trying to be a pain.

You talked about a whole bunch of stuff, I just want to make sure I understand the hypothetical, which you know is like taking a disc, a magnetic disc out and asking -- obviously, this patent is all about the fact that there has to be a disc or something in there, so the hypothetical just seems --

BY MR. MAYLE:

Q You don't like my hypothetical?

A No, I don't like your hypothetical, so --

Q Okay. The reason you don't like it is because it's --

A Oh, it's ridiculous. The reason I don't like it, it's ridiculous.

Q Professor, remember, we agreed not talk over each other.

A Okay.

Q It seems that you don't like it because you've said in your declaration, the one you submitted to the Court, that transitions are in a recorded waveform and transitions require a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium.

A Uh-huh.

Q But when I'm probing you on that, you say, no, the claim -- the method is completed when I get to the -- the signal to the end of the write head. That's what you say in your deposition, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I don't think I said the method is completed. I think I said the recorded waveform is at the -- so --

BY MR. MAYLE:

Q Well, the last step --

A The recorded waveform is at the head. That's the signal that's going to be recorded on the disc and so that's the recorded waveform. It's right

at the head.

Q The verbs used in the claim are generating no more than j consecutive transitions in the recorded waveform.

A Yes.

Q Where is that verb generating done under your understanding of the claim? Is it the tip of the write head or is it on the disc somewhere? Where does it first happen, if it happens more than once?

MR. VERDINI: Object to the form.

THE WITNESS: Where does the generating take place?

BY MR. MAYLE:

Q Yes.

A It could very well be -- I mean, I think of that as being in that electronics box. That electronics box has the digital and -- and I'm assuming it has the digital and analog pieces. The outcome of that box is the waveform that travels down a wire, goes to the head and sits -- is recorded on the medium.

Q Okay. Well, then --

A Those transitions, whatever analog -- wherever the analog circuitry is that produces that final waveform, that's where that generating step is

met. Maybe it's in that electronics piece, maybe there's another piece of electronics.

Q And you would agree that the last step of the Claim 13 is something about generating j and k, correct, in the recorded waveform?

MR. VERDINI: Object to the form.

BY MR. MAYLE

Q Then the claim just ends. There's a period.

A Okay.

Q So let's go to paragraph page four again, and let's run the hypothetical back even further. We --

A I'm sorry, sir. Tell me again where we are.

Q Page four of your declaration -- we're talking about this hypothetical hard disc drive.

A Okay.

Q Now you've just told me that the generating steps could happen in the electronics box, right? That's what you just said, right?

A Uh-huh.

Q So now let's do a hypothetical where I take a screwdriver and I rip off the write head, but I keep the circuitry intact, or something like that.

I disable the write head.

A Okay.

Q And all I have is the electronic box and I have a processor associated with the electronic box that can convert the m-bit code words into an analog signal. Do you follow so far?

A I think so.

Q But then I somehow impede the analog signal from making it to the write head or I break the write head. Do you follow the hypothetical?

A I think so.

Q Is it your opinion, then, that there would be transitions in a recorded medium under this new hypothetical?

MR. VERDINI: Object to the form.

THE WITNESS: You've broken the system, so there can't be any transitions on the magnetic medium.

BY MR. MAYLE:

Q Which claim term requires transitions to get to the magnetic medium, if any?

MR. VERDINI: Object to the form. That was your question.

MR. MAYLE: No, it wasn't.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q Do you understand what I'm saying now?

A No, I don't. No, I'm just --

MR. VERDINI: Your question was, is it your opinion that there would be transitions in a recorded medium under this new hypothetical.

BY MR. MAYLE:

Q First, let's go back. Do you understand that hypothetical?

A I think so. I think -- I'll just -- my vision is you just cut the wire on that -- on the --

Q Right. So the signal will come out?

A The thing going out to the head, you cut it.

Q Yeah. The signal will come out probably, but then it will reach a dead end. Okay? Is that fair?

A Yeah.

Q In Claim 13, in that hypothetical, where, if anywhere, would the step of generating no more than j consecutive transitions happen or does it not happen?

MR. VERDINI: Object to the form.

THE WITNESS: I would still say

it does -- it still happens.

BY MR. MAYLE:

Q And where does it happen?

A Wherever the analog circuitry is that produces the waveform, which is presumably before your cut. There's a waveform there, we've enforced this -- the j and k constraints. They -- that waveform has been generated, you just have cut its ability to get to the head. But that waveform -- whether that cut is there or not, that waveform still exists.

Q Okay. But would it also be true that in that hypothetical there won't be any reversals in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium?

A Yeah, because you broke the system. There's no way to store any information on the disc. You just broke it. It's a different system. You're describing a different system than is described in the patent. The patent assumes a working whole system.

Q Let me ask it again. I'm looking for a yes or no answer if you can give me one.

Under the hypothetical we just gave, there would not exist a reversal of the magnetic

orientation of adjacent bit regions along the recording track of a magnetic recording medium, correct?

A Yeah, under that circumstance, you've -- you've broken the system. You might as well throw away the hard drive. You might as well throw it out, send it back. CK, it's broken. It doesn't work. It doesn't -- it's irrelevant.

Q Professor?

A No, I understand, but it's just -- so, yeah, there can't be any transitions on it, you broke the system. So the answer is yes, but I'm calling out --

Q What we're doing at this deposition is trying to understand your claim construction.

A I understand.

Q And so I'm perfectly entitled to ask you any hypotheticals I want to.

A Yup.

Q And if you don't understand them, you can tell me. But I'm trying to get to your understanding of what the claims mean. I'm not trying to spar with you or anything like that.

A I'm not trying to spar with you either.

Q Okay. I'm just going to do this one more

time.

A Go for it.

Q We'll do it the hypothetical again.

Page four of your declaration. We have the hypothetical system. It's fully functional, except the circuit going to the write head has been disabled. Let's also say I removed the recording medium. It otherwise works. So, for example, I could test whether the encoding is working in the chip, right?

A Uh-huh.

Q Someone might do that, right?

A Uh-huh.

MR. KNEDEISEN: You need to answer.

BY MR. MAYLE:

Q Yes?

A Yes. I'm sorry.

Q So I could test the encoding of the chip without hooking into a write head, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yes. Yes.

BY MR. MAYLE:

Q Okay. So let's say I do that. I take a hypothetical hard disc drive. There's no magnetic recording medium and I've removed the current at

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the -- that gets to the tip of the write head. Okay? Fair enough?

A Yes.

Q I plug in the device. I feed in data words and the chip does encoding to m-bit code words. So far so good?

A Yes.

Q And then there's some kind of processor that converts into an analog signal that starts going towards the write head.

A Yes.

Q Correct?

A Yes.

Q Now let's look at Claim 13, and I'll ask you, has each step been performed. I'll go through them one at a time. That's the hypothetical.

Claim 13, the first step says: Receiving m-bit binary data words.

Correct?

A Yes.

Q Has that happened in our hypothetical?

A Yes.

Q And the second step says -- let me get it out -- producing sequences of m-bit code words.

Has that happened?

A Yes.
Q And where did that happen?
A In the electronics.
Q Right. The third step says: Imposing a pair of constraints, j, colon, k, on the encoded waveform.
Has this happened in our hypothetical?
A Yes.
Q Where has this happened?
A Presumably in the electronics. I'm okay with that.
Q Then it says, the fourth step: Generating no more than j consecutive transitions of said sequence in the recorded waveform, such that j is greater than or equal to two.
A Yes.
Q Has this happened?
A Yes.
Q Where has this happened?
A In the electronics.
Q Okay. Now I just want to see if there's -- if what you're saying now under this hypothetical is consistent with your interpretation of transitions.
A Okay.

Q That's what I'm trying to do. There's no surprise here.

A Uh-huh.

Q In paragraph 35 of your declaration, you say that it's your opinion that the claim term transition means a reversal in the magnetic orientation of adjacent bit regions along a recording track of a magnetic recording medium.

A Uh-huh.

Q But in the hypothetical we just did, number one, there's no magnetic recording medium at all, correct?

A Correct.

Q And the write head -- even if it was there, the write head was unplugged so there could be no reversal of magnetic orientation of adjacent bits, right?

A Correct, but the transitions in that waveform still exist and if you had not broken the system they would result in the magnetic transitions that the patent is talking about. So there's transition in the waveform that would exactly show up on the disc.

Q I'm not asking what would have happened. Let's just stick with what did happen in the

hypothetical. Okay?

A Okay.

Q In that hypothetical, it meets every step of the claim as you interpret it?

A Uh-huh.

Q That's what you're saying? Yes?

A Yes. Sorry. Just zap me.

Q But, isn't the case that if the Court adopts your construction of transition, in that hypothetical there are no transitions in the way that you've defined it?

MR. VERDINI: Object to the form. Asked and answered.

THE WITNESS: That's correct, there are no reversals in magnetic, yeah.

BY MR. MAYLE:

Q So I'm trying to understand. To me, it sounds like a contradiction.

That must mean that whatever that hypothetical did, did not satisfy every step of the claim, because there's no transitions, correct?

A There's no transitions in the magnetic medium, but there are transition in the waveform that would exact -- if the system hadn't -- if we had a system that was described in the patent, they would

show up on the medium.

Q So you're saying that -- are you saying that the hypothetical I gave you is a system that's not described in the patent?

A That you -- this is describing the waveform that's generated that eventually ends up on the -- on the -- on the disc that ends up recording. That's what I'm saying.

Q And do you think that it eventually -- once you have something that will eventually get there, you're done with the analysis? That's good enough for you? Then there's -- there might be a transition or there will be a transition, so there is a transition; is that what you're saying?

MR. VERDINI: Object to the form.

THE WITNESS: That there's a one-to-one correlation between the transitions and the waveform that's generated at the electronics box with the transitions on the disc. That's what I'm saying. Those are -- there's a one-to-one correlation between them.

BY MR. MAYLE:

Q They're not the same, though, right?

MR. VERDINI: Object to the form.

THE WITNESS: I would say they are the same. There's a one-to-one correlation between them.

BY MR. MAYLE:

Q Nothing in your declaration -- when you had your chance to opine on the meaning of transition, there's nothing in here in your actual declaration that says, oh, when I said a reversal of the magnetic orientation of bit regions, I meant or anything that correlates to that, correct? That's not what you said in your declaration?

A That's not in the declaration.

Q Right.

A Those words are not there.

Q So one more hypothetical.

A But someone skilled in the art would certainly understand that, for sure.

Q I'm trying to stick with what's in your declaration.

Let's say I take that electronics piece -- let's call it a chip -- that is fully capable of doing m-to-n encoding and it's fully capable of imposing j and k constraints. And I -- I write a computer code that would model the circuit exactly.

Are you familiar with something like that?

A Okay. Yes.

Q Yes?

A Yes.

Q Can we call it a computer simulation?

A I'm okay with that.

Q Have you heard of a computer simulation?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And I generate random numbers as -- as -- to represent incoming data.

A Okay.

Q Are you familiar with that?

A I'm okay -- I think I know what you're saying. I mean, yes, I'm following you so far.

Q I feed in -- let's say I set my program so I want to have it -- pick a number -- four to five, m equals four and n equals five, j equals two, k equals ten.

I set it up on a computer program on, say, this laptop. And I write a subroutine that would generate random data.

A Uh-huh.

Q And then I -- in my simulation program, I use my simulated encoder to generate m-bit code words. I could do that on a laptop, right?

A Okay. Yes.

Q Are you following what I'm saying so far?

A I think so, yeah.

Q And the computer program generates those m-bit code words in such a way that it will satisfy a j and k constraint on the computer. Do you follow that?

A I think so.

Q Would that hypothetical involve transitions as you -- within the scope of Claim 13 of the patent, as you understand that claim term transitions?

MR. VERDINI: Object to the form.

THE WITNESS: That simulation -- that simulation would simulate an analog waveform that had -- that had had the transitions in them that met the j and k constraints. So that --

BY MR. MAYLE:

Q But I'm asking you if those transitions, as you're calling them transitions, do those transitions meet your definition of transitions

that's given in your declaration on paragraph 35?

A In that simulation, there's not a magnetic medium. There wouldn't be transitions in the magnetic medium in that case, but there would be a waveform, a recorded waveform, that would have the transitions that, if put on a disc, would result in transitions.

Q We're going to take a break. I'm just looking for a yes or no if you can.

In that simulation that we just described, if we use your definition of transitions in paragraph 35 and we just did that simulation and stopped, would there be transitions in that simulation under your definition in paragraph 35 of your declaration?

A There would not be magnetic transitions.

Q So the answer is no, correct?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: But there would be -- there would be transitions -- there would not be magnetic transitions.

BY MR. MAYLE:

Q So the answer to my question is no, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Yeah, I think I've answered it the best way I could. I said there won't be magnetic transitions, but there would be a waveform that, if written on the disc, would result in magnetic transitions.

I mean, the simulation doesn't actually have the magnets in it and it doesn't have the disc in it so you can't have the magnetic transitions, but you would have a waveform that, if written, would result in it.

BY MR. MAYLE:

Q Let me ask it another way then, come at it at another angle.

A Okay.

Q If we did that simulation that we just described, would that -- and then stopped, unplugged the computer. We're done, that was the simulation for the day. Does that practice Claim 13 of the '601 patent?

MR. VERDINI: I object to outside the scope of the deposition, and the

claims haven't been construed. So --

BY MR. MAYLE:

Q Do you understand my question?

A Ask again.

Q If we did the hypothetical on the laptop, we ran the simulation as we described and then unplugged the laptop, never to do it again, and then we break the laptop and throw acid on it and burn it --

A Uh-huh.

Q -- would that process practice every step of Claim 13 of the '601 patent as you construe the claim?

MR. VERDINI: Object to the form.

THE WITNESS: The waveform that -- that -- the waveform that meets the constraints is gone now. Under your hypothetical, it's gone, never to be recovered again, so it -- it --

I'm sorry. This thing just collapsed.

That waveform is gone, and never recorded onto a disc, never resulted in magnetic transitions.

BY MR. MAYLE:

Q Then the conclusion would be that --

A But the -- I would say that -- that it would have generated a waveform that would have -- that would have met the elements of the claim if that other stuff -- if there was a magnetic disc there. So I guess -- and it's gone now. So --

THE VIDEOGRAPHER: 11:06. We're off the record. This is the end of media number two.

(Brief pause.)

THE VIDEOGRAPHER: 11:21. We're back on the record. This is the beginning of media number three.

BY MR. MAYLE:

Q Professor McLaughlin, during the break did you talk to your counsel about the substance of your testimony?

A Not about the substance of the testimony.

Q And do you recall that before the break we were talking about a hypothetical scenario where we ran a simulation.

A Yes. Yes.

Q And we had to take break, but I want to go back to my question.

A Sure.

Q If we ran this hypothetical as we just described -- if you can give me a yes or no answer, that's what I'm looking for -- would every step of Claim 13 -- as you understand the meaning of the terms, would every step of that Claim 13 be practiced by the simulation hypothetical?

MR. VERDINI: Object to the form.

THE WITNESS: In the form of a yes or no answer, I'd say no.

BY MR. MAYLE:

Q Okay. And that's because?

A There's no magnetic medium.

Q There's no magnetic medium?

A And there can't be magnetic transitions.

Q Okay. Thank you.

And you interpret transitions as a reversal in the magnetic orientation of adjacent bit regions along the recording track of magnetic recording medium, correct?

A Yes.

Q We talked earlier in the day about Professor Immink. Do you remember that?

A Yes.

Q And we talked about EFM coding?

A Yes.
Q And I think you told me that you understand that EFM would be standard essential to CD?
A Yes.
Q The CD standard?
A Yes.
Q And EFM is a DC-free code, right?
MR. VERDINI: Object to the form.
THE WITNESS: I don't remember.
Sorry, I don't remember.
BY MR. MAYLE:
Q It wouldn't surprise you if EFM was a DC-free code, right?
MR. VERDINI: Objection. Asked and answered.
THE WITNESS: You don't want to hear my spiel, I don't think.
BY MR. MAYLE:
Q Okay. Well, I'll --
A There's no such thing as DC free in optical recording, period, because there's -- it's only positive signals, so there can't be DC free. It's called DC balanced.
Q DC balanced. We talked about the RDS

concept; is that what you're talking about?

MR. VERDINI: Object to the form.

THE WITNESS: I'm sorry.

BY MR. MAYLE:

Q There was a phrase we saw earlier in that -- remember that Blu-ray exhibit? It said something running digital sum RDS. Do you remember seeing that?

A Yes.

Q And there it is. It's on page 22 of that Exhibit 1007, if you want to refresh your memory.

A Uh-huh.

Q As we discussed, at least page 22 of that Exhibit 1007, says that RLL codes in optical systems are DC free. And then it went to characterize that as an RDS issue, correct?

A Correct. And I answered that as saying, in Blu-ray, it makes sense. I couldn't recall whether, in CD, that there was a DC-free code or not.

Q Okay.

A I think I'm answering the same thing.

Q Fair enough. Fair enough. And Blu-ray, that Blu-ray paper mentioned something about a slicer, remember? I didn't understand it.

A Yeah.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q Is it fair to say that you understood that something to do with the slicer had --

A Was the reason.

Q Was the reason for -- was the reason for, quote, the DC-free constraint, correct?

A Yes.

Q Correct.

Do magnetic hard disc drives require a DC-free constraint?

MR. VERDINI: Object to the form.

Q In general?

A I'm not -- I wouldn't use the -- I wouldn't use the -- I wouldn't use the requirement in the strictest possible way. It's certainly desirable, certainly highly desirable, but I --

Because hard disc drives aren't standards driven, they don't have standards associated with them, then, you know, saying there's a requirement -- I think it's highly desirable as opposed to a requirement that conforms to a standard. I'm trying to be strict in the use of that.

Q Thank you. I understand.

Let's set aside the standard essentiality aspect for a moment, and I'll ask just you like for technical reasons.

Is there a technical reason that you know of that -- that a magnetic hard disc drive -- that a waveform used in a magnetic hard disc drive cannot have a DC component?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q Should I say the question again?

A Please.

Q Forget about standard -- standards. I just want to focus on technical reasons.

A Right.

Q Is there any technical reason that a waveform used in a magnetic hard disc drive cannot have a DC component?

MR. VERDINI: Object to the form.

THE WITNESS: I'm just afraid you used a double negative, and that's what my brain is trying to unravel. So I'm not trying to give you a hard time. I'm just trying to understand.

BY MR. MAYLE:

Q Yeah, let me phrase it again.

I'm not saying cannot have a DC free, I'm saying cannot have a DC. So is there any technical reason that a magnetic hard disc drive -- strike.

Is there any technical reason that the waveform in a magnetic hard disc drive cannot have a DC component?

MR. VERDINI: Object to the form.

THE WITNESS: I'm really not trying to give you grief. I'm really trying to understand, and I don't want to ask the question for you, but that's the -- I know I'm not supposed to do that, but I think you're basically asking do magnetic recording channels, should they be DC free or not. Is that not what you're asking?

BY MR. MAYLE:

Q No, that's --

A That's what my brain was going towards.

Q I'm not asking if they are desirable or if they ever have this. I'm saying, is there a technical reason that they must have.

A A DC-free component?

Q A DC-free component.

MR. VERDINI: Object to the form.

THE WITNESS: Yes, because the channel doesn't pass DC. So we don't want to put a DC component in there that

differentiated, because the head is a differentiator. It will eliminate any DC content. That's -- so you don't want to put -- you don't want to put information in the DC piece because the head will eliminate it.

I know that -- again, that may not be the question you're asking. That's where my brain is zeroing in on and that's what I'm trying to get out of.

BY MR. MAYLE:

Q Right. No, I thank you for clarifying.

What I'm getting at is -- let's say we're in a system on a chip that has the encoder that's going to be used for a magnetic disc hard drive.

A Okay.

Q And we're just now talking about bits. We're in the binary words still.

A Yeah.

Q And let's assume that this encoder will impose a j constraint, as you understand that term from the Claim 13 of the patent.

A Okay.

Q And it will impose a k constraint.

A Yes.

Q And it will thereby achieve some code rate which is defined as m over n, correct?
A Right.
Q And let's say we don't worry about the DC-free. And we say we want to make the rate -- generally we'd like to make the rate high, right, m over n to be high?
Is that generally true for magnetic systems?
A That we want to make the rate high?
Q Yes.
A Yes.
Q And if we then, on top of the j and k constraints, imposed an additional constraint?
A I understand. I'm with you.
Q Right. To limit the DC component?
A Okay.
Q Wouldn't that then come at the expense of rate, if we did that?
A Likely, yes.
Q And would -- is there a technical reason -- and if we just stick with magnetic systems and we're just on the chip -- that we must impose a DC-free constraint and sacrifice the rate? Is there a reason that we would have to do that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Object to the form.

THE WITNESS: What I would say is we wouldn't necessarily have to do it, but it would be desirable, but that we wouldn't -- so I'll leave it at that.

BY MR. MAYLE:

Q Okay. Yeah, I think that answers it. And as you said -- just one last thing. I don't want to mischaracterize, but I think that you're not -- is it true that you're not aware of any standards that would apply to a magnetic system that would require a DC-free component in a code used in a magnetic system; is that right?

MR. VERDINI: Object to the form.

THE WITNESS: That's correct.

BY MR. MAYLE:

Q We're still talking about transitions. I'm about to transition off. And it was your declaration, we started in, remember, paragraph -- we went through paragraph 36, 37, 38, 39.

A Yes, uh-huh.

Q And we looked at the reasons that you gave for your interpretation of transition.

You don't discuss any of the patent figures in your declaration, at this part of your

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

declaration, do you?

A I don't believe so.

Q And the patent doesn't have any pictures of hard disc drives, does it?

A That's correct. I don't believe it does.

Q And in these paragraphs, 34 through 40 of your declaration on transitions, you don't cite the prosecution history, right?

A That's correct, I do not.

Q So let's move on to some other topics. I'd like to introduce a new exhibit. This is 1012.

(McLaughlin Exhibit No. 1012 was marked for the record.)

BY MR. MAYLE:

Q Professor McLaughlin, have you ever seen this document?

A I don't believe so.

Q Okay.

A No.

Q And you see on the bottom right-hand corner, it says UMN_0001330?

A Yes.

Q In other cases you've been in, have you heard the concept of Bates numbers?

A Yes.

Q And in this case, I'll just tell you that if it's UMN, underscore, that means it came from University's files.

A Yes.

Q So this one starts at UMN_0001330 and it goes on for some pages and ends on 1346, right?

A Yes.

Q And do you see on the first cover page, on the top left, some handwritten -- something in handwriting?

A Yes.

Q And what does that say?

A I think it says: Patent no -- presumably patent number -- 5,859,601.

Q So that's the '601 patent in this case, right?

A Yes.

Q And you do you see at the top it says Alpha Consulting, Technology Transfer and Commercialization?

A Yes.

Q Have you ever heard of this outfit?

A No.

Q And do you see below that it says MTR Codes, University of Minnesota Invention Disclosure?

A Yes.

Q And then you see it says Tech Assess, March of 1999?

A Yes.

Q So keep this out. Just look at the patent for a minute, if you can, Exhibit 1 -- 1001, somewhere. And can you tell me the issue date -- no the '601 patent.

A I'm sorry. Yes. The what date? Issue date?

Q The top right, so --

A Yeah. Issue date, January 12th, 1999.

Q So this document, this Exhibit 1012 that we're on now, was in March '99, so a couple months after the patent issued, right.

A After, yes.

Q And you see at the bottom, the last sentence, the last two sentences of this first page of this document, it says: Additional IC firms are listed which appear to be serving other disc markets such as DVD and DSL market. These should also be targeted.

Do you see that?

A Okay. Yes, I see that.

Q And DVDs are -- well, they're optical

systems, right?

A Correct.

Q They're not magnetic systems, right?

A Correct.

Q DSLs are not magnetic systems, right?

A Correct.

MR. MAYLE: Let's go -- let's do another exhibit. You can set that one aside.

(McLaughlin Exhibit No. 1013 was marked for the record.)

BY MR. MAYLE:

Q Dr. McLaughlin, have you seen the exhibit marked as Exhibit 1013?

A I've never seen this before.

Q And you see in the bottom right it's a Bates number UMN ending in 916, correct?

A Yes.

Q And you see at the top of the page it's on University of Minnesota letterhead?

A Uh-huh, yes.

Q And it says Patents and Technology Marketing right below that, right?

A Yes.

Q And you see the date of May 11, 1999?

A Yes.

Q So remember, just to orientate, the patent was issued in January '99.

A Yes.

Q The previous exhibit we looked at talked about targeting from -- it was in March of '99. It talked about targeting DVDs and DSLs, right?

A Yes.

Q Then this exhibit is now May 11, 1999, right?

A Yes.

Q And do you see it's from a -- it's to a Mr. Stephen Pomraning, IT manager at Lucent?

A Yes.

Q And he was at Murry Hill, New Jersey?

A Yes.

Q You used to work there, didn't you?

A Yes.

Q At Murray Hill, New Jersey?

A Yup.

Q And you see, after the greeting, it says that Mr. Jaekyun Moon from the University of Minnesota has developed a coding scheme to improve storage capacity of magneto optical storage drives.

Do you see that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Yes.

Q And do you see at the bottom above the signature block they enclose the patent, the '601 patent, right?

A Yes.

Q So it's fair to say the letter is talking about the patent, right?

A Yes.

Q And it mentions magneto optical storage devices, right, in the first sentence?

A Yes.

Q And then in the second paragraph, they mention DVDs and DSLs again, correct?

A Yes, they do. Yes.

Q And you said you haven't seen this document before, right?

A I have not.

Q So it appears from this document that, at least on this date, the University of Minnesota does not have the view that the '601 patent is limited to magnetic, according to you, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I'm sorry. I just read it. Could you ask your question again.

BY MR. MAYLE:

Q So wouldn't it be fair to say that if the University of Minnesota thought that '601 patent was limited to magnetic recording media, they wouldn't be sending out letters to Lucent mentioning DVDs and DSL modems, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yes, they seem to be indicating that the patent applies to DVDs and DSL.

BY MR. MAYLE:

Q Thank you. Let's do another one.

Professor McLaughlin, would you disagree with the University's apparent position there that the patent applies to DSLs and modems, correct?

A Yes, I would disagree with that, at least within the context of the claims that we're looking at. But as a whole, yes, I would disagree with that assertion.

MR. MAYLE: We're up to 1014.

(McLaughlin Exhibit No. 1014 was marked for the record.)

BY MR. MAYLE:

Q I'm handing you the document 1014. On the bottom right it has the Bates number

UNM_00016155.

Do you see that?

A Yes.

Q And have you seen this document before?

A I have not.

Q Okay. And it appears to be an e-mail dated April 3rd, 2002, right, an e-mail chain?

A Yes.

Q And let's go to the bottom, which would be the -- I guess, the leading e-mail. It says -- it's signed by -- it's from Jae Moon, correct?

A Yes.

Q And he wrote the e-mail on April 3rd, 2002 to someone named Beth Trend, right?

A Yes.

Q And then he copied himself, Jae Moon@vermai.com in the To line?

A Yes.

Q And then he also wrote it to Bbrickner@bermai.com?

A Yes.

Q And B. Brickner is probably Barrett Brickner, right?

A I assume so.

Q And Jae says: As for the MTR patent, I'm

not aware of any specific potential licensees but given its wide applicability to new areas like DVD and tape storage channels, I think it's worth paying the $455 maintenance fee.

Right?

A That's what he says, yes.

Q And do you know what a maintenance fee is in a patent? Heard of it?

A I think so. I've heard of it. Just to kind of keep the patent alive or something like that?

Q Right. And so it appears he's telling the University to pay the $455 maintenance fee, right?

A That what it seems, yeah.

Q And he's saying we should do that because the patent has wide applicability to DVD, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Correct, that's what he's saying. Given its wide applicability to new areas like this, yes, he's saying that.

BY MR. MAYLE:

Q Right. And DVD is not a magnetic system, right?

A Correct.

Q And so you said you talked to Jae Moon about the '601 patent, right?
A Uh-huh.
Q Did this issue come up when you talked to Jae Moon?
A No.
MR. VERDINI: Objection. Calls for what we discussed in privileged conversations, unless there are conversations you had with Jae outside of counsel.
BY MR. MAYLE:
Q So do you disagree with Jae Moon's comment in this e-mail that the patent has wide applicability to new areas like DVD?
A I disagree because the DVD is a standard and the DVD standard does not, as far as I know, have anything with MTR codes in it.
Q But this was in 2002, right?
A Yes.
Q Was the DVD standard out in 2002?
A I'm almost certain. I'm not sure when the DVD standard started.
Q Right. Setting aside --
A He may have -- he may have contemplated

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

it to go in the standard.

Q Setting aside the issue of whether the standard of DVD requires MTR --

A Okay.

Q -- you would -- isn't it true that you disagree with Jae Moon's comment about DVD because you limit the claims to magnetic transitions only, correct?

A Yes.

Q And that's one reason you would disagree with him, right?

A Correct.

MR. MAYLE: All right. Let's do another one.

(McLaughlin Exhibit No. 1015 was marked for the record.)

BY MR. MAYLE:

Q This is Exhibit 15 now. You see the Bates number at the bottom of the first page is UMN_ then 1202, right? Professor, is that the one we're looking at?

A Yes.

Q And on the backside there's something. If you look on the back. Flip it over real quick. Do you have two pages?

A Yes.
Q It was supposed to be two pages, they printed it front and back.
A Okay.
Q So there's like an attachment, it says, and then it goes to page 1203.
A Yup, uh-huh.
Q So let's start in the middle of the page. You see at lerch 11:42 p.m., 6/9/2008.
A Middle of the page. I'm sorry.
Q It's a third of the way down maybe.
A Okay, yeah, yeah. Now I'm with you.
Q So now the last thing -- the maintenance fee document we just looked at was in 2002. So now we're in 2008, right?
A Okay.
Q And let's see if he signs it. If you look on the back page you'll see who signs it. It's JAE.
A Yeah.
Q That's Jae Moon, right?
A Yeah.
Q And he's writing to someone named Ann Slavec.
Do you see that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Uh-huh, yes.

Q And another person named Jay, but this time Jay Schrankler?

A Uh-huh.

Q It's S-c-h-r-a-n-k-l-e-r.

A Yes.

Q Do you know who Ann Slavec and Jay Schrankler are?

A No.

Q And Jae Moon says in his e-mail, June 9, 2008: I think we have something very significant here. You may recall that I mentioned more than once about how I expected the U patented MTR technology might be used by optical recording products.

Do you see that?

A Uh-huh, yes.

Q And then you see in the next paragraph he says he has strong evidence that the modulation code called 17PP that's in Blu-ray and HDVD products is derived from our MTR technology, right?

A I see that he's saying that, yes.

Q And then he has a summary of how the 17PP code uses the MTR code idea, right?

A Uh-huh, yes.

Q And Blu-ray and HDVD products are not

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

magnetic systems, right?

A That's correct.

Q And so would you disagree with Jae Moon -- Jae Moon -- well, strike that.

You understand he's talking about the '601 patent here, correct?

MR. VERDINI: Object to the form.

THE WITNESS: He hasn't explicitly said the '601 patent, but when he says Our MTR technology, it makes sense that that's -- his referring to the overall technology wouldn't surprise me, that he's referring to the patent. He may have other MTR stuff that's not in the patent, I don't know.

BY MR. MAYLE:

Q Well, let's assume for a moment that he's talking about the '601 patent and he says in his e-mail -- he talks about Blu-ray products and HDVD products using the MTR code idea. Would you disagree with that?

MR. VERDINI: Object to the form.

THE WITNESS: I'm sorry. You're asking me to disagree with what?

BY MR. MAYLE:

Q So do you think it's possible -- under your understanding of Claim 13 is it even possible that a Blu-ray product could use Claim 13 of the '601 patent?

A It's not for optical recording, so it would have to be something else. The '601 maybe had other stuff or modifying versions of it or whatever.

Q Okay. Well, let's look at the -- if you flip it over, you'll see there's an attachment?

A Okay.

Q So I haven't given you the attachment yet, so let's mark the next exhibit.

MR. MAYLE: This one is also printed double side. Have they all been double sided?

MR. VERDINI: At least the ones that we've gotten. I don't know about --

MR. MAYLE: I wasn't positive about this one.

MR. VERDINI: They do appear to be all double sided.

(McLaughlin Exhibit No. 1016 was marked for the record.)

BY MR. MAYLE:

Q So the 04 is the first page. This is a two-page document. This is 1016.

This is a two-page document and, Professor, you'll see in the bottom right corner of the top page it starts with Bates number UMN 1204, right?

A Yes.

Q And it goes over to 1205?

A Yes.

Q And flip it over to the back and look at the bottom: In conclusion, it's safe to say -- it seems safe to say that all current Blu-ray and HDVD players discs infringe upon the University of Minnesota technology as described in the Moon, et al., U.S. patent 5,859,601, right?

A That's what that says, yes.

Q So he's definitely talking about -- in the e-mail we just looked at, he's talking about the '601 patent, right?

MR. VERDINI: Object to the form.

THE WITNESS: I think that's a safe assumption.

BY MR. MAYLE:

Q And in the paragraph above, the one we

just looked at, he actually talks about Claim 13. He mentions Claim 13, right?

A Sorry. I'm looking at what he's talking about. I'm sorry. Your question was?

Q So I was just saying that Jae Moon, in this attachment, actually mentions Claim 13 specifically, correct?

A Yes.

Q And so it's fair that he's saying that he thinks, that Jae Moon thinks, that the Blu-ray standards or -- sorry -- the Blu-ray players practice Claim 13 of the '601 patent, right?

MR. VERDINI: Object to the form, foundation.

THE WITNESS: Yup, that's what he -- that seems what he's saying, yeah.

BY MR. MAYLE:

Q And would you disagree with that?

A Yes, I disagree with that.

Q And the basis is -- is the basis of your disagreement because you interpret Claim 13 as being limited to do magnetic transitions?

A That's correct.

MR. VERDINI: Object to the form.

MR. MAYLE: Let's do another one.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(McLaughlin Exhibit No. 1017 was marked for the record.)

BY MR. MAYLE:

Q This is -- I'm handing you Exhibit 1017. And Professor, you see that there's a Bates number on the bottom right UMN_1072, and then it continues on to 1074, right?

A Yes.

Q And you see the date at the top, December 17, 2008, on the cover page?

A Yes.

Q So we're still in 2008.

A Yes.

Q The last e-mail we just looked at was in 2008, right?

A Yes.

Q And you see it's the letterhead of the University of Minnesota, Office of the General Counsel?

A Uh-huh.

Q And they're sending this letter via Federal Express to someone named Mr. Lawrence A. Horn. Do you see that?

A Yes.

Q Have you heard of Mr. Lawrence A. Horn?

A No.
Q Have you heard this MPEG LA, LLC?
A I think that's the consortium that manages the MPEG patent pool or something like that.
Q And you see the Re line, Evaluation of U.S. Patent 5,859,601 for Blu-ray Disc Patent Portfolio License?
A Okay. Yeah. So maybe I was right. Miracle.
Q And you see after Dear Mr. Horn, the first paragraph says that the University is submitting the '601 patent for an evaluation of essentiality for the Blu-ray disc standard, right?
A Okay, yup.
Q And they enclose the patent. In the next paragraph they enclose the prosecution history and all the references, right? That's what it says, right?
A Yes.
Q And then they say we're -- the next sentence is they're basically requesting an evaluation on the '601 patent with respect to all basic format specs for Blu-ray formats, correct?
A Yes.
Q And then the next sentence they say --

the next paragraph they say: The following is our explanation of the essentiality of Claim 13 of the '601 patent, the Blu-ray format.

Correct?

A Yes.

Q And let's just go to the next page, 1073. And you see, second paragraph from the bottom, do you see they quote -- they block quote Claim 13, right, of the 601 patent?

A Uh-huh, yes.

Q And then if you go to the last page above the signature block, where it starts with, In view of the foregoing. Do you see do that?

It says: At least Claim 13 is essential to the Blu-ray disc specifications for recording.

A Yup.

Q And you would disagree with that, right?

A Yes.

Q And the basis for your disagreement, is that you limit Claim 13 to magnetic?

A Yes.

Q And you see -- if you look in the signature block here, you'll see it's Andrew G. Rozycki, Associate General and Senior Patent Counsel. Do you see that?

A Okay. Yes.
Q Have you ever talked to him?
A No.
Q And you see that there are some people copied, MPEG. Do you see Jay Schrankler is there again?
A Yes.
Q Michael F. Moore is copied there.
A Okay.
Q And you see Jae Moon?
A Okay.
Q And Barrett Brickner is copied on here?
A Yes.
Q Let's do the next one.
(McLaughlin Exhibit No. 1018 was marked for the record.)
BY MR. MAYLE:
Q We're up to Exhibit 1018, Professor. And you see that on the bottom right there's a Bates number, UMN_0001055?
A Uh-huh.
Q And it goes to 1057, right?
A Uh-huh.
Q And here there's a letter, do you see the date, March 12, 2009?

A Yes.

Q And you see it's to Mr. Andrew G. Rozycki in the Via E-mail. It's in the To block at the very top, under the date.

A Oh, sure. Yes. I'm sorry.

Q So that was the guy that wrote the e-mail to MPEG or that wrote the letter.

A Yup.

Q The previous exhibit.

A Yes.

Q So this looks like it's -- well, you can see what it is. The Re line, it's the investigation of the University of Minnesota patents in connection with potential Blu-ray disc patent licensing program.

Right?

A Uh-huh, yup.

Q And the center of this letter says: This letter provides the results of our evaluation regarding the '601 patent. In summary, it is our opinion that the '601 patent is essential for BD-RO, BFS discs and some other things, correct?

A Uh-huh.

Q And would you disagree with that?

A I would.

Q And again, are you disagreeing because

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

you limit the claims to magnetic?

MR. VERDINI: Object to the form.

THE WITNESS: Yup.

BY MR. MAYLE:

Q And have you seen this document before?

A No.

Q Are you aware that the University has sought opinions on whether the '601 patent is essential for Blu-ray disc?

A No, this is the first I've seen it.

Q Are you aware that they did receive an opinion on -- and saying that the '601 patent is essential for Blu-ray disc?

A No.

Q Did you ask for any opinions on the '601 patent that other people have done?

A No. I'm not sure what you -- ask your question. Did I ask for opinions that other people have done on the '601 patent?

Q Did you ask anyone to provide to you, for example, internal documents from the University that would bear on the scope of how they understand the '601 patent?

A I did not ask for that.

MR. MAYLE: Well, there's an

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

attachment. Just so you have the complete, there's an attachment to this document. It was produced separately, so I'll mark it separately.

(McLaughlin Exhibit No. 1019 was marked for the record.)

BY MR. MAYLE:

Q Exhibit 1019, you'll see it starts on -- Professor, will you confirm that what you're looking at starts with Bates number UMN 1058?

A Yes.

Q And it goes on until 1060?

A Yes.

Q Am I safe to assume you have not seen this document, either?

A I have not seen it.

Q And you see the title of it is the March 2009 Interim Report of the University of Minnesota, U.S. Patents Essential for Blu-ray.

A That's the title, yes.

Q And you see they identify Claim 13 of the '601 patent?

A Yes.

Q And then they give -- this third column of the first page, BD-RO Part 1 BFS.

Do you see that?
A Yes.
Q Do those letters and numbers mean anything to you?
A BD means Blu-ray disc. RO -- I can only guess what the rest means. But it does refer to Blu-ray.
Q That's probably -- do you think that's a standard -- certain Blu-ray standard?
MR. VERDINI: Object to the form.
THE WITNESS: It would not surprise me at all, that they're referring to sections of the standard.
BY MR. MAYLE:
Q Do you disagree with anyone who says that Claim 13 of the '601 patent is standard essential to Blu-ray disc technology?
A As I said before, '601 doesn't apply -- or applies to magnetic recording, so I disagree.
Q Professor McLaughlin, are you aware of any documents where Dr. Moon has indicated that Claim 13 is limited to magnetic recording?
A Other documents?
Q Have you seen any documents at all -- setting aside the patent and the way you interpret

the patent and the prosecution, have you seen any documents where Dr. Moon has stated or implied that Claim 13 of the '601 patent shouldn't be limited to magnetic systems?

A Could be some of the papers that he's written. I don't -- some of the other papers that he's written around MTR codes, he may have -- there may have been language in there that it's limited to. I don't remember. I've read several of those papers, but I mean, that might be considered part of the package that we're looking at.

So no other documents other than the patent and maybe some other papers that he had written. I think that's the gist of your question.

Q Right, I just wanted to know.

We just reviewed -- we've just went over a document that started in 1999 that said -- University internal documents that said we should target DVDs and DSLs, right?

A Uh-huh, yes.

Q And then in 1999 they sent a letter to Lucent talking about DVDs and DSLs, right?

A Uh-huh.

Q Then in 2002, Jae Moon said pay the issue fee because the patent has wide applicability to

DVDs, right?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q You saw that e-mail.

A Yup.

Q Right?

A Yes.

Q And then we saw in 2008, Jae Moon writes an e-mail and it says, hey, Claim 13 of the '601 patent reads on the Blu-ray disc standards, correct?

A Uh-huh, yes.

Q And then the University sent a letter to MPEG LA stating that they think that -- or the University took the position where Claim 13 covers the Blu-ray disc standard, right?

MR. VERDINI: Object to form.

THE WITNESS: Yes, we saw that document.

BY MR. MAYLE:

Q And then someone wrote back to the University on behalf of MPEG LA and said that Claim 13 covers several Blu-ray disc standards, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q So given this history of the University's positions, aren't you surprised to see how they're asking the court in this case to limit the claim to magnetic recording?

MR. VERDINI: Object to the form.

THE WITNESS: Not at all. I'm not aware of any of this -- all this is the first time I've seen all of it. It is really surprising to me that they were able to get that, given what it is I read with the patent, the prosecution history, the documents surrounding it. It was clear to me that that was the universe in which I was living and it's clear to me that it's directed towards magnetic recording.

Everything you've shown me is a surprise to me, I've never seen it before.

BY MR. MAYLE:

Q So all those people who came to a contrary conclusion, they just got it wrong, then, right?

A Yeah, I would say they got it wrong.

Q Okay. Even Jae Moon was wrong, wasn't he?

MR. VERDINI: Object to the form.

THE WITNESS: I -- yeah, it doesn't surprise me he would try to do something else, but, no, that -- it doesn't change any of my opinions.

BY MR. MAYLE:

Q Why would that not surprise you?

A I think people -- people try to take their patents and extend them beyond what they're originally intended for. That's what lawyers do, that's what inventors do, try to expand the scope of their inventions to try to license it, get some more money.

Q Do you think that's a fair thing to do for someone who has a patent, is to extend the patent past it's proper scope to get some --

A It doesn't --

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q Let me finish the question.

A Sure.

Q Do you think it's a fair thing to do for someone who has a patent to try to extend the patent

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

past it's proper scope in order to get some more money?

MR. VERDINI: Object to form.

THE WITNESS: Yeah, I think it's a fair thing to do. That's why I said it didn't surprise me. People do that.

BY MR. MAYLE:

Q Have you ever seen a patentee, then, that would to try to narrow the scope to avoid invalidity?

MR. VERDINI: Object to the form, foundation.

THE WITNESS: Yeah, I mean, that doesn't surprise me either. That's the process we're engaged in.

BY MR. MAYLE:

Q Do you think that's a fair thing for a patentee to do?

MR. VERDINI: Object to the form.

THE WITNESS: Do I think that's a fair thing for a patentee to do? Yeah, I think so.

BY MR. MAYLE:

Q Do you know if the claims are construed the same for infringement as they are for validity or can they be construed differently?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Say again, slowly.

Q So I'm asking if you know whether or not claims must be construed or should be construed the same way for purposes of infringement as for validity?

A Do --

Q I'm asking if you're aware of anything that would say that?

A Without reading more into it -- I think you're asking is there one construction that would apply to both.

Q Is that the way that claims should be construed? I'm asking if you --

A Yeah, there's one construction. That's the job -- that is my job is to take claim terms and try to elucidate them, irrespective of what -- whether it's for invalidity or whatever, that's my job.

Q So if the claims cover the Blu-ray standard, they cover optical systems, right? If?

MR. VERDINI: Object to the form.

THE WITNESS: Ask again.

BY MR. MAYLE:

Q If the claims are construed --

A Yes.

Q -- this is an if.

A Yeah.

Q -- to cover the Blu-ray disc standard, that must mean that the claims cover optical recording systems, right?

MR. VERDINI: Object to the form.

THE WITNESS: If they're construed to cover Blu-ray, then they cover optical disc. We're talking about construction; is that right?

BY MR. MAYLE:

Q Yes.

A Yes.

Q So that means that the claims are not limited to magnetic systems, right?

A If someone construed them that way.

Q All right. Let's go back to your opinions, Exhibit No. 1005. And let's go on. I think we've already hit part of recorded waveform.

MR. VERDINI: So can we go off the record for a second?

MR. MAYLE: Sure.

THE VIDEOGRAPHER: 12:04. We're off the record.

(Brief pause.)

THE VIDEOGRAPHER: 12:05. We're back on the record.

BY MR. MAYLE:

Q Professor, so we're now going to switch gears a little bit. What you'll need out for right now is your declaration, so keep that handy. And also then get back Exhibit 1004, which is what we submitted to the Court, the part we submitted to the Court. Just have both of those handy.

A That's the --

Q That's that chart. Okay.

So let's start with page 20 on your declaration. And we'll start with the section B, Recorded Waveform, and then Recorded Waveform, okay?

A Yes.

Q And you have listed UMN's proposed constructions where the recorded waveform is a waveform recorded to a magnetic recorded medium, right?

A Uh-huh.

Q And just keep that out and then flip back to Exhibit 1004. And page three of 1004.

A Yes.

Q And you see Recorded Waveform?

A Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q And here the University says that a recorded waveform is a continuous signal recorded on a medium, right?

A Uh-huh, uh-huh.

Q So isn't it true that the submission to the Court on Exhibit 1004 for recorded waveform is different than the UMN's proposed construction on page 20 of your declaration?

MR. VERDINI: Object to the form.

THE WITNESS: The words are different, I would say they mean the same thing. A wave form or continuous signal, I would say, is -- I'm happy with those, both of those.

BY MR. MAYLE:

Q Okay. So -- but on page 20 of your declaration, the recorded waveform would be a magnetic recorded medium, right?

A Uh-huh.

Q But on Exhibit 1004, it's just a continuous signal recorded on a medium. It doesn't say magnetic recorded medium, right?

A Correct, on this chart it does not say magnetic.

Q So that would be a material difference,

right?

MR. VERDINI: Object to the form.

THE WITNESS: Well, I mean -- material difference, I mean the context -- so the word magnetic is removed, the context is still magnetic medium. It just simplifies it a little bit.

BY MR. MAYLE:

Q Okay. We talked about earlier continuous signal.

A Yes.

Q We talked about that.

A Uh-huh.

Q So I don't want to -- let's go to paragraph 42 in your declaration. You start off with: As described above, the '601 patent discloses a coding scheme intended to reduce bit error probability through the j constraint, which limits the number of consecutive magnetic transitions.

Right?

A Yes.

Q When you say as described above, just in this paragraph 42, what are you referring back to? Do you remember?

A I assume there's somewhere in my declaration that talks about the purpose or purposes for the -- was around reducing error rate.

Q Okay. Fair enough. But then you -- after that sentence in paragraph 42, you cite again the specification at column two, 59, 61 and two, 40 to 42, right?

A Uh-huh, yes.

Q And we talked about those passages earlier, right?

A Yes.

Q And you remember that those were the passages cited at paragraphs 37 and 38 of your declaration, a page earlier?

A Go again. I'm sorry.

Q So paragraph 42, you cite column two, 59 to 61?

A Yes.

Q And column two, 40 to 42.

A Yes.

Q And that's the only thing you cite there, right?

A Yes.

Q That's the same citations to the spec that appear in paragraph 37 and 38?

A Correct.

Q Correct.

A Yup.

Q So in paragraph 42, there's nothing new, right?

MR. VERDINI: Object to the form.

THE WITNESS: I don't know what you mean by nothing new. We're -- have not cited different parts of the patent. So if that's what you mean by nothing new, I would agree with that.

BY MR. MAYLE:

Q Okay. Thanks. Let's go to paragraph 43. You say: Moreover, the only relevant waveforms referred to in the specification of the '601 patent are magnetization waveforms.

Do you see that?

A Yes.

Q What do you mean by the only relevant waveforms referred to in the specification?

A The wave forms that are being referred to in the specification are waveforms that are generated to be recorded on a -- on magnetic disc.

Q But you say the relevant waveforms. Are there other waveforms in the specification that are

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

not relevant, according to your opinion?

A I don't remember. I don't remember if there are other waveforms. I think relevant waveforms is just -- those are my own words. I wouldn't be surprised. It's just in the waveforms.

Q Okay. And then you dropped --

A I'm not sure I'm intending to relevant to -- distinguish or something.

Q Yeah. I'm just trying to understand what you mean.

A Yeah, I don't believe I am.

Q You drop a footnote five, right? Do you see that?

A Uh-huh.

Q In a quick summary, can you just tell us what you're trying to say in footnote five, why you've dropped this footnote five?

A That is just trying to distinguish the difference between a read-back waveform and a recorded waveform. I'm trying to say they're different things.

Q Well, let me ask you. Let's assume an ideal situation where there's no noise, the signal was recorded correctly and it was read back perfectly. Would the read-back waveform be the same

as the recorded waveform?

A I'm going to go technical on you. I mean, because of how the head works, it's not -- it depends on what type of optical disc that the read back -- the read back signal detects changes, not the actual waveform itself. So it -- yeah, it won't the same.

Q I think I understand. Let me change the question then. Thank you.

Let's assume that the device was using the an NRZI recording format and so it was recording ones for transitions and zeros for nontransitions. Would your answer be the same to the last question?

A Yes.

Q So the read-back signal would not be the same as the recorded signal?

A No. Again, the head is a differentiator. So whether you're using NRZ or NRZI doesn't matter. The head is a differentiator and all you'll see is blips where the changes are, not the actual, the waveform.

Q I understand.

Paragraph 44, let's go to that. You say that Claim 13 recites imposing a pair of constraints, j, k, on the encoded waveform, right? Do you see

that?

A Yes.

Q And then you say: In my opinion, a PHOSITA would understand the encoded waveform, one read in light of the specification, to be the recorded waveform.

A Yes.

Q That's your opinion, right?

A Yes.

Q When you say, when read in light of the specification, what do you mean by that?

A Just in the context of the -- in the context of the patent, is I think what I mean by that. Taking the patent by itself in that context.

Q Isn't it true that, outside of the claims, the phrase, the encoded waveform, is not even used in the specification of the '601 patent, right?

A That's correct. The encoded waveform does not appear in the specification, that term.

Q So when you say a PHOSITA would understand that the encoded waveform, in quotes, when read in light of the specification is the recorded waveform, what part of the specification are you talking about?

MR. VERDINI: Objection. Asked and

answered.

THE WITNESS: Ask me again. I'm sorry.

BY MR. MAYLE:

Q You say in paragraph 44 that a PHOSITA would understand, quote, the encoded waveform, unquote, when read in light of the specification, to be the encoded waveform.

A Uh-huh.

Q I want to know which specific part of the specification, if any, are you referring to in this sentence?

MR. VERDINI: Same objection.

THE WITNESS: The reading of the term encoded waveform happens in the claim. So when read, it's read in the claim and it's read in the context of the specification.

BY MR. MAYLE:

Q So -- thank you.

So the encoded waveform is recited -- those words are in Claim 13, right?

A Yes.

Q They're not anywhere else in the specification, right?

A Right.

Q And so when you put in this paragraph 44 the encoded waveform in quotes, and then you say, When read in light of the specification, are you talking about the claim or the specification, both, neither? What does that mean?

MR. VERDINI: Object to the form and asked and answered.

THE WITNESS: When you read the words encoded waveform, that's in Claim 13 or in the claims, and so the context in which that's read is in the entirety of the patent, in the entirety of the patent and in the entirety of the specification.

BY MR. MAYLE:

Q Right. So what we're trying to do here is figure out what the encoded waveform means, right?

A Yes.

Q And that's the term that's in the claim, right?

A Uh-huh.

Q And so I think you're saying that you used the specification to do this, correct?

A Uh-huh.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Yes?

THE WITNESS: Yes. Sorry.

BY MR. MAYLE:

Q In this paragraph 44, are you referring to any particular part of it? Are you setting out a general principle or are you saying something specific about what part of the specification a PHOSITA is looking at?

A I think I'm saying in general, in the entirety, in the entirety of the patent.

Q Okay. Let's go to paragraph 45. So now you're talking about Claim 13 itself again, right?

A Uh-huh.

Q And you say that the preamble --

A Yes.

Q The preamble of Claim 13 explains that the claim method -- bold -- encodes data words into code words in a, quote, recorded waveform.

That's what you say here, right?

A Yes.

Q And are you making any assumptions about how to use the preamble of a claim to interpret the body of a claim?

MR. VERDINI: Object to the form.

THE WITNESS: Ask again, please.

BY MR. MAYLE:

Q You mentioned the preamble of the claim in this sentence, and I just want to know if you're making any assumptions about how one should properly use a preamble of a claim to interpret the body of the claim?

MR. VERDINI: Object to the form.

THE WITNESS: I don't think I'm making any assumptions. And if you're getting towards a legal, I don't know the legal piece of that. I'm just saying, hey, preamble. I know there's a preamble, it's making some words, it's kind of setting it up -- setting up the rest of the claim.

BY MR. MAYLE:

Q Thank you.

And when you bold, italics encodes, why did you do that?

A I was looking at that. I'm like, why did I do that? Honestly, I don't remember.

Q Okay. Then you -- so you say something about the preamble and then you say: Thus, the recorded waveform must comprise encoded code words.

Do you see that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Uh-huh, yes.

Q So can you help me connect the dots between the first sentence and Thus and then the conclusion. What's the thought process there?

A So maybe the -- there's an encoding process that -- there's an encoding process that takes bits and puts them onto a waveform. And so that's probably that process. The preamble talks about a recorded waveform.

So I guess it's emphasizing the things that are said in the -- you know, in the preamble. So thus the recorded waveform must have the encoded code words. I think that's pretty clear.

Q So are the encoded code words -- well, code words are binary, right?

A Yes.

Q So when you say that the recorded waveform must comprise encoded code words --

A Uh-huh.

Q -- are you saying that the recorded waveform is binary?

MR. VERDINI: Object to the form.

THE WITNESS: No, I'm not saying that. I'm saying that the recorded waveform has embedded in it bits. It's

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

representative of the bits. The recorded waveform likely is two valued, is one of two -- one of two values. So in that sense it might be considered binary, but it's not considered binary in a bit form.

BY MR. MAYLE:

Q You used that word that -- I think they used the word representative. Is that what you're saying, that the recorded waveform is representative of the code words?

MR. VERDINI: Object to the form.

BY MR. MAYLE

Q Sorry. I don't want to mischaracterize you.

A No, I think that's fine. When it says -- like that's about the same as when I'm saying must comprise encoded code words.

Q So if I changed this -- if you said, Thus the recorded waveform is represent -- it represents the encoded code words, is that synonomous of what you're saying here?

A I'm good with that.

Q But just to be clear, you agree that the recorded waveform and the code words are not literally the same thing?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Object to the form.
THE WITNESS: Encoded code words and waveform are not the same -- they are not the same thing, but they -- one -- the waveform is representative of the bit -- of the code bits.
BY MR. MAYLE:
Q And let's say there's a waveform coming out of the encoder, an analog signal that's going to the write head and eventually will be written as bits on the magnetic disc.
A Uh-huh.
Q I think we've alluded to this before. But let's say while we're -- a waveform traveling to the write head. It?
A Uh-huh.
Q It hasn't hit the disc yet. Are you calling that the encoded waveform or the recorded waveform or both?
A Both.
Q You're saying it's the same thing?
A Exactly.
Q And let's say if we look now with the platter, and those magnetic -- particles; is that what we called them?

A That's fine.

Q Call them magnetic particles. Is that a magnetic waveform, too?

A It's not a waveform. Those are particles oriented on the disc. It's not a waveform.

Q That's not the waveform.

We talked about transitions for a while. Are the transitions in the recorded waveform?

A The recorded waveform has transitions in it and those are realized on the disc as transitions in the magnetization pattern.

Q Let's not -- let's do it with real eyes next, but where are -- the transitions, as you understand that term and you understand recorded waveform.

Where are the transitions -- as you understand that word transitions -- where are they actually located?

MR. VERDINI: Object to the form.

THE WITNESS: Transitions on the disc.

BY MR. MAYLE:

Q So are the transitions in the recorded waveform or not?

A There are transitions in the recorded

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

waveform, but the transitions in the claim are referring to the transitions on the disc, the transitions in the magnetization pattern.

Q The transitions in the claim are --

A That's the only way to realize the recorded waveform is the transitions on the magnetic disc.

Q So the transitions in the Claim 13 under your understanding, the transitions are on the disc, right?

A Yes.

Q But the recorded waveform is not on the disc; is that right?

A Correct. Waveforms not on the disc. It's the -- what's on the disc is the domains that have been magnetized d.

Q Let's go back to the Claim 13 again.

A I'm sorry.

Q The patent, yeah. It's Exhibit 1.

I'll direct your attention to the generating step. It says: Generating no more than j consecutive transitions of said sequence in the recorded waveform.

Right?

A Uh-huh.

MR. VERDINI: Yes.

BY MR. MAYLE:

Q Yes?

A Yes, uh-huh.

Q So can there be an interpretation on the one hand of the word transitions and an interpretation on the other hand of the word recorded waveform such that if those interpretations are both accepted, that the transitions would not be in the recorded waveform?

Do you understand what I'm saying?

A No, I'm sorry.

Q So I think you're saying that the way you interpret transitions, those are on the disc physically, right?

A Uh-huh, yes.

Q And you're saying that the record -- the way you interpret recorded waveform is not on the disc, correct?

A The recorded waveform, that's the waveform that's sitting at the head and those transitions and that waveform are going to be realized in transitions on the magnetic disc.

Q All right. I want to stay away from realized for a minute and just answer the simpler

question.

The way you understand recorded waveform, in your opinions, that recorded waveform is actually not on the disc, correct?

MR. VERDINI: Object to the form.

THE WITNESS: That's the waveform that produces the transitions, yes.

BY MR. MAYLE:

Q And that waveform is not on the disc, correct?

A Correct.

Q Okay. But the transitions are on the disc, correct?

A Transitions are on the disc.

Q So when the claim says transitions in the recorded waveform, how can you reconcile that claim language with your opinion that the transition is on the disc but the recorded waveform is not on the disc?

A The waveform has transitions on it that correspond directly to the transitions on the disc. There's a one-to-one correspondence. For every transition in the waveform, in the recorded waveform that's sitting at the head, there will be a transition on the disc.

Q So could we write this claim that says no more than j consecutive transitions corresponding to the transitions in the recorded waveform? Would that be what you're saying?

MR. VERDINI: Object to the form.

THE WITNESS: Say that again, please.

BY MR. MAYLE:

Q So are you effectively -- if I rewrote this claim in a certain, I want to see if it's consistent with what you're saying.

If I wrote, no more than j consecutive transitions, corresponding to the transitions in the recorded waveform, if I introduced this concept of corresponding, is that effectively what you're saying?

MR. VERDINI: Object to form.

THE WITNESS: I'm good with that, yeah. I'm good with that.

BY MR. MAYLE:

Q So yes?

A Yes.

Q So you're saying that the transitions in whatever you're calling the recorded waveform are not literally the transitions that are on the disc,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

right?

MR. VERDINI: Object to the form. Mischaracterizes his testimony.

THE WITNESS: Ask again, please.

BY MR. MAYLE:

Q Is it true that under your understanding of recorded waveform, whatever, quote, transitions are in a recorded waveform are not literally the same as the, quote, transitions that would be on the disc?

MR. VERDINI: Same objections.

THE WITNESS: I'm saying they are the same. That for every transition there is in the recorded waveform there's a transition on the disc too.

BY MR. MAYLE:

Q But the transition on the disc would be physical transitions between magnetic particles, right?

A Yes.

Q Those magnetic particles live on the disc, right?

A Uh-huh.

Q And they don't live anywhere else in the hard disc drive, right? They're not in the, for example, chip, encoder chip, right?

A Correct.

Q And they're not on any current that's going to a write head, correct?

A Uh-huh, correct.

Q So I'm just trying to get simple facts straight.

That whatever those transitions are, are not the same as what you're saying the transitions in the recorded waveform are, correct?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Yeah, I answered the same as before. The transitions on the disc, there's a corresponding change in the magnetic waveform and the recorded waveform that produces that transition on the disc.

BY MR. MAYLE:

Q Okay. The concept of what produces what, let's set that aside. I just want it simple. This is factual, so I'm just trying to understand your position.

The transitions that are on the disc --

A Uh-huh.

Q -- are not physically the same thing as

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the transitions in the recorded waveform, right?

MR. VERDINI: Object to the form.

THE WITNESS: They're not physically the same, but there a one-to-one correspondence between them.

BY MR. MAYLE:

Q And the reason that they're not physically the same is that the transitions on the disc are magnetic particles and what you're calling the transitions in the recorded waveform is some kind of current or voltage, right?

A The -- yes; the changes -- the change from a high to a low in the recorded waveform produce a transition in the disc. The transition in the disc is particles. The changes from high to low in the recorded waveform are voltages.

Q Voltages. Okay. So are the --

A But there's a one-to-one correspondence.

Q Let's say I set a hard disc drive here, a real one, plugged in, and I tell you, hey, this -- I'm practicing Claim 13. And I asked you -- let's assume that it does practice Claim 13, under your understanding. And.

I say, It has j consecutive transitions. And would you -- would that mean that I'm talking

about j consecutive high-low voltages or am I talking about j consecutive transitions on the disc of the magnetic particles?

MR. VERDINI: Objection to form.

THE WITNESS: It has to be the j consecutive transitions on the disc because that's -- that's the purpose of the invention. You can't realize the invention unless you talk about transitions on the disc, period, in the magnetic.

BY MR. MAYLE:

Q So would the number j of the high-low voltages be the same as the number j as the transitions in the -- on the disc?

MR. VERDINI: Object to the form.

THE WITNESS: That's the one-to-one correspondence I'm talking about.

BY MR. MAYLE:

Q In number? So if there was five high-low voltages, there would be five magnetic flips, right?

A Yeah, that's the exact correspondence I've been talking about.

Q That's what I'm trying to drill at. You're just saying in number, but they're different

things?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, the one -- the magnetic transitions we talked about are the magnetic domains, and the changes in voltage are the changes in voltage. But for every one in the waveform, there would be one on the disc. You can't realize -- you can't realize the invention without the transitions on the disc.

BY MR. MAYLE:

Q Okay. And then we run that and we record -- let's say we record an MTR waveform on the disc, as you understand it, and then we unplug it, and there's no power left. There would still be a record on the disc, right?

A Uh-huh, yes.

Q Has the recorded waveform gone away or is it still there?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, the recorded waveform has gone away.

BY MR. MAYLE:

Q It's gone away?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Uh-huh.

Q And that's because the recorded waveform, in our simple example, would be the voltage signal that goes to the write head?

A That's the waveform. What's on the disc is magnetic domain. It's not a waveform.

Q It's not a waveform. So it's not a recorded waveform or an encoded waveform, right?

MR. VERDINI: Object to the form.

THE WITNESS: It's the pattern of magnetization on the disc. It's a domain. It's not a waveform.

BY MR. MAYLE:

Q So let's go to 46 real quick. You said that the -- in line seven, you refer to the antecedent "the".

Do you see that?

A Uh-huh.

Q You say: By using the antecedent "the," a PHOSITA would understand that the encoded waveform is previously referred to in the claim.

Right?

A Uh-huh.

Q Now, are you basing that statement on some point of law that someone told you, or are you

assuming something?

MR. VERDINI: Object to form.

THE WITNESS: I don't -- I don't know about the law. Well, maybe I don't know enough about patents.

When you say the encoded waveform, it's referring to something else that it had to have been mentioned before. I think that's the antecedent basis. So you go and look for where that is.

BY MR. MAYLE:

Q And then you will always find it, correct?

A Yeah.

Q Let's go on to the paragraph 47.

A When you say you'll always find it, it's there. It's there to be found.

Q Is your going-in proposition that when I see the antecedent "the" in a patent, I'm assuming that I will be able to find the antecedent earlier in the claim or somewhere?

MR. VERDINI: Object to the form.

THE WITNESS: I think it's written in a way where it's there to be found.

BY MR. MAYLE:

Q That's not my question. I'm not talking about this particular. I'm just saying when -- I'm trying to get a sense of how you do this.

In general, if you see "the" X in a patent claim, are you then assuming that there must be some previous antecedent basis for X?

A Yes. Yes.

Q And you don't ever assume that maybe there's not an antecedent basis, do you?

MR. VERDINI: Object to the form.

THE WITNESS: No, I think you assume that there is, that it's there to be found.

BY MR. MAYLE:

Q Okay. Let's look at paragraph 47. You talked about the prosecution, right?

A Uh-huh.

Q You say that the prosecution history supports UMN's construction, right?

A Uh-huh.

Q So let's -- before we see this, so let's look at the prosecution real quick. I think you have it already from the morning. It's probably Exhibit 2, 1002. Do you have that?

A Yes.
Q And you see on the bottom right-hand corner there it says LSI Corp Exhibit 1006?
A Yes.
Q And I'll just tell you, it is Exhibit 1006 because we've used this in the IPR. You know what the IPR is, right?
A Yes.
Q So let's flip back to page, let's say, 59. And you see where it says Amendment? You see it says: In response to an office action, an amendment to the patent has --
A I just want to see where you are.
Q Kind of in the middle. I'm just making sure we're on the right page. Amendment.
A Page 59.
Q Yeah, above in the claims it says Dear Sir.
A Oh, amendment. Yeah.
Q Right. So he's responding -- so you remember there was an office action, right?
A Yes.
Q And the examiner rejected the claims, right?
MR. VERDINI: Object to the form.

THE WITNESS: Yes, I believe so.

BY MR. MAYLE:

Q Well, it looks that way, right?

A Yes.

Q Fair?

A Yeah.

Q Let's flip to the -- well, on this first page, 59, you see Claim 1, it says Once Amended?

A Yes.

Q And then, if you go to the next page, it has some underlined text?

A Yes.

Q You see stuff is underlined. And then below that Claim 13, it says Once Amended and there's something underlined?

A Yes.

Q So would you understand that the underlines are the stuff that was added to the claim?

A I believe, yes.

Q So if we look in Claim 1 it says -- we have five minutes and we'll finish on this -- means of imposing a pair of --

A We're looking where? On the patent or --

Q Stay in the prosecution on page 60 on the

top.

A Yes.

Q In Claim one, and you see they put in, means for imposing a pair of constraints, j, k, on the encoded waveform?

A Yes, uh-huh.

Q And it continues on and the fourth line says: Periods of the encoded waveform.

So they make reference to the encoded waveform twice, right?

A I'm not trying to hassle you. You're going too quickly and my eyes don't move that quickly.

Encoded waveform, you're pointing to that first one.

Q Right.

A And then you're pointing to encoded waveform above and encoded waveform here.

Q Right. So they're both underlined, right?

A Correct.

Q So they've added it to Claim 1, right?

A Yes. Two uses of the encoded waveform.

Q Correct. Exactly. And if you look on the part that's not underlined, encoded waveform is

not there in Claim 1, right? So it's been added.
See if you can agree with that.
A Correct, yes.
Q Let's look down to 13, there's less added. You see in Claim 13 they have, Imposing a pair of constraints, j, k, on the encoded waveform.
That's all underlined, right?
A Yes.
Q And would you agree that encoded waveform is within that underlined phrase?
A Yes.
Q And it wasn't otherwise in Claim 13, right?
A It's been added.
Q It's been added?
A Yes.
Q Okay. And do you know what the purpose of this -- these -- let's just stick with Claim 13.
Do you have any sense of what the purpose of this amendment is for?
MR. VERDINI: Object to the form.
THE WITNESS: I'm sorry, I don't remember off the top of my head what it's referring to.
It's referring to something that

the examiner didn't like or wanted changed or made a suggestion and this is in response to that.

BY MR. MAYLE:

Q And your opinion is that the encoded waveform is the same as the recorded waveform, right?

A Yes.

Q So if I -- if I took out this part that's been added and just deleted it back, do you think that the Claim 13 would still have the same meaning that you give it in your opinion?

MR. VERDINI: Object to the form. What are you deleting out? The whole thing?

MR. MAYLE: The whole thing. The part that's underlined.

THE WITNESS: The imposing part.

BY MR. MAYLE:

Q Yeah, let's just erase that. So Claim 13 goes back to the way it was before.

Would that claim have -- any of the terms have a different meaning?

A Can you please ask your question again? Before you're asking say remove that and has anything changed.

Q If I remove the imposing step all the way to the encoded waveform, the part that's underlined on page 60 here, would that change the meaning of the claim according to the way that you've interpreted ed the claim?

MR. VERDINI: Object to the form.

THE WITNESS: I don't think so. I think removing it would be okay in terms of interpretation of the claim.

BY MR. MAYLE:

Q Okay. Let's look at Claim 13. If you would flip back for a second to the page prior, page 59. You see how Claim 1 starts with apparatus?

A Uh-huh.

Q And you remember Claim 13 starts with a method?

A Yes.

Q So do you know what the difference is between an apparatus and method claim, generally?

A Generally, yes.

Q And you see in the apparatus claim, Claim 1, you see four lines down it says: Receiver means for receiving?

A Uh-huh.

Q Have you ever seen that word, means for

-- the phrases means for in a patent?

A Yes, I have.

Q Are you familiar with that, what it means?

A More or less.

Q And do you understand that it means that when they're specifying an element by a function in a claim that they're referring back to the structure in the specification that could do that function?

Is that your understanding?

MR. VERDINI: Object to the form.

THE VIDEOGRAPHER: We have one minute left, sir.

MR. MAYLE: So there's only one minute. We'll just hold there. We'll come back to that.

THE VIDEOGRAPHER: 12:41. We're off the record. This is the end of media number three.

(Brief pause.)

THE VIDEOGHRAPHER: 1:32. We're back on the record. This is the beginning of media number four.

BY MR. MAYLE:

Q Good afternoon, Professor. How are you?

A Just fine.
Q Did you have a chance to have lunch?
A Yes.
Q Did you talk to your lawyers about the substance of your testimony during the break?
A No.
Q Just to refresh our memory, I think we were talking about your interpretations of the encoded waveform and the recorded waveform before the break, right?
A Okay, uh-huh.
Q And we were talking about -- I think when we left off we were talking about the prosecution history. And you remember that Claims 1 and 13 were amended --
A Yes.
Q -- during prosecution?
A Yes.
Q So let's look back at that again, at Exhibit 1002, which is the prosecution. We'll go back to your declaration in a moment.
A The prosecution history. Okay.
Q Yes, if you flip to page -- remember, we were on page 59 and 60?
A Okay, yes.

Q And we'll just go to that again. If you look at Claim One, starting on 59, remember it has those words, receiver means for receiving, means for? Do you remember we talked about that before the break?

A Yes.

Q And I think that you said that you had been somewhat familiar or had at least heard of or seen in a patent the words -- those words like means for; is that right?

A Yes.

Q And would your understanding of that have something to do with the fact that someone could claim -- claim a means or a step for doing something without reciting the structure in the claim, but then you would be allowed to look back in the specification to see what the structure was? Is that generally how you understand that?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: I'm afraid I'd have to ask you to repeat.

BY MR. MAYLE:

Q Well, let me ask you a different way.

When it says receive -- encoder --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

receiver means for receiving that word?

A Yes.

Q So that claim is just reciting some sort of a function and it's just calling it a means, correct?

MR. VERDINI: Object to the form.

THE WITNESS: The ability to do that, to perform that function or something like that. That's how I --

BY MR. MAYLE:

Q Correct. And I want to now go back to your -- keeping in mind that Claim One has these means for language and it's an apparatus claim, if we go back to your declaration, which is Exhibit 1005, at paragraph 47?

A Uh-huh.

Q The reason I looked into the prosecution is because in paragraph 47 of your declaration, you -- you cite the prosecution history, correct?

A Yes.

Q And you say that the prosecution history also supports the University's proposed constructions of recorded waveform and encoded waveform, correct?

A Yes.

Q And you cite this page UMN_750 Bates

number in your paragraph 47, right?
A Yes.
Q Let's look at -- you have a text box, you have a cut and paste from the prosecution, right?
A Uh-huh, yes.
Q And it starts off: In sharp contrast to Kitani, the present invention provides an apparatus.
Do you see that?
A Yes.
Q Now, you remember that Claim One is an apparatus claim, right?
A Correct, yes.
Q And Claim 13 is a method claim, right?
A Yes.
Q And if you look on this call-out, on paragraph -- do you need to look at the prosecution?
A No, I'm good.
Q If you look at this call-out on paragraph 47 of your declaration, let's see, down to -- let's say, line 18, you see means for receiving?
A Yes.
Q And then you see on line 19, encoder means?
A Yes.
Q So this part that you've cut and paste

from the prosecution into paragraph 47 of your declaration, that's talking about Claim One, isn't it?

MR. VERDINI: Object to the form.

THE WITNESS: I see that call-out is referring to means. I don't -- I don't recall or know that it's directly reporting to One, but I do get your point that it's referring to means.

BY MR. MAYLE:

Q It's also referring to an apparatus, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And if you see -- let's look at line 21 here. You see it says: The j constraint is defined as the maximum number of consecutive transitions allowed on the clock -- on consecutive clock periods in the encoder waveform.

Do you see that?

A Yes, uh-huh.

Q I'd like you to compare that language with the prosecution on page 60 with the amendment to Claim One.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Okay.

Q So would you agree that, in paragraph 47 of your declaration where you're citing the prosecution history, that the person who wrote this was referring to the amendment to Claim One of the '601 patent, right?

MR. VERDINI: Objection to form. Foundation.

THE WITNESS: You're pointing out something that makes sense. I'm just --

BY MR. MAYLE:

Q So you would agree that there -- it's referring to Claim One, right?

MR. VERDINI: Object to form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And would you -- well, let's look at page 60 of this prosecution. You notice that in Claim One there was five lines of text underlined, added?

A Yes.

Q And in Claim 13 there was only one line of text that was added?

A Yes.

Q And you see up in Claim One there is a -- there's verbiage in Claim One, as amended, wherein

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the j constraint is defined as the maximum number of consecutive transitions allowed on consecutive clock periods in the encoded waveform to facilitate the reduction of a probability of a detection error in said receiver means.

That's what that says, right?

A Yes.

Q And that language -- would you agree that that language was not inserted into Claim 13 as amended?

A Correct, that's not inserted.

Q And so, in your opinion, does that difference in language have any difference -- give any difference in meaning to the two claims?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: Please, could you ask the question again?

BY MR. MAYLE:

Q In other words, Claim One has some verbiage wherein the j constraint is defined as, and then it gives a definition, correct?

A Yes.

Q That definition was not recited in Claim 13 as amended, correct?

A It's not -- it was not added to Claim 13. It's not -- it was not added to Claim 13, it's not one of the underlined, but the kind of definition of j was already in Claim 13.

But you're -- if the question you're asking, was it added, it was not added to Claim 13, but it was already in 13.

Q And it was in 13 because you've interpreted something along those lines; is that what you're saying?

MR. VERDINI: Object to the form.

THE WITNESS: I'm saying, you know, generating no more than j consecutive transition in the sequence, that, to me, is referring to what j really means. It's trying to shed light on what j means, which I think is what the underlined amendment in Claim One was trying to do.

BY MR. MAYLE:

Q And are you saying that, in Claim 13, there already is a step -- in existing Claim 13 there already was a step of generating no more than j consecutive transitions of said sequence in the recorded waveform such that j is greater than or

equal to two?
A Yes.
Q So are you saying that whatever that means was already there and, therefore, whatever they added in Claim One did not have to be added in Claim 13? Is that what you're saying?
A I don't think so.
Q So Claim 13 -- let's just do baby steps then. It doesn't literally contain the text. I mean, we can interpret it in, but it doesn't literally say, the j constraint is defined as X, Y, Z?
A That's correct.
Q Correct. And it also doesn't say anything about the reduction of a probability of detection error in the receiving means, right? It doesn't mention that expressly?
A In 13, correct.
Q They did put that in Claim One, right?
A Yes.
Q And are you saying that -- I'm not trying to mischaracterize. I'm just trying to understand what you're saying.
Are you saying that they didn't need to add that additional material in Claim 13 because

Claim 13 somehow already embraced that material; is that what you're saying?

A At least the j consecutive transitions piece.

Q Okay. So let's look up to Claim One, the part that's not underlined right below it.

It also already said: Said sequence is generating no more than j consecutive transitions in the recorded waveform such that j is an integer greater than or equal to two.

Correct?

A Yup, uh-huh.

Q That's essentially almost the same as --

A Yes, uh-huh.

Q We're talking over each other a little bit.

So that part I just read to you in Claim One, that was there before the amendment, was essentially already also in Claim 13 before the amendment, correct?

A Yes.

Q And so would you interpret these -- and back to Claim One, if that language was already there, wouldn't that mean, to you, that the part that was added, the underlined verbiage, must be adding

some other subject matter to the claim?

MR. VERDINI: Object to the form.

THE WITNESS: That makes sense.

That makes sense to me. I agree with that, yeah.

BY MR. MAYLE:

Q You agree with that?

A Yeah.

Q Okay. Then it would logically follow that what was added to Claim One in the underlined part was not added to Claim 13, correct?

MR. VERDINI: Object to the form.

THE WITNESS: It was not added to Claim 13, yes.

BY MR. MAYLE:

Q So then one could conclude that Claim 13, the j constraint in Claim 13 does not have the same exact meaning as the j constraint in Claim One, correct?

MR. VERDINI: Object to the form.

THE WITNESS: No, I do think they have the exact same meaning.

BY MR. MAYLE:

Q Well, in Claim One they add the text where the j constraint is defined, blah, blah, blah,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

correct?

A Uh-huh.

Q That part -- the j constraint is defined and the blah, blah, blah, the underlined part -- was added in Claim One, correct?

A Uh-huh.

Q An it was not in Claim One before that, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Correct.

MR. VERDINI: And asked and answered.

THE WITNESS: Correct.

BY MR. MAYLE:

Q It was also not in Claim 13, correct?

A Correct.

Q And it still is not in Claim 13, correct?

A Correct.

Q So therefore, wouldn't it be reasonable to conclude that the additional matter in Claim One -- starting at Wherein the j constraint is defined as, and ending to the underlined text -- is in Claim One but is not in Claim 13?

A It's -- it is -- it definitely is not in Claim 13.

Q So wouldn't that mean that the j constraint -- the definition of the j constraint that's actually written into Claim One is not -- should not be the same definition that we should give the j constraint in Claim 13, right?

MR. VERDINI: Object to the form.

THE WITNESS: No, I think it -- it's saying that -- the j -- the language in amended One and 13 that says the said sequence is generating no more than j consecutive transitions, that's the same in both. In Claim One they're illuminating what the j is, they've given the definition.

If you ask me, the definition is already in the Said Sequences portion the definition is already there, and it's illuminating the purpose of the j constraint.

Q So if the definition --

A It's the same j constraint. It's the exact same j constraint.

Q So if the definition -- I think you just said that the definitions that were added were already in Claim One, correct, through another

phrase? You've interpreted it in?

A Yes.

Q So that could mean then I could erase everything that was added in Claim One without changing the meaning of Claim One, according to your interpretation, correct?

MR. VERDINI: Object to the form. That mischaracterizes what he said.

THE WITNESS: I don't remember all the context, but, for me, it seems like that -- what would make sense to me is, is that underlined portions in the amended Claim One are intended to illuminate or reemphasize what the j constraint is and what it is for. That's the way I read it.

BY MR. MAYLE:

Q Do you think that the -- you're using the word illuminate and reemphasize.

Do you think that the underlined portion in Claim One is adding anything new to Claim One that wasn't there before?

MR. VERDINI: Object to the form.

THE WITNESS: It appears to be telling the reader why there's a need for

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

a j constraint. Well, the purpose of the invention was to facilitate a reduction in the probability of detection error. So the -- when the author, inventor, whoever it is, put that in felt like that that was necessary to illuminate the purpose or to overcome some objection or some comment from the examiner.

So that seems to be intentional and purposeful and so, as a result, necessary.

BY MR. MAYLE:

Q Do you think that this added material in Claim One makes Claim One easier to understand to a PHOSITA?

MR. VERDINI: Object to the form.

THE WITNESS: I'm not sure it makes it easier to understand, but it illuminates the purpose, so -- it illuminates the purpose. So does that make it easier to understand?

It doesn't seem to add anything to the functionality of what it is you would build to implement it, but the illumination seems to be really

purposeful and needed.

It must -- again, I'm answering outside the context of maybe what the -- what the examiner said --

BY MR. MAYLE:

Q Okay.

A -- that caused this to go in. So, I mean, maybe the examiner -- we can go back through it -- is saying this was need and the author put it there, inventor put it there for that reason.

Q Let's flip back to page 52 in the prosecution. And now we're on LSI Corp page 52. And you see it's something coming from the patent office and it says, Date Mailed 9/16/97. Do you see that?

A Yes.

Q Top right. It's under the examiner's name.

A Oh, yeah. Uh-huh.

Q It has a date mailed 9/16/97.

A I saw it. Yeah.

Q And then you see the next, look on page 53, it says Office Action Summary?

A Yes.

Q Are you familiar with the term Office Action?

A Yes.

Q This is the office action from the prosecution history, right?

A Yes.

Q You've seen this at one point, right?

A Yes.

Q And you see that, on this page 53, there was Claims One to 21 that were pending?

A Yes.

Q And do you see that Claims One to Five, Ten, 13 to 17 and 20 are rejected?

A Yes.

Q Let's flip to page 54. And do you see as Detailed Action, right? Do you see that, Professor?

A Uh-huh, yes.

Q And in paragraph one he quotes something called 35 USC 102?

A Yes.

Q You're familiar generally with 102, at a high level? I don't want a legal treatise.

A I'm not -- at one point I'm sure as I -- I can't even come close to summarizing what it is right on the spot here.

Q Have you heard of the concept of anticipation in a patent?

A Yes.

Q And do you generally understand that means that there was something in the prior art that taught exactly everything that was being claimed?

A Yes.

Q Correct?

A Yes. That's what 102 is about. It's about anticipation.

Q Correct.

A Okay.

Q And as opposed to section 103, which is about obviousness. Have you heard of obviousness?

A Yes.

Q So the examiner is talking about section 102, right?

A Yes.

Q And you see in paragraph two he says Claims One to Five, Ten, 13 to 17 and 20 are rejected under 35 USC 102(b) as being anticipated by Iketani -- however you say that -- patent number 4,760,378, right?

A Yes.

Q And so he's rejecting, among other claims, Claim One and Claim 13, right?

A Yes.

Q The claims we were just talking about, right?

A Uh-huh, yes.

Q And the examiner says that those claims, including Claims One and 13 as written, read on the well known method of channel encoding where m-bit data words are encoded to n-bit code words, with n greater than m, such that there is a minimum physical distance between level transitions in the encoded data to facilitate subsequent protection at a maximum physical distance between level transitions to facilitate synchronization, i.e., d and k constraints.

Right?

A Okay.

Q And the examiner says that Iketani has that, right?

A Yes.

Q And you can read to yourself the rest of paragraph two.

A Okay.

Q And the examiner is saying the claim language that was in there, and he's -- would you agree that he's quoting Claim One here: Generating no more than j consecutive transitions in the

recorded waveform such that j is an integer greater than or equal to two?

That's the bottom two lines?

A Yes, uh-huh.

Q He's quoting Claim One?

A Okay.

Q And the Claim 13 had language that was highly similar to that, wasn't there?

A Yes.

Q Like when it said greater than or equal to two, it used the mathematical greater than or equal to symbol?

A Yes.

Q For some reason, they spelled out greater than or equal to in Claim One, right?

A Uh-huh, yes.

Q But otherwise, those claims were similar, at least with that claim limitation?

A Yes.

Q And the examiner is saying that a d-equals-one constraint in NRZI format would satisfy that claim limitation, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yes. Yes.

BY MR. MAYLE:

Q And so he's saying -- the examiner it seems -- is it fair to say he's not treating Claim One and Claim 13 differently with respect to the reason for rejecting the claims?

A It seems he's treating them the same.

Q Okay. So before when I asked you about the amendments to Claim One and 13, you said, well, I wasn't sure of the context, perhaps the examiner had required something different between these two claims. Do you remember that?

A Yes.

Q So that's not case, right?

A Seems like they're the same, yes.

Q So, for some reason, Claim One has five lines of amended text in response to the office action on page 60, but Claim 13 only has one line of text, right?

A Uh-huh, yes.

Q And so now that you have more context, wouldn't it be fair to say that a PHOSITA would read this and would potentially interpret the j constraint in Claim One as amended as having a slightly different meaning than the j constraint in Claim 13 as amended?

MR. VERDINI: Object to the form.

THE WITNESS: No, I'm afraid I wouldn't agree with that. The patent talks only about one j constraint. In fact, I would say the exact opposite.

I would say a PHOSITA, after having read Claim One and heard this language about what -- the definition of j constraint and why it's being used, and going to Claim 13 and seeing j again, saying -- probably asking the question, geez, I wonder why that wasn't -- that additional language wasn't in there, but there's only one j, there's only one language around consecutive transitions, recorded waveform such that j is an integer greater than or equal to two.

That's in both. And that kind of illumination or explanation around the j constraint, I think a PHOSITA, for sure, would see that as applicable to 13, as well. I have no doubt about that.

BY MR. MAYLE:

Q So could we, as a thought experiment, take the added material from Claim One -- could we

write into Claim 13, quote, wherein the j constraint is defined as the maximum number of consecutive transitions allowed consecutive clock periods in the encoded waveform to facilitate the reduction of a probability of a detection error in receiving, unquote?

Could we write that quote into Claim 13 without changing the meaning of Claim 13?

MR. VERDINI: Object to the form.

THE WITNESS: That seems perfectly logical to me to do that. And as a -- as a technical matter, the fact that it was illuminated in another claim, because it applies to the exact same thing, writing it into Claim 13 seems completely logical to me.

BY MR. MAYLE:

Q Well, let me ask you, when you say it applies to the exact same thing, it applies to the exact same thing only if you construe different text to mean the same thing, correct?

MR. VERDINI: Object to the form.

THE WITNESS: If there's differences in constructions in One and in 13 for which that's -- for which

that's relevant -- actually, that -- it's a hypothetical, but I think I see where you're going and it makes some sense, but I think --

BY MR. MAYLE

Q I --

A I think --

Q Sorry. I didn't mean to ask a hypothetical. I'm just trying to get to your methodology of how you construe claims so I just can understand it, is there a chance.

And you've said that the reason that the added text in Claim One could be written in Claim 13 without changing the meaning of Claim 13 is because the claims are describing the same exact thing; is that right?

MR. VERDINI: Object to the form.

THE WITNESS: That portion of the claim's talking about the same thing. It's talking about the j constraint.

BY MR. MAYLE:

Q And --

A I don't know what is above there or below. But I mean, clearly this portion is talking about the j constraint. The underlined text in Claim

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

One is just illuminating. It doesn't seem to be describing any other functions. It's redefining what J is and then it's saying, hey, here's what j is all about, here's the purpose.

And the definition of j in 13 is the same. And so illuminating it makes sense to me, for the same reason.

Q Are you familiar with the concept of a dependent claim and an independent claim?

A Yes. Yes.

Q And briefly, can you just tell us without a legal treatise if --

A I'm sorry, I couldn't give a legal treatise.

Q No, I just want your brief understanding.

A A independent claim is a claim that more or less stands on its own and separate. A dependent claim either illuminates or gives more information about a independent claim or specifies certain values, or something like that, in the original claim, but everything is inherited from the independent claim.

Q Okay. That's close enough. A plus.

Claims One and 13 are both independent claims, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A I know 13 is. Yeah, I guess One is an independent claim, by definition.

Q And so, as you say, they stand on their own, correct?

A Yes.

Q So is there -- are you making an assumption that two independent claims that use words that overlap are describing the exact same thing?

MR. VERDINI: Object to the form.

THE WITNESS: One is a method and one is an apparatus claim. And so they may describe the same thing, but they go after -- whereas hardware means the ability. So I mean --

BY MR. MAYLE:

Q Okay. Say --

A But they might say the exact -- they might be describing the exact same function or same technology or whatever. One is --

Q Setting aside the difference. That's a good point, apparatus and method. Let's just stick with j constraint.

Both independent Claim One and independent Claim 13 recite the phrase -- actually, they don't.

So Claim 13 says imposing a pair of constraints, j comma k -- or j semicolon k, right?

A Yes.

Q A pair of constraints. Claim One says imposing a pair of constraints, and then it has a wherein clause where it defines the j constraint, correct?

A Correct.

Q So are you saying that Claim One and 13 -- the -- the interpretation of j constraint in Claim One and 13 should be exactly the same because the words, a pair of constraints, j and k, are in both claims; is that what you're saying?

MR. VERDINI: Object to form.

THE WITNESS: That would be -- I'd say that's a big reason. Maybe that's the entire reason of the -- I guess -- I know I'm not supposed to answer a question you didn't ask, but I mean, they both go after the j constraint. They're both coming at, describing or defining or illuminating the j constraint.

It's the exact same thing, j, that constraint is the exact same thing in both places. So to that extent, I'd say

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

they're equivalent. The j constraint in 13 is not different than the j constraint in One.

In One they chose to illuminate it, define it and say a little bit more that was removed or not included in 13, but that j constraint is the same thing. It's referring to exactly the same thing.

BY MR. MAYLE:

Q And so if I went in Claim One and erased two -- starting at, to facilitate the reduction. If I erased, to facilitate the reduction of a probability of detection error in said receiver means, so it was not recited as part of the definition of j constraint in Claim One, would -- would that change the meaning of Claim One?

A I would say yes, it changes the meaning. It may not change the function or the hardware or the apparatus that the claim is describing.

Removing that facilitate doesn't change what it is you would implement in hardware, but the meaning of the claim is -- the whole meaning of the claim, it's purposefully there to illuminate, to send a message, to tell the PHOSITA the purpose. And that's important, otherwise it wouldn't be included.

Q When you say it's the purpose, does that mean that the person who is designing a code that has a j constraint is intending to use it for that purpose?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q Like, whose purpose is it? What do you mean by the purpose?

A I mean the purpose of the invention is to reduce error rate. It does that by eliminating certain sequences, minimum distance error event sequences. So that's -- and then that gets implemented into the MTR code.

So that's the -- that's what I mean when I say the purpose. The ultimate purpose of the invention is to reduce error rate. That why it's -- that's how this cascade of things happened. Let's find ways to reduce error rate and -- yeah.

Q Is this the -- let's say I'm designing a code and I don't use -- let's say I use something that one might call a d-equals-1 constraint --

A Yes.

Q Does that constraint facilitate the reduction of a probability of a detection error in the receiving?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: I believe so. I believe that the d-equals-one constraint would serve the purpose of reducing error rate. It just happens to do it at low rate.

BY MR. MAYLE:

Q Could I implement something called an MTR code at a low rate?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q Could I use a rate with an MTR code that's actually lower than a rate I could use with an RLL code?

A Yes.

Q Do the claims require a rate, a certain rate?

A No.

MR. VERDINI: Object to the form.

THE WITNESS: No, they do not.

BY MR. MAYLE:

Q How do I know if I'm facilitating the reduction of a probability of detection error in a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

receiver?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q Do you understand?

A I think so.

Q How do I know if that's what I'm doing?

A You -- you test. Put your code, do your thing, implement the whole system and measure error rate.

Q Could use an MTR code that, perhaps, was poorly designed, but still an MTR code that increases the error rate in a system?

MR. VERDINI: Object to the form.

THE WITNESS: You could implement a code that made the error rate worse. In the sphere of all possible codes I assume that makes sense to me.

Could you implement -- I think your question is could I implement basically a really bad MTR code, low rate, very poorly designed, that met that constraint for which the error rate got worse?

BY MR. MAYLE:

Q Correct.

MR. VERDINI: Object to the form,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

of his question.

THE WITNESS: These are things I love to do. So give me two days, I'll come up with it.

So my gut is feeling this thing. I'm sure we could come up with some bad MTR codes.

BY MR. MAYLE:

Q Right. So let's do a hypothetical. We do come up with a bad MTR code.

A Yeah.

Q Does that code have a j constraint?

A I thought that was the calculation I was doing in my head, just by virtue of the j -- that's what your asking, right?

Does a j constraint necessarily mean an improved error rate. I think that's what you're asking.

Q Does it?

A I guess I'll ask the questions for you. No.

I don't know.

Q You don't know if the j constraint requires --

A Well, the --

Q Excuse me, Professor.

When you say I don't know, did you mean I don't know whether the j constraint requires an improvement to the error rate? Is that what you mean?

MR. VERDINI: Object to the form.

THE WITNESS: Not every j constraint on a system will result in improved error rate. I implemented a j-equals-three in a system that's not necessarily guaranteed to improve error rate. It might make it worse, yeah.

BY MR. MAYLE:

Q Let's say you have that. It makes the error rate worse, but it has a limit -- let's say it still has a limit on the maximum number of consecutive transitions in the encoded waveform. Okay? That's the hypothetical we're talking about. But it makes the error rate worse, right?

A Yes.

Q That system might satisfy Claim 13, which doesn't say anything about reducing the error rate, correct?

A Uh-huh.

Q But it would not satisfy Claim One, which

expressly says to facilitate the reduction of a probability of detection error in said receiver means, correct?

A Okay.

Q Do you agree with that?

MR. VERDINI: Object to the form.

THE WITNESS: Please ask again.

BY MR. MAYLE:

Q So that system, we said it might satisfy Claim 13 because Claim 13 is silent with respect to error rate.

A Uh-huh.

Q But given the hypothetical that we talked about, that system would not satisfy Claim One because Claim One requires -- expressly requires to facilitate the reduction of a probability of a detection error in said receiver means, right?

MR. VERDINI: Object to the form.

THE WITNESS: Uh-huh. Yeah, I'm with you so far.

BY MR. MAYLE:

Q Are you answering in the affirmative to my question?

A Please ask again.

Q Okay. So the hypothetical on the table

is that you've designed a code. Let's say three consecutive -- only three consecutive transitions are allowed, max.

A Okay.

Q But the code, when implemented, actually makes the error rate, the bit error rate on a disc go higher. Okay? Do you understand -- you have to say yes.

A I'm with you so far, yes.

Q That system would not satisfactory Claim One, and the reason it would not satisfy Claim One is because Claim One says that the j constraint is defined as the maximum number of consecutive transitions allowed to facilitate the reduction of a probability of a detection error in said receiver means, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I'm really sorry. This thing is distracting me and I was with you until the very end. I think I know the question that you're asking.

BY MR. MAYLE:

Q I'll restate it. The hypothetical is clear, right?

A Yes, yes.

Q The system that you've designed, which has -- which only allows a maximum number of three consecutive transitions, on consecutive clock periods, will not facilitate the reduction of the probability of a detection error in said receiver means, correct?

MR. VERDINI: Objection to the form.

THE WITNESS: Yes, that hypothetical -- I'm with you on the hypothetical, and the hypothetical, I've -- I've implemented a code that has certain j constraints but makes the system worse from an error probability standpoint.

BY MR. MAYLE:

Q Incorrect. Don't use the word j constraint.

We're saying that in the hypothetical there is a -- there's some constraint. We're not going to say what it is yet. But we know for sure that it -- what it does, and the only thing that it does, is that it limits the number of consecutive transitions in the encoded waveform to three. Okay so far?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A That is the j constraint, right?
Q Let's not call it the j constraint yet.
A Okay.
Q There's something in the code, a constraint, that limits the maximum number of consecutive transitions to three. Okay?
A Okay.
Q But when it does that, it makes the bit error rate of the system get higher. Okay?
A Okay.
Q So that's the hypothetical.
A Okay.
Q If we take that hypothetical code and we read Claim One, and this amendment, that hypothetical system would meet the part of the claim that says, Wherein the j constraint is defined as the maximum number of consecutive transitions allowed on consecutive clock periods in the encoded waveform, but it would not meet the second part that says, To facilitate the reduction of a probability of a detection error in said receiver means, correct?
MR. VERDINI: Objection.
THE WITNESS: Correct.
BY MR. MAYLE:
Q And so, ergo, when you limit the maximum

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

number of transitions, it is not a fact that you will automatically facilitate the reduction of a probability of a detection error in said receiver means, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Correct.

BY MR. MAYLE:

Q And that is why Claim One could be different than Claim 13 vis-a-vis the j constraint, correct?

MR. VERDINI: Object to the form.

THE WITNESS: You're -- I see the -- yes, I agree with that. The logic -- the logic follows, except that is the j constraint. The -- so your hypothetical, that is the j constraint, and the purpose of the j constraint in the context of the whole patent is to reduce error rate. That's just been clear from the very beginning.

So you're describing a hypothetical that's outside of what's the body of this patent. That's what it feels like.

BY MR. MAYLE:

Q Okay. So let's stick with Claim 13,

then.

In our hypothetical that we did where we have some sort of constraint that limits the maximum number of transitions to three, but makes the bit error rate worse.

A Uh-huh.

Q We've agree that that thing, that hypothetical code, would not satisfy Claim One, correct?

A Correct.

Q Would that hypothetical thing satisfy Claim 13?

A It sounds like it would. It would, but it makes no sense. It's not -- it's not the claim. The whole patent is about designing a code that reduces error rate.

So saying there's a system that increases error rate is -- you're saying that's the purpose of the j constraint, to make sure that we -- the value of j that we use has to be matched to the system to facilitate the reduction in error.

Q Let me try that again.

In the hypothetical we have a system -- I'm not going to call it a j constraint. It has some constraint in the code which limits the maximum

number of consecutive transitions on the encoded waveform to three.

A Uh-huh.

Q But when I implement this code on my system, it makes the error rate of the system higher. Okay. That's the hypothetical.

A Uh-huh.

Q Would that system -- does that system satisfy Claim 13?

MR. VERDINI: Object to the form.

THE WITNESS: If it does not satisfy the j constraint as communicated in this, it wouldn't meet the limitations of Claim 13.

BY MR. MAYLE:

Q And are you saying it doesn't satisfy the j constraint? It doesn't satisfy the j constraint?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q The hypothetical system, are you saying it would not satisfy the j constraint of Claim 13?

A I'm not saying it would necessarily violate the -- you're -- you proposed a hypothetical system. You didn't put j in there.

Q Correct.

A But you did talk about transitions.

Q Right. Now I'm asking you -- now I'm asking you, that system which I didn't call a j constraint, does it have a j constraint as you interpret Claim 13?

A I would say yes, it has a j constraint.

Q It does.

A Yeah.

Q But I thought you said that that same system --

A But --

Q Stay with me, Professor.

That same system does not satisfy Claim One, is what you told me, correct.

A Actually, what I'm afraid of is I'm now hopelessly confused, just because -- I -- you've pretty much lost me from the very beginning by saying we had j -- we had a certain number of three consecutive transitions, but you didn't want to say that was the j constraint. We've pulled that out.

Q Right. So you understand, what we're trying to do is figure out what the j constraint is. So if I start to tell you there's a j constraint there, it's a very useless exercise. So let's try it one more time.

Here's the hypothetical system.

A Seriously, I'm not trying to be a pain in the butt, I really am trying --

Q Professor --

A -- to understand what you're saying.

Q Please don't talk over me.

A Okay.

Q We'll take it in baby steps.

There's a hypothetical code. The code has some sort of constraint. And the code does something such that the maximum number of consecutive transitions that are allowed on consecutive clock periods is three. Do you understand that?

A I understand that.

Q Are you confused by that?

A I understand it. So far I'm not confused.

Q Okay. And then I will tell you -- that's one thing I'm going to tell you about the system.

The second thing I'll tell you about the system is that this hypothetical method or system is that, when we implement it, it does not facilitate the reduction of the probability of a detection error in a receiver means. Do you understand that?

A Yes.

Q Are you at all confused so far?
A So far not confused.
Q That system would not satisfy Claim One because Claim One requires, quote, to facilitate the reduction of a probability of a detection error in said receiver means, correct?
A Correct.
Q Now I'm going ask you a simple yes or no question.
The same system, the same hypothetical system or method, we're now talking about Claim 13. Does that hypothetical system or method have a j constraint within the meaning of Claim 13?
MR. VERDINI: Object to the form.
THE WITNESS: I think it does. I think it does.
BY MR. MAYLE:
Q Okay. Then -- so it doesn't have a j constraint with Claim One, but it does have a j constraint with Claim 13. So that means that the j constraint in Claim One does not necessarily have the same scope as the j constraint of Claim 13, correct?
MR. VERDINI: Object to the form.
THE WITNESS: But the reason --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q It's yes or -- can you answer me yes or no.

Mr. KNEDEISEN: You're talking over him now.

BY MR. MAYLE:

Q Can you answer the question --

A Can I answer the question and you not talk over me?

Q I'm looking for a yes or no if I can have one.

A The rationale for saying that it didn't satisfy One, but did satisfy 13, was because of the error rate, not because of the j constraint. That's how I process it.

Q Okay. Thank you. Thank you.

So that would mean that the reduction of the error rate, which is recited in Claim One, is not an inherent part of the j constraint in Claim 13, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I would say no, I wouldn't agree with that. The j constraint in 13, it's -- the purpose of the j constraint is -- and that's what

the whole patent talks about -- using the j constraint is to reduce error probability.

BY MR. MAYLE:

Q Let me ask --

A No one would implement -- no one would implement a system that lowered the rate and made the error probability worse. That makes -- no good engineer would ever implement a system like that. That -- that idea that they implement, it would be thrown out by their manager. Makes no sense.

Q Well, I'm not asking you what someone would do. I'm trying to get to the meaning of the claims.

Wouldn't you agree -- well, let me -- when someone is -- when a PHOSITA is construing claims as they are properly construed, and there's two different independent claims, are you assuming that the claims will have the same scope if they address -- if there are some commonalities between the claims?

MR. VERDINI: Object to the form.

THE WITNESS: No, I wouldn't assume the scope would have to be the same.

BY MR. MAYLE:

Q Okay. Let's -- let's go back to your declaration in 46 real quick. We talked about paragraph 46 before the lunch. Do you remember that, the antecedent "the"?

A Yes.

Q I think I got what you said, but now I couldn't remember.

Were you saying that when a PHOSITA sees the antecedent "the" in a claim, the PHOSITA would understand that there must be an antecedent basis for the thing in question? Is that what you're saying?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, when they see "the" -- something, like, in this case, "the" encoded waveform, they know that there's -- there's something to go find. It's there, it's present. Go find it. And I guess that's what we're calling the antecedent basis.

BY MR. MAYLE:

Q Right. And forget about -- again, I'm not talking about this claim in particular. But if a PHOSITA sees that, when you say that they would understand to go find the antecedent basis, does that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

mean that they would understand that there, in fact, will be an antecedent basis for the object in question?

MR. VERDINI: Object to the form.

THE WITNESS: I don't know whether you're asking a legal -- I'm assuming it's not a legal question, just practically speaking --

BY MR. MAYLE:

Q Well, actually --

A -- that they would -- that it's there and they should go look for it and it will be there. That's the way -- I think that's how someone skilled in the art would go for it.

They're saying there's an encoded waveform. It's been talked about before. You know, it's there, go find it.

Q Do you know if there is a legal standard for antecedent basis in a claim?

A I'm sorry, I don't know that.

Q And is it your understanding that the PHOSITA would think that in a hundred percent of the cases? When they see an antecedent word like that, that they will a hundred percent of the time, in fact, go find the antecedent basis in the claim?

MR. VERDINI: Object to form.
BY MR. MAYLE
Q Is that the PHOSITA's understanding?
MR. VERDINI: Object to the form.
THE WITNESS: I think so. I think it's a safe assumption that someone reading that, seeing "the" something, that that something is somewhere previous. I think that's a good assumption.
BY MR. MAYLE:
Q Did you use that assumption in rendering your opinion in claim 46 -- or sorry -- paragraph 46?
A Yeah, that there was an antecedent basis, yes.
Q Okay. Thank you.
MR. MAYLE: Let's do an exhibit.
MR. VERDINI: What's the next exhibit?
MR. MAYLE: 1020. And one for your counsel.
(McLaughlin Exhibit No. 1020 was marked for the record.)
BY MR. MAYLE:
Q Professor, I'm handing you this exhibit,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that you see on the top it says Block Diagram of a Rechannel?

A Okay. Yes.

Q Let's just do some thought experiments on this, and let's pretend -- or let's assume, rather, that I have a hard disc, a magnetic hard disc drive system that practices Claim 13 of the '601 patent under your interpretations of the claims. Okay?

A Okay.

Q And this is a block diagram that represents this system or this hard disc drive that's using Claim 13. Okay?

A Okay.

Q And I want to walk through the steps and ask you where the various things are happening.

A Uh-huh.

Q So Claim One -- sorry -- Claim 13 of the '601 patent refers to receiving m-bit data words, correct?

A Okay, yes.

Q And if we could point to something on this chart, where would that be happening?

A I'd say 102.

Q 102 called user bits under it?

A Yes.

Q And then it says -- the Claim 13 goes on it talks about producing sequences of n-bit code words, correct? In the claim, right?

A I'm sorry. I'm distracted. This is the first time I've seen this so I'm probably like way ahead of you. And I'm sorry, I'm not supposed to do that, but I will know --

Q Okay. So let's just go -- we'll talk about the claim and then we'll look at the figure.

The next claim of the claim, of Claim 13 of the '601 talks about producing sequences of n-bit code words, right, in the claim?

A Yes.

Q So where would that be happening in our hypothetical system here?

A The m-bit coverts?

Q The N -- November-bit code words.

A Again, I wouldn't be a hundred percent sure, but I would have to take a guess. I mean I didn't prepare this, I don't think this is in the patent. I don't believe this is in the patent.

So it wouldn't surprise me that that would be at 112.

Q Okay. And then the claim talks about that step that was added during prosecution imposing

a pair of constraints, j semicolon k, on the encoded waveform, right? That's what the claim says, right?

A Yes.

Q Where would that happen, imposing constraints?

MR. VERDINI: Object to form.

THE WITNESS: I would say probably -- I would say there are some -- because that 120 is a multiplexer, then that's still -- that's still bits at 120. And so at 122, that -- it's not clear to me whether that's bits or, you know, analog yet. At some point those bits need to be converted to a waveform, and so there's either something missing from this that -- that shows that piece.

I mean, a multiplexer indicates those are bits going in, and outcome is bits. So maybe the analog portion that produces the waveform is embedded in 104. I don't know.

So now what was your question? Oh, imposing. It was on imposing.

BY MR. MAYLE:

Q So, yeah, let me you unpack your answer.

That was very helpful.

A I'm sorry --

Q No, you're doing a great job. So are you saying -- let me just unpack it a little bit.

If 120 is a multiplexer, are you saying that everything to the left of that would still be in bit format and not yet analog?

A That's reasonable.

Q Probably?

A That's a reasonable assumption.

Q All right. Then let's assume something happens after that and there's an analog signal being sent to a write head. We'll call that 122. Okay?

A Uh-huh.

Q Let's assume that.

A Okay. You're saying that there's another box, it's just not shown here.

Q Sure. Let's assume that that's there. It's downstream of 120, but it's before 104.

A Okay.

Q Okay. Under that understanding, where -- where would the claim step of imposing a pair of constraints, j;k, on the encoded waveform happen?

A I guess I'm going to say at 122.

Q Does the -- does the MTR encoder at 110

play a role --

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q -- in imposing the j and k constraints?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: The MTR coder is going to produce bits that -- yeah, the MTR is going to produce bits, but -- I'm just -- let me see where you are.

We're talking about imposing a pair of constraints on the encoded waveform, so since that's referring to the waveform not imposing a pair of constraints on the bits, that's why I'm saying imposing that constraint means you have to enforce it or check it or test it, that would be in the analog -- because it's a waveform, that's why I'm saying it's at 122. That's the place at which it's a waveform.

BY MR. MAYLE:

Q Thank you.

Are you saying that one could not impose constraints without checking or testing whether the

constraints were imposed? Is that what you said?

MR. VERDINI: Object to the form. Mischaracterizes what he said.

THE WITNESS: I don't think that's quite what I said. It's saying imposing constraint on the waveform. It could happen -- it could happen at the bit level through the code or it could --

Because it's talking about the waveform, the constraint really is on the waveform itself. So that's why I'm saying that's the place where I would validate that the waveform meets that. So that's why I'm saying that's where.

Imposing might take place somewhere else, but in order to ensure that it was -- because, you see, I'm focusing on the waveform piece and this is the place where the waveform is. Clearly before then, it's bits.

BY MR. MAYLE:

Q Let me ask it this way.

Let's say that the MTR encoder produces n-bit code words in this hypothetical in such a way that we're -- we're still at the bit level. There'll

be a maximum of j consecutive transitions at the bit level and a maximum of k consecutive nontransitions at the bit level.

Do you follow so far?

A I'm with you so far, yeah.

Q Could that be seen as imposing a pair of constraints, j;k, on the encoder waveform?

MR. VERDINI: Object to the form.

THE WITNESS: I would say it's a -- I would say it's a less direct or indirect way, but I could see -- I could see how someone would -- I'm sorry I keep going to test, testing. But I can see that they would test that at the bit level.

BY MR. MAYLE:

Q In this hypothetical, let's turn off the LDPC encoder. Let's erase that.

A Uh-huh.

Q So 112 is n-bit code words, and we have a multiplexer.

A Right.

Q But it's just those.

A I understand.

Q And let's just say the multiplexer, like

you said, something is happening there or after there, before it get to the disc, to turn the m-bit -- the sequence of m-bit code words into an analog signal.

Does that make sense?

A I'm with you so far.

Q And let's just say that, in this system, wherever there was a one in the code word, there's going to be one voltage in the signal at 122. Whenever there was a zero in the string of code words, there's going to be a different voltage in 122. Does that make sense?

A Uh-huh, yes.

Q And let's say that the voltage corresponds exactly to the code words; in other words, every time there's a one, there's one level, there's a zero, but nothing else happens. It just turns into an analog signal. Does that make sense?

A I think so, so far, yeah. I'm with you.

Q So under that understanding, are you going to call that voltages -- that's the encoded waveform under your interpretation?

A Yeah, the analog version is the encoded waveform, yeah.

Q But couldn't one say that the constraints

have been imposed on the encoded waveform by the MTR encoder in this hypothetical?

A I'm okay with that.

Q Let's go on to the rest of the claim.

Then it says -- you remember in the claim they have the two generating steps?

A Yes.

Q Generating no more than j -- I might be paraphrasing. I should open it up so I get it right.

It says -- let's read it: Generating no more than j consecutive transitions of said sequence in recorded waveform such that j is greater than or equal to two.

Let's assume that that happens. Where would that happen on this hypothetical system?

MR. VERDINI: Object to the form.

THE WITNESS: I mean, again, I would be -- because it's focusing on the transitions and the recorded waveform and because -- I think of, you know, how to validate that that claim is met, I would want to do measurements on the waveform.

So that's why I say 122 is the place where I would validate it, but it does make sense that you could -- that

the -- that the bit sequences that come out of the -- ensuring certain properties of the bit sequence would come out of the encoder would be indicative of that, of meeting that.

But the only place to really truly measure and validate that is at the analog -- is in the analog domain.

BY MR. MAYLE:

Q Thank you. Let me ask it a different way. If you look at the verb generating in Claim 13?

A Uh-huh.

Q Let's assume that this system does that and everything after the verb generating. Which part -- which component, if any, in this system would be doing the generating, the first generating step?

A Generating transition --

MR. VERDINI: Object to the form.

THE WITNESS: Generating no more than j consecutive transitions of said sequence in the recorded waveform.

So I say, you know -- where would we generate consecutive transitions in the recorded waveform? I would do that in the analog domain. That's where the

changes in the analog -- the continuous time signal is made is in the analog domain.

But again, as I said, I see where someone might look at the bit level and say, but it's -- you know, bit level to see if that's, you know, if that's -- if that constraint -- that limitation is going to be met.

But it's saying generating no more than j consecutive transitions of the sequence in the recorded waveform, so we're talking about the transitions in the waveform. So I'm doing that in the analog domain.

BY MR. MAYLE:

Q And where --

A That's where the true generation of those levels of the waveform would take place, in the analog domain, I'm saying 122.

Q You're saying 122?

A Yes.

Q It wouldn't happen on 104?

A I thought we agreed that there was something at 122 that's not written here that may be

producing analog signal.

Q No, you're right, we have that, but I'm asking you now, let's assume 104 is -- someone labeled it disc. Let's assume that's the platters of a hard disc drive system, okay?

A Okay, uh-huh.

Q Does the -- does the first generating step in Claim 13 happen at 104?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Say that again, I'm sorry.

BY MR. MAYLE:

Q Does the first generating step of Claim 13 happen at -- in our hypothetical system, at the part labeled 104?

MR. VERDINI: Same objection and objection to form.

THE WITNESS: 104 being the platters?

BY MR. MAYLE:

Q Correct.

A No, it happens at 122, before the platters.

Q So you would say --

A It happens somewhere along this wire before the head, in the analog domain, generating --

Q I understand that.

A -- generating the waveform.

Q I'm just trying to see if it maybe also happens at 104.

Does it also happen at 104, the generating step in Claim 13?

MR. VERDINI: Object to the form.

THE WITNESS: No, because generating is applied to the waveform, so that's happening at 122, not at 104.

BY MR. MAYLE:

Q Are there transitions -- say the system does Claim 13 as you interpret it. Would there be transitions -- and when I say transitions, I mean -- I am talking about the word transitions in the claim, Claim 13, that those are the transitions that I'm talking about and no others.

Are those transitions -- would they be in part labeled 104?

MR. VERDINI: Object to the form.

THE WITNESS: I'm sorry. Could you say that again?

BY MR. MAYLE:

Q Claim 13, the first generating step uses the word transitions, right?

A Yes.

Q I'm asking about those transitions and not any other transitions. Okay? So far are you with me?

MR. VERDINI: Object to the form.

MR. MAYLE: I haven't asked a question yet.

BY MR. MAYLE:

Q But I want to limit my next question to the transitions that are in the claim and no other transitions. Are you with me so far?

MR. VERDINI: Object to the form.

THE WITNESS: You're talking just about the transitions in the claim.

BY MR. MAYLE:

Q And no other transitions. Are you with me so far?

MR. VERDINI: Same objections.

THE WITNESS: That's not what I'm not sure, when you say no other transition. We're just --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q The claim uses the word transitions, right?

A Yes, uh-huh.

Q Whatever that means, that's what I'm talking about.

A Okay.

Q And I'm not talking about any other transitions. Okay? Do you follow so far?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q Whatever that means, that word transitions, if our hypothetical system does this claim, where are the transitions on the system? Could you tell me?

A In the context -- in the context of the claim, the transitions are on the medium that were -- that's the term -- when we talked about the construction of the term transitions, I think that's what we were referring to. We're talking about the transitions that occur on the magnetic medium.

Q So are you saying that's 104 on this diagram?

A That's where the medium is, yes, that's

where the transition would take place, on the medium.

Q Does it make sense to say that transitions can be generated before transitions exist? Do you follow that question?

MR. VERDINI: Object to the form.

THE WITNESS: Well, it's talking about generating a waveform.

BY MR. MAYLE:

Q Actually, let's --

A Generating transitions in a waveform. That's done at the analog domain. That would be done in 122. The transitions are the magnetic transitions we're talking about on the disc.

Q Let's say there could be ten consecutive transitions on the recorded waveform. Okay?

A Waveform.

Q On the recorded waveform, all right?

A Uh-huh.

Q And let's say I -- someone generates the first transition and then it's recorded on the disc, right, just one at a time?

A Okay, yeah.

Q Then the second one is recorded on the disc, correct?

A Yes.

Q And then the third one is recorded on the disc, right?

A Yes.

Q When you get to the tenth consecutive transition, those are all on the disc, right?

A Okay, yes.

Q Before they get to the disc or before -- say before the tenth one is on the disc, there's not ten consecutive transitions on the recorded waveform, right?

A Uh-huh.

MR. VERDINI: Objection.

Mr. KNEDEISEN: Yes?

BY MR. MAYLE:

Q Is that a yes?

A Ask again.

Q So before all ten are -- are recorded, there can't be ten consecutive transitions in the recorded waveform, right?

MR. VERDINI: Object to form.

BY MR. MAYLE:

Q You need all ten, right?

A I'm sorry. Ask again.

Q In our hypothetical, if we're limiting consecutive transitions on the recorded waveform to

ten --

A To ten, okay.

Q -- and let's say they're recorded one at a time.

A Yes.

Q The first one gets recorded, correct?

A Yes.

Q The second one gets recorded?

A Yes.

Q The ninth one gets recorded?

A Yes.

Q And the tenth one isn't there yet, so right now there's not ten consecutive transitions on the recorded waveform, right?

MR. VERDINI: Object to the form.

THE WITNESS: There's not ten --

BY MR. MAYLE:

Q There's not yet ten consecutive transitions on the recorded waveform, correct?

A No, there's not yet ten consecutive transitions on the disc. There could be a waveform out there that's got the tenth ready to be written.

Q Let's say nine of them have been written to disc so far.

A Yes.

Q Are those recorded now?

MR. VERDINI: Object to the form.

THE WITNESS: There's -- the bits have been recorded, yes.

BY MR. MAYLE:

Q When you say the bits have been recorded, are you talking about magnetic particles or are you talking about ones and zeros?

A The ones and zeros in the waveform, there's a transition that's been written on the disc. That transition, let's say, represents a bit, a one. That's there.

Q Represents a bit, right?

A Represents a bit.

Q But is not a bit?

A Is not a bit.

Q Let's just be clear.

A Yeah.

Q So let's say nine of these transitions are on the disc.

A Yeah.

Q The tenth one has not been recorded yet.

A Right.

Q Would you say that the first nine have been recorded?

MR. VERDINI: Object to form.
THE WITNESS: Yes.
BY MR. MAYLE:
Q Is the tenth one? So is there a recorded waveform?
MR. VERDINI: Object to form.
BY MR. MAYLE:
Q Yet?
A There's a waveform that may be sitting there getting ready to be put onto the head that will then write the tenth transition.
Q Would you say in our scenario that I just gave you that 90 percent of the waveform has been recorded but not a hundred percent?
MR. VERDINI: Object to the form.
THE WITNESS: Yeah, that sounds right, yes.
BY MR. MAYLE:
Q And that's because nine out of the ten transitions are on the disc, but the tenth one is not?
A Yes.
Q Okay. Thank you.
MR. MAYLE: Let's take a break.
THE VIDEOGHRAPHER: 2:48. We're

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

off the record. This is the end of media number four.

(Brief pause.)

THE VIDEOGRAPHER: 3:01. We're on the record. This is the beginning of media number five.

BY MR. MAYLE:

Q Hi, again, Professor.

A Hello.

Q Did you talk to your counsel about the scope of your testimony on the break there?

A No.

Q Okay. I just have to ask you that.

Let's look at paragraph 49 in your declaration. We're still talking about waveform here, Exhibit 1005. It's on page 22. Okay.

And at the bottom of page 22, in paragraph 49, you cite the Wang article, right?

A Okay.

Q Do you see that?

A Yes. Uh-huh, yes.

Q And Wang was not part the patent, was it?

MR. VERDINI: Object to form.

THE WITNESS: I don't believe it was cited in the patent.

BY MR. MAYLE:

Q Right. And Wang was published in 1999, right?

A Yes.

Q And that was three years after the patent application was filed?

A Yes.

Q And then you cite, also on page 23, you cite Ashar again, right?

A I guess.

Q Is that the same Ashar article we talked about this morning?

A I believe so, yes.

Q Let's go to page 24, which is Paragraph 50 of your -- it starts on page 23. On page 23, you say: The prosecution history supports the common understanding of the meaning of waveform.

Right? It's the -- the previous page, start on the bottom of 23.

A Okay.

Q You're now citing the prosecution history, correct?

A Yes.

Q And you've put a cut and paste on page 24 of your declaration that comes out of the

prosecution, right? Is that what this picture is?
A I believe so, yeah.
Q And did you add the red text called Waveform and Bit Sequence?
A I believe -- I'm not sure I did, but I asked someone to do that.
Q So that's an annotation for this declaration?
A Yeah.
Q And those red arrows were annotated for this declaration?
A Yes.
Q And you have an arrow from the word waveform to what you're identifying as the waveform, correct?
A Correct.
Q And you have a different arrow from the word bit sequence to what you're identifying as the bit sequence, right?
A Yes.
Q And those are two different arrows, right?
A Yes.
Q And so the waveform is not the same as the bit sequence, right?

A That's correct.
Q Let's move along to imposing the pair of constraints, j;k. It's on page 24 of your declaration. You see that heading C?
A Yes.
Q And you have here a series of three -- you have a table called UMN's Proposed Constructions and you have Imposing Constraint and Pair of Constraints j;k, right?
A Uh-huh, yes.
Q And you list there, for each of those three, that -- the UMN proposed construction, correct?
A Yes.
Q So keep that aside and let's do our exercise again. Keep your finger there. Let's look to Exhibit 1004, on page four.
A Okay.
Q And would you just read to yourself the Plaintiff's proposed construction -- it looks like they've lumped in together -- let me ask you this.
On Exhibit 1004, page four, the only disputed claim term is imposing a pair of constraints, j;k, right?
A Okay, yes.

Q And so -- but in your declaration on page 24, you're interpreting each -- imposing separately -- constraint separately.

A Yes.

Q And then a pair of constraints, j;k, separately, right?

A Yes, uh-huh.

Q And let's look at -- other than that, I would point to you in Exhibit 1004 where it says Proposed Construction under the Plaintiffs. It starts with: The sequences of m-bit code words are subject to a pair of separate constraints, j;k.

Do you see that?

A Yes.

Q And, in particular, it says: The sequences of m-bit code words is what's subject to the constraints.

Right?

A Yes.

Q And if you look on the page 24 of your declaration, would you agree that there's nothing about the sequences of m-bit code words?

A Correct.

Q And so, therefore, would you -- would you agree that the University's proposed construction has

somewhat changed from what's in your declaration?

A Yes, with --

MR. VERDINI: Object to form.

THE WITNESS: Yes, with that new addition at the very beginning.

BY MR. MAYLE:

Q Okay. Let's go to your -- your declaration now, 51. You say: In my opinion, the terms imposing and constraint do not have a specialized technical meanings.

That's what you say, right?

A Correct.

Q Let's just stick with constraint. Are you sure that, in the art, the word constraint doesn't have a specialized meaning?

MR. VERDINI: Object to the form.

THE WITNESS: I mean, a constraint is a technical thing that needs to be satisfied, you know, in the encoding, but the word constraint has its plain and ordinary meaning in that context.

I'm saying, we often say a j or k constraint or some kind of constraint, it means something specific, but it's -- but the constraint itself has -- has its own

plain and ordinary meaning.

BY MR. MAYLE:

Q Okay. Let me ask you this. So when you say the constraint has a plain and ordinary meaning, do you mean it has a meaning in the art or it has a meaning as a layman would understand or in general?

MR. VERDINI: Object to the form.

THE WITNESS: I guess I'm saying they're the same thing.

BY MR. MAYLE:

Q So are you saying that the word constraint in the field of the patent has the same meaning as the word constraint from the Webster's Dictionary, for example?

A Yes. Yes. And, when you tell me what the constraint is, that's a technical thing. Right. That's a -- I don't want to say a modifier or some description of the constraint. If someone says constraint in the technical sense, it's not clear exactly what they're referring to as a term of the art.

It says -- usually it's a j;k constraint or d;k constraint or an RLL constraint, and all those two things together have a specific meaning in the art.

Q Before you came to be involved in this case, you would understand exactly what a constraint was in the context of coding for storage systems, correct?

A Yes.

Q And a PHOSITA would -- a PHOSITA, not reading these claims or nothing to do with this case, a PHOSITA would know, in 1996 and before, what a constraint was in the context of coding methods for digital storage systems, right?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, they would know a broad definition of constraint, but they -- but that, in itself, is not specifying something really specific in the art.

BY MR. MAYLE:

Q For example, a PHOSITA would know, if we said to them an RLL, d and k constraints, they know what those are, right?

A Yes.

Q Do you think that a PHOSITA, if the word impose -- if someone said to a PHOSITA before 1996, impose a constraint, they would -- a PHOSITA would know what impose means?

A Yes.

Q A PHOSITA wouldn't look to a Webster's Dictionary for impose, would he?

MR. VERDINI: Object to the form.

THE WITNESS: I don't think so.

BY MR. MAYLE:

Q Okay. But a PHOSITA wouldn't look up constraint in a Webster's Dictionary, either, correct?

MR. VERDINI: Same objection.

THE WITNESS: I don't think so.

They would know what that means, yeah.

BY MR. MAYLE:

Q And so let's look at page -- paragraph 51, you're saying that ordinary dictionaries define impose to mean establish or apply by authority, correct?

A Uh-huh.

Q And that is that is UMN's proposed construction for the term -- claim term imposing, right?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q As listed on page 24 of your declaration?

A Yes, uh-huh.

Q So in other words, UMN's proposed construction on page 24 of your declaration was taken directly and verbatim from an ordinary dictionary, correct?

MR. VERDINI: Object to the form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And let's look at constraint on page 25 of your declaration, at paragraph 51. You say that: The ordinary dictionary defines constraint as a constraining condition in Appendix B and something that restricts, limits or regulates.

Right?

A Uh-huh, yes.

Q That latter one, something that restricts, limits or regulates, is UMN's proposed construction on page 24 of your declaration.

A Okay. Yes.

Q Right? So for imposing and constraint, at least on page 24 of your declaration, the UMN copied verbatim portions of dictionary definitions, correct?

MR. VERDINI: Object to form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q And is that -- do those proposed constructions -- is that your opinion?

Is it your opinion that those two proposed constructions are the correct constructions?

A Yes, perfectly comfortable with them.

Q So let's look at paragraph 52 of your declaration. You're talking about the file history again here, right, in paragraph 52?

A Uh-huh, yes.

Q And you say that you note that the file history for the patent uses the term, quote, restrictive condition, unquote, as a meaning for, constraint, right?

A Yes.

Q But I thought you said earlier that the term constraint did not have a specialized meaning and, therefore, you would look it up and the University would look it up in any ordinary dictionary, right?

MR. VERDINI: Object to form.

BY MR. MAYLE:

Q Are you now saying that the prosecution contains a meaning for constraint?

MR. VERDINI: Object to form.

THE WITNESS: I think I'm just pointing out that the use of the term restrictive condition is consistent with a -- with the -- with the dictionary meaning.

BY MR. MAYLE:

Q Because -- is that because the word restrictive is used in the prosecution and the dictionary uses the word restricts?

A Yeah.

Q Is that why they're consistent?

A Yes.

Q But let's look at the -- on page 25 of your declaration where you have this cut and paste from the prosecution.

A Uh-huh.

Q It doesn't just say restrictive condition. The sentence at the end of that -- of your call says: All sequences containing j plus one or more consecutive transitions on consecutive clock periods are prohibited because they violate the restrictive conditions.

Correct?

A Uh-huh, yes.

Q So it uses the word prohibited and

violate, right?

A Yes.

Q And the reason that j plus one consecutive transitions are prohibited is because they violate restrictive conditions, correct?

A Yes.

Q And would you agree with me that the words prohibit and violate are absolute terms?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah.

BY MR. MAYLE:

Q In other words, if something is prohibited, you can't have any of it, correct?

A Yeah, not allowed.

Q Okay. So let's compare that concept with UMN's proposed construction of constraint, which was something that restricts, limits or regulates.

So let's take -- let's take something that regulates. Now, isn't it true that something can be regulated without being prohibited, right, in general?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q Do you want me to --

A No, I'm just thinking. Yes, I'm okay

with that. Regulation is a slightly weaker term than prohibited.

Q Right. And I'll give you an example. Banking regulations do not prohibit banking, right, in general?

A But they prohibit certain behaviors, prohibit certain behaviors in banking.

Q So if there's a regulation on banking, is it fair to say that banking is being prohibited?

A No, but it's --

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: No, but it's regulating certain aspects of banking, not all banking is not.

BY MR. MAYLE:

Q To prohibit is stronger than to regulate, right?

MR. VERDINI: Objection. Form.

THE WITNESS: Yes.

BY MR. MAYLE:

Q Now let's look at the word limits. I could limit the amount of pizza I eat without prohibiting myself from having pizza, right?

A You are prohibiting yourself from eating

more than a certain amount of pizza, so it is -- it is restrictive, but it's not absolutely restrictive.

Q If I say you are prohibited from having pizza, you can't have any pizza, right?

A Correct.

Q So to prohibit is stronger than to limit, too, right?

MR. VERDINI: Object to the form.

THE WITNESS: You could prohibit me from having more than three pieces of pizza, which is the same thing as regulating -- regulating my pizza. I mean --

BY MR. MAYLE:

Q You changed it up on me. Let's just say I tell you, you are prohibited from having pizza.

A I understand.

Q That means you can't have any pizza, right?

A Correct.

Q And the other word from the dictionary for constraint was restricts, right? So let's look at that.

I can restrict the amount of TV my daughter watches without saying she's prohibited from

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

watching TV, correct?

A Yes.

Q So would you agree that prohibit is a stronger word than restrict?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, I'm okay so far.

BY MR. MAYLE:

Q Okay. So the prosecution uses the word prohibited, right? That's in Paragraph 52.

A Okay. Yes, it does.

Q And the prosecution doesn't say that j plus one consecutive transitions are -- strike that.

MR. MAYLE: Let's go to another exhibit. It's 1021.

(McLaughlin Exhibit No. 1021 was marked for the record.)

BY MR. MAYLE

Q And Dr. McLaughlin -- or Professor, sorry.

A It's okay.

Q This document says on the first page that it's Plaintiff's claim construction charts, right?

A Yes.

Q And I think we said earlier that when --

the materials reviewed for your declaration, this is one of those documents that you reviewed at one time, right?

A Yes.

Q Let's go back -- if you flip back in this thing, you'll see there's something called Exhibit A. There's like a chart. Go to page nine, Exhibit A, page nine.

A Okay.

Q And I would direct your attention to -- you see on the left there's something 13E?

A Yes.

Q And then it says, quoting from Claim 13: Generating no more than j consecutive transitions of said sequence in the recorded waveform such that j is greater than or equal to two.

Do you see that?

A Yes.

Q Now, next to that, you see something that the University wrote, starting with: According to the product specifications.

Do you see that?

A Yes.

Q And do you see that they say that the j value in the table above is a, quote, constraint,

unquote. That, quote, refers to the maximum run of consecutive transitions, which limits the run length of Nyquist patterns.

Do you see that?

A Yes.

Q And they're quoting a Bates number, LSI-UMN?

A Uh-huh.

Q Ends in 1354, right?

A Yes.

Q And then it says: The j constraint is also a, quote, hard constraint, unquote, in the MTR codes, paren, as opposed to merely a as, quote, measurable constraint, unquote, paren.

Do you see that?

A Uh-huh, yes.

Q And you see that they're citing a Bates number at 1355?

A Yes.

Q Okay. And if you flip back to page A3, do you see that there's certain -- there's a table, it's called Table 260 RLL Code Selection, right? Do you see that, at the top?

A Yes.

Q And do you see there's something called

RLL Code Rate, the second column?

A Yes.

Q And you see there's 196 over 97, for example?

A Yes.

Q And see the 200 over 201 and the 17 over 18s are highlighted?

A Yes.

Q Do you see that?

A Yes.

Q And the other, the 96 over 97 and the 144 divided by 145 are not highlighted.

A Yes.

Q Do you see that?

A Yes.

Q So do you have an understanding of what the yellow highlighting means?

A No.

Q Well, I'll tell you to assume that the -- the yellow highlighting code rates are the code rates that allegedly infringe claim -- method Claim 13 of the '601 patent, okay?

A Okay.

Q And the -- the ones that are not highlighted yellow are not alleged to infringe Claim

13 of the '601 patent, okay?

A Okay.

Q And let's go back to page nine, Exhibit A9 of this same document. And as we talked about, the University says that the j constraint is a hard constraint as opposed to merely a measurable constraint, okay?

A Okay.

Q And so I'm going to tell you to assume that the j constraints that have hard constraints are the ones that were highlighted yellow and are accused of infringing. Okay?

A Okay.

Q And the j constraints that are merely measurable constraints, are the -- correspond to the codes that are not highlighted yellow and are therefore not allegedly infringing, okay?

A Okay.

Q Have you ever heard of terminology such as hard constraint and measurable constraint?

A Hard constraint, for sure. Measurable, I'm not sure. I'm not sure. It's been a while since I -- since I've looked at this. It's a constraint that's measurable. So I don't know if that means it's a hard constraint or not or something weaker

than a hard constraint.

Q Then let's get out the next exhibit, which is those Bates numbers that the University was citing. Let's just get a one-pager.

(McLaughlin Exhibit No. 1022 was marked for the record.)

BY MR. MAYLE:

Q Professor McLaughlin, this is Exhibit 1022. And you see at the bottom of the page, there's a Bates number, LSI-UMN 0001355, right?

A Yes.

Q Now, you see there's Table 260 RLL Codes again on this new exhibit?

A Yes.

Q That's the one that's from the University's claim chart, right?

A Got it.

Q But on the new exhibit I gave you from the product specification, there's some text below table 260. Do you see that?

A Text. Yes. Okay, so this is produce -- this comes from their product specification.

Q Sorry. Let's look at the top left corner. You see it says True Store RC 5100, RC 5200 Series, Spider Rechannel Product Specification.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Oh, got you.

Q So this is from one of LSI's accused product specifications.

A Okay. Now I'm with you.

Q The text below this table, do you see where it says for the 144, 145 and 96 over 97?

A Yes.

Q The j and k constraints reported in the preceding table are measurable constraints as opposed to hard constraints.

Do you see that?

A Yes.

Q And then it says: Pathological cases exist where constraints can be violated.

A Okay.

Q Let's read the -- let's skip down to the next paragraph: You see the constraints reported for the 200 over 201 and 17 divided by 18 codes are hard constraints, comma, and the RLL encoder never violates them.

Do you see that?

A Oh, okay. Yes.

Q So could we divine from this that a hard constraint is one that is never violated by the RLL encoder and a measurable constraint is something that

can't -- that can be violated?

MR. VERDINI: Object to the form. Foundation.

THE WITNESS: You skipped over two sentences in that text which I think is saying what you just said: Pathological cases exist where the constraints can be violated, however -- is that what you're referring to?

BY MR. MAYLE:

Q Right. I'm just trying to say -- I was asking you before what the difference between hard and measurable constraint was.

A Yes.

Q And I think this document might shed light --

A I see.

Q -- on that.

A I'm sorry. I'm talking over you.

Q That's okay.

And would you agree with me that one potential way of interpreting the difference between a hard and measurable constraint, as this document is saying it, has something to do with whether or not the constraint can never be violated or could

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

potentially be violated?

A Yes.

Q And -- so remember in the University's claim construction chart, they've highlighted -- they've highlighted only 200 over 201 and 17 over 18, right?

A Okay.

Q And the text below that chart on your new exhibit says that those constraints are never violated.

A Okay.

Q Right.

A Yes.

Q So what I'm -- and -- what I'm trying to see is, if the Court accepts your construction of constraints on page 24 of your declaration, which is something that restricts limits or regulates --

A Uh-huh.

Q -- I want to see if that construction is sufficiently strong to respect a difference between a hard constraint and a measurable constraint.

Do you follow what the program is?

A I think so, uh-huh.

Q So I'll just ask you, what do you think?

Do you think that if the Claim 13 -- if

constraint really means something that restricts, limits or regulates, would that claim then cover, for example, the rate 96 over 97 mode which has the measurable constraint in the table?

MR. VERDINI: Object to the form. The -- I'll just object to the form and leave it at that.

THE WITNESS: I would say a constraint is a constraint. I see a constraint as being more absolute than loosey-goosey. So is that what you're asking?

BY MR. MAYLE:

Q Try to give me a yes or no and then we can follow up, if you can.

A Okay.

Q If the Court accepts your proposed construction for constraint as something that restricts, limits or regulates --

A Uh-huh.

Q -- would -- would the rate 96 over 97 code have a constraint under that definition?

MR. VERDINI: I'm going to object to the form because the Court isn't going to construe constraint. The parties have

agreed that the claim language is imposing current constraints. So that's why I hesitated the last time, but I wanted to make that clear on the record. Go ahead.

THE WITNESS: And for clarification, you say 96 over 97 is a measurable constraint, not a hard constraint; is that right?

BY MR. MAYLE:

Q Correct. So I want to know if the distinction between hard and measurable constraint, in this document, has anything to do with the patent. Which of those -- do both of them count as constraints in the sense of the patent or is it only the hard constraint?

A I would say only the hard constraints.

Q Okay. Let's go back to your declaration. You can set aside that.

Let's go to paragraph 53. So we talked about this a little bit. On page 26, on top, line two, you said the j constraint.

A I'm sorry. Where are you?

Q I'm skipping ahead. Let's talk about the j -- what the j constraint means.

You cite the -- the specification at column two, 40 to 49, right? And you actually have a cut and paste?

A Yes.

Q That portion of the spec does not use the words j constraint, correct?

A J constraint's not there. It talks about MTR coding, but it doesn't have the -- the term j constraint there.

Q Okay. And we talked about this before the break. Flip back to 24 real quick. I just want to make sure because I skipped ahead a little bit before.

MR. VERDINI: Twenty-four what?

BY MR. MAYLE:

Q Page 24 of your declaration. You have UMN's proposed construction.

A Uh-huh.

Q For j constraint, you say that: The j constraint reduces the bit error probability of the magnetic recording system by removing error prone write patterns, right?

A Yes.

Q So part of the definition is the concept of reducing the bit error probability, right?

A Yes.

Q And so if there's something -- if there's a code that has some sort of a constraint that -- that removes error prone write patterns but does not reduce the bit error probability, that would not be a j constraint under your interpretation, right?

A I think you just said two conflicting things, reduces error prone sequences but does not reduce error rate. That's contradictory.

Q Well, let's start with a -- an RLL code, d-equals-1.

A Yes.

Q And that would reduce -- remove the error prone write patterns, wouldn't it? It does, right?

A It depends on the PR target, partial response target. But in the context of the patent, yes, but I mean, it doesn't reduce all error prone patterns for all PR targets. But I think I know --

There are examples where the d-equals-1 constraint is an error-reducing constraint.

Q Well, when you say in your proposed definition here, removing error prone write patterns, which targets are you talking about?

A The j constraint needs to be matched to the PR target. So a particular j constraint doesn't

work for all PR targets. You have a certain PR target, and you would identify the corresponding j that reduces error probability for that.

Q When you say identify the corresponding j, do you mean like how big the j is; is that what you mean?

A Yes.

Q Okay.

A Yeah. For a particular PR target you do an analysis to determine the value of j that would work.

Q Is that analysis complicated or --

A It can be. It can be very complicated.

Q Does the patent tell you how to do that analysis?

A The patent describes some examples of, you know, how to find those, how to enumerate those patterns.

Q Does that example allow you to -- could you follow that example to match every j to every PR target?

A Yeah, yeah. I mean, all the common -- all the common PR targets.

Q Okay. So let's -- let's do a hypothetical where I take an RLL d-equals-1

constraint, right?
A Yes.
Q And I match it to the appropriate PR target.
A Yes.
Q Would that d-equals-1 constraint reduce -- sorry -- would it remove the error prone write patterns?
A Yeah. Yes, it would.
Q And would it also reduce the bit error probability?
A Yes.
Q So, therefore, it's a j constraint?
A Not necessarily.
Q Why not?
A There are -- there are -- there may be other types of constraints that also reduce error probability.
Q That doesn't mean that the d-equals-1 constraint is not a j constraint under your definition, does it?
A I'm sorry. We were talking about the d --
Q D-equals-1 is -- it fits your definition of j constraint, correct?

A Because it reduces error probability.

Q And it removes the error prone write patterns, correct?

A Yes.

Q That's all that's required under your definition, right?

A The remainder of the -- the remainder of the -- there are other parts of the claim that describe what the j constraint is. I'm not -- I'm not defining the j constraint here. There's a clause later that describes exactly what the j constraint is.

Q Which claim is that in?

MR. VERDINI: I think he said clause.

THE WITNESS: Clause.

BY MR. MAYLE:

Q Yeah. What claim is that clause in?

A Thirteen.

Q Which clause is it?

A Generating no more than j consecutive transitions of said sequence in the recorded waveform.

Q Correct.

A Right. So that's why I'm saying,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

imposing a pair of constraints, this is not defining what the j constraint is, that the definition of j constraint is down below. This is illuminating the purpose of the j constraint.

Q So you're saying what's written on page 24 here does not define what the j constraint is; is that what you're saying?

A Right. It says imposing a pair -- imposing a pair of constraints. It's illuminating the j -- that's what it says: The j constraint reduces the error probability of the magnetic recording system, blah, blah. The j constraint down -- the j down below. J is defined down below.

Q Where is j defined?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Generating no more than j consecutive transitions of said sequence in a recorded waveform.

BY MR. MAYLE:

Q And what's the definition -- that whole thing is the definition, are you saying?

A That's enough to describe what -- what J is or what -- J is a number and this describes what the constraint is.

Q Okay. We talked about this before, but if you go back to Claim One in the patent, that generation step that you just quoted to me from Claim 13 is also recited in Claim One, correct?

A Yes.

Q But Claim One has this additional language and it says: Wherein the j constraint is defined.

Do you see that in Claim One?

A Yes.

Q And that's not in Claim 13, right?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: Yes, it's not.

BY MR. MAYLE:

Q It's not. Okay. So let's look at -- now, let's stay with this for a minute.

If the j constraint reduces the bit error probability, how much does it -- is there a certain level that it has to reduce the bit error probability in order to count under your definition?

A No, it just needs to reduce it.

Q And reduce it relative to what?

A Reducing it relative to if there was no constraint.

Q As if there was no j constraint?

A Yes.

Q Let's look at -- in the patent again, keep your declaration out, but go to column four.

Let's start on -- this is the first full paragraph. I don't know if that's line eight. Do you see, To obtain a coding gain?

A Yes.

Q It says: To obtain a coding, paren, improvement in minimum distance to the coding, unparen, the minimum distance pairs shown in figure one must be eliminated.

Do you see that?

A Yes.

Q And then it says: In accordance with the present invention, this can be accomplished using the existing RLL one, comma, k code, which does not allow consecutive transitions.

Right?

A Right.

Q So doesn't that say that the invention covers the existing RLL, one, comma, k code?

MR. VERDINI: Object to the form.

THE WITNESS: I don't think it -- no, I don't think it says that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q Okay.

A The one, comma, k code -- RLL code is a -- is a completely different kind of constraint. It happens to eliminate the minimum distance error events, but it's not the same -- the same material.

Q Let's look at paragraph 26 in your declaration. So page 13.

A I'm sorry?

Q Paragraph 36, page 13.

A Yes.

Q So you're talking about the prior art RLL codes. And I'm going to ask you a question about the last sentence, so why don't you just read it to yourself and then get down to the second to the last sentence. When you're ready, let me know.

A Okay.

Q You say in paragraph 26 that: The consequence of using such a RLL code is that the rate penalty is too large to see any coding gain.

Right?

A Yes.

Q And you cite the patent at column four, lines 15 to 22, right?

A Okay.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q So let's look at column four again. And that -- that paragraph that you cited does not start on line 15. It starts up on line eight, right?

A Okay.

Q And then it goes down to line 30 or something like that, right?

A Yes, uh-huh.

Q And so I would point you to line 24 of this -- line 24 says -- or line 22 to 24 says: An increase in noise band width translates to increased noise in the system which works against the coding gain.

Do you see that?

A Yes.

Q And they're talking about there, they're talking about using a d-equals-one constraint, right?

A I believe so.

Q And so when it says that the increase in noise bandwidth translates to increase in noise and it works against the coding gain, it doesn't say that it completely eliminates coding gain, right?

A Yes, it -- that's correct.

Q What I said was correct? Is that what you're answering?

A Yes.

Q So when you say in paragraph 26 of your declaration -- you say in paragraph 26 of your declaration that: Using an RLL code, the rate penalty is too large to see any coding gain.

A Uh-huh.

Q That statement in your declaration is not supported by that -- by that paragraph in column four of the patent, is it?

MR. VERDINI: Object to the form.

THE WITNESS: It's a stronger statement than is in the patent, yeah.

BY MR. MAYLE:

Q So you could see -- you could see a coding gain with a d-equals-1 constraint, correct?

MR. VERDINI: Object to the form.

THE WITNESS: I don't believe you would. I don't believe you would.

BY MR. MAYLE:

Q You could see it, though, couldn't you?

MR. VERDINI: Same objection, and asked and answered.

THE WITNESS: What you have to do is, because of the rate loss because of the low rate, you have to shrink the size of the marks so that you could be able to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

compare it with a higher rate code, so they both have equal density.

And my brain is telling me that, for the d-equals-1 code, that that shrinking of the marks to compensate for the rate penalty is -- increases the noise bandwidth and overwhelms the coding gain. So that's -- certainly, I stick by that -- that statement.

BY MR. MAYLE:

Q So are you now -- are you now saying that you would have to compare an RLL code at a certain rate with something else at the same rate; is that what you're saying?

MR. VERDINI: Object to the form.

THE WITNESS: At the same density. At the same -- you have to compare systems that operate at the same storage density. And if the rate is low, you have to shrink the marks compared to a high rate code, so that you have the same storage density. That's the fairest comparison.

BY MR. MAYLE:

Q Well, I thought you said before when I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

asked you how -- how I determine if the bit error rate was improved, you said you would look at the constraint versus no constraint, right?

A Yeah.

Q So now let's -- can we compare a d-equals-zero with a k code versus a d-equals-1 with a k code.

A Yes.

Q And compared those two?

A Absolutely.

Q Would the d-equals-1 code result in any coding gain or, could it, relative to the d-equals-zero code?

A In -- so my previous statement, when we said we need to compare constrained and unconstrained -- that was the first part of your question?

Q Yes.

A That comparison has to occur at -- you doesn't just -- you don't just compare the code rates together. The fairest comparison is the code rate, together with the size of the mark, so that they're both at the same density. That's -- I shortened my first answer.

That's the fairest comparison. And I'm

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

saying we would do that same kind of comparison for d-equals-zero and d-equals-1 in the example that you gave.

So I think it's generally believed that, at equal density, that the d-equals-1 constraint, the rate of that code is just too low to get any kind of coding gain from that. So I stand by that.

Q So all the stuff that you just said about comparing, with the marks being the same size and the density, none of that is in your declaration, right?

MR. VERDINI: Object to the form.

THE WITNESS: Fine, it's not in the declaration.

BY MR. MAYLE:

Q It's also not anywhere in the patent, is it?

MR. VERDINI: Same objection.

THE WITNESS: Anybody who knows anything about data storage, that's -- that statement about the d-equals-1 code is not making any sense because it has low rate. The overriding reason is because you have to compare it at equivalent density. That's -- that's -- that's basic stuff.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MR. MAYLE:

Q SO let's look at the patent. Let's look at figure -- Oh, let's look at figure 11A.

A Yes.

Q Do you see that list of rates? Do you see one 0.3333?

A Yes.

Q Where m equals two and n equals six? Is that a low rate or a high rate or --

A The very first one?

Q Yeah, 0.333.

A That's a low rate, correct.

Q Could I achieve a higher rate than that with a d-equals-1 constraint?

MR. VERDINI: Object to the form.

THE WITNESS: I have to look and see what the rate -- the allowable rates are for d-equals-1. This is 11A is for what? It's a --

BY MR. MAYLE:

Q You don't know? Are you saying you don't know?

A I'm saying --

MR. VERDINI: Object to the form.

THE WITNESS: I want to make sure I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

understand the table and the context.
You just put this table in front of me.
So what's the value of d in this table?

BY MR. MAYLE:

Q This is -- this is not -- this is an MTR code.
A It's an MTR code. Okay, great.
Q And it says it can have a rate of 0.3333, right?
A So what's the value of j and what's the value of k? K stands at four. What's the value of j in this example?
Q J equals two.
A J equals two, k equals four. So this has a rate of .33. And we want to compare that to a d-equals-1 code; is that right? That's what you want to compare with?
Q I don't know. I'm just asking you, could I get a better rate than that, higher than .33, with the d-equals-1 code?
A You might be able to. You might be able to.
Q So in that case, would the d-equals-1 code potentially outperform the MTR code?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MR. VERDINI: Object to the form.
THE WITNESS: It might, yeah.
Yeah. That's a good point.
BY MR. MAYLE:
Q Okay. What I'm trying to get at is whether your interpretation of Claim 13 requires, inherent in the j constraint, some concept of reducing the bit error rate. That's what I'm trying to get at.
And you've told me that the RLL D-equals-1 code will not do that. You say that in paragraph 26 of your declaration.
A Uh-huh.
MR. VERDINI: Object to the form.
BY MR. MAYLE:
Q But within the scope of Claim 13 are extremely low rates MTR codes, right? The claim says m and n, right?
A Yes.
Q So could I have, in Claim 13, m equals four and n equals 15? Could I construct a code like that pretty easily?
A Yes, you probably could.
Q And the rate of that code would be four divided by 15, right?

A Correct.
Q Let's use four over 16. Can we do that?
A Okay.
Q So the rate is .25, right?
A Yup.
Q And that's a fairly -- said to be a low rate, correct?
A That's a fairly low rate code. No one would ever use that code.
Q I'm not saying if anyone would ever use it. It's claimed, right?
MR. VERDINI: Object to the form.
THE WITNESS: I -- yeah, I believe so.
BY MR. MAYLE:
Q Would you say that that code has a j constraint?
A If it's an MTR code, yeah, it has a j constraint. Yes.
Q And so you think that would reduce the bit error probability on the magnetic recording system?
A Yes.
Q And if I had a low rate like that, wouldn't I have to increase the speed and bandwidth

at which the decoder must operate to produce data bits at a particular speed?

A Yes, you would need to, but as I said, no one would ever use that code.

Q And if I had to do that, wouldn't you agree with me that doing that would lead to an increase in noise bandwidth, which would translate to increased noise in the system that would work against coding gain in that example, right?

A Yes.

Q But you would still say it has a j constraint, right?

A Yes, by definition it has a j constraint, yup.

You're talking about the RLL code or are you talking about the d-equals-1 code or the --

Q The MTR code with the rate 0.25 --

A Yes.

Q -- is what we're talking about.

A Yes.

Q You'll say that has a j constraint?

A Yes.

Q But you would say it doesn't -- or does it reduce the bit error probability of the magnetic recording system? Can you just a priori whether it

would or would you have to check something?

A Yeah, you would have to check. Yeah, you would have to check it.

Q So in your interpretation of the claim I would always have to check it, right, to see if I have a j constraint?

MR. VERDINI: Object to the form.

THE WITNESS: You would select a j constraint that would reduce the error probability. That's the only thing that makes sense. You would match the j constraint to the PR target, and you could pick the -- you would pick the j constraint for which it eliminated certain error events, i.e., lower and reduced error probability.

You would never pick -- you would never pick a j constraint that had -- that had super low rate that may give a noise bandwidth little help.

BY MR. MAYLE:

Q Here again, I'm not asking what someone would do or what would typically be done. We're just talking about claim construction. That's all we're talking about.

A I understand, and that's one of the reasons do elucidate the j constraint. It's saying pick a j constraint that reduces the error probability. You would never pick a j constraint that increased the error probability.

Q Okay. Then I'm going to tell you to assume that I did just that. I picked the j constraint in a particular code, in a particular m over n rate, a particular k and when I did that, I limited the consecutive transitions but I increased the error probability.

A Okay.

Q Did I use a j constraint, as you interpret the term j constraint?

A You've used -- yeah, you used the j constraint, but again -- well, yes, you've used the j constraint. You're talking about the construction that's --

Q Correct.

A -- the construction that I proposed?

Q Yes.

A Yeah, I would say no, you haven't.

Q And the reason you're saying no is because I didn't reduce the bit error probability, correct?

A Correct.

Q Even though I've limited the consecutive transitions to j, I still don't have a j constraint; isn't that right?

A If you've limited -- if you've limited the number of j --

Q In my hypothetical, you just said I wouldn't have a j constraint. And I'm saying, the reason you said that is because I've not reduced the bit error probability, correct?

A You would -- you would still have the j constraint, it's just that you would only want to choose a j that reduces error probability. That's the purpose for illuminating -- for illuminating that piece in the claim construction.

Q Right.

A Because if you chose the wrong j constraint, you're going to cause the error probability to go up and you're going to get fired because you've got to --

Q I can guarantee, if I was in charge of it, this thing would blow up.

But I'm telling you something different. I'm telling you to assume that someone does do that.

A I understand.

Q Okay?

A Uh-huh.

Q It doesn't matter if they get fired. We're only doing claim construction.

A Uh-huh.

Q You're telling me, in that example, that that person has not used a j constraint as you understand the term?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: That's correct.

BY MR. MAYLE:

Q Let's go on to k constraint. And let's look at 57.

MR. KNEDEISEN: What's 57?

MR. MAYLE: Paragraph 57, sorry. The declaration.

THE WITNESS: I'm sorry. Page?

BY MR. MAYLE:

Q Oh, it's page -- well, first, look on page 24 again. Look at what the proposal was.

On page 24 the proposal -- there is a sentence there that says: The K constraint ensures timing recovery, correct?

A Yes.

Q Now let's go over to -- by the way, is that your opinion of how k constraint should be interpreted?

A Yes.

Q So let's then go to 57, paragraph 57. And you say -- here you're citing the specification at column three, 16 to 17, right? That's what you're citing?

A Okay.

Q And that part of the specification talks about to facilitate timing recovery, right?

A Yes.

Q But your interpretation is the k constraint ensures timing recovery, right? You saw that on page 24?

A Yes.

Q Now, is there a difference between to facilitate timing recovery and to ensure timing recovery?

A Ensure is stronger than the word facilitate.

Q And so you're --

A So they're not the quite the same.

Q So you're imposing an even stronger condition on k. Your opinion is that the k

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

constraint ensures timing recovery, right?

MR. VERDINI: Object to the form?

THE WITNESS: Yeah, yeah --

BY MR. MAYLE:

Q Correct?

A I'm comfortable with the use of the term ensuring timing recovery.

Q And in Claim 13, the word, you know, k is used, right?

A Yes.

Q But there's no upper bound or lower bound to k in the claim, is there?

MR. VERDINI: Object to form.

THE WITNESS: Please ask me again.

BY MR. MAYLE:

Q In Claim 13, is there a bound on -- does the claim impose a bound on what k is?

A No, it does not.

Q Does Claim 14 have a bound on what k is?

A No, it does not.

Q And Claim 17 doesn't have a bound on k, either, does it?

A Correct, it does not.

Q Let me give you some hypotheticals again. Let's say someone has an MTR code and they pick k

equals ten. Would you expect that that could ensure timing recovery, k equals ten?

MR. VERDINI: Object to the form.

THE WITNESS: It would ensure a certain level of quality in timing recovery.

BY MR. MAYLE:

Q Usable?

A It can ensure -- it can't ensure ultimate, 100 percent all the time, but it can ensure a certain quality of timing recovery.

Q Would someone get fired for k equals ten?

A No, that's probably okay.

Q Okay. Let's try k equals 100, would that ensure timing recovery?

MR. VERDINI: Object to the form.

THE WITNESS: Would be much -- much weaker. Again, it would only ensure a certain level of timing -- timing recovery. Probably timing recovery would be ensured 99 percent of the time, something like that.

BY MR. MAYLE:

Q How about k equals 1 million, would that ensure timing recovery?

MR. VERDINI: Same objection.

THE WITNESS: Same kind of thing. You know, probably the vast -- good majority of the time timing recovery would be satisfied, but just the quality would not be -- wouldn't be as good.

BY MR. MAYLE:

Q Let's say I set the k value higher than the bit size of the disc I'm using.

A Just say infinity.

Q Okay, k equals infinity. Would that ensure timing recovery?

MR. VERDINI: Object to the form.

THE WITNESS: Again, I would say it wouldn't -- a certain level, you know, you still probably would -- just statistically you would have enough ones -- statistically, you wouldn't have an infinite run of zeros.

So on average, you know, you get -- I would say -- I mean it would ensure a certain level of quality just because the statistical probability of having an extraordinarily long run of zeros is so low.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q So you're saying --

A It would be okay if for some reason other parts of your system were so good, a k-equals-infinity code would still ensure that you have a certain level of timing recovery because of other -- other -- the statistical likelihood of long string of zeros is enough to -- and the other parts of the system are enough to ensure -- ensure timing recovery.

Q So let's do a hypothetical where I set the k equals infinity, and I run a bit string of data. I force feed it data all zeros to the disc. Would that ensure timing recovery, if I went to read it back?

MR. VERDINI: Object to form.

THE WITNESS: You're going to get fired.

BY MR. MAYLE:

Q Let's say I put --

A Because you haven't started any information.

Q Let say I put, randomly, ten ones on there, on the disc, and I fill up the disc with zeros and randomly place in ten ones. Would that ensure timing recovery?

A Say that -- give the hypothetical again.

Q So the k constraint is set to infinity.

A Yes.

Q Say it's a large disc. Do you want to pick a side?

A Whatever. Big.

Q Big. And I fill it up with zeros, but I randomly place in, say, three ones on the disc.

A Uh-huh.

Q Would that ensure timing recovery?

MR. VERDINI: Object to the form.

THE WITNESS: It's very likely you'd have extraordinarily poor timing recovery.

BY MR. MAYLE:

Q So it would not ensure timing recovery, correct?

A It would not ensure timing recovery.

Q Would I still have a k constraint?

A Yes, you would. You would no longer have your k-plus-infinity constraint. You've thrown in three ones, so you've guaranteed that there's -- you've now -- there's no longer a k-equals-infinity constraint.

Q Three is less than infinity, correct?

A I think you told me you put an infinite number of zeros on the disc.

Q Not an infinite number. I said I filled up the disc. It's a finite size disc.

A Yup.

Q And flood it with zeros and randomly put in three ones.

A Right.

Q The k equals infinity.

A No, k is no longer infinity.

Q K is not the measure of many -- why is k not equal to infinity?

A Because you threw in -- you purposely put in ones in certain spots, so we're guaranteed to have some finite number of zeros between these ones. You're guaranteed.

Q K is the maximum number of nontransitions, right?

A Yeah.

Q And so I'm below infinity. Three is less than infinity, correct?

A Yes. So your constraint is no longer infinity. Your k constraint is no longer infinity. Your constraint is the longest running zeros between the ones that you put on the disc.

Q If k was infinity that just means I can't have infinity plus one nontransitions, right? It doesn't say how many I can have less than.
Every number less than infinity is allowable, correct?
A Yes, but by virtue of the fact that you told me, I'm going to put ones there, you didn't say, statistically I might put ones in there. But you say, I'm going to put three ones, I absolutely, 100 percent know there's no k constraint.
Q Isn't k related to the maximum number of nontransitions that would be allowable in a row?
MR. VERDINI: Object to the form.
It's been asked and answered.
THE WITNESS: Ask that again.
BY MR. MAYLE:
Q Isn't k related to the maximum number of transitions -- nontransitions that are allowable in a row? I haven't gone over infinity zeros in a row, have I?
A Right.
Q So therefore, I do have a k constraint, it's just really high, correct?
A Right. But it's not infinity.
Q Let's say I take a one gigabyte hard

drive and I set k to ten gigabytes in the chip. And I fill up the gigabyte hard drive with a -- gigabytes of zeros and three ones that are randomly put in there. I still have a k constraint, don't I?

A Yes.

Q And it's not been violated, right?

A That's right.

Q And that system that I just devised will not ensure timing recovery, correct?

A It will just have -- it will ensure a very poor level of timing recovery.

Q So is that what you mean -- when you say the k constraint ensures timing recovery, you mean any -- any di minimis-ly low amount is good enough; is that what you're talking about?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, I guess I am.

Even -- even if it's, you know, a billion bits, a billion zeros between consecutive ones, as soon as that -- you may lose timing in between, but as soon as that first one comes back, you'll be able to reimprove your timing. It won't be very good, but that one will -- will improve your timing recovery.

BY MR. MAYLE:

Q And so you're saying that in every case, in every hypothetical that I can think of where there's -- as long as there's a k constraint, no matter how high it is, even if it's bigger than the disc size, that you will tell -- when I ask you, have I just ensured timing recovery, you will say yes to every hypothetical I can think of, right?

MR. VERDINI: Object to the form.

THE WITNESS: I won't say yes that you'll be able to recover timing throughout, but you'll eventually be able to recover your timing, and that's what I mean bit overall quantity will be very, very low. You will losing time for a while, you could lose your timing after a certain long string of zeros, and as soon as the ones came, you would recover it back.

So, on average, your quality would be very low, but there definitely will be periods of time where, while you will lose -- where you will lose timing. So the overall -- that's my point. The quality of the timing recovery, that

would be unacceptably low. But it --

Q But it still --

A You would eventually get it back or you get portions of it back. You lose part -- you would certainly lose it in between. That's why I'm using the quality. It's not an absolute.

Q What could I do -- it seems like, to me, the only way I could not have a k constraint is if I put on the disc all the same sequence and fill up the entire disc. Is that the only way not to have a k constraint?

MR. VERDINI: Object to the form.

BY MR. MAYLE:

Q Say like I have a one gigabyte hard drive and I fill it with zeros.

A Uh-huh.

Q And there aren't any ones.

A Right.

Q That would not facilitate timing recovery, right?

A The way systems are designed today, right. You wouldn't have -- by driving timing from the data, you wouldn't have the ability to do that.

Q So are you saying -- is that the only way, at least sitting here now, is that the only

hypothetical we could think of where you would tell me that I wouldn't be meeting the definition of k constraint that you've set forth on page 24 of your declaration?

MR. VERDINI: Object to the form.

THE WITNESS: Yeah, I think strictly speaking, yes, it is -- the hypothetical are -- you know, I don't want to say ridiculous because I don't mean to be that pejorative.

But a single one on a disc will help -- will help some level of timing recovery. It will be very, very, very poor, but better -- better timing recovery than you would have with the all zeros.

BY MR. MAYLE:

Q Okay. Now, LSI -- it's on Exhibit 1004, page four -- is proposing that the k constraint is related to the maximum number of allowable consecutive --

A Give me one second here.

Q LSI is --

A Page? I'm sorry.

Q Page four of this.

So the University is saying that the k constraint ensures timing recovery. That's what we just talked about.

A Uh-huh.

Q But the University doesn't say anything about -- with the k constraint, they don't say anything about if the number k relates to a number of consecutive nontransitions. That's not part of their definition, is it?

MR. VERDINI: Object to the form.

THE WITNESS: That's right, it's not part of the definition.

BY MR. MAYLE:

Q They didn't say, whatever it is, it ensures timing recovery, correct?

MR. VERDINI: Same objection.

THE WITNESS: I mean, I think -- maybe I should have mentioned before, because I think people know what the k constraint is. It's not something new in this part of the patent. A PHOSITA would know what the k constraint -- what the k constraint is.

BY MR. MAYLE:

Q So what we're going to do in this case is

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the Court will tell us what the claim terms mean.

A Uh-huh.

Q Potentially.

A Uh-huh.

Q And then the jury will get that, and the jury is probably not going to be your students.

A Uh-huh, right.

Q And they probably won't know what this means. So then they're going to determine, well, using this interpretation, either does this product infringe or does the prior art read on it, et cetera.

A Uh-huh.

Q And so if we just tell someone that the k constraint ensures timing recovery, period, that wouldn't tell the person whether or not it's required -- the k constraint requires a limit on the consecutive number of nontransitions, does it?

A But in explaining it to the jury, you could, again, point out this other -- this other clause in 13 that says k consecutive sample periods without the transition. That's the -- that clause is enough to explain, you know, the maximum run length of zeros.

Q Okay.

A And it just illuminates that it's for

timing recovery.

Q Let's look at page 29 of your declaration. We're going onto a new topic.

Producing sequences of n-bit code words.

A Page 20.

Q Yes.

A Uh-huh.

Q You have here on page 29, so I think the parties are basically agreeing on what m-bit and n-bit means, so we'll just skip that.

A Uh-huh.

Q Producing sequences of n-bit code words seems to be a dispute. And you say that: Minnesota's construction was to claim the coding process produces as output sequences of bits where each sequence is n-bit long.

Right?

A Yes.

Q So let's just -- again, keep your finger there. Let's compare it to what -- Exhibit 1004, page two.

A Okay.

Q There, the University -- it looks like they've just dropped off the phrase, the claim encoding process, essentially. Would you essentially

agree with that?

A Yes.

Q And in your declaration, you're agreeing with the University's proposal that was on page 29 of your declaration, right?

A Yeah.

Q That's what you say it means?

A Yup.

Q Okay. And quick question on this paragraph 62. You say that the data words are turned or mapped into code words.

What does that mean turned or mapped?

A That they can be processed by -- you know, an algorithm or circuitry or they can be -- some circuitry could turn them. Mapping might be just go to a look-up table. Take the data words in the table and input to the table and look it up. So I think that's just what that means.

Q In the next sentence you say that a PHOSITA would understand that the data words are inputs to the encoding process and the code words are the output?

A Yes.

Q So does that mean, when you say it that way, the input and the output, does that mean the

encoding process ends when the n-bit code words are made?

MR. VERDINI: Object to the form.

THE WITNESS: The encoding of that -- of that particular data word is done, but I wouldn't say the whole encoding process is done. The whole encoding process is done over and over and over again.

BY MR. MAYLE:

Q I see.

A So but that --

Q I see. let's go -- enough on that.

Let's go to page 31 of your declaration. Generating no more than j consecutive transitions of said sequence and recorded waveform such that j is greater than or equal to two.

Do you see on page 31 you have the University's proposed construction, right?

A Yes.

Q And you agree with that -- you're giving your opinion in your declaration. I think you're agreeing with the University's construction, correct?

A Yes.

Q Now, let's look at paragraph 69 of your

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

declaration. Strike that.

Let's just look at the claims again. You can keep your declaration out. We'll go back to it in a second. Look at the claims.

Claim 13, it says: Generating no more than j consecutive transitions.

Right?

A Uh-huh.

Q Such that j is greater than or equal to two, right?

A Yes.

Q Claim One -- let's compare that with Claim One. Claim One says, in that part that was added, you remember, in prosecution: The j constraint is defined as the maximum number of consecutive transitions allowed.

Do you see that?

A Uh-huh.

Q Do you think that the maximum number of consecutive transitions allowed, as recited in Claim One, is synonomous with saying in Claim 13, generating no more than j consecutive transitions such that j is greater than or equal to two?

A Yes.

Q So --

A It's the same. They both allow j.

Q So they both would allow j consecutive transitions?

A Uh-huh.

Q But in Claim 13, to do the generating step, could you do the generating step of Claim 13 without ever getting to the limit j consecutive transitions which would be allowed?

MR. VERDINI: Object to the form.

THE WITNESS: Could you ask again, please.

BY MR. MAYLE:

Q So to do the generating step of Claim 13, could that claim step be performed, hypothetically, without hitting the limit of j of what was allowed?

A You could produce one consecutive transition or two consecutive transitions or three consecutive transitions if j was five. That's it. Yeah, that's allowed.

Q So what you if I did a d-equals-1 constraint and I would only get to one consecutive transition, the a nontransition, would that -- would that scenario -- let's pick j equals two. Let me start over.

J equals two in the Claim 13. I'm going

to run a d-equals-1 constraint, such that there's -- I'm getting a nontransition after every transition.

A Okay.

Q And I will never get to two consecutive transitions, correct?

A Under the d constraint.

Q D equals 1.

A Correct.

Q And do you think that that scenario would be something that this part of the claim is talking about or is that something different?

MR. VERDINI: Object to the form.

THE WITNESS: I'm trying to understand the gist of your question. I mean, I'm trying to figure out exactly what the question is you're asking. You need to ask it again.

BY MR. MAYLE:

Q So the way I see it, Claim One talks about the j constraint is defined as what is allowed.

A Yes.

Q Do you see that?

A Uh-huh.

Q It actually uses those words, right?

A Yes.

Q Claim 13 doesn't talk about what's allowed. It says generating no more than, correct?

A Uh-huh.

Q Are those synonomous concepts or any daylight in between them?

MR. VERDINI: Objection. Asked and answered.

THE WITNESS: I mean, that's generating no more than; it also describes what's allowed. So -- so one consecutive or two -- if a j equals five, one consecutive or two consecutives or three consecutives are allowed. They fit inside that definition.

MR. MAYLE: Let's take a break here. I think the next module will be the last one.

THE WITNESS: Okay.

MR. MAYLE: We're running out of tape. We're almost done.

THE VIDEOGRAPHER: 4:20. We're off the record.

(Brief pause.)

THE VIDEOGRAPHER: 4:34. We're back on the record. This is the

beginning of media number six.

BY MR. MAYLE:

Q Professor, we've been talking about Claim 13 quite a bit today, and it has that generating step. And it says: Generating no more than j consecutive transitions of said sequence in the recorded waveform, right?

MR. VERDINI: Object to the form.

Such that j is greater than or equal to.

BY MR. MAYLE:

Q Such that j is greater than or equal to.

My question is: What does it mean to have a transition of a sequence?

MR. VERDINI: Object to the form.

THE WITNESS: Transition of said sequence in the recorded waveform, are you asking in the context of that, or are you just saying separate from this transition of said sequence?

BY MR. MAYLE:

Q Sure. I understand it's in the recorded waveform, that j is greater or equal to. But I'm focusing on what does it mean to say a transition of a sequence?

A A transition of said sequence, just by

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

itself?

Q Right. Is it -- first, what is the sequence?

MR. VERDINI: In -- objection. I think the problem -- in the context of the patent is -- is what you keep asking.

THE WITNESS: Right.

MR. VERDINI: As opposed to generally.

BY MR. MAYLE:

Q I'm talking about the claim. I'll just make clear. I am definitely talking about Claim 13.

A Okay.

Q And it says, transitions of said sequence. It says other things, too, but I'm just focusing on, transition of said sequence. What does that mean?

A Yeah, I mean, the sequence is a sequence of bits, but I think it needs to be read all together, transition of said sequence in the recorded waveform. So there can be a transition from a zero to a one, but the transition in the recorded waveform is the, you know, voltage level that changes from, say, you know, plus one to minus one. That results in a transition recorded on the medium.

Q Thank you.

But a transition from a zero to a one -- I understand -- we're setting aside for a minute. I understand your position that the zeros and ones then correspond to voltages.

A Uh-huh, yes.

Q I'm not getting at that point right now.

A Uh-huh.

Q A transition from a zero to a one is not a transition of the sequence, is it?

A Transition from a zero to a one is not a transition of a sequence, I would agree with that. That was your question, I think.

Q Right. And the claim is talking about n-bit -- sequences of n-bit code words, right?

A Sequence is talking about n-bit code words, yes.

Q So there has to be at least -- to make a sequence, there's n-bits in a row and that's a sequence, right?

A Yes.

Q And so --

A I'm sorry, ask it again. I was distracted.

Q The sequence in the claim is n-bits long,

correct? That's a sequence?

A That's a code word.

Q Okay. That's one code word.

A That's one code word.

Q And then there's a sequence of those code words, correct?

A Correct.

Q So the sequence in the claim might be more than one code word long?

A Correct.

Q Let's say n equals five, and we'll take a sequence with three code words. That would have 15 bits, right?

A Yes.

Q Does it make sense to speak of a transition of a sequence? Do you understand what I'm trying to understand?

A It does not make sense to say a transition of said sequences. That doesn't make -- that's a difficult thing to unravel. It's referring to the transitions in the recorded waveform.

So transitions that might occur in the said sequence, those transitions it's really referring to in the recorded waveform.

Q Okay. In the recorded -- then let's go

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

with that angle.

In the recorded waveform, should we call them -- let's put some meat on this. Should we call them voltages or should we call it magnetic particles? I'm going to let you pick one and then I'll ask you -- I guess I can ask you both ways. Which do you prefer?

A I'm sorry, I was distracted as you were talking.

Q I think I'm not getting through to you the point I'm trying to find out.

A Yup.

Q So let's set aside bits, and let's go to either voltages or magnetic particles or -- because you keep bringing in the recorded waveform.

A Yeah.

Q So I think you want to go there, so which one should we pick? I'm going to ask my question, but instead of talking about ones and zeros, I'll ask you about voltages, if you're more happy with that. Let's do it with voltages.

A Fine. Yeah, I don't know what the question ultimately is.

Q Let's do it with voltages. Let's say that the sequences of n-bit code words are translated

into voltages.

A Okay.

Q And so wherever I had a one, I could have a one level of a voltage. Wherever I have a zero, I could have a zero voltage, for example. Correct?

A Okay, fine.

Q And then that sequence of n-bit code words could be, if you would, a sequence of voltages?

Does that make sense?

A Okay. I'm fine with that, yeah.

Q Something corresponding to that.

A The waveform has that.

Q What does it mean to have a transition of sequence in that context? Does the whole thing -- the whole sequence change or what does it mean?

A Right. That's -- that's -- I agree that transitions of a sequence is -- doesn't make sense, but the transitions in the recorded waveform does. So that's why, when I read that, that's how I read that, as not referring to transitions of the said sequences.

Right, like you said, that doesn't -- that doesn't make sense.

Q Is that only doesn't make sense because it -- are you saying it doesn't make sense because

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

it's bits or it doesn't make sense because transition of sequence doesn't make sense? It's like a plural thing, a transition of a sequence.

I'm trying to understand --

MR. VERDINI: Objection.

THE WITNESS: There are bits that might be changing inside -- inside a sequence. So transitions that might occur in the sequences, you know, might make some sense.

BY MR. MAYLE:

Q Okay.

A But the way it's written -- that's why I keep going back to, why saying it makes more sense if the transition's referring to the waveform. That's why I keep going back to that.

Q Right. So if we're getting away from bits and talking about a waveform --

A Yeah.

Q You'll say it now makes sense?

A It makes -- so far, it makes more sense.

Q But if the sequence of bits corresponds exactly to something on the waveform, and the claim says transitions of said sequence in the recorded waveform, what does that mean?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A I think we've been -- we've been through this like a whole bunch of times. So I guess I'm trying to get at what your question is.

But, you know, the -- maybe the easiest thing to do is just to recite what I've written here or what it means.

Q I'm not trying to get to the point of talking about whether it's magnetic or it's voltage or its bits.

What if it said transitions -- j consecutive transitions of bits or whatever is represented by bits, inside of -- inside of a sequence, rather than saying -- do you see the point I'm trying to make?

A transition of a sequence does not make grammatical sense, does it?

A Right, I don't believe it makes grammatical sense.

Q Okay.

A So we're talking about -- and that's where it goes -- that's where we're talking about the transitions in the recorded waveform. That does make sense.

So we're putting no more than j consecutive transitions in the recorded waveform.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

There is an underlying bit sequence that dictates that, but it's ultimately -- I mean, that's what the patent is really all about, generating no more than j consecutive transitions in the waveform.

Q Okay.

A Right? And underlying there, there would be changes in the bit sequence that drive that. But what it's really about is no more than j consecutive transitions in the waveform.

Q Let's go to paragraph 74. Let's take a couple quick hitters.

We're now talking about in paragraph 74, you see above this F: Generating no more than k consecutive sample periods of said sequences without a transition.

We're off j now, finally. We're on the generating k step. And you say in paragraph 74 that the patent uses the term sample periods. Do you see that on the bottom of page 74?

A Yes.

Q And you say it's in the background. Go to the next page. You say it's at column two, line to ten to 15, right?

A Right.

Q And it says the patent describes the

sequence detector, and it has sample periods.

A Uh-huh, yeah.

Q So that part of the specification is talking about reading data, correct?

A Right.

Q It's not talking about writing data; is that right?

A Okay.

Q Is that right?

A Right.

Q And is Claim 13 directed to reading data or writing data?

A Claim 13 is about writing, but if you don't have kind of the same sample period in the reading with the writing, those have to be -- those have to be matched. So whatever sample period we have on the reading side, we have to have the same sample period on the writing side.

Q Okay. And you say on paragraph 74, you say -- I think it's on page 34. Line three to four. On page 34, line three to four.

You say: The readback signal generated by the read head is typically sampled once per bit region.

Right?

A Right.

Q You don't say that it's always sampled once per bit region, right?

MR. VERDINI: Object to form.

THE WITNESS: Right. I say typically, right.

BY MR. MAYLE:

Q And it could -- the readback signal could be -- or the sample rate could be, for example, higher than once per bit region, correct?

A Yes.

Q Let's go to page -- paragraph 85. And do you see you gave a little example in the middle of the page? Do you see that Transition One, Transition Two, Transition Three?

A Uh-huh.

Q Now, let me ask you in that example that you gave, which is 001011, how many transitions are there from -- just from zero to one?

A There are two transitions from zero to one.

Q Right. And how many transitions are there from one to zero?

A There's one transition from one to zero.

Q So there's two transitions from zero to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

one and one transition from one to zero, right?
A Yes.
Q Now, the claim, if you look on page 36 at the bottom -- open up your declaration and look at the previous page. You're quoting the claim language. We're on Claim 17 now.
And it says: Wherein the binary sequences produced by combining code words have no more than one of j consecutive transitions from zero to one and from one to zero.
Right? No more than one of zero to one and one to zero, right?
A Okay.
Q So why do you say in paragraph 85 that there's three transitions there?
A There are three transitions there.
Q Is three the sum of the transitions from zero to one plus the transition from one to zero? Is that how you arrive at three?
A Yes.
Q What about the language that says in the Claim, one of j consecutive transitions from zero to one and from one to zero? Do you read that as the sum of?
A Yes, that's what and means.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q But what about the language one of, what does that mean?
A I think it's distinguishing the zero to one and it's distinguishing the one to zero.
Q And are you -- do you have to pick one of those or do you add the two to arrive at how many transitions?
A You consider both of them.
Q And then do you take the higher one, do you add them; do you take the lower one, subtract them? What do you do?
MR. VERDINI: Object to the form. Asked and answered.
THE WITNESS: You take the number of transitions from zero to one and the number of transitions from one to zero and you add them.
BY MR. MAYLE:
Q That's how you got the three?
A That's what the and means.
Q But it's not what the one of means, right?
MR. VERDINI: Objection. Asked and answered.
THE WITNESS: I -- I read the and

as adding. If it was or, that wouldn't be distinguishing either. It's not distinguishing them.

BY MR. MAYLE:

Q Let me ask you then -- let's go to page 38 of your declaration, the top. You see also in Claim 17 there's also something that says: No more than of k plus one consecutive zeros and k plus one consecutive ones.

Do you see that?

A Okay.

Q That also has the and that you were talking about, right? It has the word and?

A Uh-huh.

Q And it also has the word one of, the words one of, right?

A Uh-huh.

Q I'll give you an example. Here's a bit stream, 00111. Okay?

MR. VERDINI: I don't think that's in your declaration. I think he's just giving you an example.

THE WITNESS: Okay.

BY MR. MAYLE:

Q Yeah. 00111.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Uh-huh.

Q How many consecutive zeros are in that bit stream?

A 00111, there are two consecutive zeros.

Q And how many consecutive ones?

A Three.

Q Right. So would you say that there's five consecutive bits? Do you add two to three when it comes to k or --

MR. VERDINI: Object to form.

BY MR. MAYLE:

Q It says and. So if I asked you -- if that's the example, 00111, and then I ask you if there's, to read this claim, no more than one of k plus one consecutive zeros and k plus one consecutive ones, what is the value of k in our example 00111?

A What is the value of k?

Q Uh-huh. Would you look at the zeros or the ones, both, add them? What would you do?

A K is a constraint. I would say there are three consecutive ones and two consecutive zeros. So the --

I'm not sure what your question is. What's the value of k? I don't know what the value of k is. K is the constraint. You just gave me a

sequence. You told me to count the number of bits in the sequence. K is a constraint, not --

Q Okay. Let's say I have a code that allows eight consecutive zeros and 57 consecutive ones. What's the value of k?

MR. VERDINI: Object to the form.

THE WITNESS: In NRZ format?

BY MR. MAYLE:

Q Sure.

A I would say the larger of the two.

MR. MAYLE: I think we're out of time.

MR. VERDINI: I have some questions. Good timing. That alarm went off right when you were done. That was good.

EXAMINATION

BY MR. VERDINI:

Q Professor McLaughlin, if you would pull out Exhibit 1011, which is a patent by Soljanin.

A Okay. Soljanin.

Q Soljanin. I'm going to have to learn that between now and Wednesday.

A She's a friend of mine. She's not a friend of either one of yours, so --

Q No, clearly.

It seems to be the only one you don't have there. If you would turn to column two of the patent.

A Okay.

Q And read to yourself lines eight through 32.

A Okay.

Q Having read that, is lines -- or column two, lines eight through 34, as written by Professor Soljanin, consistent with your definition of transition?

A Yes.

Q Why do you say that? What would you point to?

A Because in this she is saying -- she is describing the seven binary bits to be represented in the magnetic medium, and then she's describing kind of the waveform in the form of electrical current, as it's been -- then she just goes on to describe the waveform or the electrical signal.

That would take that binary sequence and translate it into magnetic medium, you know, the flipping of the domains in the magnetic medium.

Q At line 16, she writes: In particular,

transitions from one direction in the current, paren, and consequently in the magnetic field, to the other correspond to binary ones in the sequence.

Did I read that correctly?

A Yes.

Q And that's your -- that's consistent with your definition of -- or your interpretation of transitions?

A Yes. That's NRZI. She's describing the NRZI method of storing information on a disc.

Q If you would pull out Exhibit 1001, which is the '601 patent. And if you would turn to column four at line one through nine.

A Column four, line one through nine; is that right?

Q Yes. What is an E PR4 ML?

A E squared PR4?

Q Yes, sorry. I missed the squared.

A That's a type of partial response target. It describes the intersymbol interference target.

Q Is that a magnetic recording system?

A Yes.

Q And if you turn to column seven.

A Yes.

Q Line 30 through 40.

A Yes.

Q Again, it references the E squared PR4?

A Uh-huh.

Q Is that a reference to a magnetic system?

A Yes.

Q Does E squared PR4 apply to optical?

A No, I don't believe any system has used that target.

Q When Mr. Mayle was asking you questions about the Blu-ray correspondence back and forth in their exhibits 1012 through 1019, you testified you had not seen any of those documents before rendering your opinions as reflected in Exhibit 1005, correct?

A Correct.

Q Having now looked at those, do any of those correspondence change your opinion?

A No.

Q And had you reviewed them before you provided your declaration in Exhibit 1005, would they have changed your opinion?

A No. I've not -- I have not reviewed them and they would not change my opinion.

Q Turn to 1005, which is your declaration. And page 21 at paragraph 47.

A Okay.

Q Mr. Mayle asked you about the call-out in paragraph 47 from the prosecution history, correct?

A Yes.

Q And you did a comparison of what was in the call-out box in 47 as compared to the amendment to Claim One?

A Yes.

Q Do you recall that?

A Uh-huh.

Q If you would, in the middle of call-out box, it's about halfway down, it starts with Means for Imposing?

A Yes.

Q Could you read that?

A Means for -- oh, out loud?

Q Uh-huh.

A Means for imposing a pair of constraints, j;k, on the waveform wherein the j constraint is defined as the maximum number of consecutive transitions allowed on consecutive clock periods in the encoded waveform.

Q Now, if you would turn to Exhibit 1002, which is the prosecution history?

A Uh-huh.

Q And turn to page 60.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A Yes.

Q And when they amend Claim One, it reads: Means for imposing a pair of constraints on the encoded waveform.

The only thing that's different between what you read in paragraph 47 is they included the word encoded before the waveform on the pair of constraints, correct?

MR. MAYLE: Objection.

THE WITNESS: The call-out, yes, says only -- says on the waveform and this amendment to Claim One says encoded waveform.

BY MR. VERDINI:

Q Isn't that consistent with your opinion that there's only one waveform that's the recorded -- encoded recorded waveform?

MR. MAYLE: Objection.

THE WITNESS: Yes, that's consistent.

BY MR. VERDINI:

Q Claim 13 has a preamble, and then we've talked about some steps that occur after the preamble; am I correct?

A Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q Is there anything -- strike that.
Having read the patent, do those steps have to occur in some sequential order?
A Not necessarily.
Q Why not?
A It's not clear from those individual steps that they all occur in that particular order. That's true. They don't need to -- they don't need to -- they don't need to be done in that order.
Q Exhibit 1004, if you would, turn to that. That's the joint chart.
A Joint chart, yes.
Q This one (indicating).
And during Mr. Mayle's direct, he identified some areas where you were proposed -- your identification of the proposed construction in your declaration was different from what was in the claim chart. Do you recall that?
A Yes.
Q Is there any substantive difference, in your mind, between any of the proposed constructions that you identified in your declaration and opined upon as compared to what is more -- the proposed constructions in Exhibit 1004?
MR. MAYLE: Objection.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS: No, there's no substantive differences.

BY MR. VERDINI:

Q And your opinions that you set forth in Exhibit 1005 would apply to all of the proposed -- to the proposed constructions as stated in Exhibit 1004, correct?

A That's right, yeah.

Q If you would turn to claim term six, which is the generating no more than six consecutive -- no more than j consecutive transitions of said sequence in the recorded waveform such that j is greater than or equal to two.

Do you see that?

A Yes.

Q In your opinion as a person of ordinary skill in the art, would a person know what claim term six means in reading the patent?

A Yes.

Q And you talked about it not making grammatical sense in some respects?

A Yes.

Q But to interpret it in the context of the claims and the patent, a person of ordinary skill in your art, in your opinion, would be able to do that?

A Yes.

Q And is that understanding reflected in the proposed construction by the University?

A Yes.

Q Leaving out -- when you wrote your declaration -- and that's Exhibit 1005 -- I think you testified you did not have the Defendant's proposed constructions for any claim terms; is that correct?

A Correct.

Q I just want to walk through just a couple --

MR. MAYLE: Just for the record, I think you actually made a privilege objection when I asked him that and would not allow him to answer.

MR. VERDINI: I let him answer the question about Defendant's proposed constructions. I did.

BY MR. VERDINI:

Q All right. I want to now to just have you look at their proposed construction, and I'm just going to ask you if you agree with it, and then ask you why or why not.

Transitions.

MR. MAYLE: Objection. It's

outside the scope of his report and I didn't ask him to do that.

MR. VERDINI: Okay. I'm going to keep asking him the questions.

MR. MAYLE: That's the objection.

MR. VERDINI: What's that?

MR. MAYLE: It's outside the scope of the cross.

MR. VERDINI: If you want to do a running objection, I'll let -- you can object to every question, but I'll give you a running objection, but I'm going to ask the questions just because I don't think there's any way at this point. You can do whatever you need to do later.

BY MR. VERDINI:

Q All right. So in light of -- so let's -- Exhibit B, Claim Term One: Defendant's proposed construction for transition is a switch from a binary one to a binary zero or vice versa.

In light of what you've reviewed in connection with your opinions, do you agree with that construction?

A No.

MR. MAYLE: Objection.

BY MR. VERDINI:

Q Why not?

MR. MAYLE: Objection.

THE WITNESS: Because as I've shown in numerous places in the patent, column two for example, it's very clear to me what's being referred to is transitions as they relate to reversals in the magnetic medium.

BY MR. VERDINI:

Q If the Court adopted LSI's construction, would it cover NRZI recording?

MR. MAYLE: Objection.

MR. VERDINI: Just a second. Let's take a break. We're doing --

MR. KNEDEISEN: There's a pending question.

MR. VERDINI: I mean, I'm not going to talk. We can go off the record.

THE VIDEOGRAPHER: 5:04. We're off the record.

(Brief pause.)

THE VIDEOGRAPHER: 5:06. We're back on the record.

MR. KNEDEISEN: This is David

Sipiora for the Defendant. We're just making an objection on this whole line of questioning. Apparently, counsel is intending to introduce a whole new section of declaration testimony or testimony from this witness, live, concerning the LSI expert testimony that was given.

This witness has testified he not see this declaration prior to giving his testimony or his report, and now he is going to be asked questions about something which he did not opine on previously and which was not inquired upon during examination today.

There's been -- a request was made to provide foundation for this question, this line of questioning, and none has been given.

And they're simply going to ask him about information that was not previously discussed in this deposition, nor discussed in his declaration and we're going to object to this line of questioning question by question and move

to strike if there's any attempt to use his testimony.

MR. VERDINI: And the University disagrees with the objection. First of all, the proposed constructions by The Defendants are not part of any expert declaration that they provided.

We got the constructions after Professor McLaughlin submitted his declaration. Defendants objected to supplemental declarations to address this, and so we are now -- to make sure that the Court has full record on which to make its decision on claim construction, I'm going to ask the witness while he's here for his opinion on Defendant's proposed constructions.

BY MR. VERDINI:

Q All right. So I think when we got off line, I think the only question I had pending was: Is LSI's proposed -- sorry.

Is Defendant's proposed construction of transitions as reflected in Exhibit 1004 consistent with NRZI recording?

MR. MAYLE: Objection.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS: No.

BY MR. VERDINI:

Q And why not?

A This -- this -- this proposed construction only addresses the NRZ and -- and, clearly, the patent and the claim doesn't specify. Claim 13, at least, doesn't specify whether you use NRZ or NRZI.

Q And are both NRZ and NRZI recording discussed in the patent?

A Yes.

Q Let's move to page three, claim term three, which is Recorded Waveform. Defendant's proposed construction is: The sequences of n-bit code words that are recorded as symbols, patterns in a medium.

Do you agree with Defendant's proposed constructions in light of your -- what you reviewed in connection with rendering your opinions in Exhibit 1005?

MR. MAYLE: Objection.

THE WITNESS: No, I don't.

BY MR. VERDINI:

Q Why not?

MR. MAYLE: Objection.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS: Really, the -- this construction, as far as I can tell, completely ignores waveform. And waveform is key, and so there's nothing in the construction that acknowledges that there's a waveform. So waveform is, therefore, removed by virtue of their construction.

BY MR. VERDINI:

Q And if we move up -- so it's actually page two, Producing Sequences of N-bit Code Words?

A Which one? I'm sorry.

Q So page two, term two.

A Okay.

Q Producing Sequences of N-bit Code Words. Are you there?

A Yes.

Q Defendant's construction is: Producing n-bit code words such that each received m-bit binary data word is sequentially encoded into an n-bit code word.

Based on what you reviewed in connection with your opinions rendered in Exhibit 1005, do you agree with Defendant's proposed construction?

MR. MAYLE: Objection.

THE WITNESS: The use of the term sequentially doesn't make sense.

BY MR. VERDINI:

Q Why do you say that?

A There's -- there's nothing in the patent specification that indicates any kind of sequential nature of the encoding of -- this is one m-bit data work into an n-bit code word. And it's saying it describes that encoding just from m to n as being done sequentially, and there's nothing -- nothing in the specification that highlights the sequential nature. It doesn't -- that doesn't make sense.

MR. VERDINI: With that, I don't have any further questions. Thanks, Professor McLaughlin.

THE VIDEOGRAPHER: 5:11. We're off the record. This is the end of media number six. This concludes today's portion of the deposition.

(Thereupon, the deposition was concluded at approximately 5:11 p.m.)

J U R A T

I, , do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on ; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this ____ day of _____________, 20 ,

at ______________________________, .

____________________________________

SIGNATURE OF WITNESS

D I S C L O S U R E

STATE OF GEORGIA ) DEPOSITION OF:

FULTON COUNTY ) PROFESSOR STEVEN W. MCLAUGHLIN

Pursuant to Article 8.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of TSG Reporting.

TSG Reporting was contacted by the offices of Kilpatrick, Townsend & Stockton, LLP to provide court reporting services for this deposition. TSG Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

TSG Reporting has no contract or agreement to provide court reporting services with any party to the case, or any reporter or reporting agency from whom a referral might have been made to cover the deposition.

TSG Reporting will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party in this litigation.

______________________________

Tanya L. Verhoven-Page,
Certified Court Reporter,
B-1790.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

C E R T I F I C A T E

STATE OF GEORGIA:
FULTON COUNTY:

I hereby certify that the foregoing deposition was reported, as stated in the caption, and the questions and answers thereto were reduced to written page under my direction, that the preceding pages represent a true and correct transcript of the evidence given by said witness.

I further certify that I am not of kin or counsel to the parties in the case, am not in the regular employ of counsel for any of said parties, nor am I in any way financially interested in the result of said case.

Dated this 11th day of May, 2018.

______________________________

Tanya L. Verhoven-Page,
Certified Court Reporter,
B-1790.

ERRATA SHEE FOR THE TRANSCRIPT OF:

Case Name: Regents v. LSI

Dep. Date: May 7, 2018

Deponent: Professor Steven W. McLaughlin

CORRECTIONS

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

Pg. Ln. Now Reads Should Read Reason

______ ______ __________________ _________________ ____________

____________________________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

This the_____ day of________________, 2018.

______________________________________

(Notary Public) My Commission Expires:__________