# EXHIBIT H

David E. Sipiora (State Bar No. 124951)
*dsipiora@kilpatricktownsend.com*
Edward J. Mayle (admitted *pro hac vice*)
*tmayle@kilpatricktownsend.com*
KILPATRICK TOWNSEND & STOCKTON LLP
1400 Wewatta Street, Ste. 600
Denver, CO 80202
Telephone:  303 571 4000
Facsimile:   303 571 4321

Scott Kolassa (State Bar No. 294732)
*skolassa@kilpatricktownsend.com*
KILPATRICK TOWNSEND & STOCKTON LLP
1080 Marsh Road
Menlo Park, CA 94025
Telephone:  650 324 6349
Facsimile:   650 618 1544

*Attorneys for Defendants LSI Corporation
and Avago Technologies U.S. Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| REGENTS OF THE UNIVERSITY OF MINNESOTA,<br><br>Plaintiff,<br><br>v.<br><br>LSI CORPORATION AND AVAGO TECHNOLOGIES U.S. INC.,<br><br>Defendants. | Civil Action No. 18-cv-00821-EJD-NMC<br><br>**DECLARATION OF PROFESSOR EMINA SOLJANIN** |

I, Professor Emina Soljanin, declare as follows:

## I. INTRODUCTION AND QUALIFICATIONS

### A. Introduction.

1. I have been engaged as an expert on behalf of LSI Corporation and Avago Technologies U.S. Inc. (collectively, Defendants or "LSI") in the above-referenced case and in the *Inter Partes* Review ("IPR") proceeding involving the patent-in-suit (U.S. Patent and

1 Trademark Office Trial and Appeal Board, IPR2017-01068). The patent at issue in both

2 proceedings is U.S. Patent No. 5,859,601 ("the '601 Patent").

3     2. I understand that ownership of the '601 Patent is claimed by the Regents of the

4 University of Minnesota ("the University"). I understand that the University sued LSI in the

5 U.S. District Court for the District of Minnesota on August 25, 2016, and that the '601 Patent

6 expired on October 15, 2016. I understand that the District of Minnesota subsequently

7 transferred this case to the U.S. District Court for the Northern District of California, San Jose

8 Division.

9     3. In this Declaration, I offer my opinions regarding, among other things, certain

10 terms in claims 13, 14, and 17 ("the Asserted Claims") of the '601 Patent. It is my opinion

11 that the Asserted Claims are indefinite under 35 U.S.C. § 112(b) because the claims, read in

12 light of the patent's specification and its prosecution history, fail to inform, with reasonable

13 certainty, a person having ordinary skill in the art at the time of the invention the scope of the

14 alleged inventions. The reasons for this opinion are set forth more fully below.

15     4. I also disclose below my understanding of certain legal principles regarding

16 claim construction and 35 U.S.C. § 112(b) provided to me by counsel, as well as my view of

17 the level of ordinary skill in the art at the time of the alleged inventions of the Asserted

18 Claims.

19     5. I am being compensated at a rate of $420 per hour for my consulting services,

20 including the preparation of this Declaration. I have no stake in the outcome of this civil

21 action or the related IPR proceedings concerning the '601 Patent.

22     **B.**     **Expert Qualifications.**

23     6. I am currently a professor of electrical and computer engineering at Rutgers

24 University. My research interests are broad, but mainly concern theoretical understanding and

25 practical solutions that enable efficient, reliable, and secure operation of communications

26 networks. I also have expertise and interest in power systems and quantum computation.

27     7. My research has been funded by the National Science Foundation, the Center

28 for Discrete Mathematics and Theoretical Computer Science (DIMACS), DARPA, and other

funding agencies.

8. All of my degrees are in electrical engineering. I earned a European Diploma degree from the University of Sarajevo, Bosnia, in 1986, and M.S. and Ph.D. degrees from Texas A & M University in 1989 and 1994, respectively.

9. Between my studies at the University of Sarajevo and my graduate studies, from 1986 to 1989, I worked in industry developing optimization algorithms and software for power system control.

10. Upon earning my Ph.D., I joined Bell Laboratories in Murray Hill, NJ, where I was a Member of the Technical Staff in the Mathematics of Networks and Communications research department. Over a dozen alumni of Bell Labs have won the Nobel prize in physics, with several more having been awarded the Turing Award, the highest distinction in computer science. In 2004 I was elevated to Distinguished Member of the Technical Staff.

11. During my time at Bell Labs, I was also an adjunct professor, guest lecturer, or visiting professor at various academic institutions around the world including, Columbia University, ENSE in Cergy-Pontoise, France, the University College Dublin, and others. I also mentored many students, interns, and postdoctoral researchers during that time.

12. In the course of my twenty year employment with Bell Labs, I participated in a wide range of research and business projects. These projects include designing the first distance enhancing codes to be implemented in commercial magnetic storage devices. Other projects that I worked on at Bell Labs included the first forward error correction for Lucent's optical transmission devices, color space quantization and color image processing, quantum computation, link error prediction methods for the third generation wireless network standards, and anomaly and intrusion detection. Some of my most recent activities are in the area of network and application layer coding.

13. According to the University's allegations in the First Amended Complaint in this case, the alleged invention of the '601 Patent is a "maximum transition run" ("MTR") code featuring a "j constraint" which "imposes a limit on the maximum number of consecutive transitions" in a binary system. I was conducting research in this area before the

DECLARATION OF PROF. EMINA SOLJANIN - 3 -
CASE NO. 18-CV-00821-EJD-NMC

1 application that matured into the '601 Patent was filed.

2     14.    The named inventors of the '601 Patent, Professor Jaekyun Moon and his then-graduate student Dr. Barrett Brickner, published a paper in 1996 entitled "Maximum Transition Run Codes for Data Storage Systems," which paper is attached to the First Amended Complaint as Exhibit 3, and referred to therein by the University as "the Moon 1996 IEEE Paper." (*See* First Amended Complaint, Dkt. No. 40, at ¶¶ 49-52; attached hereto as Appendix A.)

    15.    The University alleges that this Moon 1996 IEEE Paper is "substantially similar to the '601 Patent." (*See id*.) This is noteworthy because Dr. Moon and Dr. Brickner confirmed in their 1996 IEEE Paper that I, in my "independent study," had disclosed that "removing long runs of consecutive transitions" can improve the performance of data storage systems. (*See* Moon 1996 IEEE Paper, Appendix A, right column of first page, citing reference [6].) Reference [6], cited by Dr. Moon and Dr. Brickner in their 1996 IEEE paper, relates to my conference presentation in October 1995. (*See* Appendix A, Reference [6] listed as "E. Soljanin, 'On-track and off-track distance properties of class4 partial response channels,' SPIE Conference, Philadelphia, PA, Oct. 1995.").

    16.    Additionally, my work was published in a 1995 paper entitled "On-track and off-track distance properties of class4 partial response channels," which paper is attached as Appendix B. This paper discloses that digital storage systems can be improved "by limiting the length of subsequences of alternating symbols to four," and that in the NRZI recording format, "this can be achieved by a code that limits the runs of consecutive ones to three" and discloses a "simple and inexpensive implementation" for such a code. (*See* Appendix A, at Section 4.2.) The first-named inventor on the '601 Patent, Prof. Moon, attended my presentation given at the above-referenced conference, as described in LSI's counterclaim for inequitable conduct. (Dkt. No. 62 at p. 23 *et seq*., ¶¶ 18-49.)

    17.    Further, one of my own patents, U.S. Patent No. 5,608,397, is cited on the face of the '601 Patent. During prosecution, the examiner found that my U.S. Patent No. 5,608,397 (among others) "is considered pertinent to applicant's disclosure." (*See* File

DECLARATION OF PROF. EMINA SOLJANIN     - 4 -
CASE NO. 18-CV-00821-EJD-NMC

History, Office Action dated Sept. 16, 1997.)

18. In addition to U.S. Patent No. 5,608,397, cited by the patent examiner and listed on the face of the '601 Patent, I am the inventor of additional patents and pending patent applications. I have authored numerous peer-reviewed journal and conference publications, as well as books and book chapters. Among other professional recognitions, I was elected an IEEE Fellow for my "contributions to coding theory and coding schemes for transmission and storage systems." My curriculum vitae includes additional details about my experience and professional background. It is attached as Appendix C.

**II. MATERIALS REVIEWED**

19. My opinions are based on years of education, research and experience, as well as investigation and study of relevant materials. In forming my opinions, I have considered the materials identified in this declaration, including the '601 Patent's claims (both the Asserted Claims and the non-asserted claims), its specification (including the figures and all of the written disclosure), and the prosecution history of the application that matured into the '601 Patent. I have also reviewed the documents discussed in Section I.B above.[1]

**III. THE HYPOTHETICAL PERSON OF ORDINARY SKILL IN THE ART**

20. I have been informed that patent claims are to be interpreted the way a hypothetical person having ordinary skill in the art would have interpreted the claims at the time of the invention. For shorthand, I may refer to such a person herein as a "POSITA."

21. The application resulting in the '601 Patent was filed on October 15, 1996. The face of the patent claims priority to "Provisional application No. 60/014,954" filed April 5, 1996. Merely for argument's sake, therefore, I will assume that the Asserted Claims are entitled to a priority date of April 5, 1996. As mentioned above, I was conducting research

---

[1] I may rely upon these materials and/or additional materials to respond to arguments raised by the University or its expert(s). I may also consider additional documents and information in forming any necessary opinions—including documents that may not yet have been provided to me. My analysis of the materials produced in this investigation is ongoing and I will continue to review any new material as it is provided. This report represents only those opinions I have formed to date. I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continuing analysis of the materials already provided.

DECLARATION OF PROF. EMINA SOLJANIN - 5 -
CASE NO. 18-CV-00821-EJD-NMC

1   and publishing my work in the relevant technological field prior to April 5, 1996.

2       22.    In determining the characteristics of a person of ordinary skill in the art at the time of the claimed invention, I considered several things, including the factors discussed below, as well as (1) the levels of education and experience of the inventor and other persons actively working in the relevant field; (2) the types of problems encountered in the field; (3) prior art solutions to these problems; (4) the rapidity in which innovations are made; and (5) the sophistication of the relevant technology. I also placed myself back in the relevant time period and considered the individuals that I had worked with in the field.

    23.    It is my opinion that a person having ordinary skill in the relevant art at the time of the invention would have been someone with at least an undergraduate degree in electrical engineering or similar field, and three years of industry experience in the field of read channel technology.

    24.    I am prepared to testify as an expert in this field and also as someone who had at least the knowledge of a POSITA, and someone who worked with other POSITAs at the time of the alleged invention.

    25.    Unless otherwise stated, my statements below refer to the knowledge, beliefs, and abilities of a POSITA at the time of the claimed invention of the '601 patent.

## IV.   CLAIM CONSTRUCTION STANDARD

    26.    I understand that the Asserted Claims are construed as understood by a POSITA. Counsel informs me that sometimes the meaning of claim terms are readily apparent even to lay judges, and that, in such scenarios, claim construction involves little more than the application of widely accepted meaning of commonly understood words.

    27.    Otherwise, especially in highly-technical patents, courts look to the "intrinsic evidence" (*i.e.*, the words of the claims themselves, the specification and figures, and the prosecution history), and in some circumstances resort to consideration of extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art to interpret a patent.

    28.    Regarding the intrinsic evidence, I understand that the claims themselves

DECLARATION OF PROF. EMINA SOLJANIN     - 6 -
CASE NO. 18-CV-00821-EJD-NMC

1  provide substantial guidance as to the meaning of particular claim terms.  For example, the
2  context in which a term is used in the asserted claim can be highly instructive.  Other claims
3  of the patent in question, both asserted and un-asserted, can also be valuable sources of
4  enlightenment as to the meaning of a claim term.

5  29.  The claims do not stand alone, as they must be read in view of the
6  specification, of which they are a part.  I understand that the specification is always highly
7  relevant to the claim construction analysis and is usually the single best guide to the meaning
8  of a disputed term.  I understand that the importance of the specification in claim construction
9  derives from its statutory role, as the close kinship between the written description and the
10  claims is enforced by the statutory requirement that the specification describe the claimed
11  invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112(a).

12  30.  I understand further that the specification may reveal a "special definition"
13  given to a claim term by the patentee that differs from the meaning it would otherwise
14  possess.  In such cases, the inventor's "lexicography" governs.  In other cases, the
15  specification may reveal an "intentional disclaimer, or disavowal, of claim scope by the
16  inventor."  In that instance as well, the inventor's intention governs.

17  31.  In addition to consulting the claims and the specification, I understand that a
18  court should also consider the patent's prosecution history.  The prosecution history is a part
19  of the intrinsic evidence and consists of the complete record of the proceedings before the
20  Patent Office and includes the prior art cited during the examination of the patent.  Like the
21  specification, the prosecution provides evidence of how the Patent Office and the inventor
22  understood the patent.  Furthermore, like the specification, the prosecution history was created
23  by the patentee in attempting to explain and obtain the patent. Yet because the prosecution
24  history represents an ongoing negotiation between the Patent Office and the applicant, rather
25  than the final product of that negotiation, it often lacks the clarity of the specification and thus
26  is less useful for claim construction purposes.

27  32.  I further understand that while extrinsic evidence (*e.g.*, expert testimony,
28  dictionaries, learned treatises) can shed useful light on the relevant art, it is less significant

DECLARATION OF PROF. EMINA SOLJANIN         - 7 -
CASE NO. 18-CV-00821-EJD-NMC

than the intrinsic record in determining the legally operative meaning of claim language. I understand further that the United States Court of Appeals for the Federal Circuit has viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claims.

## V. INDEFINITENESS STANDARD

33. A provision in the Patent Act states that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or joint inventor regards as the invention." 35 U.S.C. ¶ 112(b). I understand that a claim that does not comply with this provision is said to be "indefinite," and is invalid for that reason.

34. I understand that until recently, the legal standard for definiteness was determining whether a claim is "amenable to construction," and the claim, as construed, is not "insolubly ambiguous." If a claim could be construed and was not "insolubly ambiguous," then it was definite under 35 U.S.C. ¶ 112(b).

35. I understand that the United States Supreme Court relaxed this test in 2014. Counsel informs me that the Court, in a case called *Nautilus, Inc. v. Biosig Instruments, Inc.*, ("*Nautilus*") stated as follows:

> "We conclude that the Federal Circuit's formulation, which tolerates some ambiguous claims but not others, does not satisfy the statute's definiteness requirement. In place of the 'insolubly ambiguous' standard, we hold that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

## VI. THE ASSERTED CLAIMS

36. The text of the Asserted Claims is listed below:

Claim 13

[Preamble:] A method for encoding m-bit binary datawords into n-bit binary codewords in a recorded waveform, where m and n are preselected positive integers such that n is greater than m, comprising the steps of:

[Step 1:] receiving binary datawords; and

[Step 2:] producing sequences of n-bit codewords;

[Step 3:] imposing a pair of constraints (j;k) on the encoded waveform;

[Step 4:] generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$; and

[Step 5:] generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform.

Claim 14

The method as in claim **13** wherein the consecutive transition limited is defined by the equation $2 \leq j < 10$.

Claim 17

The method as in claim **14** wherein the binary sequences produced by combining codewords have no more than one of j consecutive transitions from 0 to 1 and from 1 to 0 and no more than k+1 consecutive 0's and k+1 consecutive 1's when used in conjunction with the NRZ recording format.

## VII. THE ASSERTED CLAIMS ARE INDEFINITE

37. It is my opinion that the claim terms below are indefinite: (1) "the encoded waveform" (claim 13); (2) "generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geq 2$" (claim 13); (3) "generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform" (claim 13); (4) "wherein the binary sequences produced by combining codewords have no more than one of j consecutive transitions from 0 to 1 and from 1 to 0" (claim 17); and (5) "wherein the binary sequences produced by combining codewords have … no more than one of k+1 consecutive 0's and k+1 consecutive 1's" (claim 17).

38. My opinions are explained further below.

### 1. "The Encoded Waveform" (Claim 13)

39. Step 3 of claim 13 recites "imposing a pair of constraints (j;k) on the encoded waveform." The phrase "encoded waveform" renders claim 13 indefinite (as well as all

1  claims depending from it) because the claim, read in light of the specification of the '601

2  Patent and the prosecution history, fails to inform, with reasonable certainty, those skilled in

3  the art about the scope of the purported invention.

4       40.     First, there is no antecedent basis for the phrase "the encoded waveform" in the

5  claim. The phrase begins with the word "the," which, according to counsel, is understood to

6  be used in patent claims (and as I understand in normal English usage) to refer back to an

7  element that was recited earlier in the same claim or in an independent claim from which the

8  claim at issue depends. However, there is no earlier reference to "encoded waveform" in

9  claim 13. The term is indefinite for at least this reason.

10       41.     I am informed that the University's expert, Prof. McLaughlin, agrees that the

11  word "the" signals that the following phrase "encoded waveform" must have an antecedent

12  basis in the claim. (*See* McLaughlin Declaration at ¶ 46.) Professor McLaughlin confirms

13  that no such antecedent basis exists in the claim, stating that "[t]he *only* waveform previously

14  referred to in the claim is the '*recorded* waveform' referred to in the claim preamble, which

15  recorded waveform has encoded data as described above." (*Id*. at ¶ 46) (emphasis added).

16  Unable to find antecedent basis for "the encoded waveform," Professor McLaughlin simply

17  concludes that "the encoded waveform" is exactly the same as the "recorded" waveform. I do

18  not agree; the claim uses different words to mean different things. If "the encoded

19  waveform" was the same as the "recorded waveform," then the claim would use the phrase

20  "the recorded waveform" in step 3. Instead, it uses a different phrase—"the encoded

21  waveform."

22       42.     Second, the structure of claim 13 supports the conclusion that "the encoded

23  waveform" (recited in step 3) is not the same thing as the "recorded waveform" (recited in the

24  preamble and in "generating" steps 4 and 5.) In particular, each of the five method steps

25  recited in claim 13 begin with a verb ending in "ing": receiving, producing, imposing,

26  generating, and generating, and logically they proceed in sequential order. A "recorded

27  waveform" does not exist until steps 4 and 5 are completed. In a digital storage device, the

28  "generating" steps would happen on the recording medium, not in the "encoder." In contrast,

DECLARATION OF PROF. EMINA SOLJANIN                                                                       - 10 -
CASE NO. 18-CV-00821-EJD-NMC

1   the "imposing" step, *i.e.,* step 3 of claim 13, would happen in an encoder, which is typically a
2   discrete electrical component separate from the recording medium, such as a system on a chip.
3   The j and k constraints are "imposed" by the encoder on the sequence of n-bit codewords,
4   which are not "the recorded waveform."

5   43.   Third, consideration of claims other than claim 13 bolster my opinion. For
6   example, see claim 18, which depends from claim 14, which in turn depends from claim 13.
7   Claim 18 states that "the encoder" (as opposed to a recording medium or a component that
8   can record on a medium) is the thing that "produces a codeword in response to each dataword
9   sequentially," and the encoder imposes the j and k constraints by selecting the n-bit
10  codewords according to certain specified steps. This is consistent with my conclusion about
11  the distinction between the "recorded waveform" and "the encoded waveform" in claim 13.

12  44.   Fourth, because the term "encoded waveform" does not appear earlier in claim
13  1, or in any other claim of the '601 Patent, one naturally would look to the specification for
14  guidance. But the phrase does not appear in the specification. In addition, the phrase
15  "encoded waveform" has no standard or industry-specific definition. In fact, the phrase
16  "encoded waveform" was inserted during prosecution via a claim amendment and was
17  introduced into amended claim 1 (which is not asserted here) and amended claim 13.
18  However, neither the inventors nor the patent examiner provided a definition of this new
19  phrase, even though the inventors stated that Claims 1 and 13 had been amended "to better
20  define the invention." (*See* Response to Office Action at 3.) The patent examiner did not
21  explain the meaning of "the encoded waveform" in the Notice of Allowability or elsewhere.
22  (*See* File History (Dkt. No. 165-2).) This prosecution history underscores the fact that this
23  term – "the encoded waveform" -- not only lacks an antecedent basis in claim 13, but lacks a
24  foundation in the patent itself.

25  45.   Fifth, it is not clear what is meant by a "waveform" in Step 3 of claim 13. In
26  particular, Step 3 is listed prior to Steps 4 and 5. A waveform (in particular, a "recorded
27  waveform") is said to be "generated" in Steps 4 and 5. The phrase "the encoded waveform" is
28  used in Step 3, which is where the pair of constraints are "impos[ed]." According to the

DECLARATION OF PROF. EMINA SOLJANIN                                                          - 11 -
CASE NO. 18-CV-00821-EJD-NMC

1 specification, the step of "imposing" occurs in the production of binary codewords. *See*, *e.g.*,
2 '601 Patent at Fig. 6 and 5:12-47 (providing "equations for the encoder"). Binary codewords
3 are not a "waveform." (*See*, *e.g.*, Response to Office Action, Appendix A ("[C]ode bits are
4 indicated above the appropriate waveform")); *see also* Claims 16, 17, 18 (showing that the j
5 and k constraints are "imposed" at the binary level, *i.e.*, on sequences of 1's and 0's, and not
6 on the recorded waveform). This lack of clarity further would leave a POSITA uncertain as to
7 the meaning of the phrase "encoded waveform" in claim 13 of the '601 Patent.

8     46.     For each of these reasons, taken alone or viewed together, claim 13 is
9 indefinite under Section 112.

10     **2.**    **"Generating No More Than j Consecutive Transitions of Said Sequence**
11     **in the Recorded Waveform Such That j≥2." (Claim 13)**

12     47.     Step 4 of claim 13 recites "generating no more than j consecutive transitions of
13 said sequence in the recorded waveform such that j≥2." This phrase renders claim 13
14 indefinite (as well as all claims depending from it) because the claim, read in light of the
15 specification of the '601 Patent and the prosecution history, fails to inform, with reasonable
16 certainty, those skilled in the art about the scope of the purported invention.

17     48.     First, take the case of j = 2. If only 1 (one) consecutive transition is generated,
18 does this satisfy the limitation of Step 4? The claim disallows "*more than*" 2 consecutive
19 transitions. Because 1 is less than 2, 1 consecutive transition meets the claim language "no
20 more than j consecutive transitions." Yet the claim states that j≥2, which suggests that 1
21 consecutive transition would not satisfy the claim. In prosecution, its response to the patent
22 examiner's rejection of the claims in view of prior art, the applicant attempted to explain what
23 was being claimed and how it was different than the prior art (*see* File History), but note that
24 claim 13 is written in terms of what is ***disallowed*** (*i.e.*, "***no more than***") instead of what is
25 allowed. *Compare* independent method claim 13 ("generating ***no more than*** j consecutive
26 transitions") *with* independent apparatus claim 1 ("wherein the j constraint is ***defined*** as the
27 maximum number of consecutive transitions ***allowed*** on consecutive clock periods")
28 (emphasis added). The "definition" in claim 1 is not recited in claim 13, even though claims 1

DECLARATION OF PROF. EMINA SOLJANIN      - 12 -
CASE NO. 18-CV-00821-EJD-NMC

and 13 were amended at the same time, in response to the same Office Action. Moreover, the specification teaches that "the minimum distance pairs shown in FIG. 1 must be eliminated" and that "[i]n accordance with *the present invention*, this can be accomplished using the existing RLL (1,k) code, *which does not allow* consecutive transitions." '601 Patent at 4:8-12 (emphasis added). This adds up to lack of reasonable certainty as to the meaning of this claim limitation.

49. Second, Step 4 recites the phrase "transitions of said sequence." The "said sequence" appears to refer to n-bit codewords, but it does not make sense to speak of a transitions "of codewords." It does however make sense to think of transitions in terms of transitions between binary bits – 1 to 0 or 0 to 1. (*See e.g.*, claims 16 and 17.) This language is unclear. Moreover, a waveform does not have binary bits, making the claim ambiguous on multiple levels.

50. Third, Step 2 recites "sequences" (plural) while Step 4 recites "said sequence" (singular) and Step 5 recites "said sequences" (plural). There is no antecedent basis for the phrase "said sequence."

51. For each of these additional reasons, taken alone or viewed together, claim 13 is indefinite under Section 112.

### 3. "Generating No More Than k Consecutive Sample Periods of Said Sequences Without a Transition in the Recorded Waveform." (Claim 13)

52. Step 5 of claim 13 recites "generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform." This phrase renders claim 13 indefinite (as well as all claims depending from it) because the claim, read in light of the specification of the '601 Patent and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the purported invention.

53. What is meant by the phrase "k consecutive sample periods" of "said sequences"? The phrase "said sequences" may refer to n-bit codewords because it does not make sense to speak of a transitions of sequences. Transitions refers to transitions between

DECLARATION OF PROF. EMINA SOLJANIN - 13 -
CASE NO. 18-CV-00821-EJD-NMC

binary bits – 1 to 0 or 0 to 1.  Moreover, a waveform does not have binary bits, making the claim ambiguous on multiple levels.

54.  Also, what "sample periods" are being referred to?  Sampling is done, for example, when recorded data is read, not when data is being written.  The ''601 patent at 2:10-37 discloses sampling the context of "sequence detectors" for "data recovery devices," i.e., reading previously-recorded data from a storage medium.  But claim 13 addresses only a "writing" function, and is not directing to "reading" or recovery of stored data.

55.  Further, as noted above, Step 2 recites "sequences" (plural) while Step 4 recites "said sequence" (singular) and Step 5 recites "said sequences" (plural).  This adds to the ambiguity of the claim.

56.  For each of these additional reasons, taken alone or viewed together, claim 13 is indefinite under Section 112.

### 4.  "Wherein the Binary Sequences Produced by Combining Codewords Have No More Than One of j Consecutive Transitions from 0 to 1 and from 1 to 0."  (Claim 17)

57.  Claim 17 depends from claim 14, which depends from claim 13.  Claim 17 recites "wherein the binary sequences produced by combining codewords have no more than one of j consecutive transitions from 0 to 1 and from 1 to 0."  This phrase renders claim 17 indefinite because the claim read in light of the specification of the '601 Patent and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the purported invention.

58.  The meaning of "j consecutive transitions" in this claim is unclear.  Consider the simple bit string 01.  There is one (1) transition "from 0 to 1" but zero (0) transitions "from 1 to 0."  So what is the value of j in this simple example?  The claim does not specify that one would take the *maximum* of the two choices, or the *sum of both choices*, but it instead says that j is evaluated as "no more than *one of*" two options that are not necessarily the same.

DECLARATION OF PROF. EMINA SOLJANIN - 14 -
CASE NO. 18-CV-00821-EJD-NMC

Which one? Claim 17 is indefinite under Section 112 for at least these additional reasons.

### 5. "Wherein the Binary Sequences Produced by Combining Codewords Have … No More Than One of k+1 Consecutive 0's and k+1 Consecutive 1's." (Claim 17)

59. Claim 17 is indefinite because the phrase "no more than one of k+1 consecutive 0's and k+1 consecutive 1's" is indefinite. Consider the simple bit string 00111. There are two (2) consecutive 0's and three (3) consecutive 1's. How does one evaluate the claimed "k+1" parameter? The claim does not specify that one would take the *maximum* of the two choices, but it instead says that k+1 is evaluated as "no more than one of" two options. Claim 17 is indefinite under Section 112 for at least these additional reasons.

## VIII. CONCLUSION

60. I declare under 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Dated: April 13, 2018

By _____Emina_____
Emina Soljanin, Ph.D.