# EXHIBIT I

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN JOSE DIVISION

4    Civil Action No. Civ. 5:18-cv-00821-EJD-NMC

5    ----------------------------------------x

6    REGENTS OF THE UNIVERSITY OF MINNESOTA,

7

8                        Plaintiff,

9            -against-

10   LSI CORPORATION and AVAGO

11   TECHNOLOGIES U.S. INC.,

12

13                       Defendants.

14   ----------------------------------------x

15

16                      May 9, 2018

17                      8:58 a.m.

18

19        Deposition of EMINA SOLJANIN

20   taken by Plaintiff pursuant to Notice, held at

21   the offices of K&L Gates LLP, 599 Lexington

22   Avenue, New York, New York, before Frank J.

23   Bas, a Registered Professional Reporter,

24   Certified Realtime Reporter and Notary Public

25   of the State of New York. Job WDC-170935

Page 2

```
1    A P P E A R A N C E S:
2    K&L GATES LLP
3    Attorneys for Plaintiff
4        K&L Gates Center
5        210 Sixth Avenue
6        Pittsburgh, PA 15222
7    BY:  CHRISTOPHER M. VERDINI, ESQ.
8            -and-
9        MARK G. KNEDEISEN, ESQ.
10       christopher.verdini@klgates.com
11       mark.knedeisen@klgates.com
12
13   KILPATRICK TOWNSEND & STOCKTON LLP
14   Attorneys for Defendants
15       1400 Wewatta Street, Suite 600
16       Denver, Colorado 80202
17   BY:  DAVID E. SIPIORA, ESQ.
18            -and-
19       EDWARD MAYLE, ESQ.
20       dsipiora@kilpatricktownsend.com
21       tmayle@kilpatricktownsend.com
22
23
24
25
```

Page 3

```
1            MR. VERDINI:  Chris Verdini and
2        Mark Knedeisen of K&L Gates on behalf
3        of the plaintiff, Regents of the
4        University of Minnesota.
5            MR. SIPIORA:  David Sipiora and
6        Ted Mayle from Kilpatrick Townsend.
7        We represent the defendant LSI and
8        Avago.
9                  – – –
10
11   E M I N A   S O L J A N I N,
12   called as a witness, having been first  duly
13   sworn, was examined and testified
14   as follows:
15   EXAMINATION BY
16   MR. VERDINI:
17       Q.   Good morning, Professor.
18       A.   Good morning.
19       Q.   Can you state your full name
20   for the record?
21       A.   Emina Soljanin.
22       Q.   What is your residential and
23   business address?
24       A.   My residential address is 26
25   Britten Road, Green Village, New Jersey 07935.
```

Page 4

```
1    USA.
2        Q.   And your business address?
3        A.   It's 94 Brett Road, Piscataway,
4    New Jersey, Rutgers University.
5        Q.   Professor, you understand that
6    you're under oath today, correct?
7        A.   Yes.
8        Q.   And are you represented by
9    counsel?
10       A.   Am I represented?
11       Q.   Yes.
12       A.   No.
13       Q.   Is there any reason that you
14   can't be truthful and accurate in your
15   testimony today?
16       A.   No.
17       Q.   Are you on any medications that
18   would affect your memory or your ability to
19   give testimony today?
20       A.   No.
21       Q.   Have you ever been deposed
22   before?
23       A.   No.
24       Q.   All right.  So this your first
25   time so I'll go over a little bit of ground
```

Page 5

```
1    rules.  The court reporter who is sitting to
2    your left is writing down everything that we
3    say, okay?
4        A.   (Nodding head affirmatively.)
5        Q.   So that's going to be the first
6    rule.  He can't take down shakes of the head,
7    so all of your answers have to be verbal.
8    Okay?
9        A.   Yes.
10       Q.   And because he's writing down
11   what is said, when appropriate answer yes or
12   no as opposed to "uh-huh" or "uh-uh," because
13   that's not entirely clear when it's written
14   down.  Okay?
15       A.   I understand.
16       Q.   If you don't understand a
17   question that I've asked can you let me know
18   so that I can try to rephrase.  Okay?
19       A.   Yes.
20       Q.   And if you don't, I will assume
21   you understand the question.  Okay?
22       A.   Yes.
23       Q.   The other thing in normal
24   conversation sometimes you know where my
25   question is headed and you may want to talk
```

Page 6

1 over me, that makes it very difficult for the
2 court reporter.  So if you could let me finish
3 my question first before you answer, and I'll
4 let you answer before I ask my next question
5 so that the transcript is clear.  Okay?
6      A.   Yes.
7      Q.   And lastly, if you need a break
8 at any time just let me know.  If there's a
9 question pending I may ask you to answer that
10 question before we take the break, but we'll
11 accommodate your break request as soon as we
12 can.  All right?
13      A.   Yes.
14      Q.   What did you do to prepare for
15 today's deposition?
16      A.   I reviewed the documents and I
17 met with Mr. Mayle and Mr. Sipiora.
18      Q.   What documents did you review?
19      A.   I reviewed original patent,
20 '601.  I reviewed my declaration.  I looked
21 into court cases.
22      Q.   When you say you looked --
23      A.   Case histories.  Sorry.
24      Q.   Sorry.  Go ahead?
25      A.   Case histories, I think they're

Page 7

1 called.
2      Q.   Case histories.
3      A.   Right.
4      Q.   When you say you looked at case
5 histories, what are you referring to
6 specifically?
7      A.   This was a file that included
8 my previous declaration and description of --
9 of the background material for the patent, and
10 also the provisional application, and the
11 declaration of Professor McLaughlin.
12      Q.   Who prepared the case history?
13      A.   Mr. Sipiora and Mr. Mayle.
14      Q.   Did you have any input into
15 what was put into the case history that you
16 reviewed in preparation for today?
17      A.   No.
18      Q.   You also said you met with
19 Mr. Mayle and Mr. Sipiora, is that correct?
20      A.   Yes.
21      Q.   When was that?
22      A.   Yesterday.
23      Q.   And for how long?
24      A.   From 10 a.m. until 3 p.m.
25      Q.   You've been retained in this

Page 8

1 case to provide expert testimony on behalf of
2 the defendants LSI and Avago, is that your
3 understanding?
4      A.   Correct.
5      Q.   Do you know when you were
6 retained?
7      A.   I believe it was the fall of
8 2016.  I don't remember exact day.
9      Q.   And in connection with your
10 work for LSI and Avago in this case have you
11 worked with anybody else?
12      A.   No.
13      Q.   Have you ever been retained by
14 LSI or Avago to provide expert testimony in
15 any other case?
16      A.   No.
17      Q.   What about a company called
18 Broadcom Limited?
19      A.   No.
20      Q.   And have you provided expert
21 testimony in any other patent case prior to
22 this one?
23      A.   No.
24      Q.   All right.
25           MR. VERDINI:  I am going to

Page 9

1      introduce just a few exhibits so that
2      you'll have them in front of you, the
3      ones that we'll be referring to.
4           ---
5           (Deposition Exhibit 1,
6      U.S. patent number 5,859,601 was
7      marked for identification)
8           ---
9 BY MR. VERDINI:
10      Q.   I am going to hand you what has
11 been marked as exhibit 1.
12           Professor, do you recognize
13 exhibit 1 as U.S. patent number 5,859,601?
14      A.   I do.
15      Q.   And you understand that this is
16 the patent that's being asserted by the
17 university against LSI and Avago in this case?
18      A.   I do.
19           ---
20           (Deposition Exhibit 2, joint
21      claim construction and prehearing
22      statement was marked for
23      identification)
24           ---
25 BY MR. VERDINI:

Page 10

Q. I hand you what has been marked as exhibit 2. Professor, do you recognize exhibit 2?

A. I do.

Q. And what do you understand it to be?

A. It's my signed declaration.

Q. Almost. Exhibit 2 is the joint claim construction and prehearing statement that the parties filed without the exhibits.

A. Oh, I see.

Q. One of the exhibits is your declaration. Have you seen just the main document, the joint claim construction and prehearing statement before today?

A. Yes.

---
(Deposition Exhibit 3,
declaration of Professor Emina
Soljanin was marked for
identification)
---

BY MR. VERDINI:

Q. And last one for now, I am going to show you what has been marked as

Page 11

exhibit 3. Professor, do you recognize exhibit 3 as your declaration that you submitted in connection with the joint claim construction and prehearing statement that was marked as exhibit 2?

A. The first part of it, yes. And then there are appendices, it seems.

Q. Pardon?

A. There is declaration followed by an appendix.

Q. Right. And your declaration incorporates the appendices that are attached or part of exhibit 3, correct?

A. Yes.

Q. If you turn to page 15 of your declaration. On page 15, is that your signature at the bottom of the page?

A. Yes, it is.

Q. And in paragraph 60 you declared under penalty of perjury that what you identified in the, or what you stated in the declaration was true and correct, right?

A. Yes.

Q. On exhibit 3, if you would turn to paragraph 1. In the introduction you wrote

Page 12

(as read):

I have been engaged as an expert on behalf of LSI corporation and Avago Technologies U.S. Inc. (collectively, defendants or LSI) in the above referenced case and in the inter partes review, IPR proceeding involving the in patent-in-suit.

Is that an accurate statement, that you have been engaged not only for the district court litigation but also for the IPR proceeding?

A. Yes.

Q. And is it correct that you submitted a declaration in that IPR proceeding?

A. Yes.

Q. And in that declaration your opinion was that certain prior art references invalidated the claims of the '601 patent, correct?

A. Yes.

---
(Deposition Exhibit 4,
declaration of Professor Emina

Page 13

Soljanin regarding U.S. patent No. 5,859,601 was marked for identification)
---

BY MR. VERDINI:

Q. I am going to hand you what has been marked as exhibit 4. Professor, do you recognize what's been marked as exhibit 4 as the declaration that you submitted in the IPR proceeding referenced in paragraph 1 of your declaration in this district court litigation?

A. Yes.

Q. And on page 2 of that declaration, using the numbers in the bottom right, that's your signature at the bottom, correct?

A. Yes.

Q. It's dated March 9, 2017, correct?

A. Yes.

Q. So that was before the joint -- the declaration that you submitted in connection with claim construction in the district court litigation, correct?

A. Correct.

Page 14

1     Q.   And on page 2 above your
2  signature you declare and state that the
3  statements in the declaration are true to the
4  best of your information and belief, and made
5  under penalty of perjury, correct?
6     A.   Correct.
7     Q.   Let's go back to -- we're going
8  to look at exhibit 4 throughout today so you
9  can put it to the side for now, but let's go
10 back to exhibit 3.  And if you would turn to
11 paragraph 3.  And does paragraph 3 reflect the
12 opinion that you are giving in the district
13 court litigation in connection with claim
14 construction?
15    A.   Yes.
16    Q.   And your opinion is that the
17 asserted claims, which are claims 13, 14 and
18 17, are indefinite under 35 USC section
19 112(b), correct?
20    A.   Yes.
21    Q.   Now if you would turn to
22 exhibit 2, and go to page 3, please.  In the
23 paragraph that states LSI intends to rely on,
24 do you see that?
25    A.   Yes.

Page 15

1     Q.   Is it your understanding that
2  your testimony will be offered only on the
3  issue of indefiniteness and not for purposes
4  of general claim construction?
5          MR. SIPIORA:  Well, that's
6     really a question for counsel, and I
7     can confirm that's the case.
8          MR. VERDINI:  Okay.  And I'll
9     ask it, and you can confirm.
10 BY MR. VERDINI:
11    Q.   You are not providing any
12 testimony on any of the alternate
13 constructions that LSI has offered to the
14 extent that a claim identified by you as
15 indefinite, determines that it's not
16 indefinite, is that correct?
17         MR. SIPIORA:  Professor
18    Soljanin is only offering opinions
19    that are in her report and she does
20    not opine on those subjects.
21         MR. VERDINI:  Okay.
22         MR. SIPIORA:  In her report.
23    Obviously later in the case --
24         MR. VERDINI:  Correct.  In
25    connection with claim construction --

Page 16

1          MR. SIPIORA:  Today's
2     deposition, yes.
3          MR. VERDINI:  And the claim
4     construction briefing, she'll be
5     limited --
6          MR. SIPIORA:  Correct.
7          MR. VERDINI:  -- to the
8     indefiniteness opinions that are in
9     her declaration that's been marked as
10    exhibit 3?
11         MR. SIPIORA:  That's accurate.
12 BY MR. VERDINI:
13    Q.   So go back to exhibit 3, which
14 is your declaration in the district court
15 litigation of claim construction, and turn to
16 paragraph 5 which is on page 2.  In paragraph
17 5 you write I am being compensated at a rate
18 of $420 per hour for my consulting services,
19 including the preparation of this declaration.
20         Is that an accurate statement?
21    A.   Yes.
22    Q.   And is $420 per hour a regular
23 rate for your consulting services?
24    A.   I cannot -- I don't have
25 anything else to compare with.

Page 17

1     Q.   This is the first time that
2  you've consulted in this forum, is that
3  correct?
4     A.   Correct, yes.
5     Q.   How many hours did you spend on
6  preparing the declaration that we've marked as
7  exhibit 3?
8     A.   I don't remember exactly how
9  many hours.
10    Q.   Can you approximate?
11    A.   Not more than ten.
12    Q.   And approximately how many
13 hours did you spend drafting the declaration
14 in the IPR that's attached -- or that we've
15 marked as exhibit 4?
16    A.   This was the declaration that
17 was submitted a year ago?
18    Q.   Yes.
19         MR. SIPIORA:  So I'm going to
20    object, outside the scope.  Not
21    relevant to this deposition.  And
22    really taking discovery in the IPR.
23    So I object; outside the scope.  I
24    can't instruct not to answer, but I'm
25    going to object.  Any inquiry that

EMINA SOLJANIN - 05/09/2018                    Pages 18..21

Page 18

1    looks like discovery in the IPR is not
2    appropriate here.  So outside the
3    scope; object.
4         MR. VERDINI:  I think it
5    connects to her declaration in this
6    case, so ...
7  BY MR. VERDINI:
8         Q.   Can you approximate how many
9  hours you spent on the declaration submitted
10 in the IPR that's been marked as exhibit 4?
11        A.   Not more than ten.
12        Q.   And leaving aside anyone, any
13 lawyer for LSI or Avago, has anyone assisted
14 you with drafting the declaration that's been
15 marked as exhibit 3 in the district court
16 litigation?
17        A.   No.
18        Q.   And the same question with
19 respect to the declaration you submitted in
20 the IPR?
21        A.   No.
22        MR. SIPIORA:  The same
23    objection, outside the scope.
24 BY MR. VERDINI:
25        Q.   Professor, you were employed by

Page 19

1  Bell Labs from approximately 1995 to 2015, is
2  that right?
3         A.   From September '94 until the
4  end of 2015.
5         Q.   Can you give a brief
6  description of what Bell Labs is?
7         A.   Bell Labs is research arm of --
8  well, there are four companies that I went
9  through, and Bell Labs is the research arm of
10 all four.
11        Q.   And what were the four
12 companies that were a part of Bell Labs?
13        A.   First parent company was AT&T.
14 The second parent company was Lucent
15 Technologies.  The third parent company was
16 Alcatel Lucent.  And the last one was Nokia.
17        Q.   Does Bell Labs currently exist
18 today, to your knowledge?
19        A.   Yes.
20        Q.   And is Nokia still the parent
21 company of Bell Labs?
22        A.   Yes.
23        Q.   Can you describe at a high
24 level what your responsibilities were over the
25 course of the 20 -- about 20 years you were at

Page 20

1  Bell Labs?
2         A.   I was in general conducting
3  research on information theory and coding.
4         Q.   Your declaration refers to some
5  teaching that you did also while you were at
6  Bell Labs, is that correct?
7         A.   Yes.
8         Q.   Can you give me a sense of
9  percentage of the time that you were teaching
10 versus working at Bell Labs?
11        A.   So I worked at Bell Labs for 21
12 years, and I taught at Brooklyn Poly one
13 semester.  At Columbia two-and-a-half
14 semesters.  Everything else was less than a
15 week, at a conference, tutorial, something
16 like that.
17        Q.   So a small percentage of your
18 work?
19        A.   Very small.
20        Q.   Do you know Professor Steven
21 McLaughlin?
22        A.   I do.
23        Q.   How long have you known him?
24        A.   I don't know exact date that we
25 met, but I do believe that I know -- I knew

Page 21

1  him very early when I started working at Bell
2  Labs.
3         Q.   And in the course of that time
4  have you ever worked on any research with him?
5         A.   On a research problem, no.
6         Q.   Are you familiar with his
7  research work?
8         A.   Not anymore.
9         Q.   There was a time when you were?
10        A.   There was a time when I heard
11 him give talks, which I don't remember at the
12 moment.
13        Q.   What were the general subject
14 matters, if you recall, of the talks?
15        A.   It was in recording.
16 Information recording.
17        Q.   Have you ever used Professor
18 McLaughlin's research in your work?
19        A.   Not that I remember.
20        Q.   Would you consider him someone
21 skilled in the art in coding and detection?
22        A.   Yes.
23        Q.   And do you respect his work?
24        A.   Yes.
25        Q.   You are currently a professor

1  at Rutgers?
2      A.   Yes.
3      Q.   What do you teach?
4      A.   Since I started I taught coding
5  theory and probability theory.
6      Q.   To what types of students?
7      A.   Coding theory is a graduate
8  class.  Probability theory is an undergraduate
9  class.  Sophomore.
10     Q.   Do you still conduct research?
11     A.   Yes.
12     Q.   What percentage of your time
13 now is dedicated to research versus teaching?
14     A.   It's about equally split.  At
15 least for the paid hours.
16     Q.   What, generally speaking, is
17 the research that you are currently doing?
18     A.   Generally I work on distributed
19 systems.
20     Q.   Can you say that again?  I am
21 sorry?
22     A.   Distributed systems.
23     Q.   What are distributed systems?
24     A.   It can be distributed storage.
25 Distributed computing.  Whatever is not done

1  at the single computer, single machine, but
2  multiple machines.
3      Q.   If you would look at paragraph
4  12 of your declaration which has been marked
5  as exhibit 3.  In paragraph 12 you write --
6  you are discussing your employment with Bell
7  Labs, correct?
8      A.   Yes.
9      Q.   And you refer to, in the second
10 sentence, that the projects that you worked on
11 include (as read):
12          Designing the first distance
13       enhancing codes to be implemented in
14       commercial magnetic storage devices.
15          When you say "distance enhancing
16 codes" what do you mean?
17     A.   These are codes which would
18 cause the distance between the possible
19 sequences that can be received, at the output
20 of the channel to be larger than if it didn't
21 have the code.
22     Q.   And what is the scope of --
23          MR. VERDINI:  Strike that.
24 BY MR. VERDINI:
25     Q.   You identify specific distance

1  enhancing code in paragraph 12.  What is it?
2  Does it have a name?
3      A.   It did have a name.  I don't
4  remember the name that we used.
5      Q.   And you wrote that that
6  distance enhancing code was implemented in
7  commercial magnetic storage devices, correct?
8      A.   Yes.
9      Q.   What commercial magnetic
10 storage devices was it implemented in?
11     A.   That was the late '90s.  There
12 were channel chips that we produced.  But
13 that's about all I remember.
14     Q.   And you said that "we
15 produced."
16          When you say we, who are you
17 referring to?
18     A.   Lucent Technologies.
19     Q.   Can you describe -- you said
20 you couldn't name it.  Can you describe what
21 the first distance enhancing code was that you
22 are referring to there?
23     A.   It was a code that removed
24 certain strings from all possible sequences.
25     Q.   What strings did it remove?

1      A.   I don't remember which strings
2  were in the first code removed.
3      Q.   The distance enhancing codes
4  that you were working on, were they relevant
5  to peak detectors?
6      A.   No.
7      Q.   Why not?
8      A.   Because at that time peak
9  detectors were not in use anymore.
10     Q.   And so what were the systems
11 that were in use at the time of the distance
12 enhancing codes that you were designing?
13     A.   These were sequence detectors.
14     Q.   And again what was the time
15 frame?
16     A.   The late '90s.
17     Q.   And when you say late '90s, is
18 it '97, '98?
19     A.   So I started working on these
20 codes since I came in '94, and I believe that
21 the first chips were made in about '98.
22 That's to the best of my recollection.  I
23 don't claim that to be exact dates.
24     Q.   Moving to paragraph 13 you
25 write (as read):

Page 26

1       According to the University's
2   allegations in the first amended
3   complaint in this case, the alleged
4   invention of the '601 patent is,
5   quote, maximum transition run, end
6   quote, MTR, code featuring a, quote, j
7   constraint, which, quote, imposes a
8   limit on the maximum number of
9   consecutive transitions, end quote, in
10  a binary system.
11      Is that correct?
12  A.   Yes.
13  Q.   When you say in a binary system
14  what are you referring to?
15      A.   That means that the symbols
16  that are used in sequences are 0's and 1's.
17  Q.   In your opinion what sorts of
18  systems are binary systems?
19      A.   All systems that can either
20  transmit and receive or record, what
21  corresponds to 0's and 1's.
22  Q.   Magnetic storage is a binary
23  system?
24      A.   Yes.
25  Q.   If you turn to exhibit 4, which

Page 27

1   is your IPR declaration.  At page -- I am
2   going to use the numbers of the actual
3   declaration as opposed to the numbers that are
4   in the bottom right.  So page 4 of your
5   declaration paragraph 13.  Do you see that?
6       A.   Yes.
7   Q.   In paragraph 13 you write (as
8   read):
9           According to the patent owner,
10          the alleged invention of the '601
11          patent is, quote, maximum transition
12          run, end quote, MTR code, featuring a
13          quote, j constraint, end quote, which,
14          quote, imposes a limit on the maximum
15          number of consecutive transitions that
16          are written to the disk, end quote, of
17          a hard disk drive.
18  Did I read that correctly?
19      A.   You read correctly.
20  Q.   Yes?  You said?  I'm sorry.  I
21  didn't hear you.
22      A.   I have the same text.
23  Q.   Okay.  You would agree
24  comparing what you wrote in paragraph 13 in
25  the IPR declaration to paragraph 13 in your

Page 28

1   claim construction declaration, you changed
2   the word "hard disk drive" to binary system,
3   correct?
4       A.   Changed?  I did not have this
5   in mind when I was writing the -- this
6   opinion.
7   Q.   So why did you describe it as
8   being an invention of a hard disk drive in the
9   IPR declaration and change it to -- and
10  describe it as a binary system in paragraph 13
11  of your claim construction declaration?
12          MR. SIPIORA:  Objection as to
13          form.  But you can go ahead and
14          answer.  This is a legal thing.
15      A.   I believe here I was looking at
16  the system, at storage, and here I was
17  thinking about mathematics, probably.
18  Q.   You were thinking about?
19      A.   Mathematics, about 0's and 1's.
20  Q.   You used "this" so let's try to
21  be -- and I know you're looking at two
22  different things.  When you said you were
23  referring to the system, you were saying in
24  paragraph 13 of your IPR declaration, correct?
25      A.   IPR declaration is this one

Page 29

1   (indicating).
2   Q.   The one that says hard disk
3   drive?
4       A.   Yes.
5   Q.   Okay.  And so why did you use
6   hard disk drive in paragraph 13 of the IPR
7   declaration?
8       A.   Because it was about to
9   describe.  The invention is about to describe.
10  Q.   And in your mind is hard disk
11  drive the same thing as binary system?
12      A.   Binary systems are a more
13  general form.
14  Q.   So why did you use the more
15  general form in your declaration in connection
16  with claim construction in the district court
17  litigation?
18      A.   That I don't know.
19  Q.   Did you change that language?
20      A.   No. I did not have this in
21  front of me (indicating) when this was done
22  (indicating).
23  Q.   So in connection with drafting
24  your declaration in the claim construction --
25          MR. VERDINI:  Strike that.

Page 30

1  BY MR. VERDINI:
2      Q.   In connection with drafting
3  your declaration in the district court
4  litigation relating to claim construction you
5  did not look at your IPR declaration, is that
6  correct?
7      A.   I did not look into this
8  sentence when this sentence was written
9  (indicating).
10     Q.   Do you recall writing the
11 description of the invention in paragraph 13
12 of your claim construction declaration, which
13 is marked as exhibit 3?
14     A.   I recall discussing this with
15 Mr. Mayle, who made the draft.
16     Q.   And what did you discuss about
17 the reference to binary system?
18         MR. SIPIORA:  Objection;
19     instruct not to answer.
20         (Instruction not to answer.)
21         MR. SIPIORA:  Attorney work
22     product.
23         MR. VERDINI:  I think she's
24     relied upon it in connection with
25     drafting her opinion.  So it should be

Page 31

1      something underlying why it's there.
2      So I think that's not privileged.
3          MR. SIPIORA:  I think you're
4      wrong.
5          MR. VERDINI:  You're
6      instructing her not to answer?
7          MR. SIPIORA:  I just did.
8  BY MR. VERDINI:
9      Q.   Are you going to accept your
10 counsel's instructions?
11     A.   Yes.
12     Q.   Did you rely on counsel to
13 describe the invention as being in a binary
14 system in connection with exhibit 3?
15         MR. SIPIORA:  Professor, I'll
16     just instruct you that any
17     communication you had with counsel in
18     connection with preparing any of the
19     legal documents in this case is
20     covered by the work product doctrine
21     and the rules of the court as not
22     discoverable.  So any answer you give,
23     please don't delve into or describe or
24     characterize communications you had
25     with counsel.  So I'll just give you

Page 32

1      that general instruction.
2          Can we have the question back,
3      please?
4          (The reporter read back as
5      follows:
6          "Question:  Did you rely on
7      counsel to describe the invention as
8      being in a binary system in connection
9      with exhibit 3?)"
10     A.   No.
11     Q.   But you did testify that that
12 was something that you discussed with counsel,
13 correct?
14         MR. SIPIORA:  Objection;
15     instruct not to answer.
16         MR. VERDINI:  I think she
17     testified she talked to counsel about
18     it, so that's a yes-or-no question.
19         MR. SIPIORA:  I still am
20     instructing not to answer.
21         (Instruction not to answer.)
22 BY MR. VERDINI:
23     Q.   Did you have a discussion with
24 counsel about describing the invention as
25 being in a binary system in connection with

Page 33

1  drafting your IPR declaration that's been
2  marked as exhibit 4?
3          MR. SIPIORA:  The same
4      instruction.  Instruct not to answer
5      based on attorney work product.
6          (Instruction not to answer.)
7  BY MR. VERDINI:
8      Q.   While we're talking about
9  describing the invention of the '601 patent, I
10 am going to show you what has been marked as
11 exhibit 5.
12         ---
13         (Deposition Exhibit 5, book
14     entitled Coding and Signal Processing
15     For Magnetic Recording Systems was
16     marked for identification)
17         ---
18 BY MR. VERDINI:
19     Q.   Professor, do you recognize
20 what has been marked as exhibit 5?
21     A.   I can read what it is.
22     Q.   Are you familiar with a book
23 entitled Coding and Signal Processing For
24 Magnetic Recording Systems?
25     A.   What do you mean by "familiar"?

Page 34

1    Q.   I think you wrote a chapter in
2 it.  Do you recall that?
3    A.   Yes.
4    Q.   If you turn to the fourth page
5 of exhibit 5.  One more page, I think.  There
6 you go.  This version of the book is, there's
7 a copyright date of 2005, do you see that
8 towards the bottom of the page?
9    A.   Yes.
10    Q.   Do you know when this book was
11 first published?
12    A.   No.
13    Q.   Who would you identify as the
14 audience that this book is intended for?
15    A.   The people in the academia
16 industry who are interested in coding and
17 single processing for magnetic recording
18 systems.
19    Q.   Would it be someone of skill in
20 the art, who would be the intended audience?
21    A.   Yes.
22    Q.   We copied the beginning part of
23 the book and if you turn about three-quarters
24 of the way back you should reach chapter 11.
25 It starts with 11-1 on the bottom right.  Are

Page 35

1 you there?
2    A.   Yes.
3    Q.   This chapter is entitled
4 modulation codes for storage systems, correct?
5    A.   Yes.
6    Q.   And you and a Brian Marcus are
7 identified as the authors, is that correct?
8    A.   Yes.
9    Q.   Who is Brian Marcus?
10    A.   He's a professor at the
11 University of British Columbia.
12    Q.   And have you worked with him on
13 research before?
14    A.   No.
15    Q.   Have you written chapters about
16 modulation codes for storage systems with him
17 other than this chapter 11?
18    A.   I don't remember correct,
19 completely, but there may have been an earlier
20 book that we -- that we were asked to write
21 the survey together.  I don't remember.
22    Q.   And am I correct that you and
23 Mr. Marcus wrote this chapter together?
24    A.   Yes.
25    Q.   And you reviewed it before it

Page 36

1 was published?
2    A.   Yes.
3    Q.   And you believed it to be
4 accurate, correct?
5    A.   At the time, yes.
6    Q.   And do you recall any edits to
7 this chapter between, how about from the time
8 that it was published in 2005 to current?
9    A.   I don't remember edits.
10    Q.   And do you recall any edits --
11    MR. VERDINI:  Strike that.
12 BY MR. VERDINI:
13    Q.   If you would pull out exhibit
14 3, which is your declaration in this case and
15 go to your CV.  The easiest way to get there,
16 at the top there's pages numbers that say of
17 49.  If you would go to page 45.  There's a
18 section entitled books, book chapters and
19 editing.  Do you see that?
20    A.   Mm-hmm.
21    Q.   And this is a CV that you put
22 together?
23    A.   Yes.
24    Q.   Number 5 is identified as B.
25 Marcus and E. Soljanin, "Modulation codes for

Page 37

1 storage systems," in The Computer Engineering
2 Handbook, and it's a date of 2002.  Do you see
3 that?
4    A.   Yes.
5    Q.   Now that's the same title of
6 the chapter 11 that's referenced in exhibit 5,
7 correct?
8    A.   (Nodding head affirmatively.)
9    Q.   Verbal?  Sorry, is that --
10    A.   The same title, yes.
11    Q.   Is it the same chapter?
12    A.   I don't remember if we did any
13 edits between 2002 and 2005.
14    Q.   What is the computer
15 engineering handbook?
16    A.   CRC Press used to, maybe they
17 still do, have books of collected papers on a
18 particular topic.
19    Q.   If you know, who was the
20 intended audience for the computer engineering
21 handbook?
22    A.   Computer engineering handbooks
23 are covering many topics, so it would cover
24 many areas of engineering.
25    Q.   You referred to exhibit 5 as

http://www.yeslaw.net/help

Page 38

1  being intended for those who do research and
2  those in industry.  Is the computer
3  engineering handbook similarly intended for
4  that group of people?
5       A.   I believe it's more read by
6  industry.
7       Q.   Why did you include the chapter
8  from the computer engineering handbook in your
9  CV?
10      A.   Why I included -- why I put my
11  publication in my CV?
12      Q.   Mm-hmm.  Why did you identify
13  that one as one to include in your CV?
14      A.   I'm not sure I understand.
15      Q.   Well, let me ask it this way.
16  You do not identify what has been marked as
17  exhibit 5 in the books and book chapters that
18  you identify in 1 through 6, correct?
19      A.   Because I believe that that was
20  a similar paper, so I put only one.
21      Q.   Okay.  Is 1 through 6 that
22  you've identified as books, books chapters and
23  editing the entirety of books, books chapters
24  and editing that you've done in the course of
25  your career?

Page 39

1       A.   I wrote a CV hoping that that
2  would be the case, that I don't miss anything.
3       Q.   Okay.  No other books or book
4  chapters that you can think of while we're
5  sitting here today?  And it's not a trick
6  question.  I'm just curious as to whether you
7  selected these or if this is the entirety.
8       A.   No, this is the entirety that I
9  could recall, so it was not on purpose,
10  selected, like the next title.
11      Q.   Okay.  So let's go back to
12  exhibit 5.  Exhibit 5 is the chapter.  Sorry.
13      A.   Yes.
14      Q.   And you're at chapter 11?
15      A.   Yes.
16      Q.   And if you turn to page 11-2.
17  In the third full paragraph you wrote (as
18  read):
19           During the past few years,
20      significant progress has been made in
21      defining high capacity distance
22      enhancing constraints for high density
23      magnetic recording channels.
24      A.   Yes.
25      Q.   And that was accurate at the

Page 40

1  time you wrote it, correct?
2       A.   Yes.
3       Q.   And then you go on to --
4       A.   The time would be 2002.
5       Q.   Okay.  So even though this
6  particular chapter that's exhibit 5 is dated
7  2005 your belief is that this was written in
8  or around 2002?
9       A.   I cannot recall -- I cannot
10  recall how many -- how much editing we did.
11      Q.   Between 2002 and 2005?
12      A.   Exactly.
13      Q.   Let me ask you this:  if it was
14  published in 2002 when would you have started
15  writing the chapter with Mr. Marcus?  And I
16  don't need an exact date.  But generally how
17  long does it take to write a chapter like
18  this?
19      A.   Usually less than papers, so
20  maybe a year earlier.
21      Q.   Okay.  So you believe that the
22  statement "during the past few years
23  significant progress has been made in defining
24  high capacity distance enhancing constraints
25  for high density magnetic recording channels"

Page 41

1  was accurate in or around the time that you
2  wrote it, correct?
3       A.   Yes.
4       Q.   And in the next sentence you
5  write (as read):
6           One of the earliest example of
7      such a constraint is the maximum
8      transition run, paren (MTR), end
9      paren, constraint, bracket [28], end
10     bracket, which constrains the maximum
11     run of 1s.
12          Is that correct?
13      A.   Yes.
14      Q.   And that was accurate when you
15  wrote it, correct?
16      A.   Yes.
17      Q.   If we look at the last page of
18  the exhibit, which is 11-11.  Are you there?
19      A.   Yes.
20      Q.   Reference 28, do you see that?
21      A.   Yes.
22      Q.   What is reference 28?
23      A.   It's the Moon and Brickner,
24  maximum transition run codes for data storage.
25      Q.   And it's from the IEEE -- an

http://www.yeslaw.net/help

Page 42

1   IEEE article dated September 1996, correct?
2       A.   Yes.
3       Q.   Professor Moon and Mr. Brickner
4   are the inventors of -- the named inventors on
5   the '601 patent, correct?
6       A.   Correct.
7       Q.   Now go back to the last page
8   again.  Reference number 30, do you see that?
9       A.   Yes.
10      Q.   That's a paper that you wrote,
11  correct?
12      A.   Yes.
13      Q.   Entitled on-track and off-track
14  distance properties of class 4 partial
15  response channels.  Correct?
16      A.   Yes.
17      Q.   And that's from an October 1995
18  symposium?
19      A.   Yes.
20      Q.   Going back to 11-2.  When you
21  are describing the earliest examples of MTR
22  constraint you don't identify reference 30,
23  correct?
24           MR. SIPIORA:  Objection to the
25       form.  Misstates the document.  It

Page 43

1        says one of the earliest examples of
2        such constraint.  Not the earliest
3        example.
4             MR. VERDINI:  That wasn't
5        really my question.
6   BY MR. VERDINI:
7        Q.   My question is:  you don't
8   identify as one of the earliest examples of
9   such a constraint the reference number 30, is
10  that correct?
11       A.   It doesn't show here.
12       Q.   Go back to 11-1 of exhibit 5.
13  Which is the chapter.  Are you on page 11-1?
14       A.   Exhibit 5.  Page 11-1?
15       Q.   Yes.  It should be on the
16  bottom right.  Not figure 11-1.  I'm sorry.
17  Just back a page.  The beginning chapter.
18       A.   Oh, I see.
19       Q.   Yes.  So that's 11-2.  So I
20  want to get you to 11-1.  Thanks.
21           In the first paragraph, in the
22  third sentence you wrote (as read):
23           Perhaps the most widely known
24           constraints are the runlength limited,
25           paren RLL, paren (d,k), end paren

Page 44

1           constraints, in which 1s are required
2           to be separated by at least d and no
3           more than k 0s.
4             Was that an accurate statement at
5   the time you wrote it?
6        A.   Yes.
7        Q.   Next you wrote (as read):
8             Such constraints are useful in
9           data recording channels that employ
10          peak detection; waveform peaks --
11          colon waveform peaks, corresponding to
12          data ones, are detected independently
13          of one another.
14            Again is that an accurate statement
15  of the usefulness of the (d,k) constraint?
16       A.   They are useful for peak
17  detectors.
18       Q.   And then in the last sentence
19  of that paragraph you wrote (as read):
20           The d-constraint helps to
21          increase linear density while
22          mitigating intersymbol interference,
23          and the k-constraint helps to provide
24          feedback for timing and gain control.
25            Is that an accurate description

Page 45

1           of the purposes of the d-constraint
2           and k-constraint?
3        A.   For peak detectors, yes.
4        Q.   Is it different for other
5   detectors?
6        A.   For other detectors peak
7   constraint can offer beneficial --  additional
8   benefits.
9        Q.   First what other detectors are
10  you referring to?
11       A.   In sequence detectors, peak
12  constraints can offer, can be beneficial.
13       Q.   And how so?
14       A.   What would be a good way to
15  describe?  It would eliminate some sequences
16  which the detector can confuse easily one for
17  the other.
18       Q.   Is the help for the
19  k-constraint that you identify in chapter 11,
20  does it provide the same help to a sequence
21  detector?
22       A.   K-constraints, constraint, is
23  important for timing for any detector.
24       Q.   If we go to paragraph 3 of
25  section 11.1 of exhibit 5.  You write (as

Page 46

1  read):
2          Broadly speaking, two classes
3      of constraints are of interest in
4      today's high density recording
5      channels: (1) constraints for
6      improving timing and gain control and
7      simplifying the design of the Viterbi
8      detector for the channel, and (2)
9      constraints for improving noise
10      immunity.  Some constraints serve both
11      purposes.
12          How would you classify the MTR
13  constraint that you described on page 2 of
14  this chapter with respect to the classes that
15  you identified on page 1?
16      A.   Depending on the channel, it
17  can serve both purposes.
18      Q.   And when you say it depends
19  upon the channel, what about the channel
20  determines whether it's one class or both?
21      A.   Could you rephrase that?
22      Q.   You said depending on the
23  channel --
24      A.   Right.
25      Q.   -- an MTR constraint would be

Page 47

1  classified under both of the classes that
2  you've identified.  What is it about the
3  channel that makes a difference?
4      A.   The channel transfer function.
5      Q.   And what do you mean by that?
6      A.   That is at the end of the
7  second paragraph.  h(D).
8      Q.   So what is the transfer
9  function that would, in your mind, make the
10  MTR constraint that you described in this
11  chapter -- that would make it serve both
12  purposes, as you had identified in paragraph
13  3?
14      A.   I didn't get it.
15      Q.   Sorry.  That was a long
16  question.
17      A.   Yes.
18      Q.   What about the transfer
19  function in your mind would make the MTR
20  constraint serve both purposes that you
21  identified in paragraph 3?  I hope that's a
22  little better question.
23      A.   If h(D) here, if N is 2, maybe
24  there are some other N's that I don't know,
25  but this would be one example, an MTR

Page 48

1  constraint would simplify a Viterbi detector
2  and help improve noise immunity if the
3  detector is implemented to take into account
4  the constraint; it would not -- MTR by itself
5  would not do anything about timing and gain.
6      Q.   That's the k-constraint,
7  correct?
8      A.   Right.
9      Q.   And when you say MTR constraint
10  are you referring to the j constraint?
11      A.   The constraint that limits the
12  transitions between 0's and 1's, and 1's and
13  0's.
14      Q.   If you would turn to page 3
15  of -- well, 11-3 of exhibit 5.  The last full
16  paragraph that starts "translation of
17  constrained sequences."
18      Do you see that?
19      A.   The last paragraph, right.
20      Q.   Yes.  In the second sentence
21  you wrote (as read):
22          Saturation recording of binary
23      information on magnetic medium is
24      accomplished by converting an input
25      stream of data into a spatial stream

Page 49

1      of bit cells along a track where each
2      cell is fully magnetized in one of two
3      possible directions, denoted by 0 and
4      1.
5          Was that accurate -- is that an
6  accurate statement as of the time of this
7  chapter?
8      A.   Yes.
9      Q.   And would that have been
10  accurate as of in or around 1996?
11      A.   Yes.
12      Q.   And when you wrote input stream
13  of data, what were you referring to?
14      A.   Sequences of 0's and 1's.
15      Q.   And then what is a spatial
16  stream of bit cells?
17      A.   This is in the magnetic medium.
18      Q.   When you say this is in the
19  magnetic medium, what do you mean by "this"?
20      A.   A bit cell in the magnetic
21  medium.
22      Q.   And what is the spatial stream
23  of bit cells that you are referring to in the
24  magnetic medium?
25      A.   It's a sequence of bit cells.

Page 50

1    Q.   And the track that you're
2  referring to in the sentence is what?
3    A.   Sorry.  I don't see the track.
4    Q.   It says --
5    A.   Along the track?
6    Q.   Yes.  What is "the track"?
7    A.   The track is a spatial part of
8  disk -- the disk is round, it would be a part,
9  between two concentric circles, would be a
10 full track.
11   Q.   In the third sentence of that
12 paragraph you wrote (as read):
13        There are two important
14        modulation methods commonly used on
15        magnetic recording channels, colon,
16        non-return-to-zero, paren NRZ, end
17        paren, and modified
18        non-return-to-zero, paren NRZI.
19        And that was an accurate
20 statement as of the time of this chapter?
21   A.   Yes.
22   Q.   And that was accurate as
23 of 1996, correct?
24   A.   Yes.
25   Q.   Next you wrote (as read):

Page 51

1        In NRZ modulation, the binary
2        digits 0 and 1 in the input data
3        stream corresponds to 0 and 1
4        directions of cell magnetizations,
5        respectively.
6        Again, that was an accurate
7  statement at the time of this chapter?
8    A.   Yes.
9    Q.   And it was accurate as of 1996
10 correct?
11   A.   Yes.
12   Q.   And then next you write (as
13 read):
14        In NRZI modulation the binary
15        digit 1 corresponds to a magnetic
16        transition between two bit cells and
17        the binary digit 0 corresponds to no
18        transition.
19        Again that was accurate as of
20 the time of the chapter?
21   A.   Yes.
22   Q.   And accurate as of 1996,
23 correct?
24   A.   Yes.
25   Q.   If you turn to the next page.

Page 52

1  This section is called Constraints For ISI
2  Channels.  What is ISI?
3    A.   Intersymbol interference.
4    Q.   Can you describe what
5  intersymbol interference means?
6    A.   That means that data which is
7  transmitted or recording at different points
8  in time or space add up -- may add up to the
9  same output of the channel.
10   Q.   When you say may add up to the
11 same output of the channel, what do you mean?
12   A.   I mean what is described by
13 equation 11-1 where data is Am, and output is
14 Yn.  So the output reflects a sum, weighted sum
15 of several data symbols.  We say that this
16 data symbols interfere with each other.
17   Q.   In the introductory paragraph
18 on section 11.3 you wrote (as read):
19        We discuss a class of codes
20        known as codes which avoid specified
21        differences.
22        And you italicized "codes which
23 avoid specified differences."  What does that
24 mean?  Sorry.  What does "codes which avoid
25 specified differences" mean?

Page 53

1    A.   That means that -- so a code is
2  a set of sequences, and codes which avoid
3  specified differences are codes where the
4  sequences which are in the code cannot differ
5  from each other in the way that is specified.
6    Q.   And when you say in the way
7  that is specified, you mean in the way in
8  which it's specified in --
9        MR. VERDINI:  Strike that.
10 BY MR. VERDINI:
11   Q.   The sequences that cannot
12 differ from one another are sequences that are
13 ultimately written to the disk, is that right?
14   A.   Written or transmitted.
15   Q.   In the next sentence in that
16 first paragraph you wrote (as read):
17        This is the only class of
18        distance enhancing codes used in
19        commercial magnetic recording systems.
20        And that was accurate at the
21 time that you wrote it?
22   A.   At the time that we wrote it
23 the first time.  I am not sure if in 2005
24 there were no introduction of different codes
25 for distance enhancement.

Page 54

1    Q.   But at least as of 2002 it was
2  that class of codes that were used in
3  commercial magnetic recording systems, is that
4  correct?
5    A.   To the best I can recall.
6    Q.   And then you identify two -- in
7  your mind, two reasons for that, correct, in
8  the next sentence in this chapter?
9         (The witness reviews document.)
10   A.   Where do you see two?
11   Q.   Well, let me just read --
12   A.   I see two.
13   Q.   You say (as read):
14        There are two main reasons for
15        this, colon.  These codes simplify the
16        channel detectors relative to the
17        uncoded channel and even high rate
18        codes in this class can be realized by
19        low complexity encoders and decoders.
20   A.   Yes.
21   Q.   Was that accurate as of at
22 least 2002?
23   A.   Yes.
24   Q.   Was it accurate in 2005 as
25 well?

Page 55

1    A.   It's hard for me to say what's
2  accurate after year 2000, because Lucent
3  Technologies spun off the division that was
4  introducing these chips.
5    Q.   What were the chips?  Did they
6  have a name?
7    A.   Read channel chips they're
8  called.
9    Q.   Any special sort of trade name
10 or anything that you know?
11   A.   Not that I remember.
12   Q.   And then in 11.3.1 of this
13 section entitled Requirements, do you see
14 that?
15   A.   Yes.
16   Q.   You wrote (as read):
17        A number of papers have
18        proposed using constrained codes to
19        provide coding gain on channels with
20        high ISI.
21        Correct?
22   A.   Yes.
23   Q.   And again you identify as one
24 of the references reference 28, which is the
25 paper by Professor Moon and Brickner, correct?

Page 56

1    A.   Yes.
2    Q.   And again you do not identify
3  reference 30 which was your paper in
4  connection with the Philadelphia presentation
5  in '95, correct?
6    A.   My paper proposed the
7  constraint.  Not the code.
8    Q.   But you didn't identify it
9  there, correct?
10   A.   Not as using constrained codes.
11 Let me just check these other papers.  I'm
12 just curious.  4, 10, 20.
13        (The witness reviews document.)
14   A.   Yeah, so my paper is paper 20,
15 which was more recent paper than '95, and in
16 publications kind of supersedes the ...
17   Q.   The reference number 20 is a
18 paper that you wrote with R. Karabed and P.
19 Siegel, correct?
20   A.   Yes.
21   Q.   And it's dated September 1999?
22   A.   Yes.
23        MR. VERDINI:  I don't know if
24     you want to take a break at this
25     point?  We've been at it about an

Page 57

1  hour.
2        MR. SIPIORA:  Sure.
3        ---
4    (Recess from 10:02 to 10:14.)
5        ---
6  BY MR. VERDINI:
7    Q.   Professor, we're back on the
8  record.  Did you have any conversations with
9  counsel about the substance of your testimony
10 during the break?
11   A.   No.
12        MR. SIPIORA:  I'm just going to
13     say for the record that conversations
14     we have off the record are not
15     discoverable, so ...
16        MR. VERDINI:  That's the
17     position that you are taking in this
18     case?
19        MR. SIPIORA:  Yeah.  With
20     experts, sure.  Yes.  Experts, it's
21     not discoverable.  Fact witness is a
22     different story.
23        MR. VERDINI:  Okay.
24        MR. SIPIORA:  But experts, yes,
25     it should be off the record.

EMINA SOLJANIN - 05/09/2018                    Pages 58..61

Page 58

1  BY MR. VERDINI:
2      Q.   You can put away exhibit 5 and
3  let's go to exhibit 3, which is your
4  declaration in connection with claim
5  construction.  I think we're done with exhibit
6  5, so you can probably put it away.  Just off
7  to the side.
8      A.   Okay.
9           Could you say the number again?
10     Q.   Exhibit 3, which is your
11 declaration in claim construction.  Will you
12 turn to page -- paragraph 16, which is on page
13 4.  And in paragraph 16 you are referring to
14 your 1995 paper related to the presentation in
15 Philadelphia, correct?
16     A.   Yes.
17     Q.   And in the last sentence you
18 say that the first named inventor on the '601
19 patent, Professor Moon, attended my
20 presentation given at the above referenced
21 conference, as described in LSI's counterclaim
22 for inequitable conduct.
23          Correct?
24     A.   Is that something I'm reading
25 here?

Page 59

1      Q.   Yes.  At the last sentence in
2  paragraph 16.
3      A.   The first-named inventor of the
4  '601 patent ...
5           (The witness reviews document.)
6      A.   Yes.
7      Q.   Have you contacted anyone to
8  ask whether Professor Moon was at the
9  conference that you referred to there?
10     A.   No.
11     Q.   And who ran the conference?
12     A.   Who ran the session or the
13 conference?
14     Q.   The conference.  Who was
15 responsible for the conference?
16     A.   SPIE.
17     Q.   Have you contacted SPIE for a
18 list of attendees at the '95 conference?
19     A.   No.
20     Q.   Do you recall whether Professor
21 Moon presented any -- did any presentations at
22 that 1995 conference?
23     A.   No.
24     Q.   Was anyone else there when you
25 and Professor Moon had a conversation that is

Page 60

1  identified in LSI's counterclaim?
2      A.   No.
3      Q.   Can you tell me what you
4  remember about that conversation?
5      A.   About the conversation.
6  (Pause.)
7           MR. SIPIORA:  I'm going to
8      object; outside the scope.  But you
9      can go ahead and answer.
10          MR. VERDINI:  She talks about
11     it being described in LSI's
12     counterclaim for inequitable conduct
13     and references 31 paragraphs in that
14     counterclaim.  So I don't think it's
15     outside the scope.
16 BY MR. VERDINI:
17     Q.   So what do you recall about the
18 conversation with Professor Moon that's
19 identified in LSI's counterclaim?
20          MR. SIPIORA:  Well, if you are
21     going to ask about the counterclaim
22     you should give her the counterclaim
23     to see.
24 BY MR. VERDINI:
25     Q.   Do you recall a conversation

Page 61

1  with Professor Moon at that conference?
2      A.   I recall a conversation with
3  Professor Moon.  I don't remember the
4  conference actually.  It was in connection
5  with this paper.
6      Q.   So where was that -- where did
7  that conversation take place?
8      A.   That I don't remember.
9      Q.   What time of the day did it
10 take place?
11     A.   I don't remember.
12     Q.   Do you remember what Professor
13 Moon was wearing?
14     A.   Absolutely not.
15     Q.   And no one else was there?
16     A.   No.
17     Q.   And you don't recall whether it
18 was actually at this conference?
19     A.   Correct.
20     Q.   Did it happen before or after
21 the conference?
22     A.   It happened after this paper.
23     Q.   When you say "this paper" was
24 the paper -- the paper was presented at a
25 conference in Philadelphia in October of '95?

EMINA SOLJANIN - 05/09/2018                    Pages 62..65

Page 62

1     A.   The paper was submitted earlier
2 that year.
3     Q.   Correct.  So was the
4 conversation with Moon before or after the
5 conference in October?
6     A.   That I don't remember.
7     Q.   Where did the conversation take
8 place?
9     A.   I don't remember.
10     Q.   What city?
11     A.   I don't remember the city.
12     Q.   Was it in person?
13     A.   Yes.
14     Q.   And what was the context that
15 you and Professor Moon were in the same place?
16     A.   There was either a conference
17 or a meeting.
18     Q.   You don't know whether it was a
19 conference or a meeting?
20     A.   I don't remember at this point.
21     Q.   But you remember that the
22 conversation -- do you remember what Professor
23 Moon told you?
24     A.   Yes.
25     Q.   But you don't remember where it

Page 63

1 was?
2     A.   No.
3     Q.   Or when it was?
4     A.   No.
5     Q.   And other than in LSI's
6 counterclaim for inequitable conduct have you
7 ever discussed that conversation with anyone
8 else?
9     A.   This conversation?  Probably
10 with my husband, but no one else.
11     Q.   And when would you have
12 discussed that with your husband?
13     A.   After I came back from the
14 trip.
15     Q.   And what did you tell your
16 husband about the conversation?
17     A.   That I was offered the joint
18 patent application based on my work.
19     Q.   And why didn't you take the
20 joint patent application if it was offered?
21     A.   Because I thought that -- I was
22 post-doctoral researcher at that time.  I
23 didn't know what my rights are within the
24 company, that was something new for me, and in
25 the paper it just appeared that something very

Page 64

1 clear to me, and I wouldn't even think it
2 would be patentable.
3     Q.   What didn't you think would be
4 patentable?
5     A.   Limiting the sequences of
6 symbols to 4, for example.  It just came out
7 of mathematics easily.
8     Q.   You didn't work with Professor
9 Moon on any research, did you?
10     A.   No.
11     Q.   So how would you be a joint
12 inventor with him?
13     A.   How would I be a joint
14 inventor?
15     Q.   Yes.
16     A.   I wouldn't know at that time.
17     Q.   And did he tell you why -- tell
18 me everything you recall about what Professor
19 Moon told you in that conversation,
20 specifically?
21     A.   He specifically said that he
22 did some similar work, and that he would like
23 to patent it, and asked if I would be
24 interested to do it jointly.
25     Q.   And what did you say in

Page 65

1 response?
2     A.   That I would think about it.
3     Q.   And did you ever get back to
4 Professor Moon?
5     A.   No.
6     Q.   And is that the way the
7 conversation ended?
8     A.   Yes.
9     Q.   That was the only thing that
10 you guys spoke about during that conversation?
11     A.   Yes.  That I remember.
12     Q.   Did he reach out to you or did
13 you reach out to him?
14     A.   I didn't reach out to him.  I
15 wasn't aware of his work.
16     Q.   No, the conversation.  How did
17 it start.  Did he come over to you?
18     A.   Yes.
19     Q.   And did you know him before
20 that?
21     A.   I knew of him, we may have been
22 together at some other meetings, it's a small
23 community.  But I don't remember when I first
24 met him.
25     Q.   Have you ever had a

Page 66

1  conversation with him prior to this
2  conversation where you say he offered you to
3  be a joint inventor on a patent?
4      A.   It's possible.
5      Q.   Do you recall any conversations
6  with Professor Moon before that?
7      A.   No.  Not a conversation.
8      Q.   Do you recall any conversations
9  with Professor Moon after that time?
10     A.   I don't.
11     Q.   Have you had any conversations
12 with the other named inventor on the patent,
13 Brickner?
14     A.   Not that I remember at all.
15     Q.   Let's move to paragraph 19 of
16 exhibit 3.  In paragraph -- well, why don't
17 you tell me.  What is paragraph 19?
18     A.   What it reads, or ...
19     Q.   You can read it and tell me
20 what you intended when you wrote paragraph 19.
21          (The witness reviews document.)
22     A.   That I believe I have research
23 experience and enough material to write what I
24 wrote next.
25     Q.   So those are the documents that

Page 67

1  you reviewed in connection with providing the
2  declaration that's in exhibit 3, is that
3  correct?
4      A.   Yes.
5      Q.   Did you review your declaration
6  submitted in the IPR before you submitted the
7  declaration that's marked as exhibit 3?
8      A.   Did I review it immediately?
9      Q.   Did you review it -- let me ask
10 it this way.
11          Did it inform your opinions in
12 any way --
13     MR. VERDINI:  Strike it.
14 BY MR. VERDINI:
15     Q.   Did your IPR declaration inform
16 your opinions in any way that you recite in
17 exhibit 3, which is your claim construction
18 declaration?
19     MR. SIPIORA:  Objection as to
20 form.
21     THE WITNESS:  Excuse me?
22     MR. SIPIORA:  I just objected.
23 So I object to form procedurally
24 because I think the way the question
25 is posed has a problem and it gives

Page 68

1      him a chance to rephrase it, if he
2      wants to.  He doesn't have to.  But
3      it's up to him.  But that's not an
4      instruction not to answer.  You need
5      to go ahead and answer.
6  BY MR. VERDINI:
7      Q.   I'll re-ask the question with
8  that.
9      A.   Okay.
10     Q.   So did you rely on any opinions
11 in your IPR declaration in connection with
12 your opinions in exhibit 3, which is your
13 claim construction declaration?
14     A.   They were very different
15 opinions in my opinion, I mean that I was
16 asked to provide.
17     Q.   Why were they different in your
18 opinion?
19     A.   This one at hand was about the,
20 how claims are, are they definite, how they're
21 understood.  And the previous was about code
22 construction.
23     Q.   The previous was about what?
24     A.   Code construction.
25     Q.   When you say code construction,

Page 69

1  what do you mean?
2      A.   I mean constructing codes that
3  are -- that eliminate or prohibit certain
4  differences between sequences that we just
5  discussed.
6      Q.   Didn't you have to be
7  reasonably certain as to what the claims meant
8  to make the opinions in the IPR declaration?
9      A.   Yes.
10     Q.   Did you review Dr. McLaughlin's
11 declaration prior to submitting your claim
12 construction declaration?
13     A.   Just prior to submitting, yes.
14     Q.   And did anything in that
15 declaration, did you rely on anything in that
16 declaration in making your opinions that you
17 set forth in exhibit 3?
18     A.   No.
19     Q.   In paragraph 19 you drop a
20 footnote.  Do you see that?
21     A.   Mm-hmm.
22     Q.   And you say that you may rely
23 upon additional, quote, additional materials
24 to respond to arguments raised by the
25 university or its experts, and that you also

Page 70

1 might consider additional documents and
2 information in forming any necessary opinions,
3 including documents that may not have yet been
4 provided to you.
5        Have there been any documents
6 provided to you since you signed the
7 declaration in exhibit 3 that you are relying
8 on for your opinions?
9    A.  Since I signed which one?
10   Q.  Exhibit 3.
11   A.  Since I signed this one?  To
12 which opinion, then?  This is my latest
13 opinion.
14   Q.  Exhibit 3 is your claim
15 construction declaration.
16   A.  Opinion.  Yes.
17   Q.  And I'll call it your claim
18 construction declaration and try to reference
19 exhibit 3 just so we're clear.  So have there
20 been any documents that have been provided to
21 you since you signed your claim construction
22 declaration that you are relying on in
23 connection with your claim construction
24 opinions?
25   A.  It looks to me like a

Page 71

1 chicken/egg.
2    Q.  I'm not trying to be tricky.
3 Let me ask it this way.
4    A.  No, I'm probably not
5 understanding.  So this is the opinion I
6 provided.
7    Q.  Correct.
8    A.  So now you are saying has --
9 and I signed it.
10   Q.  On April 13.
11   A.  Right.  So you are saying since
12 April 13 is there something that's provided
13 that influenced this?
14   Q.  Correct.
15   A.  But this was before I wrote
16 that.
17   Q.  Correct.  Is there anything
18 else that you've been provided that you would
19 rely upon to support your opinions in this --
20   A.  To support this, in addition?
21   Q.  Correct.
22   A.  So yesterday I had a file with
23 documents that I've seen before.  So I don't
24 remember anything in addition.  I cannot be
25 hundred percent sure if -- to me they all look

Page 72

1 similar.
2    Q.  So sitting here today there is
3 not any other information that you can
4 specifically identify that you would rely upon
5 for your claim construction opinions, is that
6 correct?
7    A.  To be more certain about this,
8 correct.
9    Q.  In footnote 1 you also reserve
10 the right to revise, supplement or amend your
11 opinions.
12   A.  Yes.
13   Q.  Sitting here today is there any
14 reason, any revision, supplement or amendment
15 to your opinions that you are going to
16 provide?
17   A.  Not at the moment.
18   Q.  In addition to the documents
19 that you have reviewed did you have any
20 conversations with any other experts retained
21 by LSI and Avago in connection with forming
22 your claim construction opinions?
23   A.  No.
24   Q.  Have you had any conversations
25 with anyone at LSI?

Page 73

1    A.  No.
2    Q.  Anyone at Avago?
3    A.  No.
4    Q.  Other than counsel for
5 defendants, have you had any discussions with
6 anyone else relating to your declaration?
7    A.  No.
8    Q.  And again these questions are
9 excluding counsel.  Any discussions with
10 anyone relating to the '601 patent?
11   A.  No.
12   Q.  And anyone -- any discussions
13 with anyone other than counsel about the case?
14   A.  No.
15   Q.  Let's move to paragraph 23,
16 which is on page 6.  Paragraph 23, am I
17 correct that that's your description of a
18 person having ordinary skill in the art?
19   A.  Yes.
20   Q.  Anything that you need to
21 change, sitting here today?
22   A.  No.
23   Q.  And are you a person of
24 ordinary -- having ordinary skill in the
25 relevant art under your definition?

Page 74

1      A.   Yes.
2      Q.   The same page, section IV is
3  entitled claim construction standard.  Do you
4  see that?
5      A.   Yes.
6      Q.   And it goes on from paragraphs
7  26 to 32, is that correct?
8      A.   Yes.
9      Q.   Can you tell me what your
10 understanding of section IV is?
11     A.   It's about the legal standard
12 of claim construction.
13     Q.   And did you apply those
14 standards as you have laid them out in
15 paragraphs 26 through 32 in connection with
16 your claim construction opinion in this case?
17     A.   To the best of my ability, yes.
18     Q.   Did you apply those same
19 standards in connection with your IPR
20 declaration?
21     A.   It was a different opinion.  It
22 was different nature.
23     Q.   That wasn't my question.  My
24 question was did you apply the same claim
25 construction standards in connection with your

Page 75

1  IPR declaration?
2      A.   Did I -- I don't remember
3  saying discussing standards in the IPR.
4      Q.   Let's turn to exhibit 4, and if
5  you go to page 25.  Are you there?
6      A.   Yes.
7      Q.   And on page 25 you have a
8  section VI entitled claim construction,
9  correct?
10     A.   Yes.
11     Q.   And in paragraph 63 you wrote I
12 understand that in this IPR proceeding, the
13 claim terms are construed as understood by
14 persons of skill in the art.
15          Correct?
16     A.   Yes.
17     Q.   And that's the same
18 understanding that you have in connection with
19 your claim construction opinion, correct?
20     A.   Which paragraphs should I be
21 comparing?
22     Q.   Paragraph 26?
23     A.   Paragraph 26 with paragraph
24 which ...
25     Q.   Of exhibit 3, which is your

Page 76

1  claim construction declaration.
2      A.   And the paragraph here?
3      Q.   63 in exhibit 4.
4          (The Witness reviewing
5          documents.)
6      A.   Yes.
7      Q.   And in paragraph 64 of your IPR
8  declaration, if you would take a look at it.
9      A.   64, yes.
10     Q.   And you would agree that's the
11 standard you used to provide your opinions in
12 the IPR, correct?
13     A.   Yes.
14     Q.   And in your mind is that any
15 different from the standard that you used for
16 claim construction in connection with your
17 claim construction opinion?
18     A.   For the claim construction -- I
19 was not -- I was providing opinion about claim
20 construction, and ...
21          (The witness reviews document.)
22     A.   I was looking how claims are
23 written here (indicating), and -- in the most
24 recent declaration -- and the one that was a
25 year ago, I don't remember exactly.  I

Page 77

1  remember I was looking at codes more.  Because
2  the sequences that were eliminated were
3  similar in the prior art.  So ...
4      Q.   So let's stay with your IPR
5  declaration then, in light of that testimony.
6  Turn to page 8, please?
7      A.   Page 8 in the bottom or in the
8  middle?
9      Q.   In the middle.  So you should
10 be looking at paragraph 25, 26, and -- are you
11 there?
12     A.   Yes.
13     Q.   Okay.  So in paragraph -- or in
14 section IV of your IPR declaration you
15 identify, it's entitled the standards of
16 anticipation and obviousness, correct?
17     A.   Mm-hmm.
18     Q.   And that was what you were
19 providing an opinion on in connection with the
20 IPR declaration, right?
21     A.   Yes.
22     Q.   So turn to page 11 of exhibit
23 4.  Paragraph 35.  You wrote you understand
24 that determining anticipation of a patent
25 claim requires a comparison of the properly

http://www.yeslaw.net/help

Page 78

1  construed claim language to the prior art on
2  an element-by-element basis.
3          And that's what you did in the
4  IPR declaration, correct?
5      A.   Yes.
6      Q.   And so you needed properly
7  construed claim language to perform your
8  opinion in the IPR declaration, correct?
9      A.   I understand that determining
10 the anticipation of a patent claim requires a
11 comparison of properly construed claim
12 language of the prior art.  I have more
13 knowledge than -- more prior knowledge about
14 the area here than a person of ordinary skill
15 would look at this.
16     Q.   But fundamentally you had to
17 have the properly construed claim language in
18 your mind to compare whether the prior art
19 anticipated the claims of the '601 patent in
20 the IPR declaration, correct?
21     A.   That was a year ago.
22     Q.   Doesn't this first sentence --
23     A.   That is what it says, yes.
24     Q.   And that's what you did in the
25 IPR, correct?

Page 79

1      A.   Yes.
2      Q.   And in paragraph -- in fact you
3  swore to it under oath that's what you did,
4  right?
5      A.   Yes.
6      Q.   And in paragraph 36 you have,
7  the last sentence says (as read):
8          Additionally, the description
9          provided in the prior art must be such
10         that a person of ordinary skill could,
11         based on the reference, practice the
12         invention without undue
13         experimentation.
14     A.   Yes.
15     Q.   The reference to "practice the
16 invention" is the invention that's claimed in
17 the '601 patent, correct?
18     A.   Yes.
19     Q.   And so you would have to be
20 reasonably certain of the scope of the
21 invention to form an opinion whether the prior
22 art could teach a person of ordinary skill in
23 the art to practice the invention without
24 undue experimentation, correct?
25     A.   Yes.

Page 80

1      Q.   And again, that's what you did
2  in the IPR declaration, right?
3      A.   Yes.
4      Q.   So let's go back to exhibit 3,
5  which is your claim construction declaration,
6  and paragraph 27.  In the first sentence you
7  reference highly technical patents.  Do you
8  see that?
9      A.   Yes.
10     Q.   What do you mean by a highly
11 technical patent?
12     A.   Highly technical patents, if
13 more than -- if very technical skills are
14 required for understanding.
15     Q.   When you say technical skills,
16 what are you referring to?
17     A.   In the research -- in the
18 technical area.  Technical expertise.
19     Q.   And what do you mean when you
20 say technical?  What constitutes technical
21 expertise in your opinion?
22     A.   Familiarity with the area of
23 research.  I mean to a high degree.  To an
24 expert level degree.
25     Q.   What distinguishes, in your

Page 81

1  mind, a highly technical patent from one
2  that's not highly technical?
3      A.   The highly technical would have
4  more -- would be -- not many experts would be
5  familiar with it, and then the level of
6  mathematics, if it's a mathematical patent,
7  would be higher.
8      Q.   Do you consider the '601 patent
9  to be highly technical?
10     A.   I consider it to be very
11 specific.  Not many -- not a widely understood
12 area.
13     Q.   So would that be a highly
14 technical patent as you have written --
15     A.   Yes.
16     Q.   -- in paragraph 27?
17     A.   (Nodding head affirmatively.)
18     Q.   All right.  If you would look
19 at paragraph 28.  You write that regarding the
20 intrinsic evidence -- what do you mean when
21 you say intrinsic evidence?
22     A.   Something that is connected
23 with the patent itself, as opposed to provided
24 by an outside expert.
25     Q.   So regarding the intrinsic

http://www.yeslaw.net/help

Page 82

1  evidence you say you understand that the
2  claims themselves provide substantial guidance
3  as to the meaning of particular claim terms.
4       A.   Yes.
5       Q.   What do you mean by
6  "substantial guidance"?
7            (The witness reviews document.)
8       A.   I mean that not much is left to
9  imagination, and it's mostly guided.
10      Q.   It's mostly ...
11      A.   Guided.
12      Q.   Mostly guided.
13      A.   Instructions, right, are given.
14      Q.   The claims themselves are
15 mainly -- mainly guide the interpretation of
16 the particular claim terms, is that what you
17 mean?
18      A.   No, substantial guidance to the
19 meaning of a particular claim terms, right.
20 So they're not open to interpretation.
21      Q.   What isn't it open to
22 interpretation?
23      A.   Meaning of particular claim
24 terms.
25      Q.   So what do you mean when you

Page 83

1  say that means that particular claim terms are
2  not open to interpretation?  I'm not
3  understanding the answer.
4            So let's go back to the
5  sentence.  It says "I understand that the
6  claims themselves provide substantial guidance
7  as to the meaning of particular claim terms."
8       A.   Mm-hmm.
9       Q.   So what do you mean when you
10 say they provide substantial guidance as to
11 the meaning of particular claim terms?
12      A.   The claim term should not be
13 subject to interpretation and there is enough
14 information in the claim itself to know, to
15 guide the reader to interpret the term.
16      Q.   And did you apply that standard
17 in connection with providing your claim
18 construction opinions in this case?
19      A.   Yes.
20      Q.   And did you apply that same
21 standard in connection with providing your
22 opinions in the IPR declaration?
23      A.   No.
24      Q.   Why not?
25      A.   Because I was asked to provide

Page 84

1  opinion about the technical content, to the
2  best I understood it.
3       Q.   And you are a person of
4  ordinary skill in the art, correct?
5       A.   Much higher than ordinary
6  skills.
7       Q.   I did not mean that to be
8  pejorative.  You are an extraordinary person
9  of ordinary skill in the art.
10           In the next sentence you write
11 (as read):
12           For example, the context in
13           which a term is used in the asserted
14           claim can be highly instructive.
15           What do you mean by -- when you
16 say highly instructive, what does that mean to
17 you?
18      A.   That again is not subject to
19 the interpretation.
20      Q.   The claim term is not subject
21 to interpretation?
22      A.   Yes.
23      Q.   That's what you mean?
24      A.   That's how it reads, right.
25      Q.   And that's the standard that

Page 85

1  you think the claim terms have to be
2  written --
3       A.   Yes.
4       Q.   -- in relation to?
5       A.   Yes.  That I understand is the
6  legal standard.
7       Q.   And counsel for defendants
8  provided you that legal standard?
9            MR. SIPIORA:  Well, again,
10           whatever you know in terms of your
11           memory of knowledge of the basis of
12           what you testified.  But any
13           conversations with counsel are out of
14           bounds.
15 BY MR. VERDINI:
16      Q.   Yeah, I don't want specific --
17 you reference to your understanding.  Your
18 understanding is based on conversations you
19 had with counsel for the defendants, correct?
20      A.   Yes.
21      Q.   Did you have the same types of
22 discussions with counsel for defendants before
23 you submitted your IPR declaration?
24           MR. SIPIORA:  Objection.  I
25           instruct you not to answer.

EMINA SOLJANIN - 05/09/2018                    Pages 86..89

Page 86

1            (Instruction not to answer.)
2    BY MR. VERDINI:
3        Q.    Did you rely upon counsel in
4    connection with how claims should be construed
5    in connection with your IPR declaration?
6        A.    No.
7        Q.    But you did rely on counsel in
8    connection with how claims should be construed
9    in your claim construction declaration?
10       A.    Yes.
11       Q.    Why the difference?
12       A.    Because these were two expert
13   opinions that I was asked to provide.  That
14   was my understanding.
15       Q.    But you were interpreting the
16   same claims of the '601 patent, correct?
17       A.    Yes.
18       Q.    And you had to know what those
19   claim terms meant, correct?
20       A.    Yes.
21       Q.    In both the IPR declaration and
22   in your claim construction declaration?
23       A.    Yes.
24       Q.    If you would turn to page 8 of
25   your declaration -- your claim construction

Page 87

1    declaration.  Do you see section V is called
2    the Indefiniteness Standard.  Do you see that?
3        A.    Yes.
4        Q.    In paragraph 35 you write (as
5    read):
6             I understand that the United
7        States Supreme Court relaxed this
8        test... And you're referring to the
9        indefinite test, in 2014.
10            What do you mean by "relaxed"?
11       A.    The -- the paragraph before
12   says that until recently, the legal standard
13   for indefiniteness was determining whether a
14   claim is amenable to construction, and the
15   claim, as construed, is not insolubly
16   ambiguous, and that was to certain extent
17   relaxed.
18       Q.    And how was it relaxed, in your
19   view?
20       A.    As the paragraph says, that the
21   Federal Circuit formulation tolerates some
22   ambiguous claims but not others.  It does not
23   satisfy the statute's definiteness
24   requirement.
25       Q.    So what was the difference in

Page 88

1    your mind between the test before the 2014
2    United States Supreme Court decision and
3    after?
4        A.    I cannot be precise about that.
5        Q.    Can you be general about it?
6        A.    In general, yes.  That is
7    considered, let's say some less precision is
8    allowed after 2014.
9        Q.    And 2014 is before the date you
10   signed your IPR declaration, correct?
11       A.    Yes, correct.
12       Q.    Okay.  Let's move to page 9 of
13   exhibit 3.  Section VII is titled The Asserted
14   Claims Are Indefinite.  Correct?
15       A.    Yes.
16       Q.    And in paragraph 37 you
17   identify five claim terms or claim phrases
18   that you opine in this declaration are
19   indefinite, correct?
20       A.    Yes.
21       Q.    All right.  We're going to walk
22   through each one of them.  Paragraph 39.  So
23   let's go to the encoded waveform, which is one
24   of the claim terms that you opine is
25   indefinite, correct?

Page 89

1        A.    Yes.
2        Q.    So paragraph 39 you write (as
3    read):
4             The phrase encoded waveform
5        renders claim 13 indefinite (as well
6        as all claims depending from it)
7        because the claim, read in light of
8        the specification of the '601 patent
9        and the prosecution history, fails to
10       inform, with reasonable certainty,
11       those skilled in the art about the
12       scope of the purported invention.
13            Correct?
14       A.    Yes.
15       Q.    You were reasonably certain at
16   the time that you submitted your IPR
17   declaration under oath the meaning of encoded
18   waveform, weren't you?
19       A.    Yes.
20       Q.    And in fact you identified an
21   encoded waveform in both Okada and Tsang, in
22   the Okada patent and the Tsang patent that are
23   the subjects -- part of the subject of your
24   IPR declaration, right?
25       A.    Yes.

EMINA SOLJANIN - 05/09/2018                    Pages 90..93

1      Q.   So let's go to that -- the IPR
2   declaration.  So let's turn to page 25.  We
3   were already there.  This is the section
4   entitled Claim Construction.
5         In looking at that entire
6   section am I correct that paragraph --
7         MR. VERDINI:  Strike that.
8   BY MR. VERDINI:
9      Q.   Looking at section VI, the
10  claim construction, which runs from paragraphs
11  63 through paragraph 75.  Go ahead and look at
12  that.  And I am going to ask you is it correct
13  that the purpose of section VI is to identify
14  anything that you believed needed to be
15  construed --
16        MR. VERDINI:  Strike that.
17  BY MR. VERDINI:
18     Q.   It identifies anything in the
19  '601 patent claims that you believe needed to
20  be construed to provide your opinions in the
21  IPR declaration?
22     A.   Yes.
23     Q.   And in paragraph 75 you
24  conclude unless it was addressed in paragraphs
25  63 through 74 no express constructions of any

1   additional term is believed to be needed to
2   resolve the challenges herein, correct?
3      A.   What is the question?  That it
4   says --
5      Q.   So my question is, and I'll
6   rephrase it:  in paragraph 75 you write (as
7   read):
8         Unless otherwise addressed
9      herein, no express construction of any
10     additional term is believed to be
11     needed to resolve the challenges
12     herein.
13        Correct?
14     A.   Yes.
15     Q.   And the reference to "otherwise
16  addressed herein" is the paragraphs that
17  precede paragraph 75 numbered paragraph 65
18  through 74, correct?
19     A.   Yes.
20     Q.   And when you say "no express
21  construction is necessary," if you look to
22  paragraph 64, that means that in your mind the
23  meaning of the other claim terms involved
24  little more than the application of widely
25  accepted meaning of commonly understood words,

1   correct?
2      A.   No.
3      Q.   So then why didn't you construe
4   any of the other terms?
5      A.   Because this was the
6   interpretation I adopted in connection with
7   the patent claims.  I did not say that no
8   other interpretation is possible.
9      Q.   To have an interpretation of
10  the claim terms, though, you would need to
11  know what they mean, correct?
12     A.   Yes.
13     Q.   And you were able to do that in
14  connection with your IPR declaration, right?
15     A.   I can always have an
16  interpretation.  It may or may not be correct.
17  Or it may or may not be the same as someone
18  else's.
19     Q.   But you, as a person of
20  extraordinary skill in the art were reasonably
21  certain you knew what the claims meant when
22  you did your IPR declaration, right?
23     A.   I said that if they're
24  interpreted in this way, which would make
25  sense, then there is a prior art.

1      Q.   Okay.
2      A.   Could I go to the rest room
3   before you ask this question, or no?
4      Q.   Yes.  Absolutely.
5         MR. VERDINI:  Let's take a
6      break.
7         ---
8      (Recess from 10:58 to 11:06.)
9         ---
10  BY MR. VERDINI:
11     Q.   Professor, welcome back from
12  the break.  Did you discuss the substance of
13  your testimony with counsel?
14        MR. SIPIORA:  The same
15     instruction as previous.  I instruct
16     you not to answer.
17        MR. VERDINI:  The yes or no
18     question?
19        MR. SIPIORA:  Yeah, you
20     can't -- the substance of testimony?
21     You can't ask about what we talked
22     about.
23        MR. VERDINI:  No.  I want to
24     know whether in the break -- it's just
25     yes or no -- you talked with counsel

EMINA SOLJANIN - 05/09/2018                    Pages 94..97

Page 94

1  about the substance of your testimony.
2  I don't want to know what the
3  substance was.  I want to know, the
4  first question I want to ask is
5  whether it happened.
6      MR. SIPIORA:  It goes into the
7  subject matter of our conversation,
8  whether we conversed at all.  So I am
9  going to instruct her not to answer.
10  You can't ask about what we talked
11  about.
12      MR. VERDINI:  I didn't ask what
13  you talked about.  I asked whether you
14  talked about the substance of your
15  testimony.
16      MR. SIPIORA:  You did.  You
17  asked about a topic, the substance of
18  this testimony.
19      MR. VERDINI:  Correct.
20      MR. SIPIORA:  And that's a
21  topic of conversation.  So I'm not
22  going to let her answer that.
23  Conversations between counsel and a
24  witness who is an expert are off
25  limits.

Page 95

1      MR. VERDINI:  The substance of
2  them, sure.
3      MR. SIPIORA:  Right.
4      MR. VERDINI:  But I'm not
5  asking about the substance of them.
6      MR. SIPIORA:  Right.  So if you
7  want to ask her if she spoke to me
8  during the break you can ask her that.
9  But then after that anything having to
10  do with what the substance was, the
11  subject matter, that's out of bounds.
12      MR. VERDINI:  I'll ask the
13  question.
14  BY MR. VERDINI:
15      **Q.  Did you talk to counsel during**
16  **the break?**
17      MR. SIPIORA:  You can answer
18  yes or no.
19      A.  I am instructed not to answer
20  the question?
21      MR. SIPIORA:  No, you can
22  answer that one.
23      A.  Sorry.
24      **Q.  That's okay.  Did you talk to**
25  **counsel for the defendants during the break?**

Page 96

1      A.  Yes.
2      **Q.  And did you talk about the**
3  **substance of your testimony?**
4      MR. SIPIORA:  Object and
5  instruct not to answer.
6      (Instruction not to answer.)
7  BY MR. VERDINI:
8      **Q.  You're not going to answer that**
9  **question?**
10      A.  Correct.
11      **Q.  And counsel doesn't represent**
12  **you, correct?**
13      A.  Correct.
14      MR. SIPIORA:  I represent this
15  witness.  I'm standing here --
16      MR. VERDINI:  I asked her if
17  she was represented by counsel and she
18  said no.
19      MR. SIPIORA:  Well, I'm your
20  counsel.
21      THE WITNESS:  All right.
22      MR. VERDINI:  I didn't know if
23  there was some arrangement that I was
24  unaware of, but I was taking her for
25  her testimony.

Page 97

1      MR. SIPIORA:  Misunderstanding.
2  Our law firm has retained her.  We
3  actually are paying for her services
4  on behalf of our client.  But the
5  relationship is between our firm and
6  this expert.  And there's work product
7  between us.
8      MR. VERDINI:  That's fine.
9      MR. SIPIORA:  All right.
10      MR. VERDINI:  We reserve the
11  right to challenge the privilege calls
12  today, if necessary.
13      MR. SIPIORA:  By the way, it's
14  work product I'm relying upon.  Not
15  attorney-client privilege.  I'm not --
16  she's not my client in the sense of
17  like Broadcom.
18      MR. VERDINI:  So how is it work
19  product to know whether -- for the
20  objection on the record, what is the
21  basis for a work-product claim of
22  whether you talked about the substance
23  of her testimony?  Not what you talked
24  about, but whether you talked about
25  it.

Page 98

1     MR. SIPIORA:  Well, because you
2  say the substance -- you see we're
3  missing each other on this, but the
4  substance of her testimony is a topic
5  of conversation.  And anything we
6  talked about is off limits.
7     MR. VERDINI:  I'm not asking
8  about what you talked about; the
9  things you talked about.  I want to
10  know whether you talked about her
11  testimony.  How is that work product?
12     MR. SIPIORA:  Anything that we
13  talked about is off limits, including
14  the topics that we talked about,
15  and --
16     MR. VERDINI:  How is that work
17  product?  What mental impressions am I
18  getting by asking her whether or not
19  you talked about her testimony?  What
20  is the impressions that I am obtaining
21  from you?
22     MR. SIPIORA:  I don't know what
23  impressions you will form.  That's for
24  you to decide.  But anything that I
25  consult with, with an expert during

Page 99

1     the case, until they get on the stand
2     at trial, is off limits.
3        MR. VERDINI:  All right.  I'll
4     ask a different question, and you can
5     object if you want.
6  BY MR. VERDINI:
7     Q.   Did you talk about your
8  testimony in any way during the break?
9        MR. SIPIORA:  I object and
10     instruct not to answer.
11        (Instruction not to answer.)
12  BY MR. VERDINI:
13     Q.   And you are going to accept
14  that instruction, correct?
15     A.   Yes.
16     Q.   All right.
17        MR. VERDINI:  We reserve the
18     right to follow up on any instructions
19     not to answer based on work product as
20     to whether -- whether there was a
21     discussion about her testimony during
22     the break.  So let's move on.
23  BY MR. VERDINI:
24     Q.   Before the break we were
25  talking about encoded waveform, correct?

Page 100

1     A.   (Nodding head affirmatively.)
2     Q.   So let's go to your IPR
3  declaration, which is exhibit 4, page 29 and
4  section VII.  In paragraph 76 you opine that
5  claims 1, 2, 8 through 10 and 13 through 17 of
6  the '601 patent are anticipated by Okada.
7  Correct?
8     A.   Yes.
9     Q.   And when you say Okada, you are
10  referring to U.S. patent number 5,392,270,
11  where one of the named inventors is Okada,
12  correct?
13     A.   Yes.
14     Q.   Am I saying that correctly, is
15  it Okada?  Is that how you say it?
16     A.   I don't know.  Okada
17  [Oh-KAY-da] or Okada [Oh-KAH-da], because it's
18  Japanese, I guess.
19     Q.   You don't know Mr. Okada?
20     A.   I don't.
21     Q.   All right.  So let's turn to
22  page 34 of the IPR declaration.  We're in
23  exhibit 4.  And there's a subheading that is
24  4, do you see that?
25     A.   Mm-hmm.

Page 101

1     Q.   And it identifies claim 1,
2  bracket D.  Now the bracket there, you broke
3  up the claim terms in connection with your IPR
4  declaration, correct?
5     A.   Yes.
6     Q.   So claim 1 has different
7  sections and one of the sections you identify
8  is claim 1[D], correct?
9     A.   Yes.
10     Q.   And you would agree with me
11  that claim 1[D] contains the claim term
12  encoded waveform, correct?
13     A.   Yes.
14     Q.   And in paragraph 85 you
15  determined that claim 1[D] as you've
16  identified it with the term encoded waveform
17  needed no construction for your opinions,
18  correct?
19     A.   I have adopted certain
20  interpretation.
21     Q.   You write that it needs no
22  construction, correct?
23     A.   Where is that?
24     Q.   In paragraph 85.
25        (The witness reviews document.)

http://www.yeslaw.net/help

Page 102

1     A.   That's what it says, yes.
2     Q.   So let's move to paragraph 87.
3 Are you there?
4     A.   Yes.
5     Q.   In paragraph 87 you write in
6 the first sentence (as read):
7          Rule (1) and Rule (2) of Okada
8     each imposes a, quote, maximum number
9     of consecutive transitions allowed on
10    consecutive clock periods in the
11    encoded waveform, end quote, as
12    recited in claim limitation 1[D].
13    Correct?
14    A.   Yes.
15    Q.   So you were reasonably certain
16 at that time that you knew what the encoded
17 waveform was in the '601 patent claim 1[D] as
18 you've broken it up, right?
19    A.   Yes, I adopted a certain
20 interpretation I felt comfortable with.
21    Q.   In fact in the middle of
22 paragraph 87 you identified --
23          MR. VERDINI:  Well, strike
24    that.
25    Q.   You write in the middle of

Page 103

1 paragraph 87 (as read):
2          More specifically, none of the
3     encoded datawords from tables 1
4     through 7 -- and that's referring to
5     Okada, correct?
6     A.   Mm-hmm.
7     Q.   -- that form the claimed
8 encoded waveform have more than two - a finite
9 number - such consecutive transitions,
10 correct?
11    A.   Yes.
12    Q.   So for you the encoded
13 datawords from tables 1 through 7 formed the
14 claimed "encoded waveform," right?
15    A.   That's what it says.
16    Q.   And that's what you meant when
17 you wrote it, right?
18    A.   The claimed, quotation marks,
19 "encoded waveform" under my interpretation,
20 yes.
21    Q.   And then at the end of
22 paragraph 87 you're referring to tables 8 and
23 9 in Okada, correct?
24    A.   Yes.
25    Q.   And you write (as read):

Page 104

1          In particular, these sequences
2     each include a section consisting of,
3     quote, "01010" - encoded waveforms in
4     tables 8 and 9 and thus have exactly
5     two consecutive transitions from 0 to
6     1 or from 1 to 0, correct?
7     A.   Yes.
8     Q.   And so again you're identifying
9 what you believe you're reasonably certain to
10 be the encoded waveforms in claim 1[D] as
11 you've defined it of the '601 patent?
12         MR. SIPIORA:  Objection as to
13    form.
14 BY MR. VERDINI:
15    Q.   Correct?
16    A.   Yes.
17    Q.   If you turn to page 40 of your
18 IPR declaration.  Your paragraph 92 reads (as
19 read):
20         Okada thus discloses the
21    imposition of a constraint on the
22    encoded waveform data - through either
23    Rule (1) or Rule (2) - to facilitate
24    the reduction of a probability of a
25    detection error in said receiver

Page 105

1    means, which limitation is recited in
2    claim limitation 1[D], correct?
3    A.   Yes.
4    Q.   And that was your opinion as to
5 what Okada disclosed, correct?
6    A.   Yes.
7    Q.   And if you turn to page 46 of
8 your IPR declaration, paragraph 109 relates to
9 what you've identified as claim 13, bracket
10 [D], end bracket, correct?
11    A.   Yes.
12    Q.   And that's the claim term
13 imposing, or the claim phrase imposing a pair
14 of constraints j and k on the encoded waveform
15 that appears in claim 13, correct?
16    A.   Yes.
17    Q.   And in your mind --
18         MR. VERDINI:  Strike that.
19 BY MR. VERDINI:
20    Q.   In your opinion, as per
21 paragraph 109 of your IPR declaration, you
22 explained why Okada disclosed imposing a pair
23 of constraints on the encoded waveform
24 incorporating your analysis from claim element
25 1[D], correct?

Page 106

1    A.   Yes.
2    Q.   And in paragraph 89 you say
3  that Okada -- Okada's 8-to-13 bit converter is
4  what imposes a pair of constraints on the
5  encoded waveform output from the converter,
6  correct?
7         MR. SIPIORA:  89?
8         MR. VERDINI:  What did you say?
9         MR. SIPIORA:  89.
10        MR. VERDINI:  Paragraph 109.
11    If I said 89, I apologize.
12  BY MR. VERDINI:
13    Q.   Paragraph 109.
14        MR. VERDINI:  So strike that
16  BY MR. VERDINI:
17    Q.   In paragraph 109 your opinion
18  in the IPR declaration was that Okada
19  discloses an 8-to-13 bit converter that
20  imposes a pair of constraints, j and k, on the
21  encoded waveform output from the converter.
22  Correct?
23    A.   Yes.
24    Q.   And in connection with the
25  opinions on Okada, at no point in your

Page 107

1  declaration, your IPR declaration did you say
2  you didn't know what encoded waveform meant,
3  correct?
4    A.   I adopted certain
5  interpretation in the beginning of encoded
6  waveform and proceeded with it.
7    Q.   Where is that identified in
8  your declaration?
9    A.   Where is what identified?
10    Q.   What you adopted as the
11  definition of encoded waveform.
12    A.   I don't think it's expressly
13  identified.
14    Q.   So what was your definition?
15    A.   So my definition was that that
16  means the outputs of -- of the converter.
17    Q.   And you were reasonably certain
18  that's what you believed encoded waveform
19  meant in connection with that term as it's
20  used in the '601 patent, right?
21    A.   I was certain that that was a
22  reasonable interpretation.
23    Q.   Now in your IPR declaration, if
24  you turn to page 48 you also opined that
25  claims 1, 2, 8 through 10 and 13 through 17 of

Page 108

1  the '601 patent were anticipated by Tsang,
2  correct?
3    A.   Yes.
4    Q.   And when you refer to Tsang
5  you're referring to U.S. patent number
6  5,731,768, where one of the identified
7  inventors is an individual named Tsang,
8  correct?
9    A.   Yes.
10    Q.   And at paragraph 136, which is
11  on page 55, again in connection with claim
12  1[D] --
13        MR. VERDINI:  Well, strike
14    that.
15    Q.   You have identified claim 1[D]
16  as a phrase that includes the term encoded
17  waveform, correct?
18    A.   Yes.
19    Q.   And your opinion in the IPR
20  declaration was that Tsang discloses claim
21  1[D], correct?
22    A.   Yes.
23    Q.   Now in these paragraphs there
24  isn't a specific reference to an encoded
25  waveform?

Page 109

1    A.   In where?
2    Q.   In paragraphs 136 through 142?
3  I looked through it and didn't see any
4  reference to an encoded waveform.
5    A.   Explicit reference.
6    Q.   Yes.
7    A.   All right.
8    Q.   Is it your opinion that Tsang
9  discloses an encoded waveform?
10    A.   As interpreted as the output of
11  the converter.
12    Q.   Why is that your interpretation
13  of encoded waveform?
14    A.   Because that would be,
15  precisely should be called encoded symbols.
16    Q.   As you read the entire '601
17  patent?
18    A.   As it's usually called in the
19  information theory and coding theory that
20  would be encoded symbols which come out of the
21  converter.  I wasn't sure that encoded
22  waveform is, corresponds to the signal and
23  that square waves or something after NZI or
24  something like that.  But if it's interpreted
25  as encoded symbols, then it can be compared

Page 110

1  with Tsang and Okada.
2      Q.   And you thought that that was
3  the appropriate interpretation of that term?
4      A.   I thought that's one possible
5  interpretation.
6      Q.   Did you think of any other
7  interpretations?
8      A.   Of encoded waveform?
9      Q.   Mm-hmm.
10     A.   Yes.  I thought that that could
11  possibly be also something after NRZI is
12  applied.  That would be one.
13     Q.   And why didn't you adopt that
14  construction?
15     A.   Because this was actually
16  sufficient to show the existence of prior art.
17  If NRZI construction was adopted, the wording
18  would be different but the prior art would be
19  there as well.
20     Q.   So my question was, though, why
21  didn't you adopt the other reasonable
22  interpretation that you thought encoded
23  waveform would have?
24     A.   Because I had one working
25  definition which was sufficient for me to make

Page 111

1  claims -- not claims -- opinion that I had.
2      Q.   And if you turn to page 63 of
3  your IPR declaration.  And in paragraph 161,
4  similar to what you did with Okada you opined
5  that in light of your opinions as to claim
6  elements 1[D], [E] and [F], that Tsang
7  disclosed the claim element imposing a pair of
8  constraints on the encoded waveform as it's
9  stated in claim 13, correct?
10     A.   Yes.
11     Q.   So in your opinion what you did
12  for claim 1 was sufficient for claim 13, is
13  that right?
14     A.   Yes.
15     Q.   Okay.  Let's go back now to
16  exhibit 3, which is your claim construction
17  declaration.  And if you would turn to page
18  10.
19     A.   Yes.
20     Q.   Are you there?
21     A.   Yes.
22     Q.   All right.  So let's start with
23  paragraph 40.  In paragraph 40 you say (as
24  read):
25          First, there is no antecedent

Page 112

1  basis --
2          MR. VERDINI:  Well, strike
3  that.  Let me ask a foundational
4  question.
5  BY MR. VERDINI:
6      Q.   Paragraphs 40 through 45, what
7  do those reflect?
8      A.   Not definiteness of terms
9  encoded waveform and recorded waveform.
10     Q.   Are those paragraphs that you
11  wrote to explain the basis for your opinion?
12     A.   Yes.
13     Q.   All right.  So let's start with
14  the first one.  In paragraph 40 you write (as
15  read):
16          First, there is no antecedent
17      basis for the phrase the encoded
18      waveform in the claim.  The phrase
19      begins with the word, quote, "the,"
20      which, according to counsel, is
21      understood to be used in patent
22      claims, paren and as I understand in
23      normal English usage, end paren, to
24      refer back to an element that was
25      recited earlier in the same claim or

Page 113

1  in an independent claim from which the
2  claim at issue depends.
3          Correct?
4      A.   Yes.
5      Q.   When you say "according to
6  counsel," who are you referring to?
7      A.   Mr. Mayle.
8      Q.   And when did Mr. Mayle inform
9  you of the way in which patent claims are to
10  be understood?
11     A.   In which patent claims are to
12  be understood, or this particular?
13     Q.   When did Mr. Mayle inform you
14  about the, what I'll call the antecedent basis
15  principle that you're referring to in
16  paragraph 40?
17     A.   When he first time asked for my
18  opinion about definite or indefiniteness of
19  claims.
20     Q.   And you didn't have that
21  conversation with -- you weren't informed of
22  that by counsel when you did your IPR
23  declaration?
24     A.   I expressed my doubts that --
25  that I don't know what encoded waveform is,

EMINA SOLJANIN - 05/09/2018          Pages 114..117

1  and in particular that I'm not certain what
2  recorded waveform is, but there is a way to
3  understand possibly encoded waveform as
4  encoded symbols in connection with IPR.
5      Q.   That wasn't my question. So my
6  question is:  did counsel inform you of the
7  antecedent basis principle that's in paragraph
8  40 before you drafted and opined in the IPR?
9      A.   I don't remember one way or the
10 other.
11     Q.   You didn't apply any antecedent
12 basis principle in connection with your IPR
13 declaration, correct?
14     A.   Not that I remember.
15         (Reporter clarification.)
16     Q.   I think you were referring to
17 recorded.  I should have asked.
18     A.   Yes.
19     Q.   I wanted to make sure that you
20 weren't actually saying recoded.  I think you
21 were saying recorded?
22     A.   Recording, yes.
23     Q.   Now you know how magnetic
24 recording systems are designed, correct, based
25 on your work and experience?

1          I am informed that the
2      University's expert, Professor
3      McLaughlin, agrees that the, quote --
4          MR. VERDINI:  Strike that, let
5      me start over.
6  BY MR. VERDINI:
7      Q.   In paragraph 41 of your claim
8  construction declaration you write (as read):
9          I am informed that the
10     University's expert, Professor
11     McLaughlin, agrees that the word,
12     quote, "the" signals that the
13     following phrase, quote, "encoded
14     waveform," must have an antecedent
15     basis in the claim.
16         Do you see that?
17     A.   Yes.
18     Q.   Who were you informed by?
19     A.   Mr. Mayle.
20     Q.   Why didn't you just read
21 Professor McLaughlin's declaration?
22     A.   At that time I had that page.
23     Q.   So did you read Professor
24 McLaughlin's declaration?
25     A.   Yes.

1      A.   The magnetic recording system
2  of the time, yes, I'm familiar with that.
3      Q.   Do you have an understanding of
4  what LSI has proposed for the construction of
5  recorded waveform?
6      A.   No.
7      Q.   Their construction, and I can
8  show it to you if you need to see it, is the
9  sequences of n-bit codewords that are recorded
10 as symbols or patterns in a medium.
11     A.   Mm-hmm.
12     Q.   Do you follow that?
13     A.   (Nodding head affirmatively.)
14     Q.   My question for you is in a
15 magnetic recording system n-bit codewords have
16 encoded data in them, correct?
17     A.   Codewords consist of encoded
18 symbols.
19     Q.   What is the difference, in your
20 mind, between encoded symbols and encoded
21 data?  Because I use the phrase "data" is why
22 I am asking.
23     A.   Encoded data is fine.
24     Q.   Okay.  In paragraph 41 you
25 wrote in the first sentence (as read):

1      Q.   So why was paragraph 41 started
2  with "I am informed that the university's
3  expert"?  Why didn't you just say I've read
4  Professor McLaughlin's declaration and see X?
5      A.   Because this is a more precise
6  description of -- I have read it, but it
7  was -- the declaration was accessed through
8  Mr. Mayle.
9      Q.   So I think you have mentioned
10 something about it being more precise.  What
11 did you mean when you said that?
12     A.   I mean the declaration was
13 being accessed through Mr. Mayle.
14     Q.   What do you mean when you say
15 the declaration -- what declaration are you
16 referring to?
17     A.   Of professor McLaughlin, page
18 46.
19     Q.   Oh, you received that from
20 Mr. Mayle, is that what you're saying?
21     A.   Yes.
22     Q.   Did you receive the whole
23 declaration from Mr. Mayle?
24     A.   I don't remember whether I
25 received the whole declaration at this point

EMINA SOLJANIN - 05/09/2018                    Pages 118..121

Page 118

1  or at a later point.
2      Q.   Do you recall whether you
3  reviewed Professor McLaughlin's entire
4  declaration before you submitted your claim
5  construction declaration?
6      A.   Before I made the final pass
7  through -- through the document.  Final read
8  through the document, yes.
9      Q.   Let me ask it this way.  Did
10  you review Professor McLaughlin's full
11  declaration before you signed your claim
12  construction declaration?
13     A.   Yes.
14     Q.   Did you make any changes to
15  your declaration, your claim construction
16  declaration based on anything you reviewed in
17  Professor McLaughlin's full declaration?
18     A.   No.
19     Q.   All right.  Later in paragraph
20  41 -- I am going to use the numbers on the
21  side there, line 18.
22     A.   Mm-hmm.
23     Q.   You say (as read):
24         The claim uses different words
25         to mean different things.

Page 119

1         Why do you say that?
2      A.   Because for me encoded
3  waveform, I could interpret as encoded
4  symbols, or encoded data, relatively
5  reasonably, plus, minus, NRZ, and NRZI.
6  However, recorded waveform, I don't know what
7  it is.
8      Q.   You opined that Okada had a
9  recorded waveform, correct?
10     A.   I don't remember recorded
11  waveform in Okada.
12     Q.   Okay.  Let's look at exhibit 4
13  which is your IPR declaration.  And turn to
14  page 40, paragraph 94.  Do you see that?
15     A.   Yes.
16     Q.   And in the second sentence you
17  say imposition -- you're discussing Okada
18  again, correct?
19     A.   Mm-hmm.
20     Q.   And you say (as read):
21         Imposition of the first rule,
22     Rule (1), results in a maximum of one
23     consecutive transition allowed on
24     consecutive clock periods, not just in
25     the encoded waveform output from the

Page 120

1      block converter, but also later in the
2      recorded waveform that is, quote,
3      recorded to an optical disk, end
4      quote, following NRZI modulation.
5         So you knew what recorded
6  waveform meant when you opined that Okada had
7  a recorded waveform, right?
8      A.   The recorded to an optical disk
9  following an NRZI modulation.
10     Q.   Okay.  You had to know what a
11  recorded waveform was to know that Okada had a
12  recorded waveform, right?
13     A.   Oh, I am not familiar with
14  optical recording, and I don't know whether
15  there is such thing as recorded waveform in
16  the optical recording.
17     Q.   But you opined that there was,
18  in paragraph 94, didn't you?
19     A.   I assumed that there was an
20  optical recording, yes.
21     Q.   You just assumed it?
22     A.   Yes.  This entire IPR
23  declaration was under certain reasonable
24  assumptions.  I thought would be reasonable
25  assumptions or interpretation.

Page 121

1      Q.   Okay.  Well, then let's go to
2  paragraph 58 in your IPR declaration.  Are you
3  there?
4      A.   Yes.
5      Q.   And in paragraph 143 -- now
6  we're talking about Tsang again, correct?
7         MR. VERDINI:  Page 58,
8      paragraph 143.
9      Q.   You're describing Tsang again,
10  correct?
11     A.   I don't see Tsang in 58.
12     Q.   Page 58, paragraph 143, I'm
13  sorry.
14     A.   Page 58, paragraph ... ?
15     Q.   Paragraph 143.  Are you there?
16     A.   Yes.
17     Q.   And in paragraph 143 you are
18  discussing your opinion on what Tsang
19  discloses, correct?
20     A.   Yes.
21     Q.   And in the last sentence -- or
22  in the second to the last sentence you say a
23  value of j equals 2 ensures that the recorded
24  waveform, quote, avoids three or more
25  consecutive transitions, end quote.  Correct?

Page 122

1 A. Yes.
2 Q. So again you have now
3 identified the recorded waveform in Tsang,
4 right?
5 A. Yes.
6 Q. So you knew what the recorded
7 waveform was that was being claimed in the
8 '601 patent to know -- let me finish?
9 A. I'm sorry.
10 Q. -- to know that Tsang disclosed
11 it, right?
12 A. Could you say that again?
13 Q. Yes. You had to know --
14 MR. VERDINI: Strike that.
15
16 BY MR. VERDINI:
17 Q. It would be reasonably certain
18 what the recorded waveform was that was
19 disclosed in the '601 patent to know, or to
20 opine, that Tsang disclosed such a recorded
21 waveform, right?
22 A. Yeah, I adopted that
23 interpretation.
24 Q. What was the interpretation
25 that you adopted?

Page 123

1 A. That it's -- that the recorded
2 and encoded can differ only if NRZ or NRZI is
3 applied in between.
4 Q. And you thought that that was a
5 reasonable interpretation of the claim
6 language, right?
7 A. That's reasonable -- that was a
8 reasonable interpretation, yes.
9 Q. All right. So let's go back to
10 paragraph 41 of your claim construction
11 declaration, which is exhibit 3. And I think
12 we ended up talking about encoded waveform
13 because my question asked you on line 18 of
14 page 10 you wrote the statement "the claim
15 uses different words to mean different
16 things."
17 Right?
18 A. There is encoded and recorded.
19 Q. So what was the basis for you
20 to say that the claim uses different words to
21 mean different things? What was your basis
22 for that?
23 A. The encoded and recorded --
24 let's see.
25 (The witness reviews document.)

Page 124

1 A. I don't think I can say this
2 differently than is here. "If the encoded
3 waveform was the same as the recorded
4 waveform, then the claim would use the phrase
5 the recorded waveform in step 3."
6 Q. Let me ask it a different way.
7 Were you relying on any legal principle
8 provided to you by counsel to say that the
9 claim used different words to mean different
10 things?
11 A. No.
12 Q. That was your opinion --
13 A. Yes.
14 Q. -- based on reading the patent?
15 A. Yes.
16 Q. Okay. all right. You reviewed
17 the file history in connection with rendering
18 your claim construction opinions, correct?
19 A. (Nodding head affirmatively.)
20 Q. I am going to hand you what has
21 been marked as exhibit 6.
22 ---
23 (Deposition Exhibit 6, excerpt
24 of the file history that reflects the
25 Office Action dated September 16, 1997

Page 125

1 was marked for identification)
2 ---
3 BY MR. VERDINI:
4 Q. And exhibit 6 is an excerpt of
5 the file history that reflects the Office
6 Action dated September 16, 1997 and then
7 contains the University's response to the
8 Office Action. Okay?
9 A. Mm-hmm.
10 Q. What did you understand to be
11 the rejection that the examiner identified in
12 the Office Action?
13 A. So one of the rejections
14 referred to the d-constraint, which also
15 limits the number of transitions in this
16 Iketani.
17 Q. And you understand that the
18 university responded to that Office Action
19 prior to the '601 patent being granted,
20 correct?
21 A. Yes.
22 Q. And if you turn -- I am going
23 to use the little numbers on the bottom right.
24 If you turn to the page that ends in 745. Do
25 you recognize this as the University's

Page 126

1  response to the September 16, 1997 Office
2  Action?
3      A.   Yes.
4      Q.   And it runs from 745 to 757,
5  correct?
6      A.   Yes.
7      Q.   And that's the entire response,
8  as far as you know?
9      A.   Yes.
10     Q.   All right.  If you would turn
11 to the page that's identified as 750.  Do you
12 see that?
13     A.   Yes.
14     Q.   The first full paragraph, do
15 you understand that to be the University's
16 attempt to distinguish the claims of the '601
17 patent from Iketani?
18     A.   I need to read this.  Could you
19 say that again?
20     Q.   Sure.  Do you understand that
21 paragraph to be part of the University's
22 response to distinguish Iketani from the
23 invention that they were claiming?
24     A.   I understand that this entire
25 document is the response?

Page 127

1      Q.   Yes.  I am asking you to focus
2  on paragraph 750.
3      A.   Yes.
4      Q.   The first full paragraph.
5      A.   Mm-hmm.
6      Q.   And my question just is as you
7  read that, is that, in your understanding, the
8  University's -- one of the university's
9  arguments to distinguish Iketani from the
10 invention of the '601 patent?
11          MR. SIPIORA:  Why don't you go
12     ahead and take a moment and read it,
13     please.
14     A.   Sure.  You mean if it stands
15 out of the others, or something?
16     Q.   Yes.  You can read as much of
17 the document as you need to.
18          (The witness reviews document.)
19 BY MR. VERDINI:
20     Q.   Have you finished reading?
21     A.   Yes.
22     Q.   Okay.  I want to direct your
23 attention to the middle of that paragraph,
24 where it starts with "in sharp contrast to
25 Iketani," correct?  At the top.  I'm sorry.  I

Page 128

1  screwed you up.
2      A.   Yes.
3      Q.   So let's start at the top.
4  That paragraph starts in sharp contrast to
5  Iketani, the present invention provides, and
6  it goes on to provide the University's
7  description of what the invention provides,
8  correct?
9      A.   Yes.
10     Q.   And in the middle of that
11 paragraph it says, in the fifth line down, it
12 reads means for imposing a pair of constraints
13 (j;k) on the waveform.  Right?
14     A.   Yes.
15     Q.   It doesn't say the recorded
16 waveform or the encoded waveform, right?
17     A.   Yes.
18     Q.   And there's only one waveform,
19 right?
20     A.   In this paragraph it says "the
21 waveform."
22     Q.   Did you consider this paragraph
23 when you opined that different words means
24 different things?
25     A.   Not this paragraph.

Page 129

1      Q.   Doesn't this paragraph provide
2  support for the fact that there is just one
3  waveform that's referred to in the invention?
4      A.   No.  It's just mention "the
5  waveform."
6      Q.   Is there more than one waveform
7  in a magnetic system, recording system?
8      A.   Yes.  Yes, there is encoded --
9  actually I wouldn't call it waveform.  There
10 are encoded symbols.  There is a waveform that
11 read head produces.  And there is a waveform
12 that -- sorry, the write head produces, that
13 would be referring to the encoding side, so
14 the writing side.
15          And then on the reading side
16 there is also a waveform which consists of
17 series of pulses, where transitions are, which
18 would be the read waveform.
19     Q.   And here -- my point here is
20 that this paragraph only refers to the means
21 for imposing the constraints on "the
22 waveform."
23          Right?
24     A.   That's what it says, "the
25 waveform" in this line.

1    Q.   And based on your
2  understanding, and having read the prosecution
3  history, the waveform that's being referred to
4  there, is that on the read side or on the
5  write side?
6         MR. VERDINI:  And that's
7  W-R-I-T-E.
8    A.   It's on the read side.
9    Q.   It's on the read side?
10    A.   They seem to be concerned with
11  read side.  And it says encoded waveform four
12  lines down.
13    Q.   So you're saying you imposed
14  the pair of constraints on the waveform that's
15  on the read side?
16    A.   Yes.  On the -- sorry.  Oh,
17  right.  On the write side.  Yes.  The read you
18  cannot impose anything.
19    Q.   Okay.
20    A.   I may have switched that a few
21  times.
22    Q.   Let's make the record clear.
23  The waveform, on page 750 of exhibit 6, it
24  says means for imposing a pair of constraints
25  on the waveform.  The waveform there, is it on

1  the read side or the write side?
2    A.   On the write side.
3    Q.   Let's go back to exhibit 3,
4  which is your claim construction declaration.
5  And we're still on page 10 but now we're going
6  to move to paragraph 42.
7    A.   Mm-hmm.
8    Q.   Would you agree that there is
9  nothing in the terms of claim 13 that require
10  the steps to be performed sequentially?
11    A.   Which steps?
12    Q.   The steps that are --
13         MR. VERDINI:  Well, strike
14  that.
15  BY MR. VERDINI:
16    Q.   In paragraph 42 you identify
17  steps of claim 13, correct?
18    A.   Yes.
19    Q.   And my question to you is:
20  there's nothing express in claim 13 that
21  requires those steps to be performed in a
22  certain order, correct?
23    A.   I have to see the claim 13.
24  Usually in encoding order matters.
25         (The witness reviews document.)

1    A.   You need to receive a binary
2  dataword in order to produce anything.
3         (Reporter clarification.)
4    A.   You need to receive a binary
5  dataword in order to produce a codeword.
6    Q.   Okay.  Paragraph 42 relates to
7  what you've identified steps 3, 4 and 5,
8  correct?
9    A.   It refers in 5, starting with
10  imposing.
11    Q.   Yes.
12    A.   Generating --
13    Q.   And my question to you is, is
14  there anything express in claim 13 that
15  requires those steps to be performed in a
16  certain sequence?
17    A.   Is there anything in the claim
18  that requires?
19    Q.   Correct.
20    A.   A recorded waveform would come
21  after encoded waveform, so nothing can happen
22  in the recorded -- if we want to understand as
23  it was understood in the IPR case, then the
24  encoded has to be before recorded.  Which
25  would put 3 before 4.

1    Q.   And that's the way in which you
2  are interpreting the words of the patent,
3  correct?
4    A.   Not in connection with this
5  declaration.
6    Q.   Why didn't you interpret the
7  claim that way in connection with -- when you
8  say "this declaration," what declaration were
9  you referring to?
10    A.   The more recent one.
11    Q.   And why do you say that wasn't
12  the interpretation that you made in the claim
13  construction?
14    A.   Because here I was -- I was
15  only looking into definiteness of the claims,
16  and in the previous one I adopted certain
17  interpretation.
18    Q.   So you construed the claims
19  differently when you were trying to find
20  whether the prior art anticipated or rendered
21  them obvious versus when you were trying to
22  determine whether they were definite?
23         MR. SIPIORA:  Objection as to
24  form.
25    A.   Sorry?

Page 134

1              MR. SIPIORA:  I just objected
2     as to form.  You can still answer the
3     question.
4              THE WITNESS:  All right.
5         A.    So there are terms that I had
6     to interpret in order to write the last
7     declaration, and I made some what seemed to me
8     reasonable assumptions.  I was asked to
9     provide opinion about similarity with the
10    prior art.  In the more recent declaration I
11    only looked in the, whether terms themselves
12    are definite or not, regardless of how they
13    appear in claims.
14        Q.    When you say -- what do you
15    mean regardless of how they appear in the
16    claims?
17        A.    So if the claim may be
18    indefinite if the -- if it's not clear what
19    the term is, but if someone asked me encoded
20    and recorded waveform, even if I wasn't aware
21    of this entire case, I would have the same
22    doubts.
23        Q.    You would have the same?
24        A.    Doubts.
25        Q.    But you didn't have those

Page 135

1     doubts when you did your IPR declaration; you
2     interpreted --
3         A.    I did.  I did.  I made -- I
4     adopted a certain interpretation.
5         Q.    You adopted it assuming that it
6     was correct, right?
7         A.    I adopted it assuming that it
8     can be correct, yes.
9         Q.    Is it your opinion, in
10    connection with paragraph 42, that the
11    imposing step has to be done at one place in
12    the system and nowhere else?
13        A.    Yes.
14        Q.    You don't believe that the
15    constraint could be imposed by multiple
16    components in the system?
17        A.    Well, it depends how you define
18    a component.  It's imposed in the encoder.
19        Q.    How would you define the
20    component -- what are the options of the
21    components that could make up the encoder, in
22    your opinion?
23        A.    So I consider encoder a
24    component of the system.
25        Q.    Okay.

Page 136

1         A.    And that's the place where
2     constraints are imposed.
3         Q.    What would you identify as --
4     there are components of the encoder?
5         A.    In some realizations there can
6     be components of the encoders.
7         Q.    In those instances can you
8     identify for me what the components of the
9     encoder would be?
10        A.    A component would be component
11    which maps M into N, so that's sort of a
12    minimum component.  And then there can be
13    another component which would then worry how
14    to string these n-bit sequences, so that the
15    constraint is also satisfied in the sequence
16    of n-bit strings.
17        Q.    The sequence that is encoded is
18    the same that is recorded, is that correct?
19        A.    So when you say the sequence
20    that is encoded, we take M, as in Mary, bits,
21    and we encode them into N, Nancy, and
22    something corresponding to this N will be
23    eventually recorded.
24              So M are encoded -- M, as in
25    Mary, are encoded, and N are -- eventually

Page 137

1     something corresponding to the N will be
2     encoded.
3         Q.    What is the "something" that is
4     recorded?
5         A.    If it's magnetic recording it
6     would be the strings of little magnets and how
7     that corresponds to the sequence depends on
8     whether NRZ or NRZI is used.
9         Q.    If the constraint is imposed on
10    the encoded sequence -- that's what you said,
11    correct?  That the imposition of the
12    constraint is on the encoded data?
13        A.    Yes.
14        Q.    Is it fair to say then that the
15    constraint is also imposed when that data is
16    recorded?
17        A.    Yes.
18        Q.    Because if it wasn't, it would
19    defeat the purpose of having the constraint,
20    right?
21        A.    Yes.  Some counterpart to that
22    constraint.  It depends on the modulation that
23    is imposed, yes.  Exactly.
24        Q.    Let's go to paragraph 43.
25        A.    That's before --

EMINA SOLJANIN - 05/09/2018          Pages 138..141

Page 138

1        Q.   Page 11.
2        A.   That's just next page.
3        Q.   Yes.  In paragraph 43 you say
4   consideration of claims other than claim 13
5   bolster your opinion that the encoded waveform
6   is indefinite.  Correct?
7        A.   Which line are you reading?
8        Q.   The first sentence of paragraph
9   43.
10            (The witness reviews document.)
11  BY MR. VERDINI:
12       Q.   Have you read the paragraph?
13       A.   Yes, I have.
14       Q.   All right.  So in paragraph 43
15  you say that consideration of claims other
16  than claim 13 bolster your opinion that
17  encoded waveform is indefinite, correct?
18       A.   Yes.
19       Q.   Is that fair?
20       A.   Mm-hmm.
21       Q.   And one of the claims that you
22  identify is claim 18, correct?
23       A.   Yes.
24       Q.   Exhibit 1 is the patent.  If
25  you would look at claim 18.  It's on the very

Page 139

1   last page, claim 18 is.
2        A.   Yes.
3        Q.   While you're reading claim 18,
4   the question is:  does claim 18 say in express
5   terms that it's imposing any constraints?
6            (The witness reviews document.)
7        A.   Claim 18 relies on claim 14 and
8   then also removes binary words that contain
9   more than j consecutive 1's.
10       Q.   So in your opinion that is the
11  imposition of the j and k-constraint as you
12  understand it as claimed in the '601 patent?
13       A.   The -- yes.  Or at least part
14  of it.
15       Q.   Why do you say part of it?
16       A.   Because it relies on claim 14.
17       Q.   Okay.  So then going back to
18  paragraph 43 of your exhibit.  You say that
19  claim 18 -- let me do it this way.
20            In paragraph 43, in the last
21  sentence you say (as read):
22            This is consistent with my
23            conclusion about the distinction
24            between the recorded waveform and the
25            encoded waveform in claim 13.

Page 140

1            When you say "this" what is it
2   that you are referring to?
3        A.   Because, now to the best of my
4   recollection, is that in 13 you're mapping M
5   into N, and calling this N encoded.  And in 18
6   you are doing some additional things before
7   recording.  So is now encoded where claim 13
8   stops, or would you call encoded where claim
9   18 stops after which recording happens.
10       Q.   So you have claim 18 in front
11  of you.
12       A.   Yes, I can get it.
13       Q.   What are the additional things
14  that you have just testified about in claim
15  18?
16       A.   These are these paragraphs in
17  indentation.  Removing binary words, removing,
18  removing -- yeah.
19       Q.   Did why did you describe those
20  as additional things?
21       A.   Because that's what it does.
22  It removes binary words that contain more than
23  j consecutive 1's.
24       Q.   In addition to what are you
25  referring to?

Page 141

1        A.   The previous claims.
2        Q.   14 and 13?
3        A.   Yeah.
4        Q.   And so how does that support
5   that there's some difference between the
6   recorded waveform and the encoded waveform?
7        A.   So in the claim 13 the encoded
8   waveform refers to a certain step, and then
9   some other encoding like operations happen,
10  and then the recording happens.  So is the
11  encoded waveform before 18 or -- before these
12  removing, or after.
13       Q.   So can you answer your own
14  question?  So is it before or after --
15            MR. VERDINI:  Strike that.
16  BY MR. VERDINI:
17       Q.   In paragraph 44 of your
18  declaration, your claim construction
19  declaration, that is, page 11, in the third
20  sentence of paragraph 44 you say (as read):
21            In addition, the phrase encoded
22            waveform has no standard or
23            industry-specific definition.
24            Correct?
25       A.   Yes.

Page 142

1    Q.   What investigation, if any, did
2  you do in forming your opinion that encoded
3  waveform has no standard or industry-specific
4  definition?
5    A.   I don't remember ever using
6  before these patents encoded and recorded
7  waveform.
8    Q.   You are referring to your use?
9    A.   Using or seeing before --
10    Q.   Okay.
11    A.   -- this case.
12    Q.   Are you familiar with MATLAB?
13    A.   Yes.
14    Q.   Is it something that you use?
15    A.   No, but I'm familiar with it.
16    Q.   And what is it?
17    A.   It's a program for computation.
18    Q.   And is it used in data coding
19  field?
20    A.   No, that's a computer
21  programming, which people refer as coding, but
22  it's not error correction coding.  It's
23  programming, MATLAB.
24    Q.   Is it --
25    A.   Sometimes I have people in my

Page 143

1  class thinking they're programming, but it's
2  coding.
3    Q.   Say that again?
4    A.   Sometimes people register for
5  my coding class thinking they would use MATLAB
6  or programming, which is not coding.  So they
7  call coding programming, which is not this
8  coding.
9    Q.   Got it.  Can you use MATLAB to
10  simulate what's done in data coding?
11    A.   Yes I believe so.  I haven't,
12  but I believe you can.
13    Q.   I am going to show you what has
14  been marked as exhibit 7.
15        ---
16        (Deposition Exhibit 7, printout
17        from www.mathworks.com referring to a
18        Manchester receiver was marked for
19        identification)
20        ---
21  BY MR. VERDINI:
22    Q.   Exhibit 7 is a printout from
23  www.mathworks.com referring to a Manchester
24  receiver.  Do you see that?
25    A.   Yes.

Page 144

1    Q.   Do you know what a Manchester
2  receiver is?
3    A.   No.
4    Q.   You've never heard that before?
5    A.   No.
6    Q.   Under the encoding section,
7  before the table --
8    A.   Uh-huh.
9    Q.   -- you would agree that the
10  author of this uses the phrase in the table
11  encoded waveform, correct?
12    A.   Yes, I can see that.
13    Q.   And would you agree that the
14  encoded waveform is a continuous signal?
15    A.   It's a signal in time.  This
16  may be -- this continues points, these
17  squares.  That's mathematical precision.
18        MR. SIPIORA:  I'm just going to
19        note for the record this document
20        doesn't appear to be in any of the
21        intrinsic record that we've been
22        provided previous to this, so to the
23        extent you try to bring this in
24        through this testimony we're going to
25        move to strike.  We're just objecting

Page 145

1        to the use of this exhibit and any
2        questioning around it.  Just so you
3        know that.  If you try to reuse it
4        we'll move to strike.
5        MR. VERDINI:  Objection noted,
6        and we will respond if you do.
7  BY MR. VERDINI:
8    Q.   Let me show you what's been --
9  what we will mark as exhibit 8.
10        ---
11        (Deposition Exhibit 8,
12        U.S. patent number 5,608,397 was
13        marked for identification)
14        ---
15  BY MR. VERDINI:
16    Q.   Do you recognize exhibit 8?
17    A.   Yes.
18    Q.   Exhibit 8 is U.S. patent number
19  5,608,397, correct?
20    A.   Yes.
21    Q.   And you are the sole named
22  inventor, right?
23    A.   Yes.
24    Q.   If you turn to column 1 of the
25  patent?

1     A.   Yes.
2        Q.   So we are in column 1.  If you
3  go down to line, approximately, 23.
4     A.   Oh, sorry, that's a different
5  page.
6        Q.   Yes.  Column 1 of the patent.
7  Are you there?
8     A.   Yes.
9        Q.   So if you go to line,
10  approximately, 23, the patent reads (as read):
11          Error correcting codes
12          introduce additional symbols to a
13          signal, paren, e.g. to a digital
14          representing compressed information,
15          end paren, to form an encoded signal.
16          Do you see that?
17     A.   Yes.
18        Q.   And what do you mean -- what
19  were you referring to when you wrote encoded
20  signal?
21     A.   The sequence -- additional
22  symbols, the encoded signal is a redundant or
23  encoded version of the original symbols.  So
24  the original symbols and then additional
25  symbols are added.  Actually it's more like a

1  map from N to M, to form an encoded set of
2  symbols.
3        Q.   Why do you call it a signal if
4  it's just symbols?
5     A.   That -- I don't know why we
6  called it signal at that point.  I think it
7  could be either way.
8        Q.   Either way, meaning what?  It
9  could be a --
10     A.   It could be symbols and it
11  could be -- yeah, it could be signal.
12        Q.   Your testimony is that you're
13  using those two terms interchangeably?
14     A.   I don't remember, this patent
15  was 25 years ago, but it does appear from this
16  sentence that they're used interchangeably.
17        Q.   And if you go down to line 32,
18  you write (as read):
19          The encoded signal, comma,
20          comprising the codewords, comma, may
21          then be either transmitted over the
22          communications channel or recorded on
23          a medium.  Correct?
24     A.   Yes.
25        Q.   So the encoded signal, as you

1  wrote, is recorded, correct?
2     A.   Can be recorded.
3        Q.   Is there an instance when it's
4  not recorded?
5     A.   It can be transmitted.  It can
6  be preceded by an NRZI.
7        Q.   In connection with a magnetic
8  recording, it's recorded on a medium, the
9  encoded signal, correct?
10     A.   Unless it's preceded by NRZI.
11        Q.   What happens if it's preceded
12  by NRZI?
13     A.   You change -- what's recorded
14  on the medium is, there is a recorded pattern
15  on the medium.
16        Q.   But it's a one-on-one
17  correspondence between what was NRZ into NRZI,
18  right?
19     A.   There is a correspondence, yes.
20        Q.   And in column 2 of your patent
21  you are -- at line 8 --
22     A.   Yes.
23        Q.   -- you are describing the
24  background of the invention that you are
25  describing here as being applicable to

1  magnetic recording, correct?
2     A.   Yes.
3        Q.   All right.  The last paragraph
4  in this section, paragraph 45 of your claim
5  construction declaration.  So we're going back
6  to exhibit 3.
7     A.   Mm-hmm.  Oh, sorry.
8        Q.   That's okay.
9     A.   45 you said?  Or 43?
10        Q.   Correct.  Paragraph 45.
11     A.   45, yes.
12        Q.   I'm now over to page 12 of
13  paragraph 45.  So it goes to the next page.
14  At line 2 you say binary codewords are not a
15  waveform.  Correct?
16     A.   Binary codewords are not a
17  waveform, yes.
18        Q.   If you turn to the IPR
19  declaration, exhibit 4.  Page 40, paragraph
20  94.
21     A.   Yes.
22        Q.   Your opinion is that the output
23  from the block converter is the encoded
24  waveform in Okada.  Correct?
25     A.   Correct.

EMINA SOLJANIN - 05/09/2018          Pages 150..153

Page 150

1    Q.   What is the output of the
2 converter?
3    A.   It's output strings of bits.
4    Q.   Isn't that inconsistent with
5 saying in your claim construction declaration
6 that binary codewords are not a waveform?
7    A.   Binary codewords mathematically
8 are not a waveform.  This is the
9 interpretation I adopted for the IPR.
10    Q.   And again in the IPR you were
11 intending to be truthful and accurate in your
12 interpretation of the claims of the '601
13 patent, right?
14    A.   That's correct.
15    Q.   Okay.
16         MR. VERDINI:  Let's go off the
17    record.
18    (Lunch recess taken at 12:25 p.m.)
19
20
21
22
23
24
25

Page 151

1    A F T E R N O O N   S E S S I O N
2         (1:32 p.m.)
3         _ _ _
4
5 E M I N A   S O L J A N I N,
6    resumed as a witness, having been
7    previously sworn by the Notary Public,
8    was examined and testified further as
9    follows:
10 EXAMINATION BY
11 MR. VERDINI:
12    Q.   Welcome back from the lunch
13 break.  Did you talk to counsel during the
14 break about your testimony?
15         MR. SIPIORA:  Objection and
16    instruct not to answer based on work
17    product.
18    (Instruction not to answer.)
19 BY MR. VERDINI:
20    Q.   And you're going to obey your
21 counsel's instruction on work product basis,
22 correct?
23    A.   Yes.
24    Q.   Before we broke, I had one last
25 question I wanted to ask you.  You testified

Page 152

1 that binary codewords mathematically are not a
2 waveform and that's the interpretation that
3 you adopted for the IPR, is that an accurate
4 statement of your testimony?
5    A.   That is not the
6 interpretation -- that is why it's confusing,
7 in the later -- in the this year declaration.
8 For IPR I considered them the encoded
9 waveform.
10    Q.   And that's different than what
11 you stated in the claim construction
12 declaration where you say binary codewords are
13 not a waveform, right?
14    A.   Yes.
15    Q.   All right.  Let's move to
16 exhibit 3, which is your claim construction
17 declaration.  Before we move there.  You
18 haven't submitted any supplemental
19 declarations in the IPR, have you?
20    A.   Not that I remember.
21    Q.   And you haven't amended your
22 opinions in any way in the IPR, is that
23 correct?
24    A.   Not that I remember, no.
25    Q.   And sitting here today you

Page 153

1 still believe your opinions in the IPR
2 declaration are accurate, correct?
3    A.   About the existence of prior
4 art, yes.
5    Q.   And the way in which you
6 interpreted the '601 patent, correct?
7    A.   That was an interpretation
8 there.
9    Q.   Okay.  All right.  Let's move
10 to exhibit 3, page 12.  We're moving now on to
11 the claim phrase "generating no more than j
12 consecutive transitions of said sequence in
13 the recorded waveform such that j is greater
14 than or equal to 2."
15         Okay?
16    A.   Yes.
17    Q.   And it's your opinion that that
18 phrase is indefinite, is that correct?
19    A.   Yes.
20    Q.   In the IPR declaration were you
21 reasonably certain what that phrase meant?
22    A.   I had an interpretation -- a
23 possible interpretation there that I followed.
24    Q.   Was that a reasonably certain
25 interpretation?

Page 154

1     A.   It was a reasonable
2 interpretation.  I had doubts.
3        Q.   Was it reasonably certain?
4     A.   Does that have some other
5 meaning?
6        Q.   I'm just using the term
7 reasonably -- do you have an interpretation of
8 what reasonably certain means?
9     A.   Because I hear there's
10 reasonable doubts on TV.
11       Q.   That's criminal trial.  We're
12 not there.  What does the term reasonably
13 certain mean to you?
14     A.    So I had an interpretation
15 which I thought was reasonable, and I thought
16 there were other interpretations.
17       Q.    Okay.  Does that make your
18 interpretation for you reasonably certain in
19 the IPR declaration?
20     A.    Well, if -- (Pause.)  The
21 interpretation I thought was reasonable.  The
22 possibility of other interpretations were
23 there.  Then no, because the probability --
24 no.
25       Q.    You were not reasonably

Page 155

1 certain?
2     A.    (Nodding head affirmatively.)
3        Q.    So then why did you give your
4 opinions in the IPR declaration if you weren't
5 reasonably certain what the '601 patent meant?
6     A.    I had an interpretation which I
7 thought was reasonable.
8        Q.    I didn't ask -- that's not the
9 question I asked.  I said why did you provide
10 opinions under oath in the IPR declaration if
11 you were uncertain as to what the '601 patent
12 meant?
13          MR. SIPIORA:  Objection as to
14       form.
15     A.   Because I --
16          MR. SIPIORA:  Objection as to
17       form.  Misstates testimony.  Go ahead.
18     A.   Yeah, because I thought that my
19 interpretation was reasonable, and assuming my
20 interpretation I thought I could proceed.
21       Q.   In your mind, does the fact
22 that a claim term could have multiple
23 interpretation make it not reasonably certain?
24     A.   If I associate some kind of
25 percentage to reasonably certain, then the --

Page 156

1 just the existence of multiple interpretations
2 makes it not reasonably certain.
3        Q.   Is that the standard that you
4 applied in your claim construction
5 declaration?
6     A.   For which ...
7        Q.   Your claim construction
8 declaration.
9     A.   In ...
10       Q.   Is that the definition of
11 reasonably certain that you applied in your
12 claim construction declaration when you
13 opined --
14     A.   That is the most recent
15 declaration?
16       Q.   Correct.
17     A.   Yes.
18       Q.   That's the definition?  You had
19 multiple interpretations, it wasn't reasonably
20 certain, is that your testimony?
21     A.   Yes.
22       Q.   All right.  So now let's move
23 to generating no more than j consecutive
24 transitions of said sequence in the recorded
25 waveform such that j is greater than or equal

Page 157

1 to 0.
2          Your opinion in the claim
3 construction declaration is that that phrase
4 is indefinite, correct?
5     A.   Yes.
6        Q.   And in the IPR declaration you
7 identified in Okada where that reference
8 discloses a generating no more than j
9 consecutive transitions of said sequence in
10 the recorded waveform such that j is greater
11 than or equal to 2, correct?
12     A.   Yes.
13       Q.   And you did that without
14 opining that there was any construction that
15 was necessary for this claim phrase, correct?
16     A.   Yes.
17       Q.   And you didn't anywhere in your
18 IPR declaration mention that you weren't
19 reasonably certain as to what generating no
20 more than j consecutive transitions of said
21 sequence in the recorded waveform such that j
22 is greater than 2 meant, right?
23     A.   I did not consider reasonable
24 certainty.  Only reasonable interpretation of
25 text.

EMINA SOLJANIN - 05/09/2018          Pages 158..161

Page 158

1    Q.   And my question is:  you did
2  not state anywhere in the IPR declaration that
3  you were not reasonably certain what that
4  claim phrase meant, correct?
5    A.   As far as I remember that was a
6  year ago declaration.
7    Q.   And as far as you remember it's
8  not in there, right?
9    A.   If I remember correctly, it's
10  not there, yeah.
11    Q.   And you have it in front of you
12  if you want to check, but --
13    A.   Yes.  It's just little bit
14  long, but yeah.
15    Q.   So let's go to exhibit 4, which
16  is your IPR declaration.  If you would turn to
17  page 40.  And on page 40 there's a section 5
18  that you've identified as claim 1[E], correct?
19    A.   Yes.
20    Q.   And in that claim 1[E] there is
21  a reference -- the claim phrase that you are
22  opining on is said sequences generating no
23  more than j consecutive transitions in the
24  recorded waveform such that j is an integer
25  equal to or greater than 2, correct?

Page 159

1    A.   Yes.
2    Q.   And that's slightly different
3  wording than claim 13, isn't it?
4    A.   Let me just check.
5        (The witness reviews document.)
6    A.   Yes.
7    Q.   And in paragraph 94 you
8  describe what you call Rule (1) that's
9  disclosed in Okada, correct?
10    A.   Yes.
11    Q.   And if you turn to page --
12  let's start on the bottom of page 40.  You say
13  (as read):
14        Imposition of the first rule,
15      Rule (1), results in a maximum of one
16      consecutive transition allowed on
17      consecutive clock periods, not just in
18      the encoded waveform output from the
19      block converter, but also later in the
20      recorded waveform that is, quote,
21      recorded to an optical disk following
22      NRZI modulation.  Correct?
23    A.   Yes.
24    Q.   And based on that analysis you
25  concluded that Okada discloses that there is

Page 160

1  no more than two consecutive transitions in
2  the recorded waveform, right?
3    A.   Yes.
4    Q.   And in your opinion does that
5  Rule (1) meet the claim limitation?
6    A.   Yes.
7    Q.   And then in paragraph 95 you
8  say (as read):
9        Similarly, imposition of Rule
10      (2) results in a maximum of two
11      consecutive transitions allowed on
12      consecutive clock periods, both in the
13      encoded waveform before NRZI
14      modulation, paren, as seen in tables 8
15      and 9, and in the recorded waveform
16      after NRZI modulation, paren, as shown
17      in Exhibit 1011.
18        Correct?
19    A.   That's what it says, yes.
20    Q.   And you conclude that that
21  Okada, Rule(2), illustrates that there are no
22  more than exactly two consecutive transitions
23  in the recorded waveform following NRZI
24  modulation, correct?
25    A.   Yes.

Page 161

1    Q.   And in doing so you are opining
2  that Okada discloses the said sequences
3  generating no more than j consecutive
4  transitions claim phrase, correct?
5    A.   Yes.
6    Q.   Turn to page 46 of your IPR
7  declaration.  And in paragraph 110 am I
8  correct that to opine that Okada discloses the
9  way in which the generating no more than j
10  consecutive transitions phrase is used in
11  claim 13, all you did was incorporate your
12  analysis of the claim element as it appears in
13  claim 1?
14    A.   Yes.
15    Q.   And again you opine that Okada
16  discloses the generation of no more than two
17  consecutive transitions in the recorded
18  waveform as required in claim 13[E] as you've
19  identified it on page 46, correct?
20    A.   Yes.
21    Q.   Now go back to your claim
22  construction declaration, and page 12 at
23  paragraph 48.  Do you see that?
24    A.   Yes.
25    Q.   Are you there?

EMINA SOLJANIN - 05/09/2018          Pages 162..165

Page 162

1      A.   Yes.
2      Q.   In paragraph 48 is it the case
3  that you are relying on the differences in
4  claim 13 and claim 1 to support your opinion
5  that the generating no more than j consecutive
6  transitions phrase is indefinite?
7      A.   Yes.
8      Q.   How is that consistent with
9  your opinion in the IPR declaration whereby
10  you identify no differences in claim 13 and
11  claim 1 that were relevant to your opinion?
12      A.   I believe that in IPR I wasn't
13  aware of the level of the difference between
14  13 and 1.
15      Q.   Why weren't you aware of the
16  difference when you submitted your IPR
17  declaration?
18      A.   That was to the best of my
19  knowledge at the moment.
20      Q.   So what knowledge did you gain
21  between your IPR declaration and your claim
22  construction declaration -- let me finish --
23  when the patent's words never changed?
24      A.   Patent's words never changed.
25  It's my reading that understood -- I

Page 163

1  understood better.
2      Q.   Why did you understand better?
3  What did you do between -- let me ask it this
4  way.
5          What did you do between your
6  IPR declaration and your claim construction
7  declaration that allowed you -- or that gave
8  you a better understanding?
9      A.   Read over once again.
10      Q.   How many times did you read
11  over once again between the time that you did
12  your IPR declaration and your claim
13  construction declaration?
14      A.   Within that year?  Several
15  times, probably.
16      Q.   How many is several?
17      A.   Four, five.
18      Q.   How many times did you talk to
19  counsel between your IPR declaration and your
20  claim construction declaration?
21      A.   Actually, from the -- I don't
22  remember.  There was some period that we did
23  not talk.
24      Q.   But how many times?  Not the
25  period, but how many times?

Page 164

1      A.   I wouldn't be able to say
2  without looking at my calendar.
3      Q.   More than ten?
4      A.   No.
5      Q.   More than five?
6      A.   Probably not more than five.
7      Q.   Did you contact counsel when
8  you had a new understanding of the claim terms
9  in the patent?
10      A.   No.
11      Q.   Did counsel contact you?
12      A.   Not in connection with this
13  particular interpretation.
14      Q.   What do you mean by "this
15  particular interpretation"?
16      A.   I mean I had contacts, but they
17  were not let's discuss paragraph 48, or ...
18      Q.   My question is you testified
19  that you, in reading between the IPR
20  declaration and the claim construction
21  declaration you had a new interpretation of
22  the patent, right?
23      A.   Yes.
24      Q.   When you had that new
25  interpretation of the patent did you reach out

Page 165

1  to counsel?
2      A.   No.
3      Q.   How did that get communicated,
4  that you had a new interpretation of the
5  patent?
6      A.   Later I was asked to provide
7  opinion about -- what was this called?
8  Definiteness of the claims.  So that was a
9  general question.
10      Q.   And after you were asked that
11  question, is that when you formed a different
12  opinion on what the claim terms meant in the
13  '601 patent?
14      A.   After I was asked that question
15  I looked into a number of -- I looked over all
16  the claims, actually, and then whatever I
17  adopted as a possible interpretation that had
18  other possible interpretations, I tried to
19  address.
20      Q.   And that's how you came to your
21  opinion on indefiniteness?
22      A.   Yes.
23      Q.   Let's go back to your IPR
24  declaration.  In paragraph 95, that's your
25  opinion as to how Rule (2) of Okada discloses

EMINA SOLJANIN - 05/09/2018                    Pages 166..169

Page 166

1  the said sequences generating no more than j
2  consecutive transition phrase that you've
3  identified as claim 1[E], correct?
4        A.   Yes.
5        Q.   Take your time and read
6  paragraph 95.  And if you need Okada, I have
7  it, I can give it to you.
8             My question is:  would you
9  agree that if transitions is defined as a
10  switch from a binary 1 to a binary 0, or vice
11  versa, Okada would not have two consecutive
12  transitions?
13        A.   That I don't remember at this
14  point, because it took lots of work actually
15  to look into Okada and write everything down
16  and realize that yes, and write this
17  paragraph.
18        Q.   I am asking you a hypothetical.
19  Assume that "transitions" is defined as a
20  switch from a binary 1 to a binary 0 or vice
21  versa.  Looking at paragraph 95 in your
22  analysis, and in the IPR declaration, if
23  that's the definition of "transitions" how
24  many consecutive transitions does Okada Rule
25  (2) disclose?

Page 167

1        A.   So that was my assumption, not
2  hypothetical, that transitions are from 0 to
3  1, and 1 to 0.
4        Q.   Okay.
5        A.   And after going through Okada
6  patent and writing tables of sequences,
7  et cetera, I wrote what is in here.  So I
8  didn't make that as a hypothesis, but that was
9  the assumption.
10        Q.   Looking at paragraph 95, am I
11  correct that you were counting consecutive 1's
12  as consecutive transitions to --
13        A.   In NRZI, yes.
14        Q.   Yes.
15             -- to conclude that there are
16  no more than exactly two consecutive
17  transitions disclosed in Okada, is that
18  correct?
19        A.   Yes.
20        Q.   You not only opined in the IPR
21  declaration that Okada discloses the said
22  sequences generating no more than j
23  consecutive transitions in claim 13; you did
24  the same thing with regard to the Tsang
25  reference, right?

Page 168

1        A.   I didn't get that.
2        Q.   Let me just direct you.  Turn
3  to paragraph 143 of your declaration.  IPR
4  declaration.
5        A.   Mm-hmm.
6        Q.   That's on page 58.  Are you
7  there?
8        A.   Mm-hmm.
9        Q.   And in paragraph 143 you opine
10  that Tsang discloses apparatuses having an
11  MTR("j"), end paren, value of 2.  And a value
12  of j equals 2 ensures that the recorded
13  waveform, quote, avoids three or more
14  consecutive transitions.  Correct?
15        A.   If the value of j -- if there
16  are -- let's see.
17             (The witness reviews document.)
18        A.   Yes.
19        Q.   And then in paragraph 162,
20  again you just incorporate your analysis as to
21  claim element 1[E] to opine that claim element
22  13[E], which is the generating no more than j
23  consecutive transitions of said sequence in
24  the recorded waveform such that j is greater
25  than 2, is disclosed in Tsang, correct?

Page 169

1        A.   Yes.
2        Q.   So in the IPR declaration you
3  concluded and opine that Okada and Tsang
4  disclosed the generating no more than j
5  consecutive transitions of said sequence in
6  the recorded waveform such that j is greater
7  than 2 as claimed in claim 13, correct?
8        A.   Yes.
9        Q.   And to determine that you had
10  to be reasonably certain what it meant to
11  generate no more than j consecutive
12  transitions of said sequence in the recorded
13  waveform such that j is greater than 2 as
14  claimed in claim 13, right?
15             MR. SIPIORA:  Objection as to
16        form.
17  BY MR. VERDINI:
18        Q.   J is greater than or equal to
19  2, right?
20             MR. SIPIORA:  Objection as to
21        form.
22        A.   Under the interpretation I
23  adopted, that's correct.
24        Q.   And you stand by that
25  interpretation, right?

Page 170

1      A.   That was the interpretation I
2  had -- I adopted throughout the IPR.
3      Q.   And my question is do you stand
4  by that interpretation?
5      A.   The --
6          MR. SIPIORA:  Objection as to
7      form.
8      A.   What does it mean to stand by?
9  I mean that was what I adopted, and there were
10 other possibilities.
11     Q.   My question then -- I'll ask it
12 a different way.  You're not disavowing that
13 opinion in today's deposition, are you?
14     A.   I am not disavowing that
15 opinion as a possible interpretation.
16     Q.   Let's go back to exhibit 3, and
17 we're going to go to page 13, which is, and I
18 want to -- we're going to do the second half
19 of paragraph 48.  Right at the top.  If you
20 look back --
21     A.   Oh, yes.
22     Q.   Okay.  In the first full
23 sentence that starts on 1 you write (as read):
24          Moreover, the specification
25          teaches that the minimum distance

Page 171

1          pairs shown in figure 1 must be
2          eliminated and that, quote, in
3          accordance with the present invention,
4          this can be accomplished using the
5          existing RLL, paren (1,k) end paren
6          code, which does not allow consecutive
7          transitions.
8          Correct?
9      A.   Yes.
10     Q.   And you refer to part of the
11 specification in the patent at column 4 lines
12 8 through 12, correct?
13     A.   Yes.
14     Q.   And then the next sentence
15 after you quote the language from the
16 specification, you say (as read):
17          This adds up to a lack of
18          reasonable certainty as to the meaning
19          of the claim limitation.
20          Do you see that?
21     A.   Yes.
22     Q.   What is the "this" that adds up
23 to the lack of reasonable certainty, in your
24 opinion?
25     A.   The consideration that RLL

Page 172

1  (1,k) code, which will not allow consecutive
2  transitions.  Meaning it would be a transition
3  followed by a non-transition.
4      Q.   Your opinion is that the RLL
5  code in practice does not allow consecutive
6  transitions?
7      A.   Yes.  With this parameters,
8  (1,k).
9      Q.   How many consecutive
10 transitions are there if j equals 1?
11     A.   One transition.
12     Q.   How many consecutive
13 transitions?
14     A.   The j is interpreted as the
15 maximum number of transitions, right?
16     Q.   Mm-hmm.
17     A.   Yeah.  So j is 1 -- the maximum
18 number of allowable transitions is j, which is
19 1.
20     Q.   All right.  So let's look at
21 the patent, exhibit 1, column -- let's go to
22 the column that you cite, which is column 4,
23 and let's start at line 8.  And the first
24 sentence says (as read):
25          To obtain a coding gain, paren

Page 173

1          improvement in minimum distance due to
2          coding, the minimum distance pairs
3          shown in figure 1 must be eliminated.
4          Correct?
5      A.   Yes.
6      Q.   So let's turn to figure 1.
7      A.   Where is figure 1?  Yes.
8      Q.   So you can understand figure 1
9  based on your reading of the patent and your
10 experience in the field, correct?
11     A.   Let me just see.  Is this
12 reading current -- what is the -- I have to be
13 reminded.  What does this represent?  What's
14 on the disk, or ...
15     Q.   So column 3 --
16     A.   Uh-huh.
17     Q.   -- describes figure 1 at line
18 20?
19     A.   So when it says write patterns,
20 that is what is on the disk, 00, and then --
21 so the first one has 0101.  And the other one
22 has 010.  So from this delimiters here, it
23 would be in the upper part, 101, and in the
24 lower part 010.  So if I interpret that as 101
25 and 010, this would be the minimum distance

http://www.yeslaw.net/help

Page 174

1  error event.  A minimum distance error event.
2      Q.   Are there consecutive
3  transitions reflected in those write patterns?
4      A.   There are two consecutive
5  transitions, yes.
6      Q.   What are the two consecutive
7  transitions?
8      A.   So if you'll look when this
9  delimiter starts within this, this is the, in
10  the middle of the figure there are
11  transitions.
12      Q.   Okay.  And are you looking --
13  there's four different pairs there.  Are you
14  looking at a particular one?
15      A.   So the minimum distance event
16  is this central part, actually.  101 and 010.
17  And the rest is irrelevant --
18      Q.   Because this is being
19  transcribed and we can't see your hands, that
20  you're doing --
21      A.   All right.  So what I'm looking
22  is in the middle of the picture of the figure
23  1, and I have 101, if there are two levels of
24  this square train, and underneath I have -- so
25  this starts with, after the delimiters, these

Page 175

1  vertical lines, and then the bottom one has
2  010.
3      Q.   And you are looking at the
4  pairs that are designated as 1 under figure 1,
5  correct?
6      A.   Under figure 1, one can look
7  at, yes, as this is -- if this is what is
8  recorded it would be 101 and 010.
9      Q.   I am sorry.  I'm just asking
10  for clarification purposes.
11      A.   Yes.
12      Q.   The figure 1 has pairs
13  identified as 1, 2, 3 and 4, correct?
14      A.   I am only looking at the first
15  pair at the moment.  Yes.
16      Q.   Got it.  Okay.  And are there
17  any consecutive transitions in pair 1?
18      A.   Two consecutive transitions.
19      Q.   You're saying between the
20  delimiters, right?
21      A.   Yes.  The rest is irrelevant.
22      Q.   So go back to column 4.  The
23  first sentence -- I'll read the first two
24  sentences.  It says -- starting at line 8 --
25  (as read):

Page 176

1          To obtain a coding gain
2      (improvement in minimum distance due
3      to coding), the minimum distance pairs
4      shown in figure 1 must be eliminated.
5      In accordance with the present
6      invention, this can be accomplished
7      using the existing RLL (1,k) code,
8      which does not allow consecutive
9      transitions.
10          Do you agree with that
11  statement?
12      A.   Yes.
13      Q.   You stop there in connection
14  with your opinion in paragraph 48, right?
15      A.   Yes.
16      Q.   If you read the remainder of
17  column 4 lines 13 through 30 you would agree
18  that the inventors are distinguishing their
19  invention from the RLL codes that are referred
20  to in lines 8 through 13, correct?
21          (The witness reviews document.)
22      A.   The inventors are saying that
23  their code is superior.
24      Q.   Does RLL code allow dibit
25  patterns to survive in the recorded sequence?

Page 177

1      A.   It does not.
2      Q.   And that's why IPR code is
3  improvement, correct, in part?
4      A.   Yes.
5      Q.   And so do you still believe
6  that lines 8 through 12 add up to a reasonable
7  certainty as to what the claim phrase
8  generating no more than j consecutive
9  transitions of said sequence in the recorded
10  waveform such that j is greater than or equal
11  to 2?
12          MR. SIPIORA:  Objection as to
13      form.  Misstates testimony.
14          MR. VERDINI:  I am sorry.  Let
15      me rephrase the question.
16  BY MR. VERDINI:
17      Q.   Based on reading column 4 lines
18  8 all the way down to 30, do you still believe
19  that lines 8 through 13 add up to a lack of
20  reasonable certainty as to the meaning of the
21  claim limitation?
22      A.   If one reads the claim by
23  itself then what is written here I stand by
24  it, yes.
25      Q.   But you don't read the claim --

http://www.yeslaw.net/help

Page 178

1  to do claim construction on indefiniteness you
2  don't just read the claim by itself, right?
3      A.   What else would I read?
4      Q.   You didn't read anything else
5  in making your opinion?
6      A.   For the claims?
7      Q.   Mm-hmm.
8      A.   Only how I -- I concentrated to
9  understand what the claims as they are written
10  say.  But given all of my expertise and the
11  outside literature, it's different issue.
12      Q.   What is a different issue?
13      A.   Whether one can come with a
14  number of possible interpretations.
15      Q.   You're saying as you did in the
16  IPR declaration, correct?
17      A.   I adopted one interpretation
18  there, yes.
19      Q.   Now in the claim construction
20  declaration in paragraphs 49 and 50 you also
21  identify that you have some --
22      MR. VERDINI:  Strike that.
23  BY MR. VERDINI:
24      Q.   In your claim construction
25  declaration, in paragraph 49 you recite the

Page 179

1  phrase "transitions of said sequence" and
2  opine that this makes the claim ambiguous, is
3  that correct?
4      A.   Well, transitions are, as you
5  pointed out between 0's and 1's, and 1's and
6  0's, so I did not understand "transitions of
7  said sequence."  Is that between sequences,
8  or ...
9      Q.   In your IPR declaration, page
10  46, in paragraph 110 am I correct that you
11  didn't identify any ambiguity in determining
12  that Okada has transitions of said sequence,
13  is that right?
14      A.   This 110?
15      Q.   Correct.
16      A.   He said "consecutive
17  transitions within the recorded waveform."  I
18  don't see transitions between sequences here.
19      Q.   But didn't you determine that
20  Okada practiced the claim element 13[E]?
21      A.   Yes.
22      Q.   And that includes transitions
23  of said sequence, correct?
24      A.   I adopted the interpretation,
25  which is here, that there are no more than two

Page 180

1  consecutive transitions within the sequence,
2  which consists of strings of codewords.
3      Q.   So you interpreted said
4  sequence to be strings of codewords, correct?
5      A.   Yes.
6      Q.   And you did the same thing with
7  Tsang, right?
8      A.   Yes.
9      Q.   And again in interpreting Okada
10  and Tsang as it applies to the '601 patent you
11  didn't identify anywhere in your IPR
12  declaration that you were uncertain about what
13  the phrase "transitions of said sequence"
14  meant, correct?
15      A.   The interpretation I adopted
16  was the one which exactly says these
17  consecutive transitions, in the string of
18  sequences.
19      Q.   Okay.  Thanks, but that -- let
20  me ask my question again and I'll ask you to
21  answer it.
22          In interpreting Okada and Tsang
23  as it applies to the '601 patent you didn't
24  identify anywhere in your IPR declaration that
25  you were uncertain about the phrase

Page 181

1  "transitions of said sequence" as it is
2  written in the '601 patent, correct?
3      A.   I didn't discuss uncertainty
4  and certainty in that IPR at all.
5      Q.   Let's move to, back to your
6  claim construction declaration, page 13.  And
7  we'll move on to section 3, which is the
8  generating no more than k consecutive sample
9  periods of said sequences without a transition
10  in the recorded waveform element of claim 13.
11  Okay?  Are you there?
12      A.   Generating no more than k
13  consecutive sample periods of said
14  sequences ...  yeah, now I am even more
15  confused.  Yeah.
16      Q.   And your opinion is, in the
17  claim construction definition, is that that
18  phrase is indefinite, correct?
19      A.   Yes.
20      Q.   And again in your IPR
21  declaration you didn't identify any
22  uncertainty as to what that phrase meant when
23  opining that Okada and Tsang disclosed that
24  element, correct?
25      A.   Yes.

EMINA SOLJANIN - 05/09/2018          Pages 182..185

Page 182

1    Q.   And if we turn to your IPR
2 declaration, page 41 -- are you there?
3    A.   Yes, I am.
4    Q.   -- you describe the sequences
5 that you believe were disclosed by Okada,
6 correct?
7    A.   Yes.
8    Q.   In fact, on page 42 you
9 expressly opine that the sequences generated
10 by Okada have no more than k consecutive
11 sample periods without a transition in the
12 recorded waveform as recited in claim 1[F],
13 correct?
14    A.   Yes.
15    Q.   And you opine that to a person
16 of -- of someone skilled in the art k has to
17 be a finite number, right?
18    A.   K has to be a finite number.
19    Q.   That's what you opined,
20 correct?
21    A.   Yes.
22    Q.   And you base that on your
23 opinion that as someone skilled in the art you
24 know that there can never be a codeword
25 consisting of all 0's or all 1's, right?

Page 183

1    A.   Oh, there are always codewords
2 consisting of all 0's and all 1's.
3    Q.   You opine at the end of
4 paragraph 97, (as read):
5          In any case -- this is a quote
6       from yours -- in any case, there can
7       never be a codeword consisting of all
8       0's or all 1's.
9    A.   Oh, there can never be a
10 codeword within, if these rules are imposed.
11    Q.   Correct.
12    A.   That's correct.
13    Q.   All right.  So k -- and based
14 on that you opine that k is a finite number,
15 correct?
16    A.   Yes.
17    Q.   And again you didn't identify
18 any claim construction --
19          MR. VERDINI:  Strike that.
20 BY MR. VERDINI:
21    Q.   In opining as to what Okada
22 disclosed you didn't identify any need to
23 construe any of the claim terms in the '601
24 patent, correct?
25    A.   I adopted the interpretation

Page 184

1 that a sample is done once per symbol for
2 these.  That was my interpretation for
3 sampling.  For IPR.  So that was one
4 possibility to the sampling, yes.
5    Q.   And why isn't that your
6 interpretation of the '601 patent in
7 connection with your claim construction?
8    A.   It is one possible
9 interpretation.  There can be more than one
10 sample per symbol in general.
11    Q.   And again, as with the other
12 claim 13 terms in Okada, if you turn to page
13 46 at paragraph 111 there was nothing in your
14 opinion that distinguished claim 13 from claim
15 1 in terms of your opinion that Okada
16 disclosed what you've identified as claim
17 13[F] and which you now say is indefinite,
18 right?
19    A.   Yes.
20    Q.   And if you turn to page 1 -- or
21 paragraph 144 of your IPR declaration.
22    A.   I'm there.
23    Q.   In paragraph 144 you opine that
24 Tsang discloses apparatuses having a
25 constraint k of 9, which ensures generation of

Page 185

1 no more than 9 consecutive sample periods
2 without a transition in the recorded waveform.
3 Correct?
4    A.   Yes.
5    Q.   So you were able to understand
6 what sample periods were identified in claim
7 1[F] of the '601 patent, correct?
8    A.   I adopted the most common
9 sampling strategy, as an interpretation.
10    Q.   That was your opinion as to how
11 to construe the term "sample periods" as it
12 appears in claim 1 and claim 13, correct?
13    A.   Yes.
14    Q.   And again you're not changing
15 that opinion here today, right?
16    A.   That is a possible
17 interpretation.  There are others.  I am not
18 changing this as a possibility.
19    Q.   And if someone of skill in the
20 art adopted that as a construction, would you
21 say that they were wrong?
22    A.   To adopt this interpretation?
23    Q.   Yes.
24    A.   No, it's a valid
25 interpretation.  It's just one of several.

EMINA SOLJANIN - 05/09/2018                    Pages 186..189

1    Q.   What are the other ones?
2    A.   People have done, for the sake
3 of recovering timing a multiple -- sampling
4 more than once per bit period.
5    Q.   And how would that be a
6 definition of sample periods?
7    A.   So the bit period is the area
8 of the disk where magnetization is in one
9 direction, and if a read head is such that it
10 senses transitions, then you would like to
11 sample at the highest point, if you are able
12 to sample more than once, there are proposals
13 like that, there are advantages, with respect
14 to noise, with respect to timing, et cetera.
15 So there can be more frequent sampling than
16 once per period.  Bit period.
17    Q.   And that would be a reasonable
18 interpretation of sampling as well?
19    A.   That would be another
20 reasonable interpretation, absolutely, yes.
21    Q.   Any others that you have?
22    A.   For sampling?  At the moment,
23 these are either one or more than bit period,
24 yes.
25    Q.   And someone of ordinary skill

1 in the art would understand those definitions,
2 correct?
3    A.   Yes.
4        MR. SIPIORA:  Objection as to
5    form.  I'm not sure what definition
6    you're referring to.
7        MR. VERDINI:  The two
8    definitions of sample periods she just
9    gave.
10    A.   It's not two.  You are sampling
11 at rate of at least one or higher.  Per bit
12 period.
13    Q.   I'm sorry.  What did you say at
14 the end.  Per bit period?
15    A.   Per bit period.
16    Q.   Okay.  And in connection with
17 Tsang you don't identify that you were unclear
18 about what the sample periods were as claimed
19 in the '601 patent, correct?
20    A.   Correct.  Through the entire
21 IPR I made some -- picked one of a number of
22 possible choices, and I upheld it through the
23 end.
24    Q.   I am going to ask a general
25 question, then.  Nowhere in the IPR

1 declaration do you say you were uncertain
2 about what any of the claim terms meant in the
3 '601 patent, right?
4    A.   I didn't say anything like that
5 in the IPR.
6    Q.   And you didn't say that you
7 were providing interpretations, one of many
8 possibilities, right?
9    A.   I did not say that.
10    Q.   You just construed the claim as
11 you thought you should do it and applied it to
12 Okada and Tsang and the other prior art
13 references, right?
14    A.   Actually, I expressed my doubts
15 about how this was written, from the very
16 beginning.
17    Q.   Not in your IPR declaration,
18 did you?
19    A.   Not in the IPR declaration, no.
20    Q.   Who did you express those
21 doubts to?
22    A.   To Mr. Mayle.
23    Q.   When?
24    A.   When we first discussed this
25 patent.

1    Q.   Why didn't that doubt appear in
2 your IPR declaration?
3    A.   Because I adopted something
4 that at the moment was one of reasonable
5 interpretation.
6    Q.   So why did you do that?
7    A.   To be able to have something
8 which is not indefinite in order to compare it
9 with the prior art.
10    Q.   And that's what you did; you
11 took a not indefinite construction of the '601
12 patent and applied it to the prior art, right?
13    A.   I took one possible
14 interpretation and compared it with the prior
15 art, yes.
16    Q.   You just said you had to do
17 something to be able -- you wanted to have
18 something which was not indefinite in order to
19 compare it to the prior art, right?
20    A.   I cannot compare something
21 indefinite to prior art.
22    Q.   Right.  And in fact you did
23 then compare the '601 -- claim terms of the
24 '601 patent to not only Tsang and Okada, but
25 other prior art, right?

http://www.yeslaw.net/help

Page 190

1      A.   Yes.
2      Q.   All right.  Let's go to the
3  last phrase in your claim construction
4  declaration.  Now we're moving to the phrase
5  wherein the binary sequence produced by
6  combining codewords have no more than one of j
7  consecutive transitions from 0 to 1 and from 1
8  to 0, correct?
9      A.   Sorry.  This is page 13, or --
10      Q.   14, I'm sorry.  If I said 13.
11      A.   No, you didn't say any page.
12  14 at the bottom?
13      Q.   Yes, section 4 of your claim
14  construction opinion.
15      A.   I'm sorry.
16          (The witness reviews document.)
17      Q.   And that claim term appears
18  in -- or that claim phrase appears in claim
19  17, correct?
20      A.   Yes.
21      Q.   In your IPR declaration it's
22  true that you opined that both Tsang and Okada
23  disclose the elements of claim 17, correct?
24      A.   Yes.
25      Q.   And if you go to page 48 of

Page 191

1  your IPR declaration.
2      A.   Yes.
3      Q.   Paragraph 116, you quote the
4  claim language of 17, correct?
5      A.   Yes.
6      Q.   You don't identify any claim
7  terms there that require any express
8  construction, correct?
9      A.   I adopted an interpretation
10  that both are transitions, not either/or or
11  one not the other.  But that all of the
12  transitions.
13      Q.   You thought that that was a
14  reasonable interpretation?
15      A.   Yes.
16      Q.   And again you answered a
17  question, but you didn't answer the one that I
18  asked.  So you don't identify in paragraphs
19  116, 117 or 118 any claim terms that you
20  believed required any express construction,
21  correct?
22      A.   I don't identify this here,
23  yes.
24      Q.   And in those same paragraphs
25  you didn't identify any claim terms that you

Page 192

1  thought were uncertain to you, right?
2      A.   I did not identify any that had
3  other interpretations in the IPR.
4      Q.   So in paragraph 117 of your
5  opinion in the IPR declaration you refer to
6  your opinion as it respects claim 10, correct?
7      A.   Yes.
8      Q.   And you say for the reasons
9  discussed previously with respect to claim 10,
10  your opinion was that Okada discloses claim
11  17, right?
12      A.   Yes.
13      Q.   So let's look to claim 10.
14  Sorry, let's stay with the IPR declaration.
15  And let's look at your opinion with respect to
16  claim 10.
17      A.   And that was --
18      Q.   It's page 43.
19          (The witness reviews document.)
20      A.   Yes.
21      Q.   So your opinion in paragraphs
22  102 and 103 as to what Okada discloses, that's
23  inconsistent with the confusion that you
24  identified in paragraphs 58 and 59 of your
25  claim construction declaration, isn't it?

Page 193

1      A.   So here it says transitions
2  from 0 to 1 and from 1 to 0.  Whereas in claim
3  17 -- I mean in section 4 it says no more than
4  one of j consecutive transitions from 0 to 1
5  and from 1 to 0.  So it's one of what can
6  cause ambiguity is transitions from 0's and 1
7  treated separately than transitions from 1 to
8  0.
9      Q.   But in paragraph 103 of your
10  IPR declaration you expressly opine that Okada
11  discloses no more than one of two consecutive
12  transitions from 0 to 1 and from 1 to 0 in the
13  NRZ format.  You didn't have any confusion
14  there, right?
15      A.   He said and from 1 to 0.  Oh --
16      Q.   It's the same language, right?
17      A.   No more than one or j
18  consecutive transitions from zero to 1 and
19  from 1 to 0.  Yes, if you adopt that they both
20  count together.  If you adopt interpretation
21  that from 0 to 1 and 1 to 0 -- that's
22  together.  It's funny, actually they just
23  needed 1 and they would have had a better
24  code.
25      Q.   Say that again?  It's funny

EMINA SOLJANIN - 05/09/2018          Pages 194..197

Page 194

1  that what?
2       A.   From 0 to 1, that -- forget
3  about it.  I was just thinking whether we
4  patented something.  Forget about it.  It
5  might have been even better that --  yeah.
6       Q.   When you say "we patented," who
7  are you referring to?
8       A.   Lucent Technologies, later.
9       Q.   Later?
10      A.   Yes.
11      Q.   And what specific patent were
12  you thinking of?
13      A.   I don't remember now.  It was
14  late '90s.
15      Q.   Do you remember what it was
16  called?
17      A.   No.
18      Q.   And what did you recall about
19  it that sort of brought it to your mind in
20  connection with your opinion in paragraph 103
21  of your IPR declaration?
22      A.   That there are different
23  interpretations.
24      Q.   What about the Lucent patent
25  made you think there were different

Page 195

1  interpretations?
2       A.   I was just thinking whether we
3  had yet another interpretation of this, I
4  cannot say for sure if we did.  Because it was
5  long time ago.
6       Q.   When you say different
7  interpretation of this, what is the "this"?
8       A.   Of j consecutive transitions
9  from 0 to 1 versus 1 to 0.
10      Q.   So that's something that, at a
11  minimum, was in some Lucent patent that you
12  were recalling?
13      A.   I don't know if this was in the
14  Lucent patent, but there are various
15  interpretations from 0 to 1 and 1 to 0.
16      Q.   What interpretation did you use
17  in the IPR declaration?
18      A.   That they adopt that they're
19  equivalent from 0 to 1 and 1 to 0.
20           (Reporter clarification.)
21      A.   That the transitions are either
22  from 0 to 1 or from 1 to 0.
23      Q.   You made the same opinion with
24  the same construction to opine in your IPR
25  declaration that Tsang disclosed the elements

Page 196

1  of claim 17, correct?
2       A.   Yes.
3       Q.   Going to your claim
4  construction declaration.  In paragraph 58 --
5  are you there?
6       A.   Yes.
7       Q.   In paragraph 58 you identify --
8  you use as an example a simple bit string of 0
9  to 1, correct?
10      A.   Yes.
11      Q.   How many consecutive
12  transitions are there in that simple bit
13  string?
14      A.   It's one transition from 0 to
15  1.
16      Q.   How many consecutive
17  transitions?
18      A.   There is only one transition.
19      Q.   So there cannot be any
20  consecutive transitions, correct?
21      A.   Right.
22      Q.   Okay.  The claim 17 requires
23  consecutive transitions, though, correct?
24      A.   The claim 17 talks about j
25  consecutive transitions.

Page 197

1       Q.   Correct.  And your example has
2  no consecutive transitions, right?
3       A.   Correct.
4       Q.   In paragraph 59 of your claim
5  construction declaration you provide an
6  example and then you ask the question how does
7  one evaluate the claimed k plus 1 parameter,
8  correct?
9       A.   I have to remember that.
10           (The witness reviews document.)
11      A.   Yeah, that's what it said.  No
12  more than k plus 1 consecutive 0's and k plus
13  1 consecutive 1's.
14      Q.   And in paragraph 59 you provide
15  an example and you say how does one evaluate
16  the claimed k plus one parameter, correct?
17      A.   Yes.  Is k plus 1 referring to
18  0's or to 1's.
19      Q.   But you did evaluate the
20  claimed k plus 1 parameter in connection with
21  the IPR declaration, right?
22      A.   Yes.  I made the interpretation
23  that k plus 1 would be non-transitions,
24  essentially.
25      Q.   And why did you make that

http://www.yeslaw.net/help

Page 198

1  interpretation?
2      A.   Because it's a -- it's one
3  possibility, if it's referring to k plus 1
4  consecutive alike symbols.
5      Q.   And that's how you interpreted
6  the claim?
7      A.   Yes.
8      Q.   And again you would disagree
9  with someone who interpreted the claim like
10 that, right?
11         MR. VERDINI:  Strike that.
12 BY MR. VERDINI:
13     Q.   You wouldn't disagree with a
14 person of skill in the art who interpreted the
15 claim like that, right?
16     A.   I would agree that that's a
17 possible interpretation.
18     Q.   And that interpretation is how
19 you came to conclude in the IPR declaration
20 that Okada and Tsang disclosed the elements of
21 claim 17, correct?
22     A.   Yes.
23     Q.   What are the other possible
24 interpretations of k plus 1?
25     A.   So you -- it's hard to know

Page 199

1  whether you refer to 0's or 1's.  Do you refer
2  to any of them?  A minimum, or a maximum?
3      Q.   How did you decide which to use
4  in the --
5          MR. SIPIORA:  Were you done
6      with your answer?
7          MR. VERDINI:  Oh, I'm sorry.  I
8      didn't mean to cut her off.  I thought
9      she was.
10     A.   Yes, I am.
11     Q.   Sorry.  So how did you
12 determine what interpretation to use in your
13 IPR declaration?
14     A.   It's just that if instead of
15 going with a more complex interpretation,
16 which would involve separate constraints in
17 0's and 1's I decided to have identical
18 constraints in 0's and 1's.
19     Q.   But you could have --
20     A.   These are non-transitions.
21     Q.   But you could have interpreted
22 the claim using that more complex construction
23 and still have done your IPR opinion, right?
24     A.   I don't know about that.  I'm
25 not sure about that.

Page 200

1      Q.   So by definition that wouldn't
2  be a reasonable construction, would it?
3      A.   A reasonable ...?
4      Q.   Construction.
5      A.   Of what?
6      Q.   K plus 1.
7      A.   It's not a construction.  It's
8  an interpretation.  What do you mean by
9  construction of k plus 1?
10     Q.   That's what we are construing
11 the claims.  So --  construing is interpreting
12 the claims?
13     A.   Right.  So the way I
14 interpreted the claim is there are no more
15 than k plus 1 transitions.
16     Q.   Yes.
17     A.   And that's a reasonable
18 interpretation.  And as such is present in
19 prior art.  I did not, for IPR, have to come
20 with additional interpretation which would
21 also make this claim preceded by prior art.
22 My understanding was one was enough.
23     Q.   Right.  But you did, sitting
24 here today, say that there could be a more
25 complex interpretation of the k plus 1, right?

Page 201

1      A.   Yes, as in the paragraph.
2      Q.   Okay.  And my question is well,
3  why didn't you use that interpretation of k
4  plus 1 in your IPR declaration?
5      A.   Because I didn't have a reason
6  to use other.  I was asked for an opinion
7  under certain interpretation which was
8  reasonable to adopt.
9      Q.   When you say you were asked
10 under a certain interpretation, how was the,
11 quote-unquote, "certain interpretation"
12 formed?
13     A.   What I thought would be
14 reasonable to interpret as being said by the
15 claim.
16         MR. VERDINI:  Let's take a
17     break.
18         ---
19     (Recess from 2:41 to 3:00.)
20         ---
21         MR. VERDINI:  Welcome back,
22     Professor.
23 BY MR. VERDINI:
24     Q.   If you would pull out what we
25 marked as exhibit 6, which is the portion of

EMINA SOLJANIN - 05/09/2018          Pages 202..205

Page 202

1  the file history.
2      A.   Yes.
3      Q.   And turn to page 750.
4  Professor, if you would read to yourself the
5  bottom -- the very last paragraph that bleeds
6  on to page 751 for me.  And let me know when
7  you're done.
8      A.   The paragraph that starts "one
9  of the ..."
10     Q.   Yes.
11          (The witness reviews document.)
12     A.   Just the one paragraph?
13     Q.   Yes.  Would you agree with me
14  that that paragraph describes the j constraint
15  that's disclosed in the '601 patent?
16     A.   It talks about how restrictive
17  j is.  It says that -- it describes what it
18  means, that j is greater or equal than 2, or
19  what it means that j is 3.  So it gives a few
20  examples.
21     Q.   And did you consider that
22  description of the constraint in connection
23  with forming any of your opinions in the claim
24  construction declaration?
25     A.   Did I consider this particular

Page 203

1  paragraph?
2      Q.   Yes.
3      A.   I considered the -- sorry.  In
4  claim interpretation?
5      Q.   Correct?
6      A.   The most recent one?
7      Q.   Yes.
8      A.   I considered it on claims
9  language, but I considered all the material
10  around.
11     Q.   Do you recall specifically
12  reading the description of the constraint on
13  page 750 and 751 of the file history?
14     A.   I don't remember any specific,
15  but I remember going through the entire file.
16     Q.   And on the bottom of page 750
17  referring to the j constraint, it says (as
18  read):
19          Because the constraint prevents
20          only transition runs with more than j
21          consecutive transitions in consecutive
22          clock periods, patterns with j or
23          fewer consecutive transitions can be
24          permitted.
25     A.   Yes.

Page 204

1      Q.   Is that consistent with your
2  understanding of the j constraint as disclosed
3  in the '601 patent?
4      A.   Yes.
5      Q.   And then it reads (as read):
6          For example, if j equals 3 the
7          encoder can to -- which I think is a
8          typo -- produce sequences with
9          isolated transitions, two consecutive
10          transitions on two consecutive clock
11          periods, and three consecutive clock
12          periods.
13          Correct?
14     A.   Yes.
15     Q.   And again is that your
16  understanding of how the constraint -- the j
17  constraint disclosed in the '601 patent would
18  operate when j equals 3?
19     A.   In the '601 patent the j
20  constraint has a little bit different
21  definitions in claim 1 and claim 13.
22     Q.   Okay.  My question was is j
23  equals 3 under the claimed method of 13, is it
24  your understanding that the encoder could
25  produce sequences with isolated transitions,

Page 205

1  two consecutive transitions on two consecutive
2  clock periods, and three consecutive clock
3  periods, as described in the file history?
4          (The witness reviews document.)
5      A.   It says generating no more than
6  j consecutive transitions of said sequences in
7  the recorded waveform such that j is greater
8  or equal to 2.  And that means that if j is
9  equal to 2 then you cannot have -- oh, sorry.
10  If j is equal to 3 then you cannot have --
11  then having j equals -- number of transition
12  two is allowed.
13          (Reporter clarification.)
14     A.   If j is 3 then having a
15  sequence with two transitions would be
16  alright.
17          (Reporter clarification.)
18     A.   if j is 3 then having a
19  sequence with two transitions is possible.
20     Q.   And that's what's described in
21  the file history paragraph we just looked at,
22  right?
23     A.   Yes.
24          MR. VERDINI:  Subject to
25          reservation on any of the instructions

EMINA SOLJANIN - 05/09/2018                    Pages 206..209

Page 206

1   not to answer I don't have any further
2   questions other than potential
3   responsive questions if Mr. Sipiora
4   asks questions.
5       MR. SIPIORA:  Okay.  Let's take
6   a break and then we'll come back.
7       ---
8   (Recess from 3:09 to 3:44.)
9       ---
10  EXAMINATION BY
11  MR. SIPIORA:
12      Q.  Good afternoon, Dr. Soljanin.
13  I just have a few questions.
14      Did you apply the same
15  principles of claim construction in your
16  declaration relating to indefiniteness as you
17  applied in your declaration relating to the
18  inter partes review?
19      MR. VERDINI:  Object to the
20  form.
21      A.  Yes.
22      Q.  If you could turn to exhibit 3,
23  paragraph 26, where it says Claim Construction
24  Standard.
25      Did you apply, where

Page 207

1   appropriate, the claim construction principles
2   described in paragraphs 26 through 32 in
3   connection with your declaration in the
4   inter partes -- in connection with
5   indefiniteness?
6       A.  Yes.
7       Q.  And if you could turn to
8   exhibit 4, paragraphs 63 and 64, under the
9   section Claim Construction.
10      A.  I am there.
11      Q.  Did you apply the principles
12  described in these paragraphs 63 and 64 in
13  your indefiniteness declaration?  I am sorry.
14  In your IPR declaration?
15      A.  Yes.
16      Q.  There's also paragraphs in
17  here, paragraphs 27 through 48, if you could
18  take a look at those.
19      A.  I didn't get the numbers?
20      Q.  27 --
21      A.  In which one?
22      Q.  The same declaration.  If you
23  would go to paragraph 27 of exhibit 4?
24      A.  Which paragraphs?
25      Q.  Paragraph 27.  It's on page 8.

Page 208

1       A.  Yes.
2       Q.  Beginning on page 8 and
3   continuing for a number of pages there are
4   standards of anticipation and obviousness.
5       Did you apply these standards
6   in connection with exhibit 4, your
7   declaration, regarding the inter partes
8   review?
9       MR. VERDINI:  Object to the
10  form.
11      A.  Yes.
12      Q.  In connection with the
13  inter partes review were you asked to evaluate
14  the question of indefiniteness with respect to
15  any of the claim terms?
16      A.  Of the IPR?
17      Q.  Correct.
18      A.  No.
19      Q.  Now you were asked -- if you
20  could go back to exhibit 3 now, if you could
21  turn to page 8.  And on page 8 at paragraph 35
22  there's a quotation from the Supreme Court
23  case called Nautilus versus Biosig
24  Instruments.  Do you see that?
25      A.  Yes.

Page 209

1       Q.  And in that the court said (as
2   read):
3           We hold that a patent is
4       invalid for indefiniteness if its
5       claims, read in light of the
6       specification delineating the patent,
7       and the prosecution history, fail to
8       inform, with reasonable certainty,
9       those skilled in the art about the
10      scope of the invention.
11          Is that the standard that you
12  applied in connection with evaluating
13  indefiniteness with respect to the '601
14  patent?
15      A.  Yes.
16      Q.  Earlier today you were asked
17  questions concerning that standard, and in
18  particular you were asked how you interpreted
19  the phrase "reasonable certainty."
20      Do you recall that?
21      A.  I remember discussing this
22  paragraph.
23      Q.  Did you consider, when you
24  evaluated the five claim terms that you
25  identified as indefinite, whether or not those

Page 210

1 claim terms could be construed by one of
2 ordinary skill in the art with reasonable
3 certainty?
4          MR. VERDINI:  Object to the
5     form.
6     A.   I am not sure I understand.  I
7 can try to answer.  I believe that there are
8 more than one reasonable interpretation, as
9 actually we discussed, of the terms that we
10 discussed by a person skilled in art.
11     Q.   Earlier you were specifically
12 asked how you interpreted that phrase,
13 "reasonable certainty," and you said something
14 to the effect that if it had multiple
15 interpretations, that therefore there was, by
16 one of ordinary skill in the art, that there
17 would be -- there would not be reasonable
18 certainty surrounding the term.  Do you recall
19 that testimony?
20          MR. VERDINI:  Object to the
21     form and mischaracterizes the
22     testimony.
23     A.   I remember discussing this, and
24 saying something to the effect that if person
25 skilled in art would find a reasonable

Page 211

1 interpretation that is different than me, that
2 one I adopted or there are in that sense
3 multiple interpretations which are all
4 reasonable to a person skilled in art, then
5 there is no reasonable certainty.
6     Q.   With respect to the five claim
7 terms at issue, did you come to the conclusion
8 that there were multiple reasonable
9 interpretations with respect to each of them?
10          MR. VERDINI:  Object to the
11     form.
12     A.   I believe I stated examples of
13 multiple reasonable interpretation in a number
14 of places that we discussed.
15     Q.   And with respect to the
16 interpretations that you consider reasonable,
17 in the IPR did you select in each instance at
18 least one of those interpretations and rely
19 upon that consistently in the inter partes
20 review as you did your work there?
21          MR. VERDINI:  Object to the
22     form.
23     A.   Yes.
24     Q.   I am going to switch gears now
25 to the last topic.

Page 212

1          Do you recall you answered
2 certain questions earlier about constraints
3 being imposed with respect to the j and k
4 elements of the '601 patent?  Do you recall
5 that?
6     A.   Yes.
7     Q.   All right.  The constraints,
8 the j and k constraints, where are they
9 imposed in the '601 patent?
10     A.   In the.
11     Q.   Are they imposed in more than
12 one place?
13          MR. VERDINI:  Object to the
14     form.
15     A.   If encoder consists of multiple
16 parts.
17     Q.   That which is the encoder would
18 be the place, whether it be multiple parts or
19 one part, is that where the j and k
20 constraints are imposed?
21          MR. VERDINI:  Object to the
22     form.
23     A.   J and k constraints are
24 imposed, so you would have incoming sequence
25 then you would have an encoder which may be

Page 213

1 one or multiple parts, and after that you
2 would have encoded symbols.
3     Q.   Once the j and k constraints
4 are imposed can they be imposed again?
5          MR. VERDINI:  Object to the
6     form.
7          MR. SIPIORA:  Let me rephrase
8     the question.
9 BY MR. SIPIORA:
10     Q.   Once the j and k constraints
11 are imposed by the encoder in the '601 patent
12 are they imposed again?
13          MR. VERDINI:  Object to the
14     form.
15     A.   Again?  I mean once when
16 they're imposed and encoded symbols are
17 formed, then they are there.  There is no --
18 no, they're not imposed again.
19     Q.   According to your understanding
20 of the '601 patent are the j and k constraints
21 imposed again at the level, at the platter or
22 on the optical surface in connection with what
23 you consider the recorded waveform?
24          MR. VERDINI:  Object to the
25     form.

EMINA SOLJANIN - 05/09/2018          Pages 214..217

Page 214

1    A.   Between the encoded symbols and
2  the pattern in the disks there is NRZ and
3  NRZI, which are maps.  They don't impose
4  anything.
5    Q.   So is it the case that once the
6  j and k constraints are imposed on the encoder
7  there is no further imposition of those
8  constraints on the quote-unquote "recorded
9  waveform"?
10       MR. VERDINI:  Object to the
11       form and asked and answered.
12   A.   Sorry, ask --
13       MR. SIPIORA:  He's just making
14       noise.  You can answer the question.
15   A.   Could you repeat the question?
16   Q.   Yes, sure.  Is it the case, in
17  the '601 patent, that once the j and k
18  constraints are imposed by the encoder, that
19  they are not imposed again at the place that's
20  known as the recorded waveform?
21       MR. VERDINI:  The same
22       objections.
23   A.   They're not imposed again.
24   Q.   In connection with the
25  testimony you gave earlier you talked about a

Page 215

1  counterpart, there's some counterpart with
2  respect to the imposition of the j and k
3  constraints, do you recall that?
4    A.   So for each encoded sequence of
5  symbols, there is a counterpart of the disk of
6  patterns of bit magnetizations --
7       (Reporter clarification.)
8    A.   I mean cell magnetizations.
9    Q.   What does that mean when you
10  say there's a counterpart?
11   A.   That means that between --
12  there is a correspondence which is 1-to-1,
13  which depends how -- the nature of the
14  correspondence is determined whether we have
15  NRZ and NRZI.  But there is a 1-to-1
16  correspondence and that's why I called it a
17  counterpart.
18   Q.   And the counterpart is in the
19  recorded waveform, or in the magnetization,
20  let's just say in this context, or on the
21  optical disk, whatever was imposed previously
22  with respect to j and k constraints, it's
23  reflected in whatever that recording is?
24       MR. VERDINI:  Object to the
25       form.

Page 216

1    A.   Maybe I used the term upheld or
2  something.  That whatever it's imposed should
3  not be ruined, otherwise you should not be
4  imposing it to begin with.  But it's not
5  imposed again.
6       MR. SIPIORA:  Thank you.  No
7       further questions.
8       MR. VERDINI:  I think probably
9       two follow-up questions.
10  EXAMINATION (Cont'd)
11  BY MR. VERDINI:
12   Q.   You were directed to paragraphs
13  26 through 32 in exhibit 3 regarding claim
14  construction standard.
15   A.   Paragraphs ...
16   Q.   26 through 32 of your claim
17  construction declaration.
18   A.   Yes.
19   Q.   And then you were also directed
20  to exhibit 4, paragraphs 63 and 64.  So if you
21  can have them both out.  Right?
22   A.   Yes.
23   Q.   You would agree with me that
24  the claim construction standard in exhibit 3,
25  which runs from 26 through 32 has more words

Page 217

1  than the claim construction standard that you
2  applied in the IPR declaration, right?
3    A.   It has more words.  It looks it
4  has more words.
5    Q.   In your view, though, was there
6  a difference in the standards of claim
7  construction that you used in the indefinite
8  claim construction declaration and that which
9  you used in the IPR declaration?
10   A.   I think you asked me about
11  principles.  I believe I was just asked about
12  principles --
13   Q.   Yes.
14   A.   -- which is --
15   Q.   So let's use the word
16  principles, then, instead of standards.
17   A.   Okay.
18   Q.   Even though there are more
19  words --
20   A.   It's a similar approach.
21   Q.   -- you used the same approach
22  in both, isn't that right?
23   A.   Approach, yes.
24   Q.   Okay.  And you applied the
25  same -- there wasn't a different claim

Page 218

1 construction standard that you were applying
2 in one versus the other, was there?
3      A.   No.
4      Q.   And then in paragraph 35 of
5 your claim construction declaration, your
6 counsel referred you to the quote from the
7 Supreme Court, right?
8      A.   (Nodding head affirmatively.)
9      Q.   And I just want to make sure
10 we're clear.  You read the patent in
11 connection with your IPR declaration, correct?
12      A.   Yes.
13      Q.   You read the specification,
14 correct?
15      A.   (Nodding head affirmatively.)
16      Q.   You read the prosecution
17 history, correct?
18      A.   Yes.
19      Q.   And you did so as a person of
20 ordinary skill in the art, correct?
21      A.   Yes.
22      Q.   And nowhere in there did you
23 make any indication that any of the claims
24 were not reasonably certain --
25           MR. VERDINI:  Strike that.

Page 219

1 BY MR. VERDINI:
2      Q.   And in your IPR declaration you
3 didn't make any mention that any of the claim
4 terms of the '601 patent were anything other
5 than reasonably certain to you, correct?
6      A.   I did not mention.  I did not.
7           MR. VERDINI:  I have no further
8 questions.  Thank you, Professor.
9           MR. SIPIORA:  Thank you.
10           ---
11      (Time noted:  4:00 p.m.)
12
13     _____
14           EMINA SOLJANIN
15
16 Sworn and subscribed to before
17 me, this _____day
18 of _____, 2018,
19 in the jurisdiction aforesaid.
20
21 _____
22 NOTARY PUBLIC
23
24
25

Page 220

1           ***
2      ACKNOWLEDGMENT OF DEPONENT
3 I,_____, do hereby
4 acknowledge that I have read and examined the
5 foregoing testimony, and the same is a true,
6 correct and complete transcription of the
7 testimony given by me, and any corrections
8 appear on the attached Errata sheet signed by
9 me.
10
11
12
13
14 _____  _____
15 (DATE)            (SIGNATURE)
16
17
18
19
20
21
22
23
24
25

Page 221

1           C E R T I F I C A T E
2 STATE OF NEW YORK      )
3 COUNTY OF NEW YORK     )
4      I, FRANK J. BAS, a Registered Professional
5 Reporter, Certified Realtime Reporter and Notary Public
6 within and for the State of New York, do hereby
7 certify:
8      That prior to being examined, the witness named
9 in the foregoing deposition was duly sworn to testify
10 the truth, the whole truth and nothing but the truth;
11      That said deposition was taken down by me in
12 shorthand at the time and place therein named and
13 thereafter reduced by me to typewritten form and that
14 the same is a true, correct, and complete transcript of
15 said proceedings.
16      Before completion of the deposition, review of
17 the transcript [X] was [ ] was not requested.  If
18 requested, any changes made by the deponent (and
19 provided to the reporter) during the period allowed are
20 appended hereto.
21      I further certify that I am not interested in the
22 outcome of this matter.
23           Witness my hand this 11th day of May, 2018.
24
25           FRANK J. BAS, RPR CRR

```
                                        Page 222
1   --------------- I N D E X -----------------
2   WITNESS        EXAMINATION BY
3   SOLJANIN       MR. VERDINI            3, 216
4                  MR. SIPIORA            206
5
6   --------------- EXHIBITS-------------------
7   DEPOSITION          FOR ID          PAGE
8
9   Exhibit 1      U.S. patent number         9
10                 5,859,601
11
12  Exhibit 2      joint claim                9
13                 Construction and
14                 Prehearing statement
15
16  Exhibit 3      declaration of Professor   10
17                 Emina Soljanin
18
19  Exhibit 4      declaration of Professor   13
20                 Emina Soljanin regarding
21                 U.S. patent No. 5,859,601
22
23
24
25
```

```
                                        Page 223
1   ----------- EXHIBITS CONTINUED -------------
2   Exhibit 5      book entitled Coding      33
3                  and Signal Processing For
4                  Magnetic Recording Systems
5
6   Exhibit 6      excerpt of the file       124
7                  history that reflects the
8                  Office Action dated
9                  September 16, 1997
10
11  Exhibit 7      printout from             143
12                 www.mathworks.com referring
13                 to a Manchester receiver
14
15  Exhibit 8      U.S. patent               145
16                 Number 5,608,397
17
18  DIRECTION/INSTRUCTIONS NOT TO ANSWER
19  Page/Line
20  30/20; 32/21; 33/6; 86/1; 96/6; 99/11; 151/18
21
22
23
24
25
```

EMINA SOLJANIN - 05/09/2018                                    i1

**$**

**$420**
16:18,22

**(**

**(1)**
46:5 102:7 104:23
119:22 159:8,15 160:5

**(2)**
46:8 102:7 104:23
160:10 166:25

**0**

**0**
49:3 51:2,3,17 104:5,6
157:1 166:10,20 167:2,
3 190:7,8 193:2,4,5,8,
12,15,19,21 194:2
195:9,15,19,22 196:8,
14

**0's**
26:16,21 28:19 48:12,
13 49:14 179:5,6
182:25 183:2,8 193:6
197:12,18 199:1,17,18

**00**
173:20

**010**
173:22,24,25 174:16
175:2,8

**0101**
173:21

**01010**
104:3

**07935**
3:25

**0s**
44:3

**1**

**1**
9:5,11,13 11:25 13:10
38:18,21 46:15 49:4
51:2,3,15 72:9 100:5
101:1,6 103:3,13 104:6
107:25 111:12 145:24
146:2,6 161:13 162:4,
11,14 166:10,20 167:3
170:23 171:1 172:10,
17,19,21 173:3,6,7,8,17
174:23 175:4,6,12,13,
17 176:4 184:15,20
185:12 190:7 193:2,4,5,
6,7,12,15,18,19,21,23
194:2 195:9,15,19,22
196:9,15 197:7,12,13,
17,20,23 198:3,24
200:6,9,15,25 201:4
204:21

**1's**
26:16,21 28:19 48:12
49:14 139:9 140:23
167:11 179:5 182:25
183:2,8 197:13,18
199:1,17,18

**1,k**
171:5 172:1,8 176:7

**1-to-1**
215:12,15

**10**
7:24 56:12 100:5
107:25 111:18 123:14
131:5 192:6,9,13,16

**101**
173:23,24 174:16,23
175:8

**1011**
160:17

**102**
192:22

**103**
192:22 193:9 194:20

**109**
105:8,21 106:10,13,17

**10:02**
57:4

**10:14**
57:4

**10:58**
93:8

**11**
34:24 35:17 37:6 39:14
45:19 77:22 138:1
141:19

**11-1**
34:25 43:12,13,14,16,
20 52:13

**11-11**
41:18

**11-2**
39:16 42:20 43:19

**11-3**
48:15

**11.1**
45:25

**11.3**
52:18

**11.3.1**
55:12

**110**
161:7 179:10,14

**111**
184:13

**112(b)**
14:19

**116**
191:3,19

**117**
191:19 192:4

**118**
191:19

**11:06**
93:8

**12**
23:4,5 24:1 149:12
153:10 161:22 171:12
177:6

**12:25**
150:18

**13**
14:17 25:24 27:5,7,24,
25 28:10,24 29:6 30:11
71:10,12 100:5 105:9,
15 107:25 111:9,12
131:9,17,20,23 132:14
138:4,16 139:25 140:4,
7 141:2,7 159:3 161:11
162:4,10,14 167:23
169:7,14 176:17,20
177:19 181:6,10
184:12,14 185:12
190:9,10 204:21,23

**136**
108:10 109:2

**13[E**
161:18 168:22 179:20

**13[F**
184:17

**14**
14:17 139:7,16 141:2
190:10,12

**142**
109:2

**143**
121:5,8,12,15,17 168:3,
9

**144**
184:21,23

**15**
11:15,16

**16**
58:12,13 59:2 124:25
125:6 126:1

**161**
111:3

**162**
168:19

**17**
14:18 100:5 107:25
190:19,23 191:4 192:11
193:3 196:1,22,24
198:21

**18**
118:21 123:13 138:22,
25 139:1,3,4,7,19
140:5,9,10,15 141:11

**19**
66:15,17,20 69:19

**1995**
19:1 42:17 58:14 59:22

**1996**
42:1 49:10 50:23 51:9,
22

**1997**
124:25 125:6 126:1

**1999**
56:21

**1:32**
151:2

**1[D**
101:8,11,15 102:12,17
104:10 105:2,25
108:12,15,21 111:6

**1[E**
158:18,20 166:3 168:21

**1[F**
182:12 185:7

**1s**
41:11 44:1

---

**2**

**2**
9:20 10:2,3,8 11:5
13:13 14:1,22 16:16
46:13 47:23 100:5
107:25 121:23 148:20
153:14 157:11,22
158:25 168:11,12,25
169:7,13,19 175:13
177:11 202:18 205:8,9

**20**
19:25 56:12,14,17
173:18

**2000**
55:2

**2002**
37:2,13 40:4,8,11,14
54:1,22

**2005**
34:7 36:8 37:13 40:7,11
53:23 54:24

**2014**
87:9 88:1,8,9

**2015**
19:1,4

**2016**
8:8

**2017**
13:18

**2018**
219:18

**21**
20:11

**23**
73:15,16 146:3,10

**25**
75:5,7 77:10 90:2
147:15

**26**
3:24 74:7,15 75:22,23
77:10 206:23 207:2
216:13,16,25

**27**
80:6 81:16 207:17,20,
23,25

**28**
41:9,20,22 55:24 81:19

**29**
100:3

**2:41**
201:19

---

**3**

**3**
7:24 10:18 11:1,2,13,24
14:10,11,22 16:10,13
17:7 18:15 23:5 30:13
31:14 32:9 36:14 45:24

**47:**13,21 48:14 58:3,10
66:16 67:2,7,17 68:12
69:17 70:7,10,14,19
75:25 80:4 88:13
111:16 123:11 124:5
131:3 132:7,25 149:6
152:16 153:10 170:16
173:15 175:13 181:7
202:19 204:6,18,23
205:10,14,18 206:22
208:20 216:13,24

**30**
42:8,22 43:9 56:3
176:17 177:18

**31**
60:13

**32**
74:7,15 147:17 207:2
216:13,16,25

**34**
100:22

**35**
14:18 77:23 87:4
208:21 218:4

**36**
79:6

**37**
88:16

**39**
88:22 89:2

**3:00**
201:19

**3:09**
206:8

**3:44**
206:8

---

**4**

**4**
12:24 13:7, 14:8 17:15
18:10 26:25 27:4 33:2
42:14 56:12 58:13 64:6
75:4 76:3 77:23 100:3,
23,24 119:12 132:7,25

**149:**19 158:15 171:11
172:22 175:13,22
177:17 190:13 193:3
207:8,23 208:6 216:20

**40**
104:17 111:23 112:6,14
113:16 114:8 119:14
149:19 158:17 159:12

**41**
115:24 116:7 117:1
118:20 123:10 182:2

**42**
131:6,16 132:6 135:10
182:8

**43**
137:24 138:3,9,14
139:18,20 149:9 192:18

**44**
141:17,20

**45**
36:17 112:6 149:4,9,10,
11,13

**46**
105:7 117:18 161:6,19
179:10 184:13

**48**
107:24 161:23 162:2
164:17 170:19 176:14
190:25 207:17

**49**
36:17 178:20,25

**4:00**
219:11

---

**5**

**5**
16:16,17 33:11,13,20
34:5 36:24 37:6,25
38:17 39:12 40:6 43:12,
14 45:25 48:15 58:2,6
132:7,9 158:17

**5,392,270**
100:10

**5,608,397**
145:12,19

**5,731,768**
108:6

**5,859,601**
9:6,13 13:2

**50**
178:20

**55**
108:11

**58**
121:2,7,11,12,14 168:6
192:24 196:4,7

**59**
192:24 197:4,14

---

**6**

**6**
38:18,21 73:16 124:21,
23 125:4 130:23 201:25

**60**
11:19

**601**
12:20 26:4 27:10 33:9
42:5 58:18 59:4 73:10
78:19 79:17 81:8 86:16
89:8 90:19 100:6
102:17 104:11 107:20
108:1 109:16 122:8,
125:19 126:16 127:10
150:12 153:6 155:5,11
165:13 180:10,23 181:2
183:23 184:6 185:7
187:19 188:3 189:11,
23,24 202:15 204:3,17,
19 209:13 212:4,9
213:11,20 214:17 219:4

**63**
75:11 76:3 90:11,25
111:2 207:8,12 216:20

**64**
76:7,9 91:22 207:8,12
216:20

**65**
91:17

---

**7**

**7**
103:4,13 143:14,16,22

**74**
90:25 91:18

**745**
125:24 126:4

**75**
90:11,23 91:6,17

**750**
126:11 127:2 130:23
202:3 203:13,16

**751**
202:6 203:13

**757**
126:4

**76**
100:4

---

**8**

**8**
77:6,7 86:24 100:5
103:22 104:4 107:25
145:9,11,16,18 148:21
160:14 171:12 172:23
175:24 176:20 177:6,
18,19 207:25 208:2,21

**8-to-13**
106:3,19

**85**
101:14,24

**87**
102:2,5,22 103:1,22

**89**
106:2,7,9,11

---

**9**

**9**
13:18 88:12 103:23
104:4 160:15 184:25
185:1

**90s**
24:11 25:16,17 194:14

**92**
104:18

**94**
19:3 25:20 119:14
120:18 149:20 159:7

**95**
56:5,15 59:18 61:25
160:7 165:24 166:6,21
167:10

**97**
25:18 183:4

**98**
25:18,21

---

**A**

**a.m.**
7:24

**ability**
4:18 74:17

**absolutely**
61:14 93:4 186:20

**academia**
34:15

**accept**
31:9 99:13

**accepted**
91:25

**accessed**
117:7,13

**accommodate**
6:11

**accomplished**
48:24 171:4 176:6

**accordance**
171:3 176:5

**account**
48:3

**accurate**
4:14 12:9 16:11,20 36:4
39:25 41:1,14 44:4,14,
25 49:5,6,10 50:19,22
51:6,9,19,22 53:20
54:21,24 55:2 150:11
152:3 153:2

**acknowledge**
220:4

**ACKNOWLEDGME
NT**
220:2

**Action**
124:25 125:6,8,12,18
126:2

**actual**
27:2

**add**
52:8,10 177:6,19

**added**
146:25

**addition**
71:20,24 72:18 140:24
141:21

**additional**
45:7 69:23 91:1,10
140:6,13,20 146:12,21,
24 200:20

**Additionally**
79:8

**address**
3:23,24 4:2 165:19

**addressed**
90:24 91:8,16

**adds**
171:17,22

**adopt**
110:13,21 185:22
193:19,20 195:18 201:8

**adopted**
92:6 102:19 107:4,10
110:17 122:22,25
133:16 135:4,5,7 150:9
152:3 165:17 169:23
170:2,9 178:17 179:24
180:15 183:25 185:8,20
189:3 191:9 211:2

**advantages**
186:13

**affect**
4:18

**affirmatively**
5:4 37:8 81:17 100:1
115:13 124:19 155:2
218:8,15

**aforesaid**
219:19

**afternoon**
206:12

**agree**
27:23 101:10 131:8
144:9,13 166:9 176:10,
17 198:16 202:13
216:23

**agrees**
116:3,11

**ahead**
6:24 28:13 60:9 68:5
90:11 127:12 155:17

**Alcatel**
19:16

**alike**
198:4

**allegations**
26:2

**alleged**
26:3 27:10

**allowable**
172:18

**allowed**
88:8 102:9 119:23
159:16 160:11 163:7
205:12

**alright**
205:16

**alternate**
15:12

**ambiguity**
179:11 193:6

**ambiguous**
87:16,22 179:2

**amenable**
87:14

**amend**
72:10

**amended**
26:2 152:21

**amendment**
72:14

**analysis**
159:24 161:12 166:22
168:20

**answers**
5:7

**antecedent**
111:25 112:16 113:14
114:7,11 116:14

**anticipated**
78:19 100:6 108:1
133:20

**anticipation**
77:16,24 78:10 208:4

**anymore**
21:8 25:9

**apologize**
106:11

**apparatuses**
168:10 184:24

**appeared**
63:25

**appears**
105:15 185:12 190:17,
18

**appendices**
11:7,12

**appendix**
11:10

**applicable**
148:25

**application**
7:10 63:18,20 91:24

**applied**
110:12 123:3 156:4,
188:11 189:12 206:17
209:12 217:2,24

**applies**
180:10,23

**apply**
74:13,18,24 83:16,20
114:11 206:14,25
207:11 208:5

**applying**
218:1

**approach**
217:20,21,23

**approximate**
17:10 18:8

**approximately**
17:12 19:1 146:3,10

**April**
71:10,12

**area**
78:14 80:18,22 81:12
186:7

**areas**
37:24

**arguments**
69:24 127:9

**arm**
19:7,9

**arrangement**
96:23

**art**
12:19 21:21 34:20
73:18,25 75:14 77:3
78:1,12,18 79:9,22,23
84:4,9 89:11 92:20,25
110:16,18 133:20
134:10 153:4 182:16,23

185:20 187:1 188:12
189:9,12,15,19,21,25
198:14 200:19,21 209:9
210:2,10,16,25 211:4
218:20

**article**
42:1

**asks**
206:4

**asserted**
9:16 14:17 88:13

**assisted**
18:13

**associate**
155:24

**assume**
5:20 166:19

**assumed**
120:19,21

**assuming**
135:5,7 155:19

**assumption**
167:1,9

**assumptions**
120:24,25 134:8

**AT&T**
19:13

**attached**
11:12 17:14 220:8

**attempt**
126:16

**attended**
58:19

**attendees**
59:18

**attention**
127:23

**attorney**
30:21 33:5

**attorney-client**
97:15

**audience**
34:14, 37:20

**author**
144:10

**authors**
35:7

**Avago**
3:8 8:2,10,14 9:17 12:4
18:13 72:21 73:2

**avoid**
52:20,23,24 53:2

**avoids**
121:24 168:13

**aware**
65:15 134:20 162:13,15

**B**

**back**
14:7,10 16:13 32:2,4
34:24 39:11 42:7,20
43:12,17 57:7 63:13
65:3 83:4 93:11 111:15
112:24 123:9 131:3
139:17 149:5 151:12
161:21 165:23 170:16,
20 175:22 181:5 201:21
206:6 208:20

**background**
7:9 148:24

**base**
182:22

**based**
33:5 63:18 79:11 85:18
99:19 114:24 118:16
124:14 130:1 151:16
159:24 173:9 177:17
183:13

**basis**
78:2 85:11 97:21 112:1,
11,17 113:14 114:7,12
116:15 123:19, 151:21

**begin**
216:4

**beginning**
34:22 43:17 107:5
188:16 208:2

**begins**
112:19

**behalf**
3:2 8:1 12:3 97:4

**belief**
14:4 40:7

**believed**
36:3 90:14 91:1,10
107:18 191:20

**Bell**
19:1,6,7,9,12,17,21
20:1,6,10,11 21:1 23:6

**beneficial**
45:7,12

**benefits**
45:8

**binary**
26:10,13,18,22 28:2,10
29:11,12 30:17 31:13
32:8,25 48:22 51:1,14,
17 132:1,4 139:8
140:17,22 149:14,16
150:6,7 152:1,12
166:10,20 190:5

**Biosig**
208:23

**bit**
4:25 49:1,16,20,23,25
51:16 106:3,19 158:13
186:4,7,16,23 187:11,
14,15 196:8,12 204:20
215:6

**bits**
136:20 150:3

**bleeds**
202:5

**block**
120:1 149:23 159:19

**bolster**
138:5,16

**book**
33:13,22 34:6,10,14,23
35:20 36:18 38:17 39:3

**books**
36:18 38:17,22,23 39:3

**bottom**
11:17 13:14,15 27:4
34:8,25 43:16 77:7
125:23 159:12 175:1
190:12 202:5 203:16

**bounds**
85:14 95:11

**bracket**
41:9,10 101:2 105:9,10

**break**
6:7,10,11 56:24 57:10
93:6,12,24 95:8,16,25
99:8,22,24 151:13,14
201:17 206:6

**Brett**
4:3

**Brian**
35:6,9

**Brickner**
41:23 42:3 55:25 66:13

**briefing**
16:4

**bring**
144:23

**British**
35:11

**Britten**
3:25

**Broadcom**
8:18 97:17

**Broadly**
46:2

**broke**
101:2 151:24

**broken**
102:18

**Brooklyn**
20:12

**brought**
194:19

**business**
3:23 4:2

**C**

**calendar**
164:2

**call**
70:17 113:14 129:9
140:8 143:7 147:3
159:8

**called**
3:12 7:1 8:17 52:1 55:8
87:1 109:15,18 147:6
165:7 194:16 208:23
215:16

**calling**
140:5

**calls**
97:11

**capacity**
39:21 40:24

**career**
38:25

**case**
6:23,25 7:2,4,12,15 8:1,
10,15,21 9:17 12:6
15:7,23 18:6 26:3 31:19
36:14 39:2 57:18 73:13
74:16 83:18 99:1
132:23 134:21 142:11
162:2 183:5,6 208:23
214:5,16

**cases**
6:21

**cell**
49:2,20 51:4 215:8

**cells**
49:1,16,23,25 51:16

**central**
174:16

**certainty**
89:10 157:24 171:18,23
177:7,20 181:4 209:8,
19 210:3,13,18 211:5

**cetera**
167:7 186:14

**challenge**
97:11

**challenges**
91:2,11

**chance**
68:1

**change**
28:9 29:19 73:21
148:13

**changed**
28:1,4 162:23,24

**changing**
185:14,18

**channel**
23:20 24:12 46:8,16,19,
23 47:3,4 52:9,11
54:16,17 55:7 147:22

**channels**
39:23 40:25 42:15 44:9
46:5 50:15 52:2 55:19

**chapter**
34:1,24 35:3,17,23 36:7
37:6,11 38:7 39:12,14
40:6,15,17 43:13,17
45:19 46:14 47:11 49:7
50:20 51:7,20 54:8

**chapters**
35:15 36:18 38:17,22,
23 39:4

**characterize**
31:24

**check**
56:11 158:12 159:4

**chicken/egg**
71:1

**chips**
24:12 25:21 55:4,5,7

**choices**
187:22

**Chris**
3:1

**circles**
50:9

**Circuit**
87:21

**cite**
172:22

**city**
62:10,11

**claim**
9:21 10:9,14 11:3 13:23
14:13 15:4,14,25 16:3,
15 25:23 28:1,11 29:16,
24 30:4,12 58:4,11
67:17 68:13 69:11
70:14,17,21,23 72:5,22
74:3,12,16,24 75:8,13,
19 76:1,16,17,18,19
77:25 78:1,7,10,11,17
80:5 82:3,16,19,23
83:1,7,11,12,14,17
84:14,20 85:1 86:9,19,
22,25 87:14,15 88:17,
24 89:5,7 90:4,10 91:23
92:10 97:21 101:1,3,6,
8,11,15 102:12,17
104:10 105:2,9,12,13,
15,24 108:11,15,20
111:5,7,9,12,16 112:18,
25 113:1,2 116:7,15
118:4,11,15,24 123:5,
10,14,20 124:4,9,18
131:4,9,17,20,23
132:14,17 133:7,12
134:17 138:4,16,22,25
139:1,3,4,7,16,19,25
140:7,8,10,14 141:7,18
149:4 150:5 152:11,16
153:11 155:22 156:4,7,
12 157:2,15 158:4,18,
20,21 159:3 160:5
161:4,11,12,13,18,21
162:4,10,11,21 163:6,
12,20 164:8,20 165:12
166:3 167:23 168:21

169:7,14 171:19 177:7,
21,22,25 178:1,2,19,24
179:2,20 181:6,10,17
182:12 183:18,23
184:7,12,14,16 185:6,
12 188:2,10 189:23
190:3,13,17,18,23
191:4,6,19,25 192:6,9,
10,13,16,25 193:2
196:1,3,22,24 197:4
198:6,9,15,21 199:22
200:14,21 201:15
202:23 203:4 204:21
206:15,23 207:1,9
208:15 209:24 210:1
211:6 216:13,16,24
217:1,6,8,25 218:5
219:3

**claimed**
79:16 103:7,14,18
122:7 139:12 169:7,14
187:18 197:7,16,20
204:23

**claiming**
126:23

**claims**
12:20 14:17 68:20 69:7
76:22 78:19 82:2,14
83:6 86:4,8,16 87:22
88:14 89:6 90:19 92:7,
21 100:5 107:25 111:1
112:22 113:9,11,19
126:16 133:15,18
134:13,16 138:4,15,21
141:1 150:12 165:8,16
178:6,9 200:11,12
203:8 209:5 218:23

**clarification**
114:15 132:3 175:10
195:20 205:13,17 215:7

**class**
22:8,9 42:14 46:20
52:19 53:17 54:2,18
143:1,5

**classes**
46:2,14 47:1

**classified**
47:1

**classify**
46:12

**clear**
5:13 6:5 64:1 70:19
130:22 134:18 218:10

**client**
97:4,16

**clock**
102:10 119:24 159:17
160:12 203:22 204:10,
11 205:2

**code**
23:21 24:1,6,21,23 25:2
26:6 27:12 53:1,4 56:7
68:21,24,25 171:6
172:1,5 176:7,23,24
177:2 193:24

**codes**
23:13,16,17 25:3,12,20
35:4,16 36:25 41:24
52:19,20,22,24 53:2,3,
18,24 54:2,15, 55:18
56:10 69:2 77:1 146:11
176:19

**codeword**
132:5 182:24 183:7,10

**codewords**
115:9,15,17 147:20
149:14,16 150:6,7
152:1,12 180:2,4 183:1
190:6

**coding**
20:3 21:21 22:4,7
33:14,23 34:16 109:19
142:18,21,22 143:2,5,6,
7,8,10 172:25 173:2
176:1,3

**collected**
37:17

**collectively**
12:5

**colon**
44:11 54:15

**Columbia**
20:13 35:11

**column**
145:24 146:2,6 148:20
171:11 172:21,22
173:15 175:22 177:17

**combining**
190:6

**comfortable**
102:20

**comma**
147:19,20

**commercial**
23:14 24:7,9 53:19 54:3

**common**
185:8

**commonly**
50:14 91:25

**communicated**
165:3

**communication**
31:17

**communications**
31:24 147:22

**community**
65:23

**companies**
19:8,12

**company**
8:17 19:13,14,15,21
63:24

**compare**
16:25 78:18 189:8,19,
20,23

**compared**
109:25 189:14

**comparing**
27:24 75:21

**comparison**
77:25 78:11

**compensated**
16:17

**complaint**
26:3

**complete**
220:6

**completely**
35:19

**complex**
199:15,22 200:25

**complexity**
54:19

**component**
135:18,20,24 136:10,
12,13

**components**
135:16,21 136:4,6,8

**compressed**
146:14

**comprising**
147:20

**computation**
142:17

**computer**
37:1,14,20,22 38:2,8
142:20

**computing**
22:25

**concentrated**
178:8

**concentric**
50:9

**concerned**
130:10

**conclude**
90:24 160:20 167:15
198:19

**concluded**
159:25 169:3

**conclusion**
139:23 211:7

**conduct**
22:10 58:22 60:12 63:6

**conducting**
20:2

**conference**
20:15 58:21 59:9,11,13,
14,15,18,22 61:1,4,18,
21,25 62:5,16,19

**confirm**
15:7,9

**confuse**
45:16

**confused**
181:15

**confusing**
152:6

**confusion**
192:23 193:13

**connected**
81:22

**connection**
8:9 11:3 13:23 14:13
15:25 29:15,23 30:2,24
31:14,18 32:8,25 61:4
67:1 68:11 70:23 72:21
74:15,19,25 75:18
76:16 77:19 83:17,21
86:4,5,8 92:6,14 101:3
106:24 107:19 108:11
114:4,12 124:17 133:4,
7 135:10 148:7 164:12
176:13 184:7 187:16
197:20 202:22 207:3,4
208:6, 209:12 213:22
214:24 218:11

**connects**
18:5

**consecutive**
26:9 27:15 102:9,10
103:9 104:5 119:23,24
121:25 139:9 140:23
153:12 156:23 157:9,20
158:23 159:16,17
160:1,11,12,22 161:3,
10,17 162:5 166:2,11,
24 167:11,12,16,23
168:14,23 169:5,11
171:6 172:1,5,9,12
174:2,4,6 175:17,18
177:8 179:16 180:1,17
181:8,13 182:10 185:1

190:7 193:4,11,18
195:8 196:11,16,20,23,
25 197:2,12,13 198:4
203:21,23 204:9,10,11
205:1,2,6

**consideration**
138:4,15 171:25

**considered**
88:7 152:8 203:3,8,9

**consist**
115:17

**consistent**
139:22 162:8 204:1

**consistently**
211:19

**consisting**
104:2 182:25 183:2,7

**consists**
129:16 180:2 212:15

**constitutes**
80:20

**constrained**
48:17 55:18 56:10

**constrains**
41:10

**constraint**
26:7 27:13 41:7,9 42:22
43:2,9 44:15 45:7,22
46:13,25 47:10,20 48:1,
4,9,10,11 56:7 104:21
136:15 137:9,12,15,19,
22 184:25 202:14,22
203:12,17,19 204:2,16,
17,20

**constraints**
39:22 43:24 44:1,8
45:12 46:3,5,9,10 52:1
105:14,23 106:4,20
111:8 128:12 129:21
130:14,24 136:2 139:5
199:16,18 212:2,7,8,20,
23 213:3,10,20 214:6,8,
18 215:3,22

**constructing**
69:2

**construction**
9:21 10:9,14 11:4 13:23
14:14 15:4,25 16:4,15
28:1,11 29:16,24 30:4,
12 58:5,11 67:17 68:13,
22,24,25 69:12 70:15,
18,21,23 72:5,22 74:3,
12,16,25 75:8,19 76:1,
16,17,18,20 80:5 83:18
86:9,22,25 87:14 90:4,
10 91:9,21 101:17,22
110:14,17 111:16
115:4,7 116:8 118:5,12,
15 123:10 124:18 131:4
133:13 141:18 150:5
152:11,16 156:4,7,12
157:3,14 162:22 163:6,
13, 164:20 178:1,19,24
181:6,17 183:18 184:7
185:20 189:11 190:3,14
191:8,20 192:25 195:24
196:4 197:5 199:22
200:2,4,7,9 202:24
206:15,23 207:1,9
216:14,17,24 217:1,7,8
218:1,5

**constructions**
15:13 90:25

**construe**
92:3 183:23 185:11

**construed**
75:13 78:1,7,11,17
86:4,8 90:15,20 133:18
188:10 210:1

**construing**
200:10,11

**consult**
98:25

**consulted**
17:2

**consulting**
16:18,23

**Cont'd**
216:10

**contact**
164:7,11

**contacted**
59:7,17

**contacts**
164:16

**content**
84:1

**context**
62:14 84:12 215:20

**continues**
144:16

**continuing**
208:3

**continuous**
144:14

**contrast**
127:24 128:4

**control**
44:24 46:6

**conversation**
5:24 59:25 60:4,5,18,25
61:2,7 62:4,7,22 63:7,9,
16 64:19 65:7,10,16
66:1,2, 94:7,21 98:5
113:21

**conversations**
57:8,13 66:5,8,11
72:20,24 85:13,18
94:23

**conversed**
94:8

**converter**
106:3,5,19,21 107:16
109:11,21 120:1 149:23
150:2 159:19

**converting**
48:24

**copied**
34:22

**copyright**
34:7

**corporation**
12:3

**correct**
4:6 7:19 8:4 11:13,22
12:14,21 13:16,19,24,
25 14:5,6,19 15:16,24
16:6 17:3,4 20:6 24:7
26:11 28:3,24 30:6
32:13 35:4,7,18,22 36:4
37:7 38:18 40:1 41:2,
12,15 42:1,5,6,11,15,23
43:10 48:7 50:23 51:10,
23 54:4,7 55:21,25
56:5,9,19 58:15,23
61:19 67:3 71:7,14,17,
21 72:6,8 73:17 74:7
75:9,15,19 76:12 77:16
78:4,8,20,25 79:17,24
84:4 85:19 86:16,19
88:10,11,14,19,25
89:13 90:6,12 91:2,13,
18 92:1,11,16 94:19
96:10,12,13 99:14,25
100:7,12 101:4,8,12,18,
22 102:13 103:5,10,23
104:6,15 105:2,5,10,15,
25 106:6,22 107:3
108:2,8,17,21 111:9
113:3 114:13,24 115:16
119:9,18 121:6,10,19,
25 124:18 125:20 126:5
127:25 128:8 131:17,22
132:8,19 133:3 135:6,8
136:18 137:11 138:6,
17,22 141:24 144:11
145:19 147:23 148:1,9
149:1,10,15,24,25
150:14 151:22 152:23
153:2,6,18 156:16
157:4,11,15 158:4,18,
25 159:9,22 160:18,24
161:4,8,19 166:3
167:11,18 168:14,25
169:7,23 171:8,12
173:4,10 175:5,13
176:20 177:3 178:16
179:3,10,15,23 180:4,
14 181:2,18,24 182:6,
13,20 183:11,12,15,24
185:3,7,12 187:2,19,20
190:8,19,23 191:4,8,21
192:6 196:1,9,20,23
197:1,3,8,16 198:21

203:5 204:13 208:17
218:11,14,17,20 219:5
220:6

**correcting**
146:11

**correction**
142:22

**corrections**
220:7

**correctly**
27:18,19 100:14 158:9

**correspondence**
148:17,19 215:12,14,16

**corresponds**
26:21 51:3,15,17
109:22 137:7

**counsel**
4:9 15:6 31:12,17,25
32:7,12,17,24 57:9
73:4,9,13 85:7,13,19,22
86:3,7 93:13,25 94:23
95:15,25 96:11,17,
112:20 113:6,22 114:6
124:8 151:13 163:19
164:7,11 165:1 218:6

**counsel's**
31:10 151:21

**count**
193:20

**counterclaim**
58:21 60:1,12,14,19,21,
22 63:6

**counterpart**
137:21 215:1,5,10,17,
18

**counting**
167:11

**court**
5:1 6:2,21 13:11,24
14:13 16:14 18:15
29:16 30:3 31:21 87:7
88:2 208:22 209:1
218:7

**cover**
37:23

**covered**
31:20

**covering**
37:23

**CRC**
37:16

**criminal**
154:11

**curious**
39:6 56:12

**current**
36:8 173:12

**cut**
199:8

**CV**
36:15,21 38:9,11,13
39:1

**D**

**d,k**
43:25 44:15

**d-constraint**
44:20 45:1 125:14

**data**
41:24 44:9,12 48:25
49:13 51:2 52:6,13,15,
16 104:22 115:16,21,23
119:4 137:12,15 142:18
143:10

**dataword**
132:2,5

**datawords**
103:3,13

**date**
20:24 34:7 37:2 40:16
88:9 220:15

**dated**
13:18 40:6 42:1 56:21
124:25 125:6

**dates**
25:23

**David**

3:5

**day**
8:8 61:9 219:17

**decide**
98:24 199:3

**decided**
199:17

**decision**
88:2

**declaration**
6:20 7:8,11 10:7,13,19
11:2,9,11,16,22 12:15,
18,25 13:9,11,14,22
14:3 16:9,14,19 17:6,
13,16 18:5,9,14,19 23:4
27:1,3,5,25 28:1,9,11,
24,25 29:7,15,24 30:3,
5,12 33:1 36:14 58:4,11
67:2,5,7,15,18 68:11,13
69:8,11,12,15,16 70:7,
15,18,22 73:6 74:20
76:1,8,24 77:5,14,20
78:4,8,20 80:2,5 83:22
85:23 86:5,9,21,22,25
87:1 88:10,18 89:17,24
90:2,21 92:14,22 100:3,
22 101:4 104:18 105:8,
21 106:18 107:1,8,23
108:20 111:3,17 113:23
114:13 116:8,21,24
117:4,7,12,15,23,25
118:4,5,11,12,15,16,17
119:13 120:23 121:2
123:11 131:4 133:5,8
134:7,10 135:1 141:18,
19 149:5,19 150:5
152:7,12,17 153:2,20
154:19 155:4,10 156:5,
8,12,15 157:3,6,18
158:2,6,16 161:7,22
162:9,17,21,22 163:6,7,
12,13,19, 164:20,21
165:24 166:22 167:21
168:3,4 169:2 178:16,
20,25 179:9 180:12,24
181:6,21 182:2 184:21
188:1,17,19 189:2
190:4,21 191:1 192:5,
14,25 193:10 194:21

195:17,25 196:4 197:5,
21 198:19 199:13 201:4
202:24 206:16,17
207:3,13,14,22 208:7
216:17 217:2,8,9 218:5,
11 219:2

**declarations**
152:19

**declare**
14:2

**declared**
11:20

**decoders**
54:19

**dedicated**
22:13

**defeat**
137:19

**defendant**
3:7

**defendants**
8:2 73:5 85:7,19,22
95:25

**define**
135:17,19

**defined**
104:11 166:9,19

**defining**
39:21 40:23

**definite**
68:20 113:18 133:22
134:12

**definiteness**
87:23 112:8 133:15
165:8

**definition**
73:25 107:11,14,15
110:25 141:23 142:4
156:10,18 166:23
181:17 186:6 187:5
200:1

**definitions**
187:1,8 204:21

**degree**
80:23,24

**delimiter**
174:9

**delimiters**
173:22 174:25 175:20

**delineating**
209:6

**delve**
31:23

**denoted**
49:3

**density**
39:22 40:25 44:21 46:4

**depending**
46:16,22 89:6

**depends**
46:18 113:2 135:17
137:7,22 215:13

**DEPONENT**
220:2

**deposed**
4:21

**deposition**
6:15 9:5,20 10:18 12:24
16:2 17:21 33:13
124:23 143:16 145:11
170:13

**describe**
19:23 24:19,20 28:7,10
29:9 31:13,23 32:7
45:15 52:4 140:19
159:8 182:4

**describes**
173:17 202:14,17

**describing**
32:24 33:9 42:21 121:9
148:23,25

**description**
7:8 19:6 30:11 44:25
73:17 79:8 117:6 128:7
202:22 203:12

**design**
46:7

**designated**
175:4

**designed**
114:24

**designing**
25:12

**detected**
44:12

**detection**
21:21 44:10 104:25

**detector**
45:16,21,23 46:8 48:1,3

**detectors**
25:5,9,13 44:17 45:3,5,
6,9,11 54:16

**determine**
133:22 169:9 179:19
199:12

**determined**
101:15 215:14

**determines**
15:15 46:20

**determining**
77:24 78:9 87:13
179:11

**devices**
23:14 24:7,10

**dibit**
176:24

**differ**
53:4,12 123:2

**difference**
47:3 86:11 87:25
115:19 141:5 162:13,16
217:6

**differences**
52:21,23,25 53:3 69:4
162:3,10

**differently**
124:2 133:19

**difficult**
6:1

**digit**
51:15,17

**digital**
146:13

**digits**
51:2

**direct**
127:22 168:2

**directed**
216:12,19

**direction**
186:9

**directions**
49:3 51:4

**disagree**
198:8,13

**disavowing**
170:12,14

**disclose**
166:25 190:23

**disclosed**
105:5,22 111:7 122:10,
19,20 159:9 167:17
168:25 169:4 181:23
182:5 183:22 184:16
195:25 198:20 202:15
204:2,17

**discloses**
104:20 106:19 108:20
109:9 121:19 157:8
159:25 161:2,8,16
165:25 167:21 168:10
184:24 192:10,22
193:11

**discoverable**
31:22 57:15,21

**discovery**
17:22 18:1

**discuss**
30:16 52:19 93:12
164:17 181:3

**discussed**
32:12 63:7,12 69:5
188:24 210:9,10 211:14

**discussing**
23:6 30:14 75:3 119:17
121:18 209:21 210:23

**discussion**
32:23 99:21

**discussions**
73:5,9,12 85:22

**disk**
27:16,17 28:2,8 29:2,6,
10 50:8 53:13 120:3,8
159:21 173:14,20 186:8
215:5,21

**disks**
214:2

**distance**
23:12,15,18,25 24:6,21
25:3,11 39:21 40:24
42:14 53:18, 170:25
173:1,2,25 174:1,15
176:2,3

**distinction**
139:23

**distinguish**
126:16,22 127:9

**distinguished**
184:14

**distinguishes**
80:25

**distinguishing**
176:18

**distributed**
22:18,22,23,24,25

**district**
13:11,24 14:12 16:14
18:15 29:16 30:3

**division**
55:3

**doctrine**
31:20

**document**
10:14 42:25 54:9 56:13
59:5 76:21 82:7 101:25
118:7,8 126:25 127:17,
18 131:25 138:10 139:6

144:19 159:5 168:17
176:21 190:16 192:19
197:10 202:11 205:4

**documents**
6:16,18 31:19 66:25
70:1,3,5,20 71:23 72:18
76:5

**doubt**
189:1

**doubts**
113:24 134:22,24 135:1
154:2,10 188:14,21

**draft**
30:15

**drafted**
114:8

**drafting**
17:13 18:14 29:23 30:2,
25 33:1

**drive**
27:17 28:2,8 29:3,6,11

**drop**
69:19

**due**
173:1 176:2

**duly**
3:12

---

**E**

---

**e.g.**
146:13

**earlier**
35:19 40:20 62:1
112:25 209:16 210:11
212:2 214:25

**earliest**
41:6 42:21 43:1,2,8

**early**
21:1

**easiest**
36:15

**easily**

45:16 64:7

**editing**
36:19 38:23,24 40:10

**edits**
36:6,9,10 37:13

**effect**
210:14,24

**either/or**
191:10

**element**
105:24 111:7 112:24
161:12 168:21 179:20
181:10,24

**element-by-element**
78:2

**elements**
111:6 190:23 195:25
198:20 212:4

**eliminate**
45:15 69:3

**eliminated**
171:2 173:3 176:4

**else's**
92:18

**Emina**
3:21 10:19 12:25
219:14

**employ**
44:9

**employed**
18:25

**employment**
23:6

**encode**
136:21

**encoded**
88:23 89:4,17,21 99:25
101:12,16 102:11,16
103:3,8,12,14,19 104:3,
10,22 105:14,23 106:5,
21 107:2,5,11,18
108:16,24 109:4,9,13,
15,20,21,25 110:8,22
111:8 112:9,17 113:25

114:3,4 115:16,17,20,
23 116:13 119:2,3,4,25
123:2,12,18,23 124:2
128:16 129:8,10 130:11
132:21,24 134:19
136:17,20,24,25 137:2,
10,12 138:5,17 139:25
140:5,7,8 141:6,7,11,21
142:2,6 144:11,14
146:15,19,22,23 147:1,
19,25 148:9 149:23
152:8 159:18 160:13
213:2,16 214:1 215:4

**encoder**
135:18,21,23 136:4,9
204:7,24 212:15,17,25
213:11 214:6,18

**encoders**
54:19 136:6

**encoding**
129:13 131:24 141:9
144:6

**end**
19:4 26:5,9 27:12,13,16
41:8,9 43:25 47:6 50:16
102:11 103:21 105:10
112:23 120:3 121:25
146:15 168:11 171:5
183:3 187:14,23

**ended**
65:7 123:12

**ends**
125:24

**engaged**
12:2,10

**engineering**
37:1,15,20,22,24 38:3,8

**English**
112:23

**enhancement**
53:25

**enhancing**
23:13,15 24:1,6,21
25:3,12 39:22 40:24
53:18

**ensures**
121:23 168:12 184:25

**entire**
90:5 109:16 118:3
120:22 126:7,24 134:21
187:20 203:15

**entirety**
38:23 39:7,8

**entitled**
33:14,23 35:3 36:18
55:13 74:3 75:8 77:15
90:4

**equal**
153:14 156:25 157:11
158:25 169:18 177:10
202:18 205:8,9,10

**equally**
22:14

**equals**
121:23 168:12 172:10
204:6,18,23 205:11

**equation**
52:13

**equivalent**
195:19

**Errata**
220:8

**error**
104:25 142:22 146:11
174:1

**essentially**
197:24

**evaluate**
197:7,15,19 208:13

**evaluated**
209:24

**evaluating**
209:12

**event**
174:1,15

**eventually**
136:23,25

**evidence**
81:20,21 82:1

**exact**
8:8 20:24 25:23 40:16

**EXAMINATION**
3:15 216:10

**examined**
3:13 151:8 220:4

**examiner**
125:11

**examples**
42:21 43:1,8 202:20
211:12

**excerpt**
124:23 125:4

**excluding**
73:9

**Excuse**
67:21

**exhibit**
9:5,11,13,20 10:2,3,8,
18 11:1,2,5,13, 12:24
13:7, 14:8,10,22 16:10,
13 17:7,15 18:10,15
23:5 26:25 30:13 31:14
32:9 33:2,11,13,20 34:5
36:13 37:6,25 38:17
39:12 40:6 41:18 43:12,
14 45:25 48:15 58:2,3,
5,10 66:16 67:2,7,17
68:12 69:17 70:7,10,14,
19 75:4,25 76:3 77:22
80:4 88:13 100:3,23
111:16 119:12 123:11
124:21,23 125:4 130:23
131:3 138:24 139:18
143:14,16,22 145:1,9,
11,16,18 149:6,19
152:16 153:10 158:15
160:17 170:16 172:21
201:25 206:22 207:8,23
208:6,20 216:13,20,24

**exhibits**
9:1 10:10,12

**exist**
19:17

**existence**
110:16 153:3 156:1

**existing**
171:5 176:7

**experience**
66:23 114:25 173:10

**experimentation**
79:13,24

**expert**
8:1,14,20 12:3 81:24
86:12 94:24 97:6 98:25
116:2,10 117:3

**expertise**
80:18,21 178:10

**experts**
57:20,24 69:25 72:20
81:4

**explain**
112:11

**explained**
105:22

**Explicit**
109:5

**express**
90:25 91:9, 131:20
132:14 139:4 188:20
191:7,20

**expressed**
113:24 188:14

**expressly**
107:12 182:9 193:10

**extent**
15:14 87:16 144:23

**extraordinary**
84:8 92:20

---
**F**
---

**facilitate**
104:23

**fact**
57:21 79:2 89:20
102:21 129:2 155:21

182:8 189:22

**fail**
209:7

**fails**
89:9

**fair**
137:14 138:19

**fall**
8:7

**familiar**
21:6 33:22,25 81:5
115:2 120:13 142:12,15

**Familiarity**
80:22

**featuring**
26:6 27:12

**Federal**
87:21

**feedback**
44:24

**felt**
102:20

**fewer**
203:23

**field**
142:19 173:10

**figure**
43:16 171:1 173:3,6,7,
8,17 174:10,22 175:4,6,
12 176:4

**file**
7:7 71:22 124:17,24
125:5 202:1 203:13,15
205:3,21

**filed**
10:10

**final**
118:6,7

**find**
133:19 210:25

**fine**
97:8 115:23

**finish**
6:2 122:8 162:22

**finished**
127:20

**finite**
103:8 182:17,18 183:14

**firm**
97:2,5

**first-named**
59:3

**focus**
127:1

**follow**
99:18 115:12

**follow-up**
216:9

**footnote**
69:20 72:9

**foregoing**
220:5

**forget**
194:2,4

**form**
29:13,15 42:25 67:20,
23 79:21 98:23 103:7
104:13 133:24 134:2
146:15 147:1 155:14,17
169:16,21 170:7 177:13
187:5 206:20 208:10
210:5,21 211:11,22
212:14,22 213:6,14,25
214:11 215:25

**format**
193:13

**formed**
103:13 165:11 201:12
213:17

**forming**
70:2 72:21 142:2
202:23

**formulation**
87:21

**forum**
17:2

**foundational**
112:3

**fourth**
34:4

**frame**
25:15

**frequent**
186:15

**front**
9:2 29:21 140:10
158:11

**full**
3:19 39:17 48:15
118:10,17 126:14 127:4
170:22

**fully**
49:2

**function**
47:4,9,19

**fundamentally**
78:16

**funny**
193:22,25

---
**G**
---

**gain**
44:24 46:6 48:5 55:19
162:20 172:25 176:1

**Gates**
3:2

**gave**
163:7 187:9 214:25

**gears**
211:24

**general**
15:4 20:2 29:13,15 32:1
88:5,6 165:9 184:10
187:24

**generally**
22:16,18 40:16

**generate**
169:11

**generated**
182:9

**generating**
132:12 153:11 156:23
157:8,19 158:22 161:3,
9 162:5 166:1 168:22
169:4 181:8,12 205:5

**generation**
161:16 184:25

**give**
4:19 19:5 20:8 21:11
31:22,25 60:22 155:3
166:7

**giving**
14:12

**good**
3:17,18 45:14 206:12

**graduate**
22:7

**granted**
125:19

**greater**
153:13 156:25 157:10,
22 158:25 168:24
169:6,13,18 177:10
202:18 205:7

**Green**
3:25

**ground**
4:25

**group**
38:4

**guess**
100:18

**guidance**
82:2,6,18 83:6,10

**guide**
83:15

**guided**
82:9,11,12

**guys**
65:10

## H

**h(d)**
47:7,23

**half**
170:18

**hand**
9:10 10:1 13:6 68:19
124:20

**handbook**
37:2,15,21 38:3,8

**handbooks**
37:22

**hands**
174:19

**happen**
61:20 132:21 141:9

**happened**
61:22 94:5

**hard**
27:17 28:2,8 29:2,6,10
55:1 198:25

**head**
5:4,6 37:8 81:17 100:1
115:13 124:19 129:11,
12 155:2 186:9 218:8,
15

**headed**
5:25

**hear**
27:21 154:9

**heard**
21:10 144:4

**helps**
44:20,23

**high**
19:23 39:21,22 40:24,
25 46:4 54:17 55:20
80:23

**higher**
81:7 84:5 187:11

**highest**

186:11

**highly**
80:7,10,12 81:1,2,3,9,
13 84:14,16

**histories**
6:23,25 7:2,5

**history**
7:12,15 89:9 124:17,24
125:5 130:3 202:1
203:13 205:3,21 209:7
218:17

**hold**
209:3

**hope**
47:21

**hoping**
39:1

**hour**
16:18,22 57:1

**hours**
17:5,9,13 18:9 22:15

**hundred**
71:25

**husband**
63:10,12,16

**hypothesis**
167:8

**hypothetical**
166:18 167:2

## I

**identical**
199:17

**identification**
9:7,23 10:21 13:3 33:16
125:1 143:19 145:13

**identified**
11:21 15:14 35:7 36:24
38:22 46:15 47:2,12,21
60:1,19 89:20 101:16
102:22 105:9 107:7,9,
13 108:6,15 122:3
126:11 157:7 158:18

161:19 166:3 175:13
184:16 185:6 192:24
209:25

**identifies**
90:18 101:1

**identify**
23:25 34:13 38:12,16,
18 42:22 43:8 45:19
54:6 55:23 56:2,8 72:4
77:15 88:17 90:13
101:7 131:16 136:3,8
138:22 162:10 178:21
180:11,24 181:21
183:17,22 187:17
191:6,18,22,25 192:2
196:7

**identifying**
104:8

**IEEE**
41:25 42:1

**Iketani**
125:16 126:17,22
127:9,25 128:5

**illustrates**
160:21

**imagination**
82:9

**immediately**
67:8

**immunity**
46:10 48:2

**implemented**
23:13 24:6,10 48:3

**important**
45:23 50:13

**impose**
130:18 214:3

**imposed**
130:13 135:15,18 136:2
137:9,15,23 183:10
212:3,9,11,20,24 213:4,
11,12,16,18,21 214:6,
18,19,23 215:21 216:2,
5

**imposes**
26:7 27:14 102:8 106:4,
20

**imposing**
105:13,22 111:7 128:12
129:21 130:24 132:10
135:11 139:5 216:4

**imposition**
104:21 119:17,21
139:11 159:14 160:9
214:7 215:2

**impressions**
98:17,20,23

**improve**
48:2

**improvement**
173:1 176:2 177:3

**improving**
46:6,9

**include**
23:11 38:7,13 104:2

**included**
7:7 38:10

**includes**
108:16 179:22

**including**
16:19 70:3 98:13

**incoming**
212:24

**inconsistent**
150:4 192:23

**incorporate**
161:11 168:20

**incorporates**
11:12

**incorporating**
105:24

**increase**
44:21

**indefinite**
14:18 15:15,16 87:9
88:14,19,25 89:5
134:18 138:6,17 153:18

**indefiniteness**
15:3 16:8 87:2,13
113:18 165:21 178:1
206:16 207:5,13 208:14
209:4,13

**indentation**
140:17

**independent**
113:1

**independently**
44:12

**indicating**
29:1,21,22 30:9 76:23

**indication**
218:23

**individual**
108:7

**industry**
34:16 38:2,6

**industry-specific**
141:23 142:3

**inequitable**
58:22 60:12 63:6

**influenced**
71:13

**inform**
67:11,15 89:10 113:8,
13 114:6 209:8

**information**
14:4 20:3 21:16 48:23
70:2 72:3 83:14 109:19
146:14

**informed**
113:21 116:1,9,18
117:2

**input**
7:14 48:24 49:12 51:2

**inquiry**
17:25

**insolubly**
87:15

**instance**
148:3 211:17

**instances**
136:7

**instruct**
17:24 30:19 31:16
32:15 33:4 85:25 93:15
94:9 96:5 99:10 151:16

**instructed**
95:19

**instructing**
31:6 32:20

**instruction**
30:20 32:1,21 33:4,6
68:4 86:1 93:15 96:6
99:11,14 151:18,21

**instructions**
31:10 82:13 99:18
205:25

**instructive**
84:14,16

**Instruments**
208:24

**integer**
158:24

**intended**
34:14, 37:20 38:1,3
66:20

**intending**
150:11

**intends**
14:23

**inter**
12:7 206:18 207:4
208:7,13 211:19

**interchangeably**
147:13,16

**interest**
46:3

**interested**
34:16 64:24

**insolubly**

**interfere**
52:16

**interference**
44:22 52:3,5

**interpret**
83:15 119:3 134:6
173:24 201:14

**interpretation**
82:15,20,22 83:2,13
84:19,21 92:6,8,9,16
102:20 103:19 107:5,22
109:12 110:3,5,22
120:25 122:23,24
123:5,8 133:12,17
135:4 150:9,12 152:2,6
153:7,22,23,25 154:2,7,
14,18,21 155:6,19,20,
23 157:24 164:13,15,
21,25 165:4,17 169:22,
25 170:1,4,15 178:17
179:24 180:15 183:25
184:2,6, 185:9,17,22,25
186:18,20 189:5,14
191:9,14 193:20 195:3,
7,16 197:22 198:1,17,
18 199:12,15 200:8,18,
20,25 201:3,7,10,11
203:4 210:8 211:1,13

**interpretations**
110:7 154:16,22 156:1,
19 165:18 178:14 188:7
192:3 194:23 195:1,15
198:24 210:15 211:3,9,
16,18

**interpreted**
92:24 109:10,24 135:2
153:6 172:14 180:3
198:5,9,14 199:21
200:14 209:18 210:12

**interpreting**
86:15 133:2 180:9,22
200:11

**intersymbol**
44:22 52:3,5

**intrinsic**
81:20,21,25 144:21

**introduce**
9:1 146:12

**introducing**
55:4

**introduction**
11:25 53:24

**introductory**
52:17

**invalid**
209:4

**invalidated**
12:20

**invention**
26:4 27:10 28:8 29:9
30:11 31:13 32:7,24
33:9 79:12,16,21,23
89:12 126:23 127:10
128:5,7 129:3 148:24
171:3 176:6,19 209:10

**inventor**
58:18 59:3 64:12,14
66:3,12 145:22

**inventors**
42:4 100:11 108:7
176:18,22

**investigation**
142:1

**involve**
199:16

**involved**
91:23

**involving**
12:8

**IPR**
12:7,11,15 13:9 17:14,
22 18:1,10,20 27:1,25
28:9,24,25 29:6 30:5
33:1 67:6,15 68:11 69:8
74:19 75:1,3,12 76:7,12
77:4,14,20 78:4,8,20,25
80:2 83:22 85:23 86:5,
21 88:10 89:16,24 90:1,
21 92:14,22 100:2,22
101:3 104:18 105:8,21
106:18 107:1,23 108:19

111:3 113:22 114:4,8,
12 119:13 120:22 121:2
132:23 135:1 149:18
150:9,10 152:3,8,19,22
153:1,20 154:19 155:4,
10 157:6,18 158:2,16
161:6 162:9,12,16,21
163:6,12, 164:19
165:23 166:22 167:20
168:3 177:2 178:16
179:9 180:11,24 181:4,
20 182:1 184:3, 187:21,
25 188:5,17,19 189:2
190:21 191:1 192:3,5,
14 193:10 194:21
195:17,24 197:21
198:19 199:13,23
200:19 201:4 207:14
208:16 211:17 217:2,9
218:11 219:2

**irrelevant**
174:17 175:21

**ISI**
52:1,2 55:20

**isolated**
204:9,25

**issue**
15:3 113:2 178:11,12
211:7

**italicized**
52:22

**IV**
74:2,10 77:14

---

## J

**j;k**
128:13

**Japanese**
100:18

**Jersey**
3:25 4:4

**joint**
9:20 10:8,14 11:3 13:21
63:17,20 64:11,13 66:3

**jointly**
64:24

**jurisdiction**
219:19

---

## K

**K&l**
3:2

**k-constraint**
44:23 45:2,19 48:6
139:11

**K-constraints**
45:22

**Karabed**
56:18

**Kilpatrick**
3:6

**kind**
56:16 155:24

**Knedeisen**
3:2

**knew**
20:25 92:21 102:16
120:5 122:6

**knowledge**
19:18 78:13 85:11
162:19,20

---

## L

**Labs**
19:1,6,7,9,12,17,21
20:1,6,10,11 21:2 23:7

**lack**
171:17,23 177:19

**laid**
74:14

**language**
29:19 78:1,7,12,17
123:6 171:15 191:4
193:16 203:9

**larger**

23:20

**lastly**
6:7

**late**
24:11 25:16,17 194:14

**latest**
70:12

**law**
97:2

**lawyer**
18:13

**leaving**
18:12

**left**
5:2 82:8

**legal**
28:14 31:19 74:11 85:6,
8 87:12 124:7

**level**
80:24 81:5 162:13
213:21

**levels**
174:23

**light**
77:5 89:7 209:5

**limit**
26:8 27:14

**limitation**
102:12 105:1,2 160:5
171:19 177:21

**limited**
8:18 16:5 43:24

**Limiting**
64:5

**limits**
48:11 94:25 98:6,13
99:2 125:15

**linear**
44:21

**lines**
130:12 171:11 175:1
176:17,20 177:6,17,19

**list**
59:18

**literature**
178:11

**litigation**
13:11,24 14:13 16:15
18:16 29:17 30:4

**long**
20:23 40:17 47:15
158:14 195:5

**looked**
6:20,22 7:4 109:3
134:11 165:15 205:21

**lots**
166:14

**low**
54:19

**lower**
173:24

**LSI**
3:7 8:2,10,14 9:17 12:3,
5 14:23 18:13 72:21,25
115:4

**LSI'S**
58:21 60:1,11,19 63:5

**Lucent**
19:14,16 24:18 55:2
194:8,24 195:11,14

**lunch**
150:18 151:12

**M**

**machine**
23:1

**machines**
23:2

**made**
14:4 25:21 30:15 39:20
40:23 118:6 133:12
134:7 135:3 187:21
194:25 195:23 197:22

**magnetic**
23:14 24:7,9 26:22

33:15,24 34:17 39:23
40:25 48:23 49:17,19,
20,24 51:15 53:19 54:3
114:23 115:1,15 129:7
137:5 148:7 149:1

**magnetization**
186:8 215:19

**magnetizations**
51:4 215:6,8

**magnetized**
49:2

**magnets**
137:6

**main**
10:13 54:14

**make**
47:9,11,19 69:8 92:24
110:25 114:19 118:14
130:22 135:21 154:17
155:23 167:8 197:25
200:21 218:9,23 219:3

**makes**
6:1 47:3 179:2

**making**
69:16 178:5 214:13

**Manchester**
143:18,23 144:1

**map**
147:1

**mapping**
140:4

**maps**
136:11 214:3

**March**
13:18

**Marcus**
35:6,9,23 36:25 40:15

**mark**
3:2 145:9

**marked**
9:7,11,22 10:1,20,25
11:5 13:2,7,8 16:9 17:6,
15 18:10,15 23:4 30:13
33:2,10,16,20 38:16

67:7 124:21 125:1
143:14,18 145:13
201:25

**marks**
103:18

**Mary**
136:20,25

**material**
7:9 66:23 203:9

**materials**
69:23

**mathematical**
81:6 144:17

**mathematically**
150:7 152:1

**mathematics**
28:17,19 64:7 81:6

**MATLAB**
142:12,23 143:5,9

**matter**
94:7 95:11

**matters**
21:14 131:24

**maximum**
26:5,8 27:11,14 41:7,
10,24 102:8 119:22
159:15 160:10 172:15,
17 199:2

**Mayle**
3:6 6:17 7:13,19 30:15
113:7,8,13 116:19
117:8,13,20,23 188:22

**Mclaughlin**
7:11 20:21 116:3,11
117:17

**Mclaughlin's**
21:18 69:10 116:21,24
117:4 118:3,10,17

**meaning**
82:3,19,23 83:7,11
89:17 91:23,25 147:8
154:5 171:18 172:2
177:20

**means**
26:15 52:5,6 83:1 91:22
105:1 107:16 128:12,23
129:20 130:24 154:8
202:18,19 205:8 215:11

**meant**
69:7 86:19 92:21
103:16 107:2,19 120:6
153:21 155:5,12 157:22
158:4 165:12 169:10
180:14 181:22 188:2

**medications**
4:17

**medium**
48:23 49:17,19,21,24
115:10 147:23 148:8,
14,15

**meet**
160:5

**meeting**
62:17,19

**meetings**
65:22

**memory**
4:18 85:11

**mental**
98:17

**mention**
129:4 157:18 219:3,6

**mentioned**
117:9

**met**
6:17 7:18 20:25 65:24

**method**
204:23

**methods**
50:14

**middle**
77:8,9 102:21,25
127:23 174:10,22

**mind**
28:5 29:10 47:9,19 54:7
76:14 78:18 88:1 91:22
105:17 115:20 155:21

194:19

**minimum**
136:12 170:25 173:1,2,
25 174:1,15 176:2,3
195:11 199:2

**Minnesota**
3:4

**minus**
119:5

**mischaracterizes**
210:21

**missing**
98:3

**Misstates**
42:25 155:17 177:13

**Misunderstanding**
97:1

**mitigating**
44:22

**Mm-hmm**
36:20 38:12 69:21
77:17 83:8 100:25
103:6 110:9 115:11
118:22 119:19 125:9
127:5 131:7 138:20
149:7 168:5,8 172:16
178:7

**modified**
50:17

**modulation**
35:4,16 36:25 50:14
51:1,14 120:4,9 159:22
160:14,16,24

**moment**
21:12 72:17 127:12
162:19 175:15 186:22
189:4

**Moon**
41:23 42:3 55:25 58:19
59:8,21,25 60:18 61:1,
3,13 62:4,15,23 64:9,19
65:4 66:6,9

**morning**
3:17,18

**move**
73:15 88:12 99:22
102:2 131:6 144:25
145:4 152:15,17 153:9
156:22 181:5,7

**moving**
25:24 153:10 190:4

**MTR**
26:6 27:12 41:8 42:21
46:12,25 47:10,19,25
48:4,9

**MTR("J")**
168:11

**multiple**
23:2 135:15 155:22
156:1,19 186:3 210:14
211:3,8,13 212:15,18
213:1

---

**N**

**N's**
47:24

**n-bit**
115:9,15 136:14,16

**named**
42:4 58:18 66:12
100:11 108:7 145:21

**Nancy**
136:21

**nature**
74:22 215:13

**Nautilus**
208:23

**needed**
78:6 90:14,19 91:1,11
101:17 193:23

**nodding**
5:4 37:8 81:17 100:1
115:13 124:19 155:2
218:8,15

**noise**
46:9 48:2 214:14

**Nokia**
19:16,20

**non-return-to-zero**
50:16,18

**non-transition**
172:3

**non-transitions**
197:23 199:20

**normal**
112:23

**Notary**
151:7 219:22

**note**
144:19

**noted**
145:5 219:11

**NRZ**
50:16 51:1 119:5 123:2
137:8 148:17 193:13
214:2 215:15

**NRZI**
50:18 51:14 110:11,17
119:5 120:4,9 123:2
137:8 148:6,10,12,17
159:22 160:13,16,23
167:13 214:3 215:15

**number**
9:6,13 26:8 27:15 36:24
42:8 43:9 56:17 58:9
100:10 102:8 103:9
108:5 125:15 145:12,18
172:15,18 178:14
182:17,18 183:14
187:21 205:11 208:3
211:13

**numbered**
91:17

**numbers**
13:14 27:2,3 36:16
118:20 125:23 207:19

**NZI**
109:23

**Nokia**
19:16,20

**non-return-to-zero**
50:16,18

**O**

**oath**
4:6 79:3 89:17 155:10

**obey**
151:20

**object**
17:20,23,25 18:3 60:8
67:23 96:4 99:5,9
206:19 208:9 210:4,20
211:10,21 212:13,21
213:5,13,24 214:10
215:24

**objected**
67:22 134:1

**objecting**
144:25

**objection**
18:23 28:12 30:18
32:14 42:24 67:19
85:24 97:20 104:12
133:23 145:5 151:15
155:13,16 169:15,20
170:6 177:12 187:4

**objections**
214:22

**obtain**
172:25 176:1

**obtaining**
98:20

**obvious**
133:21

**obviousness**
77:16 208:4

**October**
42:17 61:25 62:5

**off-track**
42:13

**offer**
45:7,12

**offered**
15:2,13 63:17,20 66:2

**offering**
15:18

**Office**
124:25 125:5,8,12,18
126:1

**Oh-kah-da**
100:17

**Oh-kay-da**
100:17

**Okada**
89:21,22 100:6,9,11,15,
16,17,19 102:7 103:5,
23 104:20 105:5,22
106:3,18,25 110:1
111:4 119:8,11,17
120:6,11 149:24 157:7
159:9,25 160:21 161:2,
8,15 165:25 166:6,11,
15,24 167:5,17,21
169:3 179:12,20 180:9,
22 181:23 182:5,10
183:21 184:12,15
188:12 189:24 190:22
192:10,22 193:10
198:20

**Okada's**
106:3

**on-track**
42:13

**one-on-one**
148:16

**open**
82:20,21 83:2

**operate**
204:18

**operations**
141:9

**opine**
15:20 88:18,24 100:4
122:20 161:8,15 168:9,
21 169:3 179:2 182:9,
15 183:3,14 184:23
193:10 195:24

**opined**
107:24 111:4 119:8
120:6,17 128:23 156:13

**opining**
157:14 158:22 161:1
181:23 183:21

**opinion**
12:19 14:12,16 26:17
28:6 30:25 68:15,18
70:12,13,16 71:5 74:16,
21 75:19 76:17, 77:19
78:8 80:21 84:1 105:4,
20 106:17 108:19 109:8
111:1, 112:11 121:18
124:12 135:9,22 138:5,
16 139:10 142:2 149:22
153:17 157:2 162:4,9,
11 165:7,12,21,25
170:13,15 171:24 172:4
176:14 178:5 181:16
182:23 184:14,15
185:10,15 190:14
192:5,6,10,15,21
194:20 199:23 201:6

**opinions**
15:18 16:8 67:11,16
68:10,12,15 69:8,16
70:2,8,24 71:19 72:5,
11,15,22 76:11 83:18,
22 86:13 90:20 101:17
106:25 111:5 124:18
152:22 153:1 155:4,10
202:23

**opposed**
5:12 27:3 81:23

**optical**
120:3,8,14,16,20
159:21 213:22 215:21

**options**
135:20

**order**
131:22,24 132:2,5
134:6 189:8,18

**ordinary**
73:18,24 78:14 79:10,
22 84:4,5,9 186:25
210:2,16 218:20

**original**
6:19 146:23,24

**output**
23:19 52:9,11,13,14
106:5,21 109:10 119:25
149:22 150:1,3 159:18

**outputs**
107:16

**owner**
27:9

---

**P**

**p.m.**
7:24 150:18 151:2
219:11

**pages**
36:16 208:3

**paid**
22:15

**pair**
105:13,22 106:4,20
111:7 128:12 130:14,24
175:15,17

**pairs**
171:1 173:2 174:13
175:4,12 176:3

**paper**
38:20 42:10 55:25 56:3,
6,14,15,18 58:14 61:5,
22,23,24 62:1 63:25

**papers**
37:17 40:19 55:17
56:11

**paragraph**
11:19,25 13:10 14:11,
23 16:16 23:3,5 24:1
25:24 27:5,7,24,25
28:10,24 29:6 30:11
39:17 43:21 44:19
45:24 47:7,12,21 48:16,
19 50:12 52:17 53:16
58:12,13 59:2 66:15,16,
17,20 69:19 73:15,16
75:11,22,23 76:2,7
77:10,13,23 79:2, 80:6
81:16,19 87:4,11,20
88:16,22 89:2 90:6,11,

23 91:6,17,22 100:4
101:14,24 102:2,5,22
103:1,22 104:18 105:8,
21 106:2,10,13,17
108:10 111:3,23 112:14
113:16 114:7 115:24
116:7 117:1 118:19
119:14 120:18 121:2,5,
8,12,14,15,17 123:10
126:14,21 127:2,4,23
128:4,11,20,22,25
129:1,20 131:6,16
132:6 135:10 137:24
138:3,8,12,14 139:18,
20 141:17,20 149:3,4,
10,13,19 161:7,23
162:2 164:17 165:24
166:6,17,21 167:10
168:3,9, 170:19 176:14
178:25 179:10 183:4
184:13,21,23 191:3
192:4 193:9 194:20
196:4,7 197:4,14 201:1
202:5,8,12,14 203:1
205:21 207:23,25
208:21 209:22 218:4

**paragraphs**
60:13 74:6,15 75:20
90:10,24 91:16 108:23
109:2 112:6,10 140:16
178:20 191:18,24
192:21,24 207:2,8,12,
16,17,24 216:12,15,20

**parameter**
197:7,16,20

**parameters**
172:7

**Pardon**
11:8

**paren**
41:8,9 43:25 50:16,17,
18 112:22,23 146:13,15
160:14,16 168:11 171:5
172:25

**parent**
19:13,14,15,20

**part**
11:6,13 19:12 34:22

50:7,8 89:23 126:21
139:13,15 171:10
173:23,24 174:16 177:3
212:19

**partes**
12:7 206:18 207:4
208:7,13 211:19

**partial**
42:14

**parties**
10:10

**parts**
212:16,18 213:1

**pass**
118:6

**past**
39:19 40:22

**patent**
6:19 7:9 8:21 9:6,13,16
12:20 13:1 26:4 27:9,11
33:9 42:5 58:19 59:4
63:18,20 64:23 66:3,12
73:10 77:24 78:10,19
79:17 80:11 81:1,6,8,
14,23 86:16 89:8,22
90:19 92:7 100:6,10
102:17 104:11 107:20
108:1,5 109:17 112:21
113:9,11 122:8,19
124:14 125:19 126:17
127:10 133:2 138:24
145:12,18,25 146:6,10
147:14 148:20 150:13
153:6 155:5,11 164:9,
22,25 165:5,13 167:6
171:11 172:21 173:9
180:10,23 181:2 183:24
184:6 185:7 187:19
188:3,25 189:12,24
194:11,24 195:11,14
202:15 204:3,17,19
209:3,6,14 212:4,9
213:11,20 214:17
218:10 219:4

**patent's**
162:23,24

**patent-in-suit**
12:8

**patentable**
64:2,4

**patented**
194:4,6

**patents**
80:7,12 142:6

**pattern**
148:14 214:2

**patterns**
115:10 173:19 174:3
176:25 203:22 215:6

**Pause**
60:6 154:20

**paying**
97:3

**peak**
25:5,8 44:10,16 45:3,6,
11

**peaks**
44:10,11

**pejorative**
84:8

**penalty**
11:20 14:5

**pending**
6:9

**people**
34:15 38:4 142:21,25
143:4 186:2

**percent**
71:25

**percentage**
20:9,17 22:12 155:25

**perform**
78:7

**performed**
131:10,21 132:15

**period**
163:22,25 186:4,7,16,
23 187:12,14,15

**periods**
102:10 119:24 159:17
160:12 181:9,13 182:11
185:1,6,11 186:6 187:8,
18 203:22 204:11,12
205:2,3

**perjury**
11:20 14:5

**permitted**
203:24

**person**
62:12 73:18,23 78:14
79:10,22 84:3,8 92:19
182:15 198:14 210:10,
24 211:4 218:19

**persons**
75:14

**Philadelphia**
56:4 58:15 61:25

**phrase**
89:4 105:13 108:16
112:17,18 115:21
116:13 124:4 141:21
144:10 153:11,18,21
157:3,15 158:4,21
161:4,10 162:6 166:2
177:7 179:1 180:13,25
181:18,22 190:3,4,18
209:19 210:12

**phrases**
88:17

**picked**
187:21

**picture**
174:22

**Piscataway**
4:3

**place**
61:7,10 62:8,15 135:11
136:1 212:12,18 214:19

**places**
211:14

**plaintiff**
3:3

**platter**
213:21

**point**
56:25 62:20 117:25
118:1 129:19 147:6
166:14 186:11

**pointed**
179:5

**points**
52:7 144:16

**Poly**
20:12

**portion**
201:25

**posed**
67:25

**position**
57:17

**possibilities**
170:10 188:8

**possibility**
154:22 184:4 185:18
198:3

**possibly**
110:11 114:3

**post-doctoral**
63:22

**potential**
206:2

**practice**
79:11,15,23 172:5

**practiced**
179:20

**precede**
91:17

**preceded**
148:6,10,11 200:21

**precise**
88:4 117:5,10

**precisely**
109:15

**precision**
88:7 144:17

**prehearing**
9:21 10:9,15 11:4

**preparation**
7:16 16:19

**prepare**
6:14

**prepared**
7:12

**preparing**
17:6 31:18

**present**
128:5 171:3 176:5
200:18

**presentation**
56:4 58:14,20

**presentations**
59:21

**presented**
59:21 61:24

**Press**
37:16

**prevents**
203:19

**previous**
7:8 68:21,23 93:15
133:16 141:1 144:22

**previously**
151:7 192:9 215:21

**principle**
113:15 114:7,12 124:7

**principles**
206:15 207:1, 217:11,
12,16

**printout**
143:16,22

**prior**
8:21 12:19 66:1 69:11,
13 77:3 78:1,12,13,18
79:9,21 92:25 110:16,
18 125:19 133:20
134:10 153:3 188:12

189:9,12,14,19,21,25
200:19,21

**privilege**
97:11,15

**privileged**
31:2

**probability**
22:5,8 104:24 154:23

**problem**
21:5 67:25

**procedurally**
67:23

**proceed**
155:20

**proceeded**
107:6

**proceeding**
12:7,12,16 13:10 75:12

**processing**
33:14,23 34:17

**produce**
132:2,5 204:8,25

**produced**
24:12,15 190:5

**produces**
129:11,12

**product**
30:22 31:20 33:5 97:6,
14,19 98:11,17 99:19
151:17,21

**professor**
3:17 4:5 7:11 9:12 10:2,
19 11:1 12:25 13:7
15:17 18:25 20:20
21:17,25 31:15 33:19
35:10 42:3 55:25 57:7
58:19 59:8,20,25 60:18
61:1,3,12 62:15,22
64:8,18 65:4 66:6,9
93:11 116:2,10,21,23
117:4,17 118:3,10,17
201:22 202:4 219:8

**program**
142:17

**programming**
142:21,23 143:1,6,7

**progress**
39:20 40:23

**prohibit**
69:3

**projects**
23:10

**properly**
77:25 78:6,11,17

**properties**
42:14

**proposals**
186:12

**proposed**
55:18 56:6 115:4

**prosecution**
89:9 130:2 209:7
218:16

**provide**
8:1,14 44:23 45:20
55:19 72:16 76:11 82:2
83:6,10,25 86:13 90:20
128:6 129:1 155:9
165:6 197:5,14

**provided**
8:20 70:4,6,20 71:6,12,
18 79:9 81:23 124:8
144:22

**providing**
15:11 67:1 77:19 83:17,
21 188:7

**provisional**
7:10

**Public**
151:7 219:22

**publication**
38:11

**publications**
56:16

**published**
34:11 36:1,8 40:14

**pull**
36:13 201:24

**pulses**
129:17

**purported**
89:12

**purpose**
39:9 90:13 137:19

**purposes**
15:3 45:1 46:11,17
47:12,20 175:10

**put**
7:15 14:9 36:21 38:10,
20 58:2,6 132:25

---

**Q**

**question**
5:17,21,25 6:3,4,9,10
15:6 18:18 32:2,6,18
39:6 43:5,7 47:16,22
67:24 68:7 74:23,24
91:3,5 93:3,18 94:4
95:13,20 96:9 99:4
106:15 110:20 112:4
114:5,6 115:14 123:13
127:6 131:19 132:13
134:3 139:4 141:14
151:25 155:9 158:1
164:18 165:9,11,14
166:8 170:3,11 177:15
180:20 187:25 191:17
197:6 201:2 204:22
208:14 213:8 214:14,15

**questioning**
145:2

**questions**
73:8 206:2,3,4,13
209:17 212:2 216:7,9
219:8

**quotation**
103:18 208:22

**quote**
26:5,6,7,9 27:11,12,13,
14,16 69:23 102:8,11
104:3 112:19 116:3,12,

13 120:2,4 121:24,25
159:20 168:13 171:2,15
183:5 191:3 218:6

**quote-unquote**
201:11 214:8

---

**R**

**raised**
69:24

**ran**
59:11,12

**rate**
16:17,23 54:17 187:11

**re-ask**
68:7

**reach**
34:24 65:12,13,14
164:25

**read**
12:1 23:11 25:25 27:8,
18,19 32:4 33:21 38:5
39:18 41:5 43:22 44:7,
19 46:1 48:21 50:12,25
51:13 52:18 53:16
54:11,13 55:7,16 66:19
79:7 84:11 87:5 89:3,
91:7 102:6 103:1,25
104:19 109:16 111:24
112:15 115:25 116:8,
20,23 117:3,6 118:7,23
119:20 126:18 127:7,
12,16 129:11,18 130:2,
4,8,9,11,15,17 131:1
138:12 139:21 141:20
146:10 147:18 159:13
160:8 163:9,10 166:5
170:23 171:16 172:24
175:23,25 176:16
177:25 178:2,3, 183:4
186:9 202:4 203:18
204:5 209:2,5 218:10,
13,16 220:4

**reader**
83:15

**reading**
58:24 124:14 127:20

129:15 138:7 139:3
162:25 164:19 173:9,12
177:17 203:12

**reads**
66:18 84:24 104:18
128:12 146:10 177:22
204:5

**realizations**
136:5

**realize**
166:16

**realized**
54:18

**reason**
4:13 72:14 201:5

**reasonable**
89:10 107:22 110:21
120:23,24 123:5,7,
134:8 154:1,10,15,21
155:7,19 157:23,24
171:18,23 177:6,20
186:17,20 189:4 191:14
200:2,3,17 201:8,14
209:8,19 210:2,8,13,17,
25 211:4,5,8,13,16

**reasons**
54:7,14 192:8

**recall**
21:14 30:10,14 34:2
36:6,10 40:9,10 54:5
59:20 60:17,25 61:2,17
64:18 66:5,8 118:2
194:18 203:11 209:20
210:18 212:1,4 215:3

**recalling**
195:12

**receive**
26:20 117:22 132:1,4

**received**
117:19,25

**receiver**
104:25 143:18,24 144:2

**recent**
56:15 76:24 134:10
156:14 203:6

**recently**
87:12

**recess**
57:4 93:8 150:18
201:19 206:8

**recite**
67:16 178:25

**recited**
102:12 105:1 112:25
182:12

**recoded**
114:20

**recognize**
9:12 10:2 11:1 13:8
33:19 125:25 145:16

**recollection**
25:22 140:4

**record**
26:20 57:8,13,14,25
97:20 130:22 144:19,21
150:17

**recorded**
112:9 114:2,17,21
115:5,9 119:6,9,10
120:2,3,5,7,8,11,12,15
121:23 122:3,6,18,20
123:1,18,23 124:3,5
128:15 132:20,22,24
134:20 136:18,23
137:4,16 139:24 142:6
147:22 148:1,2,4,8,13,
14 153:13 156:24
157:10,21 158:24
159:20,21 160:2,15,23
161:17 168:12,24
169:6,12 175:8 176:25
177:9 179:17 181:10
182:12 185:2 205:7
213:23 214:8,20 215:19

**recording**
21:15,16 33:15,24
34:17 39:23 40:25 44:9
46:4 48:22 50:15 52:7
53:19 54:3 114:22,24
115:1,15 120:14,16,20
129:7 137:5 140:7,9
141:10 148:8 149:1

215:23

**recovering**
186:3

**redo**
106:15

**reduction**
104:24

**redundant**
146:22

**refer**
23:9 108:4 112:24
142:21 171:10 192:5
199:1

**reference**
30:17 41:20,22 42:8,22
43:9 55:24 56:3,17
70:18 79:11,15 80:7
85:17 91:15 108:24
109:4,5 157:7 158:21
167:25

**referenced**
12:6 13:10 37:6 58:20

**references**
12:19 55:24 188:13

**referred**
37:25 59:9 125:14
130:3 176:19 218:6

**referring**
7:5 9:3 24:17,22 26:14
28:23 48:10 49:13,23
50:2 58:13 80:16 87:8
100:10 103:4,22 108:5
113:6,15 117:16 129:13
133:9 140:2,25 142:8
143:17,23 146:19 187:6
194:7 197:17 198:3
203:17

**refers**
20:4 129:20 132:9
141:8

**reflect**
14:11 112:7

**reflected**
174:3 215:23

**reflects**
52:14 124:24 125:5

**regard**
167:24

**Regents**
3:3

**register**
143:4

**regular**
16:22

**rejection**
125:11

**rejections**
125:13

**related**
58:14

**relates**
105:8 132:6

**relating**
30:4 73:6,10 206:16,17

**relation**
85:4

**relationship**
97:5

**relative**
54:16

**relaxed**
87:7,10,17,18

**relevant**
17:21 25:4 73:25
162:11

**relied**
30:24

**relies**
139:7,16

**rely**
14:23 31:12 32:6 68:10
69:15,22 71:19 72:4
86:3,7 211:18

**relying**
70:7,22 97:14 124:7
162:3

**remainder**
176:16

**remember**
17:8 21:11,19 24:4,13
25:1 35:18,21 36:9
37:12 55:11 60:4 61:3,
8,11,12 62:6,9,11,20,
21,22,25 65:11,23
66:14 71:24 75:2 76:25
77:1 114:9,14 117:24
119:10 142:5 147:14
152:20,24 158:5,7,9
163:22 194:13,15 197:9
203:14,15 209:21
210:23

**reminded**
173:13

**remove**
24:25

**removed**
24:23 25:2

**removes**
139:8 140:22

**removing**
140:17,18 141:12

**rendered**
133:20

**rendering**
124:17

**renders**
89:5

**repeat**
214:15

**rephrase**
5:18 46:21 68:1 91:6
177:15 213:7

**report**
15:19,22

**reporter**
5:1 6:2 32:4 114:15
132:3 195:20 205:13,17
215:7

**represent**
3:7 96:11,14 173:13

**represented**
4:8,10 96:17

**representing**
146:14

**request**
6:11

**require**
131:9 191:7

**required**
44:1 80:14 161:18
191:20

**requirement**
87:24

**Requirements**
55:13

**requires**
77:25 78:10 131:21
132:15,18 196:22

**research**
19:7,9 20:3 21:4,5,7,18
22:10,13,17 35:13 38:1
64:9 66:22 80:17,23

**researcher**
63:22

**reservation**
205:25

**reserve**
72:9 97:10 99:17

**residential**
3:22,24

**resolve**
91:2,11

**respect**
18:19 21:23 46:14
186:13,14 192:9,15
208:14 209:13 211:6,9,
15 212:3 215:2,22

**respects**
192:6

**respond**
69:24 145:6

**responded**
125:18

**represented**

**response**
42:15 65:1 125:7 126:1,
7,22,25

**responsibilities**
19:24

**responsible**
59:15

**responsive**
206:3

**rest**
93:2 174:17 175:21

**restrictive**
202:16

**results**
119:22 159:15 160:10

**resumed**
151:6

**retained**
7:25 8:6,13 72:20 97:2

**reuse**
145:3

**review**
6:18 12:7 67:5,8,9
118:10 206:18 208:8,13
211:20

**reviewed**
6:16,19,20 7:16 35:25
67:1 72:19 118:3,
124:16

**reviewing**
76:4

**reviews**
54:9 56:13 59:5 76:21
82:7 123:25 127:18
131:25 138:10 139:6
159:5 168:17 176:21
190:16 192:19 197:10
202:11 205:4

**revise**
72:10

**revision**
72:14

**rights**
63:23

**RLL**
43:25 171:5,25 172:4
176:7,19,24

**Road**
3:25 4:3

**room**
93:2

**round**
50:8

**ruined**
216:3

**rule**
5:6 102:7 104:23
119:21,22 159:8,14,15
160:5,9 165:25 166:24

**Rule(2)**
160:21

**rules**
5:1 31:21 183:10

**run**
26:5 27:12 41:8,11,24

**runlength**
43:24

**runs**
90:10 126:4 203:20
216:25

**Rutgers**
4:4 22:1

**S**

**sake**
186:2

**sample**
181:8,13 182:11 184:1,
10 185:1,6,11 186:6,11,
12 187:8,18

**sampling**
184:3,4 185:9 186:3,15,
18,22 187:10

**satisfied**
136:15

**satisfy**

87:23

**Saturation**
48:22

**scope**
17:20,23 18:3,23 23:22
60:8,15 79:20 89:12
209:10

**screwed**
128:1

**section**
36:18 45:25 52:1,18
55:13 74:2,10 75:8
77:14 87:1 88:13 90:3,
6,9,13 100:4 104:2
144:6 149:4 158:17
181:7 190:13 193:3
207:9

**sections**
101:7

**select**
211:17

**selected**
39:7,10

**semester**
20:13

**semesters**
20:14

**sense**
20:8 92:25 97:16 211:2

**senses**
186:10

**sentence**
23:10 30:8 41:4 43:22
44:18 48:20 50:2,11
53:15 54:8 58:17 59:1
78:22 79:7 80:6 83:5
84:10 102:6 115:25
119:16 121:21,22 138:8
139:21 141:20 147:16
170:23 171:14 172:24
175:23

**sentences**
175:24

**separate**
199:16

separated
44:2

**separately**
193:7

**September**
19:3 42:1 56:21 124:25
125:6 126:1

**sequence**
25:13 45:11,20 49:25
132:16 136:15,17,19
137:7,10 146:21 153:12
156:24 157:9,21 168:23
169:5,12 176:25 177:9
179:1,7,12,23 180:1,4,
13 181:1 190:5 205:15,
19 212:24 215:4

**sequences**
23:19 24:24 26:16
45:15 48:17 49:14 53:2,
4,11,12 64:5 69:4 77:2
104:1 115:9 136:14
158:22 161:2 166:1
167:6,22 179:7, 180:18
181:9,14 182:4,9 204:8,
25 205:6

**sequentially**
131:10

**series**
129:17

**serve**
46:10,17 47:11,20

**services**
16:18,23 97:3

**session**
59:12

**set**
53:2 69:17 147:1

**shakes**
5:6

**sharp**
127:24 128:4

**she'll**
16:4

**sheet**
220:8

**show**
10:25 33:10 43:11
110:16 115:8 143:13
145:8

**shown**
160:16 171:1 173:3
176:4

**side**
14:9 58:7 118:21
129:13,14,15 130:4,5,8,
9,11,15,17 131:1,2

**Siegel**
56:19

**signal**
33:14,23 109:22
144:14,15 146:13,15,
20,22 147:3,6,11,19,25
148:9

**signals**
116:12

**signature**
11:17 13:15 14:2
220:15

**signed**
10:7 70:6,9,11,21 71:9
88:10 118:11 220:8

**significant**
39:20 40:23

**similar**
38:20 64:22 72:1 77:3
111:4 217:20

**similarity**
134:9

**similarly**
38:3 160:9

**simple**
196:8,12

**simplify**
48:1 54:15

**simplifying**
46:7

**simulate**
143:10

single
23:1 34:17

Sipiora
3:5 6:17 7:13,19 15:5,
17,22 16:1,6,11 17:19
18:22 28:12 30:18,21
31:3,7,15 32:14,19 33:3
42:24 57:2,12,19,24
60:7,20 67:19,22 85:9,
24 93:14,19 94:6,16,20
95:3,6,17,21 96:4,14,19
97:1,9,13 98:1,12,22
99:9 104:12 106:7,9
127:11 133:23 134:1
144:18 151:15 155:13,
16 169:15,20 170:6
177:12 187:4 199:5
206:3,5,11 213:7,9
214:13 216:6 219:9

sitting
5:1 39:5 72:2,13 73:21
152:25 200:23

skill
34:19 73:18,24 78:14
79:10,22 84:4,9 92:20
185:19 186:25 198:14
210:2,16 218:20

skilled
21:21 89:11 182:16,23
209:9 210:10,25 211:4

skills
80:13,15 84:6

slightly
159:2

small
20:17,19 65:22

sole
145:21

Soljanin
3:21 10:20 13:1 15:18
36:25 206:12 219:14

Sophomore
22:9

sort
55:9 136:11 194:19

sorts
26:17

space
52:8

spatial
48:25 49:15,22 50:7

speaking
22:16 46:2

special
55:9

specific
23:25 81:11 85:16
108:24 194:11 203:14

specifically
7:6 64:20,21 72:4 103:2
210:11

specification
89:8 170:24 171:11,16
209:6 218:13

spend
17:5,13

spent
18:9

SPIE
59:16,17

split
22:14

spoke
65:10 95:7

spun
55:3

square
109:23 174:24

squares
144:17

stand
99:1 169:24 170:3,8
177:23

standard
74:3, 76:11,15 83:16,21
84:25 85:6,8 87:2,12
141:22 156:3 206:24
209:11,17 216:14,24

218:1

standards
74:14,19,25 75:3 77:15
208:4,5 217:6,16

standing
96:15

stands
127:14

start
65:17 111:22 112:13
116:5 128:3 159:12
172:23

started
21:1 22:4 25:19 40:14
117:1

starting
132:9 175:24

starts
34:25 48:16 127:24
128:4 170:23 174:9,25
202:8

state
3:19 158:2

stated
11:21 111:9 152:11
211:12

statement
9:22 10:9,15 11:4 12:9
16:20 40:22 44:4,14
49:6 50:20 51:7 123:14
152:4 176:11

statements
14:3

states
14:23 87:7 88:2

statute's
87:23

stay
77:4 192:14

step
124:5 135:11 141:8

steps
131:10,11,12,17,21
132:7,15

Steven
20:20

stop
176:13

stops
140:8,9

storage
22:24 23:14 24:7,10
26:22 28:16 35:4,16
37:1 41:24

story
57:22

strategy
185:9

stream
48:25 49:12,16,22 51:3

strike
23:23 29:25 36:11 53:9
67:13 90:7,16 102:23
105:18 106:14 108:13
112:2 116:4 122:14
131:13 141:15 144:25
145:4 178:22 183:19
198:11 218:25

string
136:14 180:17 196:8,13

strings
24:24,25 25:1 136:16
137:6 150:3 180:2,4

students
22:6

subheading
100:23

subject
83:13 84:18,20 89:23
94:7 95:11 205:24

subjects
15:20 89:23

submitted
11:3 12:15 13:9,22
17:17 18:9,19 62:1 67:6
85:23 89:16 118:4
152:18 162:16

**submitting**
69:11,13

**subscribed**
219:16

**substance**
57:9 93:12,20 94:1,3,
14,17 95:1,5,10 96:3
97:22 98:2,4

**substantial**
82:2,6,18 83:6,10

**sufficient**
110:16,25 111:12

**sum**
52:14

**superior**
176:23

**supersedes**
56:16

**supplement**
72:10,14

**supplemental**
152:18

**support**
71:19,20 129:2 162:4

**Supreme**
87:7 88:2 208:22 218:7

**surface**
213:22

**surrounding**
210:18

**survey**
35:21

**survive**
176:25

**switch**
166:10,20 211:24

**switched**
130:20

**swore**
79:3

**sworn**
3:13 151:7 219:16

**symbol**
184:1,10

**symbols**
52:15,16 64:6 109:15,
20,25 114:4 115:10,18,
20 119:4 129:10
146:12,22,23,24,25
147:2,4,10 198:4 213:2,
16 214:1 215:5

**symposium**
42:18

**system**
26:10,13,23 28:2,10,16,
23 29:11 30:17 31:14
32:8,25 115:1,15 129:7
135:12,16,24

**systems**
22:19,22,23 25:10
26:18,19 29:12 33:15,
24 34:18 35:4,16 37:1
53:19 54:3 114:24

---

**T**

**table**
144:7,10

**tables**
103:3,13,22 104:4
160:14 167:6

**taking**
17:22 57:17 96:24

**talk**
5:25 95:15,24 96:2 99:7
151:13 163:18,23

**talked**
32:17 93:21,25 94:10,
13,14 97:22,23,24 98:6,
8,9,10,13,14,19 214:25

**talking**
33:8 99:25 121:6
123:12

**talks**
21:11,14 60:10 196:24
202:16

**taught**
20:12 22:4

**teach**
22:3 79:22

**teaches**
170:25

**teaching**
20:5,9 22:13

**technical**
80:7,11,12,13,15,18,20
81:1,2,3,9,14 84:1

**Technologies**
12:4 19:15 24:18 55:3
194:8

**Ted**
3:6

**ten**
18:11 164:3

**term**
83:12,15 84:13,20 91:1,
10 101:11,16 105:12
107:19 108:16 110:3
134:19 154:6,12 155:22
185:11 190:17 210:18
216:1

**terms**
75:13 82:3,16,19,24
83:1,7,11 85:1,10 86:19
88:17,24 91:23 92:4,10
101:3 112:8 131:9
134:5,11 139:5 147:13
164:8 165:12 183:23
184:12,15 188:2 189:23
191:7,19,25 208:15
209:24 210:1,9 211:7
219:4

**test**
87:8,9 88:1

**testified**
3:13 32:17 85:12
140:14 151:8,25 164:18

**testify**
32:11

**testimony**
4:15,19 8:1,14,21 15:2,

12 57:9 77:5 93:13,20
94:1,15,18 96:3,25
97:23 98:4,11,19 99:8,
21 144:24 147:12
151:14 152:4 155:17
156:20 177:13 210:19,
22 214:25 220:5,7

**text**
27:22 157:25

**theory**
20:3 22:5,7,8 109:19

**thing**
5:23 28:14 29:11 65:9
120:15 167:24 180:6

**things**
28:22 98:9 118:25
123:16,21 124:10
128:24 140:6,13,20

**thinking**
28:17,18 143:1,5 194:3,
12 195:2

**thought**
63:21 110:2,4,10,22
120:24 123:4 154:15,21
155:7,18,20 188:11
191:13 192:1 199:8
201:13

**three-quarters**
34:23

**time**
4:25 6:8 17:1 20:9 21:3,
9,10 22:12 25:8,11,14
36:5,7 40:1,4 41:1 44:5
49:6 50:20 51:7,20 52:8
53:21,22,23 61:9 63:22
64:16 66:9 102:16
113:17 115:2 116:22
144:15 163:11 195:5
219:11

**times**
130:21 163:10,15,18,
24,25

**timing**
44:24 45:23 46:6 48:5
186:3,14

**title**
37:5, 39:10

**titled**
88:13

**today**
4:6,15,19 7:16 10:15 14:8 19:18 39:5 72:2,13 73:21 97:12 152:25 185:15 200:24 209:16

**today's**
6:15 16:1 46:4 170:13

**told**
62:23 64:19

**tolerates**
87:21

**top**
36:16 127:25 128:3 170:19

**topic**
37:18 94:17,21 98:4 211:25

**topics**
37:23 98:14

**Townsend**
3:6

**track**
50:1,3,5,6,7,10

**trade**
55:9

**train**
174:24

**transcribed**
174:19

**transcript**
6:5

**transcription**
220:6

**transfer**
47:4,8,18

**transition**
26:5 27:11 41:8,24 51:16,18 119:23 159:16 172:2,11 181:9 182:11

185:2 196:14,18 203:20 205:11

**transitions**
26:9 27:15 48:12 103:9 104:5 121:25 125:15 129:17 153:12 156:24 157:9,20 158:23 160:1, 11,22 161:4,10,17 162:6 166:9,12,19,23, 24 167:2,12,17,23 168:14,23 169:5,12 171:7 172:2,6,10,13,15, 18 174:3,5,7,11 175:17, 18 177:9 179:1,4,6,12, 17,18,22 180:1,13,17 181:1 186:10 190:7 191:10,12 193:1,4,6,7, 12,18 195:8,21 196:12, 17,20,23,25 197:2 200:15 203:21,23 204:9,10,25 205:1,6,15, 19

**translation**
48:16

**transmit**
26:20

**transmitted**
52:7 53:14 147:21 148:5

**treated**
193:7

**trial**
99:2 154:11

**trick**
39:5

**tricky**
71:2

**trip**
63:14

**true**
11:22 14:3 190:22 220:5

**truthful**
4:14 150:11

**Tsang**
89:21,22 108:1,4,7,20

109:8 110:1 121:6,9,11, 18 122:3,10,20 167:24 168:10,25 169:3 180:7, 10,22 181:23 184:24 187:17 188:12 189:24 190:22 195:25 198:20

**turn**
11:15,24 14:10,21 16:15 26:25 34:4,23 39:16 48:14 51:25 58:12 75:4 77:6,22 86:24 90:2 100:21 104:17 105:7 107:24 111:2,17 119:13 125:22,24 126:10 145:24 149:18 158:16 159:11 161:6 168:2 173:6 182:1 184:12,20 202:3 206:22 207:7 208:21

**tutorial**
20:15

**TV**
154:10

**two-and-a-half**
20:13

**types**
22:6 85:21

**typo**
204:8

---

# U

**U.S.**
9:6,13 12:4 13:1 100:10 108:5 145:12,18

**uh-huh**
5:12 144:8 173:16

**uh-uh**
5:12

**ultimately**
53:13

**unaware**
96:24

**uncertain**
155:11 180:12,25 192:1

**uncertainty**
181:3,22

**unclear**
187:17

**uncoded**
54:17

**undergraduate**
22:8

**underlying**
31:1

**underneath**
174:24

**understand**
4:5 5:15,16,21 9:15 10:5 38:14 75:12 77:23 78:9 82:1 85:5 87:6 112:22 114:3 125:10,17 126:15,20,24 132:22 139:12 163:2 173:8 178:9 179:6 185:5 187:1 210:6

**understanding**
8:3 15:1 71:5 74:10 75:18 80:14 83:3 85:17, 18 86:14 115:3 127:7 130:2 164:8 200:22 204:2,16,24 213:19

**understood**
68:21 75:13 81:11 84:2 91:25 112:21 113:10,12 132:23 162:25 163:1

**undue**
79:12,24

**United**
87:6 88:2

**university**
4:4 9:17 35:11 69:25 125:18

**university's**
26:1 116:2,10 117:2 125:7,25 126:15,21 127:8 128:6

**upheld**
187:22 216:1

**upper**
173:23

**USA**
4:1

**usage**
112:23

**USC**
14:18

**usefulness**
44:15

---

**V**

**valid**
185:24

**verbal**
5:7 37:9

**Verdini**
3:1,16 8:25 9:9,25
10:23 13:5 15:8,10,21,
24 16:3,7,12 18:4,7,24
23:23,24 29:25 30:1,23
31:5,8 32:16,22 33:7,18
36:11,12 43:4,6 53:9,10
56:23 57:6,16,23 58:1
60:10,16,24 67:13,14
68:6 85:15 86:2 90:7,8,
16,17 93:5,10,17,23
94:12,19 95:1,4,12,14
96:7,16,22 97:8,10,18
98:7,16 99:3,6,12,17,
102:23 104:14 105:18,
19 106:8,10,12,14,16
108:13 112:2,5 116:4,6
121:7 122:14,16 125:3
127:19 130:6 131:13,15
138:11 141:15,16
143:21 145:5,7,15
150:16 151:11,19
169:17 177:14,16
178:22,23 183:19,20
187:7 198:11,12 199:7
201:16,21,23 205:24
206:19 208:9 210:4,20
211:10,21 212:13,21

213:5,13,24 214:10,21
215:24 216:8,11 218:25
219:1,7

**versa**
166:11,21

**version**
34:6 146:23

**versus**
20:10 22:13 133:21
195:9 208:23 218:2

**vertical**
175:1

**VI**
75:8 90:9,13

**vice**
166:10,20

**view**
87:19 217:5

**VII**
88:13 100:4

**Village**
3:25

**Viterbi**
46:7 48:1

---

**W**

**W-r-i-t-e**
130:7

**walk**
88:21

**wanted**
114:19 151:25 189:17

**waveform**
44:10,11 88:23 89:4,18,
21 99:25 101:12,16
102:11,17 103:8,14,19
104:22 105:14,23
106:5,21 107:2,6,11,18
108:17,25 109:4,9,13,
22 110:8,23 111:8
112:9,18 113:25 114:2,
3 115:5 116:14 119:3,6,
9,11,25 120:2,6,7,11,

12,15 121:24 122:3,7,
18,21 123:12 124:3,4,5
128:13,16,18,21 129:3,
5,6,9,10,11,16,18,22,25
130:3,11,14,23,25
132:20,21 134:20
138:5,17 139:24,25
141:6,8,11,22 142:3,7
144:11,14 149:15,17,24
150:6,8 152:2,9, 153:13
156:25 157:10,21
158:24 159:18,20
160:2,13,15,23 161:18
168:13,24 169:6,13
177:10 179:17 181:10
182:12 185:2 205:7
213:23 214:9,20 215:19

**waveforms**
104:3,10

**waves**
109:23

**wearing**
61:13

**week**
20:15

**weighted**
52:14

**widely**
43:23 81:11 91:24

**word**
28:2 112:19 116:11
217:15

**wording**
110:17 159:3

**words**
91:25 118:24 123:15,20
124:9 128:23 133:2
139:8 140:17,22
162:23,24 216:25
217:3,4,19

**work**
8:10 20:18 21:7,18,23
22:18 30:21 31:20 33:5
63:18 64:8,22 65:15
97:6,14,18 98:11,16
99:19 114:25 151:16,21

166:14 211:20

**work-product**
97:21

**worked**
20:11 21:4 23:10 35:12

**working**
20:10 21:1 25:4,19
110:24

**worry**
136:13

**write**
16:17 23:5 25:25 27:7
35:20 40:17 41:5 45:25
51:12 66:23 81:19
84:10 87:4 89:2 91:6
101:21 102:5, 103:25
112:14 116:8 129:12
130:5,17 131:1,2 134:6
147:18 166:15,16
170:23 173:19 174:3

**writing**
5:2,10 28:5 30:10 40:15
129:14 167:6

**written**
5:13 27:16 30:8 35:15
40:7 53:13,14 76:23
81:14 85:2 177:23
178:9 181:2 188:15

**wrong**
31:4 185:21

**wrote**
11:25 24:5 27:24 34:1
35:23 39:1,17 40:1
41:2,15 42:10 43:22
44:5,7,19 48:21 50:12,
25 52:18 53:16,21,22
55:16 56:18 66:20,24
71:15 75:11 77:23
103:17 112:11 115:25
123:14 146:19 148:1
167:7

**www.mathworks.
com**
143:17,23

## Y

**year**
17:17 40:20 62:2 76:25
78:21 152:7 158:6
163:14

**years**
19:25 20:12 39:19
40:22 147:15

**yes-or-no**
32:18

**yesterday**
71:22

**Yn**
52:14