# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Nathanael M. Cousins, Magistrate Judge

4

5  REGENTS OF THE UNIVERSITY OF  )
   MINNESOTA,                    )
6                                )
                                 )
7           Plaintiff,           )
                                 )
   vs.                           )    No. C 18-00821-EJD
8                                )
   LSI CORPORATION, et al.,      )
9                                )
            Defendants.          )
10 _____)

11                               San Jose, California
                                 Wednesday, June 28, 2023
12
        TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC
13        SOUND RECORDING 1:05 - 1:10, 1:22 - 1:50 and
                  1:55 - 2:09 = 47 MINUTES
14
   APPEARANCES:
15
   For Plaintiff:
16                               K & L Gates, LLP
                                 210 Sixth Avenue
17                               Pittsburgh, Pennsylvania
                                   15222
18                         BY:   PATRICK JOSEPH MCELHINNY, ESQ.
                                 CHRISTOPHER MICHAEL VERDINI,
19                                 ESQ.

20 For Defendants:
                                 Kilpatrick Townsend &
21                                 Stockton, LLP
                                 1400 Wewatta Street, Suite 600
22                               Denver, Colorado 80202
                           BY:   KRISTOPHER LANE REED, ESQ.
23                               EDWARD JOHN MAYLE, ESQ.

24

25

2

1  Transcribed by:                    Echo Reporting, Inc.
                                      Contracted Court Reporter/
2                                     Transcriber
                                      echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<u>Wednesday, June 28, 2023</u>                                    <u>1:05 p.m.</u>

                        P-R-O-C-E-E-D-I-N-G-S

                            --oOo--

        THE CLERK:  Calling civil 18-0821, Regents of the

University versus LSA -- LSI Corporation, and others.

    Counsel, please state your appearances for the record.

        MR. MCELHINNY:  Your Honor, Patrick McElhinny of K

and L Gates on behalf of the Regents of the University of

Minnesota.  I'm with my colleague, Mr. Verdini.

        THE COURT:  Welcome to you both.

        MR. VERDINI:  Good morning, your Honor.  Well, I

guess we're afternoon now.

        THE COURT:  Now it's afternoon.  Well, I'll take

both as welcome.

        MR. REED:  Good afternoon, your Honor.

Christopher Reed from the Law Firm of Kilpatrick Townsend,

representing the Defendants LSI Corporation and Avago.  With

me is my colleague, Ted Mayle.

        THE COURT:  Welcome to you both.

        MR. REED:  Thank you.

        THE COURT:  All right.  And, first, some stage

setting to make sure we're talking about the right stuff.

We've got -- this case is back from -- from 2018, and it's

Judge Davila's case, of course; and I'm the referred

discovery judge here in this District.  So, welcome.  I just

4

1  wanted to meet you in person.  And that means that any

2  discovery orders I issue in the case may be appealed to

3  Judge Davila within 14 days.  That's just a general

4  proceeding going forward, both today and any disputes you

5  have in the future.

6       And the motions that I believe are ripe are 116, which

7  is Plaintiff's motion to compel discovery, and there's

8  supplemental briefing on it, but that was the original

9  motion, and 129 is the Defendants' motion to strike the

10 supplemental claim construction charts.  That one, too, has

11 supplemental briefing to update me.  But those, I believe,

12 are the -- the ripe motions for discussion today.

13       So, let me just pause there to see if Plaintiff agrees

14 that's what we have on the floor today.

15            MR. MCELHINNY:  We agree, your Honor.

16            THE COURT:  Very good.  How about on the Defense?

17            MR. REED:  We agree as well, your Honor.

18            THE COURT:  All right.  So, you may have already

19 done this -- you probably have, but what would be very

20 helpful for me is to -- particularly on the motion to compel

21 discovery but also on the supplemental claim construction

22 chart, to have you confer further just for about 10 minutes

23 here, if there's any unresolved issues, to see if you can

24 resolve them.  But, short of that, if you can update me.

25 There's been roughly five years since these were filed, and

5

1  your briefs addressed this, but I really want to make sure
2  I'm not spending your time and my time litigating issues
3  that you've already decided or are not -- you know, not ripe
4  anymore.  For example, I know in the motion to compel
5  discovery that you reported that parts B through D were
6  resolved.  So, I think we're not talking about that, but I
7  don't want to ask you questions about issues that you think
8  are already resolved and I -- I just don't appreciate that
9  they were resolved or, worse, maybe it's evolved in some new
10 direction and there's new issues which I'm not appreciating.
11      So, I want you to confer together to really set our
12 agenda and say here's the issues that you need my help on,
13 and here's others which you don't need my help on and we're
14 not going to talk about today, so I can focus on the things
15 that are helpful to you to resolve.
16      So, with that short condition of about 10 minutes of
17 further conferring, my deputy -- I think the conference room
18 straight out there is open for you.  You can chat there; and
19 if -- and if you say you've already done all that, then just
20 10 minutes of cooling your heels and we'll come back for the
21 -- to take it up in person.
22      Thanks for your patience.  And there's no one else
23 coming in here.  So, if you leave things, it will stay where
24 they are.
25          MR. MCELHINNY:  Thank you, your Honor.

6

1      THE COURT:  If you settle the case, there's an
2  extra bonus.

3      (Pause.)

4      THE COURT:  They weren't supposed to laugh that
5  loud.

6      (Proceedings recessed briefly.)

7      THE COURT:  All right.  We're back on the record
8  in the University of Minnesota case, and counsel are still
9  present, and I do have my screen up.  There's no one else
10 observing our hearing from the public at the moment; but if
11 I look down, I'm looking to make sure that continues to be
12 the case and to see if the attorneys in the next Zoom matter
13 appear.

14     All right.  So, thank you for your further
15 collaboration.  Give me an update -- I'm looking at the
16 Plaintiff's side -- on the motion to compel discovery, which
17 is your motion.  What's the status, and how can I help you
18 on that one?

19     And wherever you are, you can stay -- you can come up,
20 stay seated, wherever's comfortable for you.  But just speak
21 in the microphone as we're making a recording, and that will
22 aid our record.

23     MR. MCELHINNY:  Your Honor, if it's all right,
24 I'll come to the podium.

25     THE COURT:  Yeah, wherever's comfortable for you.

1  We've got multiple of those.  You can give one to my law

2  clerk over there.  That will aid his understanding and the

3  other party as well.  Thank you.  Thank you very much.

4     I'm receiving a -- looks like a thick packet (1:23:31)

5  Golden Gophers, but I'm afraid it's, instead, fact

6  discovery.  Very disappointing.

7     All right.  Go ahead.

8         MR. MCELHINNY:  Thank you, your Honor.  Again, Pat

9  McElhinny for the Plaintiff.

10     We, regrettably, did not resolve this.

11         THE COURT:  I appreciate your efforts.

12         MR. MCELHINNY:  It is the case of only one of the

13  four issues originally presented in the motion are still

14  alive because they've withdrawn their objections on the

15  other three.

16         THE COURT:  That's Part -- Part A is the part

17  that's remaining?

18         MR. MCELHINNY:  That is correct.

19         THE COURT:  Yeah.  Thank you.

20         MR. MCELHINNY:  And what I'd like to do is just

21  step through the basis.  I'm happy to answer questions.

22  It's apparent that you've read all the papers.

23         THE COURT:  I've read them, but that doesn't mean

24  I understand them.  So, I appreciate you being here to make

25  sure I understand them.

8

1          MR. MCELHINNY:  Okay.

2          THE COURT:  And what I'll do is have you go first,

3  and then I'll give them a chance to respond, and -- and I'll

4  give you a chance to reply if there's anything to reply to.

5          MR. MCELHINNY:  Okay.  Thank you very much.

6          THE COURT:  Go ahead.

7          MR. MCELHINNY:  So, on slide two, I just want to

8  -- I'll give you a brief summary, and then I'll talk a

9  little bit about the factual predicate for our discovery and

10  emphasize that the folks here on the other side here are

11  essentially converting this into a summary judgment on a big

12  piece of our damages, and we haven't had a chance to -- to

13  actually do discovery.  We are in discovery.  And there are

14  -- are two grounds that the Court should overrule, the

15  burdensomeness objection and the relevance objection.

16      So, on the summary of the argument, this third slide,

17  the -- there is a factual predicate for the discovery here.

18  The University has alleged that the Defendants used the

19  patented method in something called the sale cycle --

20  everyone in the industry calls it a sale cycle -- to achieve

21  design wins.  And we want evidence about the records of all

22  of those uses and their value, and one of the ways that

23  those uses are valued is through worldwide sales.

24      There are three reasons why that evidence is relevant.

25  One is, as the Court in Carnegie Melon found -- and for your

9

1  Honor's information, Mr. Verdini and I represented Carnegie
2  Melon in that case.  So, we're very familiar with it.  The
3  Court in -- the Federal Circuit in that case upheld the
4  reasonable royalty on one theory was a percentage of our
5  expert proffered -- you know, we had this worldwide universe
6  of sales, and she said, Okay, well 23 or 25 percent of the
7  chips that are made worldwide get moved back into the United
8  States and are in your laptop and my laptop; and that was
9  the basis for us to recover damages.
10      And, so, just on that basis alone, we would be entitled
11  to worldwide sales information.  But the -- more of the
12  information, you know, about the sales cycle itself is
13  relevant because the thing that Carnegie Melon did -- the
14  Federal Circuit did in Carnegie Melon, is make the location
15  of the sale relevant to a method claim, and it -- it said --
16  it remanded us and said you have to go back and talk about
17  the location of the sale, and here's all these factors.  So,
18  that's what we're trying to get discovery on.
19      And then the third reason that this is all relevant is
20  that whole framework of the law I think has changed in our
21  favor in the WesternGECO case where the -- the Court said
22  that you are entitled to worldwide sales if the infringing
23  activity occurs in the U.S.  That's my read of it.  I think
24  it's a fair read.  I read it again this morning, and I think
25  that is where -- where we will ultimately be even though

1 that was a 271(f) case.

2     So, just a little bit more on the factual predicate.

3 We have -- just so you can conceptualize it, we have a

4 picture of the accused product.  It's a rechanneled chip.

5 We have on slides 5 and thereafter some pullouts from the

6 complaint that show, you know, that we made very specific

7 and detailed allegations about the sale cycle.  We're using

8 the same expert in this case we used in Carnegie Melon.

9          THE COURT:  As in Carnegie Melon?

10          MR. MCELHINNY:  The same experts actually, Mr. --

11 or Doctor Byorick (phonetic) and Cathy Watts (phonetic).

12 We're using the same experts in this case.

13          THE COURT:  Just to divert you for a second.

14 You've got your tutorial with Judge Davila coming up in

15 July, right?

16          MR. MCELHINNY:  Yes.  Correct.

17          THE COURT:  Who -- who is going to be doing that

18 show?  Will you have some experts as part of that --

19          MR. MCELHINNY:  Well, we -- we are going to --

20          THE COURT:  -- show pejoratively?  Who's going to

21 be giving the presentation?

22          MR. MCELHINNY:  Our -- we would like our technical

23 expert to do it, but he's only able to do it remotely.  So,

24 we're going to need to be in touch with his chambers.  He

25 has been promoted in the years since we've done this and is

1  now the Provost at Georgia Tech.  And, so, his schedule is a

2  little more -- a lot more challenging that it used to be.

3  So, if he can't do it, we're probably going to have one of

4  our -- one of my colleagues do it.  And -- but I -- there

5  are only three terms at issue in the claim construction.

6  So, I think it will be a relatively short presentation.

7          THE COURT:  And I take it you don't think I need

8  to wait until then and watch their presentation to

9  understand --

10         MR. MCELHINNY:  No.

11         THE COURT:  -- what you're talking about?

12         MR. MCELHINNY:  Absolutely not.  I mean, what

13  we're talking about here is just, you know, the -- the

14  simple facts that the Defendants used this patented method

15  in this very long and lengthy sale cycle; if you -- we -- we

16  put together an expert declaration from Doctor Byorick.

17  He's an industry expert.  He explains the sale cycle.  We

18  have a graphic there that shows you there is like a two-year

19  period on slide 7 where all this happened -- all this

20  actually happens in the U.S.  All the infringing uses take

21  place in the U.S. during these various phases of the -- the

22  timeline on the top.  And it's those uses that we are

23  accusing of infringement, among others; and those uses are

24  particularly valuable because they lead to the design wins

25  which are the sales.  That all happens in the U.S.  That is

12

1   our allegation.

2       And I -- I don't think there's really much of a dispute

3   about the fact that there is a sale cycle, that the uses are

4   made during the -- there's a -- assuming infringement, they

5   would say, Well, yeah, the uses are made during the sale

6   cycle.  Their SEC filings are replete with descriptions of

7   the sale cycle, et cetera.

8       And, so, that's the kind of discovery we're seeking.

9   We laid it out a little bit on slide 10.  Their objections

10  are limited to burden and relevance.  You see that they cite

11  the Caltech case, a District Court decision in the Caltech

12  case from October of 2017 in their -- in their objection.

13  There's a lot that's happened since then on Caltech.  But

14  let me just briefly push the burden thing aside.

15      They need to show burden if they want to stand on that.

16  They submitted a declaration by a Mr. Mistry, M-I-S-T-R-Y.

17  It doesn't address burden.  Mr. Mistry was not even an

18  employee of either party here.  They didn't lay the

19  foundation for any of his testimony; but, so, we shouldn't

20  need to worry about the burden point.  We can talk a little

21  bit about it if -- if they do, but I think that this really

22  turns on relevance, which tells you something because, you

23  know, it's discovery.  And we have very detailed allegations

24  that support the relevance.

25      And, so, as I said at the outset on slide 15, the

13

1 worldwide sales is relevant just to do the math for the

2 percentage of imports into the United States.  So, that's

3 one thing that we should get.

4      The second thing is all of this information and

5 evidence about the -- the sale cycle and the design cycle,

6 the design wins, is relevant under both <u>Caltech</u> and <u>Carnegie</u>

7 <u>Melon</u>.  It's -- we are -- we're using the same theory; and,

8 candidly, the same expert that we used and are using here

9 was used by Caltech because Quinn Emanuel was on the other

10 side of the <u>CNU</u> case.  They -- they saw what happened in

11 that case.  They hired her during the <u>Caltech</u> case.  So, it

12 is all the same theory.

13      And --

14           THE COURT:  It's a small world is what you're

15 saying.

16           MR. MCELHINNY:  It is.  And in <u>Caltech</u>, you know,

17 they cite this one case, this one opinion that denied a

18 little bit of what we were looking for, but they have

19 ignored the prior opinion that granted all of the

20 information on the sale cycle, and then they ignored the

21 subsequent history, which is where the District Court gave a

22 -- a lengthy instruction, and we quoted here on slide 17

23 about the sale cycle and how it applies and, you know, the

24 basis for the damages claim.  And the Federal Circuit

25 endorsed that.

14

1          THE COURT:  Yeah.  If I might give you a chance to

2  preempt their argument.  They're going to tell me in a

3  moment that it's burdensome, irrelevant and burdensome and I

4  should deny your request.

5      Is there some way to address the burden assertions they

6  make?  Is there some compromise to say, Well, if you carved

7  out this little piece, you'd still get most of what you

8  wanted, but it would address their concerns about burden,

9  and that would be the -- the reasonable approach?

10          MR. MCELHINNY:  I don't think we're going to hear

11  a lot about burdensomeness.  I mean, they don't -- they

12  haven't laid a factual predicate for that.  They've never

13  explained the burden to us.  We know for a fact that the

14  sales information on invoice -- on an invoice basis is all

15  in one database, and they can produce, you know, an Excel

16  spreadsheet electronically.  It's not -- that's not

17  burdensome.

18      Mr. Mistry in his declaration says all this stuff is in

19  -- at their headquarters in California and so it should all

20  be reasonably accessible.  We're going to do depositions of

21  the people involved in the process.  If there's a particular

22  set of issues with respect to burdensomeness, we'd be happy

23  to collaborate on that and try to get what we need while not

24  imposing a burden.

25          THE COURT:  All right.  But at this moment, you --

15

1  there's no --

2          MR. MCELHINNY:  I mean, I --

3          THE COURT:  There's no parameters of that that are

4  in the air?

5          MR. MCELHINNY:  I have not given any -- they have

6  not given us any sort of specifics about what burden -- you

7  know, what burdens have been imposed, which is why their

8  objection should be overruled, because they -- you know, the

9  burden is on them to come forward with detail on that

10 burden.

11         THE COURT:  All right.  Thank you.  Unless you

12 have -- you'll give your closing argument.  I've read all

13 you've put there on the rest of your slides.

14         MR. MCELHINNY:  So, one -- one thing is in their

15 -- in their final brief here on supplemental briefing, they

16 say, Well, all right.  Okay.  This is a method claim.  So,

17 method claims, sales -- the sales location is irrelevant.

18 So, we've come full circle.  They originally said, Well, all

19 of our sales are foreign sales.  So, they're not relevant

20 because the location of the sales is relevant, and that's

21 the whole point of the Mistry declaration.

22     Now they say, Well, it's not relevant.  But, in fact,

23 the claim at issue -- the claims at issue in Carnegie Melon

24 were method claims.  And, so, that's a distinction that --

25 that was -- that didn't matter in the Carnegie Melon case.

16

1 And it doesn't matter here.  It doesn't matter under the

2 theory that we have.  It doesn't matter under WesternGECO or

3 any of these.  The infringing act is here in the U.S., and

4 it leads to all those sales.

5          THE COURT:  All right.  And the scope of the order

6 you want here -- I'm just being sensitive to what I'm

7 committing to because we're -- this is our first get

8 together.

9          MR. MCELHINNY:  Absolutely.

10          THE COURT:  So, you've got document requests,

11 interrogatories, admissions, depositions.  This could all

12 play -- you know, whatever I say here --

13          MR. MCELHINNY:  Absolutely.

14          THE COURT:  -- could impact all that.  So, right

15 now, what are you asking me to -- to order?

16          MR. MCELHINNY:  We are asking you to overrule the

17 objection that these -- these so-called foreign activities

18 -- I forget exactly how they framed them -- are irrelevant,

19 and then that's a basis upon which discovery can be opposed.

20          THE COURT:  So, discovery generally or just

21 limited to --

22          MR. MCELHINNY:  Discovery generally.  I mean, if

23 you're more comfortable with me addressing the specific

24 requests, I'm sure the parties could work from whatever

25 ruling you make on that and apply it going forward.  But I

17

1 think if you overrule that -- that particular objection
2 generally, we'll also know the rules of the road for the
3 rest of the case.
4         THE COURT:  Yes.  All right.  Very good.  Thank
5 you very much.
6         MR. MCELHINNY:  Thank you.
7         THE COURT:  Let me get the Defendants'
8 perspective.
9         MR. REED:  Good afternoon, your Honor.  What's
10 happening here is the University is asking this Court to do
11 what no judge in this District and certainly not the Federal
12 Circuit has ever endorsed, and that is to order discovery of
13 exclusively foreign sales, and we're talking about foreign
14 sales here.  Our product's accused of infringing a method
15 claim, purely a method claim.
16         THE COURT:  And let's jump right on that.  What --
17 one of the last points you raised, your assertion is, well,
18 Carnegie Melon was also a method claim.  We're doing the
19 same thing as in that case.  Why shouldn't I say, so what?
20 Explain to me the significance of the method claim?
21         MR. REED:  So, there's really three principles
22 involved with respect to the method claim, right.  The first
23 is the overarching principle and the presumption against
24 extraterritorial effect of patents.  That's, you know, the
25 Microsoft v. AT&T Supreme Court case.  There's a presumption

18

1  here, and the method has to be honored.

2      The second is that when we're talking about method

3  claims, there's ramifications of only asserting method

4  claims.  You know, the patent that's at issue here, the '601

5  patent, there were apparatus claims.  There were claims they

6  could have asserted against the product itself, but they

7  chose not to.  Why did they choose not to?  Because if you

8  assert against a product, you have to prove that you've

9  marked the products that were made by licensees or others.

10 They couldn't do that here.  If they did that, they'd get no

11 damages because the patent expired right after they filed.

12 So, they went just with method claims.

13     But there's implications of choosing method claims,

14 implications of that election by them to only assert method

15 claims that have to be respected here.

16     And the second and maybe the most important principle

17 is there's been black letter law for over 30 years, 30 years

18 in the Federal Circuit, that a method claim is not directly

19 infringed by the sale of an apparatus even though it is

20 capable of performing -- performing only the patented

21 method.  The sale of an apparatus is not direct infringement

22 of a method claim.  And if there's a method claim, you have

23 to -- a person must have practiced -- and I'm quoting the

24 Federal Circuit again -- a person must have practiced all

25 the steps of the method claim.

1          THE COURT:  Which -- which case are you citing
2  here?  You're quoting something.  What are you quoting?
3          MR. REED:  This is the <u>Joy Techs</u> case, Federal
4  Circuit 1993.  It's in our supplemental brief, your Honor.
5      Now, with those principles in mind, let's talk about
6  what they're asking for, your Honor.  Well, first of all,
7  the only thing on the table is foreign sales.  We've given
8  them discovery on domestic sales, domestic activity, the
9  sale cycle they referred to.  We've given them discovery on
10 that.  That's not at issue.
11     All we're talking about is purely foreign activity and
12 purely foreign revenue.  That's all that is at issue.  So,
13 that presumption we talked about at the beginning, that
14 comes into effect because that's all we're talking about is
15 the foreign sales, foreign activity.
16     The second, this concept -- they keep referring to this
17 concept of accused products.  That's really a misnomer in
18 this case because we're not talking about accused products.
19 These are method claims and accused -- there's accused
20 performance of methods.  And, again, a method claim is not
21 infringed simply because you have a sale of a product that
22 can do that.  That's what the Federal Circuit has said,
23 again, for 30 years.
24     So, on its face, in those principles we discussed, the
25 discovery that they're seeking is not relevant in this

20

1 particular matter.  So, how they're trying to get around

2 this is they cite to these other cases, try to say that

3 these cases somehow preempt this 30 years of black letter

4 law from the Federal Circuit.  And the bottom line is they

5 don't.

6        And I'll start with the Caltech decision.  They talk

7 about how Caltech changed -- changed the game in some way,

8 but it didn't.  That decision involved direct infringement

9 of apparatus claim -- an apparatus claim.  What is the

10 location -- they ask what is the location of the sale of an

11 apparatus claim?  In the context of the decision, it said

12 there's no categorical rule as to the location of an

13 apparatus under Halo.  That's it.

14        But that case did not address the scenario here.  It

15 did not address the scenario where you have no apparatus

16 claim, only a method claim because you can't sell a method

17 under 271(a).  You perform a method under 271(a).  So, the

18 location of where you infringe a method is the place where

19 the method is performed.  It's not where some sale took

20 place.  That's Caltech.

21        So, you turn to the WesternGECO or WesternGECO.  I'm

22 not sure exactly how you pronounce it, but we'll go with

23 WesternGECO because that's how counsel pronounced it.  But

24 that decision, he said he read it this morning.  I read it

25 this morning as well, and that decision expressly is limited

21

1  to Section 271(f).

2      Now, let's talk just briefly about Section 271(f).  Our

3  case doesn't involve 271(f).  In fact, the Federal Circuit

4  has said that Section 271(f) cannot imply -- cannot apply to

5  method or process.  So, this is not a 271(f) case.

6  WesternGECO was a 271(f) case, and it was limited to Section

7  271(f), and why was that the case?  Well, 271(f) is actually

8  a statutory exception to the rule we talked about earlier,

9  the presumption we talked about earlier, and there was a

10 case that came up that, well, patents can apply to

11 territorially.  People were getting around U.S. patents by

12 pretty much doing everything in the U.S., making all these

13 components but not doing the last step.  They took these

14 components that were made in the U.S.  They shipped them

15 overseas.  They had the final product assembled overseas and

16 said, That doesn't infringe because you can't apply it for

17 territorially.

18     Well, Cong -- and the Court said, You know what?

19 You're right, because you can't.  So, Congress stepped in,

20 and it enacted 271(f), and they said, Look, we don't like

21 this.  We don't think this is right.  So, we're going to

22 create a statutory exception to this application of

23 extraterritoriality and say that if you do this specific

24 behavior, if you make all those components in the U.S. and

25 then you ship them overseas and assemble overseas, that's

22

1  still infringement -- that's still infringement of the U.S.

2  patent.

3      The WesternGECO case involved only 271(f).  It was

4  limited to Section 271(f).  And, so to say that WesternGECO

5  resolved anything in this case is just not correct.

6      What this Court should rely on is existing Federal

7  Circuit precedent, and that is the Power Integrations case.

8  So, what they're trying to say in effect is if you do

9  anything in the U.S., if you do anything in the U.S., if you

10 have this design win or you have this design activity, then

11 4, 5, 10, 12, 15 steps down the road, that somehow you can

12 trace whatever you did in the U.S. to some activity, some

13 performance of that method in a foreign country, you should

14 get damages for that.  And the Federal Circuit in the Power

15 Integrations case -- and that's cited on pages -- in our

16 original brief it's on page 13 and 14 -- said that's not how

17 patent law works.  It's not just attenuation causality

18 that's how we measure damages.  It said each act of

19 infringement breaks the chain of causation, and you don't

20 apply it.  But the only way you arrive where they are trying

21 to get this Court to go is by saying that WesternGECO

22 implicitly overruled Power Integrations.  Now, there has

23 been at least one court that said that -- District Court in

24 Delaware that said, Well, we read WesternGECO as implicitly

25 overruling that.  That's wrong.  And then other courts that

23

1  say, We're not going to do that.  We don't think it's

2  appropriate for a District Court, in the absence of

3  direction from the Federal Circuit, in the absence of

4  direction from the Supreme Court, to step in and say, Oh,

5  WesternGECO overruled Power Integrations, and it didn't.

6  Power Integrations is a 271(a) case.  This is a 271(a) case.

7  Power Integrations holds, and this idea of proximate

8  causation of foreign sales justifies liability for foreign

9  -- using foreign methods just simply doesn't apply.

10         THE COURT:  What's the -- the harm?  What if I get

11  this wrong in your favor and I don't allow this discovery

12  and they're going to later go to the Federal Circuit and

13  say, Well, we were hobbled by the Court at the very

14  beginning from getting the necessary discovery to present

15  our case versus getting it wrong in the other direction and

16  I allow this discovery and you strongly say, no, I shouldn't

17  allow the discovery, but I allow the discovery?  You're

18  still going to have arguments that can be made to Judge

19  Davila and the Federal Circuit that, No, that's not

20  admissible, experts can't rely on it.  If the Court enters

21  judgment, that -- that calculation is in error.  But you're

22  going to have many further arguments to make before there's

23  any prejudice, if that makes sense to you.

24     What is the harm if I allow the discovery?

25         MR. REED:  The primary harm is it enlarges the

24

1  scope of this case by some multiple, maybe even in the order
2  of magnitude in terms of what we're talking about.  All --
3  almost all of our products they are identifying here made
4  overseas, invoiced overseas, sold overseas, manufactured
5  overseas, shipped overseas.
6             THE COURT:  And what is that magnitude?  Give me
7  -- just ballpark it here, because I've got a number of
8  different billion -- billion dollar cases.  What's the
9  commerce add up to of all these different products,
10 understanding that it's a method claim?
11            MR. REED:  Of -- of the products themselves?
12            THE COURT:  Yeah.
13            MR. REED:  We're looking at -- in the United
14 States, we're looking at an order of tens of millions.
15            THE COURT:  Okay.  And how about overseas?
16            MR. REED:  It's a much much great er number.
17            THE COURT:  Yeah.  All right.  So, that in that --
18            MR. REED:  That's for total sales.  Now, there's
19 other --
20            THE COURT:  Yeah, no, I understand.
21            MR. REED:  There's other arguments about
22 noninfringement --
23            THE COURT:  But the damages claim is going to be a
24 different one.
25            MR. REED:  -- and what they haven't accused in the

1 case of being -- but I'm talking just total scope of our

2 client's business in rechanneled chips, yeah, much much

3 larger overseas.

4          THE COURT:  Yeah.  All right.  That was my guess.

5 All right.  And do you want to tackle anything about the

6 burden or is the -- the relevance the -- the main point?

7          MR. REED:  I mean, the -- the burden -- and you're

8 right, the relevance is the main point.

9          THE COURT:  Yeah.

10          MR. REED:  So, I mean, the burden is there because

11 this is an old case, and the damages window is 2010 to 2016.

12 It's not like we're just -- we're just producing new

13 information.  We have to go back, and we have to resurrect

14 this information basically to produce it in the details that

15 they want in discovery.  So, that -- that's burdensome given

16 that we're now in 2023, but the main point is relevance,

17 your Honor.

18          THE COURT:  All right.  Thank you very much.

19          MR. REED:  All right.  Thank you.

20          THE COURT:  All right.  And do you want to quickly

21 address the -- anything there?  Not to repeat, but I'll give

22 you a chance.

23          MR. MCELHINNY:  Your Honor, you got it exactly

24 right, and you preempted my note.  The issue is significant

25 enough.  It's like -- in Carnegie Melon, it was four to one.

26

1  I mean, we had 25 percent versus the whole universe, and

2  that's -- we would be back here, and we shouldn't have to

3  come back here.  This is not summary judgment.  They're

4  looking for summary judgment on all those claims, and when

5  he characterizes them as exclusively foreign sales, we

6  dispute that, and we (indiscernible) of evidence that shows

7  that.  And, you know, <u>Power Integrations</u> preceded <u>Carnegie</u>

8  <u>Melon</u>, preceded <u>Caltech</u>.  <u>Carnegie Melon</u> is the decision

9  that makes for method claims the location of the sale

10 relevant.  It was a little bit of a surprise to us, but

11 that's what they did, no denying it.  And if I'm going to

12 apply that case to this one when I ask for jury

13 instructions, they're going to be in here saying we have to

14 show evidence on where the sale took place, where the -- you

15 know.  And then I'll be, Well, you know, I have to get that

16 evidence first, and that's why we should be here.

17        THE COURT:  Yeah.  All right.  I'm going to give

18 an invitation to you, which is to file a proposed order on

19 your motion, and here's the guidance I want to give you,

20 which is I'm concerned about a forward looking -- you know,

21 something you haven't asked for now, me determining it's

22 relevant before you've even asked for it.  For example, you

23 know, saying here's a deposition question you're going to

24 ask six months from now and you want a pre-order from me

25 that, you know, I'm permitting the question.  I want to be a

27

1 little more careful than that and approve the discovery you

2 have propounded now, which is subject to this discovery

3 brief.  I'm inclined to -- to grant your motion and to order

4 the discovery, but I don't want it to be overly broad that

5 I'm addressing future problems which I don't even know

6 about.

7          MR. MCELHINNY:  Okay.

8          THE COURT:  So, if you can submit a proposed order

9 and, of course, they'll have a chance to look at that, but

10 that would help me to -- to get it right.

11          MR. MCELHINNY:  I'd be happy to submit after

12 consultation.

13          THE COURT:  Yeah.  If you could consult, and if

14 you can file something by Friday.  Can you get that done?

15 Too -- too fast?

16          MR. MCELHINNY:  I'm actually on an airplane all --

17 all day tomorrow.

18          THE COURT:  Oh, I'm sorry about that.  How about a

19 week from today?

20          MR. MCELHINNY:  That would be -- we can do that.

21          THE COURT:  There's the 4th of July in between,

22 but --

23          MR. MCELHINNY:  That won't be a problem.

24          THE COURT:  All right.  So, I'll ask you -- and I

25 haven't granted your motion, but I'm asking you to file a

28

1  proposed order by a week from today.

2          MR. MCELHINNY:  Yes.  Thank you.

3          THE COURT:  All right.  Thank you very much.

4      And we're going to just take a pause.  You can stay

5  where you are.  I'm going to do this Zoom thing here, and

6  I'll come back to take the next issue on the motion to

7  strike the supplemental claims.  All right.  One moment.

8      (Proceedings recessed briefly.)

9          THE COURT:  All right.  Back in real life as they

10 say.

11     All right.  So, the second motion is the Defendant's

12 motion to strike the supplemental claim construction chart.

13 So, I'll have the Defense go first on that one.

14         MR. REED:  Your Honor, I realized I misspoke in

15 one argument.  I just want to make a correction on the

16 record.  I'd indicated tens of millions of units in the

17 United States.  It's actually tens of thousands of units.

18         THE COURT:  Thousands.  All right.

19         MR. REED:  It doesn't impact the granting of the

20 motion I understand.  I just want to make sure the record's

21 clear that it's actually tends of thousands of units in the

22 United States.

23         THE COURT:  And you -- I think you said millions,

24 and now you said units.  So, maybe that's a different --

25         MR. REED:  Tens of thousands units we're talking

29

1  about.

2          THE COURT:  Tens of thousands of units.  Thank

3  you.  And the value of them might be totally different,

4  but --

5          MR. REED:  Completely different, your Honor.

6          THE COURT:  All right.  Now, if you want to take

7  up the supplemental claim construction.

8          MR. REED:  My colleague, Ted Mayle, will handle

9  that.

10          THE COURT:  Very good.  I welcome him.

11          MR. MAYLE:  May it please the Court.  There's two

12  reasons we filed -- two bases to grant the motion.  The

13  first one I won't belabor.  It's just procedural, that the

14  Plaintiff did not follow the scheduling order and did not

15  seek or obtain leave of court.

16      I'll move on from that unless you have any questions on

17  that, your Honor.

18          THE COURT:  Yeah.  I guess my reaction to this is

19  that Judge Ralph (phonetic), back when I was in Minnesota --

20  gosh, it's been five years and we're in a different court --

21  not that I wouldn't endorse -- or enforce the rules in

22  Minnesota, but we've got our own Local Rules and procedures,

23  and I'm probably going to let that one pass.  But go now to

24  your second point.

25          MR. MAYLE:  Yes, sir, your Honor.  Well, under --

30

1  under Judge Ralph's procedure and under the rules for this

2  Court, if you have -- try to update your infringement --

3  amend your infringement contentions, the Local Rules in this

4  Court do lay out the scenarios.  None of those apply here,

5  and there was no diligence.

6      Unlike -- one thing that's different in this case than

7  -- than it would have been had it been filed here

8  originally, the Defense already produced the core technical

9  documents in the case before the Plaintiff had to do their

10 infringement contentions.  So, they basically had everything

11 that they need, and after they did their infringement

12 contentions, the very page that they cited, which is at

13 Docket 137, shows that there was a big problem with their

14 infringement theory.  And, so, they attempted to fix this by

15 just changing their theory wholesale.

16     Now, they're going to argue that they haven't changed

17 anything.  If that was true, then there should be no harm to

18 them in granting this motion.

19     The -- the page that they cited from the product data

20 sheet shows that there's a further component in the machine

21 that they accuse that undoes something earlier that messes

22 up their infringement theory.  Remember, as my colleague

23 said, it's a method claim.  And in this claim method, the

24 method can only be infringed by the bits that get written

25 actually to the disk, and these bits get manipulated inside

31

1   this chip inside a hard disk drive component by component.
2   And there's this first component that the Plaintiff accuses
3   as of the infringement, but the -- the internal documents
4   that we provided and that they cited -- and they cited this
5   exact page in their original contentions -- show that the
6   second component  undoes the alleged infringement of the
7   first component.
8        So, I'll get to how they changed that in a minute.
9   But, before I get that, also the public domain information
10  that the Plaintiff has in their complaint -- they talk about
11  their complaint -- they cited the patents of our client in
12  their complaint that allegedly show infringement, and they
13  used some of these patents in a 12(b)(6) hearing in front of
14  the other District Judge before it was -- which they
15  prevailed on, and they showed our patents and said, Look,
16  here's how this infringement occurs in this one component
17  here.
18       Those patents that they relied on also show, consistent
19  with our confidential discovery that we provided to them,
20  that the further component undoes the alleged infringement.
21  So, now that the date has come for their infringement
22  contentions, they realize this.  And, so, they tried to
23  change their infringement theory in three ways.  One, they
24  say, Oh, you could just turn off that other component.  They
25  component they don't like, just turn it off.  So, that's a

32

1 new theory.  They could have made that from the beginning.

2      They have a second theory that's not explained, and we

3 still don't know what they mean, that even if you don't turn

4 off the second component, it doesn't matter somehow.

5      And they have a third theory only to the independent

6 claim, which is the broader claim in the case, that when you

7 leave the second component on, which in the real world

8 cannot be turned off, just by the way, that the infringement

9 still happens; but it happens in a different way they say.

10 In particular -- I don't want to get all technical here --

11 and this District Judge will see more technical stuff, but

12 there's a letter J in their claim.  It's a variable.  It has

13 to be -- for the independent claim, the broad claim in the

14 case, it can go as high as, you know, infinity.  We

15 invalidated that claim the -- inner parties' review.  And,

16 so, all they have is this narrower claim left where the J

17 number has to be nine or less.

18      Their supplemental contentions -- sorry, they call them

19 amended -- now we're moving to strike.  They filed these

20 before the IPR decision.  And for claim 13 it shows that J

21 number is actually higher than nine.  It's 27 or 19.  So, it

22 doesn't infringe the dependent claim under their own theory.

23      So, for the -- the claims that are left in the case in

24 their infringement contention, the one we're moving to

25 strike, they don't mention that -- that pesky third fact.

33

1   So, all they're left with for the claims that are still
2   remaining is to turn off the component, the component that
3   causes no infringement.  They say you could turn it off.
4   That's still in the case.  They could have made that all
5   along.  I don't think that's possible anyway.  And they have
6   the second theory, not explained; and it contradicts their
7   third theory that you can leave the second component on and
8   somehow this doesn't matter, even though the J number does
9   go below the infringement threshold.  They haven't explained
10  that.  And it could have been in the initial contention.
11  It's highly prejudicial to let them get away with this
12  because we're due claim construction.  We had an IPR, not
13  based on this theory.  The claim has to mean the same for
14  infringement invalidity.  Remember, the dependent claim
15  survived.

16      It would be inconsistent -- the way that that claim
17  survived the IPR is inconsistent with their theory that you
18  could have this other component and just by chance the
19  number doesn't go above nine.  It's inconsistent.  We can't
20  go back on that.  We're estopped from that.  So, it is
21  hugely impactful in this case whether they get to go with
22  this new theory that's inconsistent, could have been
23  alleged --

24          THE COURT:  Maybe on litigation time; but in real
25  world time, there's been -- quite a bit of time has elapsed

34

1  since the motion was filed.  Are they going to get up here
2  and tell me they've got a new theory?  I mean, is it in the
3  wind that they're going to have a new supplemental or
4  amended claim construction that they might come up with
5  eventually?
6          MR. MAYLE:  I don't think so.  We did meet and
7  confer with them.  They did seem to indicate -- they can
8  tell me if I'm wrong -- that they're not using the theory
9  for the claims that are left because, as I told you, it
10  doesn't work.  The J number has to be between two and nine,
11  and it's 27.  It says so in their own amended contention
12  which they took from our confidential discovery.
13      So, what they're trying to go with is this amorphous,
14  not explained theory.  So, they have two screens.  Turn the
15  second component on or you leave it on and they don't
16  infringe.  That's their first and third theory, you don't
17  infringe the dependent claim.
18      They have this second theory which they've never
19  explained, that you leave the component on but somehow they
20  still win.  We don't know what that means, and I think it's
21  inconsistent with the positions they've taken over the years
22  in their IPR and in their claim construction.
23          THE COURT:  All right.  I guess I -- I'm
24  challenged without a brief.  You're doing everything in the
25  IPO proceeding to know -- and you've -- you've made the

35

1  arguments to -- but what's inconsistent, what's -- what's
2  consistent, there's a lot of record (Zoom glitch), but I --
3  I hear you.

4          MR. MAYLE:  I could explain just a little.

5          THE COURT:  Yeah.

6          MR. MAYLE:  Try not to be technical.  At -- at
7  Docket 136 -- I don't know if you have it.  I don't have
8  slides.

9          THE COURT:  I will -- I will have it available.

10         MR. MAYLE:  But at page nine of Docket 136, they
11 have a table taken from our prior data sheet, and they have
12 this column of J.  It's from our documents, and it's the
13 second to the last column.  It has the J numbers listed, 19,
14 19, 19, 27.  Remember it has to be less than -- less than 10
15 for them to win on this.  It's still a live claim.  But it
16 can't.

17     So, now they're just saying, Oh, you leave this
18 component on and somehow it just -- as I gather, just once
19 in a while, it doesn't add up to these higher numbers.  Just
20 by chance it could, right.  But in the -- in the invalidity
21 case that was in the IPR, we had prior art that did
22 anticipate the independent claim.  And they won on the
23 dependent claim because the prior art had millions of
24 different combinations of these bits, and all of them except
25 for one out of the millions -- they found the one

36

1  hypothetical that wouldn't meet the claim.  And, so, that

2  claim is alive.

3      But now they're saying for infringement, Oh, it doesn't

4  have to always do this.  And, so, you can -- so, I think

5  it's inconsistent, and they should be judicially estopped

6  from that, and it would prejudice us because there's an IPR

7  estoppel.  I don't know how familiar you are with that, your

8  Honor; but once there's a final decision from the Patent

9  Office, any of the grounds of invalidity that we -- that we

10 didn't raise, we can't now raise them.  But they're --

11 they're trying to have an inconsistent infringement defense.

12          THE COURT:  Yeah.  I hear what you're saying.  All

13 right.  Thank you.  Let me give them a chance to respond.

14          MR. VERDINI:  Thank you, your Honor.  Christopher

15 Verdini on behalf of the University.

16     Let me just address the last point first on this IPR

17 prejudice.  This is the first we've heard of it; and,

18 frankly, they had a chance to supplement their briefing on

19 the motion to strike and didn't do so.  There isn't any

20 inconsistency.  There's a standard that is different for

21 anticipation and infringement.  The -- the claimed prior art

22 did not contain a disclosure of a constraint between 2 and

23 10.  And we allege that their products, when used in the

24 operating modes that we know about, do impose that

25 constraint when encoding bits.

1     I'm not going to belabor the outline here.  There's a

2 relevant timeline.  As you've said a few times, this case

3 has been ongoing for -- it was actually put in -- in halt

4 for five years.  They've had the infringement contentions --

5 the supplemental infringement contentions the entire time.

6     I just want to be clear too this isn't a change in

7 claim construction.  We aren't changing positions on claim

8 construction.  It was the addition of some information

9 related to a product specification, a nonpublic product

10 specification that they produced after we submitted our

11 initial infringement contentions.

12     I mean, even the Defendants most recently said this

13 case is in its early stages.  There's still fact discovery.

14 There's no deadline for expert discovery yet, no deadline

15 for dispositive motions.  The whole point of the Local

16 Patent Rules is to make sure that the other side knows the

17 infringement positions.  That's what we did.  We got the --

18 the product specification in December of 2017, and we

19 literally turned around the supplemental constructions -- or

20 contentions in 15 days.  And they had a chance to respond to

21 them, which they wouldn't typically even do if we had been

22 in front of this Court the entire time because the Local

23 Patent Rules here don't provide for a response.

24     They didn't ask for an extension.  They didn't say,

25 Hey, we want to -- you know, we want to make sure we

38

1  understand what you're -- what you've supplemented and let

2  us respond to it.  They just went ahead and -- and responded

3  to it.

4       So, I -- the only thing I can think is they are trying

5  to get a substantive advantage here.  They want to

6  presumably strike the words LDPC Encoder, which is the --

7  Mr. Mayle talked about the second piece of the accused

8  technology.  They want that to be stricken from our

9  infringement contentions and then what?  We're not going to

10 be allowed to address their noninfringement position later

11 on in the case?

12      So, I -- I think we understand -- we feel we've been

13 diligent.  I think it's laid out in the papers in terms of

14 when they produced documents, who quickly we turned around

15 the supplemental infringement contentions.  But at the end

16 of the day, despite what Mr. Mayle has argued today, there's

17 really no prejudice.  They know our position.  They can ask

18 our -- if they think we've changed positions -- which we

19 haven't -- they can ask our witnesses about it.  They can

20 ask our expert about it.

21      There's really no reason for this Court to strike

22 contentions that are -- comply with and in the spirit of the

23 Rule and -- and maybe face down the line some sort of

24 argument that at the end of the day, we're not going to be

25 able to address a noninfringement defense.  This isn't the

39

1  procedure for that.  If they want to move on some other

2  grounds once the record is developed, okay.  But a motion to

3  strike is not intended to provide a substantive advantage to

4  one side or the other.  And, so --

5          THE COURT:  All right.  Thank you.  I follow your

6  arguments, and I've read your briefs, and I appreciate the

7  supplement, and I'm going to take the motion under

8  submission.  I want to make my order consistent with some

9  others that present similar issues, have it for you soon.

10     Thank you for your time today.  Safe travels.  We're in

11  recess.

12     (Proceedings adjourned at 2:09 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

40

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16           Echo Reporting, Inc., Transcriber

17             Tuesday, November 7, 2023

18

19

20

21

22

23

24

25