Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
**K&L Gates LLP**
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

Patrick J. McElhinny *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
Rachel E. Ellenberger, *pro hac vice*
rachel.ellenberger@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
(206) 623-7580

*Counsel for Plaintiff*
*Regents of the University of Minnesota*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| REGENTS OF THE UNIVERSITY OF MINNESOTA,<br><br>Plaintiff,<br><br>vs.<br><br>LSI CORPORATION and AVAGO TECHNOLOGIES U.S. INC.,<br><br>Defendants. | Case No.: 5:18-cv-00821-EJD-NMC<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: December 12, 2024<br>Time: 9:00 am<br>Courtroom: 4<br><br>Hon. Edward J. Davila<br>Trial Date: March 25, 2025 |

# TABLE OF CONTENTS

I.   IPR ESTOPPEL APPLIES TO SOLJANIN'S OCT. '95 PAPER AND ALLEGED "INVENTION" .................................................................................................. 2

    A.   LSI Indisputably Could Have Raised the Soljanin Oct. '95 Paper in the IPR ............. 2

    B.   LSI Concedes the Soljanin Oct. '95 Paper and Alleged Prior "Invention" Are "Materially Identical" ........................................................................................... 3

II.  LSI CANNOT PROVE DR. SOLJANIN INVENTED ANYTHING .................................... 4

    A.   Dr. Soljanin's Testimony Does Not Establish Reduction to Practice ......................... 5

    B.   Dr. Soljanin's Testimony Must Be Corroborated ....................................................... 6

        1.   Even Disinterested Witnesses Must Be Corroborated ..................................... 6

        2.   Dr. Soljanin Is an Interested Witness ............................................................. 7

    C.   There Is No Evidence Tying Figure 1 of the Soljanin Oct. '95 Paper to Reduction to Practice of the Asserted Claims ............................................................. 8

III. LSI CANNOT PROVE INEQUITABLE CONDUCT ...................................................... 10

    A.   LSI Utterly Ignores the Materiality Requirement of Inequitable Conduct ............... 11

    B.   An Intent to Deceive the PTO Is Not the Single Most Reasonable Inference .......... 13

    C.   LSI's Personal Attacks on Prof. Moon Are Irrelevant (and Wrong) ........................ 13

IV.  CONCLUSION ................................................................................................................ 15

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*1st Media, LLC v. Elec. Arts, Inc.*,
   694 F.3d 1367 (Fed. Cir. 2012)..............................................................................13

5

6

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
   607 F.3d 817 (Fed. Cir. 2010)..................................................................11, 13, 15

7

*Boston Sci. Corp. v. Cook Grp. Inc.*,
   653 F. Supp. 3d 541 (S.D. Ind. 2023) ......................................................................3

8

9

*Cal. Inst. Tech. v. Broadcom Ltd.*,
   No. CV 16-3714-GW(AGRx), 2019 WL 8192255 (C.D. Cal. Aug. 9, 2019),
   *aff'd* 25 F.4th 976 (Fed. Cir. 2022)..........................................................................3

10

11

*Carnegie Mellon University v. LSI Corp., et al.*,
   No. 3:18-cv-04571-JD (N.D. Cal.) ...........................................................................7

12

13

*In the Matter of Certain Child Carriers & Components Thereof*,
   Inv. No. 337-TA-1154 (USITC 2020) ...................................................................15

14

15

*Cooper v. Goldfarb*,
   154 F.3d 1321 (Fed. Cir. 1998)........................................................................5, 6, 9

16

*Dana-Farber Cancer Inst. v. Ono Pharm. Co.*,
   964 F.3d 1365 (Fed. Cir. 2020) ..............................................................................11

17

18

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004)..............................................................................11

19

20

*Finnigan Corp. v. ITC*,
   180 F.3d 1354 (Fed. Cir. 1999)...........................................................................7, 8

21

22

*Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*,
   292 F.3d 1363 (Fed. Cir. 2002)........................................................................11, 15

23

*Garrett Corp. v. U.S.*,
   422 F.2d 874 (Ct. Cl. 1970), *cert. denied sub nom.*
   *U.S. v. Garrett Corp.*, 400 U.S. 951 (1970) ..........................................................12

24

25

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
   383 F.3d 1352 (Fed. Cir. 2004)..............................................................................12

26

27

*Genentech, Inc. v. Insmed Inc.*,
   436 F. Supp. 2d 1080 (N.D. Cal. 2006) ...................................................................9

28

i

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005)............................................................................8

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
    973 F.2d 911 (Fed. Cir. 1992)...........................................................................11

*Pannu v. Iolab Corp.*,
    155 F.3d 1344 (Fed. Cir. 1998)..........................................................................11

*PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.*,
    225 F.3d 1315 (Fed. Cir. 2000).....................................................................11, 15

*Phase Four Indus., Inc. v. Marathon Coach Inc.*,
    No. C 04-04801 JW, 2005 WL 2676887 (N.D. Cal. Oct. 20, 2005) ....................................4, 6

*Philip Morris Prods. S.A. v. ITC*,
    63 F.4th 1328 (Fed. Cir. 2023) ..........................................................................7

*Plastipak Packaging, Inc. v. Premium Waters, Inc.*,
    55 F.4th 1332 (Fed. Cir. 2022)..........................................................................12

*Return Mail, Inc. v. U.S.P.S.*,
    587 U.S. 618 (2019)......................................................................................2

*Sensor Elec. Tech., Inc. v. Bolb, Inc.*,
    No. 18-CV-05194-LHK, 2019 WL 4645338 (N.D. Cal. Sept. 24, 2019)............................6, 13

*Solvay S.A. v. Honeywell Int'l Inc.*,
    742 F.3d 998 (Fed. Cir. 2014)............................................................................8

*TecSec, Inc. v. IBM*,
    763 F. Supp. 2d 800 (E.D. Va. 2011), *aff'd* 466 F. App'x 882 (Fed. Cir. 2012)..............11, 15

*Therasense v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011)..........................................................................13

*Thomson, S.A. v. Quixote Corp.*,
    166 F.3d 1172 (Fed. Cir. 1999)...........................................................................7

*Unicorn Energy AG v. Tesla Inc.*,
    No. 21-cv-07476-BLF, 2024 WL 3463356 (N.D. Cal. July 17, 2024)....................................7

*Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*,
    143 U.S. 275 (1892).......................................................................................8

*Zimmer Tech., Inc. v. Howmedica Osteonics Corp.*,
    476 F. Supp. 2d 1024 (N.D. Ind. 2007) ..................................................................8

**Statutes**

35 U.S.C. § 315(e)(2).......................................................................................2

**UMN'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Regents of the University of Minnesota ("UMN") files this memorandum in reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Opposition," Dkt. 335-3) and in support of UMN's Motion for Partial Summary Judgment ("Motion," Dkt. 310).

LSI's arguments in its Opposition are irreconcilably inconsistent with the undisputed facts and compel granting UMN's Motion. On invalidity, LSI tries to fend off IPR estoppel solely on the false premise that it could not raise the Soljanin Oct. '95 Paper in the IPR because the Paper post-dates UMN's asserted May 1995 conception date. But LSI indisputably based its IPR petition on UMN being entitled to an April 1996 invention date. The PTAB in fact instituted the IPR based upon a reference (Tsang) dated between the Soljanin Oct. '95 Paper and April 1996, so LSI plainly also could have raised the *earlier* Soljanin Oct. '95 Paper in its IPR. Given these undisputed facts, IPR estoppel applies here.

Further, in response to UMN demonstrating in its Motion the fatal deficiencies of LSI's contention that Dr. Soljanin reduced to practice an invalidating invention, LSI sidesteps the undisputed facts by excerpting snippets of Dr. Soljanin's testimony about what she "may have" done. As shown below, her testimony does not come close to satisfying LSI's burden of proving invalidity by clear and convincing evidence. And LSI's explanation for Dr. Soljanin's alleged reduction to practice is mere attorney argument without supporting evidence.

On inequitable conduct, LSI has abandoned its claim that Prof. Moon should have disclosed the Soljanin Oct. '95 Paper to the PTO (because he did). LSI now relies solely on its fanciful story that Prof. Moon fraudulently hid Dr. Soljanin's supposed status as a joint inventor from the PTO. LSI's argument is fatally flawed because (1) there is no evidence—let alone corroborating evidence—of any collaboration among Drs. Soljanin, Moon, and Brickner such that Dr. Soljanin could be a joint inventor, and (2) if Dr. Soljanin's story is true, then she declined to be named a joint inventor, and Prof. Moon did as she asked, disproving any deceptive intent on his part.

1

## I.    IPR ESTOPPEL APPLIES TO SOLJANIN'S OCT. '95 PAPER AND ALLEGED "INVENTION"

2

### A.    LSI Indisputably Could Have Raised the Soljanin Oct. '95 Paper in the IPR

3

LSI does not contest the undisputed evidence establishing that the alleged Soljanin

4

"invention" is materially identical to the technical details disclosed in the Soljanin Oct. '95 Paper.

5

Indeed, LSI musters only one supposed non-technical difference between the two: "the former is

6

prior art to Dr. Moon and Dr. Brickner's alleged May 1995 invention date, while the latter is not."

7

Opp. 16.  LSI then asserts it can avoid estoppel because it could not have raised the Soljanin Oct. '95

8

Paper in the IPR since it was published after May 1995.  *Id.*  This argument is pure misdirection that

9

ignores what actually happened in the IPR and the plain language of the IPR estoppel statute.

10

Because the IPR's operative prior art cut-off date was April 5, 1996, not May 1995, LSI indisputably

11

could have raised the Soljanin Oct. '95 Paper as prior art in the IPR.  As a result, IPR estoppel

12

attaches to both the Paper and Dr. Soljanin's concededly materially identical alleged "invention."

13

When LSI filed its IPR petition, LSI asserted that the claims of the '601 Patent were entitled

14

to priority of ***no earlier than April 5, 1996***, the date of the filing of UMN's provisional patent

15

application  *See LSI Corp., et al. v. Regents of Univ. of Minn.* ("*LSI IPR*"), IPR2017-01068, Paper 1

16

at 7 (PTAB Mar. 10, 2017) ("[T]he claims of the '601 patent are entitled to an effective filing date

17

no earlier than April 5, 1996."); Dkt. 310-2, Joint Statement of Undisputed Facts ("JSUF") ¶ 5.  The

18

PTAB instituted the IPR based upon LSI's assertion, as evidenced by the fact that one of the prior art

19

references on which the PTAB instituted, U.S. Patent No. 5,731, 768 ("Tsang"), was published in

20

February 1996—***four months after the Soljanin Oct. '95 Paper but prior to the April 5, 1996***

21

***priority date.***  *See LSI IPR*, Paper 1 at 37–56, 65–69.  The IPR estoppel statute explicitly applies to

22

patent or printed publication prior art that the petitioner "raised or reasonably could have raised

23

during that inter partes review."  35 U.S.C. § 315(e)(2).  In "that inter partes review" at issue here,

24

LSI expressly petitioned for and the IPR was instituted on the basis of an April 1996 priority date for

25

the '601 Patent.  As its own actions show, LSI certainly ***could have raised*** the Soljanin Oct. '95

26

Paper, which predates April 1996, in that IPR.  *See Return Mail, Inc. v. U.S.P.S.*, 587 U.S. 618, 623

27

(2019) (stating the IPR estoppel statute allows a petitioner to challenge a patent "in light of 'patents

28

or printed publications' existing at the time of the patent application").  Had LSI done so, any

assertion that the Paper invalidates the '601 Patent would have been resolved during the IPR, as was the case with Tsang. Tsang predated the April 1996 priority date asserted by LSI in the IPR, as does the Soljanin Oct. '95 Paper. UMN asserted in the IPR that Tsang did not invalidate the '601 Patent because, among other things, "Drs. Moon and Brickner completed their invention prior to the January 1996 filing date of Tsang." *LSI IPR*, Paper 58 at 35 (PTAB Apr. 14, 2021). If LSI had raised the Soljanin Oct. '95 Paper, UMN would have made the same argument in response. Thus, whether that Paper is invalidating prior art would (and should) have been resolved during the IPR, as was Tsang, but LSI chose not to raise it. LSI must live with that choice and its result—IPR estoppel indisputably applies to the Soljanin Oct. '95 Paper.[1]

**B.      LSI Concedes the Soljanin Oct. '95 Paper and Alleged Prior "Invention" Are "Materially Identical"**

The Court should not permit LSI to evade the application of estoppel to the Soljanin Oct. '95 Paper. The purpose of IPR estoppel would be undercut if LSI is permitted to back-door the Soljanin Oct. '95 Paper as a purportedly invalidating prior art reference in this litigation by asserting the materially identical Soljanin "invention." *See* Mot. 13–16. LSI does not contest that the "materially identical" substantive standard should apply here. *See* Mot. 15 n.8; Opp. 15–16. Thus, IPR estoppel applies to Dr. Soljanin's alleged invention if "all of the material limitations of that [invention] were disclosed in a patent or printed publication" that could have been raised in the IPR. *Boston Sci. Corp. v. Cook Grp. Inc.*, 653 F. Supp. 3d 541, 594 (S.D. Ind. 2023). This uncontested legal principle makes perfect sense. Permitting LSI to evade the consequences of IPR estoppel by "simply swapping labels" from a printed publication that could have been raised in the IPR to a prior invention that is indistinct from that printed publication "in order to 'cloak' its prior art ground and 'skirt' estoppel" would undermine the entire purpose of allowing the IPR to move forward while this litigation was stayed. *See Cal. Inst. Tech. v. Broadcom Ltd.*, No. CV 16-3714-GW(AGRx), 2019

---

[1] In its Motion, UMN explained that it is entitled to summary judgment on LSI's invalidity defenses based on Tsang. Mot. 6 n.3. LSI's Opposition does not discuss Tsang at all, let alone rebut UMN's arguments, and so LSI concedes UMN is entitled to summary judgment as to Tsang.

WL 8192255, at *6–7 (C.D. Cal. Aug. 9, 2019) (allowing litigants to evade IPR estoppel prevents IPR from fulfilling "its mission of streamlining patent litigation in the district courts and promoting efficient dispute resolution"), *aff'd* 25 F.4th 976 (Fed. Cir. 2022).  Indeed, when LSI asked this Court to stay proceedings pending resolution of the IPR, LSI itself touted that the IPR would simplify the issues in this case.  Dkt. 191, at 10.  Among other reasons, LSI asserted that the IPR "may give rise to estoppel."  *Id.*  LSI was right.

It is undisputed that there are no differences, let alone material differences, between the Soljanin Oct. '95 Paper and Dr. Soljanin's alleged invention.  LSI did not even address, let alone contest, Dr. Soljanin's testimony cited in UMN's Motion establishing that the two are identical.  *See* Mot. 15.  In fact, in its own Opposition, LSI **confirms** the Soljanin Oct. '95 Paper and Dr. Soljanin's alleged invention are materially identical when, in an attempt to corroborate Dr. Soljanin's alleged invention, LSI points the Court to the Soljanin Oct. '95 Paper.  Opp. 10–14.

LSI made a deliberate choice **not** to raise the Soljanin Oct. '95 Paper in the IPR, even though LSI indisputably was aware of it and Dr. Soljanin was LSI's paid IPR expert witness.  JSUF ¶¶ 14–20.  Because LSI could have raised the Soljanin Oct. '95 Paper in the IPR but chose not to, LSI must live with the consequences of its choice—that LSI now also is estopped from asserting Dr. Soljanin's alleged invention as invalidating prior art in this litigation.  LSI's decision not to raise the Soljanin Oct. '95 Paper despite employing Dr. Soljanin as its expert speaks volumes about its attempt now to argue that the Soljanin "invention" actually anticipates the Asserted Claims.

## II.    LSI CANNOT PROVE DR. SOLJANIN INVENTED ANYTHING

Even if it were not estopped from asserting Dr. Soljanin's alleged invention as prior art, LSI confirms in its Opposition that it cannot carry its burden to show, by clear and convincing evidence, that Dr. Soljanin reduced her supposed "invention" to practice.  *See Phase Four Indus., Inc. v. Marathon Coach Inc.*, No. C 04-04801 JW, 2005 WL 2676887, at *8–12 (N.D. Cal. Oct. 20, 2005) (granting summary judgment for patentee on § 102(g) (pre-AIA) invalidity defense where challenger "failed to present evidence, which if, believed by a trier of fact, could prove by clear and convincing evidence that it reduced the invention disclosed in the [patent] to practice").

LSI relies upon only two supposed sources of proof to support Dr. Soljanin's alleged

reduction to practice: (i) Dr. Soljanin's testimony and (ii) the Soljanin Oct. '95 Paper.  Neither is sufficient to defeat summary judgment.  Dr. Soljanin's testimony is based solely on speculation and supposed general practices that cannot meet LSI's clear and convincing evidentiary burden.  But even if her testimony were unequivocal, it is entirely uncorroborated, and so is legally insufficient because an alleged inventor's testimony "must be corroborated by independent evidence."  *Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1998).  Finally, LSI cannot rely on the Soljanin Oct. '95 Paper to corroborate Dr. Soljanin's testimony on reduction to practice because there is no evidence that the paper reflects implementation of a code that practices each step of the Asserted Claims.

## A.    Dr. Soljanin's Testimony Does Not Establish Reduction to Practice

Dr. Soljanin's weak and equivocal testimony in 2024 cannot constitute clear and convincing evidence that she reduced to practice anything at all some 29 years earlier in 1995.  LSI asserts that Dr. Soljanin "testified that she designed an encoder that would limit the number of consecutive transitions in magnetic recording and she and her colleagues performed computer simulations of the same[,]" Opp. 12, but in fact, her testimony says nothing of the sort.  Instead, she repeatedly speculated and hedged under oath:

- "Q.  Did you design an encoder for a code that would limit the number of consecutive transitions? . . . A.  I believe – yeah.  I believe in the term of my tenure at Bell Labs, I believe I did, but --  Q.  And when was that?  A.  I don't remember.  Right.  But this code later became very popular, important.  Everyone who produced chips had them.  ***So this is just guessing*** based on that." Dkt. 310-15 at 66:21–67:5 (emphasis added).

- "A.  What do I recall now about encoder I designed?  ***I'd have to recall – nothing.***"  *Id.* at 67:12–15 (emphasis added).

- ***"I don't remember writing simulations."***  *Id.* at 68:2–6 (emphasis added).

- "Q.  So in the simulations that you performed, was there a limit on the number of consecutive transitions?  A.  ***I don't remember.  If I performed simulations in this context***, it must have been, because what else was I simulating?"  *Id.* at 69:22–70:2 (emphasis added).

- "[Q.]  What are you going to tell the jury you were simulating? . . . A.  So I – I have very little recollection of what happened 30 years ago.  Again, as I said, very, very little.  ***So I'm not going to say, oh, I know in this particular code on that particular day I simulated this and that.***  No.  I remember some bits and pieces.  If that's useful for this case, so be it."  *Id.* at 70:3–16 (emphasis added).

- "I think I talked about everything I remember about possible simulations. ***I didn't even say I performed simulations. I said it would be very likely to perform simulations.***" *Id.* at 70:19–71:1 (emphasis added).

- "Q. Did you ever implement it? A. ***I personally have never done an implementation.*** . . . Q. Did anybody implement it at your direction? A. At my direction? At this time? Q. Ever? A. ***I didn't direct anyone ever.***" *Id.* at 73:8–19 (emphases added).

- "Q. Did you ever implement a code in NRZI that limits the runs of successive 1s to 3? A. ***I did not implement code. I did theoretical work.*** Q. Did you ever simulate a code – A. Simulation – very likely I did. . . . It's been about 30 years ago, so I don't remember. Q. What – tell me everything you remember about those simulations. . . . A. I cannot tell you anything except that everything I did theoretically I eventually simulated. That was the general practice[.]" *Id.* at 74:20–75:15 (emphasis added).

- "I cannot tell you I simulated every single thing and by this line and this and that problem. No. It was just a general practice that I did." *Id.* at 76:2–5.

Dr. Soljanin testified she did not know whether she performed ***any*** simulations, let alone whether any such speculative simulations would have practiced every step of the Asserted Claims. Her testimony is unavoidably vague at best, contradicts LSI's claims at worst, and falls far short of the clear and convincing evidence that LSI needs to prove that she reduced her alleged invention to practice. *See Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18-CV-05194-LHK, 2019 WL 4645338, at *43 (N.D. Cal. Sept. 24, 2019) (clear and convincing evidence must show fact is "highly and substantially likely to be true [rather] than untrue"); *Phase Four Indus.*, 2005 WL 2676887, at *8–12 (granting summary judgment for patentee on § 102(g) (pre-AIA) invalidity defense where challenger presented "no evidence beyond that of the uncorroborated declaration of the alleged inventor").

**B.    Dr. Soljanin's Testimony Must Be Corroborated**

Beyond the fatal deficiencies in Dr. Soljanin's testimony, LSI's argument fails for another independent reason: it cannot corroborate her testimony as the law requires. *See Cooper*, 154 F.3d at 1330. LSI relies on two arguments on corroboration: (1) Dr. Soljanin "is a disinterested witness" such that her testimony "does not require corroboration," Opp. 14, and (2) the Soljanin Oct. '95 Paper constitutes corroboration. LSI is wrong on both.

**1.    Even Disinterested Witnesses Must Be Corroborated**

LSI is wrong on the law of corroboration. Opp. 14–15. The Federal Circuit has held

6

unequivocally that when validity is challenged under § 102(g) (pre-AIA) "corroboration is required of *any witness* whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest[,]" including so-called "[u]ninterested witnesses." *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1367 (Fed. Cir. 1999) (emphasis added). LSI does not address *Finnigan* in its Opposition, choosing instead to rely solely on *Thomson, S.A. v. Quixote Corp.,*166 F.3d 1172 (Fed. Cir. 1999). LSI's reliance on *Thomson* is misplaced. *Finnigan* post-dates *Thomson*, and clarified that *Thomson* did not address "the question of the *necessity* of corroboration vel non, but rather the *sufficiency* of the corroborating evidence[.]" *Finnigan*, 180 F.3d at 1368–69 (emphases added). *Finnigan* has been cited more than 200 times, and the Federal Circuit reaffirmed its holding on corroboration in *Finnigan* as recently as March 2023. *See Philip Morris Prods. S.A. v. ITC*, 63 F.4th 1328, 1352–53 (Fed. Cir. 2023). This Court also relied upon *Finnigan*'s corroboration holding this summer. *See Unicorn Energy AG v. Tesla Inc.*, No. 21-cv-07476-BLF, 2024 WL 3463356, at *4 (N.D. Cal. July 17, 2024). LSI's silence on *Finnigan* speaks volumes.

"[T]he need for corroboration exists regardless whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation (*e.g.*, because that party is the accused infringer) or is uninterested *but testifying on behalf of an interested party. . . . Uninterested witnesses are also subject to the corroboration requirement.*" *Finnigan*, 180 F.3d at 1367 (emphasis added). As a matter of law, Dr. Soljanin's testimony on reduction to practice must be corroborated, whether or not she is a disinterested witness.

## 2. Dr. Soljanin Is an Interested Witness

LSI also wrongly asserts that Dr. Soljanin is a disinterested witness. In doing so, LSI conveniently ignores that Dr. Soljanin's involvement in this case began as LSI's paid expert, at $420 an hour, to provide expert declarations and testimony on both (i) claim indefiniteness, *see* Dkt. 204-4, and (ii) anticipation as LSI's expert in its IPR.[2] After LSI dropped indefiniteness and its IPR failed, LSI transformed Dr. Soljanin into a supposed prior inventor and fact witness based upon

---

[2] Dr. Soljanin also testified as an expert for LSI in the pending litigation *Carnegie Mellon University v. LSI Corp., et al.*, No. 3:18-cv-04571-JD (N.D. Cal.).

1    work that she did not even bother to assert as invalidating in the IPR.  As the U.S. Supreme Court

2    explained more than 100 years ago: "'Witnesses whose memories are prodded by the eagerness of

3    interested parties to elicit testimony favorable to themselves are not usually to be depended upon for

4    accurate information,' and therefore such testimony rarely satisfies the burden upon the interested

5    party, usually the accused infringer, to prove invalidity by clear and convincing evidence."

6    *Finnigan*, 180 F.3d at 1366 (quoting *Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*,

7    143 U.S. 275, 284 (1892)).  LSI also appears to assert that because Dr. Soljanin does not have a

8    direct financial interest in the outcome of the case, she cannot be an interested witness.  That too is

9    wrong.  There are multiple ways that a witness can be interested in the outcome of a case, including

10   the accomplishment of being found to be first in the field.  *See Finnigan*, 180 F.3d at 1368.  Indeed,

11   Dr. Soljanin testified that MTR codes "later became very popular, important.  Everyone who

12   produced chips had them[,]" Dkt. 310-15 at 67:2–5, such that it would be a professional

13   accomplishment to be known as the inventor of those codes.

14   **C.    There Is No Evidence Tying Figure 1 of the Soljanin Oct. '95 Paper to Reduction**
15   **to Practice of the Asserted Claims**

16        LSI does not have any independent evidence to corroborate that Dr. Soljanin reduced her

17   alleged invention to practice, as required by § 102(g).  *See Solvay S.A. v. Honeywell Int'l Inc.*, 742

18   F.3d 998, 1000 (Fed. Cir. 2014) ("Making the invention [pursuant to § 102(g)] requires conception

19   and reduction to practice.").  LSI claims in its Opposition that Figure 1 in the Soljanin Oct. '95 Paper

20   "show[s] the performance of the [read] channel when Prof. Soljanin's invention is implemented,"

21   Opp. 11, but that is mere attorney argument that cannot carry LSI's burden.  *See Invitrogen Corp. v.*

22   *Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument

23   regarding the meaning of technical evidence is no substitute for competent, substantiated expert

24   testimony."); *see also Zimmer Tech., Inc. v. Howmedica Osteonics Corp.*, 476 F. Supp. 2d 1024,

25   (N.D. Ind. 2007) (rejecting "wholly conclusory assertions" by attorneys in lieu of "expert testimony

26   explaining the scope and meaning of" evidence proffered to support conception and reduction to

27   practice).  LSI does not, and cannot, point to any fact or expert testimony that explains Figure 1.  LSI

28   does not, and cannot, point to any fact or expert witness who testified that the curve shown in Figure

8

1 reflects implementation of a code that limits consecutive transitions. LSI does not, and cannot, point to any fact or expert witness who testified that the curve was generated using a method that practices all elements of the Asserted Claims. Indeed, Dr. Soljanin herself testified that the curve **does not** refer to a code that limits consecutive transitions. Dkt. 310-15 at 71:16–72:5 ("[A.] [The Soljanin Oct. '95 Paper] says, the analytical results of this paper together with the simulation results obtained by Sayiner, 8 and 9, allow us to compare the systems, et cetera. . . . Q. And that sentence you just read does not refer to any code that limits consecutive transitions, correct? A. This sentence does not refer to – yes.").

Moreover, the simulation results identified in the Soljanin Oct. '95 Paper were obtained by Necip Sayiner, not by Dr. Soljanin. *See* Dkt. 310-17 at -064 ("The analytical results of this paper **together with the simulation results obtained by Sayiner** allow [us] to compare the systems on the basis of their off-track performance." (emphasis added)); Dkt. 310-15 at 71:16–25 (characterizing the simulations reflected in Figure 1 as "simulations done elsewhere"). Once again, there is no fact or expert testimony in the record as to how Mr. Sayiner obtained the simulation results reflected in the Soljanin Oct. '95 Paper, including whether they were obtained by practicing the Asserted Claims. LSI did not depose or offer a declaration from Mr. Sayiner, LSI's technical expert, Dr. Koralek, did not even bother to review the Sayiner papers cited in the Soljanin Oct. '95 Paper, JSUF ¶ 65, and Dr. Soljanin did not have the cited Sayiner papers in her files. Dkt. 310-15 at 13:10–17:7. Simply put, LSI has absolutely no evidence to establish how Mr. Sayiner ran his simulations, let alone that those simulations implemented the methods of the Asserted Claims.

Finally, even if there were evidence that the curve in Figure 1 reflected the implementation of a code that limits consecutive transitions, the curve could not constitute corroboration that Dr. Soljanin reduced to practice all of the steps of the Asserted Claims. *See Genentech, Inc. v. Insmed Inc.*, 436 F. Supp. 2d 1080, 1092 (N.D. Cal. 2006) ("Reduction to practice occurs when the inventors perform a process that satisfies all of the limitations of the claim, and determine that it will work for its intended purpose."); *Cooper*, 154 F.3d at 1330 (similar). For example, the Asserted Claims recite that the *j* and *k* constraints are imposed on an encoded, recorded waveform. *See* Dkt. 310-3 at cl. 13. LSI's own expert, Dr. Koralek, admits that the curve in Figure 1 does not show use of a recorded

9

waveform and was generated "just from the mathematics." Dkt. 310-14 at 91:5–16 ("[T]here was no recorded waveform in obtaining those analytical results[.]").  Dr. Soljanin confirmed that she did not implement any encoder using a recorded waveform.  Dkt. 310-15 at 68:15–20 ("Q.  And did those computer simulations involve writing data to a recording media?  A.  Not recording media.  It's just writing 0s and 1s, making errors in the – in – in the sequence that's supposed to be recorded.  That's simulation.  ***It's not recording media.***" (emphasis added)); *id.* at 70:19–71:1 ("***I didn't even say I performed simulations.***  I said it would be very likely to perform simulations." (emphasis added)); *id.* at 74:20–23 ("Q.  Did you ever implement a code in NRZI that limits the runs of successive 1s to 3?  A.  I did not implement code.  I did theoretical work.").  Because LSI cannot prove by clear and convincing evidence that the Soljanin Oct. '95 Paper shows a reduction to practice of the "invention," the paper cannot corroborate Dr. Soljanin's testimony.

## III.    LSI CANNOT PROVE INEQUITABLE CONDUCT

LSI does not address, and therefore has abandoned, its inequitable conduct claim based upon an alleged failure to disclose the Soljanin Oct. '95 Paper to the PTO.  *See* Opp. 17–25.  LSI now bases its entire inequitable conduct claim on Prof. Moon's supposed "failure to identify Dr. Soljanin as an inventor" on the '601 Patent.  *Id.* at 19.  LSI's only support for the assertion that Dr. Soljanin could be a joint inventor is her self-serving, uncorroborated testimony that on some unknown date, at some unknown place and time, Prof. Moon purportedly approached her and asked her to be a joint inventor.  *See* Dkt. 335-5 at 60:17–63:18, 82:2–85:21.  It is undisputed that Dr. Soljanin and Prof. Moon had never met each other before this conversation allegedly occurred, *see id.* at 84:21–85:2; Dkt. 335-6 at 60:16–19, and Prof. Moon himself testified that he never suggested to anyone that Dr. Soljanin should be listed as a joint inventor on the '601 Patent.  *See* Dkt. 335-6 at 62:19–25.  Yet LSI would have this Court believe that it is not only plausible but is highly likely that Prof. Moon approached a total stranger out of the blue to volunteer that he should list her as an inventor on work where Prof. Moon had collaborated only with Dr. Brickner, and which would have given her rights to both his work and resulting monetary benefits, all of this at a time when, according to LSI, he was fixated on maximizing his own financial gain.  Leaving aside the implausibility of that scenario, LSI's reliance on this supposed conversation ultimately disproves its inequitable conduct claim.

### A.    LSI Utterly Ignores the Materiality Requirement of Inequitable Conduct

LSI states that "inventorship is highly material to patentability[,]" Opp. 18 (capitalization altered), but inexplicably fails to recite the legal standards for inventorship and, specifically, the necessary requirements for Dr. Soljanin to be a joint inventor on the '601 Patent.  LSI's failure is critical because, if Dr. Soljanin does not qualify as a joint inventor under the law, Prof. Moon could not have withheld ***material*** information about inventorship from the PTO.  LSI's own cited cases confirm this.  *See, e.g.*, *TecSec, Inc. v. IBM*, 763 F. Supp. 2d 800, 811 (E.D. Va. 2011), *aff'd* 466 F. App'x 882 (Fed. Cir. 2012) ("The proper inventorship of a claimed invention is highly material to patentability, and misrepresentations regarding inventorship, ***if true,*** could easily render a patent unenforceable due to inequitable conduct." (emphasis added)); *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 828 (Fed. Cir. 2010) ("[W]hen named inventors deliberately conceal a ***true inventor's*** involvement, the applicants have committed inequitable conduct and the patent is unenforceable[.]" (emphasis added)); *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363, 1376 (Fed. Cir. 2002) (confirming purported joint inventor "was an inventor of the patented device"); *PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1319 (Fed. Cir. 2000) (confirming "no dispute between the parties" that purported joint inventors "worked in close collaboration with the named inventors").  Under the legal standard governing joint inventorship, LSI cannot carry its burden.

 "To be a joint inventor, one must: '(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.'"  *Dana-Farber Cancer Inst. v. Ono Pharm. Co.*, 964 F.3d 1365, 1371 (Fed. Cir. 2020) (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)).  "Joint inventorship under section 116 can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts[.]"  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004); *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992)

1  ("[J]oint inventorship under Section 116 requires at least some quantum of collaboration or

2  connection.").  There is not one iota of evidence that Dr. Soljanin and the named inventors of the

3  '601 Patent ever collaborated in any way related to the '601 Patent.  Nor is there any evidence

4  corroborating Dr. Soljanin's alleged status as a joint inventor beyond her own self-interested

5  testimony and LSI's attorneys' arguments.  *See Plastipak Packaging, Inc. v. Premium Waters, Inc.*,

6  55 F.4th 1332, 1340 (Fed. Cir. 2022) ("In connection with assertions of joint inventorship, meeting

7  that standard requires alleged joint inventors to 'prove their contribution to the conception with more

8  than their own testimony concerning the relevant facts.'" (quoting *Gemstar-TV Guide Int'l, Inc. v.*

9  *ITC*, 383 F.3d 1352, 1382 (Fed. Cir. 2004))).

10      To the contrary, Prof. Moon and Dr. Brickner were a professor and graduate student,

11  respectively, at the University of Minnesota when they conceived of the invention of the '601 Patent,

12  while Dr. Soljanin worked at Bell Labs.  Mot. 4; Opp. 1.  Prof. Moon and Dr. Brickner began their

13  work in the spring of 1995, independent of Dr. Soljanin.  Dr. Soljanin and Prof. Moon agree they

14  never met each other before Dr. Soljanin claims that Prof. Moon approached her about supposedly

15  being a "joint inventor."  *See* Dkt. 335-5 at 84:21–85:2; Dkt. 335-6 at 60:16–19.  Dr. Soljanin alleges

16  that Prof. Moon, at some unknown date, time, and location, asked her to be a joint inventor on the

17  application for what would become the '601 Patent and that they discussed her "work," in an

18  apparent reference to the Soljanin Oct. '95 Paper.  Even if this improbable conversation actually

19  occurred, the Soljanin Oct. '95 Paper on its face confirms that Dr. Soljanin is not a joint inventor of

20  the inventions claimed in the '601 Patent.  In that paper's conclusion, Dr. Soljanin states, "Design of

21  high rate codes which improve both on- and off-track error probability performance of Class 4

22  channels is, however, ***an interesting open problem.***"  Dkt. 310-17 at -064.  That is the open problem

23  the '601 Patent solved.  "One who merely suggests an idea of a result to be accomplished, rather

24  than means of accomplishing it, is not a joint inventor."  *Garrett Corp. v. U.S.*, 422 F.2d 874, 881

25  (Ct. Cl. 1970), *cert. denied sub nom. U.S. v. Garrett Corp.*, 400 U.S. 951 (1970).  Dr. Soljanin may

26  have agreed on the problem to be solved, but she obviously had no part in conceiving or reducing to

27  practice Prof. Moon and Dr. Brickner's patented solution to that problem.

28      LSI cannot prove by clear and convincing evidence that Dr. Soljanin is a joint inventor and

that Prof. Moon and Dr. Brickner, therefore, withheld this material information from the PTO. LSI's failure forecloses its inequitable conduct counterclaim and affirmative defense. *See 1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372 (Fed. Cir. 2012) ("A failure of proof on any element precludes a finding of inequitable conduct.").

### B.    An Intent to Deceive the PTO Is Not the Single Most Reasonable Inference

Nor can LSI prove, by clear and convincing evidence, the legally required element of a specific intent to deceive the PTO. *See Sensor Elec. Tech.*, 2019 WL 4645338, at *43; *Therasense v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). Specific intent to deceive can be found only where it is "the ***single most reasonable inference*** able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290–91 (emphasis added). "[T]he evidence 'must be sufficient to require a finding of deceitful intent in the light of all of the circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id*.

Under the undisputed facts, LSI cannot demonstrate that the "single most reasonable inference" is that Prof. Moon intended to deceive the PTO by not identifying Dr. Soljanin as a joint inventor. LSI's argument to the contrary can be disposed of by one line from its own Opposition— ***"Professor Soljanin declined this invitation*** [to be a joint inventor]***."*** Opp. 17. It is just as reasonable an inference, if not more so, that Prof. Moon simply took Dr. Soljanin at her word when she declined his purported invitation, regardless of her reason for declining. "In evaluating intent, the district court must consider evidence that the patent applicant[] withheld information from the PTO ***in good faith***." *Advanced Magnetic Closures*, 607 F.3d at 829 ("A district court may not draw an inference of bad faith when a party has plausible reasons for withholding information: mere intent to withhold does not support an inference of intent to deceive.") (emphasis added). These facts and those cited in UMN's Motion regarding Prof. Moon's belief of his prior invention date show that LSI cannot clearly and convincingly prove that the "single most reasonable inference" is that Prof. Moon specifically intended to deceive the PTO by not identifying Dr. Soljanin as a joint inventor.

### C.    LSI's Personal Attacks on Prof. Moon Are Irrelevant (and Wrong)

Unable to address the legal insufficiencies of its inequitable conduct claim, LSI resorts to attacking Prof. Moon's character. *See* Opp. 8, 22–23 (characterizing Prof. Moon as "aggressive[,]"

1  "self-serving," "hyper-zealous," and chasing his "last shot at a windfall" (capitalization altered)).

2  While those ad hominem attacks are wholly irrelevant to the merits of LSI's inequitable conduct

3  claim, UMN is compelled to briefly respond.

4          Prof. Moon started working at UMN in 1990 as an assistant professor in the Electrical and

5  Computer Engineering Department.  Ex. 1, Declaration of Jaekyun Moon, at 2.  There, he founded

6  the Communications and Data Storage Lab.  *Id.*  His educational and academic career has focused on

7  signal processing and coding technologies.  *Id.* at 4.  At the time of invention, Dr. Brickner was one

8  of Prof.'s Moon's Ph.D. students at UMN.  *Id.* at 2.  While at UMN, Prof. Moon and Dr. Brickner

9  together invented the codes that are the subject of the '601 Patent which they named "Maximum

10  Transition Run" ("MTR") codes.  *Id.* at 2.  Prof. Moon and Dr. Brickner also wrote academic papers

11  about their invention.  JSUF ¶¶ 24–28, 31–36.  Their seminal paper about MTR codes, published in

12  1996, is frequently cited in patent applications and academic papers, including by LSI.  In 1997,

13  Prof. Moon received a Technical Achievement Award from the National Storage Industry

14  Consortium for the very MTR codes that are the subject of the '601 Patent.  Ex. 1 at 5.

15          The importance of Prof. Moon and Dr. Brickner's invention was not theoretical; as LSI

16  acknowledges in its Opposition, Prof. Moon was told on multiple occasions by colleagues in the

17  industry that "MTR code is in the read channel chips that are being shipped in large scale" by LSI.

18  *See* Opp. 8–10; Dkt. 335-20 at -235 ("I got together with a few hard disk drive read channel

19  engineers . . . MTR being in read channel chips seems to be a well-known fact around here."); Dkt.

20  335-21 at -874 ("I am in the Silicon Valley for a few days and everyone is talking about the CMU-

21  Marvell suit on read channel chip technology.  I am also hearing that LSI is nervous about UMN

22  knocking at its door any day now.  MTR is in products for sure, and lots of people are curious about

23  my reaction to that.").  It certainly is not illegal, nor even nefarious, for a professor to request his

24  university to seek to license his invention for just compensation when a multinational corporation

25  like LSI makes millions of dollars by using his patented invention without permission.

26          LSI purports to connect its attempted character assassination to five cases which supposedly

27  found "inequitable conduct on similar facts."  Opp. 22.  LSI's citations are misleading—the facts of

28  those five cases could not be more dissimilar to the facts of this case, and LSI further smears Prof.

Moon by claiming they are the same. *See, e.g.*, *Advanced Magnetic Closures*, 607 F.3d at 830 (named inventor could not explain his claimed invention and fabricated evidence of conception and presented it to court); *Frank's Casing Crew & Rental Tools*, 292 F.3d at 1368 (true joint inventor was employee of two of the named inventors who "had no technical experience" in the discipline); *PerSeptive Biosys.*, 225 F.3d at 1319, 1321–22 (no dispute over close collaboration with purported joint inventor and named inventors committed "at least five specific instances of intentional falsehoods, misrepresentations, and omissions to the PTO" "made as a 'persistent course' of conduct"); *TecSec, Inc. v. IBM*, 763 F. Supp. 2d 800, 811–12 (E.D. Va. 2011), *aff'd* 466 F. App'x 882 (Fed. Cir. 2012) (named inventor engaged in "the copying of claims from another's patent application without disclosing that to the PTO Examiner"); *In the Matter of Certain Child Carriers & Components Thereof*, Inv. No. 337-TA-1154, at *59 (USITC 2020) (non-inventor signed patent application because both he and inventor wife "believed (albeit mistakenly) that having a U.S. citizen on the application would bolster the protection, strength, and permanence of the patents").

Even if one believes LSI's characterization of Prof. Moon's motives, LSI's story not only remains irrelevant to this Motion, it makes no sense at all. LSI asserts that Prof. Moon hid Dr. Soljanin's status as a joint inventor from the PTO in order to reduce the number of co-inventors with whom he would have to split any money the '601 Patent generated. Opp. 23. Yet LSI also would have this Court believe that Prof. Moon of his own accord approached Dr. Soljanin and solicited her to join the application for the '601 Patent, in direct opposition to his supposed interest in cutting down on the number of people with whom he would need to split licensing revenues. This facial logical inconsistency undermines LSI's argument that Prof. Moon intended to deceive the PTO and demonstrates that LSI has no evidence, let alone clear and convincing evidence, that the '601 Patent is invalid for inequitable conduct.

## IV.    CONCLUSION

UMN respectfully requests that the Court grant its Motion for Partial Summary Judgment and dismiss with prejudice LSI's counterclaims of invalidity under §§ 102 and 103 and inequitable conduct and LSI's affirmative defenses on the same grounds.

1    Dated:  November 25, 2024                K&L GATES LLP

2

3                                       */s/ Christopher M. Verdini*
Edward P. Sangster (SBN 121041)
ed.sangster@klgates.com
**K&L Gates LLP**
Four Embarcadero Center, Suite 1200
San Francisco, California 94111
Tel:  (415) 882-8200
Fax:  (415) 882-8220

Patrick J. McElhinny, *pro hac vice*
patrick.mcelhinny@klgates.com
Mark G. Knedeisen, *pro hac vice*
mark.knedeisen@klgates.com
Christopher M. Verdini, *pro hac vice*
christopher.verdini@klgates.com
Anna Shabalov, *pro hac vice*
anna.shabalov@klgates.com
Rachel E. Ellenberger, *pro hac vice*
rachel.ellenberger@klgates.com
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500

Theodore J. Angelis, *pro hac vice*
theo.angelis@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
(206) 623-7580

*Counsel for Plaintiff*
*Regents of the University of Minnesota*

16

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that a true and correct copy of the above and foregoing document has been

3

served on all counsel of record via the Court's ECF system on November 25, 2024.

4

5

                                           /s/ Christopher M. Verdini

6

                                           Christopher M. Verdini

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28