# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| PRINCETON DIGITAL IMAGE CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-335-LPS-CJB |
| | ) | |
| UBISOFT ENTERTAINMENT SA and | ) | |
| UBISOFT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### REPORT AND RECOMMENDATION

Presently before the Court in this patent infringement action is Defendant Ubisoft Inc.'s ("Ubisoft" or "Defendant") *Daubert* motion, filed pursuant to Federal Rule of Evidence 702, which seeks to strike the expert report of Plaintiff Princeton Digital Image Corp.'s ("Plaintiff" or "PDI") expert Mr. David Yurkerwich and to exclude Mr. Yurkerwich's testimony (the "Motion"). (D.I. 239) For the reasons that follow, the Court recommends that Ubisoft's Motion be GRANTED.[1]

### I.    BACKGROUND

---

[1] Because the Court's decision here is to recommend grant of the motion in full, out of an abundance of caution, it is treating the motion as dispositive and issuing a Report and Recommendation. *See, e.g., Dominion Assets LLC v. Masimo Corp.*, Case No. 14-cv-03002-BLF, 2018 WL 2427790, at *2 (N.D. Cal. May 30, 2018); *Insight Equity v. Transitions Optical, Inc.*, No. 10-cv-635 (RGA), 2016 WL 7031281, at *1 (D. Del. Nov. 30, 2016) ("A decision granting Defendant's *Daubert* motion and denying Plaintiff an opportunity to submit a revised damages theory would be dispositive.").

PDI filed the instant case on February 27, 2013. (D.I. 1) On July 17, 2013, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (D.I. 10)

Briefing on the instant Motion was completed on October 26, 2018, (D.I. 316), and the Court held oral argument on the Motion (as well as another motion) on December 7, 2018. A 5-day trial is set to begin on April 8, 2019. (D.I. 141; *see also* D.I. 15 at 11)

## II. DISCUSSION

### A. Legal Standard

The Court hereby incorporates by reference its discussion of the legal standard applicable to review of *Daubert* motions that are filed pursuant to Rule 702, which was set out in a prior November 7, 2018 Report and Recommendation ("the November 7 R&R") in this matter. (D.I. 336) The November 7 R&R's discussion of the standard of review focused in particular on the reliability and relevance prongs of *Daubert*, which are the two prongs at issue in the instant Motion. (D.I. 240 at 1)

### B. Analysis

In its Motion, Ubisoft makes three arguments as to why all or portions of Mr. Yurkerwich's expert report should be stricken. The Court will address these in turn.

#### 1. Sony/Immersion Jury Verdict

First, Ubisoft asserts that: (1) the "anchor of Mr. Yurkerwich's reasonably royalty damages analysis" is his reliance in his initial expert report (the "initial report") on "an $82 million jury verdict in a case between unrelated parties (Sony [Computer Entertainment America, Inc. ("Sony") and] Immersion [Corporation ("Immersion")]) relating to unrelated

2

patents" and (2) this renders Mr. Yurkerwich's reasonable royalty conclusions unreliable. (D.I. 240 at 2-3; *see also* D.I. 247, ex. 1 at ¶ 40) Some courts have appeared to conclude that it is *per se* unreliable for a damages expert, when attempting to establish a reasonable royalty for infringement of the patent-in-suit, to rely on a jury verdict from a different case involving entirely unrelated parties and different patents. *See, e.g., Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018) (finding, in a case where the plaintiff's expert sought to rely on a jury verdict in another litigation involving unrelated parties and different patents in order to establish a reasonable royalty for infringement of the patents-in-suit, that "[j]ury determined damages are not evidence of arm's-length negotiations between parties, and will not help the trier of fact determine a royalty"); *Atlas IP, LLC v. Medtronic, Inc.*, No. 13-CIV-23309, 2014 WL 5741870, at *6 (S.D. Fla. Oct. 6, 2014) ("[I]t is self-evident jury-determined damages are not evidence of arm's-length negotiations between parties."). For example, in *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470 (D. Del. 2018), a case from this Court, Judge Andrews suggested that this type of jury verdict could never be a helpful data point in the reasonable royalty calculus, in part because: (1) it simply amounts to the "judgment of twelve (or maybe fewer) random non-experts" or "at best, an informed lay opinion" on the subject; and (2) it relates to different technology than what is at issue in the present case. 324 F. Supp. 3d at 489.

The Court is not prepared to say a patent damages expert may *never*, under any circumstances, rely on a jury verdict from a case involving different parties and different patents

in order to help frame what is a reasonable royalty in a given case.[2] *Cf. 2-Way Computing, Inc. v. Sprint Sols., Inc.*, No. 2:11-CV-12 JCM (PAL), 2015 WL 2365648, at *5 (D. Nev. May 18, 2015) ("[T]he court has found no rule that prohibits an expert from considering a jury verdict in his royalty rate calculations if that jury verdict pertains to a matter that is sufficiently comparable to the instant matter."); *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL Docket No. 2303, Case No. 11 C 9308, 2013 WL 5593609, at *33 (N.D. Ill. Oct. 3, 2013) (stating in a patent case that "jury verdicts can be data points providing a comparable license rate[] for use in hypothetical negotiations"). But under the facts here, reliance on the Sony/Immersion verdict amounts to an unreliable method of analysis.

That is so not only due to the inherent limitations involved in relying on any such verdict, as described in *Acceleration Bay LLC*—though those limitations are definitely a factor in the Court's calculus. It is also due to *another* reason that is relevant to this particular jury verdict:

---

[2] Ubisoft concedes that a jury verdict *could be* useful in a reasonable royalty analysis in at least one set of circumstances: if the verdict (1) came in a case involving one or more of the same parties who would be involved in the hypothetical negotiation at issue; and (2) was issued prior to the hypothetical negotiation, such that the parties might well have considered the impact of the verdict on patent licensing discussions held thereafter. (D.I. 316 at 1-3); *see also Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.*, — Fed. App'x —, 2018 WL 6266319, at *2-3 (Fed. Cir. Nov. 30, 2018) (upholding a district court's decision to allow the plaintiff to admit evidence of a jury verdict rendered prior to the date of the hypothetical negotiation at issue, where the verdict came in a case brought by the plaintiff against a third party, and involved the same technology (and some of the same patents) that were at issue in the instant case, since "the verdict would be a factor of which the parties would have been aware at the time of their hypothetical negotiation in 2010, and a reasonable jury could well conclude that the verdict and the amount of damages awarded in a similar prior litigation would have influenced the outcome of a hypothetical negotiation in the case at bar"); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1366 (Fed. Cir. 2006) (finding that a prior litigation between the parties involving the patent-in-suit, which resulted in a jury verdict, could be relevant to the reasonable royalty analysis in the instant case, where the hypothetical negotiation relevant to the instant case would have taken place "on the heels of the [prior case's] jury verdict").

4

the Sony/Immersion verdict form did not indicate what royalty rate the jury actually applied to controllers and games (i.e., the types of accused products at issue in this case). (D.I. 247, ex. 2 at 15) This was because the Sony/Immersion case involved accused products including not just controllers and games, but also consoles. Even though the Sony/Immersion verdict form shows that the jury returned a verdict (of "$82 million"), (*id.*), and even though the revenue base for all of the different accused products combined could be discerned, the verdict form did not indicate what amount of the damages was associated with each of the various accused products at issue (such that one would not know what the jury's chosen royalty rate was only as to controllers, or only as to games, or only as to consoles), (*id.*, ex. 3 at 208-09, 214-16). As a result, Mr. Yurkerwich was required to speculate or guess about what rate the Sony/Immersion jury *might have* been allocating to controllers (he chose 2%) and games (he chose 5%) as opposed to consoles (he chose 0.99%); once Mr. Yurkerwich did that, he then blended his chosen rate for controllers and games (to get a rate of 3.5%). (*Id.*, ex. 1 at ex. 4.2; *see also id.*, ex. 1 at ¶ 50 (Mr. Yurkerwich noting that by reviewing the Sony/Immersion verdict and a related court order, he was able to ascertain how "the jury *potentially* calculated the damages amount" there and how the jury "*may have* obtained their damages award") (emphasis added); *id.* at ¶ 51 (Mr. Yurkerwich stating that "*[i]f* the [Sony/Immersion] jury decided on a 2% royalty on the controllers and a 5% royalty on the games, which is a reasonable *possibility*" then the resulting blended rate would be 3.5%) (emphasis added)) And he then used that 3.5% royalty rate as a key

5

data point in his initial expert report when determining what a reasonable royalty might be in the instant case. (*Id.*, ex. 1 at ¶ 52 & ex. 4.2)[3]

Reliance on speculation like this is problematic. This is especially so where, as here: (1) there is "an infinite number of possible mathematical combinations of rates that the [Sony/Immersion] jury also could have applied[,]" (D.I. 240 at 4); and (2) this 3.5% royalty rate is a key component of Mr. Yurkerwich's damages analysis.

In light of the combined force of all of the reasons set out above, the Court recommends that Mr. Yurkerwich's reliance on the Sony/Immersion jury verdict be stricken. *Cf. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373-74 (Fed. Cir. 2013) (finding damages expert's testimony to be unreliable where he made speculative leaps, and such "layered assumptions lack the hallmarks of genuinely useful expert testimony").

### 2. Konami/Harmonix Settlement Agreement

Second, Ubisoft argues that Mr. Yurkerwich's reliance on a settlement agreement (the "Konami/Harmonix agreement") between Konami Digital Entertainment Co., Ltd. and Konami Digital Entertainment, Inc. (collectively, "Konami") and Harmonix, MTV Networks, Co. ("Harmonix") as an indicator of licensing value was also unreliable. (D.I. 240 at 5-6) Mr. Yurkerwich analyzed the Konami/Harmonix agreement (which settled two cases in which

---

[3] Apparently, after the Sony/Immersion jury verdict, the parties settled the litigation between them, with Sony agreeing to pay Immersion the damages amount reflected by the verdict. (D.I. 286 at 3; D.I. 289, ex. 1 at 204-06) PDI suggests that "Mr. Yurkerwich does not rely on the jury verdict alone, but also on the ensuing transaction between Sony and Immersion, in which Sony paid Immersion the amount rendered by the verdict in a subsequent settlement." (D.I. 286 at 3) The Court rejects the argument that the "ensuing transaction" between Sony and Immersion had some independent import in Mr. Yurkerwich's analysis. Mr. Yurkerwich's initial expert report mentions nothing about that settlement, and appears solely focused on the jury's verdict (and what can be read into that verdict). (*See* D.I. 247, ex. 1 at ¶¶ 49-51; D.I. 316 at 1-2)

Konami had collectively accused Harmonix's video games of infringing three Konami patents) in a supplemental expert report (the "supplemental report" and together with the initial report, the "expert report"). (D.I. 247, ex. 4 at ¶¶ 8-30)

Before an expert may rely on a license agreement in assessing a hypothetical negotiation, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue[.]" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (noting that a patentee must take care to seek only those damages "attributable to the infringing features"). However, in Mr. Yurkerwich's supplemental report, he provides only one sentence in which he compares Konami's technology at issue in the Konami/Harmonix agreement with the asserted claims of the one patent-in-suit here: PDI's United States Patent No. 5,513,129 (the "'129 patent"). This comes when Mr. Yurkerwich writes: "Based on a discussion with [PDI technical expert] Mr. [Scott] Andrews, I understand that the technology related to the [Konami] patents (that were the subject of the settlement) are comparable to the '129 patent from a technological perspective in that they score a player's action at a particular time in the game." (D.I. 247, ex. 4 at ¶ 10) Mr. Yurkerwich never further explains his assertions about comparability. And when asked in his deposition whether the asserted claims of the '129 patent required scoring a player's action, Mr. Yurkerwich said that they did not. (*Id.*, ex. 3 at 230)[4]

---

[4] Mr. Andrews' expert report does not fill in the gaps left by Mr. Yurkerwich's expert report. In his report, Mr. Andrews does describe the three Konami patents involved in the Konami/Harmonix cases. (D.I. 246, ex. 3 at ¶¶ 55-64) But PDI has not directed the Court to any portion of Mr. Andrews' report in which Mr. Andrews explicitly explains how the technology claimed in these three patents is comparable to that at issue in the asserted claims of the '129 patent.

7

With nothing more offered in his expert report about why Konami's technology at issue in the settlement agreement is comparable to the technology in the asserted claims, Mr. Yurkerwich's statements amount to "alleging a loose or vague comparability between different technologies[.]" *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012); *see also M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 676-78 (D. Del. 2016) (excluding defendant's damages expert's reliance on two settlement agreements between defendant and other companies, because (1) the damages expert provided "nebulous statements of comparability" between the patent-in-suit and the patents covered by the respective license agreement, which amounted to "ambiguous conclusions of technological comparability . . . without any rationale other than undisclosed conversations" between the damages expert and defendant's non-infringement expert; and (2) the allegedly comparable settlement agreements arose out of litigation). Therefore, the Court recommends that Mr. Yurkerwich's reliance on the Konami/Harmonix agreement be stricken from his expert report.

### 3. Reliance on Sales Figures of Accused Games

Third, Ubisoft argues that Mr. Yurkerwich's reasonable royalty analysis lacks "fit" to the facts of the case because his analysis "assumes that all of Ubisoft's sales of the alleged infringing products to end users [the "sales figures"] form the infringing royalty base." (D.I. 240 at 2; *see also* D.I. 247, ex. 1 at ¶ 78 & exs. 3.0, 5.0 (Mr. Yurkerwich using as the royalty base the amount of revenue—approximately $780 million—generated by sales of the accused video games from 2009 to 2013)) Ubisoft claims that this is so because these sales are the types of damages that would be most clearly associated with a claim of *indirect infringement* against Ubisoft, and, yet, in this case, PDI's claims of indirect infringement have been dismissed. (D.I. 240 at 2, 6) As a

8

result, PDI's claims against Ubisoft at trial are "strictly limited to '*direct infringement* relating to Ubisoft's internal use, development, and/or testing in the United States of the accused games.'" (*Id.* at 2 (quoting D.I. 199 at 2) (emphasis added)) Ubisoft argues that Mr. Yurkerwich's report should be stricken because he never attempts to explain why these sales figures can and should be used as a proxy for damages relating to Ubisoft's alleged direct infringement. (*Id.* at 6-8)

The Court agrees. As Ubisoft notes, the situation here appears very similar to that at issue in *Parallel Networks Licensing, LLC v. Int'l Bus. Machs. Corp.*, 103 Fed. R. Evid. Serv. 2016, 2017 WL 1405155 (D. Del. Apr. 17, 2017). In *Parallel Networks*, after the district court entered a summary judgment order excluding the plaintiff's theory of indirect infringement, the plaintiff's damages expert sought to use his testimony regarding the now-dismissed indirect infringement theory in order to support an award of damages for plaintiff's claim of direct infringement damages (i.e., damages that flowed "via [defendant's] use of its website"). 2017 WL 1405155 at *1. The *Parallel Networks* Court noted that the value included in the expert's damages estimate was all attributable to the defendant's sale of certain accused products, rather than to defendant's operation of its website. *Id.* at *2. And it explained that while the expert "asserted that [the defendant] directly infringed the asserted claims [based on the use of its website, he did] not explain *how* one would quantify the value [defendant] realized by any such infringement, and he [did] not indicate how the value derived from use would translate into a royalty or license agreement." *Id.* at *3 (emphasis added). In other words, the expert's report "reveal[ed] no developed damages theory that pertain[ed] to the theory of direct infringement that [the plaintiff] now advance[d]" in the case. *Id.* at *2. Because the expert had not attempted to link the revenues flowing from the sale of the accused products to the claim of direct

9

infringement still at issue in the case (i.e., the use of the defendant's website), the *Parallel Networks* Court found that the report should be excluded. *Id.* at *2-3.

As in *Parallel Networks*, here the Court cannot find any portion of Mr. Yurkerwich's expert report in which he explains *why* it is that these sales figures should be an important data point for purposes of calculating the value of direct infringement damages. There might be a sufficient answer to this question. *Cf. Carnegie Mellon Univ. v. Marvell Tech. Grp.*, 890 F. Supp. 2d 602, 609-11 (W.D. Pa. 2012) (finding, in denying a summary judgment motion, that the plaintiff could utilize defendant's non-infringing sales as a basis for determining damages for defendant's infringing acts that occurred throughout the sales cycle, where the facts of record indicated how "any profit that [defendant] derives from the sale of infringing chips is directly due to its infringements during the sales cycle"). But in the absence of having provided that linkage, the Court recommends that Mr. Yurkerwich's report, which uses Ubisoft's video game sales figures as the relevant royalty base, be stricken.

### III. CONCLUSION

For the foregoing reasons, the Court recommends that Ubisoft's Motion be GRANTED in its entirety. It also recommends that PDI be provided one further opportunity to submit a revised expert report from Mr. Yurkerwich that: (a) does not include reference to the Sony/Immersion jury verdict; but that (b) attempts to address the Court's concerns discussed above regarding the Konami/Harmonix agreement and reliance on sales figures of accused games.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **December 14, 2018,** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: December 11, 2018

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE