UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

REGENTS OF THE UNIVERSITY OF MINNESOTA,

        Plaintiff,

    v.

LSI CORPORATION, et al.,

        Defendants.

Case No.  18-cv-00821-EJD

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Re: ECF No. 310, 315

***REDACTED PUBLIC VERSION***

        Plaintiff, Regents of the University of Minnesota ("UMN"), moves for summary judgment on Defendants LSI Corporation and Avago Technologies U.S. Inc.'s (together, "LSI") claims that: (i) Claims 14 and 17 (the "Asserted Claims") of U.S. Patent No. 5,859,601 (the "'601 Patent") are invalid on the grounds of an alleged prior art invention by Dr. Emina Soljanin pursuant to (pre-AIA) 35 U.S.C. § 102(g); and (ii) the '601 Patent is unenforceable on the grounds of alleged inequitable conduct. ECF No. 310. LSI moves for summary judgment of noninfringement, no damages, and invalidity of the '601 Patent under 35 U.S.C. § 112. ECF No. 315.[1]

        For the reasons explained below, UMN's Motion is GRANTED, and LSI's Motion is GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

### A.     The Parties

UMN is a research university in Minnesota that supports and facilitates a wide range of

---

[1] The parties did not comply with this Court's Standing Order on the requirements for cross-motions for summary judgment. *See* Standing Order for Civil Cases, Section V(C) (requiring four briefs total for cross-motions for summary judgment). The Court expects the parties to adhere to this Court's Standing Orders going forward.

United States District Court
Northern District of California

research. UMN contends that Jaekyun Moon, a former University professor, and Barrett J. Brickner, a Ph.D. student, developed the invention described in the '601 Patent during their tenure at the University and assigned the '601 Patent to the University.

LSI designs, develops, and supplies integrated circuits used in data storage, such as hard disc drive ("HDD") chips.

### B.    Procedural History

UMN filed the complaint in this matter originally in the District of Minnesota on August 25, 2016, alleging that LSI used the methods claimed in claims 13, 14, and 17 of the '601 Patent. The case was transferred to this District, and on March 10, 2017, LSI filed a petition for *inter partes* review ("IPR") of certain claims of the '601 Patent, including claims 13, 14, and 17. Joint Statement of Undisputed Facts Regarding Defendants' Motion for Summary Judgment ("JSUF II") ¶ 13. The Court stayed the action pending resolution of the IPR (ECF Nos. 191, 211), and on April 14, 2021, the PTAB found that claim 13 of the '601 Patent was unpatentable, but that claims 14 and 17, which depend from claim 13, were not unpatentable. JSUF II ¶ 21. After the Federal Circuit affirmed the PTAB's final written decision (JSUF II ¶ 22), the Court lifted the stay on October 7, 2022. ECF No. 218.

The Court held a *Markman* hearing and construed the following terms:

| Claim term | Court's Construction |
|---|---|
| producing sequences of n-bit codewords | producing, as output from the received binary datawords, n-bit codewords that are combined into a sequence |
| encoded waveform | the recorded waveform |
| transition | plain and ordinary meaning; a transition can be logically represented in multiple ways depending on the recording format used—a change from 0 to 1 or from 1 to 0 when using NRZ format, for example, or a 1 when using NRZI format |

Claim Construction Order 14, ECF No. 263.

### C.    The '601 Patent

The '601 Patent generally pertains to digital storage systems. Such systems work by recording data as 1's and 0's, though the formats with which they record that data can vary. The '601 Patent discusses two such recording formats. First, a storage device can use the Non-Return-to-Zero ("NRZ") recording format. '601 Patent at col. 1:24–27. In NRZ recording, a 1 is represented by positive magnetization within the storage device, and a 0 is represented by negative magnetization within the storage device. '601 Patent at col. 1:24–27. Second, a storage device can use the Non-Return-to-Zero-Inversion ("NRZI") recording format. '601 Patent at col. 1:29–32. In this format, a 1 is represented by a magnetic transition (*i.e.*, from positive to negative), and a 0 is represented by a non-transition. '601 Patent at col. 1:29–32.

To achieve these constraints, the '601 Patent teaches the encoding of "datawords" (pieces of input data) into "codewords" (corresponding pieces of output data). '601 Patent at col. 10:50–51. The codewords are chosen such that, when the codewords are joined together in a string, the (j;k) constraints are satisfied. This encoding can be performed by using either "block" codes or "state-dependent" codes. Block codes are those where each dataword is mapped to a unique codeword. *Id.* at col. 5:66–67. By contrast, state-dependent codes assign codewords to datawords based on the previously used codeword, or "state," of the system. *See id.* at col. 5:50–53, 61–66.

UMN asserts infringement of only claims 14 and 17 of the '601 Patent. But because both claims depend from claim 13, the Court reproduces all three claims below:

> **13.** A method for encoding m-bit binary datawords into n-bit binary codewords in a recorded waveform, where m and n are preselected positive integers such that n is greater than m, comprising the steps of:
> receiving binary datawords; and
> producing sequences of n-bit codewords;
> imposing a pair of constraints (j;k) on the encoded waveform;
> generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geqq 2$; and
> generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform.
>
> **14.** The method as in claim 13 wherein the consecutive transition limit is defined by the equation $2 \leq j < 10$.

Case No.: 18-cv-00821-EJD
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

**17.** The method as in claim 14 wherein the binary Sequences produced by combining codewords have no more than one of consecutive transitions from 0 to 1 and from 1 to 0 and no more than one of k+1 consecutive O's and k+1 consecutive 1's when used in conjunction with the NRZ recording format.

UMN alleges that LSI infringes in three ways: (1) LSI directly infringes when it uses the Asserted Claims in the United States (35 U.S.C. § 271(a)); (2) LSI induces infringement when LSI's customers (and their customers) use the Asserted Claims in the United States pursuant to LSI's directions (35 U.S.C. § 271(b)); and (3) LSI engages in contributory infringement by selling systems on chips (SoCs) that LSI's customers and their customers use to practice the Asserted Claims (35 U.S.C. § 271(c)).

UMN's experts defined the term "Accused Products" to encompass both "Accused Simulators" and "Accused Read Channels." The Accused Read Channels are read channels that are part of integrated circuits used and sold by LSI. McLaughlin Rep. ¶ 4.2, ECF No. 311-6. The Accused Read Channels include a selectable operating mode, namely ▮▮▮▮▮▮ code mode, which can be set via the ▮▮▮▮▮▮▮▮▮▮ of the Accused Read Channels. *Id.* When the Accused Read Channels are operated to write binary data in this normal operating mode of the Accused Read Channels, UMN alleges the Accused Read Channels perform all of the steps of the Asserted Claims. *Id.*

The term "Accused Simulators" refers to software and hardware tools and systems, used by LSI and its customers (*i.e.*, HDD manufacturers), for reading MTR-encoded data recorded to a recording medium (*e.g.*, a disk of an HDD), particularly recorded data encoded using LSI's ▮▮▮ ▮▮▮▮▮▮▮▮ *Id.* ¶ 4.3. UMN alleges that LSI and its customers practice the Asserted Claims through the Accused Simulators by using ▮▮▮▮▮ from actual recording media that have data written thereon that is encoded via ▮▮▮▮▮▮▮▮. *Id.*

In particular, UMN asserts LSI and its customers infringe during the "extensive design, development, and sales cycle," in which they engage for every generation of SoCs sold. JSUF II ¶ 13.

## II.    LEGAL STANDARD

### A.    Motion for Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

If the burden of persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the non-movant must come forward with specific facts to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

## III.    UMN'S MOTION FOR SUMMARY JUDGMENT

UMN moves for summary judgment on two issues.  First, to the extent that LSI's counterclaim for declaratory judgment of invalidity is premised on anticipation or obviousness arguments, UMN asks for summary judgment that the remaining patent claims in this case are not invalid as anticipated or obvious.  Second, UMN seeks summary judgment in its favor on the entirety of LSI's counterclaim for declaratory judgment of unenforceability due to inequitable

1  conduct.  The Court finds that UMN is entitled to summary judgment on both issues.

2      **A.**    **Invalidity**

3      Because the parties have already litigated anticipation and obviousness through IPR, only

4  one such issue remains in this case.  LSI asserts that Dr. Emina Soljanin independently invented

5  the subject matter of claims 14 and 17 such that, under pre-AIA § 102(g), Dr. Soljanin's invention

6  is prior art that invalidates those claims.  However, UMN has shown that there is insufficient

7  evidence in the record to demonstrate that Dr. Soljanin ever reduced her purported invention to

8  practice, as required by § 102(g).  And in any case, UMN has established that IPR estoppel under

9  § 315(e)(2) bars LSI from now raising Dr. Soljanin's supposed invention as a ground for

10  invalidity.

11          **1.**    **Reduction to Practice**

12      The pre-AIA § 102(g) allows a claimed invention to serve as prior art potentially

13  invalidating a patent "if the claimed invention was made in this country by another inventor before

14  the patent's priority date."  *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 (Fed. Cir.

15  2014).  "Making the invention requires conception and reduction to practice."  *Id.*  In turn,

16  reduction to practice is established in relevant part "by evidence of [] actual performance."

17  *Goeddel v. Sugano*, 617 F.3d 1350, 1353 (Fed. Cir. 2010) (citing *Cooper v. Goldfarb*, 154 F.3d

18  1321, 1327 (Fed. Cir. 1998)); *see also Reese v. Hurst*, 661 F.2d 1222, 1227 (C.C.P.A. 1981) ("[A]

19  process is reduced to practice when it is successfully performed.") (citation omitted).

20      Here, LSI has produced some evidence of reduction to practice in the form of

21  Dr. Soljanin's testimony.  Soljanin Dep. at 66:7–76:5, ECF No. 335-5.  That testimony is

22  equivocal at best.  But construing the evidence in the light most favorable to LSI, a jury could

23  interpret Dr. Soljanin's testimony as asserting that she did actually implement her purported

24  invention.  The problem is that this is not enough to meet LSI's burden.  A party cannot invalidate

25  a patent by relying on only a single witness's testimony to meet its burden; corroboration is

United States District Court
Northern District of California

1    required.  *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999).[2]

2        LSI's only other supposed evidence of reduction to practice[3] is a 1995 paper that

3    Dr. Soljanin published describing her purported invention.  '95 Paper, ECF No. 336-2.  However,

4    the '95 Paper is not corroborating evidence.  LSI points to a sentence in the paper that "an

5    improvement in the off-track performance of [the EPR4] channel can be accomplished by limiting

6    the length of subsequences of alternating symbols to four."  *Id.* at 99.  According to LSI, this

7    shows that Dr. Soljanin's purported invention "is suitable for its intended purpose" and therefore

8    that the invention was reduced to practice.  Opp. to UMN Mot. 12 (quoting *Mahurkar v. C.R.*

9    *Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996)).  Demonstrating suitability is just one part of

10   reduction to practice, though.  Reduction to practice requires an inventor to (1) determine that an

11   invention "would work for its intended purpose" *by means of* (2) "construct[ing] an embodiment

12   or perform[ing] a process."  *Cooper*, 154 F.3d at 1327.  In other words, the inventor must actually

13   implement her invention—she cannot conclude on a solely theoretical basis that her invention will

14   do what she thinks it will do.  And the cited sentence in the '95 Paper does not suggest that

15   Dr. Soljanin ever went beyond the theoretical.

---

23   [2] LSI attempts to argue that, under *Thomson S.A. v. Quixote Corp.*, 166 F.3d 1172 (Fed. Cir. 1999), corroboration is not required when the witness is disinterested.  But *Finnigan* expressly
24   addressed *Thomson*, explaining that *Thomson* was a narrow holding and did not displace the rule that "corroboration is required of any witness whose testimony alone is asserted to invalidate a
25   patent, *regardless of his or her level of interest*."  *Finnigan*, 180 F.3d at 1368–69 (Fed. Cir. 1999) (emphasis added).

26   [3] LSI also cites to one of its expert reports, but that expert merely parrots Dr. Soljanin's testimony.  Opp. to UMN Mot. 12, ECF No. 336 (citing Koralek Rep. ¶ 105, ECF No. 335-4).  The cited
27   paragraph of the report is therefore not separate, corroborating evidence.

1    Apart from that sentence, LSI also emphasizes that the '95 Paper claims to have used

2  "simulation results obtained by Sayiner," and then argues that those simulation results are

3  reflected in Figure 1 (reproduced below). '95 Paper 100–101 & fig.1.



Figure 1: Off-track performance of PR4 and EPR4 channels.

13    This argument is mere speculation that cannot establish any genuine dispute of material

14  fact. *Javaheri v. JPMorgan Chase Bank N.A.*, 561 F. App'x 611, 612 (9th Cir. 2014). There is no

15  indication in the '95 Paper as to what the "simulation results obtained by Sayiner" actually are and

16  how they are (or are not) connected to Dr. Soljanin's purported invention. All that is known is

17  that these simulation results were somehow used in conjunction with "[t]he analytical results of

18  [the '95 Paper]." '95 Paper 100. LSI tries to bridge this speculative gap by arguing that the

19  "coded EPR4" graph in Figure 1 must refer to Dr. Soljanin's purported invention, and the graph

20  could only be generated by actually implementing the invention. Yet, LSI provides no evidence

21  beyond attorney argument for why that must be so or is even likely to be so. LSI's attorney

22  argument is based on the assumption that, because the '95 Paper disclosed how the PR4 channel

23  performed on a "1-2α" curve and the EPR4 channel performed on a "1-4α" curve, the "coded

24  EPR4" curve in Figure 1 must represent "1-3α," which reflects Dr. Soljanin's purported invention.

25  That line of reasoning is, frankly, difficult to follow, perhaps since it constitutes attorney argument

26  on highly technical matters outside of the typical attorney's knowledge. Attorneys are not

27  qualified to explain what "α" means, to determine whether the "coded EPR4" curve represented

United States District Court
Northern District of California

"1-3α," or to otherwise interpret Figure 1. LSI has not identified any expert testimony supporting its attorney argument. Accordingly, there is no material dispute that LSI has failed to meet its burden to show reduction to practice.

### 2. IPR Estoppel

Under § 315(e)(2), once a petitioner has obtained a final written decision on the validity of a patent claim in IPR proceedings, that petitioner "may not assert [] in a civil action arising in whole or in part under section 1338 of title 28 . . . that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2). Here, the parties agree that LSI did not raise the '95 Paper during IPR proceedings as a ground for unpatentability. Joint Statement of Undisputed Facts Regarding UMN's Motion for Summary Judgment ("JSUF I") ¶ 18, ECF No. 310-2. They also agree that LSI was aware of and had access to the '95 Paper when it filed its IPR petition. *Id.* ¶ 20. This means that LSI reasonably could have raised the '95 Paper as grounds for invalidity during the IPR proceedings. Finally, the parties agree that inventions under § 102(g) cannot be raised in IPR proceedings. *Id.* ¶ 19. Thus, whether IPR estoppel applies turns on whether the § 102(g) argument that LSI raises now is equivalent to an argument that LSI could have raised in IPR; namely, that the '95 Paper invalidates the claims at issue as anticipated or obvious. The Court finds that the two arguments are equivalent for estoppel purposes.

As Dr. Soljanin testified, all technical details about her purported invention were contained in the '95 Paper. *Id.* ¶ 59; Soljanin Dep. at 65:15–66:3. In other words, Dr. Soljanin's purported invention under § 102(g) contains no functionalities, characteristics, or elements not disclosed in the '95 Paper. LSI does not dispute any of this. Consequently, anticipation and obviousness arguments based on the '95 Paper would involve the exact same substantive arguments as anticipation and obviousness arguments based on the purported §102(g) invention.

The only potentially relevant difference between the '95 Paper and the purported invention, for anticipation and obviousness purposes, would be the priority date. LSI seizes onto this difference, arguing that it could not have raised the '95 Paper in IPR proceedings because the

1   '95 Paper (October 1995) postdated conception of the '601 Patent (May 1995).  Opp. to UMN

2   Mot. 15–16.  Therefore, LSI says, the '95 Paper could not have been prior art.  But Dr. Soljanin's

3   purported § 102(g) invention, which has an earlier priority date than the '95 Paper, can be prior

4   art.  LSI is jousting at windmills.  What matters is not the conception date of the invention

5   disclosed by the '601 Patent but rather the priority date of the '601 Patent itself.  The '601 Patent's

6   priority date is April 5, 1996.  JSUF I ¶ 5.  LSI could have raised the '95 Paper as prior art during

7   the IPR proceedings since the '95 Paper was published before April 1996.  As such, LSI's

8   anticipation and obviousness arguments based on the '95 Paper are materially indistinguishable

9   from those based on the purported § 102(g) invention.  LSI is estopped from using Dr. Soljanin's

10   purported invention to argue invalidity.

### B.   Inequitable Conduct

12   "To prove inequitable conduct, a party must show that the patentee withheld material

13   information from the PTO, and did so with the specific intent to deceive the PTO."  *Luv n' Care,*

14   *Ltd. v. Laurain*, 98 F.4th 1081, 1096–97 (Fed. Cir. 2024).  LSI's theory of inequitable conduct is

15   that Dr. Moon and Dr. Brickner failed to disclose Dr. Soljanin as one of the inventors of the '601

16   Patent.[4]  To succeed on that theory, LSI must be able to show that Dr. Soljanin was in fact an

17   inventor.  But it has not done so and cannot do so.

18   A joint inventor must show that her "labors were conjoined with the efforts of the named

19   inventors."  *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004).  Put

20   differently, a joint inventor must have actually worked with the named inventors.  The bar for

21   establishing this requirement is not high, but at a minimum there must be evidence that some

22   "collaboration or concerted effort occur[ed]—that is, [] the inventors ha[d] some open line of

23   communication during or in temporal proximity to their inventive efforts."  *Id.*  There is no

24   apparent evidence of such collaboration in the record.  LSI cites to its own counterclaim

_____

[4] UMN's motion for summary judgment initially addressed the argument that it was inequitable conduct for Dr. Moon and Dr. Brickner to withhold the '95 Paper from the PTO.  LSI appears to have abandoned that theory of inequitable conduct.

Case No.: 18-cv-00821-EJD
ORDER ON MOTIONS FOR SUMMARY JUDGMENT
10

United States District Court
Northern District of California

1   allegations, which are (of course) not evidence.  Opp. to UMN Mot. 17–18.  And LSI quotes

2   excerpts from Dr. Moon's and Dr. Brickner's depositions that could arguably be interpreted as

3   conceding that the '95 Paper disclosed claims 14 and 17 of the '601 Patent.  *Id.* at 20–21.  While

4   the deposition excerpts could be relevant to anticipation or obviousness arguments, they do not

5   show any collaboration that Dr. Moon and Dr. Brickner had with Dr. Soljanin.  If anything, the

6   record affirmatively shows that there was no collaboration.  LSI makes much of the (disputed) fact

7   that Dr. Moon purportedly asked Dr. Soljanin if she would like to be listed as a joint inventor on

8   the '601 Patent.[5]  However, Dr. Soljanin testified that she was not personally acquainted with Dr.

9   Moon prior to his supposed offer, so the two could not have collaborated beforehand.  Soljanin

10  Dep. at 84:21–85:2. Dr. Moon testified to the same.  Moon Dep. at 60:16–19, ECF No. 335-6.

11  Accordingly, LSI has failed to present a triable issue on its inequitable conduct claim.

12                              *       *       *

13          For the reasons above, the Court **GRANTS** UMN's motion for partial summary judgment.

## IV.    LSI'S MOTION FOR SUMMARY JUDGMENT

15          LSI moves for summary judgment on three issues.  First, LSI seeks summary judgment of

16  no infringement as a matter of law, including no direct, indirect, or willful infringement.  Second,

17  LSI requests a ruling that UMN is not entitled to damages as a matter of law.  Third, LSI moves

18  for summary judgment that the '601 Patent is invalid for lack of enablement.

19          LSI is entitled to summary judgment of no infringement for use of HDDs that are not

20  configured to use ▆▆▆▆▆▆▆ when used as configured.  The Court finds that LSI

21  otherwise has not met its burden to show it is entitled to summary judgment on the other requested

22  issues.

---

[5] As presented, LSI's allegation makes no sense.  The Court cannot think of any reason, nor has LSI provided one, explaining why Dr. Moon would offer joint inventorship to an apparent stranger at their first meeting.  That said, the Court need not and does not (and cannot at this stage) resolve this factual dispute—even if the Court were to assume, as LSI argues, that Dr. Moon did extend such an invitation, there is still no evidence of collaboration.

### A.  Infringement

#### 1.  Direct Infringement

**HDDs not configured to use** ▮▮▮▮.  The parties agree that "[u]se of HDDs that are not configured to use the ▮▮▮▮ do not directly infringe when used as configured."  JSUF II ¶ 10; *see also* Opp. to LSI Mot. 1.  The parties also agree that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were configured to use the ▮▮▮▮.  JUSF II ¶ 11.  Based on this agreement, LSI requests summary judgment of no infringement "with respect to all SoCs sold by LSI other than those used in the ▮▮▮▮."  Reply ISO LSI Mot. 1.  This argument reflects a divide in the parties' broader positions.  As the Court understands it, UMN's infringement theory does not necessarily depend on whether any HDDs were ultimately configured ▮▮▮▮.  It is LSI's, and its customers', purported use ▮▮▮▮ during the sales cycle (including testing, verification, etc.) that UMN accuses, regardless of how the HDD was ultimately configured.  *See* Opp. to LSI Mot. 3–6.  As such, summary judgment of no infringement as to all SoCs sold by LSI other than those used ▮▮▮▮ would require LSI pointing to an absence of evidence supporting UMN's theory of infringement as to those chips.  LSI has not met that burden.  Even though it is undisputed that only those ▮▮▮▮ were ultimately "configured to use" ▮▮▮▮, evidence in the record shows that UMN still has a viable theory of infringement based on the other products from use of ▮▮▮▮ during the sales cycle—regardless of how they were ultimately "configured" when commercially available.  *See, e.g.*, McLaughlin Rep. ¶¶ 8.23–8.40; Tarver Dep. at 27:7–16, 105:15–20.

The Court will GRANT summary judgment on the narrow issue of no infringement for use of HDDs that are not configured to use ▮▮▮▮ when used as configured because this request is unopposed.  The Court otherwise DENIES LSI's request for summary judgment of no infringement "with respect to all" SoCs sold by LSI other than those used in ▮▮▮▮.

**HDDs configured to use** ▮▮▮▮  LSI also moves for summary judgment

that even the SoCs in the █████████████████████████████████ do not

infringe.  For this, LSI relies primarily on its argument presented in seeking to strike

Dr. McLaughlin's report: that UMN's infringement theory is premised on a new claim

construction and contradicts UMN's infringement contentions.  As explained in the Court's order

on the parties' motions to strike and *Daubert* motion (ECF No. 393 (the "Daubert Order")), the

Court declined to strike Dr. McLaughlin's infringement theory.  And for the same reasons, the

Court disagrees that UMN's own contentions necessarily demonstrate non-infringement and that

Dr. McLaughlin's report adopts a new construction of "recorded waveform."  To recap, the Court

finds persuasive UMN's argument that Dr. McLaughlin's opinion expands upon the description in

UMN's Supplemental Contentions regarding when ████████████████ do not affect a codeword

generated ████████████████.  Additionally, Dr. McLaughlin's infringement theory as articulated

in his report applied the plain and ordinary meaning of "recorded waveform."[6]  The Court thus

declines to disregard Dr. McLaughlin's infringement theory on this basis.  On reply, LSI points to

testimony from LSI's former Director of Read Channel Architecture and LSI's R&D Director who

both stated that ████████████ increases the j constraint to ███████████████ is on.

*See* Reply ISO LSI Mot. 5 (quoting Wilson Dep. at 256:4–8, ECF No. 315-11; Yang Dep. at

52:10–53:16).  This testimony supports LSI's noninfringement theory and directly contradicts

Dr. McLaughlin's opinion that, even when ███████████████, the j constraint ████████

██████████ is on because ████████████ do not affect the codewords.  LSI's cited

testimony underscores the genuine dispute of material fact regarding the j constraint value when

for ██████████████████ is enabled.

Separate from the attacks on Dr. McLaughlin's report, LSI argues that UMN's

infringement theory still fails because UMN lacks proof that (1) "any HDDs configured with the

████████████ were ever used in the United States"; and (2) "any simulation of an HDD

---

[6] LSI contends on reply that the Court "must decide which interpretation [of 'recorded waveform'] is correct" and raises several arguments for why its interpretation should be adopted over UMN's. Reply ISO LSI Mot. 8–12.  At this stage, the Court disagrees that it must resolve any claim construction dispute to rule on LSI's motion for summary judgment.

configured to use ▆▆▆▆▆▆ was ever performed in the United States with the ▆▆▆▆

▆▆▆ disabled."  LSI Mot. 12.

This argument again relies on the parties' differing views of infringement.  It is LSI's, and

its customers', purported use of the ▆▆▆▆▆▆ during the sales cycle that UMN accuses.  So

whether any HDDs ultimately configured with the ▆▆▆▆▆▆ were sold in the United

States is immaterial to UMN's infringement theory.  What matters—and what would warrant

summary judgment of noninfringement for LSI on this issue—is if UMN lacks proof that LSI and

its customers *used* the ▆▆▆▆▆▆ in the United States.

LSI has not met its burden on this issue.  UMN identified several pieces of evidence

showing use of the Asserted Claims in the United States through testing of ▆▆▆▆▆ code.

This includes testimony from LSI's Director of Read Channel Architecture, Bruce Wilson,

discussing validation and design work with customers in California.  *See, e.g.*, Wilson Dep. at

133:18–134:25, ECF No. 333-7 (discussing interactions with customers in Minnesota, Colorado,

and California).  UMN also identified testimony from a member of Dr. Wilson's team who

discussed ▆▆▆▆▆▆▆ in California and Colorado.  *See* Yang Dep. at 72:20–

73:11 (testifying that LSI performs ▆▆▆▆▆▆▆ "[i]n California, Colorado, or

Shanghai, at least" and LSI's customers perform ▆▆▆▆▆▆▆ "[i]n Minnesota,

in California, in Asia"); *id.* at 97:14–16 ("Q. So, would the ▆▆▆▆▆▆ occur in both

California and China? A. Yes.").  This evidence supports finding use of ▆▆▆▆▆▆ in the

United States.

LSI does not address this evidence.  Instead, it doubles down on its challenge to UMN's

broader theory of infringement and seems to abandon its argument of noninfringement based on

no use in the United States.  *See* Reply 1–4.  The Court addresses LSI's arguments regarding

UMN's request for damages below.

At this stage, LSI has not met its burden to show it is entitled to summary judgment of no

direct infringement for all HDDs and simulators configured to use ▆▆▆▆▆ .

United States District Court
Northern District of California

### 2. Indirect Infringement

Liability for indirect infringement arises through the existence of direct infringement. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004). To establish indirect infringement, a patent owner can assert active inducement of infringement or contributory infringement. *See* 35 U.S.C. § 271(b)–(c). UMN brings claims for indirect infringement based on—and LSI moves for summary judgment in its favor on—both.

***Induced infringement***. Pursuant to 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." In order to succeed on a claim of inducement, UMN must show "first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407 (Fed. Cir. 2018) (citation omitted). As a result, "liability for inducing infringement attaches only if the defendant knew of the patent." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). "The intent element requires knowledge that the induced acts constitute patent infringement, which can be established by a proper finding of willful blindness." *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118 (Fed. Cir. 2022) (quotations omitted).

LSI seeks summary judgment of no induced infringement by LSI of claims 14 and 17 first because UMN has not shown direct infringement. Because the Court granted summary judgment of no infringement for use of HDDs that are not configured to use the �altered▒▒▒▒▒▒ when used as configured, the Court will in turn GRANT summary judgment of no indirect infringement based on the same.

As for the indirect infringement claims stemming from the unresolved direct infringement conduct, LSI argues summary judgment is proper for three reasons: (1) UMN cannot show pre-suit knowledge of the '601 Patent or that it was willfully blind to infringement, (2) LSI did not knowingly induce infringement, and (3) LSI did not know whether its customers imported any ▒▒▒▒▒▒▒ HDDs into the United States. LSI Mot. 14–17.

Case No.: 18-cv-00821-EJD
ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1      Pre-suit knowledge or willful blindness. LSI avers that UMN cannot show LSI had actual

2  knowledge of the '601 Patent (and alleged infringement) or that LSI was willfully blind to the

3  existence of the '601 Patent (and alleged infringement). UMN appears to not dispute it lacks

4  evidence that LSI knew the '601 Patent existed. Rather, its indirect infringement theory relies on

5  willful blindness.

6      Willful blindness occurs when parties "deliberately shield[] themselves from clear

7  evidence of critical facts that are strongly suggested by the circumstances." *Global-Tech*

8  *Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). This standard is higher than mere

9  negligence or recklessness. *Id.* at 769. Demonstrating willful blindness requires that "(1) the

10  defendant must subjectively believe that there is a high probability that a fact exists and (2) the

11  defendant must take deliberate actions to avoid learning of that fact." *Id.*

12      Here, record evidence demonstrates a genuine dispute of material fact as to whether LSI

13  was willfully blind. For instance, UMN identifies licensing discussions between the parties in

14  2013 from which a reasonably juror could infer that LSI was willfully blind to the existence of the

15  '601 Patent and potential infringement. On March 5, 2023, Dr. Moon initiated the discussions in

16  an email to Dr. Yuan Xing Lee, a member of team that developed of LSI's read channel and SoC

17  architecture, inquiring whether "LSI would be open to a friendly conversation about [UMN]

18  technology commercialization." JSUF II ¶¶ 28, 34. Dr. Lee responded two days later, copying

19  LSI's Senior IP Counsel, Ryan Phillips, as the proper contact person "for future follow-up." *Id.*

20  ¶ 35. On April 9, 2013, Dale Nugent from UMN's Office for Technology Commercialization

21  emailed Mr. Phillips writing: "I am contacting you regarding technology developed by Dr. Jae

22  Moon while he was at the University of Minnesota. We believe this should be of significant

23  interest to LSI and wish to open additional conversation." *Id.* ¶ 37. Following the email

24  exchanges, Mr. Nugent and Mr. Phillips spoke by phone (*id.* ¶ 38), and Mr. Nugent testified that

25  he told Mr. Phillips that UMN "was under the belief that LSI was utilizing the [Moon]

26  technology." Nugent Dep. at 61:4–65:25. Mr. Nugent also testified he recalled Mr. Phillips

27  having a "very gruff response" and that LSI would not engage in licensing discussing without

28

United States District Court
Northern District of California

1    UMN first providing "notice."  *Id.* at 10–25.

2         Construing these facts in the light most favorable to UMN, a reasonable juror faced with

3    this evidence could conclude that Mr. Phillips, following the emails and conversations with UMN,

4    understood a patent existed and took deliberate action to avoid confirming its existence and LSI's

5    infringement.  LSI argues that Mr. Phillips' willingness to meet with UMN's representative who

6    never mentioned the '601 Patent or accused LSI of infringement shows that UMN is to blame for

7    LSI's lack of knowledge.  On this point, however, Mr. Nugent testified that his practice is to be

8    "very careful" in conversations with potential licensees about using the term "infringement"

9    because "that tended to put a chill on any conversation."  Nugent Dep. at 64:14–22.  A reasonable

10   juror could find Mr. Nugent's deposition testimony not credible or choose to credit LSI's version

11   of the facts: that LSI had no duty to investigate even after the conversations with Mr. Nugent.  But

12   determining whether LSI was willfully blind under these circumstances requires weighing the

13   evidence.  Accordingly, summary judgment is not appropriate.

14        The evidence regarding licensing discussions standing alone is sufficient for a reasonable

15   juror to infer willful blindness.  UMN has identified additional evidence it contends further

16   support this inference.  *See* UMN Opp. to LSI Mot. 15–18.  Although Judge Wright previously

17   rejected certain theories of willful blindness as "implausible" at the motion to dismiss stage, that

18   order did not foreclose a theory of willful blindness based on other theories UMN now has

19   evidence to support, for example, evidence that LSI may have discouraged its engineers from

20   reading third party patents in the course of their work unless specifically instructed to.  *See* Order

21   Denying Motion to Dismiss 7–11, ECF No. 144; *see also* Wilson Dep. at 245:12–18.

22        <u>Knowing inducement or specific intent</u>.  LSI next argues UMN cannot show LSI

23   knowingly induced infringement or that LSI possessed specific intent to encourage another's

24   infringement.  LSI Mot. 15.  Regarding knowing inducement, LSI contends that the table from its

25   technical specifications (also cited in UMN's infringement contentions) demonstrates that all LSI

26   knew was that when its SoCs are configured to use the allegedly infringing ⬛⬛⬛ with

27   the ⬛⬛⬛, the resulting j constraint ⬛—an amount that does not meet claim

28   Case No.: 18-cv-00821-EJD
     ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

14 and 17. *Id.* LSI also argues that it "knew that its customers never sold HDDs where the ███

███████████████." *Id.* Thus, LSI "reasonably believed that use of its chips does not impose

'j' constraint less than 10 as required by" claims 14 and 17. *Id.*

Regardless of what the table does or does not show, the Court is not convinced it negates

any showing of knowing inducement. The knowledge requirement can be met by proof of willful

blindness. *See Roche*, 30 F.4th at 1118 (the intent element "can be established by a proper finding

of willful blindness"). LSI has not identified any authority supporting its suggestion that a

showing of willful blindness requires being willfully blind of the specific limitations of the

claims.[7] Indeed, willful blindness occurs when an accused infringer deliberately avoids learning

more about the claims. For the reasons stated above, UMN has presented sufficient evidence for a

reasonable juror to infer LSI was willfully blind to the existence of the '601 patent and its

infringement of the same.

But even if the record contains sufficient evidence to support the requisite knowledge (via

a willful blindness theory or not), the Court must still decide whether UMN has sufficient

evidence showing some affirmative act to induce infringement. *See Enplas*, 909 F.3d at 407. To

show this, UMN points to undisputed evidence in the record that LSI's field application engineers

work directly with LSI customers to provide technical support in using LSI's SoC (JSUF II ¶ 40)

and the product specifications for the Accused Read Channels that LSI provides to customers

includes instructions on how to configure the channels to select █████████ (*id.* at ¶ 41).

This evidence is sufficient for a reasonable juror to infer that LSI took an affirmative act to induce

its customers to infringe using █████████.

<u>Knowledge of importation</u>. Lastly, LSI argues UMN cannot show that LSI knew that its

customers were importing into the United States either of █████████ that had LSI chips

---

[7] LSI does cite *Commil*, 575 U.S. at 642, where the Supreme Court held that *Global-Tech*'s induced infringement standard "requires proof the defendant knew the acts were infringing." The Federal Circuit has since confirmed that "*Commil*, in reaffirming *Global–Tech*, also necessarily reaffirmed that willful blindness can satisfy the knowledge requirement for active inducement under § 271(b) (and for contributory infringement under § 271(c)), even in the absence of actual knowledge." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1347 (Fed. Cir. 2016).

Case No.: 18-cv-00821-EJD

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

18

United States District Court
Northern District of California

configured with ███████. LSI Mot. 17. UMN responds that those HDDs include some sold and manufactured by Western Digital, which is headquartered in California, and which had "significant sales in the relevant period." UMN Opp. to LSI Mot. 15, n.3. UMN argues that this circumstantial evidence shows LSI "in fact was aware of the existence of HDD end users for the relevant HDD generations in the U.S." *Id.*

Here, lack of knowledge that customers ultimately imported the relevant products with HDDs into the United States still does not preclude a finding of induced infringement. UMN's theory of induced infringement, mirroring its theory of direct infringement, is that LSI encouraged its customers to use ███████ during the sales cycle in their U.S. facilities.[8] Thus, it is knowledge that customers used the infringing code in the United States that matters. As explained above, UMN has adduced evidence regarding this knowledge.

LSI's motion for summary judgment of no induced infringement is therefore DENIED.

***Contributory Infringement***. A party is liable for contributory infringement under § 271(c) if: (1) "there is direct infringement," (2) "the accused infringer had knowledge of the patent," (3) "the component has no substantial noninfringing uses," and (4) "the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). Section 271(c) "require[s] a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964).

LSI argues it is entitled to summary judgment of no contributory infringement because UMN cannot prove LSI knowingly contributed to infringement, and LSI's chips have substantial noninfringing uses. Mot. 18–19. On the first point, as LSI acknowledges, the knowledge

---

[8] This theory of infringement distinguishes this case from *Viavi Sols. Inc. v. Platinum Optics Tech. Inc.*, 698 F. Supp. 3d 1145 (N.D. Cal. 2023), wherein this Court granted summary judgment of no induced infringement where the patentee lacked sufficient evidence from which a jury could infer that defendant possessed the specific intent to induce infringement. In that case, the patentee alleged defendant infringed by making and selling optical filters which included the patented technology. Unlike here, the asserted patents did not involve method claims, and the patentee did not allege infringement based on use of the technology in the United States.

Case No.: 18-cv-00821-EJD
ORDER ON MOTIONS FOR SUMMARY JUDGMENT
19

United States District Court
Northern District of California

1    requirement is the same under § 271(c) and § 271 (b).  Because the Court found that genuine

2    disputes of material facts exist regarding whether LSI was willfully blind as to induced

3    infringement, the same is true in the context of contributory infringement.

4        Next, LSI argues that UMN cannot show that LSI's chips are "not a staple or commodity

5    of commerce suitable for substantial noninfringing use."  LSI Mot. 19.  This is because LSI's

6    customers choose which ▉▉▉▉▉▉▉ to use, and the ▉▉▉▉▉▉ can be configured—and

7    indeed *was* often configured—in multiple ways that do not infringe, including a selection of the

8    ▉▉▉▉▉▉.  *Id.* (citing JSUF II ¶ 4, 5, 8, 26).

9        Both parties argue *Fujitsu* supports their side.  The "component" at issue in that case was

10    "the specific hardware and software that performs fragmentation."  *Fujitsu*, 620 F.3d at 1330.  The

11    Federal Circuit, in analyzing contributory infringement, explained that "the fragmentation

12    functions of the accused products" were "separate and distinct" features that "must [be] treat[ed]

13    separately in analyzing contributory infringement."  *Id.* at 1330–31.  The court rejected

14    defendant's argument that, because a user could turn off the infringing features, there were

15    substantial noninfringing uses.  Because it was undisputed that, "when activated, the product is

16    infringing," the Federal Circuit concluded that the fragmentation software did not have substantial

17    noninfringing uses.  *Id.* at 1331.

18        Here, LSI argues that "LSI's chips" have substantial noninfringing uses, but the proper

19    framing under *Fujitsu* is whether the accused *feature*—▉▉▉▉▉▉▉▉▉▉—when selected,

20    results in an infringing Accused Read Channel.  The answer to that question is yes, under UMN's

21    infringement theory.  LSI argues that the Accused Read Channels can be used in a noninfringing

22    way when the ▉▉▉▉▉▉ is not turned off.  Reply ISO LSI Mot. 14.  But the "Accused Read

23    Channels" are themselves treated as an Accused Product.  *See* McLaughlin Rep. ¶ 4.2 ("The

24    Accused Products include both Accused Read Channels and Accused Simulators").  The ▉▉▉

25    ▉▉▉▉▉▉ is a "separate and distinct" feature from the ▉▉▉▉▉▉ of a noninfringing rate,

26    such as ▉▉▉▉▉▉, and the contributory infringement must be analyzed "based on this separate

27    feature, rather than the entire [Accused Read Channels]."  *Fujitsu*, 620 F.3d at 1331; *see also*

28    Case No.: 18-cv-00821-EJD
    ORDER ON MOTIONS FOR SUMMARY JUDGMENT
    20

United States District Court
Northern District of California

*PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.*, No. 16-CV-01266-EJD, 2017 WL

2180980, at *19 (N.D. Cal. May 18, 2017) ("The proper question under § 271(c) is whether there

are non-infringing uses for the accused feature [], not the multi-featured product as a whole[]").

Because LSI has not shown the ████████ has noninfringing uses when enabled, it is not

entitled to summary judgment of no contributory infringement.

### B.    Willful Infringement

LSI moves for summary judgment of no willful infringement of the Asserted Claims

because UMN cannot show that LSI knew of the existence of the '601 Patent before UMN filed its

complaint, and LSI did not know it was infringing.  LSI Mot. 20.  For reasons stated above in the

context of induced infringement (*see supra* Section IV(A)(2)), evidence in the record could

support a finding that LSI was willfully blind on both fronts.  LSI's request for summary judgment

of no willful infringement is therefore DENIED for the same reasons.  *See Roche*, 30 F.4th at 1119

("In some respects, the intent standard for inducement is akin to the one for willfulness, as both

rest on the subjective intent of the accused infringer.").

### C.    Damages

LSI argues UMN is not entitled to any damages as a matter of law.  LSI's arguments on

this issue are functionally identical to those raised in its motion to exclude the damages opinion of

Ms. Lawton.  *See* Mot. to Exclude Lawton, ECF No. 317.  In denying LSI's request to exclude

Ms. Lawton's royalty base for failure to parse out noninfringing products, the Court evaluated

authority and arguments LSI relies now.  *See* Daubert Order 10–14 (addressing *Niazi*, *Cardiac*

*Pacemakers*, *CMU*, *Brumfield*, and *Synopsys*, among others).

The Court adopts its opinion as stated in the Daubert Order and accordingly DENIES

LSI's motion for summary judgment that all LSI SoCs not configured to use ████████

option must be excluded from the royalty base used to calculate damages in this case.[9]

---

[9] The Court expresses no opinion regarding whether UMN has established the requisite causal
connection between sales of noninfringing products and the alleged infringement required for
those sales to contribute to the damages calculation.  *See* Daubert Order 14 ("There remains the
factual question of whether UMN has shown the necessary causation to include noninfringing

United States District Court
Northern District of California

### D.    Invalidity

"Because patents are presumed valid, 'a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise.'"  *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed. Cir. 2010) (quoting *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006)).

> A valid patent must include a specification that contains a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

35 U.S.C. § 112(a).  The Federal Circuit has interpreted § 112(a) as containing both a "written description" requirement and an "enablement" requirement.  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010).  LSI argues that claims 14 and 17 fail the latter requirement.

The Supreme Court has stated that "the specification must enable the full scope of the invention as defined by its claims[,]" allowing for "a reasonable amount of experimentation."  *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610–12 (2023).  Put differently, a patent specification must "teach those in the art to make and use the invention without undue experimentation."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."  *Id.*  Courts consider eight factors—the *Wands* factors—when assessing whether a patent meets the enablement requirement.  These factors are: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skills of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *Id.*

---

products in the royalty base.").

LSI advances two arguments to support its contention that claims 14 and 17 are invalid due to lack of enablement. In terms of the *Wands* factors listed above, LSI asserts lack of enablement due to breadth of the claims and the amount of direction or guidance presented. Though it may not be necessary to explore each *Wands* factor in depth, an enablement analysis involves balancing of the relevant factors. *See Wands*, 858 F.2d at 737 (noting that the test for enablement is "not merely quantitative" and that the eight-factor test involves "weighing many factual considerations"). Accordingly, though LSI only focuses on certain *Wands* factors to support its motion for summary judgment, the Court will consider additional *Wands* factors to properly assess whether LSI is entitled to summary judgment on this basis.

*First*, as to the breadth, the claims cover MTR codes of every code rate up to capacity, where j is at least equal to and less than 10. The "capacity," according to Dr. Moon, is the maximum theoretical code rate for given j and k constraints. Moon Dep. at 44:10–45:6. UMN's expert counters that claims 14 and 17 "do not require that the MTR code be a block code, so a POSITA would understand that other types of codes, such as state-dependent codes constructed via the state-splitting algorithm, could be used." McLaughlin Rebuttal Rep. ¶ 8.16, ECF No. 333-21.

Second, regarding the relative level of skill of those in the art, LSI's technical expert opines that a POSITA "would have had at least an undergraduate degree in electrical engineering or similar field, and three or more years of industry experience in the field of read channel technology." Koralek Rep. ¶ 21, ECF No. 315-18. In Dr. Koralek's view, the experience would be in "read channel technology" (*id.*), but in Dr. McLaughlin's view, the experience would have "specialization in data coding and detection techniques used in connection with reading data from various storage media." McLaughlin Rebuttal Rep. ¶ 5.5 (explaining this experience is "essentially read channel technology"). McLaughlin also opines that a POSITA would have studied and been familiar with traditional data coding and detection techniques and devices including "RLL codes, peak detectors, and sequence detectors, such as Viterbi detectors." *Id.* Considering this level of skill, Dr. McLaughlin asserts that the guidance in the specification (*e.g.*,

Case No.: 18-cv-00821-EJD
ORDER ON MOTIONS FOR SUMMARY JUDGMENT
23

the explanation that state-dependent codes can be used and the example of a finite-state transition diagram for an MTR code) is sufficient because the POSITA would know "that the state-splitting algorithm could be used to generate a state-dependent MTR code." *Id.* ¶ 8.16 (ii). Dr. McLaughlin also opines that a POSITA would know "that the state-splitting algorithm can be used to generate codes at rates up to capacity, so the POSITA would know how, in light of the '601 Patent's disclosure, to construct MTR codes at rates up to capacity." *Id.*

Next, regarding the presence or absence of working examples, Dr. McLaughlin opines that the '601 Patent both explains that state-dependent codes could be used and provides an explicit example of a block code. *Id.* ¶¶ 8.15 (citing '601 Patent, col. 6:1–55); 8.16 (vi). The state-splitting algorithm was described in the ACH 1983 paper, and McLaughlin contends that ta POSITA would have known that "the state-splitting algorithm can be used to construct a constrained state-dependent code, from a finite-state transition diagram for the applicable constraints, at any rate up to capacity." *Id.* ¶ 8.15. Although the ACH 1983 paper was not cited in the specification, Dr. McLaughlin contends that a POSITA, with the relevant experience and knowledge, would have known and been familiar with the state-splitting algorithm and thus, would know how to construct state-dependent MTR codes at any rate up to capacity. *Id.*

The Court finds that LSI has not met its burden to establish an absence of genuine disputes of material fact to warrant summary judgment of invalidity for lack of enablement. As an initial matter, LSI suggests that any disagreements among the experts is irrelevant "because enablement is a question of law." Reply ISO LSI Mot. 15 (quoting *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012)). But the full quote from *MagSil* confirms that "enablement is a question of law *based on underlying factual findings*." *Id.* (citing *In re Wands*, 858 F.2d at 735). Courts routinely deny summary judgment of enablement where, as here, the underlying factual findings are genuinely disputed. A reasonable fact finder could determine that UMN overstates the need for additional examples beyond the block codes. It could also find credible Dr. McLaughlin's opinion that the state-splitting and similar articles provide a "cookbook" that one of ordinary skill could use to practice the full scope of the claims. At the

1    same time, a factfinder could determine that a POSITA would not be able to create state-

2    dependent MTR codes without undue experimentation, given the state of the art.

3        Based on the opposing expert analyses, the Court concludes that there are genuine disputes

4    of material fact that preclude granting summary judgment on lack of enablement.

5    **V.    CONCLUSION**

6        For the foregoing reasons, the Court rules as follows:

7        UMN's motion for partial summary judgment is **GRANTED**.

8        LSI's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN**

9    **PART**.  LSI is entitled to summary judgment of (1) no infringement for use of HDDs that are not

10   configured to use ▓▓▓▓▓▓▓▓▓▓ when used as configured, (2) no indirect infringement

11   based on the same.   LSI's motion is otherwise denied.

12

13       **IT IS SO ORDERED.**

14   Dated: March 3, 2025

15

16

17       EDWARD J. DAVILA
         United States District Judge

18

19

20

21

22

23

24

25

26

27

28   Case No.: 18-cv-00821-EJD
     ORDER ON MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California